Leigh A. Kirmssé (SBN 161929)
HOWREY LLP
525 Market St., Suite 3600
San Francisco, CA 94105-2708
Telephone :  (415) 848-4993
Facsimile :  (415) 848-4999
Email:  kirmssel@howrey.com

Roxann E. Henry (DC Bar No. 231282; *pro hac vice to be submitted*)
Peter E. Moll (DC Bar No. 351569; *pro hac vice to be submitted*)
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
Tel.:  (202) 383-6503
Fax:  (202) 383-6610
Email:  henryr@howrey.com
          mollp@howrey.com

Attorneys for Nestlé USA, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA A. WEAVER, on behalf of himself and a class of persons similarly situated,<br><br>                    Plaintiff,<br><br>          vs.<br><br>NESTLÉ USA, INC.<br><br>                    Defendant. | Case No.  08-cv-3636 JSW<br><br>**COMPENDIUM OF LEGISLATIVE HISTORY CITED IN SUPPORT OF DEFENDANT'S OPPOSITION TO MOTION FOR REMAND**<br><br>**Date:  October 31, 2008**<br>**Time:  9:00 a.m.**<br>**Courtroom:  16th Floor, Room 17**<br>**District Judge Jeffrey S. White** |

1

## TABLE OF LEGISLATIVE HISTORY

2

<u>**Cases**</u>                                                                          <u>**Exhibit**</u>

3

*109th Congress, 1st Session, Congressional Record (Senate)*
    151 Cong Rec S 999 (Feb. 7, 2005) ............................................................. 1

4

*109th Congress, 1st Session, Congressional Record (Senate)*
5   151 Cong Rec S 1076 (Feb. 8, 2005) ........................................................... 2

6   *109th Congress, 1st Session, Congressional Record (Senate)*
    151 Cong Rec S 1157 (Feb. 9, 2005) ........................................................... 3
7

*109th Congress, 1st Session, Congressional Record (Senate)*
8   151 Cong Rec S 1225 (Feb. 10, 2005) ......................................................... 4

9   *109th Congress, 1st Session, Congressional Record (House)*
    151 Cong Rec H 723 (Feb. 17, 2005) ........................................................... 5
10

*109th Congress, 1st Session, Senate Report 109-14*
11   109 S. Rpt. 14 (Feb. 28, 2005) ..................................................................... 6

12

Dated:  September 2, 2008                  By:    By:___ /s/ Leigh A. Kirmssé_____
13                                                 Leigh A. Kirmssé (SBN 161929)
                                                   HOWREY LLP
14                                                 525 Market St., Suite 3600
                                                   San Francisco, CA 94105-2708
15                                                 Telephone :  (415) 848-4993
                                                   Facsimile :  (415) 848-4999
16                                                 Email:  kirmssel@howrey.com

17
                                                   Roxann E. Henry (DC Bar No. 231282; *pro hac*
18                                                 *vice to be submitted*)
                                                   Peter E. Moll (DC Bar No. 351569; *pro hac vice*
19                                                 *to be submitted*)
                                                   HOWREY LLP
20                                                 1299 Pennsylvania Avenue, N.W.
                                                   Washington, DC  20004
21                                                 Tel.:  (202) 383-6503
                                                   Fax:  (202) 383-6610
22                                                 Email:  mollp@howrey.com
23

24                                                 *Attorneys for Nestlé U.S.A., Inc.*

25

26

27

28

# COMPENDIUM
# EXHIBIT 1

LexisNexis® *Total Research System*

Switch Client ⦙ Preferences ⦙ Sign Out ⦙ ? Help

Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator | Transactional Advisor | Cour

Service: **Get by LEXSEE®**
Citation: **151 cong rec s 999**

☞Select for FOCUS™ or Delivery
☐

*151 Cong Rec S 999, *

CONGRESSIONAL RECORD -- *SENATE*

Monday, February 07, 2005

109th Congress, 1st Session

151 Cong Rec S 999

**REFERENCE:** Vol. 151, No. 11

**SECTION:** Senate

**TITLE:** CLASS ACTION FAIRNESS ACT OF 2005

**SPEAKER:** Mr. SPECTER; Mr. LEAHY; Mr. HATCH

**TEXT:  [*S999]**

The PRESIDING OFFICER. Under the previous order, the hour of 3 p.m. having arrived, the Senate will proceed to the consideration of  S. 5, which the clerk will report.

The assistant legislative clerk read as follows:

A bill (S. 5) to amend the procedures that apply to consideration of interstate class actions to assure fairer outcomes for class members and defendants, and for other purposes.

Mr. SPECTER . Mr. President, I was about to note that the hour of 3 o'clock has arrived. According to the previous order, the Senate is to take up the legislation on class action. This is legislation which has been crafted over a considerable period of time. It had some difficulty in achieving 60 votes for so-called cloture to cut off debate so that the Senate would take up the issue. It had been negotiated among a number of Senators in the past to get the requisite 60 votes, and it is represented that if the bill is passed in its current form in the Senate, it will be agreeable to the House of Representatives. When I choose my words carefully_that has been represented; you never know until it gets to the other body and see what they do_but that has been the expectation.

When the issue was negotiated, there were a number of Senators who were satisfied with the structure of the bill. But all 100 Senators had not assented, agreed to it, including this Senator. We customarily are not all involved in negotiations as to the bill so that there is obviously latitude, when the matter comes before the Senate, for individual Senators to exercise their right to either offer amendments or to join in amendments which are offered.

I support class action reform. I do so essentially to prevent judge shopping to States and

even counties where courts and judges have a prejudicial predisposition on cases. Regrettably, the history has been that there are some States in the United States and even some counties where there is forum shopping, which means that lawyers will look to that particular State, that particular county to get an advantage.

Diversity jurisdiction was established in the UnitedStates so that if there was litigation between citizens of different States, there was a certain amount in controversy, a jurisdictional amount_that amount has risen over the years; when I started the practice of law it was $3,000, now it is $75,000_the diversity jurisdiction of the Federal courts was established to see to it that if a litigant from California, illustratively, came to Pennsylvania and might be in the State court, that there would be perhaps some predisposition on the part of State court judges to look more favorably upon the local litigant. And the Federal courts were viewed as being more impartial. And that thread remains to this day.

The legislation will leave in State courts, if the matter is predominantly a State court issue, where there are some two-thirds of the class in that State. If there is one-third or less, then the matter would go to the Federal court. And if it is between one-third and two-thirds, then it will be up to the discretion of the Federal judge on a series of standards which have been worked out through the leadership of Senator Feinstein of California.

The bill came before the Judiciary Committee last Thursday. And it was my request of the Judiciary Committee members at that time that amendments not be offered because if you have controversial amendments offered in committee, they are customarily taken up again on the Senate floor. And the majority leader, Senator Frist, had asked me in my capacity as
  **[*S1000]**
chairman of the committee to get the bill out last Thursday so that it could come to the floor today.

As is well-known publicly, the class action legislation is a priority of the President's. It has been the intention of the majority leader to put the matter on the agenda at an early time_obviously, February 7 is an early date_and reserve sufficient time so that Senators have a full opportunity to offer amendments, and we can move through to completion of the bill.

There is an amendment which has been discussed involving a proposal by the Senator from New Mexico, Mr. Bingaman, which would make certain that substantive rights which are now present in State courts would be retained after the enactment of this legislation. State courts use State law, and that is substantive law, in certifying class actions. And while I have stated my support for moving cases to the Federal court for the reasons I have already said, I have made a claim in the past and repeated it in the Judiciary Committee meeting last Thursday that in moving the cases to the Federal courts, I do not want to see changes in the substance of the rights of consumers or other class action litigants; that the objective which I think we ought to obtain is that the same substantive rights would remain; that this bill should not be a vehicle for modification of substantive rights, but this bill should provide the reform which will take the cases out of State courts, where there has been a record of prejudice to defendants, and take them to the Federal courts where, in the historical tradition of diversity litigation, to take them to the Federal courts where there is a better opportunity for an objective determination.

When this bill was in committee in the past, I had a concern about certain of the provisions as to mass actions. The advocates of reform legislation were concerned that mass actions might be tried in the State courts altogether and provide a procedural context where there could not be a fair or appropriate adjudication. That is a highly complex subject, and it may be the matter of some concern as we move forward on this bill.

It is my hope that we will not have so-called extraneous amendments, that we will focus on

issues of class action related to this subject matter so that we can have a full debate on the subject. Senators may have an opportunity to offer their amendments and the determination of the Senate can be made as to what ought to be done on this very important litigation matter.

I seek recognition today to open debate on the Class Action Fairness Act of 2005. This bill embodies a carefully balanced legislative solution that responds to abuses of the class action litigation device in our State courts.

A key provision in the bill amends the Federal diversity jurisdiction statute to allow Federal courts to hear large multi-party, multi-State class action disputes. Existing law prevents national lawsuits from seeing the inside of a Federal courtroom by virtue of a glitch in the way that courts have interpreted the Federal diversity jurisdiction statute_a statute that the Congress passed back in 1789.

Let me illustrate this fundamental problem by looking at two hypothetical cases. In the first case, you have a resident of, say, my State of Pennsylvania, slip and fall while filling up her car at a New Jersey gas station. The plaintiff sprains her ankle, misses work, and has medical bills. And her damages total $76,000. Under the existing diversity jurisdiction statute, if a plaintiff and a defendant hail from two different States, and if the amount in controversy exceeds $75,000, as in this example, then the case can be brought in Federal district court.

Diversity jurisdiction for Federal court exists because the Framers of our Constitution wanted to encourage interstate commerce, and they wanted cases affecting interstate commerce to be adjudicated in our Federal courts. They knew that State judges can sometimes play favorites, and that if out of State defendants were unable to access the neutral forum of a Federal court, that could have a chilling effect on interstate commerce.

But to understand how diversity jurisdiction has been misused, let's look at a second case in the class action context. Let's assume there are 1,000 plaintiffs who form a class. Let's also say they claim $100 million in damages against 300 different plumbing operations from around the country alleging that the defendants overcharged for plumbing services. And let's assume further that while these plaintiffs are spread across all 50 States, at least one of the 1 plaintiffs and one of the defendants reside in the same State. Although there is little doubt that this hypothetical lawsuit affects interstate commerce, especially given the number of parties spread throughout the country, this case would stay in State court.

In 1806, the Supreme Court in Strawbridge v. Curtis interpreted the diversity jurisdiction statute to require what is known today as "complete diversity". In other words, for diversity jurisdiction to exist, all of the named plaintiffs must be citizens of different States from all of the defendants. While the complete diversity rule makes sense in the context of a relatively smaller lawsuit, it has been used to defeat Federal jurisdiction for large interstate class actions lawsuits.

Throughout the years, the Judiciary Committee has received compelling evidence showing that certain plaintiffs' lawyers avoid Federal jurisdiction by simply naming a defendant in a complaint_such as a local pharmacy_to match the citizenship of a local plaintiff. This is done despite the fact that the real defendant and vast majority of plaintiffs hail from different States.

It is this awkward result that the bill seeks to fix. Section 4 of S. 5 amends the current diversity statute to allow larger interstate class actions to be heard in Federal court by granting original jurisdiction in those class actions where any member of a proposed class is a citizen of a different state from any defendant. To be eligible for Federal jurisdiction, the class action must cover at least 100 plaintiffs and involve an aggregate amount in controversy of at least $5 million.

While this provision represents the general rule, the bill contains certain exceptions that balance a state's interest in adjudicating local disputes. First, if two-thirds or more of the class members are from the primary defendant's home State, the lawsuit will remain in State court. Conversely, class actions filed in the home State of the primary defendant are subject to Federal jurisdiction if less than one-third of the proposed class members are citizens of that State. For cases brought in a defendant's home State in which between one-third and two-thirds of the class members are citizens of the forum State, a Federal district court judge is given discretion to exercise jurisdiction based on consideration of enumerated factors. This three-tiered test is known as the Home State Exception and represents a provision championed by Senator Feinsteinduring committee markup on the bill in the 108th Congress.

Second, the bill contains the Local Controversy Exception_a provision that enables State courts to adjudicate truly local disputes involving principal injuries concentrated within the forum State. To fall within this exception, a class action must meet the following four criteria: 1, the class must be primarily local, meaning that two-thirds of the class members reside in the forum State; 2, the lawsuit must be brought against at least one real in-state defendant whose alleged conduct is central to the class claims and from whom the class seeks significant relief; 3, the principal injuries caused by the defendants conduct must have occurred within the forum state; and 4, no other similar class actions have been filed against any of the defendants in the preceding 3 years. This exception is intended to ensure that State courts can continue adjudicating truly local controversies involving defendants that are out-of-State corporations.

I believe that modifying the current diversity jurisdiction statute is a sensible solution towards minimizing the class action abuses that we have witnessed throughout the years. Since the 105th Congress, this body has received evidence showing an extraordinary concentration of large interstate class action lawsuits in a handful of our State courts_certain county courts to be precise.

The evidence further shows that these courts operate in a manner that deprives the rights of truly injured individual plaintiffs and defendants. In **[*S1001]** many cases, courts approve settlements that primarily benefit the class counsel, rather than the injured class members. Indeed, it has become all too common for certain State courts to approve proposed settlements where class members receive little or nothing of value, such as a meaningless coupon, while their attorneys receive substantial fees. In addition, multiple class action lawsuits asserting the same claims on behalf of the same plaintiffs are routinely filed in different State courts, thus creating judicial inefficiencies and encouraging collusive settlement behavior.

Unfortunately, the injuries caused by these abuses are not confined to the parties who are named in the class action complaint. Rather, they extend to everyday consumers who unwittingly get dragged into these lawsuits as unnamed class members simply because they purchased a cell phone, bought a box of cereal, drove a car fitted with a certain brand of tires, or rented a video. What we are really talking about here is a system that impacts the vast majority of people who live in this country.

The time has now come for its full consideration of class action reform by the Senate. The bill maintains strong bipartisan support in this Chamber and has brought many members from both sides of the aisle together. Indeed, just last week, the Judiciary Committee reported this bill favorably to the floor on a strong bipartisan vote of 13-5. In this regard, I would like to applaud my colleagues Senators Grassley, Hatch, Carper, and Kohl for their tireless efforts in building consensus throughout this body.

S. 5 balances State and Federal interests in adjudicating disputes. This said, we must not lose sight of the fact that we be mindful of the substantive rights of individual plaintiffs

caught in this balancing act_rights that guarantee a citizen access to jury trials for injuries sustained at the hands of wrongdoers. In the coming days, I anticipate amendments and thoughtful arguments from my colleagues relating to this issue. As such, I look forward to the debate and the Senate's full consideration of this important legislation.

Philadelphia Eagles

Mr. President, I note the presence of my distinguished colleague, the ranking member, the first Democrat ever elected in the State of Vermont.

Mr. LEAHY. Only.

Mr. SPECTER. Before yielding, let me make one other comment; that is my congratulations to the New England Patriots. As a long-standing Philadelphia Eagle fan, going back to the days of Franklin Field, as those in Philadelphia would understand, where the Eagles played in the confines of the ballpark of the University of Pennsylvania and the features were Jimmy Brown running for the Cleveland Browns, tackled most of the time by Chuck Bednarik of the Philadelphia Eagles, in the great championship game of 1960, which the Eagles won 17 to 13. The glory days were recounted again in the New York Times. You have to go back to 1960 to find glory days for Philadelphia football. But it is recounted how Chuck Bednarik tackled Jim Taylor, the great running back of the Green Bay Packers, and sat on him until time had expired, and the Eagles also won 17 to 13.

Franklin Field seated a few over 60,000. It is now reputed that about 900,000 people were there; 900,000 people claim to have been there to have seen that game. I was there and am prepared to say so in open court and even take an affidavit on it.

It was a thrilling game yesterday. I was in Jacksonville. It was reported by one of the local firms that there were some 60,000 Eagle fans in Jacksonville who did not have tickets. And when you moved through the city, the green was everywhere, with "5" for Donovan McNabb and 81 for Terrell Owens. Owens had a spectacular game, recovering from an ankle injury in a very short period of time, catching nine passes, six in the second half, taking one high over his shoulder and doing a 270-degree pirouette, a 30-yard gain. But to the credit of Coach Bill Belichick and Quarterback Tom Brady, New England is an outstanding team.

We take great pride in what the Philadelphia Eagles have done and what Donovan McNabb has done. He had a high number of completions yesterday, but too many of them went to the Patriots, with some three interceptions_too many picked off.

They coined the phrase in Brooklyn decades ago: Wait til next year. Wait til next year. But for this year, my congratulations to the New England Patriots. My congratulations also to a fighting group of Philadelphia Eagles. Wait until next year.

I yield the floor.

The PRESIDING OFFICER. The Senator from Vermont.

Mr. LEAHY . Mr. President, I have been in the Senate for 31 years. This is one of the most enjoyable colloquies I have ever had.

I hope that the Philadelphia Eagles and actually all of their fans recognize what a great fan they have in the distinguished senior Senator from Pennsylvania. We all know him as one of the most knowledgeable and best lawyers ever to serve in the Senate in either party. But we saw another side of him today. Anybody who can recount effortlessly_I say for those reading the Record, it was without a single note_the history of the Eagles and give a play by play recounting, this recounting was a tour de force of the first order. For Eagles fans, I want you

to know his legal expertise is every bit as good.

I grew up with a different sport_baseball_in Vermont, where my home is only a couple hours' drive from Fenway Park. The distinguished Presiding Officer knows what that is like because he is even closer. We all will wait for next year and the Red Sox.

As a child growing up, my father, who had some interest in politics, used to say there will be a day when Vermont will actually elect a Democrat to the U.S. Senate. Everybody told him this would never happen in his lifetime. I am delighted that it did.

I was thinking about my father today. It was 21 years ago today that he left this Earth. He got to see this one and only Democrat, and he got to be there twice on election night and twice to see me sworn into this body, which even after six times is still one of those moments one will never forget.

We waited in Vermont from 1918_my father was 18 years old when the Red Sox won the championship_until this past year. There was some celebration. I might mention that I thought maybe there was some inspiration from Paul McCartney, who performed in the halftime show. I was very disgusted with the halftime show last year_at something nobody even noticed until the next day, when people talked about it on Web sites. The photographs of Miss Jackson became the most visited Web site in America, which gives you some idea of what our priorities are. What I found disgusting at that halftime show was Kid Rock ripping a hole in the American flag and wearing it as some kind of a poncho and then throwing it on the ground at the end of his song. I found that to be very offensive.

I would hope that some of the keepers of morality in this country, who have had a wonderful time sending out fundraising letters based on something nobody really saw until the next day and spending just as much time trying to sell patriotism to everybody, would say how disgusted they are at the actions of a rock singer who would so desecrate the American flag_to the roaring cheers of too many people in the audience. I thought that was outrageous. Perhaps we needed somebody from the United Kingdom to come over here and give us a rousing halftime show, which it was. Actually, the game got better after that. Maybe that is in the eyes of the beholder, too. But I appreciate what the Senator from Pennsylvania said.

I also note that in my 31 years here, it is the first time I heard the unanimous consent request Senator Specter made. Perhaps it was made before. I have to think that when future historians go back into the Record and find that Senators actually did that, they would probably applaud that we know what the Record is.

I recall my days in law school having a summer job and researching the Congressional Record for the then-Federal Power Commission, which later became the Department of Energy, and trying to figure out what was actually said and what was not said, what order it was said in, and why some Senators appeared to have said the same thing twice. When I came to the Senate, I must admit some of the Senators_no longer with us, God rest their souls_would tend to say the same thing **[*S1002]**
twice, but that was not intentional on their part, or at least they were unaware of it. But I commend the Senator from Pennsylvania for making a unanimous consent request that actually will make sense for those who read the Record.

Mr. SPECTER. If the Senator will yield, Senator Leahy and I are very concerned about the Record, havingbeen former district attorneys. We are very concerned about the Record. We know that every word we say is going to be in black and white and be there for a long time, so we like it to be accurate.

Mr. LEAHY. I thank my friend.

Mr. SPECTER. I thank my colleague for his kind comments. It is not inappropriate to note that on Monday afternoons, when we are not going to be taking up amendments but having opening statements, this is a little time on the Senate floor for banter and colloquy. Perhaps those who see C-SPAN might pause a moment or two longer to hear about Paul McCartney or the Patriots or about the Eagles. I was waiting in an elevator to go to my seat yesterday at around 5 o'clock, and an enormous group came and preempted about 100 fans, including this fan, who were waiting to go up so that Paul McCartney and a small group could be escorted in. He looked good for an oldtime Beatle.

Mr. LEAHY. I might say, I worked with Sir Paul and his wife on the issue of landmines and landmine removal. I must admit that he has aged better than some of us who were Beatle fans when he first started. He has his own hair, among other things.

The Senator is correct to say that sometimes on Monday afternoon, we digress. I give fair warning to the Senator from New Hampshire, now presiding, that one of these digressions in about 3 or 4 weeks when the maple syrup crop comes in, I will be extolling the virtues of Vermont maple syrup being the finest in the world. I will also compliment those from our neighboring States who do a pretty good job with their maple syrup.

Mr. LEAHY. Today, we are considering the first of several bills that I am afraid are advanced not with an interest of what is best for the American consumer but advanced by corporate special interests to dramatically limit the public's access to their courts. I am going to oppose this so-called Class Action Fairness Act for a very simple reason: it is not fair.

This legislation would make it harder for citizens to protect themselves against violations of State civil rights or consumer, health, or environmental protection laws_things we take seriously in my own State and most others do in theirs. It will make it harder because these cases will be forced out of the local State courts. Aside from being convenient, State courts have experience with the legal and factual issues involved in these important cases. This legislation sweeps these cases into Federal courts, erects new barriers to lawsuits, and places new burdens on the plaintiffs.

Let me give you an example. In the case of legal rights it would take from the citizens of my own State, this legislation would deprive Vermonters the right to band together to seek relief in their State courts_even if the harm occurred in Vermont and the principal defendant has a substantial presence in Vermont. That is a highhanded override of the rights of the American people. You have to ask who it would benefit. Obviously, it benefits the wealthy and powerful special interests.

This legislation also overrides the laws and legislatures in our State governments. I find it interesting that many colleagues who have spoken over and over again on how we have to stand up for the rights of our States are so willing, when some of their corporate backers come up with legislation like this, to simply slam the door on their own States. Indeed, the National Conference of State Legislatures wrote to us last week to note that this bill "undermines our system of federalism, disrespects our State court system, and clearly preempts carefully crafted State judicial processes which have been in place for decades regarding the treatment of class action lawsuits."

I ask unanimous consent that that letter be printed in the Record.

There being no objection, the material was ordered to be printed in the Record, as follows:

National Conference of

State Legislatures,

Washington, DC, February 2, 2005.

U.S. Senate,

Washington, DC.

Dear Senator: On behalf of the National Conference of State Legislatures (NCSL), I am urging you to oppose passage of S. 5, the "Class Action Fairness Act of 2005." This legislation will federalize class actions involving only state law claims. S. 5 undermines our system of federalism, disrespects our state court system, and clearly preempts carefully crafted state judicial processes which have been in place for decades regarding the treatment of class action lawsuits. The overall tenor of S. 5 sends a disturbing message to the American people that state court systems are somehow inferior or untrustworthy.

S. 5 amends the Federal Rules of Civil Procedure to grant federal district courts original diversity jurisdiction over any class action lawsuit where the amount in controversy exceeds $5,000,000 or where any plaintiff is a citizen of a different state than any defendant, or in other words, any class action lawsuit. The effect of S. 5 on state legislatures is that state laws in the areas of consumer protection and antitrust which were passed to protect the citizens of a particular state against fraudulent or illegal activities will almost never be heard in state courts. Ironically, state courts, whose sole purpose is to interpret state laws, will be bypassed and the federal judiciary will be asked to render judgment in these cases. The impact of S. 5 is that state processes will be preempted by federal ones which aren't necessarily better.

NCSL opposes the passage of federal legislation, such as S. 5 which preempts established state authority. State courts have traditionally and correctly been the repository for most class action lawsuits because state laws, not federal ones, are at issue. Congress should proceed cautiously before permitting the federal government to interfere with the authority of states to set their own laws and procedures in their own courts.

NCSL urges Congress to remember that state policy choices should not be overridden without a showing of compelling national need. We should await evidence demonstrating that states have broadly overreached or are unable to address the problems themselves. There must be evidence of harm to interests of national scope that require a federal response, and even with such evidence, federal preemption should be limited to remedying specific problems with tailored solutions, something that S. 5 does not do.

I urge you to oppose this legislation. Please contact Susan Parnas Frederick at the National Conference of State Legislatures at 202-624-3566 or susan.frederick@ncsl.org for further information.

Sincerely,

Senator Michael Balboni,

New York State Senate, Chair, NCSL

Law and Criminal Justice Committee.

Mr. LEAHY. Here the National Conference of State Legislatures is saying to us: Why are you being so heavy-handed that you feel the 100 Members of the Senate can just wipe out the legislatures of all 50 States on matters of their States' laws?

Fourteen State Attorneys General wrote to our Senate leaders today to express their

collective view that "despite improvements over similar legislation considered in prior years, [they] believe S. 5 still unduly limits the right of individuals to seek redress for corporate wrongdoing in their State courts."

Again, they are saying: What gives you such wisdom in the U.S. Senate that you can completely throw out 50 States and say, We know far better than they could ever know in their years and decades of experience? The letter urges passage of amendments to be offered by Senators Bingaman, Pryor, and Kennedy. This letter is signed by the Attorneys General from New York, Oklahoma, California, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, New Mexico, Oregon, Vermont, and West Virginia. I ask unanimous consent that it be printed in the Record.

There being no objection, the material was ordered to be printed in the Record, as follows:

State of New York, Office of the Attorney General, the Capitol,

Albany, NY, February 7, 2005.

Hon. Bill Frist,

Majority Leader, U.S. Senate, Dirksen Senate Office Building, Washington, DC.

Hon. Harry Reid,

Minority Leader, U.S. Senate, Hart Senate Office Building, Washington, DC.

Dear Mr. Majority Leader and Mr. Minority Leader: On behalf of the Attorneys General of California, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, New Jersey, New Mexico, New York, Oklahoma, Oregon, Vermont and West Virginia, we are writing in opposition to S. 5, the so-called "Class Action Fairness Act," which will be debated today and is scheduled to be voted on this week. Despite improvements over similar legislation considered in **[\*S1003]** prior years, we believe S. 5 still unduly limits the right of individuals to seek redress for corporate wrongdoing in their state courts. We therefore strongly recommend that this legislation not be enacted in its present form.

As you know, under S. 5, almost all class actions brought by private individuals in state court based on state law claims would be removed to federal court, and, as explained below, many of these cases may not be able to continue as class actions. We are concerned with such a limitation on the availability of the class action device because, particularly in these times of tightening state budgets, class actions provide an important "private attorney general" supplement to the efforts of state Attorneys General to prosecute violations of state consumer protection, civil rights, labor, public health and environmental laws.

We recognize that some class action lawsuits in both state and federal courts have resulted in only minimal benefits to class members, despite the award of substantial attorneys' fees. While we support targeted efforts to prevent such abuses and preserve the integrity of the class action mechanism, we believe S. 5 goes too far. By fundamentally altering the basic principles of federalism, S. 5, if enacted in its present form, would result in far greater harm than good. It therefore is not surprising that organizations such as AARP, AFL-CIO, Consumer Federation of America, Consumers Union, Leadership Conference on Civil Rights, NAACP and Public Citizen all oppose this legislation in its present form.

1. Class actions should not be "federalized"

S. 5 would vastly expand federal diversity jurisdiction, and thereby would result in most class

actions being filed in or removed to federal court. This transfer of jurisdiction in cases raising questions of state law will inappropriately usurp the primary role of state courts in developing their own state tort and contract laws, and will impair their ability to establish consistent interpretations of those laws. There is no compelling need or empirical support for such a sweeping change in our long-established system for adjudicating state law issues. In fact, by transferring most state court class actions to an already overburdened federal court system, this bill will delay (if not deny) justice to substantial numbers of injured citizens. Moreover, S. 5 is fundamentally flawed because under this legislation, most class actions brought against a defendant who is not a "citizen" of the state will be removed to federal court, no matter how substantial a presence the defendant has in the state or how much harm the defendant has caused in the state.

2. Clarification is needed that S. 5 does not apply to state Attorney General actions

State Attorneys General frequently investigate and bring actions against defendants who have caused harm to our citizens, usually pursuant to the Attorney General's parens patriae authority under our respective state consumer protection and antitrust statutes. In some instances, such actions have been brought with the Attorney General acting as the class representative for the consumers of the state. We are concerned that certain provisions of S. 5 might be misinterpreted to impede the ability of the Attorneys General to bring such actions, thereby interfering with one means of protecting our citizens from unlawful activity and its resulting harm. That Attorney General enforcement actions should proceed unimpeded is important to all our constituents, but most significantly to our senior citizens living on fixed incomes and the working poor. S. 5 therefore should be amended to clarify that it does not apply to actions brought by any State Attorney General on behalf of his or her respective state or its citizens. We understand that Senator Pryor will be offering an amendment on this issue, and we urge that it be adopted.

3. Many multi-State class actions cannot be brought in federal court

Another significant problem with S. 5 is that many federal courts have refused to certify multi-state class actions because the court would be required to apply the laws of different jurisdictions to different plaintiffs_even if the laws of those jurisdictions are very similar. Thus, cases commenced as state class actions and then removed to federal court may not be able to be continued as class actions in federal court.

In theory, injured plaintiffs in each state could bring a separate class action lawsuit in federal court, but that defeats one of the main purposes of class actions, which is to conserve judicial resources. Moreover, while the population of some states may be large enough to warrant a separate class action involving only residents of those states, it is very unlikely that similar lawsuits will be brought on behalf of the residents of many smaller states. This problem should be addressed by allowing federal courts to certify nationwide class actions to the full extent of their constitutional power_either by applying one state's law with sufficient ties to the underlying claims in the case, or by ensuring that a federal judge does not deny certification on the sole ground that the laws of more than one state would apply to the action. We understand that Senator Jeff Bingaman will be proposing an amendment to address this problem, and that amendment should be adopted.

4. Civil rights and labor cases should be exempted

Proponents of S. 5 point to allegedly "collusive" consumer class action settlements in which plaintiffs' attorneys received substantial fee awards, while the class members merely received "coupons" towards the purchase of other goods sold by defendants. Accordingly, this "reform" should apply only to consumer class actions. Class action treatment provides a particularly important mechanism for adjudicating the claims of low-wage workers and victims of discrimination, and there is no apparent need to place limitations on these types of

actions. Senator Kennedy reportedly will offer an amendment on this issue, which also should be adopted.

        5. The notification provisions are misguided

S. 5 requires that federal and state regulators, and in many cases state Attorneys General, be notified of proposed class action settlements, and be provided with copies of the complaint, class notice, proposed settlement and other materials. Apparently this provision is intended to protect against "collusive" settlements between defendants and plaintiffs' counsel, but those materials would be unlikely to reveal evidence of collusion, and thus would provide little or no basis for objecting to the settlement. Without clear authority in the legislation to more closely examine defendants on issues bearing on the fairness of the proposed settlement (particularly out-of-state defendants over whom subpoena authority may in some circumstances be limited), the notification provision lacks meaning. Class members could be misled into believing that their interests are being protected by their government representatives, simply because the notice was sent to the Attorney General of the United States, State Attorneys General and other federal and state regulators.

Equal access to the American system of justice is a foundation of our democracy. S. 5 would effect a sweeping reordering of our nation's system of justice that will disenfranchise individual citizens from obtaining redress for harm, and thereby impede efforts against egregious corporate wrongdoing. Although we fully support the goal of preventing abusive class action settlements, and would be willing to provide assistance in your effort to implement necessary reforms, we are likewise committed to maintaining our federal system of justice and safeguarding the interests of the public. For these reasons, we oppose S. 5 in its present form.

Sincerely,

Eliot Spitzer, Attorney General of the State of New York; W.A. Drew Edmondson, Attorney General of the State of Oklahoma; Bill Lockyer, Attorney General of the State of California; Lisa Madigan, Attorney General of the State of Illinois; Tom Miller, Attorney General of the State of Iowa. Gregory D. Stumbo, Attorney General of the State of Kentucky; G. Steven Rowe, Attorney General of the State of Maine.

J. Joseph Curran, Jr., Attorney General of the State of Maryland; Tom Reilly, Attorney General of the State of Massachusetts; Mike Hatch, Attorney General of the State of Minnesota; Patricia A. Madrid, Attorney General of the State of New Mexico; Hardy Myers, Attorney General of the State of Oregon; William H. Sorrell, Attorney General of the State of Vermont; Darrell McGraw, Attorney General of the State of West Virginia.

Mr. LEAHY. I know class action issues have been raised by Senators Kohl, Feinstein, Schumer, Dodd, Carper, Landrieu, and others. While I may disagree with them on some parts of this, I do so respectfully because I know how hard they have worked.

In the last Congress, they were able to negotiate some procedural improvements. They reined in some of the worst aspects of previous class action bills. One improvement was to restrict the use of worthless coupon settlements. I strongly support this improvement, which is a targeted provision that goes after a real class action abuse, not one that is just made up by special interests.

Unfortunately, there are other aspects that fail to achieve their intended goals. For example, two narrow exceptions have been negotiated to allow a few local controversies to remain in State court. But the exceptions for removal to Federal court touch on only a thin sliver of the class action cases this bill would affect_only when plaintiffs and primary defendants are from the same State_and even then it will do more harm than good with the complicated formula

that will cause costly and time-consuming litigation. So this just increases the cost and increases the litigation.

Another provision seeks to reduce the delay plaintiffs can experience when a case is removed to Federal court by setting a time limit for appeals of remand orders. But no measure
 **[*S1004]**
is included in the bill to set a timeline for the district court to rule on the actual remand motion. What this means in layman's terms is a party can pluck one of these class actions out of State court and put it in Federal court, and if the Federal court rules against you on a remand, you have a right to appeal. But what do you do if they never rule? The case could sit there year after year and with no resolution. Litigants could die. People who have been harmed could die. People could move away, and nothing happens.

Senator Feingold is going to offer an amendment to set a reasonable time limit for the district court to rule on remand orders. It does nothing to change the bill. It says you cannot pocket veto a case by sticking it away in a federal court docket somewhere. You have to rule one way or the other. We should all embrace that commonsense improvement.

I am also concerned that this bill will deny justice to consumers and others in class actions that involve multiple State laws. The recent trend in Federal courts is not to certify class actions if multiple State laws are involved. This bill, therefore, could force nationwide class actions to Federal court. Once they are removed to Federal court, you have a Catch-22. They have to be dismissed because they involve too many State laws.

If this legislation is really about transferring class actions to Federal court instead of being a pro-business vehicle for simply dismissing legitimate class actions, then the supporters of this legislation should want to solve this real Catch-22 problem. Senator Bingaman has an amendment to do just that. He is a former attorney general. He understands this. I look forward to debating this issue on the Senate floor.

Of course, the legislation covers more than just class actions. Individual personal injury actions, consolidated by State courts for efficiency purposes, are not class actions. Despite the fact that a similar provision was unanimously struck from the bill during the markup of class actions legislation in the Judiciary Committee last Congress, despite the fact that every single Republican, every single Democrat voted to strike this provision, now mass torts are again included in the bill. Again, that makes no sense. Federalizing these individual cases will delay and possibly deny justice for victims suffering real physical injuries. It will be a boon to the makers of Vioxx, but certainly will not help those who took Vioxx.

Mass tort cases are not class actions. They have not been analyzed under rule 23's standards or State law equivalents to rule 23. They are an important means by which groups of injured people have long been able to pursue remedies against those who have harmed them.

Mass tort cases address injuries to citizens' health from dangerous medical products, injuries to their property and their health from environmental disasters, and injuries to their rights and liberties from widespread mistreatment in the workplace. There are entirely different procedural vehicles to reach justice in class actions. They should not be lumped in with class actions. Senator Durbin has an amendment that would leave mass tort actions in State courts where they belong.

I am old enough to remember the civil rights battles of the 1950s and 1960s and the impact of class actions in vindicating basic rights through our courts. The landmark Supreme Court decision in Brown v. Board of Education was the culmination of appeals from four class action cases_three from Federal court decisions in Kansas, South Carolina, and Virginia, and one from a decision by the State supreme court of Delaware.

Only the supreme court of Delaware_the State court, not the Federal court_got the case right by deciding for the African-American plaintiffs. The State court justices understood they were constrained by the existing Supreme Court law but, nonetheless, held that the segregated schools of Delaware violated the 14th amendment. Before any Federal court did so, a State court rejected separate and unequal schools.

Today we take that for granted, but it was not because those cases went into Federal court that the civil rights of African Americans were determined; it was because they were in State court. Indeed, many civil rights advocates, including the Lawyers' Committee for Civil Rights Under Law, the Leadership Conference on Civil Rights, the Mexican American Legal Defense and Education Fund, and the National Asian Pacific Legal Consortium, have written to Senators in opposition to this legislation and in support of Senator Kennedy's amendment to exempt civil rights and wage and hour cases from the bill. I am proud to cosponsor his amendment, and I look forward to the debate on it.

The legislation has also been criticized by nearly all the State Attorneys General in this country. I understand that at least 43 of the 50 State Attorneys General have expressed concern that S. 5 could limit their powers to investigate and bring actions in their State courts against defendants who cause harm to their citizens because in certain instances they file suit as the class representative for the consumers of their State.

I expect Senator Pryor, a distinguished former State attorney general himself, to bring this issue to the floor with a clarifying amendment.

Some special interest groups are distorting the state of class action litigation by relying on a few anecdotes in an ends-oriented attempt to impede plaintiffs from bringing class action cases. We should take steps to correct actual problems as they occur. Simply transferring most suits into Federal court will not correct the real problems faced by plaintiffs and defendants.

In fact, this Congress and past Congresses have federalized so many criminal cases that used to be in State courts and dumped them into the Federal courts that it is increasingly difficult to even get a civil case heard in Federal court. So many things are handled by local prosecutors, such as Senator Specter and myself when we were prosecutors, by local law enforcement, but because they are interesting matters, we have succumbed to the temptation to federalize case after case that State authorities have always handled very well. These criminal cases are now in the Federal courts, and the Federal courts are overloaded with them. Now we are going to transfer a whole lot more cases into Federal courts.

Defrauded investors, deceived consumers, victims of defective products and environmental torts, and thousands of other ordinary people have been able to rely on class action lawsuits in our State court system, and there they have sought and received justice. We all know that without consolidating procedures such as class actions, it might be impossible for victims to obtain effective legal representation.

Companies tend to pay their defense lawyers by the hour. They are well paid. Plaintiffs' lawyers in class actions tend to work without pay for the possibility of obtaining a portion of the proceeds, if they are successful. It may well prove uneconomical for counsel to take on cases against governmental or corporate defendants if they must do so on an individual basis. It may be that individual claims are simply too small to be pursued.

Sometimes that is what the cheaters count on; it is how they get away with their schemes. Cheating thousands of people just a little is still cheating, or millions of people just a little creates millions of dollars for one person with nothing to stop them from doing it. Class actions allow the little guys to band together to afford a competent lawyer to redress wrongdoing.

Whether those regular citizens are getting together to force manufacturers to recall or correct dangerous products, or to clean up after devastating environmental harms that endanger their children or their neighborhoods, or to vindicate the basic civil rights to which they are entitled, they are using class actions. Why make it more difficult or costly for them to right those wrongs?

As the New York Times noted in an editorial last week opposing this bill, the real objective of this legislation is "to dilute the impact of strong State laws protecting consumers and the environment and to make it harder for Americans to win redress in court when harmed by bad corporate behavior."

We have very strong environmental laws in Vermont, and we are very  [*S1005] proud of them. Now we see this Congress about to say to the Vermont Legislature: We can apply much lesser standards; we will just take it away from any enforcement you already have.

I ask unanimous consent that the New York Times editorial be printed in the Record.

There being no objection, the material was ordered to be printed in the Record, as follows:

[From the New York Times, Feb. 2, 2005]

Class-Action Lawsuits

Tort reform is in the eye of the beholder. In the name of reforming the nation's civil justice system, and with scant public debate, President Bush and Congressional Republicans are racing to reward wealthy business supporters by changing the rules for class-action lawsuits. Their real objective is to dilute the impact of strong state laws protecting consumers and the environment and to make it harder for Americans to win redress in court when they are harmed by bad corporate behavior.

The proposed legislation, the so-called Class Action Fairness Act, will be taken up by the Senate Judiciary Committee on Thursday, with a vote by the full chamber expected as early as next week. Under the bill's sweeping provisions, nearly all major class-action lawsuits would be moved from state courts to already stretched federal courts. New procedural hurdles and backlogs would be destined to delay or deny justice in many cases, and to discourage plaintiffs and plaintiffs' lawyers from pursuing legitimate claims in the first place.

The proposed lunge to federal courts is so extreme that cases would be removed to federal courts even when a vast majority of the plaintiffs were from one state, the claimed injuries occurred in the state and involved possible violations of state law, and the principal defendant had a headquarters elsewhere but did substantial business in the state.

In a revealing but disappointing move last year, the measure's proponents rejected a balanced compromise that would have broadened federal jurisdiction while preserving the role of state courts in cases that are more local than national in flavor. Despite some useful provisions aimed at genuine abuses, the bill would reduce the accountability of corporations that violate laws protecting employees, consumers and the environment.

The measure died in the Senate at the close of the last session. But with President Bush now actively campaigning for its passage, the juggernaut may be unstoppable, particularly since some key Democrats, like Senators Charles Schumer of New York and Christopher Dodd of Connecticut, switched sides last year to back the bill in exchange for some modest revisions. The new Judiciary Committee chairman, Senator Arlen Specter, should at least be willing to entertain a handful of improving amendments. The most crucial would fix the bill's Catch-22:

plaintiffs filing class-action suits could be refused a hearing in state court if they came from several different states, and then bounced out of federal court because their complaint called for applying the laws of multiple states.

The ability of ordinary citizens with similar injuries to band together to take on powerful corporate interests by utilizing the mechanism of class-action lawsuits is one of the shining aspects of the nation's civil justice system. That reality tends to be overlooked amid all the overwrought spinning by the president and others who are trying to drum up concern about a litigation "crisis" and to pressure Congress to usurp proper state authority and weaken important protections for ordinary Americans.

Mr. LEAHY. This so-called Class Action Fairness Act falls short of the expectation set forth by its title. It will leave many injured parties who have valid claims with no avenue for relief, and that is anything but fair to ordinary Americans who look to us to represent them in the Senate.

I seem to have a touch of laryngitis which is an occupational hazard for Senators. I will not speak further, but I will come back to this issue in the future. I yield the floor.

The PRESIDING OFFICER. The Senator from Pennsylvania.

Unanimous Consent Agreement_S. Res. 38

Mr. SPECTER . Mr. President, I ask unanimous consent that at 5 p.m. today the Senate proceed to the consideration of a resolution regarding the Iraqi elections, which is at the desk; provided further, that there be 30 minutes for debate equally divided between the leaders or their designees, and that there be no amendments to the resolution or preamble. I further ask unanimous consent that at 5:30 p.m., the Senate proceed to a vote on the adoption of the resolution, and that following that vote, the preamble be agreed to, without intervening action or debate.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. SPECTER . Mr. President, I further ask unanimous consent that following the comments of the distinguished Senator from Utah I be recognized to speak briefly on the asbestos reform issue.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. SPECTER. I shall be off the floor for a few moments while Senator Hatch speaks, but I will return shortly after he completes his remarks.

Mr. LEAHY . Mr. President, I ask unanimous consent that I be included as a cosponsor of  S. Res. 38.

The PRESIDING OFFICER. Without objection, it is so ordered. The Senator from Utah.

Mr. HATCH . Mr. President, I appreciate my two colleagues and their remarks on this very important bill. I rise to express my strong support for S. 5, the Class Action Fairness Act of 2004. This bipartisan bill represents a carefully crafted legislative solution in response to the rampant abuses of the class action litigation device currently in our State courts.

The American public will benefit from a system that fairly compensates these injured people by those who are injured by unsafe or defective products. No one disputes this. We all want a system of compensation, but we must make sure the system is fair, reasonable, and equitable.

As well, this legislation helps protect against unfair recoveries because, in the end, the public pays when defendant companies are forced to pay excessive claims and sometimes must increase prices, decrease employment, or even become bankrupt or go out of business. We ought to all understand that we all pay for that, and that is why it is important we get the laws right and that we correct injustices and distortions of the law.

Before I begin discussing the legislation, I commend the distinguished majority leader, Dr. Frist, for bringing this bill up so early in the Congress. I also commend President Bush for recognizing the importance of this issue in his State of the Union Address. Senators Grassley, Kohl, and Carper also deserve recognition for all the time and effort they have devoted to this particular bill over the last several Congresses, and without their tireless work, we would not have the bipartisan compromise bill that we have in S. 5.

Finally, I must recognize Chairman Specter for placing this bill on the Judiciary Committee agenda and reporting this legislation last week.

Over the past decade, it has become painfully obvious that class action abuses have reached troublesome proportions in our civil justice system.

It has become equally clear that the true victims of this epidemic have been everyday consumers who represent the silent majority of unnamed class members. It has become too common an occurrence for plaintiff class members not to be adequately informed of their rights or of the terms and practical implications of a proposed class action settlement.

Making matters worse, judges too often approve settlements that primarily benefit class counsel, the personal injury lawyers, rather than the class members_in other words, the victims.

Efforts to reform our class action system are nothing new to the Senate. The Senate Judiciary Committee conducted hearings in the 105th, 106th, and 107th Congresses, reporting a similar bill from the committee in the 106th on a bipartisan basis. Since then, we continue to receive substantive evidence demonstrating the drastically increasing injustice caused by class action abuses.

After working extensively with numerous legislative proposals throughout the various Congresses, we are now on the verge of taking final action on a balanced bill that I would like to spend a little bit of time explaining further.

When I say a balanced bill, I refer specifically to the operation of the bill's grant of Federal jurisdiction over interstate class actions. This key provision is located in section 4 of the bill and corrects a flaw in the current application of the Federal diversity jurisdiction statute that now prevents most interstate class actions from being adjudicated in Federal courts.

Specifically, section 4 of the bill grants the Federal district courts original jurisdiction to hear interstate class actions if, one, any member of the proposed class is a citizen of a different
 **[*S1006]**
State from any defendant; two, the amount in controversy exceeds $5 million; and, three, the class action lawsuit involves a class of 100 or more members.

Although I believe the three conditions I have noted are more than sufficient to achieve the right balance between Federal and State interests, S. 5 goes a step further by incorporating two additional provisions to accommodate the States' interests in adjudicating local disputes.

First, pursuant to an amendment offered by Senator Feinstein during a markup last Congress, Federal jurisdiction would not extend to any case in which two-thirds or more of

the proposed class members and the primary defendants are residents of the State where the action was filed.

This exception keeps in the State courts those class actions that are prosecuted by a locally dominated plaintiffs' class with grievances against local defendants. In other words, a locally dominated lawyer-judge set of relationships that seems to be continually resulting in unjust treatment in the courts.

Similarly, the Feinstein amendment also provides that Federal courts may, based on a number of carefully proscribed factors, decline to exercise jurisdiction in middle tier cases in which two-thirds of the proposed class members and the primary defendants are residents of the same State.

To be sure, as part of the recent compromise reached last November with Senators Schumer, Dodd, and Landrieu, we further modified the Feinstein amendment by adding anadditional factor for the Federal courts to consider for the middle tier of cases specifically whether there is a substantial nexus between the claims and the court selected by the plaintiffs.

I will refer to the Feinstein chart. That chart makes it very clear, in my eyes, that tier I, two-thirds or more of the proposed class members, are in-State versus in-State primary defendants. That would stay in State court.

Tier II, between one-third and two-thirds of the proposed class members are in-State versus in-State primary defendants, and one can go to either State or Federal court, subject to the judge's discretion.

Tier III, where there is one-third or fewer of the proposed class members in-State versus in-State primary defendants, those cases go to Federal court.

Although I believe the three conditions I noted are more than sufficient to achieve the right balance between Federal and State interests, section 5 goes a step further by incorporating these additional principles to accommodate States' interests in adjudicating local disputes.

The second point I was making is that States' interests in adjudicating local disputes on behalf of their citizens are further preserved through a newly created exception to Federal jurisdiction for truly local controversies. This provision, which we negotiated on a bipartisan basis last November with the three new Democratic sponsors of this bill, keeps in the State courts those class action lawsuits that satisfy the following four criteria which I will discuss in greater detail so there is no confusion on this issue.

Criterion 1, the proposed class must be primarily local, where more than two-thirds of the class members are citizens of the State where the suit was filed. This formulation resembles the two-thirds test in the Feinstein amendment I just discussed and essentially requires a large majority of the injured claimants reside within the State.

Criterion 2, the class action must be brought against at least one real defendant. The local defendant cannot be peripheral. Rather, the lawsuit must be brought against at least one defendant with a significant basis of liability and from whom significant relief is sought. This provision essentially precludes personal injury lawyers from evading Federal jurisdiction by simply naming a local defendant such as Hilda Bankston, who was unmercifully dragged into scores of class action lawsuits simply because her small family-operated pharmacy sold the diet drug phen-phen. That was the only reason she was brought in, but the real reason was because she was a pigeon sitting in the State and they used her as a device to bring all of these suits by many people who had nothing to do with the State, nothing to do with her.

Criterion 3, the principal injuries must have occurred locally. In other words, the total extent

of the injuries complained of must be concentrated within the forum State. By way of an example, a nationwide drug lawsuit involving injuries spread throughout the country would certainly not qualify for this criteria. On the other hand, this criteria would be satisfied by a class action lawsuit involving a factory explosion affecting a confined geographic area.

Criterion 4, no other similar class actions can have been filed during the preceding 3 years. This criterion is intended to ensure that the exception does not apply tothose class actions that are likely to be filed in multiple States based on the same or similar factual allegations against any of the same defendants.

When applying all four criteria, the local controversy exception will enable State courts to hear local class actions alleging principal injuries confined to the forum State and where the lawsuit involved litigants who predominately reside within that State. I refer to the local controversy provision chart.

As my colleagues can see, that chart for these tier III people keeps truly local claims in State court. With regard to plaintiffs, if two-thirds or more of the proposed class members are in the State and with regard to the defendants at least one in-State defendant from whom significant relief is sought_not the Hilda Bankston who was ruined by these false suits_and alleged conduct forms a significant basis of claims, and the nature of the claim's principal injuries were incurred in the State as a result of the alleged significant conduct, then those cases can be heard in State court.

I was interested in the comments of the distinguished Senator from Vermont about justice and injustice. The injustices are all on the side of those who do not want this bill because they are protecting personal injury lawyers rather than the individual claimants.

The individual claimants will have a right to go to court. It just may be that they have to go to Federal court rather than State court.

Given the addition of Senator Feinstein's three-tiered jurisdictional test and agreed-upon local controversy exception, I find it puzzling that some have represented this bill will somehow move all class actions into Federal court. We just heard some comments like that. Nothing could be further from the truth.

I urge these colleagues to read section 4 of the bill. If they cannot find comfort in this language, I urge them to look at studies showing that the bill will do nothing of the sort. If they are still skeptical, I urge them to talk to the cosponsors of the bill, including our Democratic partners, for a completely candid assessment on whether the legislation will move all class actions into Federal court. It simply will not.

These actions will be able to be brought, but there will not be the same ability to forum shop into favorable jurisdictions that act outside the law and allow unjust verdicts such as we have today.

I think the answer is perfectly clear. This bill moves to Federal court larger interstate class actions while keeping in State court local matters that are more suited for the States. Although I have focused on two provisions in S. 5, I think it is important to note that this bill contains many other changes we included so that we could build a bipartisan consensus.

After we fell one vote shy of invoking cloture the year before last, three Democratic Senators who voted against proceeding on the bill presented us with a detailed list of issues they wanted resolved before they could support class action reform legislation. After extensive discussions in November of 2003, we responded to each and every concern raised by these Senators and made the appropriate changes that are now embodied in S. 5.

As my colleagues will see, the points we have made show each Democratic concern that was raised and how we addressed those concerns.

S. 5 is a modest bill that will help to put an end to class action abuses occurring in some of our State courts. Contrary to the arguments from the bill's opponents, S. 5 does not sweep
**[*S1007]**
into Federal court every conceivable class action. The bill more than adequately accommodates the States' interests in adjudicating local disputes.

I might add that the argument we are going to deprive consumers from their day in court is pure bunk. The fact is, under certain circumstances, they will have a right to be in State court or have a right, through the judge, to be in State or Federal court, and under certain circumstances that are much more fair to all litigants concerned, they will have to go to Federal court.

There is nothing wrong with going to Federal court. In fact, when I practiced law we loved to have cases that went to Federal court because people thought they were more important cases. Frankly, in most cases they were. When these cases are important, they will be tried in Federal court as well.

One thing we are concerned about, we think we have a better chance of having real justice in these cases in Federal court than to have the Hilda Bankstons of this world put out of business under what are false pretenses and manipulation of the Federal judicial system.

This legislation has been crafted and drafted through close bipartisan cooperation with several Members on the other side of the aisle, and as a result now commands a simple majority of support of this body. Despite this support, we are still faced with the obstructive tactics from a small minority that will do anything to appease the powerful and well-funded personal injury trial bar. I find this unfortunate and hope these colleagues can look beyond these special interests and do what is right for the country's ailing civil justice system.

I have always belonged to the trial bar and I think most trial lawyers are people of dedication and decency who want to do what is right, but we have seen in recent years a real subversion of the law by some trial lawyers who are interested only in money. In many respects, they are not worried about clients but worried about their own compensation system. The fact is, we need to do what is right for our country's ailing civil justice system.

The Class Action Fairness Act addresses an abuse of the class action system that has grown substantially in the past few years. I am referring to the gaming of the judicial system by unscrupulous lawyers to evade Federal diversity jurisdiction. In some cases, the filing and settling of class action lawsuits has become a virtual wheel of fortune with every spin of the wheel potentially worth millions of dollars. However, class members do not benefit from these spins of the wheel. Rather, it is the class counsels who receive millions of dollars in attorneys' fees who are the real winners of this gaming situation and of the game.

It is the sad but true fact that the most class members can expect to receive, which is an ironic twist, is a coupon good for the future purchase of the very product that was the basis of their claim to begin with.

Again, under the current tort system, it is the class action lawyers who are the real beneficiaries. They are the ones who walk away from a class action with millions in their pockets while the class members walk away with little or nothing at all but these coupons. Before I turn to some specific examples of class action lawyers gaming the system to the detriment of their clients, let me explain just how this game works.

It starts with a few class action attorneys sitting around a table, thinking of an idea for a

class action lawsuit. While this idea may come from any numbers of sources, it is usually formulated and solidified after an examination of the deepest pockets in the corporate world. Naturally, they want to make money.

Once an idea for a class action is formed, it is time to find a lead or named plaintiff. The named plaintiff will inevitably be someone who is a citizen of the same State as the defendant. Why? This keeps the case in State court.

Why is this essential to winning the game? Because if the suit is in State court, the class counsels can file multiple class actions, alleging similar claims against similar defendants in multiple districts. They do this in search of a judge willing to quickly certify the class.

And because the State courts do not have a method of consolidating identical claims like we have in the Federal system, all of those claims remain pending in the various State courts around the country. The filing of multiple class actions in multiple districts gives the class counsel tremendous leverage to play hard ball with the defendant companies. By bringing class action upon class action against a company, the company is left with no other option but to settle. The alternative is to be bled dry by legal fees and face the uncertainty that one of the many courts will destroy the company by delivering a jackpot award against it.

While I suppose the class counsel would like to think of it as a game of hardball, to companies it must feel a lot like execution; and it must feel a lot like what it really is: extortion.

The real kicker is this: in some cases, many believe the only interests served by these settlements are those of the class counsel. Again, they will walk away with hundreds of thousands and sometimes millions of dollars. And what do the class members recover? Perhaps a worthless coupon.

There you have it, a successful gaming of the State tort system by the class action lawyers.

This is an intolerable practice and one that the Class A Action Fairness Act will curb.

I used to be a plaintiff's attorney. I was a defense lawyer as well. I am in no way indicting the actions of all plaintiff attorneys or class action attorneys. In many cases, plaintiff attorneys play a vital role in protecting the legitimate interests of injured consumers.

For example, I supported the efforts of the Castano group of plaintiff attorneys in the class action case against cigarette companies.

Despite the fine efforts of many, many plaintiffs' lawyers, the actions of a powerful minority of plaintiffs' attorneys have created the situation we need to remedy with this situation.

To demonstrate how class action lawyers have manipulated the tort system to their benefit, let us take a spin at the wheel and see what we come up with.

Spin the wheel again and we come to the 2003 Cook County, Illinois court-approved settlement of Degradi v. KB Holdings, Inc.

This class action alleged that KB Toys, one of the largest toy retailers in the country, manipulated toy prices to lead customers to believe that they were paying discounted prices. Specifically, the suit alleged that certain products contained an inflated reference price that was marked through in red with a lower selling price next to it.

To settle the suit, the company agreed to hold what amounted to a week long sale with a thirty percent discount on selected products. However, the company was not obligated under

the terms of the settlement to advertise the discount. As a result, many of the class members eligible to receive the discount were not aware of it until long after the sale was over.

How did the game turn out for the class counsel? They won a whopping $1 million in attorneys' fees. And according to an independent analyst, KB Toys actually stood to benefit from the settlement because they were able to drive traffic into the store on the days of the discount.

All told, this was not a bad spin at the wheel for all parties concerned. That is, all parties except for the class members_in other words the people who were allegedly injured.

If you spin the wheel again you land on the in re Microsoft Litigation Settlement.

The wheel has landed on in re Microsoft Litigation Settlement.

Microsoft has been involved in multiple antitrust class action alleging that the computer giant used its control of certain programs to price gouge its customers. Ten of the class actions have been settled, including the suit brought in Johnson County, KS.

Under the terms of the settlement, class members who purchased Microsoft hardware will receive a $5 or $10 voucher toward the future purchase of particular computer hardware or software products.

If these settlement terms some like something less than a big victory for the consumers, wait until you hear about the onerous process they have to **[\*S1008]** endure in order to redeem the vouchers.

First, to even receive a voucher, a class member must first download a form from a website established for the purpose of handling the settlements, fill it out and mail it in. Then, to redeem the voucher itself, the class member must mail in the voucher with a photocopy of the original receipt and UPC code.

So the class members got some hard to redeem $5 and $10 coupons. Who then came out the big winners in the game? You guessed it, once again it was the class counsel. In these cases, they have received a mind-boggling sum in attorney's fees to the tune of hundreds of millions of dollars.

With a spin of the wheel, we come to Ramsey v. Nestle Waters North America.

This class action is better known as the Poland Springs Water class action. Let me refer to this Poland Spring Chart_this blue section which has $1.35 million on it.

The Ramsey suit alleged that Poland Spring water does not come from a spring deep in the woods of Maine as was advertised. Under the terms of the settlement approved by the Kane County, IL State court, the named plaintiff received $12,000 while the class members received discounts or free Poland Spring water of the next 5 years. The company, which denied any wrongdoing, agreed to enhance its quality control and make approximately $2.75 million in contributions to charities.

So in this round of the game, the class members got some free water. What about the class counsel? They were sitting pretty at the end of the game with $1.35 million in attorney's fees.

As Roger Parloff put it in the Forbes magazine article entitled "Springtime for Poland," the settlement was "pretty standard: next to undetectable benefits for us_some discount

coupons and whatnot and $1.35 million cash for the plaintiffs' attorneys."

That is right. Class action settlements have become so abusive that it is now standard and accepted practice for class counsel to receive millions of dollars for getting class members a bottle of water.

Now we come to the Register.com settlement, approved by the New York County, New York State Supreme Court, and affirmed by the New York Superior Court in 2003.

Register.com is the second largest domain registration company for the Internet. Those wishing to register a domain name through the company may do so for a $35 fee. But if the main name is registered, the company holds the Internet address and redirects the link to a "Coming Soon" page featuring promotional advertisements for Register.com and other companies until the domain nameholder develops a Web site of its own.

Michael Zurakov, serving as lead plaintiff for the class action, claimed that upon developing his own Web site, Register.com delayed in switching over the purchased domain name to him and continued to redirect the link to the promotional "Coming Soon" page for several months to sell advertisements. When the class counsel moved to certify the class, it was estimated that the class was comprised of approximately 3 million members.

Under the terms of the court-approved settlement, class members received $5 coupons to use. Each one got a $5 coupon to use with Register.com, assuming that the class member registered with the company again. Meanwhile, the lawyers received $642,500 in attorney fees_lawyer fees.

To quote an article appearing in Domains Magazine, "The munificence of this reward may reflect that fact that the claim, while perhaps not utterly without a shred of merit, was not exactly the most compelling ever heard."

However weak the suit, the class counsel had a good day at the game, taking home winnings of $642,500, especially compared to the $5 coupons each class member, so-called, got. That was the right to redeem, if they went to Register.com, and registered a name.

Cases such as this only further encourage the filing of frivolous claims by opportunistic class action counsel who are solely motivated by quick settlements that benefit only them.

Let me go to the Ameritech settlement for $16 million. This is a settlement approved by the notorious Madison County, IL, State court, one of the most abusive settlements I have ever seen.

You need to know about Madison County. Madison County is where a lot of these class actions go so they can make demand letters and get settlements as defense cases. Madison County has judges who seem to be in the pockets of the trial lawyers in Madison County who become cocounsel in these cases, and, of course, have an instant entree to the courts, and almost a guaranteed, outrageous award every time they go into court. Most of the time they don't go to court. You will find in the end very few actual cases are filed. But the demand letters are made. And these companies are so frightened over Madison County, because they know they are going to get killed if they go to court, that they almost automatically settle as a result of the demand letters. They settle for what it would cost them to defend these types of cases rather than go through the jackpot justice problem of getting slammed in a jurisdiction where apparently justice is not a measured factor.

Here we have the Ameritech settlement approved by the Madison County, IL, State court. This is one of the most abusive settlements I have ever seen.

Two suits were filed in Madison County, IL, by the same firm on behalf of customers in Michigan, Ohio, and Wisconsin, alleging that Ameritech wrongly charged customers for a wire maintenance program without informing them that the service was optional.

The settlement didn't provide customers with refunds for wrongful charges. Instead, it gave each class member a $5 pay phone card that could only be used at pay phones owned by SBC, the parent company of Ameritech, to make local and limited long distance calls within the State. Many of the class members complained that the cards were worthless to them because there were no SBC pay phones in the area. Other class members complained that the cards were worthless to them either because they did not use pay phones or because the cards contained so many restrictions that they were essentially unusable.

This was not exactly a sweetheart deal for these consumers. But how did the class action counsel come out in this round of the game?

They had a good spin of the wheel by any measure, winning $16 million in lawyer fees, while the class of people, alleged consumers who were supposedly abused, really got nothing.

We can no longer sit idly by and allow abusive settlements to continue. What will S. 5 do to help curb the gaming of our tort system?

First, the bill gives the Federal courts diversity jurisdiction over large, national class actions with at least 100 class members seeking an amount-in-controversy of $5 million.

They can still bring their suit, but it will be in Federal court where it is much more likely that justice will occur, fairness will occur, and decent treatment will occur.

As a result of the provision, large and national class actions may either be originally filed or removed to Federal court, a forum that is better equipped to handle these kinds of cases_and to do so fairly. They are not going to be deprived of their rights. They are just going to have to make their cases, and they are not going to be able to go to Madison County where they will have an automatic win absolutely guaranteed in the eyes of most companies which will be outrageous in nature as a general rule_or an automatic settlement for defense costs_which is as close to distortion as you can get because the companies can't afford to go to court in that particular jurisdiction with the judges the way they are, the attorneys the way they are, and all in cahoots the way they are.

Second, S. 5 contains provisions for the review and approval of proposed coupon settlements before a Federal court. It doesn't mean you can't have coupon settlements, but you are sure going to have to get the judge's approval. So these phoney coupons are going to be much fewer and much more far in between.

The bill provides that a Federal judge cannot approve a proposed coupon settlement until conducting a hearing with a written finding that the terms of the settlement are fair, reasonable, and equitable to the class members. **[*S1009]**

You would think that would be something every court in the land would want to do, but, unfortunately, we have hadfar too many of these class actions where that hasn't been the case, or where counsel are the ones who are basically mistreated in the end.

Our courts will no longer be used as a rubberstamp for proposed settlements. This provision ensures that the true beneficiaries of a settlement are the class members and not the lawyers who drew up the settlement.

It doesn't cost any more money to go to Federal court than it does State court. It isn't a

tremendous inconvenience; it is just that you can expect the Federal judges not to be judges who are sustained by financial support by the local lawyers.

Third, this legislation requires that attorneys' fee awards be based on the actual recovery of the class members in coupon settlements. In other words, contingency fees must be based on the value of coupons actually redeemed by class members. This will give the attorneys an incentive to ensure the class members actually get something in the settlement they can use.

If you are going to get bottles of water, then the attorneys can get fees based upon how many bottles of water are gotten. I don't think many lawsuits would be brought on that basis anymore. Or, if you are going to get a coupon, they can get fees based upon how many coupons are redeemed. Or, in the case of the SBC coupons, they can get fees only to the extent that those coupons are viable and can be utilized, and how many of them are actually requested.

Practically speaking, class counsel will no longer look for a quick and hefty attorney fee settlement for themselves in which the class members recover relatively worthless coupons.

The time has come for us to put an end to this unfair system. I have heard many of my colleagues on both sides of the aisle decry the state of the current tort system. I ask my colleagues to recognize this bill as the opportunity that it is, an opportunity to end the abuses of the current tort system, or at least to make a start to ending the abuses of the current tort system and restoring confidence in our justice system.

Real good lawyers, the honest lawyers, if they bring class action lawsuits, will bring suits of viability, suits that mean something, suits that are deserving of the awards that are given, not suits just for the benefit of the lawyers involved. We have spent literally years now negotiating the provisions of this delicate compromise bill. The time has come to pass it.

I might add, this bill has evolved over a number of Congresses. We have negotiated with virtually everybody who has wanted to negotiate on this bill. We have made change after change after change. It is not a major change in our law, but it certainly will bring greater justice in our law and greater fairness and greater treatment in our law.

The fact is, we need this bill to remain intact. The House has indicated they will take this bill, if we pass it in its current form, and it will become law. There will be some attempts with amendments that may have merit that I may even like, but this bill is a result of a huge series of compromises that have taken years to achieve. We know if any amendment is added to this bill, it is very unlikely the House will take it. We are faced with the proposition of the need to vote down all amendments on this bill.

The distinguished Presiding Officer has a number of amendments he would like to add to this bill, as a distinguished former supreme court justice from the State of Texas, that would improve this bill. But he knows if we are going to pass this bill, we cannot take any amendments, including his. If we are going to take other amendments, we will have to take his. The fact is, we urge all amendments be voted down so we can pass this bill and, hopefully, get it to the House and get it passed so justice can occur.

Any Member who stands in the Senate and says consumers are going to be hurt by this bill, that we are not allowing suits to be brought, has not read the bill or is deliberately distorting what is going on. The fact is, suits can be brought, legitimate suits can be brought, there will be awards that will be made in legitimate cases, as they should be, and we all will be better off as a country if we get the tort system so that it does justice, rather than jackpot justice for a few, and in a number of instances I have been citing, for lawyers only. Unfortunately, we have people gaming this system to such a degree that this bill needs to pass. We need to straighten out the mess.

I yield the floor.

The PRESIDING OFFICER (Mr. Cornyn). The Senator from Pennsylvania.

Mr. SPECTER . Mr. President, I congratulate my distinguished colleague, Senator Hatch, for the outstanding work he has done on so much legislation during his tenure as chairman of the Judiciary Committee, including the class action bill, as he has spoken of in some detail.

**SUBJECT:** LITIGATION (93%); CLASS ACTIONS (91%); SUITS & CLAIMS (90%); JUSTICE DEPARTMENTS (79%); LEGISLATIVE BODIES (79%); US STATE GOVERNMENT (79%); LEGISLATION (79%); JURISDICTION (79%); ELDER LAW (59%); SETTLEMENT & COMPROMISE (59%); LAWYERS (59%); CIVIL RIGHTS (59%); AMERICAN FOOTBALL (59%); SPORTS (59%); CONSUMER LAW (59%); LAW COURTS & TRIBUNALS (59%); INTERSTATE COMMERCE (59%); LEGISLATORS (59%); ATTORNEYS GENERAL (59%);

**LOAD-DATE:** February 8, 2005

Service: **Get by LEXSEE®**
Citation: **151 cong rec s 999**
View: Full
Date/Time: Monday, August 18, 2008 - 10:22 PM EDT



About LexisNexis  | Terms & Conditions  | Contact Us
Copyright ©  2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# COMPENDIUM EXHIBIT 2

**LexisNexis®** *Total Research System*

Search │ Research Tasks │ Get a Document │ *Shepard's*® │ Alerts │ Total Litigator │ Transactional Advisor │ Cour

Service: **Get by LEXSEE®**
Citation: **151 cong rec s 1076**

*151 Cong Rec S 1076,  \**

CONGRESSIONAL RECORD -- *SENATE*

Tuesday, February 08, 2005

109th Congress, 1st Session

151 Cong Rec S 1076

**REFERENCE:** Vol. 151, No. 12

**SECTION:** Senate

**TITLE:** CLASS ACTION FAIRNESS ACT OF 2005

**SPEAKER:** Mr. SPECTER; Mr. McCONNELL; Mr. DODD; Mr. LOTT; Mr. DURBIN; Mr. CARPER

**TEXT:  [\*S1076]**

The PRESIDING OFFICER. Under the previous order, the Senate will resume consideration of S. 5, which the clerk will report.

The bill clerk read as follows:

A bill (S. 5) to amend the procedures that apply to consideration of interstate class actions to assure fairer outcomes for class members and defendants, and for other purposes.

The PRESIDING OFFICER. The Senator from Pennsylvania.

Mr. SPECTER . Mr. President, as the Presiding Officer has noted, we are continuing consideration of class action reform. Yesterday, we had opening statements, which I led off as chairman of the Judiciary Committee, and the ranking member, Senator Leahy, made his opening statement. Senator Hatch spoke. We will be going to an amendment this morning by Senator Durbin on mass actions.

The class action bill has as its central focus to prevent judge shopping to various States and even counties where courts and judges have a prejudicial predisposition on cases. The issue of diversity of citizenship has been created in the Federal courts to eliminate favoritism. When diversity jurisdiction was established, it was undertaken in the context of the claimant from one State, illustratively, Virginia coming to Pennsylvania, and the concern there was there might be some favoritism for the local resident in Pennsylvania. So the jurisdictional amount, when I was in the practice of law, was $3,000. It is now $75,000 which would put the case in the Federal court where there would be more objectivity. That is what they are trying to do here, to eliminate judge shopping.

If the cases which stay in the State court have two-thirds of the class from that State, it would go into the Federal court. If one-third or less is not from the State_in the one-third to

two-third range_it would be the discretion of the judge.

As I said yesterday, there is, as far as I am concerned, a very important purpose here: to put cases in the Federal court to avoid forum shopping and judge shopping.

With respect to the substantive law, it is my view that the substantive law ought not to be altered. I commented briefly on the Bingaman amendment yesterday where I think it is important that the Federal judges who have the cases would have the discretion to apply State law. But that will be taken up sometime when we debate the matter later.

I want to yield now to Senator McConnell for leadership time or time as he may choose.

Mr. McCONNELL . Mr. President, I thank the chairman of the Judiciary Committee.

I rise to speak about a case that I believe perfectly illustrates some of the problems with our current class action system. This case is, unfortunately, not at all unique. These outrageous decisions happen all too frequently. The bill currently under consideration will help fix some of these problems.

I have a chart. It is kind of hard to see. Basically, it is a letter that a member of my staff recently got. It included a check. The check is made payable to a member of my staff who received it in the mail. On the check's "Pay to the Order of" line, I have covered up the name of the staffer so she may remain anonymous.

I also obscured the name of the defendant in this case. Plaintiffs' lawyers have already soaked them once, and I do not want to give them the opportunity to do it again. I would hate to see others able to sue the company because they heard the company settled at least one class action lawsuit.

Along with this settlement check, my staffer received a letter which says in part:

You have been identified as a member of the class of . . . customers who are eligible for a refund under the terms of a settlement agreement reached in a class-action lawsuit . . . The enclosed check includes any refunds for which you were eligible.

Imagine her excitement. As you know, Senate staffers are certainly not the highest paid people in town. So this woman on my staff told me she was, indeed, thrilled to anticipate what she might be receiving. And then she looked at the enclosed check to see just how big her windfall was. It was a whopping 32 cents. That is right, she received a check made out to her in the amount of 32 cents. I guess it goes without saying that she was a little bit disappointed to find out her newfound riches had disappeared already.

Do not misunderstand me. I am not suggesting my staffer deserved a bigger settlement check. In fact, she told me she had no complaint against the defendant, and she never asked to be a part of the lawsuit. Apparently, she just happened to be a customer of the company that was sued, and it was determined that she theoretically could bring a claim against the defendant. So she became a member of "a class" who was due a settlement.

If this does not precisely illustrate the absurdity of the current class action epidemic in this country, I do not know what does. To demonstrate just how far out of whack the system is, let's start with the letter notifying my staffer that she was a member of a class action lawsuit and had been awarded a settlement.

This letter and check arrived via the U.S. mail. The last time I checked, it cost 37 cents to send an envelope through the U.S. mail. The settlement check is only for 32 cents. You can probably see where I am headed with this. It cost the defendant in a class action suit 37

cents to send a settlement check worth 32 cents. I don't have the expertise in economics like my good friend and our former colleague Senator Gramm of Texas, but I can tell you, forcing a defendant to spend 37 cents to send somebody a 32-cent check does not make much economic sense, and it certainly defies common sense.

Let me point out the most disturbing element about this lawsuit. My staffer researched this case, and it may be of interest to all of our colleagues to note that the unwitting plaintiff received 32 cents in compensation from this class action lawsuit, and her lawyers pocketed in excess of $7 million_$7 million. All in all, not a bad settlement if you happen to be a plaintiff's lawyer rather than a plaintiff.

And in case you think my staffer received an unusually low settlement in this litigation, let me quote from the letter accompanying the settlement check:

At the time of the settlement, we estimated that the average [refund] would be less than $1_

The average refund would be less than a dollar_

for each eligible [plaintiff]. That estimate proved correct.

So you see, while the settlement was being arranged, it was clear each plaintiff on average would receive less than $1. It was clear that each plaintiff would receive less than $1. Yet the plaintiffs' lawyers still rake in more than $7 million.

My colleagues may also be interested to know how much the defendant was forced to spend defending the lawsuit. Knowing the extent of the defense costs is instructive in demonstrating how unjust these abusive suits can be. So we asked the defendant how much it spent defending this suit that provided each plaintiff with pennies and the lawyers with millions. Perhaps not surprisingly, the defendant was not willing to discuss the matter. You see, the defendant told us that if it were readily known just how much they spent defending the suit, then that information would almost certainly be used against them in the future. The defendant feared that if their defense costs were known, then another opportunistic plaintiff's lawyer would file another one of these predatory suits, and then that lawyer would offer to settle for just slightly less than the millions he knew it would cost the defendant to defend the suit.

This case illustrates how plaintiffs' lawyers exploit and abuse defendants under the current system. Can there be any doubt that the current class action system is in need of repair? When the lawyers get more than $7 million and the plaintiff gets a check for 32 cents, something is terribly wrong. When defendants fear to disclose how much they spend fighting these ridiculous suits because to do so would invite even more litigation, something is terribly wrong. Justice is supposed to be distributed fairly. This is clearly not a fair way to distribute justice.

By passing this legislation, we are not going to end every 32-cent award to **[*S1077]** plaintiffs and multimillion dollar award to lawyers, but we certainly can curb a great deal of this nonsense.

I know some of my friends on the other side of the aisle will complain this bill will sound the death knell for class actions in State court. Nothing could be further from the truth. This is an important piece of legislation, but it is also a moderate and reasonable piece of legislation.

Frankly, I liked the original version, but we are where we are today, and I will talk more about that in a moment. The bill on the floor is the product of not one, not two, but three carefully crafted compromises. Not one, not two, but three carefully crafted compromises. These carefully crafted compromises have us to a point where we can enact meaningful

reform that respects the ability of States to adjudicate local controversies as class actions while allowing Federal courts to decide truly national class actions.

The House, frankly, would prefer a stronger bill, and so would I. I like the original bill that stalled out at 59 votes last year. But the House also understands that the legislation on the floor is a good bill.

Therefore, the House is prepared to take this up and pass it without amendment, assuming that our carefully crafted compromise is itself not compromised on the Senate floor.

I had an opportunity to talk to Majority Leader Tom DeLay this morning and he reiterated the statement that he and Chairman Jim Sensenbrenner made last Friday and it is this: If this bill is passed without amendment in the Senate, the House will take it up immediately, pass it, and send it to the President for signature. If it is altered in any way, the House will then follow the regular order and maybe sometime during this Congress we will get a class action bill.

Frankly, in my judgment, those who are skeptical of this bill would be better off with this compromise version than having the House go through the regular order, in which case they would probably pass a bill much different from this compromise. We would ultimately have a conference and in all likelihood, out of that conference might come a bill more like the one we had last year, which stalled out at 59 votes.

So I would say that for those who are not terribly enthusiastic about this compromise, it could get a lot worse from their point of view. This compromise is one that people who have worked on this bill for years are willing to take, and so our challenge is to keep it clean, to defeat the amendments that would slow down the process and prevent this important piece of tort reform legislation from getting to the President for an early signature. So that is where we are.

We have a marvelous opportunity to demonstrate at the beginning of this Congress that we are indeed going to be able to accomplish some important things on a bipartisan basis. This compromise bill appears to have at least 62 Senators who are for it. Let us hold it together. Let us keep it as it is and demonstrate to the American public that we can work together on a bipartisan basis and pass important legislation for our country.

I yield the floor.

The PRESIDING OFFICER. The Senator from Pennsylvania.

Mr. SPECTER . Mr. President, the next Senator to seek recognition is Senator Dodd. I am informed Senator Lott will be coming to the floor shortly to speak, and that soon thereafter Senator Durbin will offer his amendment. It is now 11:18. That should take the time for floor action until the hour of 12:30 when we are scheduled under a previous order to recess for the party caucuses. So I now yield to Senator Dodd.

The PRESIDING OFFICER. The Senator from Connecticut.

Mr. DODD . Mr. President, I begin by thanking our colleague from Pennsylvania for his leadership on this issue as the new chairman of the Senate Judiciary Committee, and also to commend our colleague from Vermont, Senator Leahy, the ranking Democrat on the committee. Despite their differences on this legislation, we are debating this bill because the managers have gone through the committee process and have produced a product for the consideration of the full Senate. I am pleased this bill is finally before us once again. It has been a year and a half since we last considered this legislation.

I also commend the two leaders, Senators Frist and Daschle, for working as early as the fall of 2003 to try and craft a compromise. Senator Reid of Nevada has picked up on this and I want to particularly commend Senator Reid. He has some strong reservations about this bill, as many of our colleagues do, but he has arranged, as the Democratic leader can, for this matter to come forward. Certainly all of my colleagues are fully aware that a determined minority can pretty much stop anything from happening, but the Senator from Nevada, despite his reservations about this legislation, has worked through the process with the distinguished majority leader.

The chairman of the committee, the ranking member, and those who are interested in this bill are trying to move this matter forward. So I would not want to begin my comments without commending the leaders, but particularly the Democratic leader, my leader, for putting in the time and effort to see to it that this matter dealing with class action be a part of the Senate debate.

The legislation has had a rather long and torturous history, going back a number of years. I am not going to recite at length that history. I will only note that several of our colleagues deserve to be acknowledged for their long and steady persistence in bringing the Senate to this point. Those Senators include Senator Grassley of Iowa, Senator Kohl of Wisconsin, Senator Hatch of Utah, and Senator Feinstein of California. They have worked on the Judiciary Committee, in a very strong bipartisan fashion, to try and bring this matter up.

I also want to highlight and mention Senator Carper of Delaware who has been tireless in his support for this effort. Senator McConnell as well has worked on this issue. Senator Landrieu, and Senator Schumer, I should mention as well, as a member of the Judiciary Committee, have also been a part of an effort to try and come up with a bill that could enjoy broad-based support.

I mentioned Senators Specter and Leahy at the outset of my remarks as the chairman and ranking member who also worked well together to bring us to this point. I want to point out to my colleagues, of course, as someone who was very much involved in the negotiations back in the fall of 2003, that when the cloture motion failed, as pointed out by the Senator from Kentucky, within a few moments of that vote this Senator rose and offered to the majority at that point a willingness to sit down that day in fact to try and work out differences that would allow for this bill to go forward.

The distinguished majority leader accepted that offer and we immediately began a process to put this bill together. In fact, several of us sent a letter at that time to Senator Frist. The letter was sent by myself, Senator Landrieu, Senator Schumer, and Senator Bingaman, outlining four areas that we thought if we could be accommodated in these areas the bill could go forward in a bipartisan fashion.

I ask unanimous consent that the letter dated November 14, 2003, from three of my colleagues and me to Senator Frist be printed in the Record.

There being no objection, the material was ordered to be printed in the Record, as follows:

U.S. Senate,

Washington, DC, November 14, 2003.

Hon. Bill Frist,

Senate Majority Leader,

U.S. Capitol, Washington, DC.

Dear Majority Leader Frist: We agree with the fundamental principle of the pending class action legislation that would permit removal of national class actions to federal court. Under current law, there have been a number of instances of unjustified forum-shopping and other abuses of the legal process. We are committed to helping to reform the law to ensure fair adjudication for all Americans. To that end, we are writing to outline the policies that need to be addressed in order to move the Senate toward a bill that can pass before Congress adjourns for the year.

While we support the general thrust of  S. 1751, there are some instances where the legislation goes beyond the scope of what we believe must be addressed. It is our view that we are very close to having a bill that we can support and if we can satisfactorily address each of the following issues, we can move forward quickly with you to pass a reform bill.

Based upon our understanding of the issues that have been discussed by you and the
 [*S1078]
Democratic Leader, we believe that most of our concerns are readily solvable [while a narrow subset may require some further negotiation to resolve.]

We believe more consideration must be given to the formula for federal removal. We agree that many types of cases are best considered in federal court. At the same time, we would not want the Senate to fashion rules that permit the removal of cases that are truly single-state cases which are appropriately considered in state court. Additionally, we should permit federal court judges to consider a set of factors that includes both state and federal concerns when determining whether a case in the "middlethird" of the current formula should be removed.

Mass tort actions that are not brought as class actions should be removed from the bill. The bill passed by the Judiciary Committee did not contain this language. We understand that the peculiarities of state law in two states may need to be addressed. However, the current mass tort standard is much broader than necessary to address issues raised by two of the fifty states. We want to write a rule that is as precise as possible_in this case, by encompassing actions that are truly class actions, while at the same time excluding any cases that are not.

There are several places in the bill that pre-empt current law or allow for significant deviation from standard practice. This has the effect of encouraging manipulation or abuse by either side, and should not be allowed in reform legislation. The current version of the removal provision permits removal at any time, even during trial. This includes a potential "merry-go-round effect" of repeated removal and remand between state and federal courts. Additionally, the underlying bill does not specify when the court would measure the plaintiff class and it creates a new appellate review of remand orders.

In many cases, plaintiffs, who take the risk of coming forward, should be able to be compensated for that risk. The bill currently requires their recovery to be precisely the same as all other members of the class. Different risks and different damages in civil rights and other claims, should receive different compensation, upon approval of the trial judge.

Lastly, the underlying bill simply restates current law in requiring judges to review coupon settlements. Given the clear problems that have been raised with abusive coupon settlements, we believe it is imperative to include stronger provisions that the attorneys' fees to the actual coupons redeemed.

While time is short in this session, there is no reason why the Senate cannot consider this legislation in a bi-partisan spirit. If we indeed reach agreement, it is critical that the agreement be honored as the bill moves forward_both in and beyond the Senate. We are prepared to work with you toward that end and we look forward to hearing from you soon as

possible as to how we can best move this legislation forward.

Sincerely,

Mary L. Landrieu.

Charles Schumer.

Christopher J. Dodd.

Jeff Bingaman.

Mr. DODD. As a result of that letter, we went through several days of negotiations on this bill. The four areas that we sought changes in the bill are the following: Removal of formula including the definition of mass torts; the so-called merry-go-round problem in the bill; coupon settlements; and fair compensation for named plaintiffs. Those are the four areas we identified in the November 14 letter. As a result of our negotiations, we came back with 12 improvements in this bill, agreed to by myself, Senators Frist, Grassley, Hatch, Kohl, Landrieu, and Schumer.

I ask unanimous consent that the list of the 12 changes that was a result of that negotiation be printed in the Record.

There being no objection, the material was ordered to be printed in the Record, as follows:

Summary of Changes to S. 1751 as Agreed to by Senators Frist, Grassley, Hatch, Kohl, Carper, Dodd, Landrieu, and Schumer

### The Compromise Improves Coupon Settlement Procedures

S. 1751 would have continued to allow coupon settlements even though only a small percentage of coupons are actually redeemed by class members in many cases.

The compromise proposal requires that attorneys fees be based either on (a) the proportionate value of coupons actually redeemed by class members or (b) the hours actually billed in prosecuting the class action. The compromise proposal also adds a provision permitting federal courts to require that settlement agreements provide for charitable distribution of unclaimed coupon values.

### The Compromise Eliminates the So-called Bounty Prohibition in S. 1751

S. 1751 would have prevented civil rights and consumer plaintiffs from being compensated for the particular hardships they endure as a result of initiating and pursuing litigation.

The compromise deletes the so-called "bounty provision" in S. 1751, thereby allowing plaintiffs to receive special relief for enduring special hardships as class members.

### The Compromise Eliminates the Potential for Notification Burden and Confusion

S. 1751 would have created a complicated set of unnecessarily burdensome notice requirements for notice to potential class members. The compromise eliminates this unnecessary burden and preserves current federal law related to class notification.

### The Compromise Provides For Greater Judicial Discretion

S. 1751 included several factors to be considered by district courts in deciding whether to

exercise jurisdiction over class action in which between one-third and two-thirds of the proposed class members and all primary defendants are citizens of the same state.

The compromise provides for broader discretion by authorizing federal courts to consider any "distinct" nexus between (a) the forum where the action was brought and (b) the class members, the alleged harm, or the defendants. The proposal also limits a court's authority to base federal jurisdiction on the existence of similar class actions filed in other states by disallowing consideration of other cases that are more than three years old.

### The Compromise Expands the Local Class Action Exception

S. 1751 established an exception to prevent removal of a class action to federal court when 2/3 of the p1aintiffs are from the state where the action was brought and the "primary defendants" are also from that state (the Feinstein formula). The compromise retains the Feinstein formula and creates a second exception that allows cases to remain in state court if: (1) more than 2/3 of class members are citizens of the forum state; (2) there is at least one in-state defendant from whom significant relief is sought and who contributed significantly to the alleged harm; (3) the principal injuries happened within the state where the action was filed; and (4) no other class action asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons has been filed during the preceding three years.

### The Compromise Creates a Bright Line For Determining Class Composition

S. 1751 was silent on when class composition could be measured and arguably would have allowed class composition to be challenged at any time during the life of the case. The compromise clarifies that citizenship of proposed class members is to be determined on the date plaintiffs filed the original complaint, or if there is no federal jurisdiction over the first complaint, when plaintiffs serve an amended complaint or other paper indicating the existence of federal jurisdiction.

### The Compromise Eliminates the "Merry-Go-Round" Problem

S. 1751 would have required federal courts to dismiss class actions if the court determined that the case did not meet Rule 23 requirements. The compromise eliminates the dismissal requirement, giving federal courts discretion to handle Ru1e 23-ineligible cases appropriately. Potentially meritorious suits will thus not be automatically dismissed simply because they fail to comply with the class certification requirements of Rule 23.

### The Compromise Improves Treatment of Mass Actions

S. 1751 would have treated all mass actions involving over 100 claimants as if they were class actions. The compromise makes several changes to treat mass actions more like individual cases than like class actions when appropriate.

The compromise changes the jurisdictional amount requirement. Federal jurisdiction shall only exist over those persons whose claims satisfy the normal diversity jurisdictional amount requirement for individual actions under current law (presently $75,000).

The compromise expands the "single sudden accident" exception so that federal jurisdiction shall not exist over mass actions in which all claims arise from any "event or occurrence" that happened in the state where the action was filed and that allegedly resulted in injuries in that state or in a contiguous state. The proposal also added a provision clarifying that there is no federal jurisdiction under the mass action provision for claims that have been consolidated solely for pretrial purposes.

The Compromise Eliminates the Potential For Abusive Plaintiff Class Removals

S. 1751 would have changed current law by allowing any plaintiff class member to remove a case to federal court even if all other class members wanted the case to remain in state court. The compromise retains current law_allowing individual plaintiffs to opt out of class actions, but not allowing them to force entire classes into federal court.

The Compromise Eliminates the Potential for Abusive Appeals of Remand Orders

S. 1751 would have allowed defendants to seek unlimited appellate review of federal court orders remanding cases to state courts. If a defendant requested an appeal, the federal courts would have been required to hear the appeal and the appeals could have taken months or even years to complete.

The compromise makes two improvements: (1) grants the federal courts discretion to refuse to hear an appeal if the appeal is not in the interest of justice; (2) Establishes tight deadlines for completion of any appeals  **[\*S1079]**
so that no case can be delayed more than 77 days, unless all parties agree to a longer period.

The Compromise Preserves the Rulemaking Authority of Supreme Court and Judicial Conference

The compromise clarifies that nothing in the bill restricts the authority of the Judicial Conference and Supreme Court to implement new rules relating to class actions.

The Compromise Is Not Retroactive

Unlike the House bill, the compromise will not retroactively change the rules governing jurisdiction over class actions.

Mr. DODD. I will not go through and name each one of them. Some of them are rather arcane but nevertheless important provisions of this bill, the point being that we were prepared basically in the fall of 2003 to go forward.

We were notified at that point that the first item of business in January of 2004, more than a year ago, would be the class action reform bill. Well, here we are in February of 2005 finally getting to this matter. There was a prepared bipartisan bill over a year ago on class action and we are now dealing with exactly the same bill. As the Senator from Kentucky pointed out, he would have preferred the House bill, the bill that was not approved when the cloture motion was held, and reluctantly is supporting this bill.

There are those of us who could not have supported the House bill or the version that came up in the Senate earlier, but we have worked very hard to put this compromise together over a year ago. So we could have dealt with this a long time ago, but nonetheless we are here today and that is the good news.

I am heartened that the other body has agreed to accept this version if it goes unamended over the next day or so during the debate and consideration of this legislation. I am hopeful that will be the case.

Very briefly, I will go through what we have achieved. As I mentioned, following the vote Senator Frist asked myself and others, including my good friend from Delaware who is on the floor today, to enter into discussions with him and other Members to explore whether there might be some ways of building greater support for this bill. Senators Schumer and Landrieu joined in writing a letter to the majority leader, which I have put into the Record already, in

which we laid out the four areas of our concerns. We subsequently entered into those negotiations among our four offices. Senators Grassley, Kohl, Hatch, and Carper played very important roles in that consideration. Those negotiations were very productive. We reached significant agreement not on the four original areas of concern but on eight others as well. That point deserves special emphasis. We went into the negotiations seeking improvement on four issues. We emerged with significant changes on 12 issues.

The result is a bill that is now before this body. In my view, it is very fair and balanced, rather modest legislation that addresses a number of well documented shortcomings in our Nation's class action system. It shows what we can accomplish in the Senate when we work together in a bipartisan fashion. As with all good compromises, this bill is entirely satisfactory to no one and in some respects unsatisfactory to everyone.

There are those who will say this bill does not go nearly far enough in rectifying the shortcomings of the class action system in our country. On the other hand, there are those who believe that the sky is falling, that the bill severely impairs the ability of people to gain access to our courts. In my judgment, claims of both sides are vastly overstated. One of the reasons why I believe this is so is that the people on both sides of the legislation, proponents and opponents alike, agree our compromise has made this bill better. It targets more precisely those problems in need of reform and addresses them in an appropriate and effective manner.

We will no doubt discuss those problems in more detailin the coming hours, but allow me to briefly mention two of them. Perhaps the central problem addressed by the compromise is the forum shopping issue. Article III of the Federal Constitution sets forth the circumstances under which cases may be heard in Federal court. Article 2 of Article III extends Federal jurisdiction to suits "between citizens of different States." These are known as diversity cases. The Framers had two separate but related reasons for allowing Federal courts to hear cases between citizens of different States.

Very simply, one was to prevent the possibility that the courts of one State would discriminate against the citizens of another State. The second reason was to prevent the possibility that the courts of one State would discriminate against interstate business and thereby impede interstate commerce. Over the years, however, class action rules have been interpreted in such a way that plaintiffs' lawyers have been able to keep class actions out of Federal court, even those that are precisely the kind of cases for which diversity jurisdiction was created, because of their interstate character. They do this by adding named plaintiffs or defendants solely based on their State of citizenship in order to defeat the diversity requirement.

Alternatively, they allege an amount in controversy that does not trigger the $75,000 threshold for removing cases to Federal court. The result is frequently an absurd one. A slip-and-fall case in which a plaintiff alleges, say, $76,000 in damages can end up in Federal court. At the same time, a case involving millions of plaintiffs from multiple States and billions of dollars in alleged damages is heard in State court, just because no plaintiff claims more than $75,000 in damages or because at least one defendant is from the same State of at least one plaintiff.

Section four of the bill modifies these diversity rules to allow Federal courts to hear diversity cases that have a strong interstate character. In particular, it allows Federal jurisdiction if the amount in controversy alleged by all plaintiffs exceeds $5 million and if any member of the plaintiff class is a citizen of a different State than any defendant. At the same time, the bill creates careful exceptions that allow cases to remain in State courts where those cases are primarily intrastate actions that lack national implications.

The legislation attempts to bring diversity rules more in line with the original purpose of

Federal diversity jurisdiction. Cases that are interstate in nature because they involve citizens of multiple States and interstate commerce may be heard in Federal courts. Cases that are not interstate in nature remain in State courts.

A second problem the compromise addresses is the so-called coupon settlements. As our colleagues may know, a growing number of class action cases involves these type of settlements. In a typical coupon settlement, class members receive only a promotional coupon to reduce the cost of a defendant's products while the lawyers for the class action receive a rather large fee that is disproportionate to any client benefit.

For instance, in one case a soft drink company was sued for improperly adding sweeteners in apple juice. The company agreed to settle the case. The settlement required it to distribute to customers a 50-percent coupon off the purchase of apple juice. Meanwhile, class counsel received $1.5 million in cash.

I have no problem with attorneys earning a fee for their services. In fact, the compromise bill places no caps at all on attorney fees, although there were those who wanted to do that.

But what is particularly disturbing about these coupon settlements is class members typically redeem only a small portion of the coupons awarded. In fact, over the years only 10 or 20 percent of coupons were actually redeemed. Yet the attorneys are paid regardless of how many coupons are cashed in.

In effect, there is a negative incentive for counsel for both plaintiffs and defendants to enter into such settlements. Counsel for the plaintiff is paid their fee regardless of the percentage of coupons redeemed. At the same time, counsel for the defendants know they are likely to pay in redeemed coupons only a fraction of what they would pay if they paid cash to settle a case. Meanwhile, the actual class members_the ones who have actually been aggrieved_receive a benefit of little or no value at all.

Our compromise takes several steps to remove this negative incentive to enter into coupon settlements. Most importantly, it states that an attorney's fee incurred to obtain a coupon
  **[\*S1080]**
settlement can only be paid in proportion to the percentage of coupons actually redeemed. For example, if an attorney's fee for obtaining a coupon settlement is $5 million but only one-fifth of the coupons are actually redeemed, the attorney can only recover one-fifth of his or her fee_roughly $1 million.

In addition, the bill requires that a judge may not approve a coupon settlement until he or she conducts a hearing to determine whether settlement terms are fair, reasonable, and adequate for class members.

There are other provisions of the bill that are also important.

In the interest of time_I see my colleague from Mississippi also wants to speak before our colleague from Illinois offers the first amendment_I will defer discussing them in detail at this hour. However, to reinforce my central argument that this is a reasonable, modest piece of legislation, it is worth mentioning what the bill does not do.

First, it does not apply retroactively, despite those who wanted it to. A case filed before the date of enactment will be unaffected by any provision of this legislation.

Second, this legislation does not distinguish in any way or alter a pending case.

Third, it does not in any way alter substantive law or otherwise affect any individual's right to seek equitable and monetary relief.

Fourth, in does not in any way limit damages, including punitive damages.

Fifth, it does not cap attorney fees.

These are all matters that some people wanted to include in the bill.

And, it also does not impose more rigorous pleading requirements of evidentiary burdens of proof.

As some of our colleagues have said, this legislation is actually more court reform than tort reform. Candidly, I think they are more right than wrong about that. This is more court reform than tort reform. It stands in very sharp contrast to some of the other legislation considered by the Senate in the last Congress. That includes the Energy bill, which extinguished pending and future suits against makers of MTBE, a highly toxic substance that pollutes ground water.

It also includes legislation that shielded gunmakers and gun dealers from many types of lawsuits.

Incredibly, we were about to adopt legislation that would completely exclude an entire industry even when there was complete negligence on their behalf of being sued. I suggested when we were about to adopt those bills that Members think about talking about tort reform. Those matters cause this Senator deep concern, despite the fact I represent the largest gun producers in the United States. I cannot imagine my insurance companies getting a deal as the gun manufacturers were about to get. Nonetheless, those bills died, as they should have, in my opinion.

The legislation before the Senate today does not close the courthouse door to a single citizen in this country. Maybe that citizen will end up in Federal court rather than State court, but no citizen will lose the sacred right in America to seek redress or grievance in a court of law.

When this compromise was written 15 months ago, it was said that it was critical that this bill be honored as the bill moves forward_both within and beyond the Senate. I continue to believe that to be the case.

In the words of the Senator from Kentucky earlier today, as well as statements made by Speaker Hastert, this Member is assured that, in fact, the agreements will be kept. In fact, I had a conversation with the staff of Mr. Sensenbrenner, chairman of the House Judiciary Committee, who reinforced the notion that if we adopt this bill as it presently reads, then there will no changes in the House and they will accept the Senate language. That is good news for those of us who have worked on this compromise.

Certainly, this is not a perfect bill. No bill is. We all know that, but I think it strikes a careful balance between remedying the shortcomings and retaining the strengths of current class action practice in this country.

Obviously, the bill is not yet through the Senate. But the consent agreement entered into by the two leaders is an auspicious beginning to preserving the balance.

Let me, once again, reiterate my thanks to Senator Reid of Nevada, the distinguished Democratic leader, and for Senator Frist entering into that agreement which allows us to have this debate, and for all relevant and germane amendments to be considered to this legislation. Certainly, that is the way it ought to be done.

Moreover, I note that the leadership of the other body has indicated its willingness to respect

the balance that this bill strikes, as well. That, too, is a positive development.

I stand in strong support of this legislation. I think it is a good compromise. It is not a perfect one. I know my colleagues may offer some amendments that I might have been attracted to under different circumstances which I may support, but when you try to reach agreement here, it is not easy. And when you do, I think it is worthy of support, particularly when those agreements cover as much territory as we did during the compromise efforts 15 months ago.

As I mentioned at the outset, there were four proposals with which we ended the negotiations. Those four proposals were adopted, and eight others were added during that negotiation.

I commend again the leader. I commend Senators Specter and Leahy for their efforts, and I look forward to this bill passing the Senate and being adopted by the House and going to the President for his signature.

I yield the floor.

The PRESIDING OFFICER. The Senator from Mississippi.

Mr. LOTT . Mr. President, I rise today in strong support of the Class Action Fairness Act of 2005.

Before he leaves the floor, I thank the Senator from Connecticut, Mr. Dodd, for his comments and for his leadership in this area. He has been steadfast. He has been involved in the process of moving this bill forward. A process which involves some give and take and some compromise.

Surprise, surprise. That is the legislative process. This is not a perfect bill, as he noted. It is not one that I particularly like. I would like to make it a lot stronger, but it is a major step forward.

I thank Senator Dodd, and other Senators. Senator Carper has been involved in that process, and colleagues on this side of the aisle.

I am pleased that the first substantive bill of the year is one that truly has a chance to make a huge difference in this country, and it is a bipartisan effort. It is one that I predict, when we go through the amendment process and get to the end, will have a large vote in support. I will not be surprised if it gets 70 votes. I hope for that. That would be a positive step.

If we can hold the line on amendments that may be offered_some that I would be attracted to, some that Senators such as Senator Dodd would be attracted to_but we worked out an agreement. We should brush back those amendments, discourage a whole raft of amendments being contemplated, and complete our work. The House has indicated they will accept this product_the compromise we came up with. When was the last time you heard of that even being possible?

But they have reaffirmed just in the last few days that, yes, if we can complete it the way it is presently structured, they will take it up, pass our bill, and send it to the President. That would be a good way to start this year.

I thank colleagues on both sides of the aisle for the work that has been done.

Senator Hatch is here managing the legislation. He has worked on this long and hard, including last year when we had an opportunity that slipped away from us for a variety of reasons. It was tough last year to get much of anything done with all of us preoccupied with

the Presidential campaign and our Senate campaigns and the House races. There is no use going back and rehashing why we didn't get it completed. We didn't get the job done. But we can do it now.

I thank Senator Hatch for the work he has done on this bill over the years, and Senator Specter for getting it out of the Judiciary Committee in good order. I thank Senator Grassley for his usual dogged determination to not give up on an issue, and he continues to press not only this but the bankruptcy reform issues.

I am thankful for the way we are starting off this year. I thank the leadership for working out an agreement to  **[\*S1081]**
bring this bill to the floor. We could very well have had a filibuster. But Senator Frist, working with Senator Reid, has indicated we are not going to get into that morass. We are going to step up to this issue, we are going to address it and debate it, and we are going to get results. I think that is good.

I believe the American people want us to complete action on this legislation and pass the bipartisan compromise this week, if at all possible.

There is no reason for this to be dragged out over a long period of time. We know there are a few amendments that are going to be offered. We will debate them. Let us vote and get to the conclusion of this process in the Senate, and send it to the House so they can take it up.

Why do we need this bill?

Some people would say we have the greatest judicial and jurisprudence system in the world. Things are working fine. Let us just leave it alone.

I don't believe things are exactly working just fine.Every system over a period of time needs some adjustment, and if abuses begin to occur, we must step up and stop them.

Over the past decade, we have seen a dramatic rise in the number of interstate class actions being filed in State courts, particularly in what are called magnet jurisdictions. I regret to say, and acknowledge, my State is one of the worst abusers. To the credit of our State legislature and our Governor, Haley Barbour, last year in Mississippi we passed tort reform legislation. We have gone from being the center of jackpot justice to being a State that has been praised by legal journals and the Wall Street Journal as having stepped up to the issue and dealt with it in a responsible way. They now describe my State in this way: Mississippi, open for business.

Prior to tort reform though, businesses, industry, manufacturers, drugstores, etc. would not come to Mississippi to do business. They were not coming to my State, one of the poorest States in the Nation, because of the abuses that have been occurring in the legal system.

But now, we have done our part in Mississippi. We still need to do more, but this is a Federal interstate problem and we in Congress are going to have to help address it.

Courts where the class action mechanism is routinely and egregiously abused have been proliferating. In many instances we know the plaintiffs get little or nothing, and the lawyers have gotten massive fees. I can cite example after example in my State where awards have been de minimus or nothing. Jefferson County, MS, in my State is one of the worst, most abused magnet jurisdictions in the country. Far too often innocent local business men and women are joined as defendants in controversies to which they were merely innocent bystanders, all because plaintiffs' lawyers wanted to file the case in Jefferson County for the purpose of getting a bigger fee. Often, the cases have no other relationship to that county or to my State other than this is a good place to go. This is unconscionable. We have an

obligation to our constituents to put a stop to it.

Before going any further, it is important we take note of the title of this legislation: Class Action Fairness Act. This is not just some random title that Senator Grassley or others came up with. The whole point of the bill is to make the class action mechanism fair for all involved.

Some of my colleagues will argue today, I am sure, that the system is already fair. I ask, Is it fair for the plaintiffs in a class action suit to receive nothing, literally nothing, when the lawyers representing them receive $19 million? The citation is Shields et al. v. Bridgestone/Firestone, Inc. et al.

That is an actual case. Is it fair for the claims of residents of Mississippi, Washington, or Maine to be decided according to Illinois State law? Of course not. These are just two of the many reasons we need class action fairness, and we need it now.

Our Nation's judicial system was designed to be the fairest in the world for all litigation, and we have gotten away from that. These abuses have called into question the very fairness of our whole system. It is imperative we act to close these loopholes that have allowed this process to fail in the way that it has.

Before I talk about the specifics of what this bill does, let me take a minute to emphasize a few things the bill does not do. We will hear these allegations over the next few days, I am sure. This bill is not a tort reform bill, it is a court reform bill. This bill does not alter in any way substantive law. There may be some here who would want to debate that. However, I made that point at a meeting earlier today and I have gone back and checked it with experts. That is an accurate statement.

Contrary to the scare tactics of the plaintiffs' lawyers, this bill does not affect an individual's right to seek redress or damages through the court, and it does not in any way limit damages, either punitive or compensatory.

What does it do? First, it expands the jurisdiction of Federal courts over large interstate class actions. Clearly, that is a Federal jurisdictional issue and one we have a right and a real need to get into.

Let's be clear. We are only talking about those cases in which the aggregate amount in controversy exceeds $5 million, in which there are at least 100 plaintiffs, and in which any plaintiff is a citizen of a different State from any defendant. This makes basic sense. Where you have more than 100 class members and where parties to the litigation are from different States, the Federal courts should have jurisdiction. This provides fundamental fairness for all involved. The Framers of our Constitution were concerned about ensuring fairness in cases like this, worried that State courts could be biased in favor of a home State party versus another party who was a resident of a different State. That is the very reason for a Federal diversity jurisdiction.

It only makes sense that we close the loopholes that a growing number are abusing and exploiting with the result of creating a system that is having a huge impact in terms of dollar amounts and business and economic development.

It is also important to note that this bill does not apply to every class action, only those meeting certain criteria. It is not going to result in our Federal courts being overwhelmed by a large number of class actions. We will hear that accusation this week. And it will not move all class actions to Federal court. In fact, it leaves in State courts a significant number of class actions. It reserves for State courts those cases in which all plaintiffs and defendants are residents of the same State. It reserves for State court those class actions with less than

100 plaintiffs. Likewise, class actions involving an amount in controversy of less than $5 million would remain in the State court as would class actions in which a State government entity is the primary defendant.

As a part of the compromise worked out with Senator Feinstein last year, class actions that are brought against a company in its home State and in which two-thirds or more of the class members are also residents of that State would remain in State court.

Finally, State courts would retain jurisdiction over class actions involving local controversies where at least two-thirds of the class members and one real defendant are residents of the State where the action is brought. This bill reserves these cases for State court because it is the right thing to do.

There are other provisions of importance in this bill, including a consumer class action bill of rights. As many know, part of this section represents a compromise worked out by Senators Schumer, Dodd, and Landrieu last year. Notably, it places limitations on contingency awards for attorneys in coupon settlement cases. By basing these contingency fees on the value of the coupons that are actually redeemed, or the amount of time expended by the attorney, it provides for a far greater protection for plaintiff class members. This provision takes a big step toward addressing the grossly inequitable fee awards to attorneys when class members end up with a coupon.

Additionally, by requiring the judge to make a written finding that the benefits to class members substantially outweigh the monetary loss from a settlement, the bill provides an added layer of protection for class members who will suffer a net monetary loss as a result of payment of attorney's fees.  **[*S1082]**


Do not get me wrong. I went to law school. I practiced law for a while. Yes, I was on the defense side of the ledger most of the time. But I have to admit reluctantly that my brother-in-law_I am really not related to him by blood; he married my wife's sister_is one of the, shall we say more famous lawyers in this country, Richard Scruggs. He has brought a lot of lawsuits I don't like. On occasion he actually makes a point with some of those lawsuits. I don't want to put him out of business, but I want some reasonable restraint on how these class action suits have been abused. He has not been one of the ones who actually wound up having abused lawsuits in the courts, as he winds up getting settlements most of the time.

I understand both sides of this equation. I certainly do not want to take away people's right to sue_individuals or even class actions, when they are really a class. That is not what has been happening. There has been an effort to dredge up clients, and it has led to the next area I will talk about, mass actions.

There is language in this bill dealing with mass actions. I understand there may be an effort later today or this week to change this section with an amendment that I understand may be offered. But it is vital that we retain the mass action section of the bill without an amendment so that we don't open the door for lawyers to make an end run around what we are trying to do with class actions in this bill.

The mass action section was specifically included to prevent plaintiffs' lawyers from making this end run. It will ensure that class action-like cases are covered by the bill's jurisdictional provisions even if the cases are not pleaded as class actions.

The amendment that we are hearing may be offered later today is a little sleight of hand. This is a case where you argue that you're only changing one word but, in reality, you fundamentally alter what happens with regard to these mass actions. There are a few States, such as my State_which do not provide a class action device. In those States, plaintiffs'

lawyers often bring together hundreds, sometimes thousands of plaintiffs to try their claims jointly without having to meet the class action requirements, and often the claims of the multiple plaintiffs have little to do with each other. There was an instance in my State where you had more plaintiffs in one of these mass actions than you had people in the county, more than the residents in the county. Under the mass action provision, defendants will be able to remove these mass actions to Federal court under the same circumstances in which they will be able to remove class actions. However, a Federal court would only exercise jurisdiction over those claims meeting the $75,000 minimum threshold. To be clear, in order for a Federal court to take jurisdiction over a mass action, under this bill there must be more than 100 plaintiffs, minimal diversity must exist, and the total amount in controversy must exceed $5 million. In other words, the same safeguards that apply to removal of class actions would apply to mass actions.

Mass actions cannot be removed to Federal court if they fall into one of four categories: One, if all the claims arise out of an event or occurrence that happened in the State where the action was filed and that resulted in injuries only in that State or contiguous States. That makes sense. The second exception would be, if it is the defendants who seek to have the claims joined for trial; third, if the claims are asserted on behalf of the general public pursuant to a State statute; and, lastly, if the claims have been consolidated or coordinated for pretrial purposes only.

Some of my colleagues will oppose this mass actions provision and will want to gut it by making an effort to confuse mass actions with mass torts. I realize we are kind of getting into a legalese discussion, but words make a difference when you are considering a bill such as this. I am very concerned that the real motive is to render this provision meaningless, thereby creating a loophole for the trial lawyers to basically get a class action by another name.

Mass torts and mass actions are not the same. The phrase "mass torts" refers to a situation in which many persons are injured by the same underlying cause, such as a single explosion, a series of events, or exposure to a particular product. In contrast, the phrase "mass action" refers to a specific type of lawsuit in which a large number of plaintiffs seek to have all their claims adjudicated in one combined trial. Mass actions are basically disguised class actions.

If we enact the amendment that we are hearing may be offered to alter the mass action section, if we do not keep the mass action section intact, we will be knowingly creating a loophole that would undermine our whole effort in getting some responsible reform.

I also understand there is another amendment that will be offered, and it has been referred to as the choice of law amendment. That has a good sound, choice of law. To me, that is another word for shopping around to find the best forum, once again, with no relation to where the incident occurred or where the plaintiffs live, or the defendants, or anything.

I have spoken to several of my colleagues about this amendment in the last week or two, and some of them have even said to me: Don't you think we should include this amendment? My answer is no. This is a bad amendment. In my opinion, it is a poison pill. If we accept this choice of law amendment, basically the plaintiffs' lawyers can go to Federal court and say: OK, it is in Federal court, but we want to look at this State law, that State law, or another State law, depending on which one suits our particular cause the best. If this amendment is offered and passes, we would certainly have to go to conference then with the House. It would delay our efforts to get a final bill. And if we could not come up with a solution in conference that did not include this amendment, we would not get a bill.

So the phrase "choice of law" does sound nice, but the amendment actually would alter very fundamental legal principles. It would require Federal courts to apply one State's laws when adjudicating a nationwide class action. Here is what that means. If a nationwide class action

is brought against a Mississippi company, the judge would be forced, under this amendment, to choose one State's law to apply to the whole country. The Mississippi company, which typically conducts business in Mississippi in compliance with Mississippi law and Federal law, would not necessarily have the protection of Mississippi law. Even though the Mississippi law, with which the company complied, differed from, for example, Nebraska law, the judge could potentially choose to apply Nebraska law.

So believe me, the proponents of this amendment know exactly what they are doing. If it were adopted, it would perpetuate the forum shopping that has been going on in recent years that has led to one of many areas of abuse.

Let me conclude because I know others want to speak. We want to get the process started. It is a compromise bill. It is not perfect. There will be different points of view. I have worked in this area for many years. I have heard all the arguments. I have heard those arguments on the floor of the Senate, in committee rooms, and at the family dinner table.

I want people to be able to get justice and redress. But I do not see how anybody can argue that there has not been abuse in the area of class actions and in mass actions. It has certainly been abusive in my own State. What disgusts me the most is the lawyers it has made superwealthy while the claimants got almost nothing. We can do better. This legislation will lead to a better solution.

I yield the floor, Mr. President.

The PRESIDING OFFICER (Mr. Martinez). The Senator from Illinois.

Mr. DURBIN . Mr. President, I say to those of you who are following the Senate in action, welcome to our first substantive bill. That is right, this is the first substantive bill that we are considering. Some might conclude, if it is the first, it must be a very high priority.

Does it have to do with health care in America, the increasing costs of health care for families and businesses and individuals? No.

Does it have to do with education in America, how to improve our schools so we can compete in the 21st century? No. **[*S1083]**

It must be the Federal Transportation bill then. We know we need that. We are 2 years late in passing that bill, and we need the money spent in America to build our infrastructure. Is this the Federal Transportation bill? No.

No, it does not have anything to do with health care or education or transportation, despite the fact that every Senator in this Chamber, when they go back to their States and meet with their people, hears about those issues.

Senator, what are you going to do about the cost of health insurance? It is killing my business. Senator, what are you going to do about the President's No Child Left Behind, an unfunded Federal mandate? We are having trouble with our school districts back in Illinois and Utah and other places. What are you going to do about that? Senator, when are you going to pass the Federal Transportation bill? We need to improve our highways in Illinois.

Those are the comments we hear. But, no, when it comes to the very first bill, the highest priority of the Republican leadership in this Congress, we are going to deal with what they have characterized as a litigation crisis.

Richard Milhous Nixon, former President of the United States, wrote a famous book during his

public career entitled: "My Six Crises." Well, if you pay close attention to the Bush administration, you will find that they are way beyond six crises. They have told us we had a national security crisis that required the invasion of Iraq; an economic crisis which required tax cuts for the wealthiest people in America; a vacancy crisis in the Federal courts, despite the fact that this Senate had approved 204 of the President's 214 judges he sent to us. We were told we had a moral crisis requiring constitutional amendments. And just last week, the President has told us we have a Social Security crisis.

It is hard to keep up with this White House and all their crises. And here today, we are told we have a litigation crisis and a sense of urgency to deal with this bill. Yet the facts do not back it up.

According to the Administrative Office of the U.S. Courts, which is a part of the Federal judiciary, tort actions in Federal district courts from 2002 to 2003 dropped by 28 percent.

Over the last 5 years, Federal civil filings have not only decreased by 8 percent, the percentage of civil filings that are personal injury cases has declined to a mere 18.2 percent of the total docket.

The same thing is happening at the State level. So the statistics tell us we are not seeing an onslaught of more and more cases. Just the opposite is true; that is, in cases filed by individuals.

The study also took a look to find out what American businesses were doing_American businesses suing other businesses. It turns out American businesses were 3 to 5 times more likely to file lawsuits than individuals.

For example, in Mississippi, the State of the Senator previously addressing the Chamber and one of the States often criticized by tort reform advocates, Public Citizen found that businesses were more than five times more likely to file suits than individuals. In that State, there were 45,891 business lawsuits filed compared to 7,959 lawsuits by individuals. You sure wouldn't know it listening to the comments on the floor about a litigation crisis.

Along comes the self-styled group called the American Tort Reform Association. I think if you lift the lid on the American Tort Reform Association, you will find a lot of the big business interests in America. They have come forward and decided that they are going to call certain areas of America judicial hellholes. For example, their 2004 report labeled the entire State of West Virginia as the No. 4 judicial hellhole in America. Why? The report states that in one county, Roane County, WV, which in its first 150 years never had a class action lawsuit, actually had two class action lawsuits filed in a year and a half_two in a year and a half, the No. 4 judicial hellhole in America.

Here is another exaggeration by the same group: the No. 6 judicial hellhole in America, Orleans Parish, LA. According to the report from the American Tort Reform Association, a strong proponent of this bill, this county earned the title because "plaintiffs attorneys are turning mold into gold" by representing a class of government attorneys working in buildings containing toxic mold which caused health problems. How many class action lawsuits were filed in Orleans Parish to make them a judicial hellhole? One.

The Senator from Mississippi spoke a few minutes earlier about abuses in his own State. Take a look at what happened in the State of Mississippi. In 2002 and 2003, this same American Tort Reform Association listed Mississippi, its 22nd judicial district, as a judicial hellhole. In 2004, it didn't make the list. Why? Because the State actually received five pages of praise from the same group for changing its State's laws to deal with class action lawsuits. This Mississippi judicial hellhole became an object of praise and admiration when they fixed their own problem at the State level.

I can't avoid the topic of judicial hellholes without speaking for a moment about Madison County, IL. The President was so upset about Madison County, IL, that he flew to Collinsville a couple weeks ago to criticize their court system. Let's take a look at Madison County in terms of real numbers.

In 2004, Madison County ranked No. 1 by the American Tort Reform Association as the worst judicial hellhole in America. So what do we find about the class action lawsuits that were filed in Madison County? Of the class action lawsuits filed in 2002, four were certified to go forward. All the rest of them languished and did not. Four cases in 2002 went forward. But surely if they are a judicial hellhole, it got worse. But it didn't. In 2003, only one class action lawsuit was certified. One. What happened in 2004? Not a single class action lawsuit has been certified. So when you hear these exaggerations on the floor about judicial hellholes and all of these class action lawsuits, it turns out that the No. 1 example of a judicial hellhole_Madison County, IL_had no class action lawsuits that were certified in 2004.

We know what this is all about. We should get down to the basics. Why is the U.S. Chamber of Commerce spending over $1 billion to lobby us to pass this bill? This is the largest amount of money ever recorded for lobbying activities and the first time that lobbying spending has passed the $1 billion mark. Why is it so important? According to Senator Lott and others, it is just a simple thing. We are going to take class action lawsuits out of State courts and put them in Federal courts. What is the matter with that? Federal courts are supposed to represent the Nation. These class action lawsuits have plaintiffs from all over the country. It seems reasonable.

If that is all there is to it, why would these business interests spend such an inordinately large sum of money to lobby us to pass it? Because they know, as we know who have practiced law, that Federal courts are unfriendly to class actions. Federal courts are less likely, by their own rulings, to certify a class. In other words, a class of plaintiffs files a lawsuit in Federal court, it is less likely it will go forward. That is what this is all about. It isn't about class action fairness; this is the class action moratorium act.

Also, Federal law favors less liability in case after case. Federal law discourages Federal judges from providing remedies under State laws. So the business interests that want to move these cases from State court to Federal court understand what it is all about. Fewer cases will survive. Those that do will pay less. That is what their goal is. That is why they have spent this enormous amount of money lobbying Congress.

Listen to what the business interests say about the Class Action Fairness Act before us:

It would simply allow Federal courts to more easily hear large national class action lawsuits affecting consumers all over the country.

How harmless. Yet they spent $1 billion lobbying to pass this bill as the first bill of this Congress_before health care, before education, before the Federal transportation bill. They know, as we do, that class action lawsuits in Federal court are much less likely to survive.

Let me give an example, because the problem with talking about class actions is most people listening say: What in the world is he talking about? **[*S1084]**
Is this a class in school or class of people? Who are you referring to? Let me give a concrete example.

Charles and Jenny Will live in Granite City, IL, which happens to be in Madison County. They are an older couple. They live in a small blue and white wood-frame house. Their main source of income is Social Security. They are nice people. I am proud to have them as my constituents. On their walls hang pictures of their kids and the Last Supper.

Mr. Will has 3 years of Active-Duty service in the U.S. Navy and a sign in his front yard that he proudly put there saying "support our troops." He is 71 years old. He is on oxygen, but he moves around pretty well. He has had some major heart problems, including triple bypass in 1989, and problems with his leg where the doctors had to remove a vein for surgery.

Mr. Will is taking nitro tablets and about 15 different medications daily, two of which are insulin. He was, unfortunately, diagnosed with diabetes 20 years ago, and he has very few complications_thank goodness_but it seems to have affected his vision, which is not very good.

Mr. Will was prescribed the drug Rezulin by his doctor. He remembers it because the drug was real expensive. He told the doctor he couldn't afford it, so his doctor gave Mr. Will a bunch of samples to take home. Rezulin, a drug prescribed for the treatment of type 2 diabetes, became available in the U.S. in 1997. Warner-Lambert marketed this drug as "safe as a placebo"_in other words, as safe as a sugar pill.

Three years after Rezulin came to market, the FDA asked Warner-Lambert to voluntarily remove the drug from the market as they started noting too high an incidence of liver failure and deadly side effects. Mr. Will was subsequently taken off Rezulin and prescribed a safer treatment.

A class action lawsuit was filed in Illinois to protect people living there like Mr. Will. The case alleged that Warner-Lambert violated the New Jersey consumer fraud statute by pricing the drug much more in excess of the price that the drug would have been but for Warner-Lambert's concealment of the drug's deadly side effects.

This theory is supported by the major insurance companies.

Last year, the case was certified by the State court as a class action. But it was turned down in Federal Court. That is the problem we are running into.

Mr. President, I have an amendment I am going to offer. I think I will wait until after lunch to do that. The Senator from Texas is here and wishes to speak. We have about 20 minutes remaining.

I yield the floor.

The PRESIDING OFFICER. The Senator from Texas is recognized.

Mr. CORNYN. I will speak generally about the issue of class action reform contained in S. 5, because I believe the American civil justice system is, in many ways, at a crossroads. We have an opportunity to choose between taking a path toward greater freedom and responsibility, or heading down a path that encourages lawsuit abuse and cripples our ability to compete in a global economy. Now is the time, I believe_actually it is past time_to enact the reforms necessary to ensure America's competitiveness in the 21st century.

I am struck, as I listen to the critics of this bill, many of whom are the same people who complain about the fact that American jobs are being sent offshore to places like India, China, and elsewhere, when one of the very causes of the damage to America's global competitiveness is our civil justice system.

I think people of good faith and good will agree that the goal of our civil justice system ought to be getting people who are truly injured as a result of the fault of another fair compensation. But I think also, being objective about this issue and some of the examples of abuses that we have seen, we know too often that this goal is not being met in the current

environment. We see lawsuit abuse particularly in the class action area and also in the asbestos area. This abuse is having a damaging impact on our economy. In the asbestos area, we see people who are sick are getting pennies on the dollar in compensation because people who are not sick are getting ahead of them in line, resulting in bankruptcies which have destroyed jobs and pensions for American workers.

So it is unthinkable to me that anyone could stand here on the Senate floor and claim there is nothing wrong. That seems to be a common theme these days, whether we are talking about Social Security or lawsuit reform, or a variety of subjects. But the truth is that the facts clearly indicate otherwise.

As the continued spread of democracy and capitalism take root in countries throughout the world, and as modern travel and information technology bring our world closer together, there is no question that the health of America's economy is influenced by the free flow of goods and services in international markets.

It is a simple fact of life: We live in a global marketplace, where we do not just compete with businesses across the street, but with ones on the other side of the world. Our economic strength and ability to compete now depends on our willingness to confront the burdens that prevent growth, discourage innovation, and ultimately cost Americans their jobs.

It is unthinkable to me that anyone can claim a system that compensates people who truly are injured as a result of the fault of another so poorly, but makes a handful of lawyers rich, doesn't need to be fixed. But the system_particularly in the class action area_is fraught with abuse. I will not detail all of those abuses, since they have been addressed earlier. But one of the most classic cases is the coupon settlement. It reminds me of an old country and western song, where the lawyers get the goldmine and the consumers get the shaft.

We have all seen the numbers relating to the cost of our broken civil justice system. According to one estimate, the cost of the tort system in 2003 totaled more than $245 billion, or 2.2 percent of the gross domestic product. That amounts to a tort tax on every American citizen of approximately $845 a year.

The percentage of our economy that is devoted to tort law and resolution of claims through our tort system is far greater than any other industrialized country. In Britain, for example, the entire tort system_attorneys' fees, settlement costs, jury awards, and administrative costs_costs less as a percentage of GDP than America's plaintiffs' lawyers gross for themselves alone.

This level of stress on the economy and on our civil justice system itself is unacceptable. But it hasn't always been that way. Class actions, prior to significant rule changes in the 1960s and 1970s were not, as they are today, largely a sport for a handful of aggressive personal injury lawyers to pursue abusive litigation and junk lawsuits. Take, for example, the change in 1966, from a system where class members were required to "opt in" to a system, where now they are required to "opt out." By 1971, four times as many class actions were being filed than had been in 1966. In other words, from 1966 to 1971, we saw four times the number of class actions brought.

Since that time, recoveries have skyrocketed. This chart behind me reflects the growth I mentioned a moment ago. You can see that from 1973 to 1975 there were relatively few class action lawsuits and relatively modest recoveries. But they have obviously ballooned and appear to be getting bigger year by year.

The problems we increasingly experience with abusive class action lawsuits call for a significant overhaul of our civil justice system and particularly our rules providing for the resolution of mass tort litigation.

I must tell you that the bill we have before us today is clearly a modest reform. It amounts to an improvement over the status quo, but it doesn't begin to approach the comprehensive solution America needs.

As it stands, S. 5 provides two primary improvements: It allows removal of a greater number of class action lawsuits from State court to Federal court, and it requires judges to carefully review all coupon settlements and limit attorneys' fees paid in those settlements to the value actually received by class members.

These two reforms_as modest as they are_are important and will certainly offer fair but desperately needed **[*S1085]**
relief for State courts which are experiencing firsthand the explosion of class action litigation. It will also provide for greater fairness for defendants who are currently being dragged into "magnet jurisdictions," and it will provide greater fairness for class members who are oftentimes receiving pennies on the dollar, while class counsel get rich.

Yet, as much of an improvement as this bill is, it falls short of the ideal. To be effective and fair, I believe class actions and other mass tort litigation require three things: A level playing field; transparency, so consumers can have complete, fair, and accurate information; and a clear relationship between class members and their lawyers.

First, a level playing field depends on a fair class certification process. As the current occupant of the chair knows, almost all class actions settle if certified. The main event in class action lawsuits is the certification process because ultimately, once certified, most defendants feel as if they have no choice but to settle because even a small risk of an adverse judgment, given the large number of class members, can lead to a ruinous result. They are forced to try to settle the case on the best terms they can.

Where there is no right to an immediate interlocutory appeal of class certification and stay on discovery, class certification can cause settlements that far exceed the case's value on the merits because of the extortionate effect of the certification process and the threat it brings to the very livelihood, not to mention the financial life, of the defendant involved.

States, such as my home State of Texas, have also embraced limits on appeal bonds. Too often in large class action lawsuits, the judgment can be so large that the defendant cannot, in effect, buy an appeal bond with which to appeal the case and correct an erroneous ruling below. So the defendant is forced to settle because they cannot afford to appeal_again, not based on the merits, but based on the way class action lawsuits are structured, without a right to interlocutory appeal.

The second step toward an effective system, I believe, is information flow. Class actions require that adequate information be available both for the sake of the process itself and for policymakers, like us, to analyze. It is hard for us to do our job when it comes to class action reform or civil justice reform when some of the information_much of the information_is simply hidden from public view. Class members should be fully advised of all aspects of their case, and we should require that certain relevant information about all class action settlements be collected and published centrally for examination and review by analysts and policymakers.

Just as in Government, when it comes to class actions, people deserve to know what is going on, particularly if it is their case.

The final step, and the most important one to me, is maintaining the proper relationship between the class members and their attorney. As the occupant of the chair, the Presiding Officer, knows, this is a particularly tough issue when it comes to class counsel who may

have one real client, the class representative, with whom they deal but, in reality, class counsel calls the shots and runs the case. Class members may not even know they are involved in a lawsuit until they receive a notice of settlement and perhaps, as we heard, a coupon worth pennies on the dollar. The opportunity for abuse of that important fiduciary relationship between the lawyer and the client is very important to address.

I believe one solution would be to allow members of the class to opt in instead of opting out because, indeed, in a country that says we do not promote litigation, although we certainly give fair access to courts, it just does not make much sense to me to say to the consumers: You can be a plaintiff in a lawsuit, you can actually be a party to a lawsuit and not even know about it until the lawsuit is over, which is what happens today.

Consumers should not have to learn that they are members of a class action lawsuit by receiving a check for $2.38 in the mail and then find out in the morning paper that the lawyers who purported to represent them just collected $5 million. The cases and examples go on and on.

It should also go without saying that the attorneys should be paid at a level commensurate with the work before them, not based on strictly a contingency fee which may, indeed, allow huge financial rewards for relatively modest work actuallybeing done.

I hope those listening, if there are any listening to my comments, understand my concerns that this modest legislation does not go far enough to remove the scandal of litigation abuse that too often plagues our civil justice system and the American economy. I hope they understand my reservations do not indicate I am not for this bill because, indeed, I am. I believe S. 5 is an important first step in reform and an important step in the right direction.

In conclusion, because I know there are others who want to speak, there will be attempts to offer amendments to this bill. I know Senator Durbin, but for the loss of his voice, would have been the first to offer his amendment. I am told Senator Kennedy will be here shortly to do the same, but as everyone knows who has followed this bill_certainly Senator Carper who has been an advocate for class action reform for some time, knows_the compromise reflected by S. 5 is a very fragile one, and it essentially depends on no amendments being made to the bill or agreed to the bill. If that happens, it is likely the bill will go promptly to the House where they will pass it, and it will go to the President's desk, and we will have an early victory for the American people in this important area. But there are a number of amendments that will be offered which, in essence, are poison pills, that if agreed to will completely destroy any opportunity we have for this modest reform.

I have my own amendments that I filed, if others are offered and agreed to, which I believe are important to move the bill in the direction where I think it ought to go. But the truth is, I am refraining from urging those amendments at this time because I think this fragile compromise, as modest as it is, does represent real reform in moving the bill in the right direction.

Here again, as the Washington Post editorial on August 27, 2001, points out:

No portion of the American civil justice system is more of a mess than the world of class action. None is in more desperate need of policymakers' attention.

That was in 2001, and certainly the situation has not changed today.

I am baffled by those who want to whistle past the graveyard and act as if there is nothing wrong and that everything is just hunky-dory when it comes to class action reform. I believe the American people expect that the civil justice system will operate in their best interest, not in the best interest of a handful of lawyers.

I am confident the damage that is being done to American competitiveness is killing jobs that would be created in the United States but for the fact that people do not want to subject themselves to an out-of-control class action system. So, instead, jobs are being created in other countries across the world where they do not have those same concerns.

This is clearly an area that cries out for reform. It is one that is long past due.

I congratulate Senator Carper and others on that side of the aisle who have worked so carefully to try to craft this fragile compromise. But I want my colleagues to understand_and I think they all do; I think we all do_that any amendments to this bill will doom it. So I urge all of my colleagues to vote against any and all amendments; indeed, even ones that I may like but which I know will have the ultimate effect of killing the bill. I think it is better to save those for another day and another time rather than have the prospect of this bill going down in flames.

Mr. President, I appreciate the time and yield the floor.

The PRESIDING OFFICER. The Senator from Delaware is recognized.

Mr. CARPER . Mr. President, I understand that under the previous order, the Senate will stand in recess at 12:30 p.m. for our weekly caucus luncheons. I ask unanimous consent, notwithstanding that unanimous consent agreement, to proceed for 5 minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. CARPER . Mr. President, before Senator Cornyn leaves the floor, I **[*S1086]** thank him for his kind words, and I am pleased that we are at the point where we are on this legislation this week. I look forward to both sides exercising constraint_we cannot let the perfect be the enemy of the good_and pass the good legislation that has been introduced and debated this week, with the understanding the House will accept it and the President will sign it into law.

We heard a fair amount already about the ills of class action lawsuits. Class action lawsuits, in and of themselves, are not a bad thing. Class action lawsuits give little people who are harmed, in some cases by companies, the opportunity_maybe not harmed in a way that the consumers, the little people, lose their eye, arm, leg, or life, but they suffer some kind of harm.

The idea behind class action lawsuits is to say when little people are harmed by big companies or others that those people can band together and present their grievances to an appropriate court, State or Federal, and for the people who are harmed to be made whole.

At the same time, it is important that when the plaintiffs are bringing a class action lawsuit against a defendant from another State, that the case be heard in a court where both sides can get a fair shake, the plaintiffs as well as the defendant.

If we go back over a couple hundred centuries in this country, we ended up with a law that the Congress passed that said if we have a defendant from one State and plaintiffs from another State, it is not fair to the defendant to have the case necessarily heard in the home of the plaintiffs. Someone may have dragged the defendant in across the State lines and put them in a courthouse or courtroom where there is a bias toward the local plaintiffs who brought the case against the defendant from another State, and in an effort to try to make sure that we are fair to both parties, those who are bringing the accusations and those who are defending against them, we have the Federal courts which were established in many cases to resolve those kinds of issues.

Unfortunately, we have seen an abuse of some class action lawsuits in recent years which led the Congress to begin debating this issue and considering legislation to address these abuses starting in, I want to say 1997, 7 years ago. The original problem that was discovered or was pointed out is this: There seems to be a growing prevalence of plaintiffs' attorneys who are forum shopping in State or local courts where the plaintiff class may have an inordinate advantage against the defendant. I will not go into the examples today, but there are any number of instances where one can see forum shopping has gone on, a State or a county courthouse has certified a class, agreed to hear a case, and it sets up a situation where the defendant company or the defendant knows they are going to have a hard time getting a fair shake in that courthouse. As a result, the defendant will agree to a settlement with the plaintiffs' attorneys. The settlement may richly reward the plaintiffs' attorneys for bringing the case, the defendant may cut their losses, but the folks on whose behalf the litigation was brought in the first place, those who allegedly are harmed, in many instances get little or nothing for their harm. That is not a fair situation. It is not fair to the little people on whose behalf the case has been brought. It is arguably not fair to the defendant because they are in a courtroom where they do not have a fair chance to defend themselves. It can be fixed, and it ought to be fixed.

The legislation before us today will not end the practice of class action lawsuits being litigated and decided in State courts. I believe the majority of class action lawsuits, even if this legislation is passed, which I am encouraged that it will, will still continue to be held in State courts, and they should be. We will have the opportunity to explain why that is true later on.

Before my 5 minutes expires, I conclude with this: There are any number of people on both sides of the aisle who would like to offer amendments to this bill. We have been working for 7 years to try to pass something that the House, the Senate, and the President will agree to. The time has come. To the extent that we make a change, whether it is in a Republican amendment or a Democratic amendment that might be offered, if we make a change, we invite the other side to retaliate and to offer their amendments and perhaps to adopt their amendments. For those of us who want to see this bill passed, I believe this legislation is about the fairest balance we are going to get, and I would encourage us to support it. We should consider and debate the amendments but in the end turn those amendments down.

I look forward to debating each of those amendments, and I hope in the end we can accomplish three things with this legislation: No. 1, make sure that where small people are harmed in a modest way, they have the opportunity to be made whole; No. 2, make sure that the defendants who are pulled into court on these class action lawsuits have a reasonable chance of getting a fair shake; and lastly, I am not interested in overburdening Federal judges. I think most of this litigation should remain in State court. I believe the compromise we have struck will do that. Those are our three goals, and I look forward to the debate that is going to follow.

**SUBJECT:** LITIGATION (92%); CLASS ACTIONS (90%); SUITS & CLAIMS (90%); LEGISLATION (89%); LEGISLATIVE BODIES (79%); TORT REFORM (59%); FIREARMS (59%); ATTORNEYS FEES (59%); RETAIL COUPONS (59%); APPEALS (59%); PERSONAL INJURY (59%); JURISDICTION (59%); LAW COURTS & TRIBUNALS (59%); INTERSTATE COMMERCE (59%); POLITICAL PARTIES (59%); LEGISLATORS (59%); EVIDENCE (59%);

**LOAD-DATE:** February 9, 2005

Service: **Get by LEXSEE®**
Citation: **151 cong rec s 1076**
View: Full

Date/Time:  Monday, August 18, 2008 - 10:30 PM EDT

Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator | Transactional Advisor |
Counsel Selector
History | Delivery Manager | Switch Client | Preferences | Sign Out | Help



About LexisNexis  | Terms & Conditions  | Contact Us
Copyright ©  2008 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.

COMPENDIUM
EXHIBIT 3



**LexisNexis®** *Total Research System*

Switch Client | Preferences | Sign Out | ? Help

Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator | Transactional Advisor | Cour

Service: **Get by LEXSEE®**
Citation: **151 cong rec s 1157**

☞Select for FOCUS™ or Delivery
☐

*151 Cong Rec S 1157, *

CONGRESSIONAL RECORD -- *SENATE*

Wednesday, February 09, 2005

109th Congress, 1st Session

151 Cong Rec S 1157

**REFERENCE:** Vol. 151, No. 13

**SECTION:** Senate

**TITLE:** CLASS ACTION FAIRNESS ACT OF 2005

**SPEAKER:** Mr. SPECTER; Mr. PRYOR; Mr. CARPER; Mr. CORNYN; Mr. SALAZAR; Mr. GRASSLEY; Mr. HATCH; Mr. KENNEDY; Mr. BOND; Mrs. FEINSTEIN; Mr. BINGAMAN; Mr. FRIST; Mr. REID; Mr. SESSIONS; Mr. LEAHY; Mr. FEINGOLD; Mr. DODD

**TEXT:  [*S1157]**

The PRESIDING OFFICER. Under the previous order, the Senate will resume consideration of S. 5, which the clerk will report.

The assistant legislative clerk read as follows:

A bill (S. 5) to amend procedures that apply to consideration of interstate class actions to assure fairer outcomes for class members and defendants, and for other purposes.

Pending:

Durbin (Modified) Amendment No. 3, to preserve State court procedures for handling class actions.

The PRESIDING OFFICER. Under the previous order, the pending amendment is set aside and the Senator from Arkansas, Mr. Pryor, is recognized.

The PRESIDING OFFICER. The Senator from Pennsylvania.

Mr. SPECTER . Mr. President, parliamentary inquiry: We are proceeding now to go to the class action bill?

The PRESIDING OFFICER. The Senator is correct.

Case 3:08-cv-03636-JSW     Document 24-4     Filed 09/02/2008     Page 3 of 90

Mr. SPECTER. And the next order of business is the Pryor amendment?

The PRESIDING OFFICER. That is correct.

Mr. SPECTER. I see the Senator from Arkansas on the floor, so I will yield the floor.

Amendment No. 5

Mr. PRYOR . Mr. President, I send an amendment to the desk and ask for its immediate consideration.

The PRESIDING OFFICER (Mr. Graham). The clerk will report the amendment.

The assistant legislative clerk read as follows:

The Senator from Arkansas [Mr. Pryor], for himself, Mr. Salazar, and Mr. Bingaman, proposes an amendment numbered 5.

Mr. PRYOR . Mr. President, I ask unanimous consent that the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To exempt class action lawsuits brought by the attorney general of any State from the modified civil procedures required by this Act)

On page 5, between lines 2 and 3, insert the following:

"(1) Attorney general._The term 'attorney general' means the chief legal officer of a State.

On page 5, line 3, strike "(1)" and insert "(2)".

On page 5, line 5, strike "(2)" and insert "(3)".

On page 5, line 12, strike the period at the end and insert the following: ", but does not include any civil action brought by, or on behalf of, any attorney general.".

On page 5, line 13, strike "(3)" and insert "(4)".

On page 5, line 17, strike "(4)" and insert "(5)".

On page 5, line 21, strike "(5)" and insert "(6)".

On page 6, line 1, strike "(6)" and insert "(7)".

On page 6, between lines 5 and 6, insert the following:

"(8) State._The term 'State' means each of the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, and any territory or possession of the United States.

On page 14, strike lines 20 and 21, and insert the following:

(1) by striking subsection (d) and inserting the following:

"(e) As used in this section_

"(1) the term 'attorney general' means the chief legal officer of a State; and

"(2) the term 'State' means each of the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, and any territory or possession of the United States."; and

On page 15, line 7, insert ", but does not include any civil action brought by, or on behalf of, any attorney general" before the semicolon at the end.

Mr. PRYOR . Mr. President, I rise to offer an amendment to S. 5, the Class **[*S1158]** Action Fairness Act of 2005, to ensure that State attorneys general elected by the people of their States as the chief law enforcement officer will still be able to do their business and protect the people of their States.

My amendment simply clarifies that State attorneys general should be exempt from S. 5 and be allowed to pursue their individual State's interests as determined by themselves and not by the Federal Government.

I know that S. 5 is intended to fix problems around class action law in America, and I think most agree that the attorneys general are not part of the problem. In the simplest terms, this amendment allows them to seek State remedies to State problems. I hope we can all agree infringement on State rights should not be a result of this bill.

I believe class actions remain an important tool for enforcing shareholder and employee rights, for cracking down on telemarketing fraud in attempts to prey on the elderly, and in forcing companies to improve product safety both in the manufacture of unreasonably dangerous products and in drugs. We need to make sure class action reform does not unnecessarily restrict the ability of citizens to seek redress for legitimate claims.

While we all may not agree with those in Congress that we need to improve the class action process, we should all agree that it should not be done by shutting State attorneys general out of the system. I believe to do so would circumvent the intent of our Founding Fathers in recognizing that State sovereignty should not be dismissed by Federal action so easily. To that end, I offer this amendment in an attempt to quash ambiguity about the authority of State attorneys general that may exist in this bill.

It should be known that this commonsense amendment in no way impairs the class action reforms as intended in this bill, nor does it in any way expand the authority of State attorneys general. What this amendment does is clarify the existing authority of State attorneys general.

I have heard in the hallways, and as I have gone through the corridors in the Senate in the last few days, that there are some who do not want any amendments to this bill. This amendment, if accepted, I believe is very consistent with the intent of the bill. I believe the authors of the bill did not intend to shut out State attorneys general. So even though some do not want amendments_I think we ought to consider all amendments; some of the amendments are very worthy of consideration. Although some do not want amendments, I think they can vote for this with a clear conscience that this will not change the intent of the bill.

I am a former State attorney general. I understand the important work they do for consumers and the most vulnerable in our society. It is not just my opinion that this amendment is needed. I offer this amendment on behalf of a bipartisan group of 46 State

attorneys general who have expressed that it is critically important to all their constituents, especially the poor, elderly, and disabled, that provisions in this legislation be clarified so as not to compromise the traditional law enforcement authority.

I have a letter. Interestingly enough, in the first paragraph of the letter, it says_and these are 46 State attorneys general:

We take no position on the act as a general matter and, indeed, there are differing views among us on the policy judgments reflected in the act.

This is very clear. The attorneys general are split on the underlying act, but they are not split on their authority being called into question with this act.

They say:

Clarifying the act does not apply to and would have no effect on actions brought by State attorneys general on behalf of their respective States and citizens.

I want to talk in just a minute about how State attorneys general are different from private sector lawyers. I will get to that in a minute.

I ask unanimous consent to print in the Record this letter signed by 46 State attorneys general, Democrats and Republicans, collectively representing more than 90 percent of the country, who are very concerned that this legislation as it is written will stop them from doing an important part of their jobs.

There being no objection, the material was ordered to be printed in the Record, as follows:

National Association

of Attorneys General,

Washington, DC, February 7, 2005.

Hon. Bill Frist,

Senate Majority Leader, U.S. Senate, Dirksen Building, Washington DC.

Hon. Harry Reid,

Senate Minority Leader, U.S. Senate, Hart Building Washington, DC.

Dear Senate Majority Leader Frist and Senate Minority Leader Reid: We, the undersigned State Attorneys General, write to express our concern regarding one limited aspect of pending Senate Bill 5, the "Class Action Fairness Act," or any similar legislation. We take no position on the Act as a general matter and, indeed, there are differing views among us on the policy judgments reflected in the Act. We join together, however, in a bipartisan request for support of Senator Mark Pryor's potential amendment to S. 5, or any similar legislation, clarifying that the Act does not apply to, and would have no effect on, actions brought by any State Attorney General on behalf of his or her respective state or its citizens.

As Attorneys General, we frequently investigate and bring actions against defendants who have caused harm to our citizens. These cases are usually brought pursuant to the Attorney General's parens patriae authority under our respective consumer protection and antitrust statutes. In some instances, such actions have been brought with the Attorney General acting as the class representative for the consumers of the state. It is our concern that

certain provisions of S. 5 might be misinterpreted to hamper the ability of the Attorneys General to bring such actions, thereby impeding one means of protecting our citizens from unlawful activity and its resulting harm.

The Attorneys General have been very successful in litigation initiated to protect the rights of our consumers. For example, in the pharmaceutical industry, the States have recently brought enforcement actions on behalf of consumers against large, often foreign-owned, drug companies for overcharges and market manipulations that illegally raised the costs of certain prescription drugs. Such cases have resulted in recoveries of approximately 235 million dollars, the majority of which is earmarked for consumer restitution. In several instances, the States' recoveries provided one hundred percent reimbursement directly to individual consumers of the overcharges they suffered as a result of the illegal activities of the defendants. This often meant several hundred dollars going back into the pockets of those consumers who can least afford to be victimized by illegal trade practices, senior citizens living on fixed incomes and the working poor who cannot afford insurance.

We encourage you to support the aforementioned amendment exempting all actions brought by State Attorneys General from the provisions of S. 5, or any similar legislation. It is important to all of our constituents, but especially to the poor, elderly and disabled, that the provisions of the Act not be misconstrued and that we maintain the enforcement authority needed to protect them from illegal practices. We respectfully submit that the overall purposes of the legislation would not be impaired by such an amendment that merely clarifies the existing authority of our respective States.

Thank you for your consideration of this very important matter. Please contact any of us if you have questions or comments.

Sincerely,

Mike Beebee, Attorney General, Arkansas; Mark Shurtleff, Attorney General, Utah; Gregg Renkes, Attorney General, Alaska; Fiti Sunia, Attorney General, American Samoa; Terry Goddard, Attorney General, Arizona; Bill Lockyer, Attorney General, California; John Suthers, Attorney General, Colorado; Richard Blumenthal, Attorney General, Connecticut; Jane Brady, Attorney General, Delaware; Robert Spagnoletti, Attorney General, District of Columbia; Charlie Crist, Attorney General, Florida; Thurbert Baker, Attorney General, Georgia; Mark Bennett, Attorney General, Hawaii; Lawrence Wasden, Attorney General, Idaho; Stephen Carter, Attorney General, Indiana.

Tom Miller, Attorney General, Iowa; Greg Stumbo, Attorney General, Kentucky; Charles Foti, Attorney General, Louisiana; Steven Rowe, Attorney General, Maine; Joseph Curran, Attorney General, Maryland; Tom Reilly, Attorney General, Massachusetts; Mike Cox, Attorney General, Michigan; Mike Hatch, Attorney General, Minnesota; Jim Hood, Attorney General, Mississippi; Jay Nixon, Attorney General, Missouri; Mike McGrath, Attorney General, Montana; Jon Bruning, Attorney General, Nebraska; Brian Sandoval, Attorney General, Nevada; Kelly Ayotte, Attorney General, New Hampshire; Peter Harvey, Attorney General, New Jersey.

Eliot Spitzer, Attorney General, New York; Roy Cooper, Attorney General, North Carolina; Wayne Stenehjem, Attorney General, North Dakota; Pamela Brown, Attorney General, N. Mariana Islands; Jim Petro, Attorney General, Ohio; W.A. Drew Edmondson, Attorney **[\*S1159]** General, Oklahoma; Hardy Myers, Attorney General, Oregon; Tom Corbett, Attorney General, Pennsylvania; Roberto Sanchez Ramos, Attorney General, Puerto Rico; Patrick Lynch, Attorney General, Rhode Island.

Henry McMaster, Attorney General, South Carolina; Lawrence Long, Attorney General, South

Dakota; Paul Summers, Attorney General, Tennessee; Rob McKenna, Attorney General, Washington; Darrell McGraw, Attorney General, West Virginia; Peg Lautenschlager, Attorney General, Wisconsin; Patrick Crank, Attorney General, Wyoming.

Mr. PRYOR . Mr. President, I have served with some of these attorneys general, and I can say they come from different ideological points of view and different ways of practicing law. As a whole, they are not taking a position on the bill, but as you can see by this letter, the vast majority of State AGs agree on one point: As the chief legal officers for their respective States, there must be clarification in the bill to make sure they can continue to represent the citizens of their States and carry out their duties as elected officials.

As we all know, attorneys general frequently investigate and bring actions against defendants who have caused harm to their citizens. These cases are usually brought pursuant to the attorneys general parens patriae authority under their respective consumer protection and antitrust statutes. This is an important point. Not all States have parens patriae authority. In fact, the State of Arkansas, when I was attorney general, had very limited parens patriae. In fact, one could argue none at all. We always had to pursue our actions under the Deceptive Trade Practices Act, which is a State statute, and we had specific authority in that statute.

I heard some people say, again, in the hallways here, that all States have parens patriae and therefore we do not need this amendment. But that is not the case. In some instances, such actions have been brought with the attorney general acting as the class representative for consumers in the State. It is my concern, as well as those of 46 attorneys general, that certain provisions in S. 5 might be interpreted to hamper their ability to bring such actions, thereby impeding one means of protecting their citizens from unlawful activity and resulting harm.

It is important to all consumers, but especially to the poor, elderly, and disabled, that the provisions of the act not be misconstrued and that attorneys general maintain the enforcement authority needed to protect them from illegal practices.

I know there are many people who want this body to pass class action reform this year and do not want to ruin its chances by adding too many amendments to the underlying bill. But, as I said a few moments ago, in this case, with this particular amendment, we are not changing the intent of the bill.

I would like to address a falsehood about the amendment that I have heard, and that is that some people have said this amendment would create a major loophole because suits could be brought on behalf of State attorneys general, that some attorneys general may allow their friends to use their names to avoid moving the case to Federal court.

The notion is incorrect and, quite frankly, it is offensive. Let me be clear.

No one can add a State attorney general without his or her express consent or permission. Moreover, attorneys general are statewide elected officials accountable to the same citizens who vote for us. They work hard and take their responsibility as chief legal officers very seriously. State attorneys general would not expend the resources or their reputations to take up a class action they did not believe was worthy of protecting their citizens.

In addition, it should be noted that in many cases, attorneys general are not after the check or the payment in litigation. They are not eyeing the big settlement,although in some cases there are large settlements at the end of the horizon. The primary objective of State attorneys general is not chasing the money but bringing about reform.

Let me be clear on this point. I alluded to this a few moments ago. State attorneys general are fundamentally different from private attorneys. Private attorneys have clients, and they

are out there doing what their clients want: trying to get a recovery and trying to make their clients whole. I understand that. That is a good thing. I do not have any problem with that.

State attorneys general are different. Generally speaking_maybe not in every single case but generally speaking, when the State attorney general becomes involved, there is a matter of public policy in the litigation. In fact, I said a few moments ago that the State attorneys general are elected officials. That is not true in every single case. I think there are about 35 elected attorneys general. There are a couple selected by the supreme court or by the State legislature, and some are appointed by the Governor.

Nonetheless, attorneys general have a level of accountability that you do not find in private practice because they are accountable to the people, either the people who elected them or appointed them or selected them for the office. And attorneys general, more than private lawyers, are sensitive to criticism.

I can assure you, the last thing an attorney general wants to read is an opinion by a judge who is criticizing the attorney general for bringing a frivolous lawsuit, criticizing the attorney general for going too far. That is the last thing the attorney general wants to read in the paper.

Also, there is the court of public opinion. The attorney general does not like bad editorials to be written about him or her. They do not like to be out on the street and people questioning their integrity or their sense. So attorneys general have a level of accountability that just does not exist in other areas of practice.

That is an important distinction. As I mentioned a few moments ago, normally cases brought by States involve a matter of public policy, and we can go through a long list of cases and show where the public policy is in the cases and also show how a lot of these cases would not be profitable for the private sector to bring.

Oftentimes there is a matter of fairness and not a matter of money involved in these cases. There are several major examples where State attorneys general have filed a cause of action in State court to protect their citizens or bring reform. However, if we do not act to clarify S. 5, I am concerned this legislation would make it much harder for the attorneys general to do their jobs.

Back in the 1990s, the attorneys general around the country pooled together and sued the tobacco industry for reimbursement of State moneys as a result of disease brought about by smoking. I know in some quarters that is still a very controversial decision. Let me very respectfully remind the Congress that the Congress a year, two or three before this settlement occurred had the chance to enter into a federally mandated global settlement of all claims. That did not happen. The States pursued their case after the Congress failed to act.

This tobacco case resulted in a historic global settlement that drastically altered the way our Nation views and approaches smoking. Money from these settlements was used by the States for youth smoking prevention, to improve health care, educate citizens on the dangers of smoking, and an increased level of treatment for smoking-related illnesses. My State of Arkansas has spent every penny of the tobacco money it has received on health-related issues_every single penny.

Back to the point about the difference in the private sector attorney representing the individual or representing a class versus the attorney general representing the State's interest and the citizens of the State, when you look at the settlement agreement between the tobacco companies and the State, if I recall right, it was about 147 pages long. It was very detailed, very negotiated, a very hard-to-reach settlement.

I believe it was 147 pages long without the attachments, and 91 of those pages, that is two-thirds of the pages approximately, were about the public policy and changing the tobacco industry's practices. Here again, in private litigation it is about getting recovery for one's client, and we understand that, but when the attorney general is involved it is a materially different type of litigation.

I have never seen a private settlement in which two-thirds of the settlement document requires the industry **[*S1160]** or the company to change its practices, but that is the type of litigation the attorneys general enter into.

Each State in the tobacco case filed individual suits in their respective State's court alleging fraud. In our particular State, we alleged the Deceptive Trade Practices Act violations and also a number of common law claims. Due to the nature of the claims, if this legislation as it is written would have existed at the time of this case, it may have presented hurdles to the attorneys general that could have prevented a resolution.

In 2001, several State attorneys general took on Ford and Firestone for failure to disclose defects in Firestone tires used on Ford SUVs, of which they should have been aware. These cases were brought again in Arkansas, and other States have similar laws, under our State's Deceptive Trade Practices Act, fraud and consumer protection laws.

Let us make this point in another case. In private causes of action, and there were many relating to the Ford and the Firestone litigation, the parties' and the lawyers' primary concern was trying to make the plaintiffs whole. That is the nature of that type of litigation.

In the attorney general actions, we established a restitution fund and a long series of injunctions against the companies in the way they marketed their products. In fact, some people may have noticed they have seen some new Ford Explorer ads on television in recent weeks. These Ford Explorer ads are due to the attorney general lawsuit, and they deal with the safety of Ford Explorers. All this goes back to the way Ford Explorers were marketed originally. The buyers bought them thinking they were safe under pretty much all conditions, but practice has taught us differently. So I make that point one more time to show how different State litigation is versus private litigation.

Ultimately, the Ford case was settled. However, had these States been required to file separate State cases under their own consumer protection laws, as could be required under this class action bill, those States would have been removed to Federal court. The Federal court would then have been required to become an expert in each State's diverse consumer laws and remedies.

State litigation is different from private litigation, and I think to some degree this amendment is a matter of States rights. In 2000, 26 attorneys general from 26 States brought suit against Publishers Clearinghouse claiming that the company was intentionally preying on the elderly by misrepresenting their sweepstakes award. My colleagues may remember that for years people used to get mail with pictures of celebrities, and in big bold letters it would have your name and say: You have won X number of millions of dollars. Or it would say: Congratulations, millionaire.

Think about it. We do not get those letters anymore. Why? Because the States intervened. The States came in under consumer protection laws and looked at how deceptivethose ads were. In fact, in Arkansas when I was in the attorney general's office I would talk to an adult child of a deceased person or an adult child who had put their parents in a nursing home and they would clean out the closets and the living room or whatever and they would find stacks and stacks of magazines that had been ordered through these sweepstakes companies.

Even if one reads everything in great detail, they would find in the fine print that ordering does not increase their chances of winning. Most people do not read all the fine print. Most people thought that ordering did increase their chance of winning, and what happened was people would order the same magazine. People would tell me they would find 10 copies of the same Sports Illustrated or 10 copies of the same Newsweek or Good Housekeeping because these senior citizens ordered to try to win the sweepstakes.

It is sad and unfortunate, but they saw this as a chance they were willing to take to leave a lot of money to their children and grandchildren. So we came in as States and put a stop to that. I think it was 26 States that banded together and put a stop to that.

It was alleged that Publishers Clearinghouse was profiting from this fraud at the expense of the vulnerable elderly. I can recall that these individuals had spent their life savings on these fraudulent sweepstakes. When we got inside of the cases, we found many seniors in Arkansas who had spent hundreds, maybe thousands of dollars trying to win sweepstakes.

Is there someone here who thinks the actions of the attorneys general are out of step with common sense and fairness? In this bill we should make sure we do not take away any existing authority of the attorneys general.

These are just a few examples of the very hard and worthy work by the State attorneys general where they are trying to protect the citizens of their States. I challenge my colleagues to deem the work they do as frivolous or as junk lawsuits because attorneys general around the country have a layer of accountability that does not exist elsewhere. They are accountable to the people. They are accountable to the legislature that makes their budgets. They are accountable to the Governor. They are accountable in the court of public opinion.

I ask my colleagues to support this amendment to this bill for several reasons. One is that the overwhelming majority of State attorneys general, our States' chief legal officers, are concerned about the language of this bill, and we should be concerned about it. Remember, these attorneys general represent the citizens in all of our States. They try to get out there and do the right thing for their citizens.

Secondly, by making this change, we are not obstructing the intent of the bill, but I believe very strongly we are clarifying the authority that already exists.

Third, we should allow our attorneys general to seek State remedies to State problems. I think this is an important piece of this. It goes back to States rights. It goes back to local control and people trying to do things the way they want to handle them in their own States.

So I implore all of my colleagues who are champions of States rights or who want to protect the integrity of the bill and want to leave the tools that currently exist with the State attorneys general, to vote for this amendment.

I yield the floor.

The PRESIDING OFFICER. The Senator from Pennsylvania.

Mr. SPECTER . Mr. President, a time agreement has been worked out. I ask unanimous consent that the vote in relation to the Pryor amendment occur at 12:15 today, with the time equally divided in the usual form prior to the vote, with no amendment in order to the amendment prior to the vote. Further, the time to be divided begins from when the amendment was sent to the desk. So to amplify that, the time for the Democrats would begin when Senator Pryor started to speak.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

Mr. SPECTER. I know the Senator from Delaware, Mr. Carper, has another engagement, so I will speak very briefly as the lead opponent of this amendment.

I do oppose the amendment. I appreciate the experience of Senator Pryor having been attorney general of the State of Arkansas. I did not hold such a lofty position. I was just a district attorney, but I appreciate the reasons he has put forward for the amendment.

It is my suggestion that it is not necessary. When the Senator from Arkansas has enumerated a number of situations where attorneys general protect the interests of the citizens of their State, that can be accomplished even if this bill is adopted. In the first place, the bill provides that if two-thirds of the parties involved are citizens of the State, it stays in the State; if one-third, it goes to the Federal court; and between one-third and two-thirds, it is up to the discretion of the judge.

So even within the confines of the language of the bill, the interests that the Senator from Arkansas has articulated will be protected.

Next, the attorneys general have authority under parens patriae statutes enacted by the many state legislatures to represent the citizens of their State. They are the lawyer for everybody in the State. The Latin phrase of parens patriae has been adopted and that gives them sufficient standing to undertake whatever is necessary. **[*S1161]**

There is a provision in the Pryor amendment which broadens it substantially by providing that any civil action brought by or on behalf of the attorney general in a State would be excluded so that there would be latitude for the attorney general to deputize private attorneys to bring their class actions and to find an exclusion, which is a pretty broad exclusion, not to use pejorative terms, but a pretty broad loophole.

Those are the essential arguments. I could expand on them, but we have limited time. The Senator from Texas has been in the Chamber since we started the debate, but as I understand it, he has agreed to yield to the Senator from Delaware.

Mr. CORNYN. It is my understanding Senator Carper would like to speak for about 5 minutes. I ask unanimous consent that I be recognized immediately after Senator Carper, and then Senator Salazar be recognized in that sequence.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. SPECTER. I thank the Senator from Texas, and I yield the floor.

The PRESIDING OFFICER. The Senator from Delaware is recognized for 5 minutes.

Mr. CARPER . Mr. President, I thank Senator Specter for yielding to me. I say to my friend and colleague from Arkansas, he knows how fond I am of him and how highly I regard him, both in his previous role as attorney general and as a colleague in the Senate.

When I heard of the amendment he was preparing to offer, I stopped and I said to my staff, let's find out if this is something I can support. As many of my colleagues know, we have endeavored to improve this bill over time, and the legislation before us today is a far different bill than was first proposed 7 years ago or even was debated 2 years ago and

reported out of committee.

Senator Specter has spoken of the option that is available to most attorneys general, an approach called parens patriae, which I understand means "government stands in the place of the citizen." For most attorneys general who wish to file a case on behalf of their citizens against some defendant, they have the opportunity to use parens patriae. For those who do not, in my judgment, they still have the opportunity to use the class action lawsuit.

What we have sought to do over the last couple of years in modifying this bill is to make sure that the class action lawsuits brought by an individual in a State, if they are of a national scope, they would be in a Federal court. If they are not, if they are more of a local issue involving residents of that State, a defendant in that State, or even where there are multiple defendants, but a defendant in that State who has a principal role as a defendant, not just somebody who was sort of pulled out of the air, to make sure there is a real defendant with a real stake in it that has a real financial ability to pay damages, then the legislation that is before us actually permits an attorney general or, frankly, any attorney, plaintiff's attorney, to bring that kind of class action.

The legislation that is before us says if two-thirds of the plaintiffs in a class action lawsuit are from the same State as the defendant, it will stay in the State court, no question. The legislation before us says that if anywhere from one-third to two-thirds of the plaintiffs on whose behalf the class action is brought meet certain standards that are set out in the bill, that can stay in State court as well.

The legislation that is before us today provides exemptions as well for incidents involving a sudden single accident. The legislation before us today also provides exemptions under the Dodd-Schumer-Landrieu language that provide even further opportunities to proceed with a class action lawsuit if the matter that is being discussed is truly a local matter, if most of the people involved both as plaintiffs and defendants are within that State.

The last thing I would say is there are plenty of people on both sides of the aisle who would like to offer amendments. My fear is if any of those amendments were adopted, we invite the House of Representatives to come back and to offer quite a different bill than the compromise that is before us today. To those of us who seek reasonable, modest reforms_and this is a court reform bill, not a tort reform bill_but to those who seek moderate reforms incorporated in this legislation, I did not support this amendment because I think it would simply invite the adoption of other amendments and, frankly, put us in the situation which will end in a conference with the House of Representatives with a bill that is frankly far different than this one and will provide an end product not to my liking and I suspect even less to the liking of those who are opposed to this compromise.

I reluctantly oppose this amendment with that in mind, but it is not something I do easily or lightly.

I thank my friend Senator Cornyn for making it possible for me to have this time.

The ACTING PRESIDENT pro tempore. The Senator from Texas is recognized.

Mr. CORNYN . Mr. President, I first want to say how much I respect and admire the author of this amendment, Senator Pryor. He and I served together as State attorneys general, he in Arkansas and I in Texas, for 4 years. Our careers overlapped. I agree with him about the important role that attorneys general play when it comes to protecting a State's citizens and a State's consumers. But I think where I part company with my friend Senator Pryor is, No. 1, this amendment is not necessary to preserve the authority of the State attorney general to protect the State's consumers, and, second, this amendment as worded_and I know this is not his intention_would create a potential loophole big enough to drive a truck through, that

could cause substantial mischief that is intended to be prevented by this very bill.

Finally, as Senator Carper has said, this is a negotiated bill. There are amendments I would like to offer that I think would make it a better bill. But I think we all realize that after many Senators have labored long and hard to try to get us to the point today where we literally have bipartisan support for this compromise, to offer any amendments, and particularly one like this and others that have been filed but not yet called up, would threaten our chance of success. I think that would be a shame because we all agree that the class action abuses we see are very real and are something that do not benefit the American people or consumers in general.

We have seen that some of these egregious abuses of the class action procedure have been used to make certain entrepreneurial lawyers very wealthy when the consumers literally get a coupon worth pennies on the dollar.

I am not opposed to lawyers. Let me say up front I happen to be a lawyer. But I do think that all lawyers, all people, anybody with common sense_some may say that excludes lawyers_but I like to think anybody with common sense recognizes the very real abuses that have occurred in the class actionsystem. We have heard a lot about that. I will not repeat all of that now. I think we all take that as a given.

First, let me allude to the letter signed by_the Senator from Arkansas said 46 State attorneys general from the National Association of Attorneys General, an organization of which I used to be a member and for which I have a lot of respect, both for the people who help run that organization as well as the attorneys general who make up its membership.

I point my colleagues to paragraph 2 in this letter, which I believe makes my initial point which is that this amendment is not necessary to preserve the authority of State attorneys general. Indeed, in the last sentence in the second paragraph these 46 attorneys general say:

It is our concern that certain provisions of S. 5 might be misinterpreted to hamper the ability of attorneys general to bring such actions, thereby impeding one means of protecting our citizens from unlawful activity and its resulting harm.

In other words, these 46 lawyers, the chief law enforcement officers of these States, make no claim that in fact this bill would impede their authority but, rather, that it might be misinterpreted.

I think it is fair to say that any law that has ever been written is capable of being misinterpreted. That is why we have the court system. But we certainly do not need an amendment like  **[\*S1162]**
this to protect the States or the attorneys general against a potential misinterpretation of S. 5, the Class Action Reform bill. That is the function, that is the role of the courts. I think it is very plain that no power of the State attorney general is impeded by virtue of S. 5, or will be once it is signed into law.

Indeed, the Senator from Arkansas alluded to statutes that are typical of every State_deceptive trade practice acts and consumer protection statutes_which in my State and I believe in virtually every other State specifically authorize the attorney general to seek remedies on behalf of aggrieved consumers. This bill certainly would not encroach on that authority. Indeed, he also alluded to common law claims that are asserted by the attorneys general in pursuit of justice for their State's citizens.

We heard the Senator from Delaware talk about the parens patriae doctrine, which is generally recognized as providing the authority to the attorney general to sue on behalf of his

State's citizens. I acknowledge, as he said, there are some variations in terms of the court's interpretation in each State about the scope of that doctrine and how much or what kinds of actions might be authorized. But clearly, when State law and the State Constitution specifically provide for the right of an attorney general, a State attorney general, to sue on behalf of his State's citizens, then this bill, when made a law, will not in any way impede that endeavor.

Finally, in terms of the lack of necessity of this bill, the Senator from Delaware pointed out that where a substantial number of a State's citizens are party to a class action and are located in one State, they are carved out by the very terms of this bill so that the case will remain in State court if that is where it was originally filed.

But the real danger in this amendment_and here again I am not suggesting that anyone intended this, but I think it does show the potential for mischief with amendments that have not been the subject of long debate and negotiation_is the language that says:

. . . does not include any civil action brought by or on behalf of the Attorney General of any State.

I am very sensitive to that particular phrase in the amendment because of a, frankly, very tragic experience I had as attorney general of my State. It is a fact that my predecessor as attorney general in the State of Texas is currently in the Federal penitentiary. He is in the Federal penitentiary because he was convicted, based on his own confession, of mail fraud and other violations of law primarily related to his attempt, almost successful, to backdate outside counsel contracts with an old buddy of his, that would potentially entitle his friend to $520 million out of the taxpayers' recovery in the Texas tobacco litigation.

I take no pleasure in bringing this up but merely make mention of it to point out the potential for mischief_not when cases are brought by an attorney general, somebody who is elected by the people, whose future, frankly, is dependent on their dutiful discharge of their obligations and faithful discharge of their duties_but when you carve out suits brought on behalf of the attorney general, which could include any lawyer who any attorney general might choose to hire as outside counsel and, of course, who is unelected and unaccountable to the people. Here, we see the potential for grave abuses.

As I have pointed out, this example was part of the Texas tobacco litigation that was part of a nationwide set of litigation, one which ultimately involved settlements on behalf of several individual States. I want to say, if my memory serves me, that Florida, Mississippi, and Texas filed their individual lawsuits and had individual judgments rendered. But the remainder of the States, including, I believe, the States of the Senator from Arkansas and the Senator from Colorado_they will correct me if I am wrong_they had a collective judgment rendered against the tobacco industry of almost $250 billion, a sum we would recognize, even here in Washington, as being significant.

The problems presented by outside counsel performing the duties of an attorney general under an exception like this just go on and on. My own experience is, again, where outside counsel of the State of Texas claimed the right to $3.3 billion out of the Texas tobacco lawsuit recovery, which by any reasonable measure was an extraordinary fee, one that, when calculated by the hours of work actually put into the lawsuit, has been described as scandalous and unconscionable. The ultimate concern must be the public interest. By accepting an amendment that would place outside the scope of this bill someone bringing a lawsuit on behalf of the attorney general, somebody unelected by the people, not accountable at the polls, we would be creating an environment ripe for fraud.

Let me tell you this: I recall that many of the States' attorneys general believed in good faith that the tobacco industry was responsible for contributing to the death and the illness of

hundreds of thousands of Americans each year. Indeed, that is a fact. We lose 400,000 people each year in this country as a result of consuming tobacco products. But the lawsuits brought, which were ultimately settled by the tobacco industry, were brought under the guise of protecting children and protecting the American consumer. We now see that almost $300 billion was paid out but not a single tobacco company is out of business today. Indeed, they continue to make their product, not only in this country but worldwide. There has been no decrease in the number of people who get sick or die as a result of consuming tobacco products in this country each year.

I just have to ask whether it is wise_I suggest it is not_to create an exception, to place outside the protections of the bill not the attorneys general per se but those who seek to bring suits on the attorney general's behalf. I suggest to you the evidence in my State_and perhaps nationwide_indicates that the lack of accountability to the voters, the lack of concern for ultimate welfare of the consumer, and the potential presence of an immediate personal self-serving motive to maximize a huge attorney fee, creates enough opportunity for mischief under this well-intended amendment that it should be voted down on that basis, if no other.

Finally, let me say in conclusion that I know the Senator from Arkansas has filed this amendment in good faith and certainly does not intend any of the results I have suggested here today. But I reiterate what the Senator from Delaware has said, and what I have been told both privately and publicly. If I were to offer amendments which I believe would make this bill better, it would be a poison pill for this litigation. Indeed, I believe that no matter how well intended the amendment offered by the Senator from Arkansas is, it would have that same effect. I don't believe that is in anyone's interest.

I thank the Chair. I thank my colleagues.

I yield the floor.

The PRESIDING OFFICER. The Senator from Colorado.

Mr. SALAZAR . Mr. President, I rise in support of the amendment which has been offered by the Senator from Arkansas. I have a great deal of respect for the National Association of Attorneys General. I also served in that position in the past, as well as the Senator from Texas and the Senator from Arkansas.

Let me very quickly make three points.

First, as has already been alluded to by both the Senator from Texas and the Senator from Delaware, the intent of this bill is to have no effect whatsoever on the powers and duties of the attorneys general to enforce their consumer protection responsibilities. I believe that point should be very much a part of the legislative history of this legislation as it moves forward.

Second, the powers and duties of the attorneys general in our States are very important powers and duties. Those are in those cases powers and duties that result from elections of the people of their States who elected individuals to serve in the capacity of attorney general.

In the context where we are limiting the ability for class actions to be brought under S. 5, that ability of the attorneys general to protect vulnerable consumers is all the more important. It is important for us to make sure as this legislation is being considered that we all understand it is going to have no impact on the powers and duties of the attorneys general.  **[*S1163]**


The letter that came in from our 46 of our former colleagues, interestingly, is an

accumulation of almost all of the attorneys general from around the country. It includes Democrats and Republicans alike. It includes Republicans such as my successor, John Suthers, from the State of Colorado, and Democrats such as Tom Miller from the State of Iowa. I think their letter and Senator Pryor's amendment with respect to some of those are indeed just an effort to make sure the legislative intent that has been talked about here would impact the legislation; that is, that this legislation, S. 5, is not going to have any diminishing effect whatsoever on the powers and duties of the attorneys general to proceed forward under the laws of their States, both constitutionally and also consumer protection laws.

I yield the floor.

The PRESIDING OFFICER. The Senator from Iowa.

Mr. GRASSLEY . Mr. President, I have been working on this legislation for five Congresses, and I would like to get this legislation to the President without any amendments. We have heard from the highest levels of the House of Representatives that if we can pass this bill without amendments, we will be able to get it to the President without going to conference; in other words, the House will adopt it the way we do.

I don't know how many times I would like to have heard that in the House of Representatives. I don't know when I have ever heard that in my entire career. I hope everybody in the Senate has a strong heart. If I didn't have a strong heart, I wouldn't say that. And if I heard it, I wouldn't believe it. I would pass out if the House was going to take something the Senate did without question. We ought to grab the ball and run with it.

Regardless of the merits of the amendment by the Senator from Arkansas, I hope we can defeat that amendment.This amendment would exclude this language from the bill: "Any action brought by or on behalf of the Attorney General of any State."

I ask my colleagues not to be fooled. Although this amendment sounds good, and there was a good presentation made by the authors of the amendment, it is potentially harmful and could lead to gaming by class action lawyers. I will explain what I mean by gaming.

First, before I do that, in my judgment, the amendment is not necessary. I will explain. State attorneys general have authority under the laws of every State to bring enforcement action to protect their citizens. Sometimes these laws are parens patriae cases, similar to class actions in the sense that the State attorney general represents the people of that State. In other instances, their actions are brought directly on behalf of that particular State. But they are not class actions; rather, they are very unique attorney general lawsuits authorized under State constitutions or under statutes.

One reason this amendment is not necessary is because our bill will not affect those lawsuits. Our bill provides class actions under that term "class action" as defined to mean any civil action filed in a district court of the United States under rule 23 of the Federal Rules of Civil Procedure or any civil action removed to a district court that was originally filed under State statute or rule authorizing an action to be brought by one or more representatives as a class action.

The key phrase there is "class action." Hence, because almost all civil suits brought by State attorneys general are parens patriae suits, similar representative suits or direct enforcement actions, it is clear they do not fall within this definition. That means that cases brought by State attorneys general will not be affected by this bill.

The supporters of this amendment say it is necessary because State attorneys general can bring class actions and those cases might become removable to Federal court. That

possibility does not make this amendment necessary. That is because State attorneys general are not required to use class actions to enforce their State laws. If State attorneys general want to recover on behalf of their citizens, they can always bring actions as parens patriae suits under statutes that authorize representative actions or even as direct enforcement actions. Again, such lawsuits will not be subject to this bill.

In addition, our bill has been drafted so as to distinguish between solely truly local class action lawsuits and those that involve national issues. That compromise, which was not part of my original bill, was reached with Senator Feinstein on the home State exception provision as well as further compromises made with Senators Dodd, Schumer, and Landrieu, dealing with the local controversy exception. As a result of these compromises, they will keep then truly local cases where they ought to be_in State court.

Another concern with this amendment is that it is worded in such a way to exclude class actions, not just by State attorneys general but also, in their words, on behalf of State attorneys general. The way this provision is drafted would allow plaintiffs' lawyers to bring class actions and simply include in their complaint a State attorney general's name as a purported class member, arguably to make their class action completely immune to the provisions of this bill. Plaintiffs' lawyers could simply ask State attorneys general to lend their name to a class action lawsuit so as to keep them in the State court.

That creates a very serious loophole in this bill. We should not risk creating a situation where State attorneys general can be used as pawns so that crafty class action lawyers can avoid the jurisdictional provisions of this bill. Our bill would put an end to class action abuses without diminishing the ability of State attorneys general to protect their citizens in State court. This is another way for lawyers to keep cases in State courts.

This is what this bill is all about, to make sure that cases that have national significance are not determined by some county judge in one of our 50 States that end up having national implications. Those cases should be in Federal court and, for the most part, under our legislation will be.

This amendment would seriously create a loophole in the reforms we are trying to accomplish with this bill. I urge my colleagues to join me in opposing this amendment.

Mr. HATCH . Mr. President, I rise in opposition to the amendment offered by my colleague from Arkansas. At best, this amendment is unnecessary. At worst, it will create a loophole that some enterprising plaintiffs' lawyers will surely manipulate in order to keep their lucrative class action lawsuits in State court.

Before I go into more details about the problems with the amendment, I would like to point out that the National Association of Attorneys General does not endorse this measure, nor has it pushed for its inclusion in the class action bill. One would expect that if the current bill somehow impairs the ability of State attorneys general to bring lawsuits on behalf of their citizens, we would have a position from them by now. But we do not, and the association's silence speaks volumes about the merits of this amendment.

Let me first note that this amendment, which excludes from the scope of this legislation any "civil action brought by or on behalf of, the Attorney General of any State," is unnecessary. Let me explain why.

State attorneys general have authority under the laws of every State in this country to bring enforcement actions to protect their citizens. These suits, known commonly as parens patriae cases, are similar to class actions to the extent that the attorney general represents a large group of people.

But let me be perfectly clear that they are not class actions.

There is no certification process, there are no representative class members named in the complaint, and plaintiffs' attorneys who stand to gain millions of dollars in fees. Rather, they are unique lawsuits authorized under State constitutions or State statutes that are brought on behalf of the citizenry of a particular State. These actions are brought typically in consumer protection matters under State law and usually involve local disputes. As such, S. 5 in no way affects these lawsuits.

To underscore, I direct my colleagues to section 1711(2) of the bill which explicitly defines a "class action" to mean any civil action filed in a district court of the United States under rule **[*S1164]**
23 of the Federal Rules of Civil Procedure, or any civil action that is removed to a district court of the United States that was originally filed under a State or rule of judicial procedure authorizing an action to be brought by one or more representatives as a class action.

This statutory definition makes it perfectly clear that the bill applies only to class actions, and not parens patriae actions. Class actions being those lawsuits filed in Federal district court under rule 23 of the Federal rules of civil procedure or lawsuits brought in State court as a class action. Neither of these conditions are met when compared to the nature of a parens patriae action, and consequently, are excluded from the reach of this bill.

What I think the proponents of this amendment are really concerned about is the impact of this bill on State attorneys general if they choose to pursue an action other than a parens patriae action. But this possibility does not make this amendment necessary.

First, attorneys general are not required to use class actions to enforce their State laws and protect their citizens. To the contrary, their main weapon has been, and continues to be, the parens patriae action authorized under State statute.

Second, this legislation has been carefully crafted to distinguish between truly local suits and those that involve national issues. Thus, if an attorney general brings a class action, and that class action involves matters of truly local concern, it will certainly fall under one of the bill's exceptions. On the other hand, if the lawsuit is aimed at an out-of-State corporation for conduct that affects citizens in multiple States, or if the lawsuit is interstate in nature, then that suit should be removed to Federal court. Removal of such a case is particularly appropriate because there would likely be similar suits brought in a number of courts, and one of the central purposes of this legislation is to promote judicial efficiency and fairness by allowing copy-cat class actions to be coordinated in one Federal proceeding.

As I noted earlier, this amendment is not only unnecessary, it actually creates opportunities for gaming. If this legislation enables State attorneys general to keep all class actions in State court, it will not take long for plaintiffs' lawyers to figure out that all they need to do to avoid the impact of S. 5 is to persuade a State attorney general to simply lend the name of his or her office to a private class action. In other words, plaintiffs' lawyers will try to keep interstate class actions in State court by simply naming that State's attorney general at the end of complaint as a cocounsel or of-counsel. Undoubtedly, we will see arguments that if an attorney general merely sends in a letter saying that he/she is sympathetic 10 the action, the lawsuit will be exempt from the bill's provisions. I think this is the very type of forum shopping that S. 5 is supposed to eliminate and we should not be encouraging it now.

Indeed, to give the potential gaming some real life perspective, I direct your attention, Mr. President, to an article from the Boston Globe which reports that the Massachusetts attorney general had made arrangements with private plaintiffs' attorneys to prosecute a consumer-oriented class action against the drug store chain Walgreens. Under the arrangement, the plaintiffs lawyers pocketed hefty fees while the state AG's office received a portion of the

settlement money.

But the article reports that this privatization arrangement has drawn criticism because the settlement did very little to benefit consumers. The article reports that too little of the settlement money actually went to consumers, but rather to groups such as Public Citizen, the American Lung Association, and Massachusetts Bar Association. Perhaps more troubling about the article is the alleged campaign contribution ties between the private attorneys who prosecuted these cases and the State attorney general office.

Given the close ties between this State AG and private attorneys, I find that this amendment will only encourage these types of arrangements in the future that do not benefit consumers.

We do not want to risk creating a situation in which State attorneys general can be used as pawns so that class action lawyers can remain in one of their magic jurisdictions and avoid the import of this bill. S. 5 would put an end to class action reform without diminishing in any way the ability of State attorneys general to discharge their duty to protect their citizens_and to do so in State court. I urge my colleagues to vote against this amendment.

The PRESIDING OFFICER. The Senator from Arkansas.

Mr. PRYOR. I thank my colleagues for their attention to this amendment. I am encouraged in one way because I know they have spent time with the amendment and studied it, analyzed it. What encourages me is all four who spoke against this_in fact, every Senator who spoke against the amendment_have said that this bill as currently drafted will not alter or limit the existing rights of any State attorney general. That is very good news.

I don't agree with that interpretation. In fact, there are 46 attorneys general, Democrats and Republicans from all over the country, who have written a letter saying they do not agree, or at least they have concern with that interpretation.

I hope when this law, if it passes, S. 5, is challenged, and it will be at some point or be litigated at some point, and a State attorney general tries to pursue some sort of action and there is a challenge saying the State cannot do it, I hope the courts will recognize the legislative history we developed today. The intention of this Senate and the conference is not to limit any existing rights or any existing abilities of the State attorneys general in pursuing cases they may deem appropriate to pursue.

In addition, a number of the opponents, maybe all, have focused on some language in the bill. We need to clarify that language so when we vote on this we will be able to vote from an informed position. The language is "but does not include any civil action brought by or on behalf of any Attorney General."

Chairman Grassley and others have pointed to that language and indicated they have some concern with that. I respect that concern.

Let me flesh that out, if I may. In virtually every State, and probably every State, the work of the attorney general's office is too large for one person to do. In other words, the AG himself or herself cannot sign every pleading, cannot attend every hearing, cannot participate in everything. They cannot do it. There are not enough hours in the day and the workload is too heavy. Again, I think every State law does this routinely. I don't know of any exception.What that means is every attorney general in America has an assistant attorney general or deputy attorney general or some other titled person in their office who every single day routinely does things on behalf of the attorney general. It has to be that way.

Under the laws of the States, the attorney general is the one who is ultimately responsible. When a pleading is signed, that signatory_whichever deputy or assistant or attorney general

it may be_that person is binding the State's attorney general to certain things in the pleadings.

The attorney general is the officer of the court. The attorney general has ethical responsibilities and ethical duties. I would argue that these ethical duties are above and beyond what is in the private practice of law because that lawyer, as the attorney general, is representing the State he or she was elected or selected to represent. Also, some are concerned that the phrase "or on behalf of" may mean that a private sector law firm could be retained by the State to pursue a matter. That is true. That is existing law today. And everybody has said the intention of S. 5 is not to limit or alter or change any authority of the States' attorneys general.

So all that is true. However, in every State I am aware of_I cannot promise this is true in every State, but in every State I am familiar with, there is a process which States' attorneys general have to go through in order to hire outside counsel. I think if we spent 30 minutes looking at various States and the needs of various States, probably 100 percent of the people in the Senate would understand that there may be cases where it might be appropriate to hire outside counsel under certain circumstances. **[*S1165]**

But there is a process. For example, in Arkansas, we had to go to the State legislature. We had to go to the State legislative committee and get approval to hire outside counsel. We also had to have the Governor sign off on the approval. So we had both the legislative and the executive branch signing off on that decision. Again, I cannot promise every State has that same process, but every one I am familiar with has some sort of process they go through and do that.

The United States is a union of States. We should not think of these attorneys general as attorneys. I tried to make this point several times. They are different than private practice attorneys. These attorneys represent the State. They are the mouthpiece for the State. They do the will of the legislature of the State in all of its various capacities.

Mr. President, may I ask how much time I have?

The PRESIDING OFFICER (Mr. Thune). Fifteen seconds.

Mr. PRYOR . Mr. President, after the 15 seconds, what will happen? Can I ask unanimous consent to extend it for another, say, 10 minutes?

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

Mr. PRYOR. Thank you, Mr. President.

But the only point I was going to make on that is, we are a union of States. We should always see the States' attorneys general as being a little different than private sector lawyers. There is nothing wrong with private sector lawyers. Like I said many times during the course of this debate on this amendment, they are doing their job. Theyare representing their clients, and that is great and fantastic. That is the way the system works. But the State's attorney general does more. The State's attorney general has more responsibility. When they speak, they speak on behalf of the State. It is kind of like us being here in Washington. Certainly we are everyday citizens like everybody else, but we are elected to come here and represent our States in this great body.

So I will ask my colleagues to try to see States' attorneys general in a different light, in a

materially different light, not a slightly different light but in a materially, substantially different light than you see your ordinary attorneys in private practice.

Like I said, some say this amendment is unnecessary because it honors the integrity of the bill. I like that in terms of legislative history. But I also say the counterargument there is: If it is unnecessary and if it does not change the impact of the bill, why not vote on it and allow the amendment to make sure we are all protecting the ability of our States to pursue litigation in the way they have always been able to do that.

Mr. President, I ask for the yeas and nays on my amendment.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The yeas and nays were ordered.

Mr. PRYOR . Mr. President, I yield the floor.

Mr. GRASSLEY. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. SPECTER . Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. SPECTER . Mr. President, the time of 12:15 having arrived, we are set for the vote. I move to table the Pryor amendment No. 5, and I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The question is on agreeing to the motion. The clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. McCONNELL. The following Senator was necessarily absent: the Senator from New Hampshire (Mr. Sununu).


[Rollcall Vote No. 5 Leg.]


YEAS - 60
Alexander
Allard
Allen
Bennett
Bond
Brownback

Bunning
Burns
Burr
Carper
Chafee
Chambliss
Coburn
Cochran
Coleman
Collins
Cornyn
Craig
Crapo
DeMint
DeWine
Dodd
Dole
Domenici
Ensign
Enzi
Frist
Graham
Grassley
Gregg
Hagel
Hatch
Hutchison
Inhofe
Isakson
Kohl
Kyl
Lincoln
Lott
Lugar
Martinez
McCain
McConnell
Murkowski
Nelson (NE)
Roberts
Santorum
Schumer
Sessions
Shelby
Smith (OR)
Snowe
Specter
Stevens
Talent
Thomas
Thune
Vitter
Voinovich
Warner

NAYS - 39

Akaka
Baucus
Bayh
Biden
Bingaman
Boxer
Byrd
Cantwell
Clinton
Conrad
Corzine
Dayton
Dorgan
Durbin
Feingold
Feinstein
Harkin
Inouye
Jeffords
Johnson
Kennedy
Kerry
Landrieu
Lautenberg
Leahy
Levin
Lieberman
Mikulski
Murray
Nelson (FL)
Obama
Pryor
Reed
Reid
Rockefeller
Salazar
Sarbanes
Stabenow
Wyden

NOT VOTING - 1

Sununu

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced_yeas 60, nays 39, as follows:

The motion was agreed to.

Mr. SPECTER . Mr. President, I move to reconsider the vote.

Mr. BOND. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. SPECTER . Mr. President, the Senator from Missouri has requested some time in morning business, which is acceptable to the managers. Senator Bond will take 10 minutes in morning business. Then we will proceed to amendments.

I see our colleagues on the other side of the aisle who have risen, who are ready for amendments, so after Senator Bond's 10 minutes we will proceed with the laying down of an amendment.

Mr. KENNEDY. Reserving the right to object, my intention was just to call it up. If I could have the attention of the leader? It was just to call it up, have it before the Senate. We have other Senators who want to speak. Then I will speak on it later, after my colleagues speak.

Could I have the opportunity to call up my amendment and just have it before the Senate?

Mr. SPECTER. Do I understand the Senator from Massachusetts wants 2 minutes?

Mr. KENNEDY. That will be plenty.

Mr. SPECTER. Does the Senator from Missouri agree?

Mr. BOND. I am agreeable.

Amendment No. 2

Mr. KENNEDY. I ask unanimous consent the pending amendment be set aside and call up my amendment, No. 2, which is at the desk.

The PRESIDING OFFICER. Without objection it is so ordered. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from Massachusetts [Mr. Kennedy], for himself, Ms. Cantwell, Mr. Biden, Mr. Leahy, and Mr. Corzine, proposes an amendment numbered 2.

On page 15, strike lines 3 through 7, and insert the following:

"(B) the term 'class action'_

"(i) means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action; and

"(ii) does not include_

"(I) any class action brought under a State or local civil rights law prohibiting discrimination on the basis of race, color, religion, sex, national origin, age, disability, or other classification specified in that law; or

"(II) any class action or collective action brought to obtain relief under State or local law for failure to pay the minimum wage, overtime pay, or wages for all time worked, failure to provide rest or meal breaks, or unlawful use of child labor";

Mr. KENNEDY . Mr. President, because of other Members' schedules, they want to address this and other issues at this time. I intend to come back and have a more complete

statement.

This is about discrimination. It is also about a worker's rights. Those were issues that were never intended to be included in this class action legislation. **[*S1166]**

I will have more to say about it, but it is an extremely important amendment. I will address the Senate on this issue in a very short period of time.

I thank the floor managers for their courtesies in letting us get this matter up. Hopefully, we will have a chance midafternoon to have a vote on it.

Mr. BOND . Mr. President, I ask unanimous consent I may be permitted to speak as in morning business for up to 10 minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

(The remarks of Mr. Bond are printed in today's Record under "Morning Business.")

The PRESIDING OFFICER. The Senator from Pennsylvania.

Mr. SPECTER . Mr. President, the senior Senator from California is on the floor to offer an amendment, titled the Feinstein-Bingaman amendment, which has been the subject of considerable discussion.

As I have said in the earlier portions of the discussion on this bill, I believe class action reform is necessary to move cases into the Federal courts, but I think it is important that there not be any substantive law changes, as I indicated previously on the floor. I had been in support of the Bingaman amendment. The management in opposition will be handled by Senator Hatch.

I yield the floor.

The PRESIDING OFFICER. The Senator from California.

Mrs. FEINSTEIN . Mr. President, I thank the Senator from Pennsylvania.

I ask unanimous consent that the pending amendment be set aside.

The PRESIDING OFFICER. Without objection, it is so ordered.

Amendment No. 4

Mrs. FEINSTEIN . Mr. President, I send an amendment to the desk.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from California [Mrs. Feinstein], for herself and Mr. Bingaman, proposes an amendment numbered 4.

Mrs. FEINSTEIN . Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To clarify the application of State law in certain class actions, and for other purposes)

On page 24, before line 22, insert the following:

(c) Choice of State Law in Interstate Class Actions._Notwithstanding any other choice of law rule, in any class action, over which the district courts have jurisdiction, asserting claims arising under State law concerning products or services marketed, sold, or provided in more than 1 State on behalf of a proposed class, which includes citizens of more than 1 such State, as to each such claim and any defense to such claim_

(1) the district court shall not deny class certification, in whole or in part, on the ground that the law of more than 1 State will be applied;

(2) the district court shall require each party to submit their recommendations for subclassifications among the plaintiff class based on substantially similar State law; and

(3) the district court shall_

(A) issue subclassifications, as determined necessary, to permit the action to proceed; or

(B) if the district court determines such subclassifications are an impracticable method of managing the action, the district court shall attempt to ensure that plaintiffs' State laws are applied to the extent practical.

Mrs. FEINSTEIN . Mr. President, what I would like to do is say a few words on behalf of this amendment which is submitted on behalf of both Senator Bingaman, who will be on the floor shortly to speak on it, and myself.

As the legislation has been debated, Senator Bingaman has raised, I think, a reasonable, valid, and a real concern about whether certain national class action cases may be caught in a catch-22 when they were prohibited from having their cases heard either in State or Federal court, leaving the case to reside in oblivion.

This problem was best described by the Bruce Bromley Harvard Law Professor Arthur Miller in a letter he sent to Senator Bingaman. It is a lengthy letter, but I will read one part:

Under current doctrines, federal courts hearing state law-based claims, must use the "choice-of-law" rule of the State in which the federal district court sits. These procedural rules vary among states, but many provide that the federal court should apply the substantive law of a home state of a plaintiff, or the law of the state where the harm occurred. In a nationwide consumer class action, such a rule would lead the court to apply to each class member's claim the law of the state in which the class member lives or lived at the time the harm occurred. As noted, most federal courts will not grant class certification in these situations because they find the cases would be "unmanageable."

That is the catch-22. You send a consumer class action to Federal court, the judge says it is unmanageable, will not certify it, the case cannot go back to State court and it sits in oblivion. Senator Bingaman and I have worked to address this problem. I believe we have.

The original solution proposed by Senator Bingaman was a bit too broad because it could impact consumers in States with strong consumer protection laws such as my State of California. What we tried to do, and did, was develop a compromise amendment that

provides Federal judges with guidance on how to proceed in these cases, while leaving the judges with the discretion they need to manage their court dockets.

This ensures that national class actions will be heard. They will be certified and claimants in those cases will be more likely to receive the benefit ofhis or her own State's law.

Let me quickly go over the amendment. The amendment basically provides that:

Notwithstanding any other so-called choice of law rule [which is what is involved here] in any class action over which the district courts have jurisdiction, asserting claims arising under State law concerning products or services marketed, sold, or provided in more than 1 State on behalf of a proposed class, which includes citizens of more than 1 such State, as to each such claim and any defense to such claim_

Here is the amendment:

(1) the district court shall not deny class certification, in whole or in part, on the ground that the law of more than one State will be applied.

That solves the problem of the kind of unanswered question in this bill, Can a class action remain uncertified? The answer is, clearly, no.

(2) the district court shall require each party to submit their recommendations for subclassifications among the plaintiff class based on substantially similar State law; and

(3) the district court shall_

(A) issue subclassifications, as determined necessary, to permit the action to proceed; or

(B) if the district court determines such subclassifications are an impracticable method of managing the action, the district court shall attempt to ensure that plaintiffs' State laws are applied to the extent practical.

This provides guidance to the judge. Secondly, it requires these cases receive certification in the district court.

We believe this is a good solution. It is a significant solution. I hope this Senate will accept that.

Let me say something about this bill as a supporter of a class action bill. This bill is not perfect. It represents the best that can be done to solve what is a real problem in our legal system. I have tried to spend a good deal of time on this issue through Judiciary Committee hearings, personal hearings with both sides, and research and analysis.

As I said in the Judiciary Committee when we marked up the bill, I had a kind of epiphany in one of the hearings a few years ago when a woman named Hilda Bankston testified before our committee. She was the owner of a small pharmacy, with her late husband, in Mississippi. The Bankstons were sued more than 100 times for doing nothing other than filling legal prescriptions. The pharmacy had done nothing wrong, but they were the only drugstore in the county, a county that was so plaintiff friendly that there are actually more plaintiffs than residents. So she, in effect, became a person to sue in that county to enable the forum shopping process to take place.

I will read a letter from her because it is indicative. Let me say this: This bill is not anti-class action as some would have Members believe. This bill tries to fix a broken part of class action which is the ability to venue or forum shop and to make that much more difficult. The

Bankston case is a reason for doing that. So many people such as Hilda Bankston, innocent people who have done nothing wrong, get caught up in how these class actions are put together.

Let me quickly read what she told us in committee:  **[*S1167]**

For 30 years, my husband, Navy Seaman Fourth Class Mitchell Bankston, and I lived our dream, owning and operating Bankston Drugstore in Fayette, MS. We worked hard and my husband built a solid reputation as a caring, honest pharmacist . . .

Three weeks after being named in the [first] lawsuit, Mitch, who was 58 years old and in good health, died suddenly of a massive heart attack . . .

I sold the pharmacy in 2000, but have spent many years since retrieving records for plaintiffs and getting dragged into court again and again to testify in hundreds of national lawsuits brought in Jefferson County against the pharmacy and out-of-state manufacturers of other drugs . . . I had to hire personnel to watch the store while I was dragged into court on numerous occasions to testify.

I endured the whispers and questions of my customers and neighbors wondering what we did to end up in court so often. And, I spent many sleepless nights wondering if my business would survive the tidal wave of lawsuits cresting over it . . .

This lawsuit frenzy has hurt my family and my community. Businesses will no longer locate in Jefferson County because of fear of litigation. The county's reputation has driven liability insurance rates through the roof.

No small business should have to endure the nightmares I have experienced.

This amended Class Action Fairness Act goes a long way toward stopping forum shopping by allowing Federal courts to hear truly national class action lawsuits. The Constitution itself states that the Federal judicial power "shall extend . . . to controversies between citizens of different States."

Yet an anomaly in our current law has resulted in a disparity wherein class actions are treated differently than regular cases and often stay in State court. The current rules of procedure have not kept up with the times. The result is a broken system that has strayed far from the Framers' intent.

I believe this bill is a well-thought-out, reasoned and an easily read bill. I have actually read it three times_as solution to this problem it does a number of things.

First, the bill contains a consumer class action bill of rights to provide greater information and greater oversight of settlements that might unfairly benefit attorneys at the expense of truly injured parties.

For instance, the bill ensures that judges review the fairness of proposed settlements if those settlements provide only coupons to the plaintiffs. It bans settlements that actually impose net costs on class members. It requires that all settlements be written in plain English so all class members can understand their rights. And it provides that State attorneys general can review settlements involving plaintiffs.

All these things are important guarantees for the plaintiff, for the individual, for the aggrieved party. I believe it makes the class action procedure much sounder for the consumer.

Secondly, the legislation creates a new set of rules for when a class action may be so-called removed to Federal court. These diversity requirements were modified in committee and again since then to make it clear that cases that are truly national in scope should be removed to Federal court. But equally important, the rules preserve truly State actions so that those confined to one State remain in State courts.

Now, the original bill that came to the Judiciary Committee said all class actions where a substantial majority of the members of the class and the defendants are citizens of the State would be moved to Federal court. We changed this. I actually offered an amendment in committee that changed this definition to split the jurisdiction into thirds. Now there is less ambiguity about where a case will end up, and more cases will actually remain in State court.

I think that is important to stress: more cases will actually remain in State court. This is an important compromise.

If more than two-thirds of the plaintiffs are from the same State as the primary defendant, the case automatically stays in State court.

If fewer than one-third of the plaintiffs are from the same State as the primary defendant, the case may automatically be removed to Federal court. Remember, this happens only if one of the parties asks for removal. Otherwise, these cases, too, remain in State court.

In the middle third of the cases, where between one-third and two-thirds of the plaintiffs are from the same State as the primary defendant, the amendment would give the Federal judge discretion to accept removal or remand the case back to the State based on a number of factors which are defined in the bill.

I would hope Members would take the time to read the bill. I think it is an important bill. I think to a great extent it has been maligned in that people have chosen to interpret it as anti-class action. I think if those of us_and it is interesting that some of us on this bill are not attorneys; Senator Grassley, Senator Kohl, certainly myself from the Judiciary Committee_I think if you are not an attorney, you can look at the forest and not really get caught up in some of the process trees of that forest, and you can make an assessment whether the forest well serves class action cases.

I think these changes, and particularly the diversity requirement changes, make this a much sounder way to make a decision as to whether a class action should remain in State court or is truly national in scope and, therefore, should be heard by the Federal court.

I commend to this body the consumer bill of rights. It is very clear in reading the bill that protections are given for coupons. There is review for settlements. The consumer is taken very seriously. I think the system is improved.

Now, let me speak just for a moment to this business: Well, you have to take the bill as is or forget it, there is not going to be a bill. There is an arrangement with the House to take the bill if it is exactly as is.

Well, in many complicated issues, there are dilemmas or problems or issues or corrections that need to be made which appear as the legislative process takes place. And that is what has happened with this bill. In certain areas of concern, where the law may be silent, and case law may be conflicting, I think it is important to clarify the law. That is what the Feinstein-Bingaman amendment does. There is a hole there. The issue is governed by old case law. What we do is, in essence, codify that so we make clear the discretion that the judge has.

Most importantly, we make clear that a bona fide class action going to Federal court is not going to fall into oblivion because a judge is going to say, Oh, my goodness, there are so many State laws at issue here I can't possibly manage the case, and, therefore, that judge does nothing and the case goes nowhere.

So I think we have worked out a good solution. I know Senator Bingaman was here on the Senate floor. I would say to the Senator from Pennsylvania, I know he is desirous of saying a few words. So perhaps if his staff is listening, they will urge him to come to the floor. Otherwise, Mr. President, I thank the Chair, and I thank the chairman.

I yield the floor.

Mr. GRASSLEY. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. BINGAMAN . Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BINGAMAN . Mr. President, I rise to express my strong support for Senator Feinstein's amendment. The amendment will provide courts with guidance as to how to manage large multistate class actions in Federal court. This amendment addresses a flaw in the underlying legislation that, if left uncorrected, could leave many properly filed multistate consumer class actions without a forum in which those cases could be heard.

I had prepared an amendment that would have reaffirmed the discretionary authority of a judge to select the law of one State, as is currently permissible under the Constitution, and reaffirm the right of the judge to do that instead of denying certification for large multistate consumer class actions. There were some concerns raised by my colleagues, and I have agreed to withhold that amendment and lend my support to the Feinstein compromise approach. I believe the Feinstein compromise will accomplish what I intended to address in my amendment; that is, to make sure injured consumers have their day in court.
  [*S1168]

By amending the diversity jurisdiction rules, the Class Action Fairness Act of 2005 will give almost exclusive jurisdiction to the Federal courts to hear class action cases. The proponents of the legislation argue that such changes are necessary due to abuses that are occurring in a handful of State courts. Although the bill makes changes to other aspects of class action litigation, such as coupon settlements, this procedural removal of cases from State court to Federal court should be the focus of our scrutiny. This goes to the core of the 10th amendment of the Constitution that preserves the right of a State to protect its citizens. While this shift may be necessary in certain cases, it should not be taken lightly, as we will be taking away the ability of States to hear cases involving injuries to their citizens that are in violation of the State law. This is clearly a fundamental change in jurisprudence.

Class action suits have long provided a means for individuals to band together to seek a remedy when they have collectively been damaged in a manner that is significant but would not be economical to advance on their own. These actions empower those citizens who would be left without redress, absent the collective effort of others. This system has provided a necessary balance to a system weighted toward those with the means to defend their actions in court. The suits also take much of the pressure off of a State attorney general. The State

attorneys general are not able to investigate and seek remedies for all the citizens who have been damaged or hurt by business in and outside of a State. Class actions reduce the need for overly burdensome regulations and laws that would be necessary if it were to be forced to limit the discretion given to businesses to operate in a responsible manner.

Finally, class action litigation protects our citizens from future injuries by putting an end to certain acts of corporate malfeasance and negligence. Although there have been abuses on occasion, the benefits of class action litigation should be evident. Under current law, an individual has the right to participate in a class when a number of people have been injured in a similar fashion by the same defendant. Once the class has been created, if the injury is based on a violation of State law_and many are, as there are really no general consumer protection laws_the class representative generally has the option of filingeither in State court or Federal court. In this respect, a class action is similar to any action that is filed in court; that is, the plaintiff is the master of his or her claims.

The proponents of this legislation have argued that the basic goal of the legislation is to move these large class actions to Federal court. For instance, Stanton D. Anderson, executive vice president and chief legal counsel for the U.S. Chamber of Commerce, wrote in the Philadelphia Inquirer, dated February 27, 2004, that:

[t]he Class Action Fairness Act would simply allow federal courts to more easily hear large, national class action lawsuits affecting consumers all over the country.

Similarly, in testimony before the Judiciary Committee on July 31, 2002, Walter Dellinger stated:

[t]he principal purpose and effect of the [class action] bill is undeniably modest: it merely adjusts the rules of diversity jurisdiction so that certain large multi-party cases_those with true nationwide compass, affecting many or even all states at once_will be litigated in the federal courts rather than in the courts of just one state (or county) or another.

Suffice it to say, the new Federal diversity statute for purposes of class action will accomplish this as very few, if any, cases will meet the standards necessary to remain in State court. The operative question is, then, What will happen to these cases once they are in the Federal court system? If we look at the past decade or so, we note an interesting pattern. Although some State courts have certified these large multistate class actions, the Federal courts have not. In fact, six U.S. circuit courts of appeal_the Third Circuit, the Fifth Circuit, the Sixth Circuit, the Seventh Circuit, the Ninth Circuit, and the Eleventh Circuit_and at least 26 Federal district courts have denied class certification in multistate consumer class actions. Except for a 1986 Third Circuit decision which has since been narrowed to only its facts, no U.S. circuit court of appeals has granted class certification in such a case. At the same time, at least seven different States have certified large multistate consumer class actions.

Under rule 23(b)(3) of the Federal Rules of Civil Procedure, an action "may be maintained as a class action if the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members."

Because class action lawsuits involving fraud and deceptive sales practices or sales of defective products allege violations of State consumer protection statutes or common law, there is always a possibility that the laws to be applied will be different. If a court determines that they must apply the laws of different States to different members of a class action, they often find that questions of law common to the members of a class do not predominate. That renders the adjudication of the case as a class action unmanageable, and they deny class certification. This denial is effectively the end of the action. It is not hard to understand why State courts are the forum of choice for these large class actions.

The proponents of this legislation are aware that Federal courts do not certify these large class actions. In fact, in most cases, they argue this very point in court.

For example, in re Simon, the second litigation, which was before the U.S. Court of Appeals for the Second Circuit, the Chamber of Commerce opined:

. . . it is nearly a truism that nationwide class actions in which the claims are subject to varying State laws cannot be certified because they are simply unmanageable.

Obviously, these arguments have been persuasive before the Federal courts. In re the Ford Motor Company ignition switch products liability litigation that was in the U.S. District Court for New Jersey, that court stated:

[P]laintiffs' first cause of action contends that Ford breached an implied warranty of merchantability under each of the many States' laws that govern this action. Variations among these States' laws, however, preclude classwide adjudication of plaintiffs' claims.

This case involved a defective ignition switch that caused it to fail. It has been claimed that this failure may have resulted in as many as 11 deaths and 31 injuries, not to mention almost a billion dollars spent by consumers to replace the defective product. The case was ultimately settled, but it was only settled after a State court in California agreed to certify a class.

Senator Feinstein's amendment makes sure that by moving these cases to Federal court, we are not pushing them into a forum that will fail to hear those cases because too many State laws apply.

The amendment requires the parties to submit plans as to how the case could be managed by dividing it into subclasses based on the similarity of the State laws that would need to be applied. The judge would then have the discretion to divide the class into subclasses or use some other manner that ensures that the plaintiffs' State laws are applied.

Under the Feinstein amendment, the Federal court is not required to divide the class into subclasses; it is simply discretionary. It can still follow the State's choice of law rules, or use any other means permissible to ensure that the plaintiffs' State laws are applied to the extent practicable.

If we are going to take away the right of State judges to hear a class action, it is incumbent upon us to make sure the Federal judge is not able to not certify the class because too many State laws would apply. That would be an unfair result.

I have heard many Members argue that a deal is a deal; therefore, Members who support the bill, including those who were able to get changes made to the bill before it was brought to the floor, should be precluded from supporting any amendment, including this amendment. I remind my colleagues that although this legislation has been around for years, there has not been a single amendment to improve this legislation that has been voted on on the floor of the Senate prior to this week.

The stated intention of the proponents of this bill is to avoid conference with the House and to have that Chamber pass the bill exactly the way it passes the Senate. While they argue this is a reason to not support  **[*S1169]**  amendments, I would argue the opposite. Because we know this is the only opportunity for any Member of Congress to amend this legislation, it is imperative that we remain openminded to the few amendments that are going to be offered and debated on the bill.

In the 22 years I have been in the Senate, I do not recall a single piece of legislation that

could not have benefited from input from all interested Members of the Senate. The Founding Fathers of our country created a legislative branch that is intentionally deliberative and subject to the repetitive processes of debate and amendment.

I remind my colleagues of the language included in last year's nonamendable Omnibus appropriations bill that would have allowed staff from the appropriations committees to review taxpayers' tax return information. That one provision almost derailed the entire spending bill for our country. Clearly, if Members had been presented with an opportunity to review the bill on the floor, to amend that bill, we could have avoided that problem.

As elected officials, we have a responsibility to the public to do our best to improve legislation before it becomes law, which I believe argues for Members to consider each amendment with an open mind. If my colleagues disagree with this amendment, then I encourage them to vote against it. However, if they agree with me that this catch-22, which is in the current bill, should be corrected, then I hope they will vote for this Feinstein amendment, regardless of whether you previously stated support for the overall bill.

I would like to acknowledge and thank the chairman of the Judiciary Committee, Senator Specter, for his support of my amendment and what I understand to be his support of the Feinstein amendment. No one could debate the chairman's dedication to getting this bill passed. Yet he agrees that the legislation would be improved by correcting the problem we have identified.

Substantively, one of the arguments that was raised by proponents of the bill is that courts have been certifying classes in these large multistate class actions, even though all of the circuits I mentioned before in numerous district courts have denied certification on the ground that the case is unmanageable. The cases enlisted by proponents of the bill in defense of their claim that cases have been certified are cases involving a Federal question or certifications of a class for purposes of settlement. These types of certifications are entirely different than the cases we are referring to; that is, cases involving violations of State law for purposes of a trial. The only way these cases are going to get to the settlement phase is if there is the possibility that a case could be taken to trial, if necessary. It is an important distinction.

Again, I point to this in re Simon II litigation where the Chamber of Commerce argued against certification, stating that it is nearly a truism that nationwide class actions in which the claims are subject to varying State laws cannot be certified because they are simply unmanageable.

As I mentioned before, this is not just an abstract situation. There are over 300,000 homeowners in Mississippi, Louisiana, Florida, and Texas who have been compensated for defective siding they had purchased for their houses. When this case was brought before the Federal court, it was not certified, in part because the court could not "imagine managing a trial under the law of 51 jurisdictions on the defectiveness of masonite siding." Because an Alabama State court agreed to certify the case for trial, the case was settled, and these homeowners werecompensated for their damages.

Proponents of the legislation also argue that a class denied certification would be free to refile its cases in either State or Federal court. Based on the underlying legislation, the State court cases, almost without exception, would be removed again to the Federal court, and once in Federal court, the case would be sent to the same Federal court that failed to certify the class in the first place due to the procedure for consolidation and the operation of the multidistrict litigation panel.

This MDL, multidistrict litigation panel, streamlines large, unwieldy multidistrict litigation involving the same parties and the same facts when those cases are filed in Federal courts.

This panel of seven judges appointed by the Chief Justice of the Supreme Court determines which cases pending in Federal court should be transferred to a single district court for purposes of hearing and ruling on pretrial matters, including the matter of class certification.

The proceedings can be initiated by the MDL panel or by any party involved in one of the actions pending in a district court. All cases of a similar nature in Federal court, including those filed after the consolidation, are affected and subject to being transferred. Once a transferee court has been selected, it rules on all pretrial motions, including class certification, but will send the cases back to the transferor courts for trial, assuming that the case has not settled or been dismissed. All future cases involving similar claims and similar parties are automatically sent back to the same transferee court for any future actions.

Class actions by their very nature are large cases and they are affected by the ability of the MDL panel to consolidate, as there are generally different cases pending in district courts throughout the country. Under current law, a class based on claims of State law violations can avoid this consolidation by remaining in State court, but this will no longer be the case after this bill becomes law. Instead, plaintiffs who go through the consolidation process and are not certified will not refile these cases since they would ultimately be back before the same judge who failed to certify the class in the first place.

Finally, the proponents of the bill have argued that taking away the right of a judge to deny certification based on too many States' laws is a violation of due process and is anticonsumer. It seems implausible to me that an amendment that would ameliorate the impact of denying States the right to hear certain cases could be considered either a violation of due process or anticonsumer. I believe the amendment of the Senator from California is fair. It is a reasonable approach to dealing with a serious problem created in the underlying legislation.

As Chairman Specter stated earlier in the week, this legislation is intended to change the procedure for class actions and not the substantive law. Without Senator Feinstein's amendment this bill could effectively limit the substantive rights of citizens to obtain a remedy for modest damages when a defendant has injured many in a similar fashion. I hope my colleagues will join me in supporting the Feinstein amendment.

I have a letter I received from Professor Arthur Miller at the Harvard Law School. He has been very helpful to me and to other Senators in trying to help us understand the seriousness of the issue and the importance of remedying this through proposals such as the Feinstein amendment. I ask unanimous consent that the letter be printed in the Record at the end of my remarks.

There being no objection, the material was ordered to be printed in the Record, as follows:

Harvard Law School,

Cambridge, MA, June 17, 2005.

Hon. Jeff BIngaman,

U.S. Senate,

Washington, DC.

Dear Senator Bingaman: I am happy to respond to your letter of June 14 asking for my views of your proposed "choice of law" amendment to the proposed "Class Action Fairness Act" ( S. 2062). After decades of teaching, practicing, writing, and serving the Judiciary in various public service capacities in the fields of civil procedure, complex litigation, and class actions, I

very interested in any federal legislation affecting class action lawsuits, and particularly, in the possibility of making this particular legislation fairer and more balanced.

In general, S. 2062 would place in federal court most class actions that involve more than $5 million in losses and more than 100 class members, and in which any defendant is a citizen of a state that is different from that of any member of the plaintiff class. In effect, the proposed legislation would federalize all class actions of any significance. I be1ieve that this radical departure from one of the most basic, longstanding principles of federalism is a particular affront to state judges when we consider the unquestioned vitality and competence of state courts to which we have historically and frequently entrusted the enforcement of state-created rights and remedies. I recognize, however, that apparently a majority of the Senate supports the idea of moving most class action lawsuits from state to federal court. If
 **[\*S1170]**
that is the case, your proposed amendment is essential to ensure that, once class actions were moved into the federal courts, these cases not be consigned to oblivion. That real possibility goes beyond the just mentioned intrusion on federalism principles and raises legitimate concerns about the fairness and balance of S. 2062.

Proponents of S. 2062 argue that federal courts are the more appropriate forum for lawsuits involving plaintiffs from multiple states. They assert that the goal of the bill is to ensure that nationwide cases will "be litigated in the federal courts rather than in the courts of just one state (or county) or another." Of course, that statement ignores the fact that state courts have been trusted to adjudicate multi-state controversies since the foundation of the Nation. Moreover, the truth is that these cases are not litigated in federal court; most commonly they are denied class certification. The proposed legislation would magnify that reality.

Federal courts have consistently denied class certification in multi-state lawsuits based on consumer laws as well as other state laws. This fact is acknowledged by most class action practitioners and experts, regardless of their position on class action policy issues. Just last year, the U.S. Chamber of Commerce_the leading proponent of S. 2062_filed an amicus curiae brief in the U.S. Court of Appeals for the Second Circuit urging the court to overrule a distinguished district court's class certification decision because ". . . federal courts have consistently refused to certify nationwide class actions in product defect cases because the need to apply the laws of many different states would make such a sprawling class action unmanageable." The Chamber went on to conclude, ". . . it is nearly a truism that nationwide class actions in which the claims are subject to varying state laws cannot be certified because they are simply unmanageable." On this point, the Chamber is correct_not a single Federal Circuit Court has granted class certification for such a lawsuit, and six Circuit Courts have expressly denied certification.

It is not surprising that federal courts are reluctant to grant certification to multi-state class actions based on state consumer protection laws. After all, these are laws with which the federal courts generally are not familiar or comfortable. Imagine the discomfort of a federal judge, then, when confronted with a case involving tens of thousands of individuals from all fifty states and state laws that at least superficia11y appear to be different. Moreover, our federal courts have limited resources and are responsible for adjudicating a tremendous array of substantive matters. State courts, on the other hand, are far more comfortable handling cases involving state contract or tort law and are, therefore, more inclined to try to find a way to hear and resolve those cases.

Your proposed amendment will provide guidance to federal judges that will enable more multi-state consumer class actions to be certified in federal court and, hopefully, resolved on their actual merits. If S. 2062 is enacted without the amendment, class action lawsuits brought on behalf of consumers who have been defrauded or injured because of corporate misconduct that affected people in multiple states will continue to be non-viable.

The following is a brief description of how federal courts currently treat class actions based on different state laws. It will elucidate the need for an amendment like yours in the event that Congress does indeed give federal courts exclusive jurisdiction over class actions that involve solely state law claims.

The rationale that many federal courts use for refusing to certify consumer class actions that involve solely state law claims on beha1f of citizens from different states rests on the requirement of Federal Rule of Civil Procedure 23(b)(3), which governs most consumer class actions brought in federal court. Rule 23(b)(3) says, in pertinent part: "An action may be maintained as a class action if . . . the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." When courts feel compelled to apply the laws of different states to different members of a class action, they often find that questions of law common to the members of the class do not predominate, leading them to conclude that proceeding on a class action basis would prove to be unmanageable, and they deny class certification.

Federal courts often conclude they must apply the laws of different states to different members of a class action after they engage in a complex "choice of law" analysis to determine which state's law to apply to the claims of the class members. Under current doctrines, federal courts hearing state law based claims must use the "choice-of-law" rule of the state in which the federal district court sits. These procedural rules vary among states, but many provide that the federal court should apply the substantive law of the home state of the plaintiff, or the law of the state where the harm occurred. In a nationwide consumer class action, such a rule would lead the court to apply to each class member's claim the law of the state in which the class member lives, or lived at the time the harm occurred. As noted, most federal courts will not grant class certification in these situations because they find that the classes would be "unmanageable."

Your amendment would allow a federal court to choose not to follow the choice-of-law rule of the state in which the court is located. The federal judge could instead make the case more manageable by choosing the law of one state with sufficient ties to the underlying claims to meet the choice of law requirements that the Constitution demands be met. That state often will be the state in which the defendant's headquarters is located, or where the product was designed or manufactured, or where the marketing materials were conceived, or where the particular business practice being challenged was developed or executed.

If the federal district judge chooses to reject the option of applying one state's law to the case, your amendment ensures that the judge does not deny class certification on the sole ground that the laws of more than one state would apply to the action. This protects consumers from being caught in the ultimate Catch-22 situation_their lawsuit is in federal court because the class includes people from many states and Congress has said that is the only place the class can go, but then, the federal court will not grant class certification precisely because the class involves citizens from multiple states. That simply violates the most basic principles of citizen access to the courts. I believe that your amendment strikes the appropriate balance among the interests of the class members, defendants, and the courts. Most important, it will ensure that S. 2062 does not lead to the unintended consequence of robbing from consumers their only avenue to seek redress from corporations that violate the law.

If S. 2062 passes without your amendment, the only outlet for injured consumers will be single-state class actions. But that would fly in the face of what the proponents of the bill are apparently trying to achieve, which is to consolidate nationwide class actions in one forum, federal court, so that businesses do not have to face multiple lawsuits throughout the country. What is worse, the only plaintiffs who will he represented and compensated through single state actions are those from highly-populated states, where the damages suffered by the class members will be large enough to finance a costly and typically risky class action

lawsuit. This may be a practical and viable solution for those who live in a state like California or Texas. But it will leave millions of consumers who have been harmed in less-populated states, such as your home state of New Mexico, without relief.

Your amendment effectively and efficiently allows multi-state class actions in consumer cases to be certified in federal court. It actually accomplishes what the bill purports to achieve_giving harmed consumers from multiple states one federal forum in which to seek relief. Under your amendment, the federal judge will have the discretion to apply one state's law, as long as that is constitutionally permissible. Or the judge may choose to manage the case in a different way, perhaps by grouping states together that have similar laws into subclasses or by using exemplar or test cases or by resorting to the increasingly sophisticated tool chest of management procedures our courts have developed. In any event, the judge may not dismiss a case on the ground that the litigation is unmanageable simply because multiple state laws apply. The judge does, of course, maintain the discretion to refuse to certify the class on other grounds. The amendment is quite modest, but it does restore some balance and fairness to the bill by increasing the likelihood that citizens will have access to the courts to present their grievances.

Your letter to me notes that proponents of the bill are portraying this amendment as anti-consumer. Such a characterization could not be further from the truth and is little more than rhetoric. Indeed, in my judgment, it is S. 2062 that is anti-consumer.

As noted above, under current practice, federal courts rarely certify nationwide consumer class actions. In almost every instance in which allegations of wrongdoing injuring large numbers of consumers have been brought, the decision to deny class certification will eviscerate any opportunity for the victims to seek redress. The individual members of the class simply will not suffer losses large enough to justify bringing suit solely on one person's behalf. It is hardly anti-consumer to provide a mechanism to enable federal courts to certify cases and afford consumers an opportunity to have their grievances heard.

Thus I believe your amendment provides a balanced solution. It allows injured consumers a better chance of getting their day in court. And it provides federal judges with a reasonable way to manage multi-state class actions based on consumer laws.

You also note that proponents of the legislation have suggested that this amendment is unconstitutional. There is no basis for such an assertion.

Your amendment expressly honors the Constitution by stating, "the district court may apply the rule of decision of one state having a sufficient interest in the claim that the application of that state's law is permissible under the Constitution." Although the amendment allows a federal judge to apply one state's law, it does so only when that is constitutionally acceptable.

The constitutional limitation on applying a single state's law to a multi-state action is derived from Phillips Petroleum Co. v. Shutts et al., 472 U. S. 797 (185), a case that I argued on behalf of Phillips Petroleum Co. before the Supreme Court. The Court held that "for a State's substantive law to be selected in a constitutionally permissible manner, that **[\*S1171]** State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." Id. at 818 (internal cite and quotations omitted). Thus, as long as there are "significant contacts" and the choice of law is not "arbitrary" or "fundamentally unfair," then a single state's laws may apply to a multi-state class action. Neither party can object to that.

Because your amendment effectively codifies Shutts, it is constitutional. If there is a multi-state class action in which no single state's law meets the constitutional standard set forth in Shutts or if the judge does not choose to apply a single state law that does meet the

constitutional criteria, then the judge may follow the choice of law rules of the state in which the district court sits. Part (b) of the amendment does not implicate the Constitution in any way. It merely provides that if the judge does not apply a single state law, then he or she may not deny certification under Rule 23 on the narrow ground that multiple states' laws apply to the case and make it unmanageable. It encourages federal judges to try to go forward and reach the merits of the dispute.

Thus, your amendment gives federal judges appropriate guidance about how to address multi-state consumer class action lawsuits. It does not mandate a result or tie their hands. This ability to make a case more manageable will allow at least some multi-state consumer class actions to be heard, rather than to be denied certification. As the California State Supreme Court aptly recognized, defendants should not be able to keep ill-gotten gains "simply because their conduct harmed large numbers of people in small amounts instead of smal1 numbers of people in large amounts." State v. Levi Strauss & Co., 41 Cal.3d 460 (1986). Yet that is where this bill as written will lead us, and that is extremely bad policy.

Unless the Senate wants to enact legislation that, as a practical matter, eliminates multi-state class actions, it should not pass S. 2062 as it is written. Under S. 2062, multi-state class actions in consumer law cases, a vital mechanism for promoting social justice, giving people access to the courts and dealing fairly with our citizenry, will become an artifact, a thing of the past. At a minimum, the Senate would be wise to adopt your amendment, which would allow plaintiffs to have their day in federal court; after all, the proponents of the legislation argue that is the goal of the bill.

Thank you again for your willingness to address this important issue. If you have any additional questions about S. 2062 or the benefits of your amendment, I would be happy to assist you further.

Sincerely yours,

Arthur R. Miller,

Bruce Bromley Professor of Law.

Mr. BINGAMAN. I yield the floor, and I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. GRASSLEY . Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Mr. Chambliss). Without objection, it is so ordered.

The Senator from Iowa is recognized.

Mr. GRASSLEY . Mr. President, when I spoke prior to Senator Pryor's amendment, I made a pitch that I want to repeat about the opportunity we have now, after four Congresses_this is the fifth Congress_to get this bill to the President. It has passed the House so many times, and we have never been able to get it to finality in the Senate. We have the House in position now, even after all of these compromises we have made which have diluted the bill more than I would have liked to have done, of passing a bill the leadership in the House of Representatives tells us they will take the way we pass it and send it to the President as long as there are no changes, and this assurance about no changes comes from two standpoints.

One, in the previous Congress we made compromises to get Democratic votes with the idea that once those changes were made and we got this bill through the Senate, they would not be changed in the House. We also got the assurance from the House that they would not change it, even though the House has passed much stronger legislation a couple of times. So there is an assurance in this body for people who would rather not pass strong legislation but they know there needs to be some changes in class action regime, to make some modest changes, and make sure that what they agree to will be what gets to the President, and then the House saying now for a new Congress they will pass this legislation without amendment.

So every Democrat who has made a compromise with us so we can get this bill behind us can be satisfied that they will not be nickeled and dimed to death.

Obviously, not all Democrats are satisfied with this sort of agreement and that is their right as individual Senators to try to change it more. But as I said before, any changes in this bill negate both promises that have been made. It means the promise to go through the House will not be kept because the bill has been changed in the Senate, and then for those Senators who got the assurance from me that this bill would not be changed in the House so that they were not nickeled and dimed away with their compromises are going to lose the opportunity of getting what they want without the assurance that somewhere else in the legislative process, probably conference, there might be a much stronger bill than they want.

This bill was originally introduced in the 105th Congress, then the 106th Congress, then the 107th Congress. We moved it in the 108th Congress. Now we are here in the 109th Congress. Almost everybody seems to believe there is some reform that needs to be done in the class action tort regime. This bill is it.

Now we have amendments. We defeated the amendment of Senator Pryor. We had an amendment by Senator Bingaman that we were going to deal with, that would have destroyed this compromise. There must have been a belief on the part of the people behind the Bingaman amendment that it would not go, so instead of the Bingaman amendment we have in front of us a Feinstein modification of the Bingaman amendment.

I am in the same position I was with the amendment of Senator Pryor, asking people to defeat the Feinstein-Bingaman amendment. I will be very precise why that needs to be done. But the substance of the amendment and my arguing against the substance of the amendment should not carry as much weight with my colleagues as my pleading with them that we defeat all amendments because this bill has been compromised to satisfy a supermajority of Senators_not a bare majority, a supermajority.

So I take this opportunity to speak out against the Feinstein-Bingaman "choice of law" amendment, and I urge my colleagues to oppose it. Pure and simple, this amendment blows a hole in the bill and guts the modest reforms we are finally going to be able to get to the President.

This amendment would require the Federal courts to certify a class that does not meet basic class action requirements. In addition, what the amendment does is a contravention of the requirements of rule 23 of the Federal Rules of Civil Procedure, which rule says you have to have similar law in fact in order to certify a class. The net result of this amendment is that it would require Federal judges to hear dissimilar claims that do not belong together as a class action, and would not be allowed to proceed as a class action under current law. Requiring courts to subclass does not make this amendment any better.

This amendment would require Federal judges to not follow the requirements for certifying class under rule 23. Why do the proponents of this amendment want to do that? They have given reasons for their amendment and I think, whether this is their intention or not_and I should not question the motives of people_but the end result is perpetuating the abuses that

were already seen in the magnet courts, these infamous judicial hellholes which have been referred to. I remember only one out of dozens throughout the country, but one was in Madison County, IL.

The purpose of class actions is obvious: to enable courts to decide large numbers of similar claims and to do it fairly and to do it in an efficient manner. Different claims cannot be pulled together as a class action because that would be unfair and it would violate the due process rights of both plaintiffs and defendants. But the Feinstein-Bingaman amendment would require judges to do just that. As you know, that is exactly what the problem is all about, what our bill was trying to correct: judges certifying classes that should never have been certified in the first place. Rules are in place as to what should or should not be certified,
 **[*S1172]**
and the Feinstein-Bingaman amendment blows those rules off. The efficiency and the rationale of that rule should not be followed.

The Federal courts should undertake a review to determine whether multistate class actions involving State law claims should be certified. They need to determine that the legal claims are sufficiently similar to warrant class certification. Most State courts make the same kind of determinations as well. The magnet State courts, on the other hand, do not make this determination and that is why they certify huge classes that involve claims that are completely dissimilar, to the detriment of both plaintiff and defendant. That ends up being a due process problem.

In addition, this amendment before us ignores how diversity jurisdiction works, and it eviscerates the reforms that are contained in our bill.

Another argument for this amendment by Senator Feinstein and Senator Bingaman is allegedly that Federal courts refuse to certify nationwide class actions. That sort of presumption is plain wrong. That is not the case. There are numerous examples of where Federal courts have certified multistate class actions based on State law claims. There is not a rule against nationwide class actions. Federal courts do certify nationwide class actions where the laws that govern the claims are similar.

Class actions are also certified when the plaintiffs' lawyers organize the claims in a manner so that they may be litigated fairly, even under differing State laws, where they appropriately organize the claims into subclasses. But this amendment does not give the courts any choice to determine whether it is appropriate to subclass.

So for a third time during this period that I am standing, I remind my colleagues again about the extensive efforts on the part of Senator Kohl of Wisconsin, Senator Hatch of Utah, and this Senator from Iowa, getting to this version of the Class Action Fairness Act. No one can question that we negotiated in good faith with our colleague Senator Feinstein, as well as our colleagues Senators Dodd, Schumer, and Landrieu, to make changes to address concerns they had about the original bill introduced.

The bill we have now will keep many class actions in State court under the Feinstein home State exception. That was accepted in committee, way back there in early 2003, in the 108th Congress. Also under the local controversy exception we crafted with Senators Dodd, Schumer, and Landrieu, that will stay in State court.

So I hope I get us back in an understandable way, and what people think is rational after all these compromises, so that there is no further need to change this bottom-line compromise. Again, the purpose of this amendment is to gut the modest, commonsense reforms contained in this bill. This is an attempt to legitimize the class action abuse we have been seeing in the magnet State courts. It is an attempt to legalize the problem by putting it into the rule.

All I can say is, that is not all right. It is not OK. If we are serious about putting a stop to class action abuse, I urge my colleagues to oppose this amendment.

Mr. President, I ask unanimous consent to have printed in the Record the letter by Walter Dellinger.

There being no objection, the material was ordered to be printed in the Record, as follows:

O'Melveny & Myers LLP,

Washington, DC, February 4, 2005.

Re Proposed Choice-of-Law Amendment to Class Action Fairness Act (S. 5).

Hon. Arlen Specter,

Chairman, Committee on the Judiciary,

U.S. Senate, Washington, DC.

Dear Mr. Chairman: I write concerning the "choice-of-law" amendment that Public Citizen has been suggesting should be offered to the Class Action Fairness Act. As I understand it, this amendment would encourage or require federal court judges, faced with multi-state or nationwide class actions, to either: (1) apply the laws of one state to all the claims in the case; or (2) certify the class action despite the manageability problems created by conflicting state laws.

I strongly recommend rejection of this seriously flawed proposal for several reasons.

The Public Citizen amendment violates basic principles of federalism and would extend "magnet" state court abuses to federal court. Many consumer protection cases now proceed on a nationwide basis in federal court in those instances in which Congress has determined that a single national law ought to govern. This has been the case with laws such as the Truth in Lending Act (TILA) and the Real Estate Settlement Practices Act (RESPA). Frequently, nationwide class actions are brought and tried to successful conclusions under laws such as these.

Where Congress has chosen not to enact uniform national legislation under which citizens can bring suit, however, it has left the legal issues to be resolved by each state adopting its own law. Allowing each state to decide for itself and for its citizens is the essence of federalism. Instructing a federal judge to pick out one state's law and impose it on other states is a profound violation of federalism principles. Congress is elected by all the people of the United States. When it is acting within its constitutional power under Article I, Congress can decide to impose a uniform rule on the states. It is a far more serious intrusion into the autonomy of the States when a single judge, not Congress, acts to set aside the laws of all of the states (but one) by choosing whichever particular state law the judge likes best and imposing that law on all of the other states.

For example, in Avery v. State Farm Mut. Auto Ins. Co., 746 N.E.2d 1242 (Ill. App. 2001), the sate court decided that Illinois law could be applied to a nationwide class of policyholders, and held that State Farm's use of "non-original equipment manufactured" automobile service parts violated Illinois law. Yet many other states' insurance laws either expressly or implicitly permitted or even required insurance companies to use non-OEM parts as a way to reduce insurance costs. Avery has been uniformly recognized as an example of judicial excess_the Illinois court exceeded its authority by purporting to dictate the insurance laws of 49 other states. Nonetheless, the proposed amendment would tell federal courts to do precisely the

same thing. It would, in effect, recreate in federal court the very state-court problem that precipitated the introduction of this legislation.

The amendment would reverse the decisions of numerous state supreme courts that have rejected application of their laws extraterritorially. Opponents of S. 5 have argued that this amendment is necessary because "state courts . . . are far more comfortable handling cases involving state contract or tort law." Aside from certain magnet courts, however, many state courts have strongly rejected what Public Citizen proposes: i.e., nationwide application of individual states' laws. In fact, the proposed amendment would eviscerate a number of decisions by state supreme courts, refusing to apply one state's consumer protection laws in nationwide class actions. Among the state court decisions that could be reversed by the proposed amendment are the following:

Goshen v. Mutual Life Insurance Company of New York, 774 N.E.2d 1190 (N.Y. 2002), (explaining that to "apply the [New York consumer] statute to out-of-state transactions in the case before us would . . . tread on the ability of other states to regulate their own markets and enforce their own consumer protection laws.").

Compaq Computer Corp. v. Lapray, 2004 Tex. LEXIS 435 (Tex. May 7, 2004) ("The putative class members are domiciled in fifty states and the District of Columbia. All these fifty-one relevant jurisdictions are likely to be interested in ensuring that their consumers are adequately compensated for a breach of warranty. Texas law may not provide sufficient consumer protections in the view of the other states . . . The differences in state law outlined above cannot be concealed in a throng.").

Zarella v. Minnesota Mutual Life Ins. Co., 1999 R.I. Super. LEXIS 161 (R.I. Super. Ct. 1999) (the court found that there were substantial variations on issues such as statutes of limitations and burdens of proof, which "plaintiffs have not adequately addressed").

Ex parte Green Tree Financial Corp., 723 So. 2d 6, 11 (Ala. 1998) (the Alabama Supreme Court expressed "grave concerns as to whether any national class of plaintiffs in an action involving the application of the differing laws of numerous states can satisfy the requirements" for certifying a class action).

Dragon v. Vanguard Indus., 277 Kan. 776, 789 (Kan. 2004) (reversing certification of a nationwide class of property owners alleging defective plumbing due to, inter alia, "wide variance in the laws of various states" on relevant issues).

State ex rel. Am. Family Mut. Ins. Co. v. Clark, 106 S.W.3d 483, 487 (Mo. 2003) ("The trial court abused its discretion in certification of the class with respect to insureds whose contracts are subject to the laws of states other than Missouri").

Henry Schein v. Stromboe, 102 S.W.3d 675 (Tex. 2002) (decertifying a class of some 20,000 purchasers of software products on theories of fraud, breach of express warranty, negligent misrepresentation, promissory estoppel, and deceptive trade practices because class could not demonstrate that Texas law should apply to individual issues of reliance and trial court was required to look to the laws of all fifty states to adjudicate the claims).

Philip Morris, Inc. v. Angeletti, 358 Md. 689, 747 (Md. 2000) (denying certification of a proposed tobacco class because, inter alia, Maryland "conflict of law principles necessitate that the [lower court] engage in individualized assessments for each class member").

Washington Mutual Bank v. Superior Court, 24 Cal. 4th 906, 926 (Cal. 2001) (reversing the
 **[*S1173]**
certification of a nationwide class and holding that "a class action proponent must credibly demonstrate, through a thorough analysis of the applicable state laws, that state law

variations will not swamp common issues and defeat predominance").

Stetser v. TAP Pharm. Prods. Inc., 598 S.E.2d 570, 586 (N.C. Ct. App. 2004) (reversing trial court's certification of a nationwide class of persons alleging the defendant companies had inflated prices and defrauded patients and insurance companies) ("Because this case is composed of plaintiffs nationwide, the remaining forty-nine states' laws, as well as the law of the District of Columbia, must be analyzed to determine whether it conflicts with the law of North Carolina.").

Linn v. Roto-Rooter, Inc., 2004 Ohio 2559, P57 (Ohio Ct. App. 2004) (reversing trial court's decision to certify a nationwide class "because of the widespread reluctance to certify nationwide class actions involving consumer protection, fraud, and unjust enrichment claims, and due to the variances in these laws which would render a nationwide class unmanageable . . . the trial court abused its discretion in certifying the class which entails litigants from 35 states").

Liggett Group Inc. v. Engle, 853 So. 2d 434, 448, 449 (Fla. Dist. Ct. App. 2003) (decertifying a statewide class of smokers because, inter alia, the "highly transient population" of Florida would "require examination of numerous significantly different state laws governing the different plaintiffs' claims") (matters under review by the Florida Supreme Court, see 873 So. 2d 1222 (Fla. 2004)).

Although proponents of the amendment say that its purpose is to protect state law, its real effect would be to overrule an established body of state law.

I would also note that these state supreme court decisions are no less binding on federal courts than on lower state courts. The reason is because, in "diversity" cases, federal courts look to the choice-of-law rules of the state in which they sit to decide what substantive state law should apply. Thus, a federal court confronting a nationwide class action would currently defer to the decision of the highest appellate court of that state declining to allow that state's law (or any other single state's law) to govern the claims of consumers residing throughout the nation. But the "choice-of-law" amendment would change that. As its proponents concede, the "amendment would allow a federal court to choose not to follow the choice-of-law rule of the state in which the court is located." That is another serious distortion of federalism principles.

The amendment could hurt consumers from states with strong consumer protection laws. Another problem with the proposal is that, in their effort to make sure that a single state's law may be applied even in a nationwide class action, critics of S. 5 have not thought through the consequences of what would happen if federal courts actually did apply a single state's law. To pose the question bluntly: which single state's law? If the choice-of-law amendment were adopted, that question_the "which state" question_likely would be the source of considerable mischief, often to the detriment of consumers.

For example, assume that someone brings a nationwide class action alleging that the defendant company participated in fraudulent sales behavior. State consumer protection statutes vary widely, but the court may decide to apply Alabama law to all claims. That would be bad news for the class members living in California and other states with strong consumer protection statutes, because the Alabama statute prohibits the assertions of consumer protection claims on a class basis. Thus, the claims of all class members presumably would be subject to dismissal. In short, consumers with valid claims under their home state laws, adopted by their own state legislatures and courts to protect their interests, may have their claims obliterated (or, at least, rendered much less beneficial).

Even its proponents appear to acknowledge this problem. Professor Arthur Miller, for example, has suggested that one state whose law would "often" be applied in a nationwide

class action would be "the state in which the defendant's headquarters is located." See Letter of Prof. Arthur Miller to Sen. Bingaman, June 17, 2004, at 3.

The amendment, in short, is a radical attempt to avoid the fact that in some areas Congress has chosen to leave the decision of what substantive law should govern conduct to the legislative process of each state. By having judges dismiss the laws of all states but one, the Public Citizen amendment violates fundamental principles of federalism.

The amendment is based on the false premise that federal courts never certify multi-state classes based on state law. It is worth noting that neither federal nor state courts have any hard-and-fast rule against the certification of nationwide or multi-state classes asserting state law claims. To the contrary, federal "[c]ourts have expressed a willingness to certify nationwide classes on the ground that relatively minor differences in state law could be overcome at trial by grouping similar state laws together and applying them as a unit." In re Prudential Ins. Co. of America Sales Practices Litig., 148 F.3d 283, 315 (3d Cir. 1998). Indeed, the two leading proponents of the Public Citizen amendment_Prof. Arthur Miller and Prof. Samuel Isaacharoff_have themselves succeeded in persuading federal courts to certify such nationwide class actions.

The main reason why courts, state and federal, often refuse to certify nationwide classes is because attorneys too often propose classes that overreach_classes that encompass too many people with too many disparate facts asserted under too many different laws. See, e.g., Chin v. Chrysler Corp., 182 F.R.D. 448 (D.N.J. 1998) ("Plaintiffs could have reduced or simplified the case . . . by the creation of a smaller and more clearly defined proposed class. Instead, Plaintiffs have asked this Court to certify the largest class possible . . . on the basis of mere promises that a manageable litigation plan can be designed . . . for five causes of action under the laws of 52 jurisdictions"). That, I submit, is a necessary consequence of respect for federalism. There is no reason to exalt the need for nationwide class actions in every case above the basic principles of federalism.

The amendment, which would ignore the manageability problems engendered by varying state laws, would violate due process rights. If a federal court decided that a single state's law cannot be applied over all claims in a nationwide class action without violating the Constitution, the choice-of-law amendment would allow a federal court to apply several states' laws to the claims at issue. But in that circumstance, the proposed amendment would then forbid the court from denying class certification (even "in part") on the grounds that applying those several states' laws would render the case one devoid of common legal issues that could not be tried fairly on a class basis.

The amendment would distort traditional and prevailing class action practice in a way that raises serious due process concerns. The basic reason is that it would instruct federal judges that, even if they truly believe that the fact that several (or even all 50) states' laws must be applied in a particular case means that the case cannot possibly be fairly adjudicated as a class action, they must simply ignore that true belief and grant class certification anyway.

In deciding whether to certify a class, for example, a federal court must inquire into (a) whether "common questions of law" will "predominate" and (b) whether the class action is "superior" to other methods, both of which require consideration of any "difficulties likely to be encountered in the management of the class action." Fed. R. Civ. P. 23(b)(3). What that means is that a party objecting to the proposed class action can argue that various state's laws must be applied in the case; that those state laws differ in important ways (indeed, they may even conflict); and that those variations (or conflicts) will make it impossible to adjudicate the class action fairly on a class basis_and will make it impossible for one jury to decide those different or conflicting laws in one trial. In the parlance of Rule 23, the party objecting to the proposed class may argue that the differing state laws are reasons why common questions of law do not "predominate" and that the multi-state or nationwide class

action is not "superior" to other methods of resolving the case (including a statewide class action).

Again, the Avery case makes for a good example. If the court had (correctly, in my view) concluded that many states' laws would need to be applied to resolve that nationwide class action, that determination would in all likelihood have also led the court to conclude that it would not have been fair to try before one jury the legality of the use of non-OEM parts nationwide. After all, how could a single jury hearing that the practice is illegal in Illinois, legally required in other states, permitted in other states, and not addressed at all by still other states, render a fair and coherent verdict? Especially when one keeps in mind that some class actions involve dozens of claims, nationwide class actions would in some cases require literally hundreds of different decisions for a single jury to make.

These Rule 23 requirements have due process underpinnings. Class actions serve an important public function: they allow numerous, similarly situated individuals whose relatively small claims might otherwise be shut out of the legal system to aggregate their claims and obtain collective relief. At the same time, the purpose of the class action device is to allow the aggregation of only some_not all_lawsuits. Indeed, as the U.S. Supreme Court has noted, there is a strong presumption in our legal system that claims will be litigated individually; class actions are an exception to that general rule. Thus, lawsuits seeking damages in which common questions of questions do not "predominate," and in which the class action is not "superior" method of resolving the dispute, are denied class treatment for the very reason that the court concludes that it would not be fair to resolve the whole case in one trial. In other words, a class cannot be certified at the expense of "procedural fairness." Amchem Prods., Inc. v. Windsor, 521 U. S. 591, 613 (1997); see also Malcolm v. Nat'l Gypsum Co., 995 F.2d 346, 350 (2d Cir. 1993) (holding that the benefits of aggregated litigation "can never be purchased at the cost of fairness"). This principle is as important for protecting the plaintiffs (that is, the unnamed class members) as it is for protecting defendants. See id.; see also Hansberry v. Lee, 311 U. S. 32, 40-42 (1940).

The proposed amendment violates this principle by elevating the class certification decision over "procedural fairness." Whereas the fact that different state laws would need to be applied to a multi-state or nationwide class action is unquestionably a valid factor to consider in deciding whether a class should be certified, the proposed amendment would dictate to federal judges that they cannot consider that factor at all. For example, under the facts of the Avery case, the **[*S1174]** choice-of-law amendments would require the federal court to ignore the central fact that the 50 states have made fundamentally conflicting policy choices over the legality of the conduct at issue. The court would be required not to consider the obvious fact that it might be procedurally unfair for the same jury to decide whether the use of non-OEM parts is legal in all of the different states.

I am not suggesting that, in every multi-state class action, the laws of every state must be applied as a matter of due process. That depends upon the particular case, and upon the connection that any one state might have to a proposed class action. Rather, what I am suggesting is that in cases in which federal courts themselves decide that due process requires the application of numerous states' laws, it is a serious due process problem to tell those same federal courts that they may not deny class certification on same basis_to tell those federal courts that they must certify a class despite their firmly held relief that the differing state laws will make use of the class action device fundamentally unfair.

For all of the foregoing reasons, I find the proposed choice-of-law amendment to be constitutionally suspect (both from a federalism and due process standpoint) and wrongheaded as a public policy matter. It should be rejected.

Sincerely,

Walter E. Dellinger.

The PRESIDING OFFICER. The majority leader is recognized.

Mr. FRIST . Mr. President, for the information of our colleagues, we are making good progress on the class action bill. I appreciate everyone's participation in coming to the floor and offering and talking about their amendments. I want to keep the pace going.

The Democratic leader and I have been in discussions over the day. We want to complete this bill at the earliest possible time this week.

I will shortly be asking unanimous consent that the vote on the Kennedy amendment be this afternoon at a time which I will state. After that we will be proceeding to the Feinstein amendment. We will at that time divide the time accordingly.

At this point, I ask unanimous consent that the vote occur in relation to the Kennedy amendment No. 2 at 4 p.m. today; provided further that following that vote the Senate proceed immediately to a vote in relation to the Feinstein amendment No. 4; provided further that the debate until 4 be equally divided in the usual way, and that no amendments be in order to either amendment prior to the votes.

Finally, I ask unanimous consent that there be 2 minutes for debate equally divided following the first vote. I further ask unanimous consent that 15 minutes of minority time be reserved for Senator Kennedy.

Mr. REID . Mr. President, I have no objection to the unanimous consent request.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

Mr. FRIST . Mr. President, while the Democratic leader is here, I mentioned as he was returning to the floor that we are all working very hard to complete the bill on class action. I understand there are several other amendments to be considered. But I reflected our commitment to stay on the bill and complete it at the soonest time possible.

Mr. REID. It is my understanding that the distinguished Republican leader has indicated we will finish this bill this week. Is that right?

Mr. FRIST . Mr. President, that is right.

Mr. President, again I encourage our colleagues to focus on the bill before us today and tonight and tomorrow, and we will be staying on the bill until we complete the bill. I appreciate everybody's consideration.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. SESSIONS . Mr. President, I ask unanimous consent that the order for the quorum call be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The PRESIDING OFFICER. The Senator from Alabama is recognized.

Mr. SESSIONS . Mr. President, Senator Feinstein has offered an amendment to S. 5, the Class Action Fairness Act of 2005, to address the opponents' claim that Federal courts routinely deny certification of multistate or nationwide classes that involve different State laws. Under this amendment, that would change the underlying bill we are considering here. Federal courts would be required to certify class actions, even if the claims were brought under State law.

The amendment further provides that courts faced with nationwide classes involving different State laws should either create subclasses to account for variations in State law or, if such subclasses are impractical, to attempt to apply the proper State law to the class members claims only to the extent doing so is practical.

The proposal would toss State laws and procedural fairness out of the window for the sake of allowing a nationwide class action. It would reverse nearly 70 years of established Supreme Court case law that requires Federal courts to apply the proper State law when they hear claims between citizens of different States.

It would reverse numerous decisions about State supreme courts rejecting the application of one State's law to class action claims that arise in 50 States, and it would seriously undermine the ability of plaintiffs and defendants alike to have a fair trial.

Most importantly, it would have the perverse effect of perpetuating the very magnet court abuses that the legislation seeks to end.

Here is why the latest choice-of-law amendment should be rejected. First, the premise of the amendment is false. Federal courts do not have a hard and fast rule against certifying multistate class actions. Rather, both Federal and State courts_except for certain magnet jurisdictions_conduct a careful inquiry before certifying a class to ensure that common legal issues predominate, as required by the Federal rules governing class actions.

The reason for this requirement is self-evident. The whole point of a class action is to resolve a large number of similar claims at the same time. If the differences among the class members' legal claims are too great, a class trial will not be fair or practical.

In some circumstances, Federal courts have found that the law of different States was sufficiently similar that a class action could go forward. In other cases, they have found the differences were too great to have a fair class action trial.

If the laws under which the liability is founded are significantly different, you can't try them in the same trial. If they are not that much different, you can make it work.

The proposed amendment would take away the discretion of Federal judges to make these important decisions as they always have.

Proponents of the amendment conveniently ignore the fact that Federal law on this issue is quite consistent with the approach taken by numerous State supreme courts, which have refused to certify cases where the differences in State law would make it impossible to have a fair or manageable trial.In fact, the proposed amendment would reverse decisions by the Supreme Court of California, Texas, New York, and numerous other States that have rejected nationwide classes in such circumstances as these.

Second, Federal courts already use subclassing where appropriate. Subclassing basically means dividing a class into a couple of smaller classes where claims may be more similar to

one another. In rule 23 of the Federal Rules of Civil Procedure, the nearly 40-year rule governing class actions explicitly gives courts the option of using subclasses to account for variations in the class as long as the trial would still be manageable and fair.

For example, if a case involved State laws that can be easily divided into three or four groups, subclassing would be appropriate if the trial would otherwise be manageable. At the same time, if subclassing were used in every situation that involved different State laws, in some cases there would be so many subclasses it would be impossible to have a manageable or fair trial.

Under the current law, Federal judges have the discretion to decide when subclassing makes sense. That approach is working. Why change it? If it "ain't" broke, don't fix it. We have not had serious problems, and it is better to allow the discretion with the judge than for us to try to anticipate and put in hard law requirements involving complexities in the future we cannot anticipate fully today.

Third, the amendment would hurt consumers by subverting State laws. **[*S1175]** The proposed amendment suggests that if subclassing will not work, the court should simply respect State laws "to the extent practicable." What does that mean? How does the court partially carry out State law? Judges are responsible for carrying out the law, not for carrying out the law to the extent practicable. It would be a dangerous empowerment and an erosion of our classical commitment to following law.

By suggesting that Federal courts should ignore variations in State laws when respecting State law is impractical, this provision would perpetuate the very problem the class action bill is trying to fix. For example, in the notorious Avery v. State Farm case, a county judge in Illinois applied Illinois law to claims that arose throughout the country, ruling that insurers could not use aftermarket parts in making auto accident repairs even though several States had passed laws encouraging, even requiring the use of these more economic parts to keep down the cost of insurance premiums. The approach taken by the Avery judge and condoned by the proposed amendment actually hurts consumers by denying them the protection of their State's laws.

Some State legislatures have adopted particularly strong laws in certain areas because their citizens have expressed strong feelings about these issues; for example, privacy or consumer fraud. Under this amendment, the citizens of such States would not be entitled to the protection of their State's laws in nationwide class actions. Instead, their claims would be subject to some compromise law created by the judge in order to carry out a class action.

These are some thoughts I share about this legislation. We do have a need for class action reform. The legislation before the Senate is sound. We know if we stay firm, if we do not willy-nilly amend this bill, if we keep it clean and send it forward to the House, they will approve it, we will make this law, and for once pass a serious tort reform legislation that will improve justice in America and reduce costs.

I yield the floor and suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. CARPER . Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. CARPER . Mr. President, I would like to take a couple of minutes today to speak to the amendment being offered by Senators Feinstein and Bingaman. I don't think we will find on either side of the aisle a Democrat or Republican more thoughtful than either of them, or more fair-minded. Senator Feinstein, in particular, has been heroic in her efforts to try to bring about consensus on class action so we end up with legislation to make sure little people who are harmed by big companies are able to bind together and be made whole; to ensure that the companies that are accused know if they step out of line there is a price to pay for that; legislation that will also make sure that the defendant companies, large or small, have the opportunity to have a fair trial for whatever they are accused of in the litigation; and our last goal is to make sure the Federal judiciary is not overwhelmed with litigation that could be in State courts, ought to be in State courts, and is needlessly moved to Federal courts.

Those are the objectives we all share, Democrats and Republicans, whether we like or do not like the bill. I am in support of the legislation.

Most consumer laws that end up in courts are laws that are adopted by our States. There are some areas where the Federal Government has laws in place to protect the consumers, but the lion's share of the consumer protection laws are written by the various States.

The effort by Senators Feinstein and Bingaman is laudable; that is, to make sure that when State laws have been violated, particularly when State laws have been violated in a number of States, that whoever has violated those laws is going to be held accountable. The question is, If you have a class action case that is brought forward based on the laws of 10, 20, or 30 States or more, under whose State law do we argue in court the class action litigation? Is it in a State that has fairly weak consumer protection laws or a State that has very strong consumer protection laws?

I am not a lawyer by training, and I come at this as a lay person simply trying to figure out what is the right and fair thing to do. As I understand class action litigation, I will use the example of where we have maybe 21 States that have been bound together in a class action filed in a particular State court, one of those 21 States, and in particular, a State where the litigation is brought, the effort might be to apply that State's laws to all the other States that are part of this. Senator Sessions talked about a situation in a case involving class action with State Farm, where the suit alleged that consumers were being harmed because in the car repair business, when replacement parts were used, some of the States allowed the use of non-original equipment replacement crash parts, sometimes referred to as generic parts.In this case, Avery v. State Farm, an Illinois judge applied the Illinois Consumer Fraud Act to a 48-State class, even though there were significant differences in the States' consumer protection laws and vast differences in the laws of the different states on the use of these types of parts. Most States explicitly authorize their use and a few States even require their use to reduce costs for consumers.

As I have looked into this matter, I have learned when there is an effort to move a class action litigation on consumer issues from a State court to a Federal court, the Federal judge has a number of decisions to make as to whether they want to receive it and hear it at the Federal level.

One, they can say, yes, on the basis of the law that is in question here, and the facts, this is one that makes sense to be heard at the Federal level and to go forward.

The Federal judge can say_again, using the example of 21 States because the math works easily_let's divide those 21 States into three subgroups, and each of those 7 States have laws that are fairly similar but distinct and apart from the other two subgroups. So a Federal judge could say, we are going to go forward with this class action litigation. We will do it as one case, but we will have three subcategories of subgroups.

A third alternative that is available to a Federal judge would be to say, we are not going to have one case; we will have maybe three cases. In those instances where the laws of the States are pretty similar, we will group those seven, and the same would be true for this seven and that seven. And we will hear three separate cases, not one.

If none of that works, the Federal judge is always free to say this is a State matter. The laws and the facts are in such disarray that it is difficult to try them as one case.

Some States have very strong consumer laws, some not. There is a whole big range in between where the laws and the facts are just too disparate and different, and the judge can simply remand it back to the States.

If the Federal judge declines to hear that consumer class action, then it can be tried in State court. Whoever the plaintiffs are, in those instances, will have their day in court. If you happen to be from California, the latter course is not a big deal because you have so many people, 30 million people, and it is not as difficult to put together a meaningful class and to be able to attract an attorney to represent your case. If you happen to be from a smaller State, with fewer people, then it can be more of a challenge to put together a large enough plaintiff class in that State to pay for an attorney to represent the interests of consumers in that State. I acknowledge that.

Having said that, my overriding concern with this legislation is this. I mentioned the four principles earlier, but my overriding concern with this legislation is that we not begin to pick apart this carefully balanced compromise on which we have worked. I have been here 4 years. We have worked on it for almost those 4 years I have been in this Senate. I know people worked on this 3 years before that. We have come so far from where this legislation began in 1997.

This is not tort reform, as a lot of people like to think of it. This is, as **[*S1176]** others have said today, court reform. Our goal is to, again, make sure if people get harmed, they have an opportunity to be made whole, to band together into similar groups to make sure the accused and the defendants in the case have a chance to be fairly defended in a courtroom. It is a fair shot.

My fear is, to the extent this amendment would be adopted, it invites amendments of others who may not like this bipartisan compromise because it does not go far enough.

Earlier this month, in the House of Representatives, their bill, which passed by a fairly wide margin in the last Congress, was reintroduced. There are some people in the other Chamber, as well as some in this body, who would like nothing better than to be able to change this bipartisan compromise and move it, frankly, a lot closer to where the House bill is.

Eventually, my friends, we are going to pass a class action bill this year. My own view is it is not going to get any better or more balanced or fairer to plaintiffs and defendants than the compromise we have worked out here this year. As a result, I will oppose, albeit with some reluctance, the amendment offered by Senators Feinstein and Bingaman. I know they have put a lot of time and energy into this amendment. Frankly, my staff and I have as well, trying to find a way to accommodate the concerns they have raised. In the end, I do not believe we can, and I must reluctantly oppose the amendment.

I yield back my time.

The PRESIDING OFFICER (Mr. Martinez). The Senator from Vermont.

Attacking The Democratic Leader

Mr. LEAHY . Mr. President, I am going to speak in favor of the commonsense amendment brought to us by Senators Bingaman and Feinstein. Before I do, though, if I could make a couple personal comments.

I have been in the Senate for 31 years. I came at a time when there was a real effort for Republicans and Democrats to work together, and for White Houses to do so. I have been here during the administrations of President Ford, President Carter, both terms of President Reagan, President George H.W. Bush, both terms of President Clinton, and now into the second term of President George W. Bush.

I have seen terrific majority leaders in both parties, leaders in both parties. Senator Mansfield, Senator Scott, Senator Byrd, Senator Baker, Senator Dole, Senator Mitchell, obviously Senator Daschle. I think of all the times they would work so closely to bring people together. The President, whoever the President was, would do the same.

I can remember times Senator Dole, a partisan, tough-minded Republican, would reach a point as majority leader when he would call Senators from both parties into his office and say: OK, boys, let's see where we go from here. How do we get this legislation done?

Senator Baker would do that. Senator Mansfield was famous for coming out on the floor during evening sessions and picking a few Senators from both sides of the aisle and saying: Come up to the office. We have to chat and work things out. Senator Baker had the ability to do that. He would go down and speak to President Reagan and suggest to him which Democrats, which Republicans, he might call to make things work out.

You also had, during that time, the practice where the two great parties, the Democratic Party and Republican Party, would keep from attacking the leaders of the other party's caucus in either body. They did it because they knew that, while they might oppose each other on one issue today, they were going to have to work together for the betterment of the country the next day.

Now it has broken down. For some reason, something I never thought I would see, nor, I suspect, did any of those leaders I mentioned from either party ever think they would see, it stopped last session when the leader of one party went to the home of the leader of the other party and attacked him in a political campaign, and attacks were then mounted by the national party. I think it was a mistake.

In the years I have talked about, the 31 years of both Republicans and Democrats running the Senate_we have seen it go back and forth a half a dozen times since I have been here_it has worked very well, where you fight for your party, you fight for your majority or minority, but you do not go after the leaders.

I was hoping the last election might be an aberration. Now I see a difference when the Republican National Committee has come out with the most scurrilous, outrageous attack on the Democratic leader, Senator Reid.

It makes no sense whatsoever. Senator Reid spent his years as the deputy Democratic leader helping to get legislation through this place. He worked very closely with two different Republican deputy leaders, both when he was in the majority and in the minority, to move legislation through.

I can think of dozens of times, hundreds of times on this floor when legislation looked like it might not get through, and both Republicans and Democrats were going to Harry Reid as the deputy leader to say: How can we work this out?

He would say: Why don't you leave off these amendments, and I will talk to the Republicans

and they will leave off these amendments. We will get it through.

It always worked. The legislation we have before us is not one that Senator Reid favors, but he worked in good faith with the Republican leadership to bring it up. Almost a day after he does that, he gets attacked by the Republican National Committee, a day or so after the President of the United States in his State of the Union message said how we must all work together, and on the day when the President invites Senator Reid down for a cordial family dinner, which is, of course, showing how bipartisan we can be, the Republican National Committee_controlled, of course, by the White House_sends out this scurrilous attack on Senator Reid.

It is a mistake. I would say the same thing if the Democratic Party was doing it to the Republican leadership. It is a mistake because ultimately the Senate consists of only 100 men and women who have the privilege to represent 290 million Americans at any given time. There are so many things we need to get done. We should be working together.

An example: During President Reagan's term, we were facing a real crisis_not a manufactured crisis but a real crisis in Social Security, not the manufactured one we see today, a real one_and we were stuck here on the floor. Neither side seemed to budge, and efforts to do something that might save Social Security seemed lost when two giants of the Senate_I know this for a fact because I was standing right here on the floor_Senator Daniel Patrick Moynihan of New York and Senator Robert Dole, the leaders on the Finance Committee where Social Security reform now seemed founded, were talking, and Pat Moynihan walks over to Bob Dole and says: We have to give this another try. It is far too important to let this fall apart in partisan bickering. Let us make this work. You know the two of us can do it.

I and a couple others who were standing there said: We are all with you.

When I say "I and a couple others," Republicans and Democrats said: We are all for you. You can do it.

They went down and saw President Reagan, talked with him and said: Look, we are going to take another try at it, if you will work with us.

He said: Fine.

And they did. As a result of that, in the 1980s, Social Security was put in solvent standing for 70 years. If we do nothing with Social Security now, it will still be solvent in the year 2045, 2050.

Wouldn't it be nice if we went back to the days of giants in the Senate and Presidents of both parties who wanted to work with the Members of the House and Senate whoactually want to get something done, not for partisan gain but for American gain, not for one political party but for all Americans?

Those who came up with the bright idea of attacking Harry Reid, a man who will get reelected his next term, I suspect by even a greater margin than the last landslide he had, ought to step back. They might raise money this way. They might stir up some of the true believers this way. They do nothing for the country. They do nothing for the Nation. All they do is deepen the divides instead of healing them. It would be nice if we could have leaders
 [*S1177]
who would try to be uniters, not dividers. We haven't had that for a few years. I wish we could.

I digress somewhat. I see the distinguished Chair, a man I knew before he came here,

admired in his work as a member of the Cabinet. We are benefited by having him here. I hope that he might be one of those who will come in not with preconceptions but his enormous talent of bringing people together and work with us. I say this somewhat unfairly because under the rules he cannot respond, of course. I hope I have not damaged him irreparably with the Republican Party in Florida, but he has known me long enough to know I mean what I am saying.

This Bingaman-Feinstein amendment is a commonsense amendment. It seeks to rectify one of most significant problems of the class action legislation under consideration by the Senate. As we all know, this class action bill is going to sweep most class actions into Federal court. But then many of the Federal courts refuse to certify multistate class actions because the court would be required to apply the laws of different jurisdictions to different plaintiffs, even if the laws of those jurisdictions are quite similar.

Without this balanced amendment, members of important class actions that involve multiple-State laws may have no place to receive justice. In other words, they get removed from the State court to Federal court, but then the Federal court says: Well, because the State laws may be different, we can't do anything. But you can't go back to State court because you are removed here. It is probably as classical a legal Catch-22 as one could see.

According to 14 of our State attorneys general:

[I]n theory, injured plaintiffs in each state could bring a separate class action lawsuit in federal court, but that defeats one of the main purposes of class actions, which is to conserve judicial sources. Moreover, while the population of some states may be large enough to warrant a separate class action involving only residents of those states, it is very unlikely that similar lawsuits would be brought on behalf of residents of many smaller states.

The Feinstein-Bingaman amendment would help citizens of States such as my own of Vermont. We have smaller populations. We are only the size of one congressional district, 610,000 people. But it would allow us to join with other injured plaintiffs from other States to have their day in court. Federal courts should be allowed to certify nationwide class actions by applying one State's law with sufficient ties to the underlying claims in the case. This amendment would give Federal judges that power and make it clear that they should not deny certification on the sole ground that the laws of more than one State would apply to the action.

If the Senate is truly interested in passing class action legislation that gives injured citizens from every State a place to seek relief, then all Senators should embrace this commonsense amendment. I hope my colleagues will support this important amendment.

I thank Senators Bingaman and Feinstein for their hard work on the amendment.

Sad News for Vermont

On another issue, I spoke of my small State. I was born in Vermont, a precious State. We have had Leahys there since the 1850s. It is in my heart and soul. I read with pride but with sadness an article on the front page of the Washington Post today about Vermont and the number of our brave men and women who have been called up in the Guard and Reserves. Two States have the highest per capita callup in the Nation_Hawaii and Vermont, two of the smaller States. We also have the very sad distinction of having the most fatalities, the most soldiers killed per capita of any State in the Union.

I mention this because in our State, everybody knows everybody else. If one person dies, everybody in the State feels it. I have been to those funerals where I have seen people with whom I was in kindergarten, people I grew up with, neighbors of mine or my sister's, people

my parents knew. You go to the funeral, you walk into a church, not as a member of the congressional delegation from Vermont_we have all done that_but you go as a friend and neighbor, and that is what you see, friends and neighbors. I will later today put the full article in the Record.

It struck me as to what this means. We have one small town that is about the size of a small town in which my wife and I live in Vermont. They have one country store. It is a small store, but it is important to the town. Everybody goes there. A mother and a son run the store. The son gets called up. He goes bravely, of course. The mother cannot handle the store by herself, and the store closes. The community in many ways has lost its center.

These are the realities of what is happening. Several of us met earlier today from both bodies, both parties, to introduce legislation to increase health benefits for those in the Guard and Reserves who are called up, to improve their retirement situation, make sure they stay healthy, make sure if they have a solely owned business and they get called up, they can at least have health care for their family.

I mention this again not because it is apropos to the legislation_I do not see anybody else seeking recognition; I am not taking away from others' time_but I hope those who are watching or listening to this will read this article about what happens in rural America with these callups.

In my State, the largest community is only 38,000 people. The town I live in has about 1,500 people. They know everybody. I live on a dirt road on the side of a mountain with magnificent views. Again, everybody is on a first-name basis. When somebody gets called up, you know it, you feel it.

This is not a question about whether somebody is for or against the war. In my State, everybody has supported those who have gone. Even though I would suspect the majority of the people in Vermont are opposed to the war, they are all supportive of our troops. But it hurts. It is real. I hope we can bring them home soon.

I was heartened by the elections in Iraq. I was heartened by the efforts of those who would brave in some cases death to go out and vote. I hope those of us in our country who say it is going to be a hard time to vote today because it is raining or it is snowing or it is cold or it is hot or it is inconvenient to go those extra five blocks, or whatever the reason, look at what they did.

I hope that country will soon be able to take care of itself. We are going to spend huge amounts of money in this budget to build schools, improve police forces, build communications, roads, and hospitals all in Iraq. We have those same needs at home. I hope soon they can be on their own. I hope soon our men and women can come home, as many safely as possible.

Mr. President, I yield the floor and suggest the absence of a quorum.

The PRESIDING OFFICER (Mr. Burr). The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. HATCH . Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. HATCH . Mr. President, I would like to take a moment to demonstrate just how out of

balance the class action has become and to underscore why we need to get this bill passed.

Before I do, I want to make it clear that I do not object to class lawsuits. Legitimate class action lawsuits are helpful, when they are legitimate, when there is a good cause of action, when people really have been abused.

Legitimate cause of actions do not have to seek out these favorable jurisdictions where the law is stacked against the defendants, which is what this bill helps to cure. When they are legitimate and brought in the best interest of the class members, class action lawsuits are a vital part of our judicial system. They can serve as a means to ensure that injured parties who might otherwise go unrepresented have the opportunity to have their injuries redressed.

However, in recent years we have witnessed a disturbing trend where some lawyers are bringing and settling class action lawsuits in which the chief interests actually being served appear to be those of the lawyers and not the people for whom they are bringing the actions. Too often the plaintiffs' attorneys recover millions of dollars in attorney's fees while the class action members get little more than a coupon, if that.

While we must acknowledge that there have been a few isolated instances of abusive settlements in the Federal courts, these are the rare exception. By contrast, numerous examples of abusive class action settlements  **[\*S1178]**
originate from the State courts. As we have noted in the Judiciary Committee report in the 108th Congress, the Class Action Fairness Act is a "modest, balanced bill to address some of the most egregious problems in class action practice." It is not, however "intended to be a panacea that will correct all class action abuses."

This bill is the result of intense bipartisan negotiations and is our best effort to address a problem that is pervading our State court system. Abuse of the class action system has reached a critical point, and it is time that we as a legislative body address the problem. The public is increasingly aware of the system's unfairness. News programs, such as ABC's "20/20," have covered the rise in class action jurisdictions in certain magnet jurisdictions, magnet meaning jurisdictions where these extortionate suits are brought because they can get a tremendous advantage regardless of whether they are right or wrong.

Scores of editorials have called for actions in newspapers all across this country. Abuse of the class action system has even become the inspiration for popular literature. In 2003, the author, John Grisham, released a book entitled "The King of Torts." Grisham's novel takes its reader into the world of the mass tort/class action lawyer where clients are treated like chattel and bargaining chips. The value of a potential action is not measured by the merit of the claim but on the number of class members that can be rounded up. The end game is not the pursuit of justice for the class members and clients, but in the pursuit of a hefty attorney's fee.

Although Grisham's book is intended as fiction, it is hard to distinguish it from the facts of our broken class action system.

Let me read a few passages:

Nobody earns ten million dollars in six months. . . . You might win it, steal it, or have it drop out of the sky, but nobody earns money like that. It's ridiculous and obscene.

Now this quote may come from a fictional story, but it is too often too close to the truth. This short novel written by Grisham demonstrates the problems with our class action system all too well. As his book shows, with drug manufacturers the sad but inevitable fact is that people are injured every day in this country by products they buy, and justice does require that they receive just compensation for their injuries.

Frequently, class actions are the best way to compensate large groups of injured consumers. Yet, Grisham's novel, "The King of Torts," also shows that the financial reward of a settlement is so great that the class action system has attracted a small group of unscrupulous lawyers who will do anything, say anything, and sue anything or anybody_not to help their clients but to line their own pockets.

We keep hearing this is not a crisis, that not everyone is gaming the system. Everyone in this body knows, however, that a few bad apples can spoil the bunch. In this case, these few lawyers are hurting our civil justice system. This reform is one small step toward restoring some balance to that system. What I have read in this work of fiction is too often fact today. Everybody knows it. Without question, many of today's class actions are nothing more than business opportunities for some lawyers to strike it rich and too often they have little, if anything, to do with fairly compensating the injured class members.

Some law firms make no secret of this. One law firm actually states on its Web site that it has brought over 24 nationwide class actions in Madison County, IL, a court notorious for approving settlements that benefit the lawyers, and that it specializes in class actions that seek less than $500 in damages for class members. Plaintiffs beware.

I am told, for example, of a law firm that explicitly acknowledges that the more potential class members there are to a claim, the more the case is worth their while. Specifically, the "frequently asked questions" section of their firm's Web site states:

More claimants means greater potential liability for defendants. Because there is greater potential liability, these lawsuits become worthwhile for lawyers to prosecute on a contingent-fee basis.

Worthwhile, indeed. Worthwhile for the lawyers.

A small handful of wealthy lawyers is profiting from the class action system. According to an article appearing in the 2001-2002 edition of the Harvard Journal of Law and Public Policy five firms accounted for nearly half of the class action lawsuits filed in Madison County, IL, and Jefferson County, TX.

Of the lawsuits filed in these districts, many allege the same causes of action, represent the same class of plaintiffs that are brought against many of the same parties within an industry.

While these lawyers might have something to gain, the same cannot clearly be said with respect to plaintiffs, consumers, and those employed by defendant companies, who lose their jobs as a result of these types of lawsuits.

It is evident that a few key courts have been singled out by a small group of legal players in the class action world. This point is reinforced by a 2003 study conducted by the Institute for Civil Justice/RAND and funded jointly by the plaintiffs and defense bar to determine who gets the money in class action settlements. The study found that in State court consumer class settlements, it is the class counsel and not their clients who often walk away with a disproportionate share of the settlement.

What do their clients get? Well, quite simply, not enough. I believe that the many hard-working andhonest class action lawyers should be compensated for their hard work and efforts. The overwhelming number of lawyers are honorable people. They are honest. They are hard working. Only a few are causing the lion's share of trouble. The majority of the honest ones are not searching for jackpot jurisdictions where the judges and the lawyers are in cahoots and somehow always find against the defendants.

I also believe such compensation should be reconcilable with a fair recovery for the client. I have supported large recovery for trial lawyers when I thought it was justified. Quite honestly, it is simply not right when our judicial system allows lawyers to walk away with millions of dollars while in some cases their clients walk away with nothing more than a coupon good toward a future purchase of the very product that was the subject matter of the class action to begin with.

I do not know about my colleagues, but when I have a problem with a product, sometimes the last thing I want to do is buy that product or have anything to do with the company or firm that makes that particular product. Frankly, keep your coupon and show me the money. If the coupons were so good, one would expect the lawyers would request that they be paid in coupons, not money.

In real life, we are too often reminded of the legendary fictional case Jarndyce v. Jarndyce of Charles Dickens' "Bleak House" in which legal fees ate up the whole estate so that the intended beneficiaries could not benefit.

Consider the case of Degradi v. KB Holdings, Inc., in Cook County, IL. The suit alleged that KB Toys, one of the Nation's largest toy retailers, engaged in deceptive pricing practices in some of their products. Specifically, the suit alleged that the prices of certain products were marked to appear reduced when in fact the apparently reduced price was the market price.

In the settlement with KB Toys over these allegedly deceptive pricing practices, the toy store paid attorney's fees and costs of $1 million and not one dime of cash to class members. As part of the settlement, the store held an unadvertised 30-percent-off sale on selected products. That is laughable. Under the terms of the settlement agreement, the toy retailer agreed to offer a 30-percent discount on selected products between October 8 and October 14, 2003. In other words, they held a week-long sale that was not even publicly advertised. By the time most of the class members learned about the sale, their opportunity to recover under the terms of the settlement had passed.

In fact, an independent analyst stated that KB Toys would likely benefit from the settlement because they were driving traffic. What did the class counsel get? They got $1 million. Good work if one can get it, but not necessarily a good outcome for their clients.

Then there was the 1998 class action filed in Fulton County, GA, alleging **[*S1179]** that Coca-Cola improperly added sweeteners to apple juice. In this Coca-Cola case, in the settlement of a class action lawsuit alleging that Coca-Cola improperly added sweeteners to apple juice, it was the lawyers who got a sweet deal_$1.5 million in fees and costs. Unfortunately, class members came up empty again, receiving 50-cent coupons but no cash. So each of them got 50-cent coupons while the lawyers walked away with $1.5 million in attorney's fees.

As my colleagues know, I am a lawyer. In my practice, I represented both plaintiffs and defendants. I have watched some of the greatest lawyers appear in court when I started to practice law in Pittsburgh, PA, such as James McArdle. When Jimmy McArdle tried a case, the courtroom was always filled with young and old lawyers who wanted to watch a master at work. He brought one of the first cases against the tobacco industry.

He lost that one, but it was the case that paved the way to clean up the tobacco industry in this country.

I supported many of the tobacco class action lawyers because I thought what they did was in the best interests of their clients and the American public. But this current class action system is out of whack and needs to be fixed. I understand many of these classes are comprised of hundreds if not thousands of members, and I do not begrudge class action

attorneys a reasonable fee award. But when the class member gets a 50-cent coupon and the lawyers get $1.5 million because the company has to settle rather than take a chance of going on and getting killed in a forum-shopped court, then you can see why I am upset about this.

There is also the case of Scott v. Blockbuster, Inc. Blockbuster Video was named as a defendant in 23 class action lawsuits brought by consumers, alleging that they were charged excessive late movie return fees. In 2001, Blockbuster agreed to enter into a settlement agreement. Under the terms of the settlement, which was approved by a Jefferson County, TX, State court, the class attorneys received approximately $9.25 million in attorney's fees while the class members received_you guessed it_coupons. Each class member got a $1-off, or buy one get one free coupon. Experts have predicted only 20 percent of the class members will even redeem these coupons.

I am pleased the bill before us at least ties legal fees to the actual amount of redeemed coupons. If only 1,000 people redeem those $1 coupons, the attorneys would be entitled to a percentage of that $1,000 but not $9.25 million.

I have described a few of the many class action settlements streaming out of our State court system. Many State courts appear at times to be nothing more than rubberstamps for the lawyers' proposed settlement agreements. This is not civil justice.

In that Jefferson County case, the company, Blockbuster, had to settle. They could not risk going to trial in that particular jurisdiction because of the outrageous verdicts that are granted by jurors who appear to be compromised.

This is akin to legalized extortion. Too often it appears that the chief interests served by these settlements are those of the class counsel and not the class members. This bill does not prevent class action suits, but it does stop some of these excesses.

The Class Action Fairness Act would alleviate many of the problems present in the current class action system by allowing truly national class actions to be filed in or removed to Federal court. Some of our colleagues have indicated the consumer will be lost here because they will not be able to bring these cases. Give me a break. Of course they will be able to bring these cases. But they have to be brought in a legitimate way, in Federal court where it is much less likely that they will be hammered by political judges who are in cahoots with the plaintiffs' lawyers in that jurisdiction. Federal courts as a general rule will adequately dispense justice in these matters. So the suits can be brought. This will level the playing field that has become tilted in many jurisdictions in the last few years.

It also reforms the way Federal courts would approve proposed settlements with basic requirements such as a hearing and a finding by the court that the settlement is fair, reasonable, and adequate.

This is the second time the Class Action Fairness Act has come to the Senate floor, but we have been working on it for 6 years. When we failed to achieve cloture by one vote in the preceding Congress_by one vote we failed to achieve cloture_we sat down with several Democratic Senators to reach bipartisan agreement on a bill. We know it is difficult for them to work on this bill because the largest hard money contributor to Democrats in the Senate happens to be the American Trial Lawyers Association. Some people believe Democrats are owned by them. I do not believe that. I know there are many wonderful lawyers in the American Trial Lawyers Association. Most are decent, honorable people, and I know many of them. But there are some who are unscrupulous, and they are the ones who have been fighting this reform. And they have the means to do so since they have become billionaires as a result of these coupon cases won in jackpot jurisdictions.

The bill we are considering today is the result of all of these negotiations. S. 5, the Class Action Fairness Act of 2005, presents this Congress with an opportunity to correct some of the dubious practices currently found in the class action system, and to protect the average consumer.

The first response I have is that this amendment is based on a faulty premise. Federal courts do not have a hard and fast rule against certifying multistate class actions. Rather, both Federal and State courts conduct a fair, full inquiry before certifying a class, to ensure that common legal issues predominate, as required by the Federal rule governing class actions. Put simply, this Bingaman-Feinstein amendment, as amended by Senator Feinstein, would toss State laws and procedural fairness out the window for the sake of allowing nationwide class actions. It would reverse nearly 70 years of established Supreme Court case law that requires Federal courts to apply the proper State laws when they hear claims between citizens of different States.

It would reverse numerous decisions by State supreme courts rejecting the application of one State's laws to class action claims that arise in 50 States, and it would seriously undermine the ability of plaintiffs and defendants alike to have a fair trial.

Most importantly, it would have the perverse effect of perpetuating the very magnet court abuses that this legislation seeks to end. The reason for this requirement is self-evident. The whole point of a class action is to resolve a large number of similar claims at the same time. If the differences among class members' legal claims are too great, a class trial will not be fair or practical. In some circumstances, Federal courts have found that the law of different States was sufficiently similar that a class could go forward. In other cases, they have found that the differences were too great to have a fair class trial.

The proposed amendment would take away the discretion of Federal judges to make these important decisions. It is as though we do not trust our Federal judges. In this case, we can trust them.

Proponents of the amendment conveniently ignore the fact that Federal law in this issue is quite consistent with the approach taken by numerous State supreme courts which have refused to certify cases where the differences in State law would make it impossible to have a fair and manageable trial.

In fact, the proposed amendment would reverse decisions by the Supreme Courts of California, Texas, New York, and numerous other States that have rejected nationwide class actions under such circumstances.

Second of all, Federal courts already use subclassing where appropriate. Subclassing basically means dividing a class into a couple of smaller classes whose claims are similar. Rule 23 of the Federal Rules of Civil Procedure, the nearly 40-year-old rule governing class actions, explicitly gives courts the option to use subclasses to account for variations in a class as long as the class would still be manageable and fair_for example, if a case involves State law that can easily be divided into three or four groups, subclassing would be appropriate if the trial would otherwise be manageable. At the same time, if subclassing were used in every **[*S1180]** situation that involves different State laws, in some cases there would be so many subclasses that it would be impossible to have a manageable or even a fair trial.

Under current law, Federal judges have discretion to decide when subclassing makes sense.

This approach is working. Why would we change it?

The amendment not only changes it but makes it even worse.

Finally, the amendment would hurt consumers by subverting State law. The proposed amendment suggests that if subclassing will not work, the courts should simply respect State laws to the extent practical. What does that mean? How does a court partially carry out a State law? Judges are responsible for carrying out the law, period_not for carrying out the law to the extent practical.

By suggesting the Federal courts should ignore variations in State laws when respected State law is impractical, this provision would perpetuate the very problem that the class action bill is trying to fix. For example, in the notorious Avery vs. State Farm case, a county judge applied Illinois law to claims that arose throughout the country, ruling that insurers could not use aftermarket parts in making auto accident repairs even though several States had passed laws encouraging and even requiring the use of these more economical parts to keep down the costs of insurance premiums. The approach taken by the Avery judge_condoned by the proposed amendment_hurts consumers by denying them the protection of their State laws.

Some State legislatures have adopted particularly strong laws in certain areas because their citizens have expressed strong feelings about those issues_for example, privacy or consumer fraud. Under this amendment, citizens of such States will not be entitled to the protection of their States laws in nationwide class actions. Instead, their claims will be subject to some compromise law created by a judge who allowed for a class action trial. That is not justice. That is not good law. That is not a good way to approach things. That is not good procedure.

For all of these reasons I urge our colleagues to vote against the Bingaman-Feinstein amendment and keep this bill intact. We also know that should that amendment pass, this bill is dead. One more time, it will be dead. I hope we have enough Senators who realize the importance of getting this bill through and getting these egregious harms straightened out to pass this bill without amendment.

Let me refer one more time to Dickie Scruggs' comments which he made at a luncheon_"Asbestos for Lunch"_which was a panel discussion at the Prudential Securities Financial Research and Regulatory Conference on June 11, 2002, in New York.

I happen to admire Dickie Scruggs. He is very sharp. He is smart. He has made a billion dollars from practicing law, and I think he has made it legitimately_mainly in the tobacco cases. I have worked very closely with the attorneys in those cases. I have a lot of respect for him. He is an honest man.

When this honest man, a top trial lawyer, one of the best in the country, who is a plaintiffs' lawyer, who has brought class actions, who understands the whole system better than those lawyers, says this, I think we ought to pay attention to it. Here is what he said at that luncheon, and he is one of the leading plaintiffs' lawyers in the country. He said:

[w]hat I call the "magic jurisdictions" . . . [is] where the judiciary is elected with verdict money.

What does he mean by that? He means the attorneys make so much money that they in turn can give a small percentage of that money to these judges so they can get elected and reelected. So there is an interest in the courts in making sure the attorneys make a lot of money so they can get their share to be reelected.

Let me start at the beginning again. It is best heard in full. Here is what Dickie Scruggs said:

[W]hat I call the "magic jurisdictions, . . . [is] where the judiciary is elected with verdict money. The trial lawyers have established relationships with the judges that are elected; they're State Court judges; they're popul[ists]. They've got large populations of voters who

are in on the deal, they're getting their [piece] in many cases. And so, it's a political force in their jurisdiction, and it's almost impossible to get a fair trial if you're a defendant in some of these places. The plaintiff lawyer walks in there and writes the number on the blackboard, and the first juror meets the last one coming out the door with that amount of money . . . The cases are not won in the courtroom. They're won on the back roads long before the case goes to trial. Any lawyer fresh out of law school can walk in there and win the case, so it doesn't matter what the evidence or the law is.

He said it better than anybody on this floor has said it. And he is a trial lawyer. He said it is almost impossible to get a fair trial if you are a defendant in some of these places. He is talking about Madison County, IL, Jefferson County, TX, jurisdictions in Mississippi, and other jurisdictions throughout the country. I do not want to name them all. The fact is that is what he is talking about. It is impossible to get a fair trial.

I wonder. I have heard my colleagues come on the Senate floor and say there were only two cases a year in Madison County. Come on. That ignores all the threatened cases, demand letters, and settled cases for what are basically defense costs_whatever it costs the company to hire their law firm to defend them because they cannot afford to go to a verdict in that particular jurisdiction because that verdict money is what supports the judges to begin with. They are as interested as anybody in making sure that those verdicts are big, even if they are unjust.

That is what this is all about_and the Bingaman amendment, as amended by my dear friend, Senator Feinstein from California, continues to perpetuate this system.

This is not an overwhelming antilawyer bill. This is not an overwhelming bill that takes away consumers' rights. In fact, it is not a bill that takes away consumers' rights at all. This is not a bill that is unfair. This is a bill that will straighten out these egregious, wrongful actions by some of these jurisdictions by putting these important cases in courts where it is much more likely that justice will prevail. That is what this bill does. It will not prevent anybody from suing. It will not prevent anybody from recovering. It is just that these cases will be tried in Federal jurisdictions in these very prestigious Federal courts, as they should be because of the diversity problems that are presented by these cases, and it is much more likely that we will have less fraud, less unfairness, less jackpot justice in the Federal courts than lawyers are allowed to forum shop them in remote counties with little attachment to the parties.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. KENNEDY . Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

amendment no. 2

Mr. KENNEDY . Mr. President, I urge all of my colleagues to support this amendment to exclude civil rights and wage and hour cases from the bill's provisions on removal of cases to Federal court. Working Americans and victims of discrimination seeking justice under State laws don't deserve to have the doors of justice slammed on such claims, but that is exactly what this bill will do.

All of us know that families across the country are struggling to make ends meet. We cannot

ignore that they are too often hurt by the denial of a fair wage, or by unfair discrimination. We cannot tell the victims of these practices that Congress does not care about this enormous problem.

This amendment is needed, because the harm suffered by plaintiffs in State civil rights and labor cases is real, devastating, and personal_not the sort of harm that results in a few dollars of damages or a coupon settlement.

We have been told that this bill was designed to correct the problem of class actions in which plaintiffs get only a few dollars for minor claims, while elite attorneys earn million-dollar fees. We have yet to hear one example of that happening in a civil rights case or a labor case. We certainly haven't heard anything to suggest there is a major problem in those areas.

Some have said it is too late to raise these concerns about civil rights and workers' rights. We have been told that **[*S1181]** too much work has gone into this legislation to consider these issues now. But it is always the right time to stand up for principle.

In its current form, this bill is just another example of the administration's misguided priorities_putting the interests of big companies ahead of America's working families. Why should Congress protect companies that violate State laws by engaging in discrimination or exploiting low wage workers, while making it harder for victims of those practices to get relief in court? Those are the wrong priorities, and we cannot ignore that problem.

We can't turn our backs on victims of discrimination such as Kathleen Rudolph. She and other working women in Florida brought a class action alleging sexual harassment. These women provided health care and other services to inmates in State prisons. They told the court they had suffered almost daily sexual harassment from male inmates, and prison officials failed to stop it. What sense does it make to force a case like that to go to a Federal district court?

The same principle applies to wage and hour laws. A fair day's work deserves a fair day's wage. State wage-and-hour laws provide basic protections to workers, particularly now, as companies continue to improve their bottom lines by pressuring workers to work off the clock. A recent New York Times article described the growing phenomenon of low-wage workers in many fields, including hairstylists, supermarket cashiers, and call center workers, being forced to work without recording their full hours.

These workers are denied overtime pay, and in many cases, working extra hours means they don't even earn the minimum wage. Many of these workers refuse to underreport their hours, and they are punished for not doing so. One manager interviewed by the New York Times admitted:

Working off the clock was a condition of a call service representative's employment. Hourly workers who complained were weeded out and terminated.

Professor Eileen Applebaum of Rutgers University emphasized that workers have little choice but to go along. She said, "One big reason for off-the-clock work is that people are really worried about their jobs."

Congress should not take away the right of these workers to recover the wages they are owed. Locking the courthouse door against them will hurt people such as Nancy Braun and Debbie Simonson, who worked at a national discount chain in Minnesota. They were constantly forced to work through their meal breaks and work off the clock. They and workers like them would not be able to recover their wages without a class action. We should not put more barriers in the way of their pursuit of justice.

The new Federal overtime rule that takes away overtime from so many Federal workers means that State-law overtime protections are more important than ever. This is particularly true in States such as Illinois, which have wage-and-hour laws similar to the Federal law, and have explicitly rejected the new Federal regulations.

With 8 million Americans out of work, and so many other families struggling to make ends meet, cutbacks in overtime are an unfair burden that America's workers should not have to bear. Overtime pay accounts for about 25 percent of the income for those who work overtime, and workers denied that protection routinely end up working longer hours for less pay.

Employers are all too ready to classify workers as not eligible for overtime. Warren Dubrow and Sam O'Lear discovered that problem when they worked in Orange County, CA, as service mangers at an automotive chain.

They often had to work more than 50 hours a week. Yet they were denied overtime pay because their employer called them "managers." Never mind that they spent most of their time on nonsupervisory tasks like greeting customers, filling out order forms, and even changing tires. In State court, they and thousands of their fellow service managers won the right to overtime pay under State laws providing that workers who spend more than half their time on non-managerial tasks are entitled to overtime. Why should a Federal court be required to hear a case like that?

This isn't just a matter of moving civil rights cases and labor cases to a different forum. The real effect is much more harmful. Too often, moving these cases to Federal courts will mean they are never heard at all because strict Federal rules for class certification will prevent the plaintiffs from being approved as a class. If a Federal court decides not to certify the class, that is probably the end of the case, because many members of class action lawsuits can't afford to pursue their cases individually. Extended litigation in Federal court is too expensive for low wage workers and victims of discrimination, many of whom live paycheck to paycheck. Defendant companies are eager to throw sand in the gears of the law, and Congress shouldn't be encouraging them.

There has been some confusion during this debate about whether the class action bill would really move cases involving local events into Federal courts. Yesterday, the distinguished Senator from Utah questioned whether cases based on truly local events would really be affected by the class action bill. Let there be no doubt, it will happen if the current bill isn't modified.

If 100 Alabama workers bring a class action case under Alabama law for job discrimination that took place in Alabama, the employer can still use this bill to drag the case into Federal court if the employer company is incorporated outside the State. The same is true if low-wage workers are denied fair pay in their home State. As long as an employer is incorporated out of State, that employer can move the case into Federal court.

Section 4 of the bill allows a case to stay in State court only if a primary defendant is a "citizen" of the same State as the plaintiffs who brought the case. Companies are citizens of the State where they are incorporated, regardless of where they do business. As a result, plaintiffs who file a case in State court against a company with offices in their home State could quickly find their case in Federal court if the company is incorporated somewhere else.

That will affect a huge number of State law cases. To show the scale of this problem, let's look at the figures. More than 308,000 companies are incorporated in Delaware, including 60 percent of the Fortune 500 firms and 50 percent of the corporations listed on the New York Stock Exchange. Most of these companies also do business in many other States. But plaintiffs in those other States will not be able to file cases against these companies without

being dragged into Federal court. That result violates basic fairness and common sense.

The Senator from Utah also suggested that this amendment isn't necessary to protect victims of discrimination because Federal courts have traditionally been defenders of civil rights.

Federal courts do perform the important job of protecting civil rights under Federal law and the U.S. Constitution. No one is questioning that. This amendment wouldn't change the fact that Federal civil rights claims can be decided by Federal courts. Nor would it exempt Federal civil rights or Federal wage and hour cases from the other requirements of this bill, such as the requirement that appropriate Government officials be notified of class action settlements.

This amendment does only one thing. It leaves in place the current rules governing removal of civil rights and labor cases filed under State or local laws. When States are ahead of the Federal Government in giving their citizens greater protection than Federal law_as several States have done in the area of genetic discrimination and discrimination based on marital status_State courts, not Federal courts, should interpret those laws.

The Senator from Utah suggested that this amendment isn't necessary because civil rights cases are filed under Federal laws. That is not accurate. There are many Federal class actions, but there are also many emerging areas in which victims of discrimination are seeking relief through State law class actions.

Sexual harassment cases are often brought in State courts under State law, like Kathleen Rudolph's case which I mentioned earlier.

Many civil rights class actions can only be brought under State law because there is no Federal law on the **[*S1182]**
particular issue involved. That is true for genetic discrimination. It is true for discrimination based on marital status, parental status, and citizenship status. Those types of discrimination are prohibited under many State laws, but not yet under Federal law.

If we don't let State courts develop these emerging protections under State laws, we are stacking the deck against workers and victims of discrimination. That is because Federal courts have said, time and time and time again, that they will interpret State laws narrowly.

The Court of Appeals for the Seventh Circuit, faced with opposing interpretations of State law, has ruled that it will "choose the narrower interpretation that restricts liability." The First and Third Circuits have made similar rulings. There is no question that Federal courts are more likely than State courts to rule against plaintiffs in interpreting State law. Federal judges have said so themselves. Moving these cases into Federal courts will put a Federal thumb on the scale in favor of companies that violate the law.

We can't let that happen. I urge all of my colleagues on both sides of the aisle, and on both sides of the class action debate, to support this amendment. This legislation is supposed to reduce class action abuses, not add new abuses.

Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. SESSIONS . Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. SESSIONS . Mr. President, I rise in opposition to the Kennedy amendment that would exclude labor class actions from the scope of S. 5. At the outset, I have serious problems with any of the carve-out amendments to S. 5. These amendments are part of an effort by opponents of the bill to mischaracterize S. 5 as anticonsumer and to make it appear that some of these carve-outs and exceptions are necessary to prevent injustice. But, Mr. President, S. 5 is a good deal across the board. It is going to improve class actions for consumers, for workers, for our economy, and for businesses. Why should American workers be denied its benefits? Why would people who have a labor dispute not want to have that dispute settled in a Federal court under these superior procedures?

S. 5 will keep most labor cases in State court, anyway. The act includes two exceptions_the home State exception, and the local controversy exception_that are intended to keep most local class actions in State court. That means if local residents sue a local employer, the case will probably stay in State court, anyway.

Second, any labor class actions that will be removable to Federal court under the bill would still be governed by State law. This is not unusual. It is done all the time in Federal court. Nothing in the act changes substantive law in any way. It does not strip any worker of any right to seek redress for a labor violation. It creates no new defense for corporate defendants in time-shaving cases or otherwise. In short, workers who bring State labor claims after the Act passes_and I expect that it will_will have the exact same rights they have now.

Third, Federal courts have frequently certified overtime class actions. Some critics have said they are worried about Federal courts refusing to certify employee claims, but that is not true.

A recent study by the Federal Judicial Centerfound that class actions generally "are almost equally likely to be certified" in State and Federal court.

Certification, of course, is when a Federal court agrees that a class action should be tried as a class action. A lawyer can't go in and declare, I am representing a whole class of people, without some finding that there is a class that has been similarly wronged, or there is a similar litigation issue at stake.

A review of these decisions in Federal court found numerous examples of Federal judges certifying wage-labor class actions. For example, a Federal court in New York recently certified a State labor law class action on behalf of employees of a chain of natural food stores, many of whom were immigrants, who claimed they were not properly compensated for their overtime claims. The Federal judge accepted that case.

A Federal court in New York also certified a class of delivery persons and dispatchers at a drugstore chain who alleged they were not paid the minimum wage or overtime in violation of New York law. That was already accepted under current law, and it certainly would not change under this.

We made some efforts to improve the overtime laws in the Federal rules with regard to it. I have personally, as a private practitioner, represented two clients in wage cases involving overtime. The reason those cases were litigated is because the laws are not clear about what overtime is and what it is not. Nor is the law clear as to who is entitled to overtime and who is not. That needs to be clarified, and I salute the President for his attempt to do so. That is a parenthetical comment.

In a multidistrict litigation proceeding in the Federal court in Oregon, a Federal court certified seven State law classes brought by claims representatives against an insurance company, alleging they were improperly classified as exempt. In a case in Federal court in Illinois, the

judge certified a class of employees who said their employer violated State law by failing to pay them for time spent loading trucks and driving to sites.

So the judge certified a class of employees who were making a claim in Federal court for violation of State labor laws. Judges will try that case based on whether it violated State law.

In a case in Washington State, the district court certified a class of meat processing plant employees who accused their employer of failing to pay them for work at the beginning and end of each day when they were on meal breaks. This is a constant source of litigation in these types of cases.

I would suggest that the argument that Federal courts will not certify class actions in wage and hour cases is not correct.

Finally, Mr. President, contrary to what has been suggested today, Federal courts have a long record of protecting workers in employment class actions. Congress has passed strong laws, such as title VII, that were specifically crafted to give workers access to Federal courts so they could bring employment discrimination cases in a fair forum.

We have always believed Federal court is a fair, objective forum for people who have been discriminated against, whether they claim employment rights or civil rights.

As a result, Federal courts already have jurisdiction over most employment discrimination and pension claims, and their record is in sharp contrast to courts such as in Madison County, IL, and Jefferson County, TX.

Which courts system oversaw the Home Depot gender discrimination case settlement that paid class members about $65 million? Which courts oversaw the $192 million Coca-Cola race discrimination settlement in which each class member was guaranteed a recovery of at least $38,000?

The answer to both is these were Federal court cases, not magnet State courts that to often look out for lawyers instead of consumers.

In sum, the only class of workers that will be negatively affected by S. 5 is the trial lawyers who will no longer be able to bring major nationwide class actions in their favorite county court. For everyone else, S. 5 is a win-win proposition that will put an end to class action abuse while protecting consumers who seek to bring legitimate class actions.

I urge my colleagues to reject this amendment and those other carve-out amendments that are being introduced.

Senator Kennedy has also added to his amendment, the employer-worker rights cases, the civil rights carve-out. I would like to make a few points about the civil rights cases.

The amendment, as I understand it, would exclude from the reach of this bill all class actions involving civil rights_all of them. It should be defeated for several reasons.

First, an amendment that would affirmatively exclude civil rights cases from Federal jurisdiction would be contrary to a long tradition of encouraging the availability of our Federal courts to address civil rights claims.  **[*S1183]**

Indeed, we have on the books several statutes that are intended to ensure that Federal civil rights cases can be heard in Federal courts. It has long been recognized that Federal courts, by virtue of their independence from political pressure, provide a more objective, hospitable

forum for civil rights cases than State courts.

One statute that permits removal to Federal court for a broad range of civil rights actions is 28 U.S.C. 1443. A second statute, 28 U.S.C. 1343, provides broad Federal jurisdiction over a whole host of civil rights claims. For example, any action "for injury to person or property or because of the deprivation of any right or privilege of a citizen of the United States," any action "to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights."

Indeed, that section provides original Federal jurisdiction over any action "to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens."

Would this amendment take those from State court? I do not think that is healthy, and I do not think that is what we should do.

Second, contrary to the sponsor's assertion, the bill will not discourage people from bringing class actions by prohibiting settlements that provide named plaintiffs full relief for their claims. The answer to this contention is simple: There is no such provision in the bill. Indeed, the bill does not contain any provisions that will change claimants' substantive rights to recovery in any respect. The "consumer bill of rights" provisions of the bill used to include a section that prohibited the payment of excessive "bounties" to class representatives. The rationale for that provision was to protect the class members. However, because of concern from the civil rights community about that provision being potentially misused, we have deleted that provision from the bill.

Finally, contrary to the position of the amendment's proponents, the bill will not impose new, burdensome and unnecessary requirements on civil rights litigants and the federal courts.

The provision of the bill requiring that certain public officials be notified about proposed settlements will not delay the approval of settlements. The period allowed for commentary from public officials is consistent with the time that it normally takes to get settlement notices to class members and conduct the "fairness hearing" process to obtain judicial approval of a proposed settlement.

The whole purpose of this additional requirement is to ensure that proposed settlements are fully scrutinized to protect the interests of the unnamed class members.

This bill protects the rights of civil rights plaintiffs.

It should not be amended.

The PRESIDING OFFICER. The Senator's time has expired en bloc.

Mr. SESSIONS. I thank the Chair. I urge the amendment be defeated. I yield the floor.

The PRESIDING OFFICER. Who yields time?

The Senator from Massachusetts.

Mr. KENNEDY . Mr. President, how much time remains?

The PRESIDING OFFICER. Three minutes remain.

Mr. KENNEDY. I yield myself such time.

Mr. President, a point has been raised by those who are opposed to this amendment that there have been examples where issues affecting working conditions have been considered in the Federal courts and, therefore, we should not be so concerned. That misses the point.

The fact is, we know of a number of cases that have been referred to Federal courts and the Federal courts have been uncertain as to which way to rule. Therefore, they have made a judgment consistently to have the narrowest possible interpretation. Narrowest possible interpretation means workers are going to get shortchanged on wages and working conditions. That is what it means.

Why take it away from the local jurisdiction? We know the same argument with regard to civil rights. We all understand and respect the fact that when it comes to constitutional rights or interpreting the laws that have been passed here with Federal guarantees there is going to be Federal jurisdiction. But that ignores the basic fact that in a number of the States there have been enhancements of civil rights. The States have made those judgments. Judges understand that. They understand what has been considered by the legislature. They know what the temperament of the legislation is all about.

Why take away those protections? This legislation does so. Quite frankly, those areas of workers' rights and civil rights were never really thought about as being the major reason for this legislation. They represent about 10 percent of the total class action, but they do involve protecting workers and workers' rights and they do involve protecting the basic civil rights which the States have enhanced over the Federal laws.

Why are we going to take away from the States the opportunity, the power, the authority, to go ahead and interpret that? That is going to be unfair to those individuals who ought to have the protection. This is going to provide less protection for workers, less protection for their wages and their working conditions, and it is going to put at risk the kinds of protections that States have decided should be there to protect their citizens in the area of civil rights. It makes no sense, and I would certainly hope that our amendment would be accepted.

I yield back the remainder of my time.

The PRESIDING OFFICER. The Senator from Pennsylvania.

Mr. SPECTER . Mr. President, the hour of 4 has arrived. Pursuant to the previous order, we will now vote on the Kennedy amendment with a stacked vote on the Feinstein-Bingaman amendment to follow immediately.

The PRESIDING OFFICER (Mr. Coburn). Under the previous order, the question is on agreeing to amendment No. 2 offered by the Senator from Massachusetts.

Mr. SPECTER. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. McCONNELL. The following Senator was necessarily absent: the Senator from New Hampshire (Mr. Sununu).

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced_yeas 40, nays 59, as follows:

[Rollcall Vote No. 6 Leg.]


YEAS - 40

Akaka
Baucus
Bayh
Biden
Bingaman
Boxer
Byrd
Cantwell
Clinton
Conrad
Corzine
Dayton
Dorgan
Durbin
Feingold
Harkin
Inouye
Jeffords
Johnson
Kennedy
Kerry
Landrieu
Lautenberg
Leahy
Levin
Lieberman
Lincoln
Mikulski
Murray
Nelson (FL)
Obama
Pryor
Reed
Reid
Rockefeller
Salazar
Sarbanes
Schumer
Stabenow
Wyden


NAYS - 59

Alexander
Allard
Allen
Bennett

Bond
Brownback
Bunning
Burns
Burr
Carper
Chafee
Chambliss
Coburn
Cochran
Coleman
Collins
Cornyn
Craig
Crapo
DeMint
DeWine
Dodd
Dole
Domenici
Ensign
Enzi
Feinstein
Frist
Graham
Grassley
Gregg
Hagel
Hatch
Hutchison
Inhofe
Isakson
Kohl
Kyl
Lott
Lugar
Martinez
McCain
McConnell
Murkowski
Nelson (NE)
Roberts
Santorum
Sessions
Shelby
Smith
Snowe
Specter
Stevens
Talent
Thomas
Thune
Vitter
Voinovich
Warner

                    NOT VOTING - 1
Sununu

The amendment (No. 2) was rejected.

                    Amendment No. 4

The PRESIDING OFFICER. Under the previous order, there are now 2 minutes of debate equally divided prior to a vote in relation to the Feinstein amendment No. 4.

The Senator from California.

Mrs. FEINSTEIN . Mr. President, I understand I have 1 minute to discuss **[\*S1184]** the amendment before the Senate. This amendment is on behalf of Senator Bingaman and myself. It essentially deals with an issue that emerged in the consideration of the class action bill.

I am a supporter of the class action bill. However, there is a loophole. That loophole is with class action consumer-related cases. They could go to a Federal judge, and the Federal judge could say the various laws of the 50 States are so complex he cannot decide on a given law. Then the class action remains in limbo. It cannot go back to State court.

This is a compromise between Senator Bingaman and myself. It essentially says the judge can either issue subclassifications as determined necessary to permit the action to proceed or, if that is impractical, look at other courses, including the plaintiff's State laws.

The PRESIDING OFFICER. The Senator from Iowa.

Mr. GRASSLEY . Mr. President, there is no loophole in this bill. This amendment would force the Federal courts to certify dissimilar and unmanageable claims, which is the problem occurring in certain magnet State courts right now. This is a fairness and a due process problem. This is not really a compromise at all. It defeats the purpose of the bill.

The amendment tells courts to ignore State law and forget about fairness just so a class can be certified. It would require courts to subclass even where it would be unwieldy and impractical.

If you want to stop the abuses and pass class action reform, you will oppose this amendment. This underlying bill is the compromise.

Mr. CARPER. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The question is on agreeing to the amendment.

The clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. McCONNELL. The following Senator was necessarily absent: the Senator from New Hampshire (Mr. Sununu).

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced_yeas 38, nays 61, as follows:

[Rollcall Vote No. 7 Leg.]


YEAS - 38
Akaka
Baucus
Biden
Bingaman
Boxer
Byrd
Cantwell
Clinton
Conrad
Corzine
Dayton
Dorgan
Durbin
Feingold
Feinstein
Harkin
Inouye
Johnson
Kennedy
Kerry
Landrieu
Lautenberg
Leahy
Levin
Mikulski
Murray
Nelson (FL)
Obama
Pryor
Reed
Reid
Rockefeller
Salazar
Sarbanes
Schumer
Specter
Stabenow
Wyden


NAYS - 61
Alexander
Allard
Allen
Bayh
Bennett
Bond

Brownback
Bunning
Burns
Burr
Carper
Chafee
Chambliss
Coburn
Cochran
Coleman
Collins
Cornyn
Craig
Crapo
DeMint
DeWine
Dodd
Dole
Domenici
Ensign
Enzi
Frist
Graham
Grassley
Gregg
Hagel
Hatch
Hutchison
Inhofe
Isakson
Jeffords
Kohl
Kyl
Lieberman
Lincoln
Lott
Lugar
Martinez
McCain
McConnell
Murkowski
Nelson (NE)
Roberts
Santorum
Sessions
Shelby
Smith
Snowe
Stevens
Talent
Thomas
Thune
Vitter
Voinovich
Warner

NOT VOTING - 1

Sununu

The amendment (No. 4) was rejected.

The PRESIDING OFFICER. The majority leader.

Mr. FRIST . Mr. President, very briefly, a number of Members have inquired about the schedule. It is my understanding that shortly Senator Feingold will be offering his amendment, and then we will debate that amendment tonight. We will have the vote on that amendment tomorrow at some time. We will have discussions with the Democratic leadership and Senator Feingold in terms of time. Thus, we will have no more rollcall votes tonight. The next rollcall vote I expect will be on the Feingold amendment sometime tomorrow.

With that, the prospects of finishing this bill tomorrow at a very reasonable time_hopefully, midafternoon or early afternoon_are very good, very positive. There are lots of other discussions and issues that have to be dealt with, and I encourage they be dealt with later this afternoon and into the evening, tonight, and tomorrow morning so we can bring this bill to closure.

We were just remarking, it has been a real pleasure, in terms of the approach of this bill_a bipartisan bill, amendments being debated in a timely way, people being able to express themselves_but bringing the bill to closure at an appropriate point, to me, is very constructive and very positive. I thank my colleagues for that.

Thus, the next rollcall vote will be tomorrow at some point. No more rollcall votes tonight.

The PRESIDING OFFICER. The Senator from Wisconsin.

Mr. FEINGOLD . Mr. President, I ask unanimous consent that the pending business be set aside.

The PRESIDING OFFICER. Without objection, it is so ordered.

Amendment No. 12

Mr. FEINGOLD . Mr. President, I send an amendment to the desk and ask for its immediate consideration.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from Wisconsin [Mr. Feingold] proposes an amendment numbered 12.

Mr. FEINGOLD . Mr. President, I ask unanimous consent that the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To establish time limits for action by Federal district courts on motions to remand cases that have been removed to Federal court)

On page 22, strike line 22 and all that follows through page 23, line 4, and insert the following:

"(1) In general._Section 1447 shall apply to any removal of a case under this section, except that_

"(A) not later than 60 days after the date on which a motion to remand is made, the district court shall_

"(i) complete all action on the motion; or

"(ii) issue an order explaining the court's reasons for not ruling on the motion within the 60 day period;

"(B) not later than 180 days after the date on which a motion to remand is made, the district court shall complete all action on the motion unless all parties to the proceeding agree to an extension; and

"(C) notwithstanding section 1447(d), a court of appeals may accept an appeal from an order of a district court granting or denying a motion to remand a class action to the State court from which it was removed if application is made to the court of appeals not less than 7 days after entry of the order."

Mr. FEINGOLD . Mr. President, if we are going to pass this bill, I think we should do all we can to ensure citizens get their day in court promptly, whether it is in a Federal court or a State court. We are all familiar with the adage that justice delayed is justice denied. So we cannot let this bill become a vehicle for delay.

The bill includes complicated requirements for determining which cases can be removed to Federal court. We need to make sure the cases that belong in State court under this bill do not get caught up in some kind of procedural wrangling that would effectively deny justice to the plaintiffs through delay.

Current Federal court practice allows a case filed in a State court to be automatically removed to Federal court by the filing of a notice of removal. If a party believes the case does not belong in Federal court, it can then remove in Federal court to remand or return the case to the State court.

Under current law, when a Federal district court decides to grant a motion to remand the case back to State court, right now that order is not appealable. S. 5, the bill before us, makes such orders appealable for the first time in over a century. Due to the efforts of Senator Schumer, Senator Dodd, and Senator Landrieu, the bill requires the court of appeals to decide appeals of remand orders within 60 days unless the parties agree otherwise. This 60-day time limit recognizes that there is a potential for delay that these newly permitted appeals could cause and that there is a need for courts to resolve quickly at the appellate level the issue of where a case will be heard.

I strongly support this idea of a time limit for decisions on appeals. But it **[*S1185]** also highlights another great potential for delay that is caused by this bill. Before that 60-day clock begins to run on an appeal, the district court must first rule on the motion to remand the case to State court. Unfortunately, some courts take a great deal of time to decide motions to remand. The result is simply putting a case in limbo.

Take, for example, the case of Lizana v. DuPont. In this case, cancer victims in Mississippi allege they became sick because they lived next door to a DuPont manufacturing plant.

DuPont then removed the case to Federal court on January 21, 2003, and the victims then moved to remand the case to State court. The Federal district court finally granted the victims' motion, a year after the motion to remand was filed.

In an Oklahoma case called Gibbons v. Sprint, a group of consumers filed a case against Sprint for installing cable lines across their land without giving proper notice or paying compensation to the landowners. Sprint then removed the case to Federal court. A remand motion was filed on October 4, 1999, and was granted, but only after a delay of nearly a year.

These are real-life examples of how an improper removal can end up delaying a case for a significant period of time. By rewriting diversity jurisdiction rules in this bill, we are handing defendants a tool for delay, even if they do not actually qualify to have their cases removed. So we need to make sure that in cases that are removed from State courts as a result of this bill, remand motions are decided promptly. At the very least, we should require that the courts review these motions and decide them quickly, if they can.

The amendment that I offered in the Judiciary Committee would have placed a 60-day time limit on district court consideration of motions to remand. This is the same limit that the new bill places on courts of appeals when decisions on motions to remand are appealed.

My committee also adopted the other components of the bill's provision on appeals. It allowed all parties to agree to an extension of any length and allows the court to take an additional 10 days for good cause shown. If courts of appeals are going to be required to rule on appeals of decisions on motions to remand in short order, I thought we should require district courts to make those decisions just as quickly. That way, we could be sure that removals will not be used as a tool for delay.

On Monday, the Judicial Conference sent a letter to the chairman of the Judiciary Committee concerning my amendment. Not surprisingly, it opposes the amendment. The Judicial Conference historically has opposed, as it says in its letter, "statutory imposition of litigation priority, expediting requirements, or time limitation rules in specified types of civil cases."

In other words, judges do not like being told by Congress how to prioritize their cases or how quickly they should do their work. And I do not blame them. But we do it when we think it is important. And here we are sending a potentially large new number of cases to Federal court. We are increasing the workload of the Federal courts, making it more likely cases will be delayed because of crowded dockets.

What the committee amendment did was to require the courts to quickly assess whether a case belongs in Federal court, whether this bill applies to it. I do not think that amendment of mine was unreasonable at all.

On the other hand, I am sympathetic to the concern expressed by the Judicial Conference that in some cases 60 days may not be enough time to decide the motion. Its letter points out that, in some cases, an evidentiary hearing might be required and the time to fully brief the motion may exhaust a portion of this 60-day period. My committee amendment allowed for an automatic 10-day extension and an extension of any amount if both sides agree.

I have read the letter from the Judicial Conference and I am trying to come to a reasonable solution. I accept the possibility that changes I have made to date perhaps are not enough. So I am not wedded to the 60-day period itself. What I am wedded to is the idea that these motions should not be permitted to languish unexamined for months and months. I have made further modifications to the amendment that I offered in committee in the hope that the sponsors of the bill would be willing to work with me to reach an accommodation on this issue.

The amendment I have proposed on the floor requires the district court to do one of two things within 60 days of a motion to remand being filed. First, the court can decide the motion. I hope many, if not most, motions to remand could be decided that quickly. But under my amendment before the body, the court has another option under this amendment. It can issue an order within a 60-day time period indicating why a decision within that time cannot be made. Perhaps the reason is that the factual record cannot be completed within that time, or that other pressing matters must receive priority in light of the court's full docket. The amendment does not presume to specify what reasons are good or adequate reasons. The justification is entirely within the court's discretion, but it must give some explanation, some reason in an order that would be issued within this 60-day period.

If such an order is issued, the court is then allowed, under the amendment before the body, to issue a decision up to 180 days after the filing of the motion. That gives the court a full 6 months to make a decision. I argue that should be enough time for even the most complex of remand motions. Once again, an extension of any length is permitted if all the parties to the case agree.

I believe these changes more than address the concerns raised by the Judicial Conference, but they also make sure that a remand motion will not languish for more than 6 months because the court simply has not gotten around to it.

My hope is that the requirement that an order be issued within the 60 days will make it more likely that the court will devote enough time to the motion to realize that it is possible for a final decision to be reached within that time. If more time is needed, 180 days should be more than sufficient.

A 6-month time limit will not cause undue hardship to our Federal courts. For those who doubt that removal will become a tool for delay, let me call their attention to testimony before the House Judiciary Committee by legal scholar Theodore Eisenberg of Cornell Law School. Professor Eisenberg testified that his research has found that even though the number of class action lawsuits is declining, efforts to remove cases are not. More importantly, he found that remand rates are increasing over time.

In recent years, more than 20 percent of diversity tort cases removed to Federal court have been remanded to State court. Now, that means that one out of five removals are improper. We have no way of knowing what will happen under this bill. Perhaps some of the 20 percent will now be properly removed to Federal court. But given the complexity of the bill's new requirements, I think it is safe to assume that a significant number of removals will still turn out to be improper.

Once a district court decides to remand a case, that remand order will almost certainly be appealed. Plaintiffs with legitimate class actions in State court therefore need the additional protection provided by my amendment in order to avoid being unfairly harmed by this bill. Some time limit on district court consideration of remand motions in class action cases is critical to minimize the denial of justice to citizens who legitimately turn to the State courts, even under this bill, to have their grievances heard.

I know there is tremendous opposition to any attempt to perfect this bill on the floor because of concerns about the other body, but I implore my colleagues who support the bill to not let their no-amendment strategy prevent them from taking a hard look at this problem. Do we want to leave unaddressed the possibility that a case could sit in Federal court with a motion to remand pending for a year or more, only to have the case properly returned to State court once the court finally takes a look at the motion? Is that a just result?

I am convinced that we can work at something if my colleagues will simply take a quick look

at this issue with an open mind. This amendment does not even come close to blowing this bill up. It is certainly not a poison pill. It is just an effort to make the bill work better, and surely the supporters of this bill should have the flexibility to do that. **[*S1186]**

This bill is called the Class Action Fairness Act. To be fair to people seeking justice from courts, we should ask the courts to act quickly on remand motions at both the court of appeals and district court levels. So I urge my colleagues to support this amendment.

I yield the floor, and I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. DODD . Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. DODD . Mr. President, I begin by thanking the leadership. I thank Senator Reid of Nevada particularly because, as my colleagues know, the minority in this institution, even a minority of 1, can make life difficult for a majority even of 99.

The Framers of the Constitution created an institution that would make sure that the rights of minorities would be protected in this body. Contrary to his own substantive feelings about the matter before us, the distinguished Democratic leader has made it possible, because of the unanimous consent agreement entered into with the distinguished majority leader, for this matter to proceed. I also thank Senator Frist, the majority leader, for working out that arrangement so that we can deal with the matter before us.

As someone who a year and a half ago negotiated an agreement that was satisfactory to many, not to all, I am pleased that we are within a day or so of adopting this very important legislation. We would not be able to do that were it not for the leadership shown by the minority and the majority in allowing this amendment process to go forward. So I begin there.

I commend my colleagues who have offered amendments. They have offered germane and relevant amendments to this bill that have at the very least some kernels of sound judgment and good ideas to them. I regretfully disagree with my colleagues substantively and have expressed that in the Record. I know my colleague from Delaware, Senator Carper, who has spent a lot of time on this legislation, has been more deeply involved in this question than almost anyone in this body and has listened very carefully to all of those who have argued their amendments and considered them thoroughly. So I thank them for offering these ideas. I do not suggest that I would necessarily be opposed to all of these amendments under different circumstances, although I think there are substantive arguments against them.

I say to one of my dearest friends in this body_and I know we call each other good friends, but Russ Feingold is one of my best friends in the Senate, and it is a rarity when he and I are on different sides of an issue. I am not comfortable disagreeing with my friend from Wisconsin because I admire him so much, but there is a substantive disagreement over having mandatory time requirements.

The Judicial Conference of the United States, in a letter dated February 7, addresses specifically this amendment and urges our colleagues not to impose a time certain. The Senator from Wisconsin makes a strong argument on having some predictability, and I agree

with him about predictability for all involved, for defendants and plaintiffs, but there is a danger in making the predictability so certain that it makes it difficult for the judicial process to necessarily work in a fair and balanced way. Because there are so many extenuating circumstances which can complicate a given mandatory time requirement, it can actually work adversely to plaintiffs or defendants in the case, and I know my colleagues are aware of that.

A sound case can be made for Senator Feingold's amendment. There was a sound argument on the other side as well as to why this can be dangerous. The Judicial Conference has come down rather strongly in a letter in opposition to a mandatory time requirement. Rather than go through and read this whole letter, I ask unanimous consent that the letter from the Judicial Conference dated February 7 be printed in the Record.

There being no objection, the material was ordered to be printed in the Record, as follows:

Judicial Conference of

the United States,

Washington, DC, February 7, 2005.

Hon. Arlen Specter,

Committee on the Judiciary, U.S. Senate, 224 Dirksen Senate Office Building, Washington, DC.

Dear Mr. Chairman: I write on behalf of the Judicial Conference of the United States, the policy-making body for the federal courts, to express the judiciary's opposition to the amendment offered, and later withdrawn, by Senator Russ Feingold to the Class Action Fairness Act of 2005 (S. 5) during the Senate Judiciary Committee's business meeting on February 3, 2005. That amendment would require the district court to complete all action on a motion to remand a class action case not later than 60 days after the date on which such motion was made, unless all parties agree to an extension or the court grants an extension up to 10 days for good cause shown and in the interests of justice. As further explained below, the Judicial Conference opposes the imposition of mandatory time frames for judicial actions. Because the amendment may be considered further as S. 5 moves to the floor of the United States Senate, I wanted to provide you with these views as soon as possible.

The Judicial Conference strongly opposes the statutory imposition of litigation priority, expediting requirements, or time limitation rules in specified types of civil cases brought in federal court beyond those civil actions already identified in 28 U.S.C. 1657 as warranting expedited review. The Conference also strongly opposes any attempt to impose statutory time limits for the disposition of specified cases in the district courts, the courts of appeals, or the Supreme Court. (Report of the Proceedings of the Judicial Conference of the United States, September 1990, p. 80.) Section 1657 currently provides that United States courts shall determine the order in which civil actions are heard, except for the following types of actions that must be given expedited consideration: cases brought under chapter 153 (habeas corpus petitions) of title 28 or under 28 U.S.C. 1826 (recalcitrant witnesses); actions for temporary or injunctive relief; and actions for which "good cause" is shown.

The expansion of statutorily mandated expedited review is unwise for several reasons. Individual actions within a category of cases inevitably have different priority requirements, which are best determined on a case-by-case basis. Also, mandatory priorities and expediting requirements run counter to principles of effective civil case management. In addition, as the number of categories of cases receiving priority treatment increases, the ability of a court to expedite review of any of these cases is necessarily restricted. At the same time, district

courts must meet stringent deadlines for the consideration of criminal cases, as required by the Speedy Trial Act.

From a practical standpoint, it may be difficult in many situations to meet the 60-day deadline under Senator Feingold's amendment. The filing of a remand motion following a notice of removal pursuant to 28 U.S.C. 1447 would trigger the 60-day period. Under current local rules of practice in the district courts, a motion to remand may not be fully briefed and ready for court consideration until a substantial portion of the 60-day deadline has expired. In addition, the district court must consider the criteria listed as a threshold for federal court jurisdiction under S. 5 before deciding the motion to remand, which may require the court to hold an evidentiary hearing with witnesses.

The judiciary shares Senator Feingold's desire to facilitate the consideration of cases. However, for the reasons stated above, the judiciary believes the amendment is unwise. Nevertheless, if Congress determines that a specific reference beyond 28 U.S.C. 1657 is appropriate, then the following alternative language is suggested for the Committee's consideration as a replacement for subsection (A) on pages 1 and 2 of Senator Feingold's amendment:

"(A) the district court shall complete all action on a motion to remand as soon as practicable after the date on which such motion was made; and"

OR

"(A) the district court shall expedite all action on a motion to remand to the greatest extent practicable; and".

Similar language has been used by Congress in other legislation and is now found within the draft asbestos bill being discussed in your Committee. It has reminded federal judges of the importance Congress has given to the resolution of the particular matter without precluding a fair hearing of the issues underlying the motion or action.

Thank you for your consideration of the above comments. If you have any questions, please contact Mike Blommer, Assistant Director, Office of Legislative Affairs, at 202-502-1700.

Sincerely,

Leonidas Ralph Mecham,

Secretary.

Mr. DODD. I am not going to go through each and every amendment, but the amendments offered by my friends, Senators Kennedy, Bingaman, and Feinstein, also make good points, but as the Senator from Delaware and others have pointed out there are substantial and substantive reasons why those amendments are even incorporated already under the legislation **[*S1187]**
and thereby covered or that would undo what we have attempted to achieve in this legislation.

I pointed out the other day that back in the fall of 2003_I believe in October_a group of us who objected to the cloture motion and provided the margin of difference that day from invoking cloture provided the necessary votes to secure passage of the then as written class action reform bill. I think we were right in doing so. That bill, I believe, was excessive. There was a real danger it would have undone a lot of good law in this country which made courts accessible to legitimate class action plaintiffs.

We were asked, a small group of us who were willing to work on this issue, to try to come up with some compromises, and we did. We submitted a letter to the majority leader saying there were four items that we thought needed to be addressed in that bill. We then sat down and negotiated not only the 4 items but 8 items additional to the 4, so we came back with 12 improvements to that bill, far more than we were asked to do by those concerned with legislation. I am not suggesting that covered the universe. Obviously, other ideas occurred in the last year and several months since that was struck. I was disappointed we didn't bring up the reform bill in January of last year, as the leader announced we would do. We lost an entire year on this matter, where we could have had the same arrangement we agreed to over a year ago. Nonetheless, we are back here with that same agreement.

Across the country, those who have had a chance to look at this legislation have spoken very extensively in favor of it. In fact, some 109 editorials across the Nation, from publications, daily publications literally across the Nation in virtually every jurisdiction of the country, have come out and strongly endorsed this compromise package. I have a list of the 109 editorial comments made in support of this legislation, from publications that have reputations of being center, right, and left. It transcends the traditional ideological differences one might find in our daily newspapers. It is instructive to those of us anxious to know what those editorials have to say about this bill.

I ask unanimous consent that list be printed in the Record.

There being no objection, the material was ordered to be printed in the Record, as follows:

109 Editorials Supporting Class Action Reform

The Washington Post

Get Tort Reform Right_January 10, 2005

Reforming Class Actions_June 14, 2003

Making Justice Work_November 25, 2002

Restoring Class to Class Actions_March 9, 2002

Actions Without Class_August 27, 2001

The Wall Street Journal

Tort Reform Roadmap_January 27, 2005

Class-Action Showdown_July 8, 2004

Class-Action Showdown_June 12, 2003

Mayhem in Madison County_December 6, 2002

Miracle in Mississippi_December 3, 2002

Class War_March 25, 2002

Chicago Tribune

Mr. Bush goes to Collinsville_January 5, 2005

American as apple pie_July 7, 2004

Madison (just another) County_June 18, 2004

The Judicial Hellhole_March 11, 2004

The class-action money chase_June 18, 2003

The judges of Madison County_September 6, 2002

Financial Times

Class Action Repair_September 18, 2003

Out of Action_March 18, 2002

USA Today

Class-action plaintiffs deserve more than coupons_October 9, 2002

Akron Beacon Journal

Classier act_May 2, 2003

Baltimore Sun

No-Class Action_October 26, 2003

Bangor Daily News

Class-action reform_June 3, 2004

Action on Lawsuits_September 17, 2003

Bloomington Pantagraph (Bloomington, IL)

Congress should approve class-action suit reforms_June 30, 2004

The Buffalo News

Class Action Compromise_December 6, 2003

Class-Action Lawsuits_October 14, 2003

Protection for plaintiffs_July 31, 2002

Business Insurance

Tort Reform Takes Time_July 19, 2004

Tort Reform Deserved More_January 26, 2004

Redouble Effort in Tort Reform Battle_October 27, 2003

Stick With Original Class Action Bill_September 29, 2003

Maintain Class-Action Reform Push_September 8, 2003

The Christian Science Monitor

Reforming class-action suits_April 17, 2003

Contra Costa Times (Walnut Creek, CA)

Class-Action Reform_July 9, 2004

Crain's New York Business

A Class Action for Schumer_September 1, 2003

Daily Jefferson County Union

Take Bite Out of Frivolous Suits_October 20, 2003

The Des Moines Register

Pass the class-action reform_July 14, 2004

Reform class actions_February 14, 2003

The Florida Times-Union (Jacksonville, FL)

Congress: Minority Rules_July 11, 2004

Progress Is Seen_December 16, 2003

Class Warfare_September 8, 2003

Always Alert_June 17, 2003

The Gazette (Cedar Rapids, Iowa)

Clamp down on class-action suits_May 19, 2004

More class-action suits should be federal cases_July 10, 2002

The Gazette (Colorado Springs, CO)

Our View: A lawyer's paradise_July 5, 2003

Greensboro News & Record

Class-Action Lawsuit Abuse Less Under Senate Rewrite_January 12, 2004

The Hartford Courant

Abuse of the Courts_June 16, 2004

Compromise on Class Action_December 31, 2003

Sen. Dodd's Crucial Vote_October 26, 2003

Stop Class-Action Abuses_August 22, 2003

The class-action racket_July 15, 2002

The Herald (Everett, WA)

Class-action reform needed to curb abuse_June 25, 2003

The Indianapolis Star

Lawyers Get Rich, Plaintiffs Get Coupons_September 2, 2003

Class-action suits shop the system_May 15, 2002

Investor's Business Daily

A Shorter Leash for Trial Lawyers_January 6, 2005

Any Tort In A Storm_December 18, 2003

King County Journal (Bellevue/Kent, WA)

Our View: Class-action reform needs Senate action_July 8, 2003

Knoxville News Sentinel

Class action act was reasonable legislation_October 27, 2003

Las Vegas Review-Journal

Tort Reform_June 2, 2004

Coupon Clippers_January 12, 2004

A real class act_June 13, 2003

Lincoln Journal Star (Lincoln, Neb.)

Take small step toward legal reform_June 30, 2003

Mobile Register

Senate Has a Chance To Limit Lawsuit Abuse_August 16, 2003

Montgomery Advertiser

Negotiate Fair Bill on Lawsuits_October 27, 2003

Newsday (Long Island, NY)

Lawsuit reform is within reach; Stop stalling class-action remedy_July 9, 2004

A Little Compromising Helps Bill on Mass Lawsuits_December 4, 2003

Senate Should Change the Rules for Mass Lawsuits_November 5, 2003

Congress should stem abuses of class-action lawsuits_March 3, 2003

New York Daily News

End Lawyers' Shopping Spree_September 28, 2003

New York Sun

Breaking With the Bar_November 20, 2003

Senators With Class?_October 22, 2003

Northwest ArKansas Business Journal

Class-action reform a must_May 27, 2002

The Oklahoman

So Long to Reform_October 29, 2003

Odessa American (Odessa, Texas)

Lawsuit reform seems necessary_July 8, 2003

Omaha World-Herald

A Final Judgement_May 20, 2004

Ready for (Class) Action_February 12, 2004

Class-action bill sinks_October 27, 2003

Reshaping Class Action Suits_October 13, 2003

Balance the Scales_July 25, 2003

Shopping days may be over_June 16, 2003

Fix class-action abuse_July 29, 2002

The Oregonian

Approve class-action reform_July 29, 2002

Orlando Sentinel

A Needed Crackdown: It's Important for Congress to Revive the Effort to Control Class-Action Abuse_January 28, 2005

Congress Should Approve a Plan To Reform the Class-Action-Lawsuit System_June 1, 2004

Cut Down On Judge-Shopping_February 1, 2004

Stop abuse of class actions_June 23, 2003

Pittsburgh Tribune-Review

No-class action_July 12, 2004

The Providence Journal

Crimes against consumers_May 19, 2003 **[*S1188]**

Stop these corrupt suits_April 6, 2002

Rocky Mountain News (Denver, Colorado)

Pay the Lawyers in Coupons, Too: Class-Action Excesses_July 25, 2004

Sun Journal (Lewiston, Maine)

Reform Class Actions_September 7, 2003

St. Louis Post-Dispatch

Madison County: Bush in the "hellhole"_January 5, 2005

Feathering the Legal Nest_April 6, 2004

Tilted Scales_January 23, 2004

The Lawyers Win Again_October 24, 2003

Derail Madco's gravy train_October 2, 2003

Lawsuit heaven_January 13, 2003

The Santa Fe New Mexican

Time for a tad of tort reform_July 16, 2003

Spokane Spokesman-Review

Class Action Bill Needs Action Now_July 20, 2004

Unclassy Action in Need of Reform_September 3, 2003

Times Union (Albany, NY)

Class Action Victory_December 3, 2003

Class Action Showdown_November 10, 2003

Fix class-action law_July 28, 2002

Tyler Morning Telegraph

Small firms new target in lawsuit abuse crisis_June 23, 2003

Vero Beach Press-Journal

Class-action reform delayed by Democrats' stalling tactics_July 14, 2004

No Class_October 24, 2003

Washington Times

Ushering thru tort reform_July 7, 2004

Wisconsin State Journal

Put Fair Limits on Group Lawsuits: Class-Action Abuses Enrich Lawyers While Yielding Pennies for Plaintiffs_June 7, 2004

Mr. DODD. As a source of some parochial pride, I ask unanimous consent the entire editorial in the Hartford Courant of Hartford, CT, be printed in the Record supporting this legislation. It is entitled "Reining In Class-Action Abuses."

There being no objection, the material was ordered to be printed in the Record, as follows:

[From the Hartford Courant, Feb. 8, 2005]

Reining In Class-Action Abuses

Congress finally appears ready to curtail the worst abuses in class-action lawsuits.

The House and Senate have debated the issue for a decade. Now the Senate is prepared to vote, possibly this week, on a bipartisan compromise engineered by Democratic Sen. Christopher Dodd of Connecticut and others. President Bush has indicated he will sign the measure.

Lawyers long have had a field day with class-action lawsuits. They sometimes solicit clients and then shop for friendly state courts with reputations for handing down huge monetary awards. Too often, though, plaintiffs end up with pennies, while the lawyers take home millions of dollars.

Under a bill that cleared the Senate Judiciary Committee last week, most interstate class-action lawsuits in which claims total more than $5 million would appropriately be moved to federal courts.

Truly local lawsuits involving plaintiffs and defendants within a state would properly remain in local courts.

The bill, known as the Class Action Fairness Act, has other useful provisions, such as tighter controls on so-called coupon settlements, in which consumers receive discount coupons instead of cash. Also, there would be better scrutiny of settlements in which class members actually lose money.

Critics say the bill would unfairly penalize consumers because federal consumer-protection laws are weak. There still is time to address this shortcoming. But lawmakers must resist the temptation to add extraneous amendments_such as one to increase the salaries of federal judges_that would doom the bill.

The measure enjoys broad support in the House, which gave it overwhelming approval last year but which must vote again.

Once Congress acts on class-action lawsuits, it can turn its attention to two other urgent

lawsuit abuses_medical malpractice and asbestos.

Mr. DODD. Let me say again to my colleagues here, many of whom I know have offered amendments that have not succeeded in the past, I know it can be disappointing to work on the amendment and not get the necessary votes. But let me remind my colleagues, those who believe_and that is most of us here_that clearly the class action situation in this country cries out for reform, that this bill is a court reform bill rather than a tort reform bill. No courts are closing their doors to class action plaintiffs at all. But the situation had gotten out of hand. I think most of us here agree with that.

We have written an improved bill_from both a plaintiff's perspective as well as a defendant's perspective. We can have access to courts, get good judgments, and see to it that victimized plaintiffs will receive the compensation they deserve as a result of a class action decision in their favor.

I suggest to those who would have liked to have us add additional amendments here that there was a very real danger indeed that had we not stuck with the agreement reached almost a year and a half ago, the original bill would have come back or a bill adopted in the other body would have been the vehicle chosen as the vehicle for class action reform. I believe that would have been a mistake.

I know there are colleagues who are disappointed that some of us did not support them in their efforts. I state there are substantive reasons that we did not, but also there is the reason that had we done so, this matter would have been opened and the results would have been a bill that would have been dangerous. I would have opposed it, but I think the votes are here to carry it. It is always a tough call, and I am not going to suggest otherwise. Those are the kinds of decisions you have to make in a legislative body with 99 other colleagues, 435 in the other body, and a President. We are dealing with a legislative form of government. Unfortunately, as much as we would like to write our own bills and have everybody go along and agree with our ideas, that is not the way the process works.

We think we have a substantially improved piece of legislation, one that I heartily endorse. We will discover in time if there are any shortcomings, but by and large I believe we have written a good bill.

I mentioned in his absence my friendship with the Senator from Wisconsin, talking about his amendment. As I said earlier, there is more than just a kernel of truth in what he suggests. There is an argument on the other side that I know my colleague, as a very distinguished member of the bar, will appreciate. I will not be able to support his amendment, but nonetheless I appreciate the point he is making about certainty and predictability, which is not an irrelevant issue when it comes to our courts.

For those reasons, I appreciate the fact that a majority of us here in a bipartisan way_not overwhelmingly bipartisan but a bipartisan fashion_have rejected the amendments offered by our colleagues today. My hope is that a similar result will occur with remaining amendments, that we can have final passage of this bill, that the leadership of the House will do what they said they were going to do, and that is to embrace this compromise package, and that we will be able to send this bill to the President for his signature and make a major step forward in reforming our courts so that class actions can proceed in the way the Framers intended in the Constitution, which is fair to plaintiffs and defendants alike.

I yield the floor.

The PRESIDING OFFICER. The Senator from Wisconsin.

Mr. FEINGOLD . Mr. President, let me say I appreciate the comments of my friend from

Connecticut, as I always do. I just want to point out that the amendment I have offered, as opposed to the one I offered in committee, has increased the time for deciding these motions from 60 days to 180 days. Surely 6 months is plenty of time, even in a complicated motion. So I believe the concerns of the Judicial Conference have been addressed, unless we in the Congress are going to go along with the idea there should be no time limit at all.

At this point I simply leave it at that, hoping that prior to the time of actually voting on the amendment tomorrow I would have a few minutes to repeat and reiterate my position on this amendment.

I yield the floor.

The PRESIDING OFFICER. The Senator from Delaware.

Mr. CARPER . Mr. President, while Senator Dodd is still on the floor, and Senator Feingold as well, let me first of all say to Senator Dodd that we would not be here today with this compromise, which is good public policy but also something Democrats and Republicans, not all, can support_and I know we will get the support of the House and the President. I want to say a special thank you for your leadership. I have learned a lot in the last 4 years watching you and listening to you. Certainly in this instance it is no exception, but thank you.

I want to say to Senator Feingold, we had a number of amendments that have been presented to us today, all thoughtful amendments by some of our  **[*S1189]** very finest Members. I was not able to support any of them.

The one amendment that I have literally worked, as he knows, behind the scenes to try to get included in a managers' amendment is this amendment or some variation of this amendment. I think the underlying point you make_if a class action is filed in a State court and that is turned down and there is an effort to move it to Federal court, that is turned down, and then there is another effort to move that class action from State court to Federal court, we limit the second time through. There has to be a response in 60 days to the appeal by the Federal judge on the appeal. That would sort of beg the question, Should not there maybe be some kind of time limit as well on the first time there is an attempt to remove the case to the Federal court? That strikes me as something that makes common sense and seems fair and reasonable. As he knows, I have reached out as recently as last night with some of the people involved in the Judicial Conference and the Rules Committee to see if there is a way to strike the balance, and I believe you have moved toward that balance.

My hope is that we could take this amendment or something similar to this amendment and include it in a managers' package. You have heard Senator Dodd and me and others say there is a very delicate compromise here, and there is a concern if we change one piece of the bill we invite friends on the other side, who have a different view about the balance and would like to take the bill in a different direction_we unleash them to feel free to come forth with their amendments and set the bill back.

Having said that, I still think this amendment as you have redrawn it would actually be a good addition to a managers' amendment. I learned today there is not going to be a managers' amendment. As a result, I am not going to be able to support this amendment.

I discussed this this morning with Senator Specter; he finds favor with your amendment. I think he mentioned that at the Senate Judiciary Committee hearing. He said to me_and he has no reason to say this, but I think it is just in his heart_he thinks you are onto something here and would like to take the Senator's approach on this provision and include it in another bill that he is working on and presumably will have hearings on.

I think this idea, if it does not pass tomorrow and does not get included in the underlying bill,

is going to live for another day and we will be back to where we can hopefully all support it.

I thank the Senator for a real thoughtful approach and for his willingness to compromise and try to find some middle ground. I think he has found it. I think his efforts will ultimately be rewarded.

Mr. FEINGOLD . Mr. President, I thank the Senator from Delaware for his kind remarks and for his genuine efforts to try to reach an accord. It is a shame when we have the chairman of the committee admitting that this ought to be dealt with, and one of the great advocates of this legislation admitting that this is just a question of fixing something, we can't get it done. There is something wrong with the way we are proceeding when we can't fix something that basically nobody is really against if we do it right.

I recognize what is likely to happen in the vote. But I take the Senator at his word that he is hoping we can resolve it. Perhaps this is something that can still happen on this bill. If not, we have to resolve it another way. But I thank him for his sincere efforts to solve this problem.

I yield the floor. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. FRIST . Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

**SUBJECT:** ATTORNEYS GENERAL (92%); JUSTICE DEPARTMENTS (91%); LITIGATION (91%); CLASS ACTIONS (90%); SUITS & CLAIMS (90%); LEGISLATIVE BODIES (79%); LEGISLATION (79%); ELDER LAW (59%); SWEEPSTAKES (59%); LAWYERS (59%); US TERRITORIES (59%); US STATE GOVERNMENT (59%) CONSUMER LAW (59%); FALSE OR MISLEADING ADVERTISING (59%); POLITICAL PARTIES (59%); TOBACCO & HEALTH (59%);

**LOAD-DATE:** February 10, 2005

Service: **Get by LEXSEE®**
Citation: **151 cong rec s 1157**
View: Full
Date/Time: Monday, August 18, 2008 - 10:56 PM EDT

Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator | Transactional Advisor | Counsel Selector
History | Delivery Manager | Switch Client | Preferences | Sign Out | Help



About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# COMPENDIUM
# EXHIBIT 4

LexisNexis® *Total Research System*

Switch Client ⋮ Preferences ⋮ Sign Out ⋮ 🔲 Help

Search ▏ Research Tasks ▏ Get a Document ▏ *Shepard's*® ▏ Alerts ▏ Total Litigator ▏ Transactional Advisor ▏ Cour

Service: **Get by LEXSEE®**
Citation: **151 cong rec s 1225**

☞Select for FOCUS™ or Delivery
☐

*151 Cong Rec S 1225, *

CONGRESSIONAL RECORD -- *SENATE*

Thursday, February 10, 2005

109th Congress, 1st Session

151 Cong Rec S 1225

**REFERENCE:** Vol. 151, No. 14

**SECTION:** Senate

**TITLE:** CLASS ACTION FAIRNESS ACT OF 2005

**SPEAKER:** Mr. SPECTER; Mr. VITTER; Mr. HATCH; Mr. GRAHAM; Mr. GRASSLEY; Mr. FEINGOLD; Mr. CARPER; Mr. SESSIONS; Mr. DURBIN; Mr. LEVIN; Mr. SCHUMER; Mr. ENZI; Mr. KOHL; Mr. ALLEN; Mrs. CLINTON; Mrs. DOLE; Mr. VOINOVICH; Mr. JEFFORDS; Mr. REED; Mr. LEAHY; Mr. DODD; Mr. REID; Mr. REID. ; Mr. FRIST; Mr. LOTT

**TEXT: [*S1225]**

The PRESIDING OFFICER. Under the previous order, the Senate will resume consideration of S. 5, which the clerk will report.

The legislative clerk read as follows:

A bill (S. 5) to amend the procedures that apply to the consideration of interstate class actions to assure fairer outcomes for class members and defendants, and for other purposes.

Pending:

Durbin (Modified) Amendment No. 3, to preserve State court procedures for handling mass actions.

Feingold Amendment No. 12, to establish time limits for action by Federal district courts on motions to remand cases that have been removed to Federal court.

Mr. SPECTER . Mr. President, I thank Senators on both sides of the aisle for their cooperation in moving this class action bill. We reported it out of committee a week ago today and started the opening debate on it on Monday afternoon and then proceeded in a very timely fashion. The prospects are good that we will conclude action on the bill today. A unanimous consent agreement is currently in the process of being worked out, and we will know in the next few minutes precisely what will happen.

We are going to proceed in a few minutes to the amendment offered by the Senator from Wisconsin, Mr. Feingold, which would impose some time limits on the courts which, as I said at the committee hearing last week, I think is a good idea. I advised Senator Feingold that I would feel constrained to oppose it on this bill because of the procedural status, where the House of Representatives has been reported to accept the Senate bill provided it comes over as what we call a clean bill, without amendments.

But as I said to Senator Feingold, and will repeat for the record, I had heard many complaints about delays in our Federal judicial system. I believe that is an appropriate subject for inquiry by the Judiciary Committee on a broader range than the issue specifically proposed by Senator Feingold. It is in the same family.

I want to be emphatic. We are not impinging in any way on the independence of the Federal judiciary, their discretionary judgments. But when it comes to time limits, how long they have these matters under advisement, I think that is an appropriate matter for congressional inquiry. It bears on how many judges we need and what ought to be done with our judicial system generally. So that will be a subject taken up by the Judiciary Committee at a later date.

I think the Senate bill_this may be a little parochial pride_is more in keeping with an equitable handling of class action bills than is the House bill. For example, the House bill would be retroactive and apply to matters now pending in the State courts, which would be extraordinarily disruptive of many State court proceedings. I think it is fair and accurate to say that the House bill is more restrictive than the Senate bill and our Senate bill, I think, is a better measure to achieve the targeted objective of having class actions decided in the Federal court with balance for plaintiffs and for defendants as well.

So we are moving, I think, by this afternoon, to have a bill which will be ready for concurrence by the House, and signature by the President, and that I think will be a sign that we are moving forward on the legislative calendar.

The Senator from Louisiana is going to seek recognition in a few minutes. I thank my distinguished colleague, Senator Hatch, the former chairman, who has agreed to come over and manage the bill during my absence. We are, at the moment, having hearings on the bankruptcy bill which we hope to have in executive session next Thursday, to move ahead on our fast moving, ambitious judiciary calendar.

I now yield to my distinguished colleague from Louisiana.

The PRESIDING OFFICER. The Senator from Louisiana.

Mr. VITTER . Mr. President, I rise in strong support of S. 5, the Class Action Fairness Act of 2005. In doing so, I wish to recognize and thank them for their leadership, so many Senators who have moved the bill thus far, certainly including the chairman of the Judiciary Committee who just spoke, also the Senator from Iowa, the chief sponsor of the bill, and also the Senator from Utah, the former chairman of the Judiciary Committee.

I am also an original cosponsor of this bill, because it would protect consumers from some of the most egregious abuses in our judicial system.

Let me begin by saying that class actions are an important part of our justice system. They serve an important purpose when properly defined. No one would dispute they are a valuable feature of the legal system. This bill doesn't do away with them.

As stated so eloquently by the bill's chief sponsor, my colleague from Iowa, S. 5 is really

court reform more than tort reform. What does it reform? What is the problem?

The reason we need to pass this bill is that there are loopholes in the class action system, and it allows bad actors to game the system. As a result, in recent years class actions have been subject to abuses that actually work to the detriment of individual consumers, plaintiffs in such cases. That is exactly who the law is supposed to help.

Additionally, this gaming of the system clearly works to the detriment of business and our economy, and the need for job creation in forging a strong economy.

Such abuses happen mainly in State and local courts in cases that really ought to be heard in Federal court.

We currently have a system, therefore, which some trial lawyers seeking to game the system in an effort to maximize their fees seek out some small jurisdiction to pursue nationwide cookie-cutter cases, and they act against major players in a targeted industry. Often, these suits have very little, if anything, to do with the place in which they are brought. Rather, lawyers select the venues for strategic reasons, or for political reasons, a practice known as forum shopping.

These trial lawyers seek out jurisdictions in which the judge will not hesitate to approve settlements in which the lawyers walk away with huge fees and the plaintiff class members often get next to nothing. The judges in these jurisdictions will decide the claims of other State citizens under their unique State law. They will use litigation models that deny due process rights to consumers and defendants.

Often the decisions coming out of these hand-picked and carefully selected venues are huge windfalls for trial lawyers and big law firms and a punch line for consumers and the people the lawyers claim to represent. There is now in our country a full blown effort aimed at mining for jackpots in sympathetic courts known as "magnet courts" for the favorable way they treat these cases.

Let us look at a few examples of exactly what I am talking about. Perhaps the best example nationwide, in terms of preferred venues for trial lawyers, is Madison County, IL, where class action filings between 1998 and 2000 increased nearly 2,000 percent. There is actually an example of a South Carolina law firm filing a purported class action on behalf of three named plaintiffs. None ofthem lived in Madison County, IL, but the lawsuit was filed in that jurisdiction against 31 defendants throughout the United States. None of those defendants were located in Madison County. These lawyers based the alleged jurisdiction on the mere allegation that some as yet unknown class **[*S1226]** member might happen to live in Madison County.

I have a law degree. That is stunning to me. You can imagine how astounding and silly and ridiculous that seems to the American people, small business owners, and consumers around the country. So Madison County is a great example of one of these magnet jurisdictions. Once their reputation as a magnet jurisdiction is established, they attract major nationwide lawsuits that deal with interstate commerce_exactly the types of lawsuits that should be decided in the Federal court.

As noted in one study:

Virtually every sector of the United States economy is on trial in Madison County, Palm Beach County, FL, and Jefferson County, TX_long distance carriers, gasoline purchasers, insurance companies, computer manufacturers and pharmaceutical developers.

Let us review some of the outrageous decisions that this gaming of a broken system

produces.

The Bank of Boston case, where class action members actually lost money when their accounts were debited to pay their lawyers $8.5 million; the Blockbuster settlement, where the class action members received coupons off their next rentals while their lawyers were paid $9.25 million; and, the Cheerios case where the plaintiffs got coupons for cereal, while the lawyers reaped $1.75 million_coupons that, quite frankly, they could have gotten in the Sunday local newspaper.

Sad to say, this is hitting home in my home State of Louisiana as well, because one of the jurisdictions that is appearing more and more on the list of these magnet jurisdictions is in Louisiana, Orleans Parish, the city of New Orleans.

I have mentioned how this gaming of the system is a huge disservice so many times to the consumers that were allegedly harmed. They get coupons or next to nothing. In one case, they had to pay even after the award. It is also a huge cost to business and a huge drain on the American economy.

Small businesses are already spending, on average, $150,000 annually on legal fees. The tort system costs U.S. small business $88 billion per year. This is all money that could be used to hire new employees or to improve benefits. I have long been concerned that Louisiana is increasingly becoming a part of this trend.

I mentioned a minute ago Orleans Parish, which is clearly showing up more and more on the list of these magnet jurisdictions. This is bad for our Louisiana efforts at job creation. It is a serious negative for companies looking to locate in our State.

I will quote from an amicus brief filed at the Louisiana Supreme Court in the case of Sutton Steel and Supply, Inc., Kate Davis, and Mestayer and Mestayer, APLC v. Bellsouth Mobility, Inc. In that brief, they said:

In a recent poll of more than 1,400 in-house general counsel and other senior litigators at public corporations . . . Louisiana was ranked 46th for its treatment of class actions, out of the 48 States that permit classaction suits in their courts.

The study they cited is the Chamber of Commerce study done in March 2004, and the amicus brief continues:

Importantly, 80 percent of the respondents_these are businesses now, job creators_indicated that they perceive fairness of the litigation environment in a State "could affect important business decisions at their company, such as where to locate or do business" and with good reason.

Of course, many small businesses are dragged down by what are known as Yellow Page lawsuits. In these cases, hundreds of defendants are named in a lawsuit, and it is their responsibility to prove they are not culpable. In many cases, plaintiffs named defendants using vendor lists, or even lists literally from the Yellow Pages of certain types of businesses, be they auto supply stores, drugstores, what have you, in a particular jurisdiction.

Imagine what this means to your State's job creation efforts when national attention is brought to your local jurisdiction because it is a new magnet jurisdiction_a new Madison County, IL. The only jobs that you will be creating are legal positions for the flyby lawsuit filed by out-of-Staters hoping for a payoff from your local industries and companies.

I have identified the problem, gaming a broken system. We have identified the real and negative results of that problem, hurting the actual consumers who are supposed to be

helped, and costing business and job creation in your State, including my home State of Louisiana, enormous amounts, including in terms of jobs not created or lost jobs.

Why is S. 5 the solution?

I believe S. 5 is a careful, reasonable, and moderate response to the problem with our class action system. We have a bipartisan compromise that has been in the making for 6 years: 6 years of negotiation, careful study, and careful compromise. It deserves our support.

The House of Representatives has already passed similar class action reform legislation more than once. I have personally supported and worked for that, and voted for that when I served in the House.

S. 5 provides for Federal district court jurisdiction for interstate class action, specifically those in which the aggregate amount in controversy exceeds $5 million and any member of a plaintiff class is a citizen of a different State from any defendant. Under the bill, certain class actions with more than 100 plaintiffs also would be treated as class actions and subject to Federal jurisdiction.

The bill provides exceptions for cases in which Federal jurisdiction is not warranted. Under the so-called home State exception and the local controversy exception, class action cases will remain in State courts if there is significant connection to a local issue or event or a significant number of plaintiffs are from a single State.

The bill includes consumer protections so the real little guy, the plaintiff, the consumer who is wronged, is truly made whole. The bill's consumer bill of rights would require, among other things, that judges review all coupon settlements and limit attorney's fees paid in such settlements to the value actually received by class members. It would also require judges to carefully scrutinize net law settlements in which the class action members end up losing money in a class action settlement, and would prohibit settlements in which parochial judges allow some class action members to have a larger recovery because they simply live closer to the courthouse.

I am pleased there is bipartisan, bicameral support for a carefully crafted, well-thought-out measure. S. 5 is long overdue.

It is also important to say what we are not doing. This bill is not an attempt to eliminate class action lawsuits. Time and again, it has been said by parties on all sides that class actions have a proper place in the legal system. This bill is a modest effort to swing the pendulum back toward common sense, making the system work as it was intended.

This bill will not move all class actions to Federal court, only the ones most appropriately settled there. This bill will not overload Federal courts with class actions. They are prepared to deal with these cases far better than State courts, many of whom are overburdened now. We are also not delaying justice for plaintiffs. Federal courts have as good or better records of dealing with class actions in a timely manner.

In closing, our class action system is rife with abuses. It is gamed. It is broken. We need to fix it. First, we need to fix it for the consumers who are hurt by alleged abuses which are the subject of this class action litigation. Plaintiffs leave feeling cheated because they receive a token settlement in many cases for their efforts while lawyers reap all of the financial benefits.

Second, the system is broken and we need to fix it so we do not hurt legitimate business, legitimate job-creation efforts in Louisiana and elsewhere. Right now, businesses, fearing the mere threat of legal action, settle cases_a form of judicial blackmail. The whole economy is

dragged down and fewer jobs are created as a result.

Third, our system of federalism is undermined today because one State's legal system, rather than the legal system of the Federal branch of the courts, is making decisions that affect many or even all other States. So the system is not working for anyone but the lawyers and law firms gaming that system.

A lot of good, hard work has been put into S. 5. I compliment again the prime sponsor, Senator Grassley, as well as the Judiciary Committee, led by the Senator from Pennsylvania. I compliment all of their leadership and **[*S1227]** their respective staff members for their efforts. I am proud to be a cosponsor of S. 5. I urge my colleagues to support and vote for the Class Action Fairness Act.

I yield the floor.

The PRESIDING OFFICER. The Senator from Utah.

Mr. HATCH . Mr. President, today is going to be an important day for the American public because the Senate will adopt legislation that takes a significant step forward in improving our Nation's civil justice system. I commend my colleagues on both sides of the aisle for coming together on this very important bipartisan bill. Our work in this body bodes well for the Senate's ability to tackle important issues in the 109th Congress.

Let me now take a couple of minutes to address the pending amendment, Senator Feingold's amendment, that would add a provision to S. 5 requiring Federal courts to consider remand motions in class actions within a specified period. This amendment is based on the questionable premise that Federal courts move too slowly and consumer claims will stall while plaintiffs are waiting for courts to rule on jurisdictional issues.

In fact, in many cases, Federal courts move more quickly than the State courts. Resolving remand motions is always their first course of business, and we are moving these cases to Federal courts.

The amendment also fails to recognize the important considerations a judge must make as part of a remand decision. Like other amendments that have been offered, this proposal would result in a less workable bill, not a better one. This amendment should be rejected.

The fact is, the Federal courts do not drag their feet in dealing with remand motions. Federal courts always consider jurisdictional issues first, as they must, before allowing discovery or other substantive motions. The Supreme Court has repeatedly held that jurisdiction is a threshold matter that must be decided prior to other substantive issues in a case. Courts take up jurisdiction as the first course of business already. The amendment is, therefore, unnecessary.

I also want to correct the misunderstanding that Federal courts drag their feet in dealing with class actions generally. This is not the case. In fact, Federal courts generally move more quickly than State courts when it comes to class actions. A recent 2004 study by the Federal Judicial Center found that State courts are far more likely than Federal courts to let class actions linger without ruling on class certification. Moreover, the median time for final disposition of a civil claim filed in Federal court throughout this country is 9.3 months; the median time to trial in a civil matter in State court is 22.5 months. Let me repeat that: 9.3 months in Federal courts versus 22.5 months in State courts for civil claims to be disposed. The dates showing the Federal courts act more than twice as fast as State courts come from the nonpartisan Administrative Office of the United States Courts. There is simply no evidence that States proceed more quickly. Thus, the alleged problem that this amendment would fix is nonexistent. It does not exist.

Take, for example, the case cited by Senator Feingold yesterday, Lizana v. DuPont. It did take a year to rule on the motion to remand, but it is my understanding that the court's docket reveals at the time the court was considering the motion, there were numerous briefings and motions on both sides and numerous hearings to determine whether to remand. The court was hardly sitting on its hands. If anything, this case shows that the courts may require more than 180 days to make a correct decision. They were moving, and moving ahead, and moving ahead with dispatch. But it was a complicated case and it took a little longer. It may very well take more than 180 days, and in some cases, it certainly will.

Another case cited in support of the amendment was Gipson v. Sprint. But when you look at the facts, the facts do not show much support for the amendment at all. Again, it is my understanding the docket reveals that the court was very busy on the case before the ruling on the motion to remand was even handed down. In fact, one of the motions the court was contending with was a motion for continuance filed by, you guessed it, plaintiffs' counsel. This means it was the plaintiffs who wanted the court to delay its ruling. How can anyone complain about the time it takes for a district court not to rule on a remand motion when there are scores of docket entries in a single year and the plaintiffs themselves were seeking delays?

Some opposed to this amendment suggested that defendants will use removal as a delay tactic, but Federal law already penalizes defendants who engage in such tactics. The Federal law governing removal gives judges discretion to make a defendant pay the plaintiff's attorney's fees if remand is granted. In addition, rule 11 of the Federal Rules of Civil Procedure gives Federal judges the authority to levy sanctions for frivolous filings. Thus, the law already addresses concerns about improvident removals.

The bottom line is that this amendment will make it unnecessarily difficult for judges to issue fair rulings in these more complicated cases. And class actions generally are more complicated cases. By forcing judges to decide remand motions by a certain date, as the Feingold amendment would do, that amendment fails to recognize that in some cases the jurisdictional issues will be complex, requiring discovery, substantial briefing, and hearings before the judge.

At times, courts consider several remand motions jointly in order to conserve judicial resources, such as in multidistrict litigation, or MDL, as it is called, and this may, in a limited number of complex cases, result in a slightly longer time period for resolution as well. Forcing judges to rush these issues in all cases regardless of their complexity could result in a denial of due process in these cases where the judge cannot fully comprehend and resolve the issue, or issues, in the time allotted by the Feingold amendment.

The reality is that most remand motions will be decided in less time than the amendment requires, but in some cases they will require more time. We should not create rules of law that force judges to decide issues without full and fair consideration. And that is exactly what the Feingold amendment would do.

Finally, there is a reason the time limits make sense for remand appeals and not for initial rulings on remand motions. In contrast to district courts, which often must develop a factual record to address remand issues, an appeals court that is asked to review a remand order will be provided with a full record from which to reach a decision. Often, the appeals court's decision will be based simply on a reading of the law, and it will, thus, be less time-consuming than the district court's decision.

Even a 180-day time limit may be too stringent in some circumstances. Extending it to district court judges will make it more difficult for them, in some cases, to do their jobs in a fair and efficient fashion.

So I hope our colleagues will vote down the Feingold amendment. Frankly, it is another poison pill amendment that would probably scuttle this bill for another year. We have already been on this bill for 6 solid years. We have a consensus in this body to pass it. We know if we pass it in the form that it is in, the House will take it. We know it will become law because the President will sign it into law. Frankly, I hope this amendment will be voted down for all of those reasons.

Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant bill clerk proceeded to call the roll.

Mr. HATCH . Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Mr. Graham). Without objection, it is so ordered.

Mr. HATCH . Mr. President, I would like to talk more generally about the Class Action Fairness Act because it responds to a serious abuse of the class action system that is on the rise; namely, the filing of copycat or duplicative lawsuits in State courts.

Over the past several years, we have seen a rise in the number of class action lawsuits filed in a few State courts known for tilting the playing field in favor of the plaintiffs' bar; in other words, dishonestly, basically, getting the courts to not do justice. These courts, referred to as "magnet courts" for their attractive qualities to enterprising plaintiffs' lawyers, certify class **[\*S1228]** actions with little regard to defendants' due process rights. They award substantial attorneys' fees as part of class settlements, and they approve coupon settlements to the class members that are sometimes worth little more than the paper on which they are printed.

It has not taken the plaintiffs' lawyers long to figure out which courts are good for their bank accounts. There was an 82-percent increase in the number of class actions filed in Jefferson County, TX, between the years of 1998 and 2000. During the same time span, Palm Beach County, FL, saw a 35-percent increase. The most dramatic increase, however, has occurred in Madison County, IL. Madison County has seen an astonishing 5,000-percent increase in the number of class action filings since 1998.

Let me just refer to this bar chart. It shows that the number of class actions filed in State courts has skyrocketed under current law: Palm Beach County, 35 percent in just 2 years or 3 years; Jefferson County, 82 percent in the same 2 or 3 years; and Madison County, over 5,000 percent. And then this chart shows the overall increase in State courts: 1,315-percent growth.

Now, in their effort to gain a financial windfall in class action cases, some aggressive plaintiffs' lawyers file copycat class action lawsuits. This tactic helps explain the dramatic increase in filings in these magnet courts. Here is how the copycat class action strategy works: Competing groups of plaintiffs' lawyers, and sometimes even the same lawyers, file nearly identical class action lawsuits asserting similar claims on behalf of essentially the same class in State courts around the country. Some lawyers file duplicative actions in an effort to take a potentially lucrative role in an action. Other times, these duplicative actions are the product of forum shopping by the original lawyers who file similar actions in different State courts around the country, perhaps with the sole purpose of finding a friendly judge willing to certify the class.

Because these duplicative actions are filed in State courts of different jurisdictions, there is no way to consolidate or coordinate these cases. As a result of the separate, redundant litigation of copycat lawsuits, our already overburdened State courts can become clogged with complicated class actions that potentially affect the rights and recoveries of class members throughout the entire country.

There is not a single magnet State court in this country that has not encountered the copycat phenomenon. For example, it is my understanding that in Shields v. Allstate County Mutual Insurance Company, filed in Jefferson County, TX, in the year 2000, three named plaintiffs sought certification of a nationwide class comprised of members who were insured by three insurance companies. At the very same time this action was brought in Jefferson County, no fewer than nine similar actions, representing a similarly situated class and alleging the identical claims, were pending in Madison County, IL, against the same insurance companies.

Another example of copycat lawsuits is Flanagan v. Bridgestone/Firestone, filed in Palm Beach County, FL.Now, this lawsuit was but one of the approximately 100 identical class actions filed in State courts throughout the country in the wake of the Ford/Firestone tire recall in the year 2000.

One of the most obvious problems with copycat lawsuits is that they place new burdens on an already stressed State court system. Class actions are large, complex lawsuits with potential ramifications in jurisdictions across the country. Our State courts are courts of general jurisdiction that deal with issues ranging from domestic disputes to routine traffic offenses. They are simply not the best entity to handle the growing number of these complex lawsuits being filed across the country where multiple parties and multiple issues are involved.

S. 5 will mitigate the growing burden on our State courts by providing a means through which truly national class actions will be resolved in the most appropriate forum; that is, the Federal courts.

Over the past several months, I have heard some opponents of this bill argue that the Class Action Fairness Act will somehow result in a delay or even a denial of justice to consumers. They have argued that State courts resolve claims more quickly, and that removing these actions will result in the overburdening of our Federal courts. I have yet to see or hear a single shred of persuasive evidence to support these claims. In fact, according to the data, a strong case in the opposite direction can be made. According to two separate examinations of the State and Federal court systems conducted by the Court Statistics Project and Administrative Office of the U.S. Courts, the average State court judge is assigned nearly three times_nearly three times_as many cases as a Federal court judge. The increase of State court class actions further compounds this burden and interferes with the ability of the State court judges to provide justice to their citizens.

In fact, the Illinois Supreme Court has repeatedly criticized its own Madison County, IL, State court for its horrible backlog. The backlog is the result of the local court's willingness to take on cases that have nothing to do with Madison County, the county in which they sit. In fact, one Madison County State court judge expressed his willingness to take on cases that have little or no connection to Madison County, or even Illinois, for that matter, when he stated:

I am going to expand the concept that all courts in the United States are for all citizens of the United States. . . .

The fact is, when cases are accepted that have nothing to do with the State in which they are filed, it is difficult to see how justice is served. When the cases are forced to remain in State court because some plaintiff's lawyers have exploited the system by engineering the composition of the class and the defendants, both the class members and the defendants can

easily be deprived of justice. In some cases, it appears that the interests disproportionately served are those of the class counsel who stand to receive millions in attorney's fees upon the swift approval of a proposed settlement while their clients receive next to nothing.

Despite claims to the contrary, S. 5 will not flood or remove all class actions to Federal court. Instead the bill acts to decrease the number currently falling in State court dockets. Most of the cases that would be removed to the Federal courts under the bill are precisely the type of cases that should be heard by such courts in the first place; namely, large national class actions affecting citizens in and around the country, including the very copycat lawsuits I have discussed today.

Class actions generally have three things in common. No. 1, they involve the most people. No. 2, they involve the most money. And No. 3, they involve the most interstate commerce issues. Taken as a whole, the national implications of class actions are far greater than many of the cases filed and heard by the Federal courts today. With this in mind, one is left to wonder how anyone could argue that these actions are not deserving of the attention of our Federal courts.

As Chief Justice Marshall noted:

However true the fact may be, that the tribunals of the States will administer justice as impartially as to those of the nation, to parties of every description, it is not less true that the Constitution itself either entertains apprehensions on this subject, or views with such indulgence the possible fears and apprehensions of suitors, that it has established national tribunals for the decision of controversies between aliens and citizens, or between citizens of different States.

When the Framers of the Constitution created the Federal courts in article 3 of the Constitution, they gave them jurisdiction over cases involving large interstate disputes, cases such as class actions. Contrary to the claims of opponents of this bill, article 3 does not require complete diversity amongst parties to a claim.

The Class Action Fairness Act will also help protect the interests of consumer class members from copycat lawsuits. When duplicative lawsuits are pending in different States, a settlement or judgment in any one case has the potential to make every other pending case moot. This winner-takes-all scenario acts as an incentive for plaintiffs' lawyers with multiple class actions to seek a quick settlement in the case, even if the settlement does no more than make the lawyers involved rich. The bona fide claims of the plaintiffs to the other class actions are wiped out by the settlement. That is not fair, but that is what is happening.
 **[\*S1229]**
Sometimes they file multiple suits so they can force a settlement with a simple settlement demand. And what company wouldn't pay the defense costs to get out of this type of abusive jurisdiction of the various courts throughout the country.

What this means is that while one injured consumer in one court of the country recovers for their injuries, an identically injured consumer in another part of the country may get nothing. The quick settlement of a copycat lawsuit may essentially steal the ability for similarly situated plaintiffs to fully or fairly recover for their injuries, especially if the forum-shopped court is going to pull this kind of stuff and favor certain attorneys over others and certain clients over others ratherthan do what is just under the law.

Under S. 5, many of these copycat lawsuits would be removed to Federal court and consolidated to ensure that all similarly situated plaintiffs received the same recovery under any settlement. Unlike State courts, Federal courts are equipped with a mechanism for consolidating similar claims. In the Federal court system, a judge may consolidate multiple identical lawsuits found in various jurisdictions into one proceeding before a single Federal

court known as the multidistrict litigation panel or MDL. The MDL panel has proven to be a valuable tool for preventing abuse, judicial waste, and disparate outcomes in Federal courts.

Under this system, much of the time-consuming pretrial activity in the lawsuit is heard by a single court. This serves to help protect against the plaintiffs' lawyer from making a separate deal for some plaintiffs that is not in the best interests of all class members. And by the way, for those who argue that consumers are being hurt by this bill, guess how many consumers are hurt by a collusion between plaintiffs' counsel and a particular corporation to settle in one State that wipes out everybody else throughout the country.

That happens. It happens because we have not solved these problems. This bill goes a long way toward solving some of these problems.

S. 5 solves this very problem by ensuring that a plaintiff's claim is not extinguished by the settlement of the duplicative action in another part of the country. This bill protects consumers in areas where they are not protected under current law.

Before I close, I want to stress that this bill does not change substantive law. The Class Action Fairness Act does not make it any harder or easier to file or win a lawsuit unless, of course, winning is unjustly based upon an uneven playing field. In other words, courts who homer the cases because they want to help certain attorneys who have supported them for their election to those State court positions.

This bill is one that is long overdue. As Chief Justice Rehnquist stated:

We can no longer afford the luxury of State and Federal courts that work at cross-purposes or irrationally duplicate one another.

This bill is a procedural bill that applies common sense to streamline the court system. The underlying substantive law is the same for class actions whether they are in Federal or in State court. This bill is a balanced, modest approach to solving some of the most abusive problems in our current civil justice system. Members on both sides of the aisle have worked long and hard to formulate a bipartisan bill, and we are succeeding in this bipartisan effort on behalf of the American people.

I steadfastly support the Class Action Fairness Act and urge my colleagues to do so as well, because it is the right thing to do. It is the right thing to do for the legal profession and for the plaintiffs who deserve compensation.

I have been in some pretty tough cases in my day, but I have never seen a case I could not win if the case was the right thing to bring. I would not bring it if it were not the right thing to bring. I loved being in Federal court, time I could get there. I also loved being in State court. I never wanted a judge to lean my way or the other way. I wanted the judge to be down the middle, and if that is the case, I thought I stood a good chance of winning the case.

We are talking about unfair advantage here in these magnet courts, these forum-shopped areas. Madison County has become the "poster child" for magnet courts. It deserves its reputation.

This is an important bill. This is a bill that makes sense. This bill does not deprive anybody of rights. This is a bill that will resolve a lot of these conflicts and problems, and it is a bill that I think will help all within the legal community to live within certain legal and moral constraints.

Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. HATCH . Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. HATCH . Mr. President, I ask unanimous consent that at 12:30, the Senate resume debate on the Feingold amendment, and that the time be equally divided in the usual form; provided that at 12:40, 10 minutes later, the Senate proceed to a vote in relation to the Feingold amendment, with no intervening action or debate and no amendments in order to the amendment prior to the vote. I further ask consent that following that vote, debate be equally divided between the two leaders or their designees until the hour of 3 p.m.; provided further that the time between 2:20 and 2:40 be equally divided between Senator Specter and Senator Leahy; and that at 2:40, the final 20 minutes be reserved, with the Democratic leader in control of 10 minutes, to be followed by the majority leader for the final 10 minutes; provided further that at 3 o'clock, the Senate proceed to a vote in relation to the Durbin amendment, with no amendment in order to the amendment prior to the vote. I further ask unanimous consent that following that vote the bill be read the third time and the Senate proceed to a vote on passage of the bill, with no intervening action or debate. Finally, I ask that no other amendments be in order other than the two above-mentioned amendments.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

Mr. HATCH . Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. GRAHAM . Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Mr. Hatch). Without objection, it is so ordered.

Mr. GRAHAM . Mr. President, in light of the unanimous consent agreement that will bring this bill to closure, there is something I needed to get on the record. I appreciate getting a few minutes. I intend to vote for the bill. Everything the Senator said about the bill is very much true. The Senator from Utah has been working as chairman for years. The legal abuse that the Senator described is real. This bill really brings it to an end.

I found Federal court to be a fair place to try cases. The Senator is also right about the scope of class action lawsuits. They involve many people from different places throughout the country. We have a good balance in the bill of when you can be removed. Every class action is not going to go to Federal court. If the formula is right, and if it has enough national impact, Federal court will be the place to go because of the abuses described.

Those of us who practiced law for a living before we got here understand that the legal system can be reformed. I admire what the Senator from Utah and Senators Specter and Grassley have done to bring about reform. But we find ourselves in a unique political dynamic with this bill. Our friends in the House say they want it like we have it. We all agree there are

amendments that could make the bill better that we would vote for, but the political moment will not allow that to happen. I regret not offering in committee the amendment I am going to speak about. I learned from my mistakes there.

One of the things we have done by federalizing certain class action lawsuits is we have taken the abuse out of the system, and we have gone to Federal court to have a more fair way of
 [*S1230]
doing business when the formula is right and when there is a national impact to stop home cooking.

The reason the diversity clause exists to begin with is that when you have two people from different States, you want to pick a neutral sight. You do not want to do home cooking. Really, the whole goal of this bill is to get it in a neutral site where people can have their fair day in court. I certainly appreciate that.

But there is another component to class actions that is missing in this bill. Class actions, by their very nature, as Senator Hatch described, involve a lot of people from different places and usually a lot is at stake. Sometimes it is money. Sometimes it is a business practice that does not have a lot of economic effect on one person, but when you add up the economic effect, it is bad for the country. People are cheating. People are nickel and diming folks, getting rich at the expense of the elderly or the infirm, by taking a few dollars here, and it adds up to be a very bad situation for the country. Those type cases lend themselves to class action.

There is another group of cases that could lend themselves to class action, too. That is when products are not designed right. They are consumer cases where consumers throughout the country are affected by the particular behavior in question.

Most States have a procedure, when such cases exist affecting the public at large, where the judge is able to determine what is fair in terms of sealing documents relating to settlements. I had an amendment that was modeled after a South Carolina statute_and over 20 States have a similar statute_that says in cases where the public's interest is present, where there is a consumer case that affects the health or well-being of the community at large, settlements can be sealed, documents can be made secret to protect business interests, but only if the judge determines that the public interest is also being met.

The amendment I proposed would have received well over 50 votes in this body, and I think Senator Hatch would have been friendly to it. But I understand the effect it would have on the bill.

The current chairman, Senator Specter, and I will have a colloquy for the record. This is the point of my seeking recognition.

This bill will leave the Senate and go to the House in a way to solve abuse, but I think it is lacking in consumer protections. The reason I am speaking today is this colloquy for the record with Senator Specter recognizes the value of this amendment and a commitment on his part and the committee's part to allow this amendment to move forward at another date, another time, in another place.

The reason I am agreeing to that is enough of my colleagues who are sympathetic to the amendment do not want to vote for anything that would derail the bill. I very much appreciate that because that is the way politics is, and there is nothing wrong with that as long as we do not lose sight of the goal. And the goal is to have a balance, to take care of abuses, but at the same time protect the public when the public needs to be protected.

What I am trying to say is I will not put my colleagues in a bad spot of having to vote down

an amendment with which they agree because I do not have 50 votes. I am mature enough to know when you can win and when you cannot. Sometimes it is OK to lose. Losing is not bad as long as you feel good about what you are doing.

I do not want to offer the amendment, have colleagues vote against it, and create problems unnecessarily, but I do want my colleagues to know_and this colloquy will express this_that this bill needs to be amended and this problem needs to be addressed. We need to have a provision that is married up with the bill that is about to leave the Senate and go to the House that will allow a judge, upon motion of the parties, to determine in a situation where there is a request to keep the settlement secret and seal the documents from public review, to have a judge to determine what documents should be sealed in secret and what documents should be released to the public, balancing the needs of business and the right of the public to know what they should know about their health and their safety.

There were class action cases with the sunshine statute, about which I am talking, in effect. Without that statute, deadly lighters, exploding tires, defective drugs, toxic chemicals, and faulty automobile designs would not have been known if it were not for a procedure for the judge to release certain documents because the request was: We will give you money, but you cannot tell anybody about the underlying problem.

Sometimes that is very much unfair. I have case after case of sunshine statutes allowing the judge to determine what was in the public interest, to inform the public of deadly events, and peoples lives were saved and their health was protected.

The PRESIDING OFFICER. The Senator's time has expired.

Mr. GRAHAM. I ask unanimous consent for 2 more minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

### protective orders

Mr. GRAHAM . Mr. President, I appreciate Chairman Specter taking the time to join me in discussing a concern I have regarding S. 5, the class action bill. I am still prepared to seek a vote on my amendment, but based on my conversations with a number of senators this week, including Chairman Specter, and in a desire to see this bill pass as soon as possible, I have decided not to offer my amendment.

I agreed to support this bill some time ago because I believe we are long overdue for reform in the class action area. Over the last few years, I have worked to support this bill in both the Judiciary Committee and on the senate floor.

While I have fully supported this reform, I have also noticed some areas where the bill could be improved. I had hoped to offer an amendment on the floor regarding protective orders during discovery. I am confident that the amendment that I had hoped to introduce with Senator Prior of Arkansas would have made a significant improvement in the area of class action discovery.

Our amendment is very simple. It is based on the local rule in South Carolina Federal Courts for obtaining protective orders for documents. All it says is, if you want a protective order, you must make a motion at the beginning of trial, explain why it is necessary for the court to seal your documents, and provide public notice of the motion and a description of the documents. that's it.

At least 20 states have taken action to limit secrecy agreements. This type of scrutiny should be extended throughout the nation, especially where we are removing parties from the

protections afforded them by their States.

And let me be clear. This is not an onerous burden to place on those seeking protective orders. It is not that far a departure from the current discovery rules. We could have gone a lot further; with higher standards, a presumption against sealing, and other controversial discovery reforms. However, we are not seeking to tilt the playing field to one side or the other, just make sure some reasonable, well-thought out ground rules are applied to everyone.

My amendment creates a presumption of openness_it would require the parties in class action lawsuits to justify their requests for secrecy, followed by a medical review of the information they want the court to keep under seal.

They would have to identify the documents or information they want sealed_and most importantly the reasons why it's necessary to keep them secret.

They also would have to explain why a protective order approach is necessary and justify the request based on controlling case law.

The public would be notified of the information that was being put under seal_and a descriptive non-confidential index of the secret documents would be provided.

In the end, however, it is still up to the judge's discretion, albeit with a slightly higher standard than currently exist under the Federal rules of civil procedure.

I am doing this because I am convinced Federal Judges will come down on the side of consumer protection where it's in the public interest and come down on the side of secrecy where merited. In short, while the burden here is on any party that wants to keep
 **[*S1231]**
something secret, it is not an onerous task, nor impossible.

Valid trade secrets and proprietary information_sensitive information that goes to the heart of a company being able to compete in the market place should and will be protected. There must be safeguards for businesses_they have a right to protect valid trade secrets_patents and other proprietary information. But this isn't something that can just go on automatic pilot_there has to be some judicial review and I am confident the procedures protect all the parties in a class action lawsuit.

So again, we have merely tried to find a way to balance the legitimate interests of companies, who we want to remain strong competitors in the marketplace, with the public's interest in disclosing potentially harmful products or practices.

Our amendment strikes the right balance because it raises the bar only slightly for companies to justify why they need to impose secrecy, using our courts to do so, but does not force them to open up their companies to every passerby simply because they are defending a lawsuit.

Now there are critics who warn that an amendment like this is going to create a number of problems in the judicial system, making discovery more difficult and deterring settlements.

I do not agree. Take a look at Florida, which has one of the most stringent sunshine laws. I don't think anyone can tell you Florida is a magnet for class actions. In fact, the most recent studies in the 20 States that have sunshine laws show that limiting court secrecy has not led to more litigation or curtailed the number of case that are settled.

In fact I do not believe there is any evidence that supports the proposition that more cases

will go to trial and fewer settlements will be reached if some procedural safeguards are put in place.

Also, you have to remember that our amendment only applied to court-ordered secrecy. Parties would still have been free to privately agree upon secrecy between them.

In closing Mr. President, I must say I have been a bit taken aback by all the turmoil this amendment has caused. I am pretty sure we can all agree that ours was a fairly benign procedural amendment, one that serves both the public and those before our courts.

Toward that end, I very much appreciate the understanding I and Senator Pryor have been able to reach with Chairman Specter regarding the substance of our amendment. The chairman has graciously agreed to assist us with this amendment in the Judiciary Committee. I thank the chairman and look forward to working with him to address this issue in the near future.

Mr. SPECTER. I appreciate Senator Graham's willingness to help us move forward on this bill. He and I have agreed that, due to the procedural posture of this particular bill, we should address the substance of his amendment in committee in the future.

Mr. GRAHAM. I thank my chairman for his future assistance.

Mr. President, I say to my colleagues that they will have done a good thing by passing this bill. They will do a very good thing if we can take up this amendment at another time to make this bill more balanced because the abuses as described by Senator Hatch are real. My colleagues have worked a long time to bring about this date. They should be proud of it.

There is a way to make this bill better, and if we do not address this problem, I predict something is going to happen out there without a sunshine amendment. There is going to be a class action case involving consumer interests, and if there is no procedure for the judge to balance the public interests against business interests, we are going to shield the public from something they should know. There is no reason we cannot do both: Stop the legal abuse and help consumers. It is my pledge and my promise to work with everybody in this body to make that happen.

I yield the floor and thank the Senate for its indulgence.

The PRESIDING OFFICER. The Senator from Iowa. Without objection, the Senator is recognized on the minority time.

amendment no. 12

Mr. GRASSLEY . Mr. President, I rise in opposition to Senator Feingold's amendment which would add a provision to the bill requiring the Federal courts to consider remand motions in class actions within a set timetable. This amendment needs to be rejected because it is unnecessary.

There is not any evidence that the Federal courts are particularly slow in dealing with class actions, or specifically that they are slow relative to remand motions. In fact, there is evidence that the Federal courts move more quickly than State courts in considering these motions because they always consider jurisdictional issues first. Senator Feingold cites three examples of delay to support his amendment, but I do not think that is enough to start placing strict time limits on court procedure. I think that Senator Feingold is in search of a problem that does not really exist.

Also, the amendment could make it hard for judges to issue fair rulings in complicated class

action cases because judges would be forced to make rushed decisions. This deadline may be too stringent and inflexible to deal with complex cases, where sometimes several remand motions are considered jointly in order to conserve judicial resources. These motions may require hearings, and the timeframe provided in Senator Feingold's amendment may not be enough time for a court to schedule a hearing and consider all the evidence.

I also understand that Federal judges who have learned of this possible time limitation on deciding these kinds of motions are concerned that it would place an unreasonable restriction on their ability to fairly decide cases. The Judicial Conference sent a letter opposing a previous iteration of Senator Feingold's amendment that was more stringent that the current language. However, this amendment still puts significant time constraints on Federal judges that could prove to be too stringent.

So there just is not any evidence that there is a problem with remand motions in class action cases that requires this time limitation that Senator Feingold is proposing. This is just an attempt to weaken the bill. So I urge my colleagues to reject this amendment.

The PRESIDING OFFICER (Mr. Graham of South Carolina). The Senator from Wisconsin.

Mr. FEINGOLD . Mr. President, I ask unanimous consent that I have restored the full 5 minutes I was originally given.

The PRESIDING OFFICER. The Senator has 3 seconds remaining.

Mr. FEINGOLD. I ask unanimous consent to have the 5 minutes restored. I would appreciate that, because the chairman who is handling this bill on the floor asked me to stay in committee and finish the bankruptcy hearing. I feel justified in asking for my time to be restored.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. FEINGOLD . Mr. President, everyone understands that this bill will allow many more class actions to be removed from State to Federal court, but as the supporters have been proclaiming all week long, there are still class actions that belong in State court, even under this bill. Unfortunately, that may not stop defendants from removing cases that should still be in State court.

When a notice of removal is filed, the case is removed to Federal court. There is no proceeding in the State court to make sure the removal is proper. It is up to the Federal court to decide that question, but only if the plaintiffs file a motion to remand to return the case back to the State court.

The amendment I have offered is designed simply to make sure that this process of removal and remand does not become a tool for delaying cases that actually belong in State court. It requires a district court to take a look at a motion to remand within 60 days of filing and then do one of two things: Decide it, which I hope will be possible in almost all cases, or issue an order stating why a decision is not yet possible. If the court issues that order, it must then reach a decision within 180 days of filing. The parties can agree on an extension of any length.

I want to make this clear because I heard Senator Grassley responding to my original argument when I came on the floor. The amendment before us actually gives the court a great deal of flexibility. It will also assure that a **[\*S1232]** motion to remand does not languish for months, or even years, before a court reviews it and says, oops, this case really should be back in State court.

As I noted last night, we have many examples of remand motions sitting unresolved for a year and then the case goes back to State court.

As the Senator from Iowa pointed out, the Judicial Conference did oppose my amendment in committee that had a strict limit of 60 days, but what I have done to try to accommodate this concern, which I believe moves in their direction, is tripled that limit in the pending amendment. I think that is eminently reasonable, as the Senator from Delaware, a strong supporter of this bill, acknowledged last night on this floor.

The bill itself provides that appeals of remand motions must be decided within 60 days. So why would there be any substantive argument against having a similar limitation at the district court level?

I heard the Senator from Utah suggesting that somehow my amendment denies due process, but I suggest that 180 days is enough time to handle any remand motion. That is time for discovery and for an evidentiary hearing. The problem is that without a deadline, the motion can sit there for a year or longer without any action.

What I am hearing from some of my colleagues who support the bill and recognize that what I am trying to do is reasonable is that they cannot upset the delicate agreement that has been reached with the House. On this one, I cannot accept that. It makes no sense to me that Senators would give up their independent judgment because of a fear of the leadership of the other body. Does anyone think, after everything this bill has been through, that the House leadership is going to refuse to pass this bill if my very reasonable amendment, simply making sure that motions to remand are decided on time, is included? Are they going to further delay this bill for this? I do not think so.

This amendment does not blow the bill up. It is not a poison pill. Everyone I have talked to says this amendment basically makes sense. So I implore my colleagues to exercise their own good judgment, accept this amendment, and persuade their colleagues on the House side and the business community, which several of my colleagues have told me privately, that this amendment makes sense.

It does not harm the bill. In fact, it makes the bill better because it means all the cases we agree on should remain in State court will actually proceed in State court without delay.

I thank the Chair for according me this additional time. I yield the floor, and I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The question is on agreeing to amendment No. 12.

The clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. McCONNELL. The following Senators were necessarily absent: The Senator from New Hampshire (Mr. Sununu) and the Senator from Indiana (Mr. Lugar).

The PRESIDING OFFICER (Mr. Martinez). Are there any other Senators in the Chamber desiring to vote?

The result was announced_yeas 37, nays 61, as follows:

[Rollcall Vote No. 8 Leg.]

YEAS - 37

Akaka
Baucus
Biden
Bingaman
Boxer
Byrd
Carper
Clinton
Conrad
Corzine
Dayton
Dorgan
Durbin
Feingold
Feinstein
Harkin
Inouye
Jeffords
Johnson
Kennedy
Kerry
Lautenberg
Leahy
Levin
Lincoln
Mikulski
Murray
Nelson (FL)
Obama
Pryor
Reed
Reid
Rockefeller
Salazar
Sarbanes
Stabenow
Wyden

NAYS - 61

Alexander
Allard
Allen
Bayh
Bennett
Bond
Brownback
Bunning
Burns

Burr
Cantwell
Chafee
Chambliss
Coburn
Cochran
Coleman
Collins
Cornyn
Craig
Crapo
DeMint
DeWine
Dodd
Dole
Domenici
Ensign
Enzi
Frist
Graham
Grassley
Gregg
Hagel
Hatch
Hutchison
Inhofe
Isakson
Kohl
Kyl
Landrieu
Lieberman
Lott
Martinez
McCain
McConnell
Murkowski
Nelson (NE)
Roberts
Santorum
Schumer
Sessions
Shelby
Smith
Snowe
Specter
Stevens
Talent
Thomas
Thune
Vitter
Voinovich
Warner


                NOT VOTING - 2
Lugar

Sununu

The amendment (No. 12) was rejected.

Mr. GRASSLEY. I move to reconsider the vote, and I move to lay that motion on the table.

The motion to lay on the table was agreed to.

The PRESIDING OFFICER. Under the previous order, the time until 2:20 p.m. is equally divided between the leaders or their designees. Who yields time?

The Senator from Delaware.

Mr. CARPER . Mr. President, in an hour or two or three, we will have the opportunity to vote final passage on class action reform legislation.

The goals of this legislation are fourfold: One is to make sure when people_I say "little" people_are harmed by companies, big or small companies, that the little people have the opportunity to band together and be made whole and compensated for harm. The second goal is to make sure the companies know that if they shortchange their customers or others in our country, there will be a price to pay if they get caught. The third goal is to make sure when companies are called on the carpet and are involved in class action litigation, they are in a court, in a courthouse, with a judge, where the companies have a fair shake and the deck is not stacked against them. Finally, our goal is to make sure that, in shifting some class action litigation of a national scope with hundreds of or thousands of plaintiffs across the Nation, multimillions of dollars involved and defendants scattered across the country in different States than the plaintiffs, to make sure we move some class action litigation to Federal courts, we do not overburden the already busy Federal judiciary.

I take a moment or two today to go through and cite examples_not all of them; this is not an exhaustive list_but some of the examples we have sought to make sure in many instances that the majority of class action litigation remains in State court where it belongs.

Let me cite a couple of examples where this bill has been modified over the years to enable a majority of class action litigation cases to stay in State courts. For example, these are cases where the litigation will remain in State courts: No. 1, cases against State and State officials will remain in state court. Smaller cases will remain in State court. Cases where there are fewer than 100 plaintiffs or in which less than $5 million is at stake, those cases are not eligible for removal from State to Federal court. Cases in which two-thirds or more of the plaintiffs are from the same State as the defendant will remain in State court. Cases in which between one-third and two-thirds of the plaintiffs are from the same State as the defendant may well remain in State court. It is left to the discretion of the Federal judge to decide whether it is Federal or State based on the criteria laid out in the bill.

Similarly, cases involving a local incident or controversy, where the people involved are local, where at least one of the significant defendants involved in the litigation is within the same State, in those instances as well, the cases can and probably should remain in State courts.

That is a handful of the examples where we make sure a lot of the class action litigation remains in State courts where it belongs.

If you go back, the first bill introduced on class action litigation goes back about 7 years, I think, to 1997. That initial bill, along with a number of bills that were introduced in subsequent Congresses, was opposed by the Federal bench. There is an arm of the Federal judiciary called the Judicial Conference of the United States. They have a couple different

committees, and from time to time they are asked, and they respond with their opinion, about whether certain legislation is needed, is appropriate, as it pertains to them and the work they are doing.

The initial legislation proposed, I think, in 1997, 1998, was opposed by the Federal judiciary through their Judicial Conference of the United States. In the next Congress, again, the Federal **[*S1233]** judiciary opposed that legislation. As the legislation has evolved, we have gone back to ask the Federal judiciary: What do you think? We know you were opposed to original versions of this bill in the late 1990s. How about this latest revision? They continued to oppose subsequent versions of the class action reform until the last Congress.

The Federal judiciary has the same concerns a lot of us have, the wholesale shifting of class action cases from the State courts to the Federal courts. Federal judges are busy, and they do not want to see an avalanche of litigation coming to them. With the adoption of a number of provisions in this legislation that comes to us today, the Judicial Conference wrote to the Senate in 2003 that, particularly given the changes Senator Feinstein proposed, their concerns about the wholesale shifting of State class action litigation to the Federal courts, for the most part, had been met and been satisfied.

They are not taking a position, saying the Senate should vote for this legislation. That is not what they are about. But the concerns they had expressed earlier, year after year after year, have been addressed.

Mr. President, I ask unanimous consent to have printed in the Record a letter from the Judicial Conference of the United States, dated April 25, 2003.

There being no objection, the material was ordered to be printed in the Record, as follows:

Judicial Conference

of the United States,

Washington, DC, April 25, 2003.

Hon. Patrick J. Leahy,

Ranking Member, Committee on the Judiciary,

U.S. Senate, Washington, DC.

Dear Senator Leahy: Thank you for your letters of April 9, 2003, and April 11, 2003. In those letters, you requested that the Judicial Conference provide the Senate Judiciary Committee with legislative language implementing the Judicial Conference's March 2003 recommendations on class-action litigation and the views of the Conference on  S. 274, the "Class Action Fairness Act of 2003," as reported by the Senate Judiciary Committee on April 11, 2003.

As you know, at its March 18, 2003, session, the Judicial Conference adopted the following resolution:

That the Judicial Conference recognize that the use of minimal diversity of citizenship may be appropriate to the maintenance of significant multi-state class action litigation in the federal courts, while continuing to oppose class action legislation that contains jurisdictional provisions that are similar to those in the bills introduced in the 106th and 107th Congresses. If Congress determines that certain class actions should be brought within the original and

removal jurisdiction of the federal courts on the basis of minimal diversity of citizenship and an aggregation of claims, Congress should be encouraged to include sufficient limitations and threshold requirements so that the federal courts are not unduly burdened and states' jurisdiction over in-state class actions is left undisturbed, such as by employing provisions to raise the jurisdictional threshold and to fashion exceptions to such jurisdiction that would preserve a role for the state courts in the handling of in-state class actions. Such exceptions for in-state class actions may appropriately include such factors as whether substantially all members of the class are citizens of a single state, the relationship of the defendants to the forum state, or whether the claims arise from death, personal injury, or physical property damage within the state. Further, the Conference should continue to explore additional approaches to the consolidation and coordination of overlapping or duplicative class actions that do not unduly intrude or state courts or burden federal courts.

S. 274, as reported by the Senate Judiciary Committee, generally provides for federal jurisdiction of a class action based on minimal diversity of citizenship if the matter in controversy exceeds the sum of $5 million, exclusive of interest and costs. (S. 274 as introduced established a $2 million minimum amount in controversy.) The bill also now permits a federal district court, in the interests of justice, to decline to exercise jurisdiction over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the state in which the action was originally filed. The court would be required to consider five specified factors when exercising this discretion. (This discretionary provision was not included in the bill as introduced.)

In addition, S. 274 as reported provides that the federal district courts shall not have original jurisdiction over any class action in which: (A) two-thirds or more of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the state in which the action was originally filed; (B) the primary defendants are states, state officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; or (C) the number of members of all proposed plaintiff classes in the aggregate is less than one hundred. As introduced, the second and third exceptions were the same, but the first one originally precluded federal jurisdiction where "the substantial majority of the members of the proposed plaintiff class and the primary defendants are citizens of the State in which the action was originally filed" and "the claims asserted therein will be governed primarily by the laws of that state. The replacement language in essence substitutes a numerical ratio for "substantial majority" and eliminates the choice-of-law requirement.

We are grateful that Congress is working to resolve the serious problems generated by overlapping and competing class actions. The Judicial Conference "recognizes that the use of minimal diversity of citizenship may be appropriate to the maintenance of significant multi-state class action litigation in the federal courts." At the same time, the Judicial Conference does not support the removal of all state law class actions into federal court. Appropriate legislation should "include sufficient limitations and threshold requirements so that federal courts are not unduly burdened and states' jurisdiction over in-state class actions is left undisturbed." Finding the right balance between these objectives and articulating that balance in legislative language implicate important policy choices.

Any minimal-diversity bill will result in certain cases being litigated in federal court that would not previously have been subject to federal jurisdiction. The effects of this transfer should be assessed in determining the appropriateness of various limitations on the availability of minimal diversity jurisdiction.

Certain kinds of cases would seem to be inherently "state-court" cases_cases in which a particular state's interest in the litigation is so substantial that federal court jurisdiction ought not be available. At the same time, significant multi-state class actions would seem to be

appropriate candidates for removal to federal court.

The Judicial Conference's resolution deliberately avoided specific legislative language, out of deference to Congress's judgment and the political process. These issues implicate fundamental interests and relationships that are political in nature and are peculiarly within Congress's province. Notwithstanding this general view, we can, however, confirm that the Conference has no objection to proposals: (1) to increase the threshold jurisdictional amount in controversy for federal minimal diversity jurisdiction; (2) to increase the number of all proposed plaintiff class members required for maintenance of a federal minimal-diversity class action; and (3) to confer upon the assigned district judge the discretion to decline to exercise jurisdiction over a minimal-diversity federal class action if whatever criteria imposed by the statute are satisfied. Finally, the Conference continues to encourage Congress to ensure that any legislation that is crafted does not "unduly intrude on state courts or burden federal courts."

We thank you for your efforts in this most complex area of jurisdiction and public policy.

Sincerely,

Leonidas Ralph Mercham,

Secretary.

Mr. CARPER. We are going to vote on final passage in an hour or two. I think Senator Durbin is going to come to the floor. He may ask for a vote on his amendment. I am not sure he will. He cares deeply, passionately about these issues and has sought to try to make sure that we end up not making bad, unwise public policy decisions. My guess is, he is not going to come to the floor and urge us to vote for the bill or say he is going to vote for it. I know he has serious misgivings about this legislation. But he has worked constructively, as have people on our side and the Republican side, to get us to this point in time.

Senator Reid of Nevada is our new leader on the Democratic side. He is not on the floor, but I express to him and my colleagues, if he is listening, my heartfelt thanks for working with the Republican leadership and those on our side who support this legislation, to enable us to have this opportunity to debate it fairly and openly, allowing people who like it, people who do not like it, those who wanted to offer amendments, those who did not want to offer amendments, to have a chance for the regular order to take place, to debate the issues and vote, and then to move on.

I do not know if this legislation, the way we have taken it up and debated it, can serve as a template or example to use in addressing other difficult issues_energy policy, asbestos litigation, a variety of other issues_but it might. Because in this case, Democratic and Republican leaders have worked together, have urged us, the rank and file in the Senate, to work together.

Each of the folks in the private sector_people who have an interest in this bill, not only the business side, but the plaintiffs' lawyers side, and other **[*S1234]** interested parties, labor, and so forth, consumer groups_I think everybody has acted in good faith to get us to this point in time.

Whether you like the bill, I urge my Democratic colleagues, if you are on the edge and not sure which way to go_you may have voted for all these amendments, and you are not sure how to vote on final passage of the bill_I urge you to vote for this bill.

I do not know if it is possible to have a big margin. I would love to have 70 votes, 75 votes for this bill. I hope we can do that.

Let me close, if I can, by saying, whether you are for the bill or against it, for the amendments or against them, I hope there is one thing we can all agree upon. I will bring to mind the words of one of our colleagues, a legendary trial lawyer from Illinois, who has gone on to be elected and serves with us in the Senate. I will close my comments with his admonition. That admonition is the old Latin phrase: semper ubi sub ubi. Whether you like the bill, I think we can all agree on that admonition today.

With that having been said, I yield back my time and suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. CARPER . Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. CARPER . Mr. President, I ask unanimous consent that again we go into a quorum call, but that the time be equally divided.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. CARPER. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. SESSIONS . Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Mr. Alexander). Without objection, it is so ordered.

Mr. SESSIONS . Mr. President, this week's debate is the culmination of more than 6 years of work in the Senate on a very important piece of legislation, reform that is needed in the U.S. legal system_class action reform.

I practiced law for most of my adult life and have litigated in a number of different forums. I believe in our legal system. It is critical for America's economic vitality and our liberty to have a good legal system. There is no doubt in my mind that the strength of this American democracy, the power of our economy, and our ability to maintain freedom and progress are directly dependent on our commitment to the rule of law and a superb legal system, and we can make it better.

To keep our system strong, we in this Congress have to meet our responsibility to pass laws that improve litigation in America. Our court system must produce effective results that further our national policy, correct wrongs, punish wrongdoers, and generate compensation for those who suffer losses in a fair and objective way. We, therefore, as a Congress must periodically review what is happening in our courts and make adjustments if they are needed. That is what we are here for.

This class action fairness bill, S. 5, seeks to make the adjustments we currently need, in my opinion. It will guarantee that the plaintiffs in a class action, the people who have been actually harmed and have a right to be compensated, are the actual beneficiaries of the class

action and not just their attorneys and not sometimes the defendants who benefit by being able to get rid of a bunch of potential litigation by settleing the case and paying less to the plaintiffs than the case is really worth.

The Class Action Fairness Act will not move "all class actions" to Federal Court or "shut the doors to the courthouse" as some have claimed_rather it will provide fairness for the class action parties by allowing a class action to be removed from a State court where it has been filed to a Federal court when the aggregate amount in question exceeds $5 million and the home State plaintiffs make up two-thirds or less of the plaintiff class.

The Act contains a bill of rights for class action plaintiffs to ensure that coupon settlements or net loss awards receive special scrutiny. We have had some real problems with those. The stories are painful to recite by those of us who believe in a good legal system.

Furthermore, the Class Action Fairness Act will provide notice to public officials of proposed settlements_I was an attorney general, and I know that notice is given to the proper official in a State so that public officials can react if the settlement appears to be unfair to some or all of the class members.

The Class Action Fairness Act has been through the proper charnels in the Senate. The Act has been through the Judiciary Committee not just once but twice. The bill originally passed out of the Judiciary Committee by a 12 to 7 vote over a year ago in June of 2003. It was a bipartisan vote. Since then, it has gone through two substantive negotiations, each bringing on more Senators to support the bill. Just last week, we again passed a bill out of the Judiciary Committee, this time with an even stronger vote of 13 to 5. Today, we expect that more than 70 Senators will support it. The bill is a responsible, restrained bill that will curb class action abuses and further productive class action litigation.

The concept of class actions is a good one. Class actions can be extraordinarily effective tools in helping us deal with legal problems confronting America. Sometimes error or negligence is committed by more than one defendant which harms multiple litigants. In such cases, the number of cases filed can quickly become unmanageable if separate individual lawsuits are required by each person who suffered the harm. One hundred thousand individual lawsuits would not be appropriate when one case could settle the issue for all involved.

Anyone looking closely at our legal system today knows that we have a number of problems to address. One of the main problems is how much the system costs the average American. Americans pay these costs primarily through increased insurance premiums. They also pay it in increased costs for our judiciary.

The 2004 Tillinghast study on the cost of U.S. tort systems found that the U.S. tort system_a tort is a lawsuit or an act that has wronged or injured someone_cost $246 billion in 2003. That is $845 per person. That is a significant number. It is worthy of repeating. The tort system cost $246 billion at an average cost per American citizen of $845. That is an average of $70 a month out of somebody's livelihood. Now, $246 billion is equivalent to 2 percent of GDP, gross domestic product. That is a stunning number. By 2006, the study estimates that the U.S. tort system will cost over $1,000 per person.

Most Americans would be surprised to know that the 2003 version of the Tillinghast study found that the U.S. tort system returned less than 50 cents on the dollar to the people it is designed to help_the plaintiffs_and only 22 cents on the dollar to compensate for actual economic loss. Who, then, would appear to be making the money out of our current tort system? An earlier Tillinghast study reported that the income of litigation attorneys, trial lawyers, in 2001 was $39 billion. That same year Microsoft made only $26 billion, and Coca-Cola, $17 billion.

As a Washington Post editorial has noted: No portion of the American civil justice system is more of a mess than the world of class action.

There are a number of problems with the class action system currently making up the mess The Washington Post referred to.

The number of class actions pending in State courts, many of them nationwide, increased 1,042 percent from 1988 to 1998, while the number pending in Federal courts increased only 338 percent during that same period.

State courts are being overwhelmed by class actions. A number of State courts lack the necessary resources to supervise the class or the proposed settlements affected. Many State judges do not have even one law clerk, and most of the class actions involve citizens from a number of different States, requiring the application of multiple State laws. Some times a state court dockets becomes jammed while the judge researches out-of-State law to get up to speed.  **[*S1235]**

Some say it is a burden on the Federal courts, but Federal judges have on their docket a fraction of the cases of most State court judges in America. Some cases are complex, but that is the nature of Federal court cases for the most part. They have at least two law clerks. The occupant of the chair, Senator Alexander, clerked for Federal judges. District court judges all have at least two clerks, and appellate Federal judges have three or more. Some of them have their clerical support become on staff lawyers and then they really end up with three clerks. At any rate, they have a greater ability to give the time and attention to a major interstate class action involving over $5 million and maybe thousands of plaintiffs than an average circuit judge in a State court system in America. I do not think that can be disputed.

The class action settlement process is problematic because many of the class members have no part in shaping the settlement agreement. In fact, many of the members of the class have no knowledge they have even been involved in a lawsuit or one has been filed on their behalf, leading to an abuse of the settlement process. In this scenario, plaintiffs' attorneys can find themselves in a position where their loyalty is not to these class members. It creates an unhealthy situation. For example, a plaintiffs' lawyer does not know the 1,000 or 10,000 members of his class. He is talking regularly with the defendant's company, and they say: Let us settle this case.

The plaintiffs' lawyer says: We would like to settle this case.

They say: What will it take?

He says: The plaintiffs want $50 million to settle it.

They say: Well, that is too much. Look, why do we not give you $10,000 in coupons for all of your victims and we will give you $10 million or $20 million in legal fees?

Now, most lawyers handle themselves well, but that plaintiffs lawyer now finds themselves in an ethical dilemma. His oath as a lawyer says that he or she should defend the interests of the client, get the most money for their client, but the defendant is dangling out a personally large fee in exchange for a settlement to end the litigation. We have had that happen, frankly, and we have seen that too often. Too often, the attorneys are the ones who received the big fees, and the named plaintiffs, the victims, have gotten very little. It is appropriate, then, that we in this Congress examine this difficulty in our legal system and tighten it up so we have less of that occur.

Many class actions appear to be filed solely for the purpose of forcing a settlement, not the

protection of an interest of a class, and that has been referred to in debate frequently as "judicial blackmail." Rather than losing a public relations battle, going through court for several years, the defendants often feel they have to settle these cases even if they are frivolous so they do not risk the cost of litigation and the embarrassment and difficulty of explaining some complex transaction.

There are several other problems. One is forum shopping, and another is settlements detrimental for class members.

Forum shopping occurs when the attorney sets out to try to find the best place to file the class action lawsuit. You could have a case involving an attorney from New York with California plaintiffs filing a class action lawsuit in Mobile, AL. Where can national class action lawsuits be filed today? Amazingly, the answer is in almost any venue, any court, county, circuit court in America. A plaintiff can search this country all over and select the single most favorable venue in America for filing their lawsuit_that is, if it is a broad-based class action that covers victims in every state and county in America, and some of them do. Some may just cover a region or half the counties in America or involve 10 percent of the States. At any rate, they are able to search within that area for the most favorable venue.

I believe that is not healthy. A report issued this year by the American Tort Reform Association about the abuse of this choice named the various counties around the country as "judicial hellholes." The study pointed to the large number of frivolous class actions found in counties it named, citing judicial cultures that ignore basic due process and legal protections and efforts by the county's judges to intimidate proponents of tort reform.

By bringing their suits in one of these areas, plaintiffs' attorneys can defeat diversity by naming a single defendant and a single plaintiff who have citizenship in the same State, thus preventing a Federal court from hearing the case and allowing a State court in a single county to bind people all over the country under that one State or county's laws.

Let me read what the Constitution says about diversity:

The judicial Power of the United States shall extend to all Cases, in law and equity, arising under this Constitution, the Laws of the United States . . . to Controversies which the United States shall be a party;_Controversies between two or more States, between a State and a Citizen of another State;_between Citizens of different States. . . .

Our Founding Fathers thought about this issue, and they concluded that, if a person from Alabama wanted to sue a person from Illinois, the person in Illinois might not be comfortable being sued in an Alabama state court. They might think that might not be a favorable forum. There might be "home cooking" for the Alabama citizen there. So they said those cases ought to be in Federal court.

As history developed, pretty early in our process it was concluded that diversity required complete diversity; that is, if one plaintiff and one of a host of potential defendants was a local defendant, then that could be kept in State court.

I am not disputing that. All I am saying is I believe the Founding Fathers would have believed that a lawsuit that is predominantly intrastate in nature, involving the real defendant, should be in Federal court.

So what happens is if you sue a drug company and you want to keep it in State court, you sue the lady in small town Mississippi who sells the prescription at her store_she is a local defendant, whereas the person who is going to be paying the judgment is out of State. If the drug company had been sued directly, it would have been in Federal court, but by suing one local State defendant along with the big-money deep-pocket in New York, that is not the

case.

The PRESIDING OFFICER. The time controlled by the majority has expired.

Mr. SESSIONS . Mr. President, I thank the Chair. I will conclude by saying there are a lot of reasons we ought to support this bill. It has been thought out very carefully. A lot of work has gone into it over a number of years. We are in a position to pass good legislation at this time.

I yield the floor.

The PRESIDING OFFICER. The Senator from Illinois.

Mr. DURBIN . Mr. President, I would like to spend a few minutes to discuss my amendment No. 3, which is pending at this time, and then ask that it be withdrawn. This is the amendment I had offered on Tuesday to clarify the scope of the "mass action" provision in Section 4(a) of the bill.

As I had explained earlier this week, this provision requires that mass actions be treated the same as class actions under this bill, and therefore taken out of State courts and removed to Federal courts. But it was still unclear to me_and to many of the injured people who will be affected by this bill_what precisely the drafters had in mind in coming up with this "mass action" language in the bill.

When I last took the floor, I had raised some questions about the differences between "mass actions" and "mass torts," and whether mass torts would be ,I affected by the language in S. 5. I heard from proponents of this bill that these are two very different types of cases, and that the bill is designed to affect only mass actions and not mass torts.

In fact, Senator Lott of Mississippi the other day explained on the floor that:

Mass torts and mass actions are not the same. The phrase "mass torts" refers to a situation in which many persons are injured by the same underlying cause, such as a single explosion, a series of event, or exposure to a particular product. In contrast, the phrase "mass action" refers to a specific type of lawsuit in which a large number of plaintiffs seek to have all their claims adjudicated in one combined trial. Mass actions are basically disguised class actions.

I am glad that the proponents of this bill agree with me that there is a very **[*S1236]** significant difference between these two types of cases. Mass torts are large scale personal injury cases that result from accidents, environmental disasters, or dangerous drugs that are widely sold.

Cases like Vioxx that I described earlier, and cases arising from asbestos exposure, are examples of mass torts. These personal injury claims are usually based on State laws, and almost every State has well established rules of procedure to allow their State courts to customize the needs of their litigants in these complex cases.

Senator Lott also explained on the floor that:

There are a few States, like my State_I think, and West Virginia is another one and there may be some others_which do not provide a class action device. In those States, plaintiffs' lawyers often bring together hundreds, sometimes thousands of plaintiffs, to try their claims jointly without having to meet the class action requirements. And often the claims of the multiple plaintiffs have little to do with each other.

So, it seems to me that the authors of this bill are trying to include only these so-called mass

actions and not mass torts.

And I understand from the statements made by Senator Lott, the U.S. Chamber of Commerce, and many other proponents of the bill, that these so-called mass actions are currently filed only in Mississippi and West Virginia. In other words, this provision of S. 5 will have no impact on mass torts cases filed in the other 48 States.

That is good news because I would hate to see this bill_which already turns the idea of federalism on its head_preempt any more State rules and procedures than it already does with the diversity provisions.

I agree with the proponents that the scope of this language is limited.

It is my understanding from conversations with my colleagues who support this bill that a mass action, as used in this section of the bill, is simply a procedural device designed to aggregate for trial numerous claims. If that is the case, I believe my amendment would not be necessary.

I had offered my amendment as a good faith effort to keep mass tort cases from being impacted negatively by this provision. But if the language affects only a narrow set of procedural devices in a limited number of States, then I believe that is consistent with what I had attempted to achieve with my amendment.

Accordingly, I ask unanimous consent that my amendment, Amendment No. 3, be withdrawn.

The PRESIDING OFFICER. Is there objection to the request of the Senator to withdraw the amendment? Without objection, it is so ordered.

Mr. DURBIN . Mr. President, I would also like to talk about the bill generally.

Why are we even debating a question about whether a lawsuit can be filed in a State court or a Federal court? If you can file a lawsuit, you are supposed to have your day in court. But it is not that simple.

The reason why the business lobbies have spent millions of dollars in Washington pushing for this bill, the reason why this bill is the highest priority of the Bush administration and the Republican leadership in Congress, is because of one simple fact: Class action cases removed from State courts to Federal courts are less likely to go forward to be tried, they are less likely to reach a verdict where someone wins or loses, and if there is a decision on behalf of the plaintiffs, they are less likely to pay a reasonable amount of money in Federal court than in State court.

What I say to you is not idle speculation; it is based on Federal court decisions. That is why the business community has worked so long and so hard to remove the rights of consumers and citizens to sue in their own State courts. Rather, they want them removed to Federal courts where they have a better chance to win. The businesses know they can win more class action cases in Federal courts than they could ever win in State courts. That is what this whole debate is about. So you hear all of this talk about whether class action suits are filed here, whether they are filed there_frankly, many of these discussions overlook what these class action lawsuits are all about.

I had my staff compile some information on some of these lawsuits because people tell me: I don't understand what is a class action. I can understand if I am in an automobile accident, I get hurt, and I sue the person who ran into me. Is this what we are talking about? That probably wouldn't be a class action.

Let me give you some examples of real class action lawsuits. These cases will be more difficult to file and more difficult to be successful because the business interests are going to pass this bill.

U.S. postal workers given Cipro after the anthrax attacks in 2001 found out there were many damages that came from the drug, and the postal workers came together as a group to sue the company that made Cipro. This is a class action lawsuit.

Then we had a group of people in Rhode Island who were harmed because they were exposed to lead in paint. They sued, as a class, the manufacturers of lead paint that caused the damage to them physically. But because the manufacturers are not based in Rhode Island, this class action might be removed to a Federal court under this bill.

Then there was a court in Illinois in a class action lawsuit in one of the counties the proponents of this bill like to rail about. It was against Ford Motor Company because they were selling Ford Crown Victoria vehicles to police departments alleging they were better cars for police use. It turned out they had a defective fuel tank that made them dangerous for policemen. So, all of the police departments that bought these cars sued Ford Motor Company as a class because of a defective product. But because Ford Motors is based in Michigan, the Illinois police officers might have to litigate this case in a Federal court.

Here is another one against Foodmaker, which ran Jack-in-the-Box restaurants. It turned out thousands of their patrons were subjected to food contamination and serious illness. The patrons sued as a class. Why? Because any individual might say: I took my child to Jack-in-the-Box, my child became sick and went to the hospital, and was there for two days. The medical bills came to $1,500. But I can't file a lawsuit against the restaurant for $1,500.

Then, the parent finds out that the same thing happened to hundreds of other kids, so all the parents come together and say: Jack-in-the-Box, you should have done a better job. And this class of plaintiffs went forward in a State court. But they would have less of a chance for success under this bill. That is what it is about.

A suit was brought by mothers and fathers when they discovered that Beech-Nut was selling apple juice for infants that turned out to be nothing but sugar water.

What is the damage to an individual infant, or a single family? How do you measure it? If a company sold millions of bottles of this defective product, shouldn't that company be held accountable?

That is what this debate is all about. It is about accountability for those who cause harm to the public. The businesses that are responsible for environmental contamination, for producing dangerous products that cause injuries, for manufacturing items that shouldn't be sold, or for overcharging customers, should be held liable.

But these business interests come to Congress for help, and they are going to win today. As a result of this victory, fewer consumers and fewer families are going to have a chance to succeed in court.

The Government closes down the agencies to protect you, Congress will not pass the laws to protect you, and now this Senate will pass a law to close the courthouse doors in your States when you want to come together as a group and ask for justice. This is the highest priority of the Bush administration: closing that courthouse door, making sure these families and these individuals don't have a fighting chance.

I think there are a lot of other priorities we should consider, such as the cost of health care in

America. We will not even talk about that issue on the Senate floor, let alone discuss bipartisan options for addressing that pressing problem.

This so-called Class Action Fairness Act may pass today, but the ultimate losers are going to be families across **[\*S1237]**
America who are hoping that Congress will at least consider their best interests in the very first piece of legislation that we consider.

I yield the floor.

Mr. LEVIN . Mr. President, I will vote against the Class Action Fairness Act of 2005 because, although this bill is an improvement over previous versions, it still has significant deficiencies that would have been corrected by a number of common sense amendments that were not adopted.

For example, forty seven attorneys general, including the attorney general of Michigan, expressed concern that this legislation could limit their powers to investigate and bring actions in their State courts against defendants who have caused harm to their citizens. The attorneys general supported an amendment offered by Senator Pryor that would have exempted all actions brought by State Attorneys General from the provisions of S. 5 stating, "It is important to all of our constituents, but especially to the poor, elderly and disabled, that the provisions of the act not be misconstrued and that we maintain the enforcement authority needed to protect them from illegal practices." The Pryor amendment was defeated.

Federal courts generally do not certify class actions if laws of many states are involved. However, this legislation would force nationwide class actions into Federal courts where they would likely be dismissed for involving too many state laws. This would deprive the plaintiffs from the opportunity to have their case heard. An amendment sponsored by Senator Feinstein, a cosponsor of this legislation, and Senator Bingaman would have fixed this problem by prohibiting the district court from denying class certification in whole or in part on the ground that the law of more than one State will be applied. However, that amendment failed.

Senator Feingold offered an amendment that would have set a time limit for a district court to assume jurisdiction or rule on a remand motion to State court. The amendment, which failed, would have provided protection for plaintiffs against attempts to remove cases to Federal court merely to delay the outcome.

We do need class action reform, however this bill fails to adequately protect the rights of our citizens and therefore I cannot support it.

Mr. SCHUMER . Mr. President, I rise today to express my support for S. 5, the Class Action Fairness Act, and to explain why I supported the amendment proposed by my friend from California, Senator Feinstein, for herself and on behalf of my friend from New Mexico, Senator Bingaman.

I support the class action legislation before us today. Certain lawsuits have become a concern to many Americans. Many lawsuits have been filed in local State courts that have no connection to the plaintiff, the defendant, or the conduct at issue. This allows forum shopping, which undercuts the basic fairness of our justice system.

Having said that, I am not one of those who think access to the courts should be unduly blocked. Our citizens' use of the courts has led to many reforms in the protection of civil rights and the environment, and has held corporate malefactors accountable for improper conduct that has cost victims billions of dollars. Often for those without power, a lawsuit is the only avenue for redress. We need lawsuits, but the rules governing them should be fair.

As we have heard yesterday and today, courts in some places have become magnets for all kinds of lawsuits. Some of these lawsuits are meritorious; some are not. In either scenario, if the case affects the Nation as a whole, it should be heard in Federal court. Judges in small counties should not make law for all of America. Although those judges might make good law, there is a real risk that parochial concerns would dominate in that type of decision. That is not to say that there are not judges in the Federal courts who do not have extreme views on both sides of the issues, much as we try not to confirm judges who fall out of the mainstream.

Consequently, we need to rein in forum shopping. When consumers allege that a product sold nationwide to consumers in all 50 States is defective, a Federal court should decide that case.

It is for these reasons that I joined with my colleagues, the Senator from Connecticut, Mr. Dodd, and the Senator from Louisiana, Ms. Landrieu, to help craft the compromise that led to the bill before us.

The spirit of the compromise we reached would not create a new mechanism to dismiss class actions, but instead would remove the large and national class actions to the Federal courts.

But when Senators Dodd, Landrieu, Carper, Kohl, and I, all of whom have worked so long and hard on this bill, met with the majority leader and others 2 years ago, we made perfectly clear the right of the minority to offer amendments. That right remains an essential part of my participation in the compromIse.

Although we worked hard to improve the bill, we wanted to make sure that our colleagues had the opportunity to offer amendments because no bill is perfect.

One area where the bill could be improved stems from a real concern that many of the consumer class actions removed to Federal court might not be certified on the grounds that there would be too many non-common issues due to differences among State laws that would apply to different members of the national class. To date, at least 26 Federal district courts have refused to certify class actions on those grounds.

Some of us believed that not certifying could have resulted in a problem because it would effectively mean the weakening, if not the disappearance, of the class members' ability to get remedies, particularly with the changes made to current law by this bill. Not certifying could also create a practical problem for lawyers, who have the opportunity to try their class action before one court, and post-decertification might have to re-plead and try several class actions in several courts, thereby destroying the sought-after efficiency of class actions and creating the risk that the results would not be uniform.

This was not the desired outcome of our compromise: We intended to send national class actions to Federal court, not to their graves.

The amendment that my friend from California, Senator Feinstein, and my friend from New Mexico, Senator Bingaman, introduced would not only have improved the bill, but would have also furthered the spirit of the compromise by clarifying our intention that the bill remove, but preserve class actions, even when Federal judges face choice of law issues.

Importantly, this amendment would not have aided forum-shopping plaintiffs' lawyers. Instead, it would have clarified options for a Federal judge facing a choice of law question. That clarification would have helped to grind to a halt the class action merry-go-round between the State and Federal courts. I hope that Federal judges view this bill, even without the amendment, as a vehicle that was intended to bring national class actions to the Nation's

courts and not as a vehicle to balk at certification. The use of subclasses to protect people's rights under their State laws is now in the hands of Federal judges. They have the tools to protect those rights. This bill was not intended to destroy them.

That view will protect an important instrument of deterrence against future wrongdoing and an important adjunct to regulators in the enforcement of laws protecting our citizens.

Mr. ENZI . Mr. President, today I rise in support of S. 5, the Class Action Fairness Act of 2005. The class action system in our country is broken. Over the past decade, class action lawsuits have grown by over 1,000 percent nationwide. This extraordinary increase has created a system that produces hasty claims that are often unjust. Lawsuits that have plaintiffs and defendants from multiple States are tried in small State courts with known biases. This leads to irrationally large verdicts that make little sense legally or practically.

The U.S. Constitution gives jurisdiction to the Federal Government when cases involve citizens of differing states. It makes sense, that, in a case involving plaintiffs from Wyoming and Alabama and defendants from New York and Idaho, that no party be given the inevitable "home-court" advantage that comes when a case is tried in your backyard. Regrettably, for years, Congress has required all plaintiffs to be  **[\*S1238]**
diverse from all defendants. In large class action lawsuits, with plaintiffs or defendants from states throughout the Nation, it is increasingly difficult for this requirement of complete diversity to be met.

In the system we have created, we see lawyers seeking out victims instead of victims seeking out lawyers. We see lawsuits being adjudicated in a select few courts with proven track records for delivering large verdicts instead of lawsuits being tried in courts with the most appropriate jurisdiction.

S. 5 is a step in the right direction. It eliminates the lottery-like aspect of civil liability that individuals now face by moving interstate cases to the federal level. If passed, S. 5 makes it so that class action cases involving citizens from Wyoming, Utah, Kansas and Texas will not be adjudicated at a courthouse in Madison County, Illinois. In the same vein, it ensures that cases involving folks from Illinois, Arkansas, and Mississippi are not decided in a State court in Wyoming. These are interstate cases and should decided without a home state bias that can exist in some State courts.

When the Founding Fathers drafted the Constitution and its provisions regarding the filing of interstate cases, they could never have imagined that our court system would be used someday to engage almost every sector of the U.S. economy in just three counties. That statistic should be a wake up call that something is dreadfully wrong and that the system is not working as the designers intended. By placing cases in Federal court, we avoid the forum shopping that has become so commonplace over the past few decades. S. 5 gives the defendants in a lawsuit a chance to have their day in an impartial court.

While State courts undoubtedly have their place, and in many instances operate more effectively than Federal courts, a select few have become notorious for delivering outrageous verdicts. Consequently, many of our most costly class action lawsuits end up in these courts. This should not be the case.

S. 5 will not only benefit the defendants, it will also make the system more fair for the plaintiffs. Weak oversight of class action lawsuits has created a system that returns less than 50 cents on the dollar to plaintiffs in a case. Compensation, when compared to actual economic loss, is approximately 22 cents per dollar. Settlement notifications are often times so confusing that plaintiffs do not understand what they are receiving. Plaintiffs are signing off on agreements they do not even understand, with even less understanding about how to challenge the settlement. They are getting a raw deal.

I am pleased that the Class Action Fairness Act addresses this problem by including a "Consumer Class Action Bill of Rights." The "Bill of Rights" includes a provision requiring the Federal court to hold a hearing and find that a settlement is fair before it can be approved. It includes provisions that make more fair what have become known as "coupon settlements," in which the attorneys receive real money and the victims receive the equivalent of a Sunday newspaper clipping.

S. 5 works to reign in the only people who covertly benefit from the way the class action system works today, a select group of defense attorneys who seem more interested in profits than process. These lawyers are more concerned with reaching a settlement than helping their victims. They push for quick class certification, and once they have crossed that hurdle, they push for a quick settlement by threatening the defendants with large monetary verdicts that have come about in past cases.

In the face of these ridiculous verdicts, defendants settle quickly. They know the stars are lined up against them if the case goes all the way to trial and often times, by agreeing to coupon settlements, the defendants pay only a fraction of the stated damages. The Class Action Fairness Act takes steps to change this practice. It takes steps to ensure that when a settlement is reached, the lawyers and the defendants do not come out ahead when the victims come out behind.

Is S. 5 perfect? Absolutely not. It does not require that individuals opt-in to class action lawsuits. It does not require sanctions be brought against attorneys who file frivolous lawsuits over and over again. There are a number of provisions that I believe should be included in the bill that did not make the cut.

But S. 5 is the true example of a bipartisan compromise. S. 5 takes into account the wants of the various parties. It took a lot of give and take to get to this point, and now, we have a bill that does some good. We have a bill that takes a first step toward reforming our court system to make it more fair for both the plaintiffs and the defendants.

I look forward to voting in favor of the Class Action Fairness Act later today, and I will encourage all my colleagues to do the same.

Mr. KOHL . Mr. President, I rise today on the final day of debate on the class action reform bill to say a final word in support of the legislation. We have worked for many years on this bill through numerous hearings, committee markups and repeated floor consideration. We can proudly say that we are about to succeed in passing modest, yet important changes to the class action process. Consumers and businesses across the country will benefit and not a single case with merit will go unheard.

Today is the culmination of many years of our bipartisan efforts on this issue as we have attempted to make the class action system fairer for both consumers and businesses alike. Our success once again demonstrates that the Congress works best when we work together. I am most proud that we were able to construct a bipartisan core of supporters to pass this bill.

While this bill does not solve all of the problems in the system, consumers will never again need to worry about being injured and receiving worthless coupons as damages. Businesses will never again need to fear being sued in a small county court where the rules are stacked against them. Most importantly, under our bill every claim with merit will still go forward and the court house doors will always be open.

It is a well-known saying that success has many fathers, so many will deserve thanks for their work leading to the passage of this bill today. I would like to mention a few people

specifically who have been indispensable to the passage of this legislation. Senator Grassley and I have worked on this bill for 7 years now. He has been a good partner and leader. He deserves tremendous credit for his willingness to accept bipartisan compromises in an effort to get this bill done.

Senators Carper and Hatch also deserve praise for the tremendous energy that they have brought to this bill over the past two Congresses. Without them, class action reform certainly would not have made it to the verge of passage today.

In addition, Senators Dodd, Feinstein, Schumer and Landrieu contributed significantly in this process by making important changes to the bill. They were successful in identifying ways to ensure that primarily State cases stayed in state court and only truly national cases could be removed to the Federal courts. This has been our goal all along. With their assistance we have accomplished it.

I would be remiss if I did not thank the many very fine staffers whose work often goes unheralded. This bill addresses a very technical and difficult area of the law, so their contribution to this bill was truly indispensable. All of the following were essential to the final passage of this bill: Rita Lari with Senator Grassley; Jonathon Jones, Sheila Murphy and John Kilvington with Senator Carper; David Hantman with Senator Feinstein; Jeff Berman with Senator Schumer; Shawn Maher with Senator Dodd; and Harold Kim with Senator Hatch.

Finally, Paul Bock and Jeff Miller, my chief of staff and chief counsel respectively, deserve significant credit for the passage of this bill. They have worked tirelessly on this legislation for several years and have provided wise counsel during the long and difficult negotiations on this legislation. With their assistance, we succeeded in crafting a moderate bill that will help business and consumers alike. For that, we should all be proud.

Mr. ALLEN . Mr. President, I rise today in support of the Class Action Fairness Act.

This legislation we are considering today is crucial to ensuring that there  **[*S1239]** is fairness in our courtrooms, that claimants receive the judicial consideration they deserve, and that the American economy and small businesses are able to stay competitive.

This class action reform legislation is primarily designed to allow defendants to move a class action lawsuit from State court to Federal court when there is diversity or citizens from different States involved in the litigation. This concept is as old as our Republic. No one will be denied access to the courts. It is simply allowing most litigants to find the most appropriate court to decide the case. In significant cases with diversity, the Federal courts are the proper choice.

We have heard about cases where lawyers shop around to find courts in particular counties that have a proven track record of being sympathetic to class action lawsuits with absurdly large judgments. When justice arbitrarily hinges on what county in which a case is tried, that is not fair.

A recent study found that 89 percent of Americans believe the legal system is in need of reform. The statistics are indeed alarming: Over the past decade, the number of class action lawsuits has increased by over 1,000 percent nationwide. And the cost of the U.S. tort system has increased one hundred fold over the last 50 years. Lloyd's of London estimates that the tort system cost $205 billion in 2001, or $721 per U.S. citizen. Most importantly, Lloyd's estimates this number to rise to $298 billion by this year. At current levels, U.S. tort costs are equivalent to a five percent tax on wages.

The implications of an abused tort system on the American economy are of legitimate concern. While there is no doubt that many class action lawsuits are legitimate, the

inadequacies of the system have resulted in frequent abuses. And the increased cost to businesses has an enormous impact_tying the hands of businesses and restricting their ability to expand, provide additional jobs, or contribute to the economy. Even the threat of class action lawsuits forces businesses to spend millions of dollars. Defendants face the risk of a single judgment in the tens of millions or even billions of dollars, simply because a State court judge has rushed to certify a class without proper review. The risk of a single, bankrupting award often forces defendants to settle the case with sizable payments even when the defendant has meritorious defenses.

Believe it or not, some opponents of the Class Action Fairness Act are still urging that the current class action system works well and that class action reform is unnecessary. Apparently, they do not think it is a problem when consumers take home 50-cent coupons to compensate them for their injuries, while their lawyers pocket millions in cash. Take for example a case against Blockbuster, Inc., where customers alleged they were charged excessive late fees for video rentals. These customers received $1 coupons while their attorneys received over $9 million. Or when one State court prevents citizens from litigating their claims under the law of their home State. Or when attorneys file the same lawsuit in dozens of State courts across the country and file the same lawsuit in a race to see which judge will certify the fastest and broadest class.

In fact, numerous studies have documented class action abuses taking place in a small number of "magnet" State courts, and by now, it is beyond legitimate debate that our class action system is in shambles. As the Washington Post editorial page has noted, "[n]o portion of the American civil justice system is more of a mess than the world of class action."

A RAND Institute for Civil Justice, ICJ, Study on U.S. class actions released at the end of 1999 empirically confirms what has long been widely believed_State court consumer class actions primarily benefit lawyers, not the consumers on whose behalf the actions ostensibly are brought. Case studies in the ICJ piece confirm that in State court consumer class actions_that is, cases not involving personal injury claims_the fees received by attorneys are typically larger than the total amount of monetary benefits paid to all of the class members combined. In short, the lawyers are the primary beneficiaries. The ICJ Study contains no data indicating that this problem exists in Federal court class actions.

If we do not pass this vital legislation, the class action process will remain a system ripe for exploitation, and the harm to the fundamental fairness of the civil justice system will continue to grow. Excessive and frivolous class action lawsuits stifle innovation, discourage risk-taking, and harm the entrepreneurship that drives our Nation's economic growth and job creation.

This commonsense, bipartisan legislation will help alleviate the dramatic effects that have resulted from an abuse of the class action system. This legislation ensures that legitimate class action cases are given full consideration and that prevailing plaintiffs receive the compensation they deserve. Americans deserve to have a judicial system that is effective and efficient, and, most importantly, fair_this legislation goes a long way toward accomplishing these objectives. I urge my colleagues to support this legislation. In the 108th Congress, this legislation came up one vote short. We now have four more Senators on our side of the aisle, so I am confident in its success in the 109th Congress. This is a success that people in States desire, and it will be a promise kept.

Mrs. CLINTON . Mr. President, I oppose this legislation called the Class Action Fairness Act of 2005, because I do not believe it is fair to litigants who have legitimate claims that are most appropriately addressed by our state courts.

Yes, there are some problems in the use of class actions, and in some cases there are excessive fees or inappropriate coupon settlements. I am pleased that after many years of

seeking to move class action "reform" legislation, the bill proponents finally agreed to include language that addresses some of the abuses concerning "coupon" settlements, in which plaintiffs who have proven their case in court receive in turn coupons for products or services that have little value. This language has long been advocated by the distinguished ranking member of the Senate Judiciary Committee, Senator Leahy, and it is a good provision because in contrast to most of the bill, it is narrowly crafted to address an actual problem that the legal system and litigants confront.

But the vast majority of the provisions in this legislation are not narrowly crafted to address discrete problems. Instead, this legislation is an extremely blunt instrument that I believe will result in justice delayed and justice denied for many Americans.

There have been many claims about "judicial hellholes" and "magnet jurisdictions" but the evidence shows that these claims are, at best, overstated, and are certainly not so widespread so as to justify passage of this legislation that turns 200 years of federalism on its head. Indeed, a recent report by Public Citizen found that there were, at most, two jurisdictions_Madison County and St. Clair County, IL_of the 3,141 court systems in the United States for which bill proponents have provided limited data that they are "magnet jurisdictions." As to Madison County in particular, the facts also do not support the rhetoric. In 2002, only 3 of 77 class actions were actually certified to proceed to trial, and in 2003, only 2 of 106 class actions filed were certified.

Moreover, the Public Citizen report notes that, in recent years, at least 11 states have made major changes to the class action process used in their States to aid in the administering of justice, and in fact Illinois is in the process of doing the same.

The legislation purports to help Americans but I believe it will hurt them. The legislation itself states its purpose is to: "(1) assure fair and prompt recoveries for class members with legitimate claims; (2) restore the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate cases of national importance under diversity jurisdiction; and (3) benefit society by encouraging innovation and lowering consumer prices."

As to assuring "fair and prompt recoveries," hundreds of consumer rights, labor, civil rights, senior, and environmental organizations, esteemed legal experts, and many State Attorneys General believe, as I do, that this legislation will do just the opposite.

There is also no reasonable basis for the assertion that this legislation "will **[*S1240]** restore the intent of the framers" with respect to the role of our federal courts. As Arthur Miller, the distinguished Harvard Law School professor, author, and expert in the fields of civil procedure, complex litigation, and class actions noted with respect to similar legislation considered last year: it is a "radical departure from one of the most basic, longstanding principles of federalism [and] is a particular affront to state judges when we consider the unquestioned vitality and competence of state courts to which we have historically and frequently entrusted the enforcement of state-created rights and remedies."

As a Senator representing the great State of New York, I have worked closely with many businesses in my state to help them with their efforts to grow and create jobs, and I am a firm believer in encouraging innovation and lowering consumer prices. But even if we assume there is a strong connection between this legislation and those goals, there are many more appropriate means to achieve those ends without doing the harm to the administration of justice that I believe this legislation will impose.

In addition to being unfair to the American people, I do not believe this legislation is fair to our State or Federal judiciaries. This bill will effectively preclude state courts in many instances from employing their expertise and experience in class action cases based on state

law that they have historically considered. I believe that state courts should determinematters of state law whenever possible. It is not fair to our Federal judiciary, which simply does not have the resources or experience to handle a mass influx of class action cases to our federal courts.

Indeed, the Judicial Conference of the United States has expressed its opposition to similar legislation introduced in prior Congresses because it "would add substantially to the workload of the federal courts and [is] inconsistent with principles of federalism." Similarly, the Board of Directors of the Conference of Chief Justices representing the Chief Justices of our state courts has said that legislation of this kind is simply unwarranted "absent hard evidence of the inability of the state judicial systems to hear and decide fairly class actions brought in state courts." That evidence simply does not exist.

As the National Conference of State Legislatures, NCSL, has noted in its strong opposition to this legislation, the legislation "sends a disturbing message to the American people that state court systems are somehow inferior or untrustworthy." The NCSL went on to say that the effect of the legislation "on state legislatures is that state laws in the areas of consumer protection and antitrust, which were passed to protect the citizens of a particular state against fraudulent or illegal activities, will almost never be heard in state courts. Ironically, state courts, whose sole purpose is to interpret state laws, will be bypassed and the federal judiciary will be asked to render judgment in those cases."

Although bill proponents have sometimes suggested the contrary, make no mistake: if enacted, this legislation will not only result in the majority of class action lawsuits being transferred from our state to Federal courts, but it will also serve to terminate some class action lawsuits that seek to provide justice to everyday Americans.

Proponents of this legislation refer to an alleged abuse by lawyers in bringing class actions and assert that too many cases are instituted that are without merit. As I have already noted, I believe some proponents of this legislation have mischaracterized the extent of the problems concerning class actions. But, even if these assertions were true, the proponents have failed to justify the rejection of the very reasonable amendments offered by my colleagues that sought to address major concerns with the legislation without undermining its spirit or intent.

One such amendment was offered by my colleague Senator Pryor of Arkansas, a former Arkansas State Attorney General. It would have clarified the role that State Attorneys General would continue to play in State class action cases. That amendment had the express written support of 47 of the 50 State Attorneys General in our Nation. As the highest law enforcement officers in their respective States, I cannot imagine that anyone in this body would believe that such public servants would bring "frivolous lawsuits" or would seek to abuse the class action process. And yet, that amendment failed, primarily along party lines.

The remaining amendments met a similar fate, including one offered by Senators Bingaman and Feinstein. There is no general Federal consumer protection statute, which is why consumer fraud, deceptive sales practices, and defective product cases are almost always commenced in state courts.

Yet, the legislation before us would effectively move many of these cases to Federal courts, courts that are already overburdened and have neither the experience nor the expertise to handle these cases. If such cases are forced into Federal courts through consolidation of many state court cases, a Federal court hearing such a case must then decide which state laws should be applied. Because these kinds of circumstances have presented enormous challenges to our Federal courts, many Federal judges have simply, and understandably, denied certification of nationwide consumer fraud cases. Yet, the bill language would preclude the consideration of many of these cases in state courts, creating what many have described

as the bill's "Catch-22." At that point, such cases would literally be in justice "limbo" because a federal court would have dismissed the case but under the provisions of the legislation, the case could not withstand a defendant's challenge to maintain the case in a State court.

The amendment offered by Senator Feinstein, an original cosponsor of the underlying legislation, and Senator Bingaman, would have provided a process to handle such cases to increase the likelihood that such cases would be certified by a Federal court and the appropriate State laws would be applied. This was a more than reasonable effort to address a significant concern with this legislation without undermining the legislation's intent to transfer many class actions to Federal courts. But, once again, a majority of the Members of this body chose to reject it.

The Leadership Conference on Civil Rights has stated, and no one has refuted, that "there is no evidence that lawsuits brought by workers seeking justice in state courts on issues ranging from overtime pay to working off the clock are abusing the system. To the contrary, failure to exempt such lawsuits in this legislation is an abusive act against every hard-working American seeking fair pay and a better life." Yet, the amendment offered by Senator Kennedy that would have carved out such cases from this legislation was rejected as well.

In short, this bill currently stands now in the same shape as when it was introduced. Though valiant efforts were made to improve it, none were successful. Eliot Spitzer, the distinguished New York State Attorney General, and a number of other State Attorneys General, expressed their overall concern with the bill, including the fact that the legislation still "unduly limits the right of individuals to seek redress for corporate wrongdoing in their state courts." I could not agree more.

In speaking in opposition to this legislation on the Senate floor earlier this week, Senator Leahy, the Ranking Member of the Senate Judiciary Committee, reminded all of my colleagues that sometimes individual claims are so small that even though a harm was done for which a plaintiff should receive relief, it is not worth it for him or her to spend significant financial resources to obtain that relief through the judicial process. Unfortunately, as he said, "[s]ometimes that is what cheaters count on, and it is how they get away with their schemes. [Yet,] cheating thousands of people is still cheating. Class actions allow the little guys to band together, allow them to afford a competent lawyer, and allow them to redress wrongdoing." With the expected passage of this legislation today, I believe the "little guy" loses, and I believe that is neither fair nor just. That is why I cannot support this legislation.

I appreciate the concerns raised by businesses in New York and around the country about the cost of litigation. I too believe that litigation costs have increased significantly. Any legislation that seeks to address discrete problems with class action litigation should address this and other concerns without **[*S1241]**
unnecessarily and negatively affecting the ability of Americans to seek and obtain justice through our courts. A proper balance must be struck. The so-called Class Action Fairness Act simply does not strike that balance.

Mrs. DOLE . Mr. President, I rise today in support of the Class Action Fairness Act of 2005, legislation that is greatly needed to restore public confidence in our Nation's judicial system and protect jobs in my own State and throughout the country.

Frivolous litigation has helped drive the total cost of our tort system to more than $230 billion a year. Tort costs in America are now far higher than those of any other major industrialized nation, and in our global economy, this has become a tremendous disadvantage for American manufacturers and entrepreneurs, who have long sought reform. But this affects not just certain businesses; this affects our overall economy and all Americans.

The Class Action Fairness Act will provide that some class action suits be litigated in the Federal courts rather than allowing venue shopping for a sympathetic State court. The measure will also ensure that cases of national importance are not overlooked. Most importantly, this legislation will ensure that class members with legitimate claims are fairly compensated.

Class action suits are an important part of our legal system. They originated to make our courts more efficient by joining together parties with a common claim. However, growing abuses by opportunistic plaintiffs' attorneys_coupled with the skyrocketing costs of runaway litigation and excessive awards_have had a dramatic impact on America's interstate commerce.

Over the past decade, the number of class action lawsuits has grown by over 1,000 percent nationwide. And the jury awards are sharply increasing over time as well. In 1999, the top 10 awards totaled $9 billion; by 2002, that number had jumped to $32.7 billion.

Businesses, like those in my home State of North Carolina, are losing out because the rules in place today allow lawyers to "shop" for the "friendliest" court to hear their case. And it is not just large companies being sacked with enormous payouts in class action lawsuits. Small businesses are bearing the majority of tort liability costs. According to a study conducted for the U.S. Chamber of Commerce, small businesses bear 68 percent of tort liability costs but take in just 25 percent of business revenue.

We all know that small businesses are the job creators and the engines of our economy. They create 70 percent of all new jobs in America. Yet the rules in place today allow for a judicial system that is truly hurting them and causing them to spend money_on average $150,000 a year_on litigation expenses rather than on business development and equipment and expansion_the very things that can lead to more jobs.

Our goal in reforming class action lawsuits is to provide justice to the truly injured parties, not to deny victims their day in court and their just compensation. Lawsuit costs have risen substantially over the past several decades, and a significant part of these costs is going towards paying exorbitant lawyers' fees and transaction costs. And some injured plaintiffs are suffering because of weak State court oversight of class action cases. In fact, under the current U.S. tort system, less than 50 cents on the dollar finds its way to claimants, and only 22 cents compensate for actual economic loss.

And sometimes class members don't receive cash at all. For example, in a settlement with Crayola, approved by a State court in Illinois, crayon purchasers in North Carolina and around the country received 75-cent coupons for the purchase of more crayons; their lawyers, however, received $600,000 in cash.

And in the Cheerios class action settlement, also approved by State court in Illinois, consumers in North Carolina and around the country received coupons for buying a single box of cereal, while lawyers got $1.75 million.

I hardly think it's in the best interest of the class member to actually have to purchase more of a product to receive any benefit. And it isn't fair that class members are losing out while their attorneys are cashing in.

This legislation establishes a "Consumer Class Action Bill of Rights" that will ensure that class actions do not harm the intended beneficiaries_people who were actually harmed by the actions of a defendant. And it does nothing to prevent class members from having their cases heard_it just establishes that some of these cases may be heard in Federal courts.

It is time we do what is right and repair this broken system_for claimants in class action

cases, for our Nation's economy, businesses large and small, and for all Americans.

Mr. VOINOVICH . Mr. President, I rise today to speak on behalf of the Class Action Fairness Act, a bill to stop unfair and abusive class action lawsuits that ignore the best interests of injured plaintiffs. This legislation is sorely needed to help people understand their rights in class action lawsuits and protect them from unfair settlements.

It is also needed to reform the class action process, which has been so manipulated in recent years that U.S. companies are being driven into bankruptcy to escape the rising tide of frivolous lawsuits and has resulted in the loss of thousands of jobs, especially in the manufacturing sector.

Unfortunately, not enough Americans realize that we are in a global marketplace and businesses now have choices as to where they manufacture their products. Many of our businesses are leaving our country because of the litigation tornado that is destroying their competitiveness. The Senate must start taking into consideration the impact of its decisions on this Nation's competitive position in the global marketplace.

I believe that for the system to work, we must strike a delicate balance between the rights of aggrieved parties to bring lawsuits and the rights of society to be protected against frivolous lawsuits and outrageous judgments that are disproportionate to compensating the injured and made at the expense of society as a whole. This is what the Class Action Fairness Act, does, and I am proud to cosponsor it.

Since my days as Governor of Ohio, I have been very concerned with what I call the "litigation tornado" that has been sweeping through the economy of Ohio, as well as the Nation.

Ohio's civil justice system is in a state of crisis. Ohio doctors are leaving the State and too many have stopped delivering babies because they can't afford the liability insurance.

From 2001-02, Ohio physicians faced medical liability insurance increases ranging from 28 to 60 percent. Ohio ranked among the top five States for premium increases in 2002. General surgeons pay as much as $74,554, and OB-GYNs pay as much as $152,496. Comparatively, Indiana general surgeons pay between $14,000-$30,000; and OB-GYNs pay between $20,000-$40,000.

Further, Ohio businesses are going bankrupt as a result of runaway asbestos litigation. And today, one of my fellow Ohioans can be a plaintiff in a class action lawsuit that she doesn't know about and taking place in a State she has never even visited.

In 1996, as Governor of Ohio, I was proud to sign H.B. 350, strong tort reform legislation that became law in Ohio for a while. It might have helped today's liability crisis, but it never got a chance.

In 1999, the Supreme Court of Ohio, in a politically motivated 4-3 decision, struck down Ohio's civil justice reform law, even though the only plaintiff in the case was the Ohio Academy of Trial Lawyers_the personal injury bar's trade group.

Their reason for challenging the law? They claimed their association would lose members and lose money due to the civil justice reform laws we enacted.

The bias of the case was so great that one of the dissenters, Justice Stratton, had this to say:

This case should have never been accepted for review on the merits. The majority's acceptance of this case means that we have created a whole new arena of

jurisdiction_advisory opinions on the constitutionality of a statute challenged by a special interest group.

From this, it is obvious to me that the way we currently administer class actions is not working.

While we were frustrated at the State level, I'm proud to have continued my fight for a fair, strong civil justice system in the United States Senate.  **[*S1242]**


To this end, a few years ago I worked with the American Tort Reform Association to produce a study entitled "Lawsuit Abuse and Ohio" that captured the impact of this rampant litigation on Ohio's economy, with the goal of educating the public on this issue and sparking change.

Can you imagine what this study found? In 2002 in Ohio, the litigation crisis costs every Ohioan $636 per year, and every Ohio family of four $2,544 per year. These are alarming numbers. And this study was released on August 8, 2002_imagine how high these numbers have risen in 2 1/2 years.

In tough economic times, families can not afford to pay over $2,500 to cover other people's litigation costs. Something needs to be done, and passage of this bill will help!

Mr. President, this legislation is intended to amend the federal judicial code to streamline and curb abuse of class action lawsuits, a procedural device through which people with identical claims are permitted to merge them and be heard at one time in court.

In particular, this legislation contains safeguards that provide for judicial scrutiny of the terms of class action settlements in order to eliminate unfair and discriminatory distribution of awards for damages and prevent class members from suffering a net loss as a result of a court victory.

This bill would establish a concept of diversity jurisdiction that would allow the largest interstate class actions into Federal court, while preserving exclusive State court control over smaller, primarily intrastate disputes. As several major newspaper editorial boards_ranging from the Post to the Wall Street Journal_have recognized, enactment of such legislation would go a long way toward curbing unfairness in certain state court class actions and restoring faith in the fairness and integrity of the judicial process.

This bill is designed to improve the handling of massive U.S. class action lawsuits while preserving the rights of citizens to bring such actions.

Class action lawsuits have spiraled out of control, with the threat of large, overreaching verdicts holding corporations hostage for years and years.

In total, America's civil justice system had a direct cost to tax payers in 2002 of $233.4 billion, or 2.23 percent of GDP. That is $809 per citizen and equivalent to a 5 percent wage tax. That's a 13.3 percent jump from the year before_a year when we experienced a 14.4 percent increase which was the largest percentage increase since 1986.

Now, some of my colleagues have argued that this bill sends most state class actions into Federal court and deprives state courts of the power to adjudicate cases involving their own laws. They argue that the bill therefore infringes upon States' sovereignty.

However, in one empirical study done by two attorneys from O'Melveny & Myers, their data indicated that this bill would not sweep all class actions into Federal court. Rather, the bill is a targeted solution that could result in moving to Federal court a substantial percentage of

the nationwide or multi-State class actions filed in class action "mill" jurisdictions (like Madison County, IL), while allowing State courts everywhere to litigate truly local class actions (the kinds of class actions typically filed in State courts that do not endeavor to become "magnet" courts for class actions with little or no relationship to the forum).

There is just no evidence for the assertion that this bill deprives State courts of their power to hear cases involving their own laws. In fact, it is the present system that infringes upon state sovereignty rights by promoting a "false federalism" whereby some state courts are able to impose their decisions on citizens of other States regardless of their own laws.

Another argument against this bill is that it will unduly expand Federal diversity jurisdiction at a time when courts are overcrowded. However, State courts have experienced a much more dramatic increase in class action filings and have not proven to be any more efficient in processing complex cases.

In addition, Federal courts have greater resources to handle the most complex, interstate class action litigation, and are insulated from the local prejudice problems so prevalent under current rules.

Mr. President, I emphasize to my colleagues that this isn't a bill to end all class action lawsuits. It's a bill to identify those lawsuits with merit and to ensure that the plaintiffs in legitimate lawsuits are treated fairly throughout the litigation process.

It's a bill to protect class members from settlements that give their lawyers millions, while they only see pennies. It's a bill to rectify the fact that over the past decade, State court class action filings increased over 1,000 percent. It's a bill to fix a broken judicial system.

I am a strong supporter of this bill, and I urge my colleagues to do the same.

Mr. JEFFORDS . Mr. President, I am pleased to support S. 5, the Class Action Fairness Act of 2005.

I believe there are problems with our current class action system that should be addressed through Congressional action. These problems include:

Cases and controversies that are national in scope and are currently being decided in State courts;

Decisions or settlements that are determined in one State's court system, are being applied nationwide, and conflict with laws in other States; and

Plaintiffs receiving little compensation, or in the most extreme example, actually owing money from the settlement of a class action lawsuit.

Class action lawsuits serve a useful purpose in our judicial system. Class actions allow individuals to merge a number of similar claims into one lawsuit, which can be an efficient use of judicial resources. Class action lawsuits enable individuals with small claims the ability to seek justice.

The legislation we are considering today will fairly determine whether a class action should be considered in a State court or a Federal court. Thus, the legislation will help ensure that issues that are national in scope are heard in federal court, while issues that are local in nature are heard in State courts.

The Class Action Fairness Act also provides some common sense reforms and oversight of the class action settlement process. These changes will help ensure that individuals who should

be compensated receive fair compensation for their injuries, rather than worthless coupons, or actually owing money.

I cannot, and would not, support legislation that denies individuals their ability to pursue compensation in the legal system for damages they have suffered. The legislation before this body is a bipartisan compromise worked out over many years. It does not deny individuals their right to pursue justice through the legal system. Because I believe the Class Action Fairness Act of 2005 fairly addresses the problems in our class action system, I will support its passage today.

Mr. REED . Mr. President, I rise to speak about S. 5, the Class Action Fairness Act.

First and foremost, I want to commend both the Republican and Democratic Leaders for all the work they did to bring this bill before the Senate. In particular, I am pleased that the consent agreement allowed all relevant amendments to be offered and debated.

I believe many of these amendments would have improved the underlying legislation without threatening its reforms. In particular, I think we should have adopted the Feinstein-Bingaman amendment, which would have given federal judges clear guidance about how to apply state consumer laws in multi-state class action lawsuits. This would have permitted more multi-state consumer class actions to be certified in federal court and resolved on their merits.

After S. 5 is enacted into law, I believe we should rapidly revisit this issue and make sure that consumers are actually getting their day in court and not having their class action cases thrown out because Federal courts are deeming them too complex or unmanageable to certify.

That being said, I think this legislation benefited greatly from the negotiations entered into by Senators Dodd, Landrieu and Schumer with the bill's major sponsors, Senators Grassley, Kohl, Hatch and Carper. Although S. 5 is not the bill I would have written, I do think it will address some of the well-documented problems created by overlapping class actions in State and Federal courts.  **[*S1243]**

In particular, the Dodd-Landrieu-Schumer language included in S. 5 addressed some of my biggest concerns about moving class actions to Federal court. Many class actions involve only State law issues, are brought by plaintiffs from the same geographical area and have a defendant who is based within that same community. Moving these cases to Federal court is inappropriate, especially if they do not involve issues of national importance. In many cases, it is our State judges who are in the best position to make determinations about State law. The Dodd-Landrieu-Schumer compromise created a new exception for keeping cases like this in State court. Under the bill, if two-thirds of the plaintiffs are from a given State, the injury happened in that State and at least one significant defendant is from that same State, then the class action can remain in State court. As a result, I believe S. 5 ensures that "nationwide" class actions are separated from those that should continue to be heard in State courts.

I also believe that any attempt to stop forum shopping by plaintiffs should minimize forum shopping by defendants. The Dodd-Landrieu-Schumer compromise in S. 5 addressed this issue by making it clear that there is a firm 30-day deadline for the removal of nationwide class actions to Federal court once the plaintiffs have filed papers that create conditions for removal.

I also am pleased that the Dodd-Landrieu-Schumer compromise dealt with one of the most serious abuses in class action cases, certain types of collusive coupon settlements. S. 5

clarified that if a settlement provides coupons as a remedy, attorneys' fees will only be paid in proportion to the redemption of the coupons. A provision like this does not prohibit coupon settlements, but practically speaking, attorneys will not agree to such settlements unless the coupons are actually valuable. S. 5 also requires that a judge may not approve a coupon settlement until a hearing is conducted to determine if the settlement terms are fair, reasonable, and adequate for class members.

Finally, I believed that is important to preserve the ability of the Advisory Committee on the Federal Rules, the U.S. Judicial Conference, and the Supreme Court to amend the class action rules or procedures to the extent necessary to accomplish their purposes more effectively or to cure any unanticipated problems. S. 5 also included a provision saying that the Federal courts could make such changes as appropriate.

As a result of all of these improvements, I believe S. 5 is legislation that addresses serious problems in our nation's class action system and will make the system fairer for both plaintiffs and defendants.

The PRESIDING OFFICER. Twenty minutes is to be equally divided between the chairman and ranking member of the Judiciary Committee.

The Senator from Vermont.

Mr. LEAHY . Mr. President, I commend the distinguished senior Senator from Illinois. He is absolutely right. You have the corporate interests, and this administration is closing courthouse doors_one of the few places where people can go that are not aligned with either the Republican or the Democratic Party; a place where they don't need any political clout; a place where somebody can't say they are going to contribute heavily to a political party so their interests will be heard, or something like that. There is one place they could go_whether they are a mechanic, a bus driver, a person raising a family, somebody who had been damaged by a product sold when the manufacturer knew of the flaw_the one place they could go would be the courthouse. They are not the rich, powerful, or well-connected. They could win. Or at least seek justice. We are going to close that door, too.

Over the few days that the Senate has been considering this bill, there have been a few modest amendments that might actually keep the door open a tiny crack for the people who need it. There have been serious concerns raised by the National Conference of State Legislatures of our 50 States, the National Association of State Attorneys General, prominent legal scholars, consumers, environmental groups, and civil rights organizations. They asked us to at least consider a few improvements but the courthouse door was slammed shut. The Senate's door was slammed shut.

For anybody watching this debate, they have figured out that by now the fix was in, despite these legitimate concerns.

After 31 years here I am disappointed that the Senate is now taking its marching orders for major legislation from corporate special interests and the White House.

We could have actually acted as an independent body and made some changes in this bill. Instead, we are saying_the 100 of us_to all 50 of the State legislatures that we know better than they do, that they are irrelevant, that we could close them off.

It is going to make it harder for American citizens to protect themselves against violation of State civil rights, consumer, health, environmental protection laws, to take these cases to State court.

Aside from being convenient, plaintiffs actually know where the local state courthouse is.

These courthouses have experience with the legal and factual issues within their States. We are simply going to sweep these cases into Federal court, after we have already swept so much criminal jurisdiction there, and you can't get a civil case heard anyway. We are erecting barriers to lawsuits, and we are placing new burdens on plaintiffs. They will languish.

The bill contains language that would reduce the delay that parties can experience when a case is removed to Federal court by setting a limit for appeals of remand orders. But we don't say anything about how long the court can sit on the remand motion. They could sit on it for 10 years if they want to before they do a thing. Plaintiffs can die, witnesses can move away, memories could grow dim, and nothing happens.

Senator Feingold offered a modest amendment to set a reasonable time for action on remand motions. The solution received praise from one of the sponsors of this legislation, but the corporate masters and the White House said no. So it was rejected by the Senate.

The biggest concern raised by legal scholars and agreed to by several Senate sponsors of the bill would address the recent trend in Federal courts not to certify class actions if multiple state laws are involved.

The way this is set up in the bill_a lot of the business groups are behind this_one could easily get a case dismissed by a Federal court.

Senator Feinstein and Senator Bingaman worked together to alleviate what was a legal Catch-22. The Federal court says if a case has complicated State laws in it, it can't hear it. But you can't bring it in State court either. The Federal court says the State laws are complicated and it should have been heard in the State court. But under this bill, it goes to the Federal court so, of course, the corporate interests win. We tried to change that.

Cynics might even speculate that is what the business groups behind this purported "procedural" change are really seeking, the dismissal of meritorious cases on procedural grounds by the federal courts. Naturally, the orders came down from the corporate masters and the White House: Don't do it. We love the way this is going to allow us to keep things out of court. There it goes.

Anyone who reads this bill will notice that despite its title, it affects more than just class actions. Individual actions, consolidated by state courts for efficiency purposes, are not class actions. Despite the fact that a similar provision was unanimously struck from the bill during the last Congress, mass actions reappeared in this bill this Congress. Federalizing these individual cases will no doubt delay, and possibly deny, justice for victims suffering real injuries. Senator Durbin's amendment sought to clarify the bill's effect on these cases. I'm glad the debate this week served to clarify the narrow scope of this provision.

It is interesting because a similar provision to was unanimously struck from the bill during the last Congress_unanimously but that wasn't good enough for the corporate masters. It was slipped back into the bill this Congress. **[*S1244]**

Class action legislation had been criticized by nearly all of the State attorneys general in this country, Republicans and Democrats alike. The distinguished former attorney general, Senator Pryor of Arkansas, had a concern that S. 5 would limit their official powers to investigate and bring actions in State courts against defendants. He wanted to put in minor clarifications to show they could do that. Although these attorneys general contacted their Senators_Republicans and Democrats alike_they were tossed out.

Senator Kennedy's amendment to exempt civil rights, and wage and hour cases in the bill, was a sensible solution. Prominent civil rights organizations and labor advocates requested

that the bill be modified to acknowledge the fact that many of our states have their own protective civil rights and employment laws. I was proud to cosponsor it and regret that with the fix being in, this amendment was rejected by the Senate. But the fix was in, and that is out.

What we have done here? I will give you an example of one class action suit that would have been impacted under this legislation_Brown v. Board of Education, finally ending segregation in our schools, a blight on the American conscience. And how did Brown v. Board of Education get to the Supreme Court? Not from the three Federal courts in that class action suit; not the three Federal courts that said "separate but equal" is the law of the land. It had been good enough for all of us. Send those African-American children to one school. Send the White kids to a much better school_because that is what it was. The view was that is good enough for us, always been that way.

Only one State court in the State of Delaware said: That might be what the U.S. Supreme Court said, but they are wrong. They are wrong. We don't believe in Plessy v. Ferguson. We don't believe in the separate but equal. We say sending Black children to one school and White kids to the other is not equal. We are making second-class citizens of these African Americans.

And because a State court heard and ruled on that class action, it went up to the U.S. Supreme Court, and the U.S. Supreme Court unanimously came down with Brown v. Board of Education.

We pray there is not some class of people in this country being damaged the way African-American children were being damaged at that time because if they go into the courts in the wake of this legislation, the fix is in, this Senate has closed the court doors to them, this White House has closed the court doors to them, these corporate interests have closed the court doors to them. It is a shame. It is wrong. It is one heck of a message to send to this country.

It is disappointing to me that the Senate has refused to listen to wise counsel of our state legislatures, our state law enforcement officers, our state judges and even the views expressed by our federal judiciary since they are the institutions that we are affecting by enacting this legislation.

I predict this legislation will be manipulated by well-paid corporate defense lawyers to create complex, expensive and lengthy litigation over the criteria and factors in the bill and whether they apply to a particular case. Unfortunately, one of the great boons of this legislation, to the extent it does not simply deter class actions brought by consumers, is that it will make them more costly, burdensome and complicated.

The so-called Class Action Fairness Act falls short of the expectation set by its title. It will leave many injured parties who have valid claims with no avenue for relief, and that is anything but fair to the ordinary Americans who look to us to represent them in the United States Senate.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. SPECTER . Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. SPECTER . Mr. President, I thank my colleagues for moving this bill through to final conclusion where we are now scheduled to vote on final passage at 3 o'clock this afternoon.

We took this bill up in the Judiciary Committee a week ago today. Although there was some conjecture we could not pass the bill out of committee, in the morning we did so. We started the floor debate Monday afternoon. I led off in my capacity as chairman of the Judiciary Committee. We had a number of amendments and we have worked the will of the Senate. A number of amendments have been withdrawn, a number of amendments have been defeated.

The Senator from Wisconsin, Senator Feingold, offered an amendment which would have imposed time limitations on the courts on their handling of class action cases. I told him I thought it was a good idea, but I was constrained to vote against it because we have an understanding_implicit or explicit, I am not quite sure which because I was not party to it_with the House of Representatives that if we sent them a so-called clean bill without amendments, they would accept the Senate version. I told Senator Feingold as to his issue, I have had a number of complaints about delays in the administration of the courts. That is something the Judiciary Committee will take up.

I make it plain we will not deal with judicial independence or the court's discretionary functions, but when it comes to delays, that is a matter of congressional oversight on our fundamental responsibility to decide how many judges there will be at all levels. That is an issue we will take up.

The Senator from South Carolina, Senator Lindsey Graham, had proposed an amendment on disclosure, on transparency, sunshine. There again, that is a good idea. We have worked through a colloquy. I have not seen the final form, but I was discussing it with Senator Graham again this morning and the staffs are working that out. I anticipate we will have that finished.

The Senator from Illinois, Senator Durbin, had a proposed amendment on mass actions. We had worked through to see if we could formulate a colloquy. That has not reached fruition. Senator Durbin has decided to withdraw. That is a complex matter which we took up in committee 2 years ago. We made some modifications in the bill, but it is very important as this bill moves forward to become law that it be dealt with as a procedural change, that there not be substantive changes in the rights of the parties.

We have sought to move into the Federal courts in order to avoid forum shopping on judges or courts where there is some indication of a prejudicial predisposition. It is my hope as this class action bill is interpreted that it will not effect substantive rights.

There is a tender issue on selection of State law where there are a number of States involved. There is a lot of commonality in our law injected through the uniform commercial code and interjected through the restatement of varieties of substantive matters such as torts, where class actions can be certified, so it is my hope this bill, this act, will not be interpreted to curtail a substantive right.

There is a great deal of wisdom in the Senate on this bipartisan bill which has received considerable support on the Democratic side of the aisle as well as very strong support on the Republican side of the aisle to move through without a conference where we might have had a bill which was a great deal more restrictive of plaintiffs' rights, where we might have had a bill where the House provision calls for retroactive application. That would upset a great many existing lawsuits. All factors considered, we have come to a wise conclusion.

Mr CORNYN. Mr. President, I have spoken previously on this floor about my concerns that this legislation does not go far enough to address the scandal of litigation abuse that plagues our civil justice system. I stand by those concerns today. We can and should do more to reduce the burden of frivolous, expensive litigation. Our Nation's economic competitiveness in the 21st century depends on it.

We should consider additional measures that better level the playing field, that produce a good flow of information and transparency, and that provide a clear relationship between plaintiffs and their attorneys.

But while this modest legislation could do more, I believe that S. 5 is an important first step to reform_a step in the right direction.  **[*S1245]**


By providing for removal of a greater number of class action lawsuits from State court to Federal court and by requiring that judges carefully review all coupon settlements and limit attorneys' fees paid to these settlements to the value actually received by class members, it sets the groundwork for a much needed reform.

In the spirit of bipartisan cooperation that drove this bill forward, I set aside my concerns for now and am proud to co-sponsor.

I thank my friend from Iowa, Senator Grassley, for his leadership and persistence on this issue. For five consecutive Congresses, dating back to 1997, Senator Grassley has taken up the mantel of class action reform and he deserves a great deal of credit for it.

Finally, I want to thank Chairman Specter and Senator Hatch for their continued stewardship. Without them, this bill would not be where it is today.

Mr. SPECTER . Mr. President, I have a few minutes remaining on my 10 minutes. I notice the distinguished Democratic leader is here, but I said I would yield to the Senator from Connecticut, Senator Dodd. He has a very unique spot in my evaluation of Senators because he was elected in the class of 1980. He reminds me there were 18 of us elected, and the Democrats, through their tenacity and wisdom, have maintained 50 percent of their class and the Republicans, on the other hand, have only retained 12 1/2 percent. Of course, we started with 16 to 2, so let the record show that the Republicans from the class of 1980 still outnumber the Democrats 2 to 1.

I yield to Senator Dodd.

Mr. DODD . Mr. President, I thank my colleague from Pennsylvania. One of the great pleasures over the past 24 years has been to serve with Arlen Specter in this body.

We are nearing the end of consideration of this bill.

I would like to spend just a few minutes to offer some thoughts on it.

First, a brief word about the process by which this bill has been considered by the Senate. I don't think it is an overstatement to say that_aside from the details of the legislation itself_the most important factor in its expected passage is the unanimous consent agreement that was put into place at the onset of the Senate's deliberations on the bill.

In that respect, the two leaders_Senator Frist and Senator Reid_are to be greatly commended. Either one could have refused to enter into such an agreement_which would have made the prospects for passage of this legislation far less certain.

As I said yesterday, a determined minority of even one Senator can impede or block consideration of legislation in this body. Either Leader, by declining to enter into a consent agreement, could have paved the way for others to employ dilatory, delaying, and distracting tactics.

However, both Senators Reid and Frist agreed that only relevant amendments to the bill would be in order. No doubt, that agreement displeased some members in both caucuses. However, it helped ensure that the debate we have had on this bill has been substantive, orderly, and deliberate. And it minimized the risk that this bill would be derailed by contentious issues wholly unrelated to the substance of the bill itself.

So the cooperation shown by the two leaders on this legislation cannot be overemphasized. Senator Reid is to be particularly commended in this regard, given that a majority of the members of his caucus do not appear to support the bill.

The consent agreement that he entered into with the majority leader demonstrates his commitment to working in as cooperative a manner as possible for the good of the Senate.

Allow me to spend a few moments talking about the substance of this legislation. We have heard a lot of characterizations over the past few days to describe the bill and the problems it seeks to correct. I am among those who believe that our class action system is in need of reform. There are clear abuses and shortcomings that have not served the interests of the parties or the interests of justice. And this bill takes a number of significant steps to remedy those abuses and shortcomings.

To those who say that this legislation will have dire consequences on the quality of justice in our Nation, I must respectfully disagree. And I do so for a number of reasons.

First, it is important to view this legislation in a larger perspective. According to one estimate, .92 percent of all cases filed in Federal courts over the past three decades have been class actions. This point deserves special emphasis: from 1972 to 2002, less than one percent of all cases filed in the Federal courts of our Nation have been class actions.

Not all states compile similar data, so there are no comparable statistics for class actions as a percentage of all cases filed in State courts. However, there is every reason to believe that the percentage of class actions filed in state courts is at least as minuscule as the percentage filed in state courts. My point is simply this: that this legislation will affect only a very small percentage of all cases filed in our courts_less than 1 percent.

Some would argue that if even one just case in America were denied by this bill, that would be an unit result, and merit the defeat of this bill. I am not unsympathetic to that argument. Indeed, I agree wholeheartedly with it. Our system of justice is premised on the belief that equal justice under law is the right of each and every citizen.

Even one just cause unjustly denied offends our Nation's commitment to justice and fair play. Any legislation that would deny to even one citizen the right to equal justice deserves opposition, at least in this Senator's opinion.

But this bill does not deny such a right. It does not even come close. It will not close the courthouse door on a single citizen.

Moreover_unlike other legislation that has been considered by this body_it will not cap damages in a single case.

It will not cap attorney's fees for a single class action lawyer.

It will not extinguish or alter in any way a single pending class action.

Nor does it impose more rigorous pleading requirements or evidentiary standards of proof in a single class action.

In short, no citizen will in any way lose his or her right to go to court and seek the redress of grievances.

My colleagues might ask: if this bill will not do any of these things, then what will it do?

First and foremost, it will put an end to the kind of abusive forum-shopping that has grown in frequency and notoriety over the past few years.

Opponents of this bill claim that, by in any way altering the procedural rules governing class actions, substantive rights will be denied.

However, this argument is trumped by a little document called the U.S. Constitution.

Article III of that document extends Federal jurisdiction to suits between "citizens of different States." The purpose of extending this "diversity jurisdiction" to citizens is to prevent the citizens of one State from being discriminated against by the courts of another State.

However, over the years, this purpose has been increasingly thwarted by clever pleading practices of enterprising class action attorneys.

By adding a plaintiff or a defendant to a lawsuit solely based on their citizenship, they have been able to defeat efforts to move cases to Federal court_even cases involving multiple parties from multiple States. Likewise, by alleging an amount in controversy that does not trigger the $75,000 threshold, they have thwarted Federal jurisdiction_even in cases alleging millions if not billions of dollars in damages.

In short, current pleading practice by the class action plaintiffs bar has very effectively denied Federal jurisdiction over cases that are predominantly interstate in nature. These are precisely the kinds of cases the Framers thought deserve to be heard in Federal courts.

All that this legislation does in this respect is bring pleading practice more into line with constitutional requirements. Cases that are primarily intra- rather than interstate in nature may continue to be heard in State courts.

But those that are clearly interstate in nature will now be more likely to be heard in Federal court, where they belong.

The notion that cases will be "dismissed" as a result of this and other changes created by this legislation is, in my view, patently absurd. No provision of this legislation requires a single case to be dismissed. Plaintiffs' attorneys may end up spending more time in **[*S1246]** Federal court than State court. They may not be able to pick a class of plaintiffs that is as large as they can now, or that encompasses as many States. They may end up bringing cases in two or more courts that they might have preferred to bring in a single court. But they will not find their cases dismissed.

As my friend and colleague from Utah, Senator Hatch, said earlier, good lawyers will find a way to do well under this bill. Good lawyers will do well in Federal courts, as they have done well in State courts. In that sense, then, this bill is exceedingly modest.

We write our laws on paper. We do not etch them in stone. I am confident that the bill we have written here is a good one. I believe that, if and when it becomes law, it will withstand

the test of time. Likewise, I am confident that if in the future any shortcomings emerge, we will have the good sense to fix them.

By way of analogy, I remind our colleagues of another reform bill that was considered several years ago. The Senator from New Mexico, Senator Domenici, and I wrote a bill to address frivolous securities lawsuits directed primarily at high-tech companies. The bill was on the floor of the Senate for about 2 weeks, if I recall correctly. A number of amendments were offered. It ultimately became law, despite a Presidential veto.

There were those who predicted dire consequences as a result of that bill's enactment. We were told that securities lawsuits would dry up, that harmed investors would have no recourse.

Well, here we are, about 9 years after enactment of that law, and there has been no appreciable drop-off in investor lawsuits and recoveries. In fact, some of the most vehement opponents of that law in the trial bar continue to be some of the most successful under the law.

In sum, we have written a good bill here. It deserves to become law. I hope that it will. I want to acknowledge those of our colleagues who are most responsible for bringing us to this point: Senators Frist and Reid, as I have already mentioned; as well as Senators Grassley, Kohl, Hatch, Feinstein, Carper, and others. I also want to acknowledge the hard work of their staff, who in some cases have worked on this legislation for a number of years.

So, to briefly reiterate, I thank my leader, Senator Reid, and the majority leader, as well. We would not be in the position we are in, I have said on several occasions over the last 3 or 4 days, had the Democratic leader_particularly because the minority always has unique rights in this Senate to delay or stop legislation moving at all.

Even though my colleague from Nevada has strong reservations, which I am sure he will express shortly, about the substance of this bill, as a result of his willingness to let a product move forward, we are here today about to adopt a piece of legislation. When I hear some of the comments being made about whether Democrats are willing to work on issues, even ones they disagree with, that is belied by the fact that the minority leader made it possible for us to be here to deal with all relevant, germane amendments on this bill. I thank the Senator from Nevada for his efforts in allowing that to go forward.

There has been a lot of talk over the last several days. Classically, with a matter like this the opponents and proponents have a tendency to engage in, if I may say with all due respect, a little bit of hyperbole. But it's important to stick to the facts. And one important fact that should shape how we view this legislation is that less than 1 percent of all cases filed in the Federal courts since 1972 have been class action cases. I searched very tirelessly to find out the percentages in State courts. I could not come up with an exact number. I am told by those knowledgeable the number of class actions filed in State courts as a percentage of all State actions is not substantially different than the Federal courts, and is likely to be even smaller given the large number of State cases filed generally. What is beyond dispute is that a very small percentage of the cases filed in our court systems are class actions.

Obviously, if anyone is denied access to the courts in this country because of things we do here, then, obviously, justice is denied to someone who cannot make that case.

We have not done that. This system of class action is in need of reform.

This is about money. Unfortunately, it is not about the money that legitimate plaintiffs get; it is about the money that is either saved by a defendant or made by the plaintiffs' bar. That is what this is about, and forum shopping around the country, finding the venue that gets you

the best possible result for your particular point of view_not exactly what the Founders had in mind when they drafted the diversity provisions of article III of the Federal Constitution. If you want to change the Constitution and say that no longer should diversity apply, then you may try to do that. If that is what opponents of this legislation believe, then they can try to amend the Constitution to in effect keep all these cases in State courts. But since the founding of this Republic, the diversity clause of article III of the Constitution has been very clear.

Mr. REID . Mr. President, I ask unanimous consent that the Senator from Connecticut be allowed 5 more minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. DODD . Mr. President, I thank my colleague. I will go quickly.

The point is, this is about court reform more than tort reform. About fifteen months ago, as many of my colleagues recall, we worked out this bill. We struck an agreement, a good one. Unfortunately, the majority here, last year, decided not to bring this bill up. I believe they made a mistake in doing that. We could have wrapped this bill up in January of 2004 but did not do it. This agreement has been ready for the Senate's consideration for over a year. We have had good debate on some of these amendments, and we have drafted a pretty good bill. It is not written in marble; it is not written in granite; it is written on paper. And we think it is going to provide equal access to the courts. It is going to provide a fairness to plaintiffs and defendants, to see that they get a just decision regarding the matters that are brought before the courts.

So to my colleagues who are strong opponents of all of this, believe me, this bill is a simple matter of court reform. It will help ensure that victims of wrongdoing get fair compensation and relief, rather than a raw deal that lines the pockets of those who either allegedly represent them or those who are on the defendant side who want to avoid some of the payments they would otherwise have to make.

There are no caps in this bill. It does not impose any rigorous procedural requirements or evidentiary requirements of proof at all. In short, no citizen will in any way lose his or her right to go to court to seek redress for their grievances.

You get anecdotal stories, hearing of one case or another. This bill is about court reform, getting a system right. It is long overdue. It does not mean that every tort reform measure that comes before us ought to be supported, but on this one, those of us who worked on this believe we have done a good job. We were asked to make four improvements in this bill. We made 12 of them over a year ago.

I thank the Senator from Delaware, Mr. Carper, Senator Feinstein, Senator Schumer, Senator Landrieu, and other Members on the Democratic side who have worked on this issue to make this possible.

Again, my thanks_and it should be noted_to the distinguished Senator from Nevada, Mr. Reid, and Senator Frist, who struck a procedural agreement so the Senate could consider this bill.

The PRESIDING OFFICER. The Democratic leader.

Mr. REID . Mr. President, yesterday on the Senate floor I expressed serious concerns about this legislation that is pending before the Senate. I explained at that time that this legislation, in my opinion, is one of the most unfair, anti-consumer pieces of legislation to come before the Senate in a long time. It slams the courthouse doors on a wide range of

injury plaintiffs, it turns federalism upside down by preventing State courts from hearing State law claims, and it limits corporate accountability at a time of rampant corporate scandals. Instead of turning up **[*S1247]**
the heat on corporate fraud, this bill lets corporate wrongdoers off the hook.

At the beginning of the debate yesterday, I said this is a bad piece of legislation, but there are going to be some amendments offered, amendments that will improve this bad legislation. They would have made significant improvements. But my hope of these amendments passing was very short lived. It did not happen. Over the last 2 days, the Senate has turned away each and every effort to make this bill less offensive. Every single amendment_each a message of fairness_was debated and turned down. That is a shame. Proponents of this bill explained their opposition to the common sense amendments by describing the current bill as a "delicate compromise." I have heard that so many times. I spoke to Congressman Sensenbrenner, the chairman of the Judiciary Committee in the House, who is supposedly the gatekeeper on this legislation. He said: We are going to accept legislation that is in keeping with what you did last time. Well, when he said, What you did last time, he was talking about the bill that came out of the Senate Judiciary committee and was here on the floor. These changes would not have dramatically altered that.

If you went downtown to see what K Street wanted with these amendments, of course they were against all of them because, in my opinion, this legislation slams the door on most everyone who wants to bring a case and use class action as the tool for coming to court.

The debate yesterday was characterized by two significant misunderstandings about the bill. First, proponents claimed that under this bill, class action lawsuits could stay in State courts as long as two-thirds of the plaintiffs are from a single State. Well, in fact, the bill reverses longstanding Federal court diversity rules by saying that no matter how many plaintiffs are from a single State, the case can still be removed to Federal court if the defendant corporation is incorporated in a different State. Keep in mind, of the Fortune 500 companies, 58 percent of them are incorporated in Delaware, so the majority of class action lawsuits would be removable just on that figure alone.

For example, in the State of Nevada, at the famous Yucca Mountain, the contractors were in such a rush, the Department of Energy was in such a rush to drill a hole in this mountain, they had a huge auger. The size of this auger was halfway to the top of the second story of this Chamber. It was a huge machine. It dug a hole almost as big as this Chamber_a big tool going right through that mountain. They knew they were coming to a formation there and that the toxic mineral dust from drilling the formation would cause people to get really sick with silicosis. They knew that, but they were in such a rush that they would not even wet down this big tool to prevent the dust. They drilled dry, so to speak, and this toxic dust flew all over and the workers inhaled it. And today, as we speak, people are dying as a result of that.

Well, there has been a request for the case to be considered a class action_under the old law in existence before this passes_that would allow all those workers to join together in a class action and have it certified. Even though well over two-thirds of the plaintiffs are residents of Nevada, the harm was caused in Nevada, and the defendants were obviously doing business in Nevada, a defendant incorporated in a State other than Nevada could remove the case fromNevada State court. That is how this bill works. It is just unfair.

The second mischaracterization of this legislation is that supporters make it sound as though all we are talking about is venue: These cases will simply move from State court to Federal court and proceed just the same. That is simply not true. Under Supreme Court precedents that this bill does nothing to change, Federal judges routinely dismiss class action lawsuits based on State law. Those cases that are not dismissed go to the back of a very long line in the overburdened Federal court system.

One of the foremost experts on class actions is a man who is also an expert in antitrust law. He is a professor at Harvard Law School. His name is Arthur Miller. Here is what he said:

Federal courts have consistently denied class certification in multi-state lawsuits based on consumer as well as other state laws. . . . not a single Federal Circuit Court has granted class certification for such a lawsuit, and six Circuit Courts have expressly denied certification.

The rejection of the Feinstein-Bingaman amendment shows this bill's true colors. And I admire greatly Senator Feinstein for having the courage to do the right thing and say: I have been one of the original pushers of this legislation, but what we are trying to do is unfair, and the Bingaman amendment should be adopted. She joined with him for the Feinstein-Bingaman amendment.

So, if the sponsors merely wanted federal court review of lawsuits with national implications, they would not object to an amendment making clear that federal judges may not dismiss these cases.

But without that change, the truth is plain to see: This bill is designed to bury class action lawsuits, to cut off the one means by which individual Americans ripped off by fraudulent or deceptive practices can band together to demand justice from corporate America.

What does this change mean in the real world? It means, for example, that cases like the one brought by Shaneen Wahl will not be able to go forward. Shaneen is a 55 year old woman, and she was diagnosed with breast cancer. Her health insurance company raised the rates on her insurance premiums from $194 a month to $1,800 a month_a little jump in price.She found out that her insurance company was improperly doing this for tens of thousands of other chronically ill patients. She got a lawyer, they banded together in a class action lawsuit, and they prevailed in state court. Under this legislation, the case would be dismissed.

Another breast cancer survivor also a Florida woman, is 40-year-old Susan Friedman. Susan's insurance company removed her case to federal court, where it was dismissed. She is an unlucky example of what will happen to more people under this legislation. This is the fate of many other class action lawsuits under the bill the Senate will soon pass.

Unfortunately, insurance companies are ripping people off all the time, and this legislation will give the biggest, best businesses in the world, the insurance companies, more money.

In the real world, this legislation means that when a phone company systematically bills customers for services they had cancelled or a plumbing company routinely overcharges customers by $10, those practices will not be brought to light. The dollar amounts would be too small. Why should the plumbing company get an extra $10 from everyone? I guess what this legislation means is if you cheat a lot, you can take them to court, but if you cheat just a little bit, lots and lots of times, have at it, because no one can do anything about it. This is the "cheat a little bit" legislation.

This legislation is not good. It will help the tobacco industry avoid accountability. It virtually guarantees that tobacco-related cases will end up in federal court where they won't be able to proceed. I had a person, Fritz Hahn, who lived on my property in Nevada to keep an eye on things. He was there for many years. He started smoking when he was a teenager. He is now dead as a result of tobacco. He smoked too much. He got throat cancer. He died a slow, terrible death. But for class action lawyers, tobacco companies would have a free rein, and they would be able to kill a lot more people like Fritz Hahn.

That is what class action is all about, joining together and going after those companies who do bad things to people. However, this legislation will make it so much more difficult. That is

why numerous consumer groups, including the Campaign for Tobacco-Free Kids, the Leadership Conference on Civil Rights, the Consumers Union, the AFL-CIO, Public Citizen, and many others have urged the Senate to reject the bill.

I ask unanimous consent to print in the Record scores and scores of companies that support my statement against this legislation.

There being no objection, the material was ordered to be printed in the Record, as follows:
  [*S1248]

National Organizations Opposed to Federal Class Action Legislation as of May 21, 2004

AARP, ADA Watch/National Coalition for Disability Rights, AFL-CIO, Alliance for Healthy Homes, Alliance for Justice, Alliance for Retired Americans, American Association of People with Disabilities, American Association of University Women, American Cancer Society, American Heart Association, American Federation of Government Employees, American Federation of State, County and Municipal Employees, American Lung Association, American-Arab Anti-Discrimination Committee, Americans for Democratic Action, Bazelon Center for Mental Health Law, Brady Campaign to Prevent Gun Violence, United with the Million Mom March, and Campaign for Tobacco Free Kids.

Center for Disability and Health, Center for Justice and Democracy, Center for Responsible Lending, Center for Women Policy Studies, Civil Justice, Inc., Clean Water Action, Coalition to Stop Gun Violence, Commission on Social Action of Reform Judaism, Communication Workers of America, Consumer Federation of America, Consumers for Auto Reliability and Safety, Disability Rights Education and Defense Fund, Earthjustice, Education Law Center, Environmental Working Group, Epilepsy Foundation, Families USA, Federally Employed Women, Friends of the Earth, and Gray Panthers.

Greenpeace, Homeowners Against Deficient Dwellings, Jewish Labor Committee, Lawyers' Committee for Civil Rights Under Law, Leadership Conference on Civil Rights, Mexican American Legal Defense and Educational Fund, Mineral Policy Center, NAACP Legal Defense and Education Fund, National Alliance of Postal and Federal Employees, National Asian Pacific Legal Consortium, National Association for the Advancement of Colored People, National Association for Equal Opportunity in Higher Ed, National Association of Consumer Advocates, National Association of Consumer Agency Administrators, National Association of the Deaf, National Association of Protection and Advocacy Systems, National Bar Association, National Campaign for Hearing Health, National Center on Poverty Law, and National Coalition on Black Civic Participation.

National Committee on Pay Equity, National Consumer Law Center, National Consumer's Coalition, National Council of La Raza, National Employment Lawyers Association, National Fair Housing Alliance, National Gay and Lesbian Task Force, National Law Center on Homeless & Poverty, National Legal Aid and Defender Association, National Organization for Women, National Partnership for Women & Families, Natural Resources Defense Council, National Workrights Institute, National Women's Health Network, National Women's Law Center, North Carolina Justice Center, NOW Legal Defense and Education Fund, People for the American Way, Public Citizen, andPride at Work.

Project Equality, Religious Coalition for Reproductive Choice, Sargent Shriver National Center on Poverty Law, Service Employees International Union, Sierra Club, Tobacco Control Resource Center, Tobacco Products Liability Project, UNITE!, United Food and Commercial Workers International Union, United Steelworkers of America, USAction, U.S. Public Interest Research Group, Violence Policy Center, and Women Employed.

Government Organizations Opposed to Class-Action Legislation

Conference of Chief Justices (State Supreme Court Justices), Judicial Conference of the
United States (Federal Judges Association), Attorney General of California, Bill Lockyer,
Attorney General of Illinois, Lisa Madigan, Attorney General of Maryland, J. Joseph Curran,
Jr., and Attorney General of Minnesota, Mike Hatch.

Attorney General of Missouri, Jeremiah W. Nixon, Attorney General of Montana, Mike
McGrath, Attorney General of New Mexico, Patricia A. Madrid, Attorney General of New York,
Eliot Spitzer, Attorney General of Oklahoma, W.A. Drew Edmondson, Attorney General of
Vermont, William H. Sorrell, and Attorney General of West Virginia, Darrell Vivian McGraw, Jr.

Mr. REID. Organizations are against it. State court judges, Federal judges, many state
Attorneys General, and the National Conference of State Legislators are against it. Officials in
our home States are telling us not to do this. The only groups that want us to pass this bill
are those representing defendants in these lawsuits. Sure, they want to be relieved of the
burden of accountability. We shouldn't let them. This is not just a battle between big
business and lawyers. It is more. It is certainly more anti-lawyer than I would like to think.
But that is what we hear coming from the White House.

At a meeting in Las Vegas, the President said: The most hurtful thing in the American
economy today is lawyers. I don't believe that, as indicated by the instances I gave about
tobacco. Sure there are bad lawyers who bring meritless cases, and there should be
something we do to crack down on them. But this bill is not about punishing bad lawyers.
More fundamentally this bill is about limiting access to civil courts and hurting consumers.

One of the grievances that inspired our Founding Fathers to revolt against King George was
they couldn't bring their grievances to a body.

The PRESIDING OFFICER. The time of the Senator has expired.

Mr. REID. What time is that? I will use leader time.

The PRESIDING OFFICER. The Senator had 10 minutes.

Mr. REID. I thank the Chair.

As I was saying, one of the grievances that inspired our Founding Fathers to revolt against
King George was limited access to the civil courts. That was based on the rights secured in
the year 1215, when King John signed the Magna Carta. King John couldn't sign his name, so
he put an X. From that day forward, one of the things that was brought over the ocean and is
now in our common law, when the Founding Fathers developed our country, is that you bring
to court your grievances. They had a jury that could sit down and talk about what was good
and bad about your case. Access to the courts is a basic right in our democracy, and after
today it will be a diminished right.

These rights are being denigrated, taken away from us with this legislation. It is too bad. A
basic right that has been in existence since we have been a country, they are chipping away
at.

I am going to vote against this ill-considered bill. I recognize it is going to pass. I think that
is too bad. I can say this without any question: Downtown beat us. There is no question
about that.

The PRESIDING OFFICER. The majority leader is recognized.

Mr. FRIST . Mr. President, in a few minutes we will be voting on the Class Action Fairness Act. We have before us truly a bipartisan bill that was introduced with 32 cosponsors, 24 Republicans and 8 Democrats. It was voted out of the Judiciary Committee on a strong bipartisan vote. Every vote on every amendment that has been offered has been bipartisan, if we look at the vote tallies. I do anticipate that in a few minutes our vote on final passage will be strongly bipartisan as well.

There are a few misconceptions about the bill that I would like to definitively dispel in these final moments. This bill does not close the courthouse doors to injured or aggrieved plaintiffs. It does not. This is court reform. It is designed to rein in lawsuit abuses, and it does just that. The plaintiff may end up in Federal court, yes, rather than State court, but no citizen will lose his or her right to bring a case_no citizen. In fact, the Class Action Fairness Act will protect plaintiffs in large interstate class action cases. No longer will predatory lawyers be able to negotiate deals that leave their clients with coupons while they take home millions. Plaintiffs will now be covered by a consumer bill of rights for the first time, a consumer bill of rights that will require lawyer's fees for coupon settlements to be based either on the value of the coupons that are actually redeemed or on the hours actually billed.

Take the case such as the one in my home State of Tennessee involving a Memphis car dealer. It was discovered that a dealership was instructing its employees to cheat car purchasers by as much as $2,000. Numerous residents were affected so a class action suit was filed. The suit was eventually settled, and the plaintiffs received a coupon for $1,200, but that coupon could only be used if they went back to the same dealer who had cheated them in the first place and bought another car. Meanwhile, the trial attorneys who settled the suit received $1.3 million in legal fees. A number of customers were understandably upset that in order to receive any financial benefit, they would have to take that coupon and go back to the very same dealer, while at the same time the lawyers were able to take their money and put it right into their pockets. The legislation before us today will put a stop to such unfair practices.

Second, the class action bill will help end the phenomenon that we all recognize known as forum shopping. Aggressive trial lawyers have found that a few counties are lawsuit friendly, and in these select State courts, judges are quick to certify a class action and juries are known to grant extravagant damage awards. Meanwhile, this same defendant can face copycat cases all **[*S1249]** across the country, each jury granting a different result. These counties may have little or no geographic relationship to either the plaintiff or to the defendant, but the trial lawyers know that simply the threat of suing in these particular counties can lead to huge, extravagant cash settlements. One study estimates that virtually every sector of the U.S. economy is on trial in only three State courts.

The Class Action Fairness Act moves those large nationwide cases that genuinely impact interstate commerce to the Federal courts where they belong. The Class Action Fairness Act is a good bill. It is a fair bill. It is a significant first step in putting an end to the lawsuit abuses that undermine our legal system.

I commend my colleagues for their hard work. I thank, in particular, Senator Grassley, the bill's lead sponsor, who has been working on this issue for a decade; Senator Specter, for leading the bill expeditiously through the Judiciary Committee and on to the floor; Senator Hatch, who has been a tireless advocate for legal reform and class action reform and has helped to manage this bill on the floor; Senator Cornyn, who has been tireless in his presence and participation on this class action bill over the last several days; the bill's Democratic supporters, especially Senator Kohl, Senator Dodd, Senator Carper, Senator Ben Nelson; all have worked and reached across the aisle despite great pressure from the bill's opponents, and for that I thank them.

Finally, I thank the Democratic leader, Harry Reid, for working on a process. We just heard him speaking on the floor against the bill. In spite of that personal feeling toward this bill, he has worked in a real leadership manner_working with us to deal with the bill in a timely and expeditious manner on the floor.

The American people expect and deserve a government that works and leaders who work together. I think they have seen it play out very well on this bill. They did elect us to govern toward meaningful solutions. The bill, I believe, demonstrates we are accomplishing just that. We are meeting the challenge and we are moving America forward. I look forward to quick passage of the bill in the House and being able to send it to the President's desk.

Mr. President, we will vote very shortly. So that Members can plan on their schedules, this upcoming vote on final passage of the class action fairness bill will be the last vote of the evening.

Following this vote, we will have a few Members making statements. We will remain in session for a short period today. The Senate will not be in session tomorrow and we will reconvene on Monday.

On Monday, the plans are to begin debate on the nomination of Michael Chertoff to be Secretary of Homeland Security. At closing today, we will reach an agreement that will provide for debate on the Chertoff nomination during Monday's session, with a vote to occur on that nomination on Tuesday.

Therefore, I am prepared to announce we will not have any votes on Monday. I will have more to say about the precise timing of the debate and vote later today when we wrap up our business. Once again, I thank all Members for their cooperation and assistance throughout the debate on the class action bill. I believe we are ready for final passage.

Mr. President, I ask for the yeas and nays on the bill.

The PRESIDING OFFICER (Mr. Coleman). Is there a sufficient second? There is a sufficient second.

The question is on the engrossment and third reading of the bill.

The bill was ordered to be engrossed for a third reading and was read the third time.

The PRESIDING OFFICER. The bill having been read the third time, the question is, Shall the bill pass?

The yeas and nays have been ordered. The clerk will call the roll.

The legislative clerk called the roll.

Mr. McCONNELL. The following Senators were necessarily absent: the Senator from Pennsylvania (Mr. Santorum) and the Senator from New Hampshire (Mr. Sununu).

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced_yeas 72, nays 26, as follows:

[Rollcall Vote No. 9 Leg.]

YEAS - 72

Alexander
Allard
Allen
Bayh
Bennett
Bingaman
Bond
Brownback
Bunning
Burns
Burr
Cantwell
Carper
Chafee
Chambliss
Coburn
Cochran
Coleman
Collins
Conrad
Cornyn
Craig
Crapo
DeMint
DeWine
Dodd
Dole
Domenici
Ensign
Enzi
Feinstein
Frist
Graham
Grassley
Gregg
Hagel
Hatch
Hutchison
Inhofe
Isakson
Jeffords
Johnson
Kohl
Kyl
Landrieu
Lieberman
Lincoln
Lott
Lugar
Martinez
McCain
McConnell
Murkowski
Nelson (NE)
Obama
Reed

Roberts
Rockefeller
Salazar
Schumer
Sessions
Shelby
Smith
Snowe
Specter
Stevens
Talent
Thomas
Thune
Vitter
Voinovich
Warner


NAYS - 26
Akaka
Baucus
Biden
Boxer
Byrd
Clinton
Corzine
Dayton
Dorgan
Durbin
Feingold
Harkin
Inouye
Kennedy
Kerry
Lautenberg
Leahy
Levin
Mikulski
Murray
Nelson (FL)
Pryor
Reid
Sarbanes
Stabenow
Wyden


NOT VOTING - 2
Santorum
Sununu


The bill (S. 5) was passed, as follows:


S. 5

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. SHORT TITLE; REFERENCE; TABLE OF CONTENTS.

(a) Short Title._This Act may be cited as the "Class Action Fairness Act of 2005".

(b) Reference._Whenever in this Act reference is made to an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of title 28, United States Code.

(c) Table of Contents._The table of contents for this Act is as follows:

Sec. 1. Short title; reference; table of contents.

Sec. 2. Findings and purposes.

Sec. 3. Consumer class action bill of rights and improved procedures for interstate class actions.

Sec. 4. Federal district court jurisdiction for interstate class actions.

Sec. 5. Removal of interstate class actions to Federal district court.

Sec. 6. Report on class action settlements.

Sec. 7. Enactment of Judicial Conference recommendations.

Sec. 8. Rulemaking authority of Supreme Court and Judicial Conference.

Sec. 9. Effective date.

SEC. 2. FINDINGS AND PURPOSES.

(a) Findings._Congress finds the following:

(1) Class action lawsuits are an important and valuable part of the legal system when they permit the fair and efficient resolution of legitimate claims of numerous parties by allowing the claims to be aggregated into a single action against a defendant that has allegedly caused harm.

(2) Over the past decade, there have been abuses of the class action device that have_

(A) harmed class members with legitimate claims and defendants that have acted responsibly;

(B) adversely affected interstate commerce; and

(C) undermined public respect for our judicial system.

(3) Class members often receive little or no benefit from class actions, and are sometimes harmed, such as where_

(A) counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value;

(B) unjustified awards are made to certain plaintiffs at the expense of other class members; and

(C) confusing notices are published that prevent class members from being able to fully understand and effectively exercise their rights.

(4) Abuses in class actions undermine the national judicial system, the free flow of interstate commerce, and the concept of diversity jurisdiction as intended by the framers of the United States Constitution, in that State and local courts are_

(A) keeping cases of national importance out of Federal court;

(B) sometimes acting in ways that demonstrate bias against out-of-State defendants; and

(C) making judgments that impose their view of the law on other States and bind the rights of the residents of those States.

(b) Purposes._The purposes of this Act are to_

(1) assure fair and prompt recoveries for class members with legitimate claims;

(2) restore the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate cases of national importance under diversity jurisdiction; and

(3) benefit society by encouraging innovation and lowering consumer prices. **[*S1250]**


SEC. 3. CONSUMER CLASS ACTION BILL OF RIGHTS AND IMPROVED PROCEDURES FOR INTERSTATE CLASS ACTIONS.

(a) In General._Part V is amended by inserting after chapter 113 the following:

"CHAPTER 114_CLASS ACTIONS

"Sec.

"1711. Definitions.

"1712. Coupon settlements.

"1713. Protection against loss by class members.

"1714. Protection against discrimination based on geographic location.

"1715. Notifications to appropriate Federal and State officials.

"1711. Definitions

"In this chapter:

"(1) Class._The term 'class' means all of the class members in a class action.

"(2) Class action._The term 'class action' means any civil action filed in a district court of the United States under rule 23 of the Federal Rules of Civil Procedure or any civil action that is removed to a district court of the United States that was originally filed under a State statute

or rule of judicial procedure authorizing an action to be brought by 1 or more representatives as a class action.

"(3) Class counsel._The term 'class counsel' means the persons who serve as the attorneys for the class members in a proposed or certified class action.

"(4) Class members._The term 'class members' means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

"(5) Plaintiff class action._The term 'plaintiff class action' means a class action in which class members are plaintiffs.

"(6) Proposed settlement._The term 'proposed settlement' means an agreement regarding a class action that is subject to court approval and that, if approved, would be binding on some or all class members.

"1712. Coupon settlements

"(a) Contingent Fees in Coupon Settlements._If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed.

"(b) Other Attorney's Fee Awards in Coupon Settlements._

"(1) In general._If a proposed settlement in a class action provides for a recovery of coupons to class members, and a portion of the recovery of the coupons is not used to determine the attorney's fee to be paid to class counsel, any attorney's fee award shall be based upon the amount of time class counsel reasonably expended working on the action.

"(2) Court approval._Any attorney's fee under this subsection shall be subject to approval by the court and shall include an appropriate attorney's fee, if any, for obtaining equitable relief, including an injunction, if applicable. Nothing in this subsection shall be construed to prohibit application of a lodestar with a multiplier method of determining attorney's fees.

"(c) Attorney's Fee Awards Calculated on a Mixed Basis in Coupon Settlements._If a proposed settlement in a class action provides for an award of coupons to class members and also provides for equitable relief, including injunctive relief_

"(1) that portion of the attorney's fee to be paid to class counsel that is based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (a); and

"(2) that portion of the attorney's fee to be paid to class counsel that is not based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (b).

"(d) Settlement Valuation Expertise._In a class action involving the awarding of coupons, the court may, in its discretion upon the motion of a party, receive expert testimony from a witness qualified to provide information on the actual value to the class members of the coupons that are redeemed.

"(e) Judicial Scrutiny of Coupon Settlements._In a proposed settlement under which class members would be awarded coupons, the court may approve the proposed settlement only after a hearing to determine whether, and making a written finding that, the settlement is fair, reasonable, and adequate for class members. The court, in its discretion, may also require that a proposed settlement agreement provide for the distribution of a portion of the value of unclaimed coupons to 1 or more charitable or governmental organizations, as agreed

to by the parties. The distribution and redemption of any proceeds under this subsection shall not be used to calculate attorneys' fees under this section.

"1713. Protection against loss by class members

"The court may approve a proposed settlement under which any class member is obligated to pay sums to class counsel that would result in a net loss to the class member only if the court makes a written finding that nonmonetary benefits to the class member substantially outweigh the monetary loss.

"1714. Protection against discrimination based on geographic location

"The court may not approve a proposed settlement that provides for the payment of greater sums to some class members than to others solely on the basis that the class members to whom the greater sums are to be paid are located in closer geographic proximity to the court.

"1715. Notifications to appropriate Federal and State officials

"(a) Definitions._

"(1) Appropriate federal official._In this section, the term 'appropriate Federal official' means_

"(A) the Attorney General of the United States; or

"(B) in any case in which the defendant is a Federal depository institution, a State depository institution, a depository institution holding company, a foreign bank, or a nondepository institution subsidiary of the foregoing (as such terms are defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)), the person who has the primary Federal regulatory or supervisory responsibility with respect to the defendant, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person.

"(2) Appropriate state official._In this section, the term 'appropriate State official' means the person in the State who has the primary regulatory or supervisory responsibility with respect to the defendant, or who licenses or otherwise authorizes the defendant to conduct business in the State, if some or all of the matters alleged in the class action are subject to regulation by that person. If there is no primary regulator, supervisor, or licensing authority, or the matters alleged in the class action are not subject to regulation or supervision by that person, then the appropriate State official shall be the State attorney general.

"(b) In General._Not later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement consisting of_

"(1) a copy of the complaint and any materials filed with the complaint and any amended complaints (except that such materials shall not be required to be served if such materials are made electronically available through the Internet and such service includes notice of how to electronically access such material);

"(2) notice of any scheduled judicial hearing in the class action;

"(3) any proposed or final notification to class members of_

"(A)(i) the members' rights to request exclusion from the class action; or

"(ii) if no right to request exclusion exists, a statement that no such right exists; and

"(B) a proposed settlement of a class action;

"(4) any proposed or final class action settlement;

"(5) any settlement or other agreement contemporaneously made between class counsel and counsel for the defendants;

"(6) any final judgment or notice of dismissal;

"(7)(A) if feasible, the names of class members who reside in each State and the estimated proportionate share of the claims of such members to the entire settlement to that State's appropriate State official; or

"(B) if the provision of information under subparagraph (A) is not feasible, a reasonable estimate of the number of class members residing in each State and the estimated proportionate share of the claims of such members to the entire settlement; and

"(8) any written judicial opinion relating to the materials described under subparagraphs (3) through (6).

"(c) Depository Institutions Notification._

"(1) Federal and other depository institutions._In any case in which the defendant is a Federal depository institution, a depository institution holding company, a foreign bank, or a non-depository institution subsidiary of the foregoing, the notice requirements of this section are satisfied by serving the notice required under subsection (b) upon the person who has the primary Federal regulatory or supervisory responsibility with respect to the defendant, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person.

"(2) State depository institutions._In any case in which the defendant is a State depository institution (as that term is defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)), the notice requirements of this section are satisfied by serving the notice required under subsection (b) upon the State bank supervisor (as that term is defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)) of the State in which the defendant is incorporated or chartered, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person, and upon the appropriate Federal official.

"(d) Final Approval._An order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under subsection (b).

"(e) Noncompliance if Notice Not Provided._

"(1) In general._A class member may refuse to comply with and may choose not to be bound by a settlement agreement or consent decree in a class action if the class **[\*S1251]** member demonstrates that the notice required under subsection (b) has not been provided.

"(2) Limitation._A class member may not refuse to comply with or to be bound by a settlement agreement or consent decree under paragraph (1) if the notice required under subsection (b) was directed to the appropriate Federal official and to either the State

attorney general or the person that has primary regulatory, supervisory, or licensing authority over the defendant.

"(3) Application of rights._The rights created by this subsection shall apply only to class members or any person acting on a class member's behalf, and shall not be construed to limit any other rights affecting a class member's participation in the settlement.

"(f) Rule of Construction._Nothing in this section shall be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon, Federal or State officials.".

(b) Technical and Conforming Amendment._The table of chapters for part V is amended by inserting after the item relating to chapter 113 the following:

"114. Class Actions

                1711".

    SEC. 4. FEDERAL DISTRICT COURT JURISDICTION FOR INTERSTATE CLASS ACTIONS.

(a) Application of Federal Diversity Jurisdiction._Section 1332 is amended_

(1) by redesignating subsection (d) as subsection (e); and

(2) by inserting after subsection (c) the following:

"(d)(1) In this subsection_

"(A) the term 'class' means all of the class members in a class action;

"(B) the term 'class action' means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action;

"(C) the term 'class certification order' means an order issued by a court approving the treatment of some or all aspects of a civil action as a class action; and

"(D) the term 'class members' means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

"(2) The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which_

"(A) any member of a class of plaintiffs is a citizen of a State different from any defendant;

"(B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

"(C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

"(3) A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of_

"(A) whether the claims asserted involve matters of national or interstate interest;

"(B) whether the claims asserted will be governed by laws of the State in which the action was originally filed or by the laws of other States;

"(C) whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction;

"(D) whether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants;

"(E) whether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States; and

"(F) whether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

"(4) A district court shall decline to exercise jurisdiction under paragraph (2)_

"(A)(i) over a class action in which_

"(I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

"(II) at least 1 defendant is a defendant_

"(aa) from whom significant relief is sought by members of the plaintiff class;

"(bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

"(cc) who is a citizen of the State in which the action was originally filed; and

"(III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

"(ii) during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons; or

"(B) two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

"(5) Paragraphs (2) through (4) shall not apply to any class action in which_

"(A) the primary defendants are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; or

"(B) the number of members of all proposed plaintiff classes in the aggregate is less than 100.

"(6) In any class action, the claims of the individual class members shall be aggregated to

determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

"(7) Citizenship of the members of the proposed plaintiff classes shall be determined for purposes of paragraphs (2) through (6) as of the date of filing of the complaint or amended complaint, or, if the case stated by the initial pleading is not subject to Federal jurisdiction, as of the date of service by plaintiffs of an amended pleading, motion, or other paper, indicating the existence of Federal jurisdiction.

"(8) This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that action.

"(9) Paragraph (2) shall not apply to any class action that solely involves a claim_

"(A) concerning a covered security as defined under 16(f)(3) of the Securities Act of 1933 (15 U.S.C. 78p(f)(3)) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

"(B) that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

"(C) that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).

"(10) For purposes of this subsection and section 1453, an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.

"(11)(A) For purposes of this subsection and section 1453, a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs.

"(B)(i) As used in subparagraph (A), the term 'mass action' means any civil action (except a civil action within the scope of section 1711(2)) in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).

"(ii) As used in subparagraph (A), the term 'mass action' shall not include any civil action in which_

"(I) all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous to that State;

"(II) the claims are joined upon motion of a defendant;

"(III) all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action; or

"(IV) the claims have been consolidated or coordinated solely for pretrial proceedings.

"(C)(i) Any action(s) removed to Federal court pursuant to this subsection shall not thereafter be transferred to any other court pursuant to section 1407, or the rules promulgated thereunder, unless a majority of the plaintiffs in the action request transfer pursuant to section 1407.

"(ii) This subparagraph will not apply_

"(I) to cases certified pursuant to rule 23 of the Federal Rules of Civil Procedure; or

"(II) if plaintiffs propose that the action proceed as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure.

"(D) The limitations periods on any claims asserted in a mass action that is removed to Federal court pursuant to this subsection shall be deemed tolled during the period that the action is pending in Federal court.".

(b) Conforming Amendments._

(1) Section 1335(a)(1) is amended by inserting "subsection (a) or (d) of" before "section 1332".

(2) Section 1603(b)(3) is amended by striking "(d)" and inserting "(e)".

   SEC. 5. REMOVAL OF INTERSTATE CLASS ACTIONS TO FEDERAL DISTRICT COURT.

(a) In General._Chapter 89 is amended by adding after section 1452 the following:

        "1453. Removal of class actions

"(a) Definitions._In this section, the terms 'class', 'class action', 'class certification order', and 'class member' shall have the meanings given such terms under section 1332(d)(1).

"(b) In General._A class action may be removed to a district court of the United States in accordance with section 1446 (except that the 1-year limitation under section **[\*S1252]** 1446(b) shall not apply), without regard to whether any defendant is a citizen of the State in which the action is brought, except that such action may be removed by any defendant without the consent of all defendants.

"(c) Review of Remand Orders._

"(1) In general._Section 1447 shall apply to any removal of a case under this section, except that notwithstanding section 1447(d), a court of appeals may accept an appeal from an order of a district court granting or denying a motion to remand a class action to the State court from which it was removed if application is made to the court of appeals not less than 7 days after entry of the order.

"(2) Time period for judgment._If the court of appeals accepts an appeal under paragraph (1), the court shall complete all action on such appeal, including rendering judgment, not later than 60 days after the date on which such appeal was filed, unless an extension is granted under paragraph (3).

"(3) Extension of time period._The court of appeals may grant an extension of the 60-day period described in paragraph (2) if_

"(A) all parties to the proceeding agree to such extension, for any period of time; or

"(B) such extension is for good cause shown and in the interests of justice, for a period not to exceed 10 days.

"(4) Denial of appeal._If a final judgment on the appeal under paragraph (1) is not issued before the end of the period described in paragraph (2), including any extension under paragraph (3), the appeal shall be denied.

"(d) Exception._This section shall not apply to any class action that solely involves_

"(1) a claim concerning a covered security as defined under section 16(f)(3) of the Securities Act of 1933 (15 U.S.C. 78p(f)(3)) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

"(2) a claim that relates to the internal affairs or governance of a corporation or other form of business enterprise and arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

"(3) a claim that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).".

(b) Technical and Conforming Amendments._The table of sections for chapter 89 is amended by adding after the item relating to section 1452 the following:

"1453. Removal of class actions.".

SEC. 6. REPORT ON CLASS ACTION SETTLEMENTS.

(a) In General._Not later than 12 months after the date of enactment of this Act, the Judicial Conference of the United States, with the assistance of the Director of the Federal Judicial Center and the Director of the Administrative Office of the United States Courts, shall prepare and transmit to the Committees on the Judiciary of the Senate and the House of Representatives a report on class action settlements.

(b) Content._The report under subsection (a) shall contain_

(1) recommendations on the best practices that courts can use to ensure that proposed class action settlements are fair to the class members that the settlements are supposed to benefit;

(2) recommendations on the best practices that courts can use to ensure that_

(A) the fees and expenses awarded to counsel in connection with a class action settlement appropriately reflect the extent to which counsel succeeded in obtaining full redress for the injuries alleged and the time, expense, and risk that counsel devoted to the litigation; and

(B) the class members on whose behalf the settlement is proposed are the primary beneficiaries of the settlement; and

(3) the actions that the Judicial Conference of the United States has taken and intends to take toward having the Federal judiciary implement any or all of the recommendations contained in the report.

(c) Authority of Federal Courts._Nothing in this section shall be construed to alter the authority of the Federal courts to supervise attorneys' fees.

SEC. 7. ENACTMENT OF JUDICIAL CONFERENCE RECOMMENDATIONS.

Notwithstanding any other provision of law, the amendments to rule 23 of the Federal Rules of Civil Procedure, which are set forth in the order entered by the Supreme Court of the United States on March 27, 2003, shall take effect on the date of enactment of this Act or on December 1, 2003 (as specified in that order), whichever occurs first.

SEC. 8. RULEMAKING AUTHORITY OF SUPREME COURT AND JUDICIAL CONFERENCE.

Nothing in this Act shall restrict in any way the authority of the Judicial Conference and the Supreme Court to propose and prescribe general rules of practice and procedure under chapter 131 of title 28, United States Code.

SEC. 9. EFFECTIVE DATE.

The amendments made by this Act shall apply to any civil action commenced on or after the date of enactment of this Act.

The PRESIDING OFFICER. The Senator from Mississippi.

Mr. LOTT . Mr. President, I move to reconsider the vote and I move to lay that motion on the table.

The motion to lay on the table was agreed to.

**SUBJECT:** LITIGATION (92%); CLASS ACTIONS (91%); SUITS & CLAIMS (90%); LAWYERS (79%); LEGISLATIVE BODIES (79%); LEGISLATION (79%); SMALL BUSINESS (59%); JUDGES (59%); ATTORNEYS FEES (59%); US STATE GOVERNMENT (59%); JOB CREATION (59%); JURISDICTION (59%); TRIAL & PROCEDURE (59%); CIVIL PROCEDURE (59%); LEGISLATORS (59%); EMPLOYMENT GROWTH (59%); US FEDERAL GOVERNMENT (59%);

**LOAD-DATE:** February 11, 2005

Service:  **Get by LEXSEE®**
Citation: **151 cong rec s 1225**
View:  Full
Date/Time: Monday, August 18, 2008 - 11:22 PM EDT


About LexisNexis  | Terms & Conditions  | Contact Us
Copyright ©  2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

COMPENDIUM
EXHIBIT 5

**LexisNexis®** *Total Research System*

Switch Client ┊ Preferences ┊ Sign Out ┊ [?] Help

Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator | Transactional Advisor | Cour

Service: **Get by LEXSEE®**
Citation: **151 cong rec h 723**

*151 Cong Rec H 723, *

CONGRESSIONAL RECORD -- *HOUSE*

Thursday, February 17, 2005

109th Congress, 1st Session

151 Cong Rec H 723

**REFERENCE:** Vol. 151, No. 18

**SECTION:** House

**TITLE:** CLASS ACTION FAIRNESS ACT OF 2005

**SPEAKER:** Mr. SENSENBRENNER; Mr. CONYERS; Mr. BOUCHER; Mr. GOODLATTE; Mr. GOODLATTE. ; Mr. MARKEY; Mr. CANNON; Mr. KELLER; Mr. SCOTT of Virginia; Mr. WATT; Mr. MORAN of Virginia; Mr. INSLEE; Ms. JACKSON-LEE of Texas; Mr. HASTERT; Mr. UDALL of Colorado; Mr. BLUMENAUER; Mr. WEXLER; Mr. SHAYS; Mr. BACA; Mr. MEEHAN; Mr. STARK; Mr. BLUNT; Ms. PELOSI; Mr. SMITH of Texas; Mr. NADLER; Mr. WEINER; Mr. BROWN of Ohio; Mr. ROSS

**TEXT:  [*H723]**

Mr. SENSENBRENNER . Madam Speaker, pursuant to House Resolution 96, I call up the Senate bill ( S. 5) to amend the procedures that apply to consideration of interstate class actions to assure fairer outcomes for class members and defendants, and for other purposes, and ask for its immediate consideration.

The Clerk read the title of the Senate bill.

The SPEAKER pro tempore (Mrs. Capito). Pursuant to House Resolution 96, the bill is considered as read.

The text of S. 5 is as follows:

S. 5

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. SHORT TITLE; REFERENCE; TABLE OF CONTENTS.

(a) Short Title._This Act may be cited as the "Class Action Fairness Act of 2005".

(b) Reference._Whenever in this Act reference is made to an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other

provision of title 28, United States Code.

(c) Table of Contents._The table of contents for this Act is as follows:

Sec. 1. Short title; reference; table of contents.

Sec. 2. Findings and purposes.

Sec. 3. Consumer class action bill of rights and improved procedures for interstate class actions.

Sec. 4. Federal district court jurisdiction for interstate class actions.

Sec. 5. Removal of interstate class actions to Federal district court.

Sec. 6. Report on class action settlements.

Sec. 7. Enactment of Judicial Conference recommendations.

Sec. 8. Rulemaking authority of Supreme Court and Judicial Conference.

Sec. 9. Effective date.

SEC. 2. FINDINGS AND PURPOSES.

(a) Findings._Congress finds the following:

(1) Class action lawsuits are an important and valuable part of the legal system when they permit the fair and efficient resolution of legitimate claims of numerous parties by allowing the claims to be aggregated into a single action against a defendant that has allegedly caused harm.

(2) Over the past decade, there have been abuses of the class action device that have_

(A) harmed class members with legitimate claims and defendants that have acted responsibly;

(B) adversely affected interstate commerce; and

(C) undermined public respect for our judicial system.

(3) Class members often receive little or no benefit from class actions, and are sometimes harmed, such as where_

(A) counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value;

(B) unjustified awards are made to certain plaintiffs at the expense of other class members; and

(C) confusing notices are published that prevent class members from being able to fully understand and effectively exercise their rights.

(4) Abuses in class actions undermine the national judicial system, the free flow of interstate commerce, and the concept of diversity jurisdiction as intended by the framers of the United States Constitution, in that State and local courts are_

(A) keeping cases of national importance out of Federal court;

(B) sometimes acting in ways that demonstrate bias against out-of-State defendants; and

(C) making judgments that impose their view of the law on other States and bind the rights of the residents of those States.

(b) Purposes._The purposes of this Act are to_

(1) assure fair and prompt recoveries for class members with legitimate claims;

(2) restore the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate cases of national importance under diversity jurisdiction; and

(3) benefit society by encouraging innovation and lowering consumer prices.

SEC. 3. CONSUMER CLASS ACTION BILL OF RIGHTS AND IMPROVED PROCEDURES FOR INTERSTATE CLASS ACTIONS.

(a) In General._Part V is amended by inserting after chapter 113 the following:

"CHAPTER 114_CLASS ACTIONS

"Sec.

"1711. Definitions.

"1712. Coupon settlements.

"1713. Protection against loss by class members.

"1714. Protection against discrimination based on geographic location.

"1715. Notifications to appropriate Federal and State officials.

"1711. Definitions

"In this chapter:

"(1) Class._The term 'class' means all of the class members in a class action.

"(2) Class action._The term 'class action' means any civil action filed in a district court of the United States under rule 23 of the Federal Rules of Civil Procedure or any civil action that is removed to a district court of the United States that was originally filed under a State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representatives as a class action.

"(3) Class counsel._The term 'class counsel' means the persons who serve as the attorneys for the class members in a proposed or certified class action.

"(4) Class members._The term 'class members' means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

"(5) Plaintiff class action._The term 'plaintiff class action' means a class action in which class

members are plaintiffs.

"(6) Proposed settlement._The term 'proposed settlement' means an agreement regarding a class action that is subject to court approval and that, if approved, would be binding on some or all class members.

### "1712. Coupon settlements

"(a) Contingent Fees in Coupon Settlements._If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed.

"(b) Other Attorney's Fee Awards in Coupon Settlements._

"(1) In general._If a proposed settlement in a class action provides for a recovery of coupons to class members, and a portion of the recovery of the coupons is not used to determine the attorney's fee to be paid to class counsel, any attorney's fee award shall be based upon the amount of time class counsel reasonably expended working on the action.

"(2) Court approval._Any attorney's fee under this subsection shall be subject to approval by the court and shall include an appropriate attorney's fee, if any, for obtaining equitable relief, including an injunction, if applicable. Nothing in this subsection shall be construed to prohibit application of a lodestar with a multiplier method of determining attorney's fees.

"(c) Attorney's Fee Awards Calculated on a Mixed Basis in Coupon Settlements._If a proposed settlement in a class action provides for an award of coupons to class members and also provides for equitable relief, including injunctive relief_

"(1) that portion of the attorney's fee to be paid to class counsel that is based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (a); and

"(2) that portion of the attorney's fee to be paid to class counsel that is not based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (b).

"(d) Settlement Valuation Expertise._In a class action involving the awarding of coupons, the court may, in its discretion upon the motion of a party, receive expert testimony from a witness qualified to provide information on the actual value to the class members of the coupons that are redeemed.

"(e) Judicial Scrutiny of Coupon Settlements._In a proposed settlement under which class members would be awarded coupons, the court may approve the proposed settlement only after a hearing to determine whether, and making a written finding that, the settlement is fair, reasonable, and adequate for class members. The court, in its discretion, may also require that a proposed settlement agreement provide for the distribution of a portion of the value of unclaimed coupons to 1 or more charitable or governmental organizations, as agreed to by the parties. The distribution and redemption of any proceeds under this subsection shall not be used to calculate attorneys' fees under this section.

### "1713. Protection against loss by class members

"The court may approve a proposed settlement under which any class member is obligated to pay sums to class counsel that would result in a net loss to the class member only if the court makes a written finding **[*H724]** that nonmonetary benefits to the class member substantially outweigh the monetary loss.

"1714. Protection against discrimination based on geographic location

"The court may not approve a proposed settlement that provides for the payment of greater sums to some class members than to others solely on the basis that the class members to whom the greater sums are to be paid are located in closer geographic proximity to the court.

"1715. Notifications to appropriate Federal and State officials

"(a) Definitions._

"(1) Appropriate federal official._In this section, the term 'appropriate Federal official' means_

"(A) the Attorney General of the United States; or

"(B) in any case in which the defendant is a Federal depository institution, a State depository institution, a depository institution holding company, a foreign bank, or a nondepository institution subsidiary of the foregoing (as such terms are defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)), the person who has the primary Federal regulatory or supervisory responsibility with respect to the defendant, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person.

"(2) Appropriate state official._In this section, the term 'appropriate State official' means the person in the State who has the primary regulatory or supervisory responsibility with respect to the defendant, or who licenses or otherwise authorizes the defendant to conduct business in the State, if some or all of the matters alleged in the class action are subject to regulation by that person. If there is no primary regulator, supervisor, or licensing authority, or the matters alleged in the class action are not subject to regulation or supervision by that person, then the appropriate State official shall be the State attorney general.

"(b) In General._Not later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement consisting of_

"(1) a copy of the complaint and any materials filed with the complaint and any amended complaints (except such materials shall not be required to be served if such materials are made electronically available through the Internet and such service includes notice of how to electronically access such material);

"(2) notice of any scheduled judicial hearing in the class action;

"(3) any proposed or final notification to class members of_

"(A)(i) the members' rights to request exclusion from the class action; or

"(ii) if no right to request exclusion exists, a statement that no such right exists; and

"(B) a proposed settlement of a class action;

"(4) any proposed or final class action settlement;

"(5) any settlement or other agreement contemporaneously made between class counsel and counsel for the defendants;

"(6) any final judgment or notice of dismissal;

"(7)(A) if feasible, the names of class members who reside in each State and the estimated proportionate share of the claims of such members to the entire settlement to that State's appropriate State official; or

"(B) if the provision of information under subparagraph (A) is not feasible, a reasonable estimate of the number of class members residing in each State and the estimated proportionate share of the claims of such members to the entire settlement; and

"(8) any written judicial opinion relating to the materials described under subparagraphs (3) through (6).

"(c) Depository Institutions Notification._

"(1) Federal and other depository institutions._In any case in which the defendant is a Federal depository institution, a depository institution holding company, a foreign bank, or a non-depository institution subsidiary of the foregoing, the notice requirements of this section are satisfied by serving the notice required under subsection (b) upon the person who has the primary Federal regulatory or supervisory responsibility with respect to the defendant, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person.

"(2) State depository institutions._In any case in which the defendant is a State depository institution (as that term is defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)), the notice requirements of this section are satisfied by serving the notice required under subsection (b) upon the State bank supervisor (as that term is defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)) of the State in which the defendant is incorporated or chartered, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person, and upon the appropriate Federal official.

"(d) Final Approval._An order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under subsection (b).

"(e) Noncompliance if Notice Not Provided._

"(1) In general._A class member may refuse to comply with and may choose not to be bound by a settlement agreement or consent decree in a class action if the class member demonstrates that the notice required under subsection (b) has not been provided.

"(2) Limitation._A class member may not refuse to comply with or to be bound by a settlement agreement or consent decree under paragraph (1) if the notice required under subsection (b) was directed to the appropriate Federal official and to either the State attorney general or the person that has primary regulatory, supervisory, or licensing authority over the defendant.

"(3) Application of rights._The rights created by this subsection shall apply only to class members or any person acting on a class member's behalf, and shall not be construed to limit any other rights affecting a class member's participation in the settlement.

"(f) Rule of Construction._Nothing in this section shall be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon, Federal or State officials.".

(b) Technical and Conforming Amendment._The table of chapters for part V is amended by inserting after the item relating to chapter 113 the following:

"114. Class Actions

1711".

SEC. 4. FEDERAL DISTRICT COURT JURISDICTION FOR INTERSTATE CLASS ACTIONS.

(a) Application of Federal Diversity Jurisdiction._Section 1332 is amended_

(1) by redesignating subsection (d) as subsection (e); and

(2) by inserting after subsection (c) the following:

"(d)(1) In this subsection_

"(A) the term 'class' means all of the class members in a class action;

"(B) the term 'class action' means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action;

"(C) the term 'class certification order' means an order issued by a court approving the treatment of some or all aspects of a civil action as a class action; and

"(D) the term 'class members' means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

"(2) The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which_

"(A) any member of a class of plaintiffs is a citizen of a State different from any defendant;

"(B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

"(C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

"(3) A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of_

"(A) whether the claims asserted involve matters of national or interstate interest;

"(B) whether the claims asserted will be governed by laws of the State in which the action was originally filed or by the laws of other States;

"(C) whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction;

"(D) whether the action was brought in a forum with a distinct nexus with the class

members, the alleged harm, or the defendants;

"(E) whether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States; and

"(F) whether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

"(4) A district court shall decline to exercise jurisdiction under paragraph (2)_

"(A)(i) over a class action in which_

"(I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

"(II) at least 1 defendant is a defendant_

"(aa) from whom significant relief is sought by members of the plaintiff class;

"(bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

"(cc) who is a citizen of the State in which the action was originally filed; and **[*H725]**


"(III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

"(ii) during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons; or

"(B) two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

"(5) Paragraphs (2) through (4) shall not apply to any class action in which_

"(A) the primary defendants are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; or

"(B) the number of members of all proposed plaintiff classes in the aggregate is less than 100.

"(6) In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

"(7) Citizenship of the members of the proposed plaintiff classes shall be determined for purposes of paragraphs (2) through (6) as of the date of filing of the complaint or amended complaint, or, if the case stated by the initial pleading is not subject to Federal jurisdiction, as of the date of service by plaintiffs of an amended pleading, motion, or other paper, indicating the existence of Federal jurisdiction.

"(8) This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that action.

"(9) Paragraph (2) shall not apply to any class action that solely involves a claim_

"(A) concerning a covered security as defined under 16(f)(3) of the Securities Act of 1933 (15 U.S.C. 78p(f)(3)) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

"(B) that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

"(C) that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).

"(10) For purposes of this subsection and section 1453, an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.

"(11)(A) For purposes of this subsection and section 1453, a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs.

"(B)(i) As used in subparagraph (A), the term 'mass action' means any civil action (except a civil action within the scope of section 1711(2)) in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).

"(ii) As used in subparagraph (A), the term 'mass action' shall not include any civil action in which_

"(I) all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous to that State;

"(II) the claims are joined upon motion of a defendant;

"(III) all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action; or

"(IV) the claims have been consolidated or coordinated solely for pretrial proceedings.

"(C)(i) Any action(s) removed to Federal court pursuant to this subsection shall not thereafter be transferred to any other court pursuant to section 1407, or the rules promulgated thereunder, unless a majority of the plaintiffs in the action request transfer pursuant to section 1407.

"(ii) This subparagraph will not apply_

"(I) to cases certified pursuant to rule 23 of the Federal Rules of Civil Procedure; or

"(II) if plaintiffs propose that the action proceed as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure.

"(D) The limitations periods on any claims asserted in a mass action that is removed to Federal court pursuant to this subsection shall be deemed tolled during the period that the action is pending in Federal court.".

(b) Conforming Amendments._

(1) Section 1335(a)(1) is amended by inserting "subsection (a) or (d) of" before "section 1332".

(2) Section 1603(b)(3) is amended by striking "(d)" and inserting "(e)".

SEC. 5. REMOVAL OF INTERSTATE CLASS ACTIONS TO FEDERAL DISTRICT COURT.

(a) In General._Chapter 89 is amended by adding after section 1452 the following:

"1453. Removal of class actions

"(a) Definitions._In this section, the terms 'class', 'class action', 'class certification order', and 'class member' shall have the meanings given such terms under section 1332(d)(1).

"(b) In General._A class action may be removed to a district court of the United States in accordance with section 1446 (except that the 1-year limitation under section 1446(b) shall not apply), without regard to whether any defendant is a citizen of the State in which the action is brought, except that such action may be removed by any defendant without the consent of all defendants.

"(c) Review of Remand Orders._

"(1) In general._Section 1447 shall apply to any removal of a case under this section, except that notwithstanding section 1447(d), a court of appeals may accept an appeal from an order of a district court granting or denying a motion to remand a class action to the State court from which it was removed if application is made to the court of appeals not less than 7 days after entry of the order.

"(2) Time period for judgment._If the court of appeals accepts an appeal under paragraph (1), the court shall complete all action on such appeal, including rendering judgment, not later than 60 days after the date on which such appeal was filed, unless an extension is granted under paragraph (3).

"(3) Extension of time period._The court of appeals may grant an extension of the 60-day period described in paragraph (2) if_

"(A) all parties to the proceeding agree to such extension, for any period of time; or

"(B) such extension is for good cause shown and in the interests of justice, for a period not to exceed 10 days.

"(4) Denial of appeal._If a final judgment on the appeal under paragraph (1) is not issued before the end of the period described in paragraph (2), including any extension under paragraph (3), the appeal shall be denied.

"(d) Exception._This section shall not apply to any class action that solely involves_

"(1) a claim concerning a covered security as defined under section 16(f)(3) of the Securities Act of 1933 (15 U.S.C. 78p(f)(3)) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

"(2) a claim that relates to the internal affairs or governance of a corporation or other form of business enterprise and arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

"(3) a claim that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).".

(b) Technical and Conforming Amendments._The table of sections for chapter 89 is amended by adding after the item relating to section 1452 the following:

"1453. Removal of class actions.".

SEC. 6. REPORT ON CLASS ACTION SETTLEMENTS.

(a) In General._Not later than 12 months after the date of enactment of this Act, the Judicial Conference of the United States, with the assistance of the Director of the Federal Judicial Center and the Director of the Administrative Office of the United States Courts, shall prepare and transmit to the Committees on the Judiciary of the Senate and the House of Representatives a report on class action settlements.

(b) Content._The report under subsection (a) shall contain_

(1) recommendations on the best practices that courts can use to ensure that proposed class action settlements are fair to the class members that the settlements are supposed to benefit;

(2) recommendations on the best practices that courts can use to ensure that_

(A) the fees and expenses awarded to counsel in connection with a class action settlement appropriately reflect the extent to which counsel succeeded in obtaining full redress for the injuries alleged and the time, expense, and risk that counsel devoted to the litigation; and

(B) the class members on whose behalf the settlement is proposed are the primary beneficiaries of the settlement; and

(3) the actions that the Judicial Conference of the United States has taken and intends to take toward having the Federal judiciary implement any or all of the recommendations contained in the report.

(c) Authority of Federal Courts._Nothing in this section shall be construed to alter the authority of the Federal courts to supervise attorneys' fees.

SEC. 7. ENACTMENT OF JUDICIAL CONFERENCE RECOMMENDATIONS.

Notwithstanding any other provision of law, the amendments to rule 23 of the Federal Rules of Civil Procedure, which are set forth in the order entered by the Supreme Court of the United States on March 27, 2003, shall take effect on the date of enactment of this Act or on December 1, 2003 (as specified in that order), whichever occurs first.

SEC. 8. RULEMAKING AUTHORITY OF SUPREME COURT AND JUDICIAL CONFERENCE.

Nothing in this Act shall restrict in any way the authority of the Judicial Conference and the Supreme Court to propose and prescribe general rules of practice and procedure under chapter 131 of title 28, United States Code. **[*H726]**

SEC. 9. EFFECTIVE DATE.

The amendments made by this Act shall apply to any civil action commenced on or after the date of enactment of this Act.

The SPEAKER pro tempore. After 90 minutes of debate on the bill, it shall be in order to consider the amendment in the nature of a substitute printed in House Report 109-7, if offered by the gentleman from Michigan (Mr. Conyers) or his designee, which shall be considered read and shall be debatable for 40 minutes equally divided and controlled by the proponent and opponent.

The gentleman from Wisconsin (Mr. Sensenbrenner) and the gentleman from Michigan (Mr. Conyers) each will control 45 minutes of debate on the bill.

The Chair recognizes the gentleman from Wisconsin (Mr. Sensenbrenner).

General Leave

Mr. SENSENBRENNER . Madam Speaker, I ask unanimous consent that all Members may have 5 legislative days within which to revise and extend their remarks and include extraneous material on S. 5.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Wisconsin?

There was no objection.

Mr. SENSENBRENNER . Madam Speaker, I yield myself such time as I may consume.

Madam Speaker, I rise in strong support of S. 5, the Class Action Fairness Act of 2005. Today marks the culmination of nearly a decade of legislative efforts to end systematic abuse of our Nation's class action system. We stand on the cusp of sending landmark legislation on civil-justice reform to the President that has been approved by increasing majorities each time it has been considered by the House in each of the last three Congresses and which passed the other body last week with an overwhelming majority of 72 votes.

Since these reforms were first proposed, the magnitude of the class action crisis, the need to address it has become more and more urgent. The crisis now threatens the integrity of our civil justice system and undermines the economic vitality upon which job creation depends.

A major element of the worsening crisis is the exponential increase in State class action cases in a handful of "magnet" or "magic" jurisdictions, many of which deal with national issues in classes. In the last 10 years, State court class actions filings nationwide have increased over 1,315 percent. The infamous handful of magnet courts known for certifying even the most speculative class action suits, the increase in filings now exceeds 5,000 percent. The only explanation for this phenomenon is aggressive forum shopping by trial lawyers to find courts and judges who will act as willing accomplices in a judicial power grab, hearing nationwide cases and setting policy for the entire country.

A second major feature of the present class action crisis is a system producing outrageous settlements that benefit only lawyers and trample the rights of class members. Class actions

were originally created to efficiently address a large number of similar claims by people suffering small harms. Today they are too often used to efficiently transfer the large fees to a small number of trial lawyers, with little benefit to the plaintiffs.

The present rules encourage a race to any available State courthouse in the hopes of a rubber-stamped nationwide settlement that produces millions in attorney's fees for the winning plaintiff's attorney. The race to settle produces outcomes that favor expediency and profits for lawyers over justice and fairness for consumers. The losers in this race are the victims who often gain little or nothing through the settlement, yet are bound by it in perpetuity. And all Americans bear the cost of these settlements through increased prices for goods and services.

The bill before the House today offers commonsense procedural changes that will end the most serious abuses by allowing more interstate class actions to be heard in Federal courts while keeping truly local cases in State courts. Its core provisions are similar to those passed by this body in the last three Congresses. S. 5 also implements a consumer bill of rights that will keep class members from being used by the lawyers they never hired to engage in litigation they do not know about or to extort money they will never see.

Madam Speaker, when the House considered this important reform in the last Congress, I remarked that, "The class action judicial system has become a joke, and no one is laughing except the trial lawyers . . . all the way to the bank."

I imagine that laughter turned to nervous chuckles when S. 5 emerged unscathed from the gauntlet in the other body with 72 votes last week. Today, as the House prepares to pass this bill, I suspect you could hear a pin drop in the halls of infamous courthouses located in Madison County, Illinois and Jefferson County, Texas, where for so long the good times have rolled for forum-shopping plaintiffs' attorneys and the judges who enable them. And when this legislation is signed by the President one day soon, those same halls may echo with sobs and curses because this time justice and fairness and the American people will have the last laugh.

Madam Speaker, after years of toil, the moment has arrived. The opportunity to restore common sense, rationality, and dignity to our class action system is now before us, and the need for reform has never been more certain. I urge my colleagues to support the Class Action Fairness Act of 2005.

Madam Speaker, I reserve the balance of my time.

(Mr. CONYERS asked and was given permission to revise and extend his remarks.)

Mr. CONYERS . Madam Speaker, I yield myself such time as I may consume.

Madam Speaker, with the consideration of this legislation, the majority begins their assault on our Nation's civil justice system. Today we will attempt to preempt State class actions. Next month we will take up a bankruptcy bill that massively tilts the playing field in favor of credit card companies and against ordinary consumers and workers alike. On deck and pending are equally one-sided medical malpractice bills and asbestos bills that both cap damages and eliminate liability to protect some of the most egregious wrongdoers in America.

The majority's assault on victims and consumers is unprecedented in its scope and stunning in its breadth. Collectively, these measures will close the courthouse doors on millions of Americans harmed by intentional wrongdoing, negligence, and fraud. And so, long after the 109th Congress has forgotten, American consumers and workers will be paying the price for these special interest bills through needless injuries and uncompensated harm.

This legislation will remove class actions involving State law issues from State courts, the forum most convenient for victims of wrongdoing and with the judges most familiar with the substantive law, and this legislation will move it to the Federal courts where the case will take far longer to resolve and is far less likely to be certified.

Now, you do not need to take my word for it. Let us just ask big business itself. The Nation's largest bank, Citicorp admits "the practical effect (of the bill will) be that many cases will never be heard. Federal judges facing overburdened dockets and ambiguities about applying State laws in a Federal court, often refuse to grant standing to class action plaintiffs."

Forbes Magazine writes, "The legislation will . . . make it more difficult for plaintiffs to prevail, since . . . federal courts are . . . less open to considering . . . class action claims."

Passage of this legislation would be particularly devastating for civil rights cases and labor law cases. As the Lawyers Committee For Civil Rights Under The Law explained, "The consequences of the legislation for civil rights class actions . . . will be astounding and, in our view, disastrous. Redirecting State law class actions to the Federal courts will choke Federal court dockets and delay or foreclose the timely and effective determination of Federal (civil rights) cases."

Since the November election we have heard a lot of talk about values, and that is fine; but will someone during this discourse today tell me where the value is in denying senior citizens who suffered heart attacks because they took Vioxx for their arthritis? Where is the morality in preventing poor workers from joining together to obtain compensation when unscrupulous employers pay them slave-labor wages? **[*H727]**
Where is the righteousness in telling victims of discrimination that they will have to wait years for a Federal court to consider violations of their own State laws?

If we have learned anything from the Enron, TYCO, Firestone, and other legal debacles, it is that our citizens need more protection against wrongdoers in our society, not less. And yet the class action bill before us takes us in precisely the opposite direction.

The House should reject this one-sided, anti-consumer and anti-civil rights legislation.

Madam Speaker, I reserve the balance of my time.

Mr. SENSENBRENNER . Madam Speaker, I yield 3 minutes to the gentleman from Virginia (Mr. Boucher) to show the breadth of the bipartisan support of this legislation.

(Mr. BOUCHER asked and was given permission to revise and extend his remarks.)

Mr. BOUCHER . Madam Speaker, I thank the gentleman from Wisconsin (Mr. Sensenbrenner) for yielding me time.

Madam Speaker, I am pleased to rise this morning in support of the bill before us. In the two decades that I have been privileged to serve in the House, the class action measure that is before us today is the most modest litigation reform that has been debated, and it strikes in a narrow and appropriate way at an egregious abuse of justice.

The bill before us makes procedural changes only. There are no restrictions on the substantive rights of plaintiffs. There are no caps on damages. There is no elimination on the rights of plaintiffs to recover.

The bill simply permits the removal to Federal courts of class actions that are truly national in scope, with plaintiffs living across the Nation and the large corporate defendant, even if the

current diversity of citizenship rules are not strictly met.

This change is much needed. Cases that are truly national in scope are being filed as State class actions before certain favored judges who employ an almost "anything goes" approach that remedies virtually any controversy subject to certification as a class action. Once certification occurs, there is then a rush to settle the cases. The lawyer who filed the case makes an offer that is hard for the corporate defendant to refuse.

He asks for large fees in the millions of dollars for himself and coupons for the plaintiff class members that he represents. Rather than go through years of expensive litigation, the defendant settles. The judge who certified the class quickly approves the settlement. The lawyer who filed the case gets rich. The plaintiff class members get virtually nothing.

That is the problem that this bill is designed to address. It permits the removal of these national cases to the Federal court in the State in which the State class action has been filed.

In the Federal court, the rights of plaintiffs will be more carefully observed. Any settlement involving non-cash compensation will be carefully reviewed to assure that it is fair. Under the bill, cases that are local in scope will remain in the State court where they are initially filed.

I want to commend the gentleman from Virginia (Mr. Goodlatte) for the thoughtful leadership that he has provided in steering this measure to the point of passage today. The gentleman from Virginia (Mr. Goodlatte) has exhibited both foresight and patience and as chief sponsor of the bill through three Congresses deserves tremendous credit for the success that we are now on the brink of achieving.

I also want to commend the gentleman from Wisconsin (Mr. Sensenbrenner) for the wise course that he has followed as chairman of the House Committee on the Judiciary in permitting the Senate to act in advance of our action today.

I want to commend our former House colleague, Senator Tom Carper, for the outstanding work he performed in negotiating changes to the measure which resulted in 72 Members of the Senate voting to approve this reform.

I hope the House will also lend its support to this reform.

Mr. CONYERS . Madam Speaker, I yield myself as much time as I may consume.

The gentleman from Virginia (Mr. Boucher) is a dear friend of mine, and I merely want to take one observation that he made, that this is just a procedural process and that there is no substantive changes, but I say to him, if the legal system is rigged and the rules are stacked against you, you never have to get to the substance; you do not even get your day in court.

That is the problem with this bill. It is a procedural process that prevents people from bringing actions in State courts, and we are sending it to the Federal courts when both the Federal judiciary has spoken against this measure and the State judges have spoken against this measure as well. I think that that should be a very instructive criticism against this bill.

The proposal before us is opposed by both State and Federal judiciaries. It is opposed by the National Council of State Legislatures; consumers and public interest groups, including Public Citizen, the Consumers Federation of America, the Consumers Union, the United States PIRG; a coalition of environmental advocates; health advocates, including the Campaign for Tobacco Free Kids; civil rights groups such as the Alliance for Justice, the Leadership Conference on Civil Rights, the National Association for the Advancement of Colored People, and the Lawyers' Committee for Civil Rights and labor such as the American Federation of Labor-Congress of Industrial Organizations, AFL-CIO.

This legislation is also opposed by many of the Nation's editorial boards in the newspaper business. A New York Times editorial board just this weekend wrote this about the measure that is before the House today: "Instead of narrowly focusing on real abuses of the system, the measure reconfigures the civil justice system to achieve a significant rollback of corporate accountability and people's rights. The main impact of the bill, which has the sort of propagandistic title normally assigned to such laws, the Class Action Fairness Act, will be to funnel nearly all major class action lawsuits out of State courts and into already overburdened Federal courts. That will inevitably make it harder for Americans to pursue legitimate claims successfully against companies that violate State consumer, health, civil rights and environmental protection laws."

Madam Speaker, I reserve the balance of my time.

Mr. SENSENBRENNER . Madam Speaker, I yield myself such time as I may consume.

(Mr. SENSENBRENNER asked and was given permission to revise and extend his remarks.)

Mr. SENSENBRENNER . Madam Speaker, first, I have a lengthy additional statement explaining how this bill is to work. We do not have the time in general debate for me to give this statement on the floor, so I will insert the statement relative to the intent of the managers of the bill in the Record at this point.

Madam Speaker, I would like to provide a brief summary of the provisions in Sections 4 and 5 of S. 5, the Class Action Fairness Act of 2005. Section 4 gives Federal courts jurisdiction over class action lawsuits in which the aggregate amount in controversy exceeds $5 million, and at least one plaintiff and one defendant are diverse. Overall, new section 1332(d) is intended to expand substantially Federal court jurisdiction over class actions. Its provisions should be read broadly, with a strong preference that interstate class actions should be heard in a Federal court if removed by any defendant. If a purported class action is removed under these jurisdictional provisions, the named plaintiff(s) should bear the burden of demonstrating that the removal was improper. And if a Federal court is uncertain about whether the $5 million threshold is satisfied, the court should err in favor of exercising jurisdiction over the case.

The Sponsors intend that in a case seeking injunctive relief, a matter be subject to Federal jurisdiction under this provision if the value of the matter in litigation exceeds $5 million either from the viewpoint of the plaintiff or the defendant, and regardless of the type of relief sought (e.g., damages, injunctive relief, or declaratory relief). Similarly, in assessing the jurisdictional amount in declaratory relief cases, the Federal court should include in its assessment the value of all relief and benefits that would logically flow from granting the declaratory relief sought by the claimants. For example, a declaration that a defendant's conduct is unlawful or fraudulent will carry certain consequences, such as the need to cease and desist from that conduct, that will often "cost" **[*H728]** the defendant in excess of $5 million. In addition, the law is clear that, once a Federal court properly has jurisdiction over a case removed to Federal court, subsequent events cannot "oust" the Federal court of jurisdiction. While plaintiffs can seek to avoid Federal jurisdiction by defining a proposed class in particular ways, they lose that power once the case was properly removed.

New subsections 1332( d)(3) and (d)(4)(B) address the jurisdictional principles that will apply to class actions filed against a defendant in its home State, dividing such cases into three categories. First, for cases in which two-thirds or more of the members of the plaintiff class and the primary defendants are citizens of the State in which the suit was filed, subsection 1332(d)(4)(B) states that such cases will remain in State court. Second, cases in which more than two-thirds of the members of the plaintiff class or one or more of the

primary defendants are not citizens of the forum State will be subject to Federal jurisdiction since such cases are predominantly interstate in nature. Finally, there is a middle category of class actions in which more than one-third but fewer than two-thirds of the members of the plaintiff class and the primary defendants are all citizens of the State in which the action was filed. In such cases, the numbers alone may not always confirm that the litigation is more fairly characterized as predominantly interstate in character. New subsection 1332(d)(3) therefore gives Federal courts discretion, in the "interests of justice," to decline to exercise jurisdiction over such cases based on the consideration of five factors.

First, the court should consider whether the claims asserted are of "significant national or interstate interest." Under this factor, if a case presents issues of national or interstate significance, that argues in favor of the matter being handled in Federal court. Second, the court should consider whether the claims asserted will be governed by laws other than those of the forum State. Under this factor, if the Federal court determines that multiple State laws will apply to aspects of the class action, that determination would favor having the matter heard in the Federal court system, which has a record of being more respectful of the laws of the various States in the class action context. The third factor is whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction. The purpose of this inquiry is to determine whether the plaintiffs have proposed a "natural" class that encompasses all of the people and claims that one would expect to include in a class action, as opposed to proposing a class that appears to be gerrymandered solely to avoid Federal jurisdiction by leaving out certain potential class members or claims. If the Federal court concludes evasive pleading is involved, that factor would favor the exercise of Federal jurisdiction. The fourth factor considers whether there is a "distinct" nexus between: (a) The forum where the action was brought, and (b) the class members, the alleged harm, or the defendants. This factor is intended to take account of a major concern that led to this legislation_the filing of lawsuits in out-of-the-way "magnet" State courts that have no real relationship to the controversy at hand. Thus, for example, if the majority of proposed class members and the defendant reside in the county where the suit is brought, the court might find a distinct nexus exists.

The fifth factor asks whether the number of citizens of the forum State in the proposed plaintiff class(es) is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class(es) is dispersed among a substantial number of States. If all of the class members who do not reside in the State where the action was filed are widely dispersed among many other States, that point would suggest that the interests of the forum State in litigating the controversy are preeminent. However, if a court finds that the citizenship of the other class members is not widely dispersed, the opposite balance would be indicated and a Federal forum would be favored. Finally, the sixth factor is whether one or more class actions asserting the same or similar claims on behalf of the same or other persons have been filed in the last three years. The purpose of this factor is efficiency and fairness: To determine whether a matter should be subject to Federal jurisdiction so that it can be coordinated with other overlapping or parallel class actions. If other class actions on the same subject have been (or are likely to be) filed elsewhere, the Sponsors intend that this consideration would strongly favor the exercise of Federal jurisdiction. It is the Sponsors' intention that this factor be interpreted liberally and that plaintiffs not be able to plead around it with creative legal theories. If a plaintiff brings a product liability suit alleging consumer fraud or unjust enrichment, and another suit was previously brought against some of the same defendants alleging negligence with regard to the same product, this factor would favor the exercise of Federal jurisdiction over the later-filed claim.

New subsection 1332(d)(4)(A) is the "Local Controversy Exception." This subsection prohibits Federal courts from exercising diversity jurisdiction over a class action under the foregoing provisions if the plaintiffs clearly demonstrate that each and every one of the following criteria are satisfied in the case at issue. First, more than two-thirds of class members are citizens of the forum State. Second, there is at least one in-State defendant from whom

significant relief is sought by members of the class and whose conduct forms a significant basis of plaintiffs' claims. Third, the principal injuries resulting from the alleged conduct, or related conduct, of each defendant were incurred in the State where the action was originally filed. And fourth, no other class action asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons has been filed during the preceding three years.

This provision is intended to respond to concerns that class actions with a truly local focus should not be moved to Federal court under this legislation because State courts have a strong interest in adjudicating such disputes. At the same time, this is a narrow exception that was carefully drafted to ensure that it does not become a jurisdictional loophole. Thus, in assessing whether each of these criteria is satisfied by a particular case, a Federal court should bear in mind that the purpose of each of these criteria is to identify a truly local controversy_a controversy that uniquely affects a particular locality to the exclusion of all others. For example, under the second criterion, there must be at least one real local defendant. By that, the Sponsors intend that the local defendant must be a primary focus of the plaintiffs' claims_not just a peripheral defendant. The local defendant must be a target from whom significant relief is sought by the class (as opposed to just a subset of the class membership), as well as being a defendant whose alleged conduct forms a significant basis for the claims asserted by the class. Similarly, the third criterion is that the principal injuries resulting from the actions of all the defendants must have occurred in the State where the suit was filed. By this criterion, the Sponsors mean that all or almost all of the damage caused by defendants' alleged conduct occurred in the State where the suit was brought. The purpose of this criterion is to ensure that this exception is used only where the impact of the misconduct alleged by the purported class is localized. For example, a class action in which local residents seek compensation for property damage resulting from a chemical leak at a manufacturing plant in that community would fit this criterion, provided that the property damage was limited to residents in the vicinity of the plant. However, if the defendants engaged in conduct that could be alleged to have injured consumers throughout the country or broadly throughout several States (such as an insurance or product case), the case would not qualify for this exception, even if it were brought only as a single-State class action.

The fourth and final criterion is that no other class action involving similar allegations has been filed against any of the defendants over the last three years on behalf of the same or other persons. Once again, the Sponsors wish to stress that the inquiry under this criterion should not be whether identical (or nearly identical) class actions have been filed. Rather, the inquiry is whether similar factual allegations have been made against the defendant in multiple class actions, regardless of whether the same causes of actions were asserted or whether the purported plaintiff classes were the same (or even overlapped in significant respects).

New subsections 1332(d)(5)(A) and (B) specify that S. 5 does not extend Federal diversity jurisdiction to class actions in which (a) the primary defendants are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief, or (b) the number of members of all proposed plaintiff classes in the aggregate is fewer than 100 class members. The purpose of the "State action" cases provision is to prevent States, State officials, or other governmental entities from dodging legitimate claims by removing class actions to Federal court and then arguing that the Federal courts are constitutionally prohibited from granting the requested relief. However, Federal courts should proceed cautiously before declining Federal jurisdiction under the "State action" case exception, and do so only when it is clear that the primary defendants are indeed States, State officials, or other governmental entities against whom the "court may be foreclosed from ordering relief." The Sponsors wish to stress that this provision should not become a subterfuge for avoiding Federal jurisdiction. In particular, plaintiffs should not be permitted to name State entities as defendants as a mechanism to avoid Federal jurisdiction over class actions that largely target non-governmental defendants. The Sponsors intend that "primary

defendants" be interpreted  **[*H729]**
to reach those defendants who are the real "targets" of the lawsuit_i.e., the defendants that would be expected to incur most of the loss if liability is found. It is the Sponsors' intention with regard to each of these exceptions that the party opposing Federal jurisdiction shall have the burden of demonstrating the applicability of an exemption.

The Sponsors understand that in assessing the various criteria established in all of these new jurisdictional provisions, a Federal court may have to engage in some fact-finding, not unlike what is necessitated by the existing jurisdictional statutes. The Sponsors further understand that in some instances, limited discovery may be necessary to make these determinations. However, the Sponsors caution that these jurisdictional determinations should be made largely on the basis of readily available information. Allowing substantial, burdensome discovery on jurisdictional issues would be contrary to the intent of these provisions to encourage the exercise of Federal jurisdiction over class actions.

Under new subsection 1332(d)(9), the Act excludes from its jurisdictional provisions class actions that solely involve claims that relate to matters of corporate governance arising out of State law. The purpose of this provision is to avoid disturbing in any way the Federal vs. State court jurisdictional lines already drawn in the securities litigation class action context by the enactment of the Securities Litigation Uniform Standards Act of 1998. The Sponsors intend that this exemption be narrowly construed. By corporate governance litigation, the Sponsors mean only litigation based solely on (a) State statutory law regulating the organization and governance of business enterprises such as corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and business trusts; (b) State common law regarding the duties owed between and among owners and managers of business enterprises; and (c) the rights arising out of the terms of the securities issued by business enterprises.

New subsection 1332(d)(11) expands Federal jurisdiction over mass actions_suits that are brought on behalf of numerous named plaintiffs who claim that their suits present common questions of law or fact that should be tried together even though they do not seek class certification status. Mass action cases function very much like class actions and are subject to many of the same abuses. Under subsection 1332(d)(11), any civil action in which 100 or more named parties seek to try their claims for monetary relief together will be treated as a class action for jurisdictional purposes. The Sponsors wish to stress that a complaint in which 100 or more plaintiffs are named fits the criteria of seeking to try their claims together, because there would be no other apparent reason to include all of those claimants in a single action unless the intent was to secure a joint trial of the claims asserted in the action. The Sponsors also wish to stress that this provision is intended to mean a situation in which it is proposed or ordered that claims be tried jointly in any respect_that is, if only certain issues are to be tried jointly and the case otherwise meets the criteria set forth in this provision, the matter will be subject to Federal jurisdiction. However, it also should be noted that a mass action would not be eligible for Federal jurisdiction under this provision if any of several criteria are satisfied by the action, including (1) when all the claims asserted in the action arise out of an event or occurrence in the State where, the suit is filed and the injuries were incurred in that State and contiguous States (e.g., a toxic spill case) and (2) when the claims are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such an action.

The first exception would apply only to a truly local single event with no substantial interstate effects. The purpose of this exception is to allow cases involving environmental torts such as a chemical spill to remain in State court if both the event and the injuries were truly local, even though there are some out-of-State defendants. By contrast, this exception would not apply to a product liability or insurance case. The second exception also addresses a very narrow situation, specifically a law like the California Unfair Competition Law, which allows

individuals to bring a suit on behalf of the general public.

Subsection 1332(d)(11)(B)(i) includes a statement indicating that jurisdiction exists only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under section 1332(a). It is the Sponsors' intent that although remands of individual claims not meeting the section 1332 jurisdictional amount requirement may take the action below the 100-plaintiff jurisdictional threshold or the $5 million jurisdictional amount requirement, those subsequent remands should not extinguish Federal diversity jurisdiction over the action as long as the mass action met the various jurisdictional requirements at the time of removal.

Under subsection 1332(d)(11)(C), a mass action removed to a Federal court under this provision may not be transferred to another Federal court under the MDL statute (28 U.S.C. 1407) unless a majority of the plaintiffs request such a transfer. The Sponsors wish to make clear that this restriction on MDL transfers applies only to mass actions as defined in subsection 1332(d)(11); the legislation does not more broadly restrict the authority of the Judicial Panel on Multidistrict Litigation to transfer class actions removed to Federal court under this legislation. Under subsection 1332(d)(11)(D), the statute of limitations for any claims that are part of a mass action will be tolled while the mass action is pending in Federal court.

The removal provisions in Section 5 of the legislation are self-explanatory and attempt to put an end to the type of gaming engaged in by plaintiffs' lawyers to keep cases in State court. They should thus be interpreted with this intent in mind. In addition, new subsection 1453(c) provides that an order remanding a class action to State court is reviewable by appeal at the discretion of the reviewing court. The Sponsors note that the current prohibition on remand order review was added to section 1447 after the Federal diversity jurisdictional statutes and the related removal statutes had been subject to appellate review for many years and were the subject of considerable appellate level interpretive law. The Sponsors believe it is important to create a similar body of clear and consistent guidance for district courts that will be interpreting this legislation and would particularly encourage appellate courts to review cases that raise jurisdictional issues likely to arise in future cases.

Thank you, Madam Speaker, for allowing me to provide an explanation of these jurisdictional provisions.

Madam Speaker, for purposes of engaging in a colloquy with the two gentlemen from Virginia (Mr. Goodlatte) and (Mr. Boucher), I yield to the gentleman from Virginia (Mr. Goodlatte).

Mr. GOODLATTE . Madam Speaker, I thank the chairman very much for yielding.

Madam Speaker, the general principles behind S. 5 and many of the provisions in the legislation are similar to those in  H.R. 1115, which the House passed in 2003, and  S. 274, which was voted out of committee in the Senate in 2003 but did not ultimately pass.

To the extent these provisions are the same, the House Committee on the Judiciary's report on H.R. 1115 and the Senate Committee on the Judiciary's report on S. 274 reflect the intent and understanding of the committee and the sponsors as to the import of these provisions. However, there are several new provisions in S. 5 regarding Federal jurisdiction over class actions that were not included in prior versions of the legislation.

I would like to ask my colleague, the chairman of the Committee on the Judiciary, to provide an overview of the jurisdictional provisions in the legislation, and I would like to discuss the various exceptions included in the legislation and the intent of the sponsors with regard to these exceptions.

Mr. SENSENBRENNER . Madam Speaker, reclaiming my time, I appreciate the gentleman's question.

Section 4 of the bill gives Federal courts jurisdiction over class action lawsuits in which the matter in controversy exceeds the sum or value of $5 million, excluding interests and costs and at least one proposed class member and one defendant are citizens of different States or countries.

For purposes of the citizenship element of this analysis, S. 5 does not alter current law. Thus, a corporation will continue to be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business. However, the bill provides that for purposes of this new section, and section 1453 of title 28, an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it organized. This provision is added to ensure that unincorporated associations receive the same treatment as corporations for purposes of diversity jurisdiction. New subsection 1332(d)(10) corrects this anomaly.

Mr. BOUCHER . Madam Speaker, will the gentleman yield?

Mr. SENSENBRENNER. I yield to the gentleman from Virginia.

Mr. BOUCHER . Madam Speaker, I thank the gentleman for yielding.

What about the amount-in-controversy component, the $5 million? Under current law, some Federal courts have determined the value for **[*H730]** requests for injunctive relief by considering the value to each individual plaintiff. Since that value is usually less than $75,000, these courts have kept such cases in State court. This is sometimes known as the plaintiff's viewpoint, defendant's viewpoint problem. Would the Chairman explain how the bill resolves this challenge?

Mr. SENSENBRENNER . Madam Speaker, reclaiming my time, under new subsection 1332(d)(6), the claims of the individual class members in any class action shall be aggregated to determine whether the amount in controversy exceeds the sum or value of $5 million. The sponsors intend this subsection to be interpreted broadly, and if a purported class action is removed under this provision, the plaintiff shall bear the burden of demonstrating that the $5 million threshold is not satisfied. By the same token, if a Federal court is uncertain about whether a case puts $5 million or more in controversy, the court should favor exercising jurisdiction over the case.

This principle applies to class actions seeking injunctive relief as well. The sponsors intend that a matter be subject to Federal jurisdiction under this provision if the value of the matter in litigation exceeds the $5 million, either from the viewpoint of the plaintiff or the viewpoint of the defendant, regardless of the type of relief sought, such as damages, injunctive relief or declaratory relief.

The sponsors are aware that some courts, especially in the class action context, have declined to exercise Federal jurisdiction over cases on the grounds that the amount in controversy in those cases exceeded the jurisdictional threshold only when assessed from the viewpoint of the defendant.

For example, a class action seeking injunctive relief that would require a defendant to restructure its business in some fundamental way might cost a defendant well in excess of $75,000 under current law, but might have substantially less value to each plaintiff or even to the class of plaintiffs as a whole. Because S. 5 explicitly allows aggregation for the purposes of determining the amount of controversy in class actions, that concern is no longer relevant.

To the extent plaintiffs seek to avoid this rule by framing their cases as individual actions for injunctive relief, most Federal courts have properly held that in an individual case the cost of injunctive relief is viewed from the defendant's perspective. This legislation extends that principle to class actions as well.

The same approach would apply in a case involving declaratory relief. In determining how much money a declaratory relief case puts in controversy, the Federal court should include in its assessment the value of all relief and benefits that would logically flow from the granting of the declaratory relief sought by the plaintiffs.

For example, a declaration that a defendant's conduct is unlawful or fraudulent will carry certain consequences, such as the need to cease and desist from that conduct that will often cost the defendant in excess of $5 million; or a declaration that a standardized product sold throughout the Nation is defective might well put a case over the $5 million threshold, even if the class complaint did not affirmatively seek a determination that each class member was injured by the product.

The bottom line is that new section 1332(d) is intended to substantially expand Federal court jurisdiction over class actions, not to create loopholes. This provision should be read broadly, with a strong preference that interstate class actions should be heard in a Federal court if properly removed by a defendant.

Mr. GOODLATTE . Madam Speaker, will the gentleman yield?

Mr. SENSENBRENNER. I yield to the gentleman from Virginia.

Mr. GOODLATTE . Madam Speaker, I would also like to discuss the home State exception in the legislation.

New subsections 1332(d)(3) and (d)(4)(B) address the jurisdictional principles that will apply to class actions filed against the defendant in its home State, dividing such cases into three categories.

First, for cases in which two-thirds or more of the members of the plaintiff class and the primary defendants are citizens of the State in which the suit was filed, section 1332(d)(4)(B) states that Federal jurisdiction will not be extended by S. 5. Such cases will remain in State courts.

Second, cases in which more than two-thirds of the members of the plaintiff class are not citizens of the State in which the action was filed will be subject to Federal jurisdiction. Federal courts should be able to hear such lawsuits because they have a predominantly interstate component. They affect people in many jurisdictions, and the laws of many States will be at issue.

Finally, there is a middle category of class actions in which more than one-third, but fewer than two-thirds, of the members of the plaintiff class and the primary defendants are all citizens of the State in which the action was filed. In such cases, the numbers alone may not always confirm that the litigation is more fairly characterized as predominantly interstate in character. New subsection 1332(d)(3), therefore, gives Federal courts discretion in the interests of justice to decline to exercise jurisdiction over such cases based on the consideration of five factors.

Madam Speaker, I would ask the chairman to explain these factors.

Mr. SENSENBRENNER. Reclaiming my time, Madam Speaker, I am pleased to answer the

gentleman.

The first factor is whether the claims asserted are of significant national or interstate interest. Under this factor, if a case presents issues of national or interstate significance that argues in favor of the matter being handled in Federal Court, for example, if a class action alleges a nationally distributed pharmaceutical product caused side effects, those cases presumably should be heard in Federal court because of the nationwide ramifications of the dispute and the potential interface with Federal drug laws.

Under this factor, the Federal court should inquire whether the case does present issues of national or interstate significance of this sort. If such issues are identified, that point favors the exercise of the Federal jurisdiction.

The second factor is whether the claims asserted will be governed by laws other than those of the forum State. The sponsors believe that one of the significant problems posed by multistate class actions in State court is the tendency of some State courts to be less than respectful of the laws of other jurisdictions, applying the law of one State to an entire nationwide controversy and thereby ignoring the distinct and varying State laws that should apply to various claims included in the class, depending upon where they arose.

Under this factor, if the Federal court determines that multiple State laws will apply to aspects of the class action, the determination would favor having the matter handled in the Federal court system, which has a record of being more respectful of the laws of various States in the class action controversy. Conversely, if the court concludes that the laws of the State to which the action was filed will apply to the entire controversy, that factor will favor keeping the case in State court.

The third factor is whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction. The purpose of this inquiry is to determine whether the plaintiffs have proposed a natural class, a class that encompasses all the people and claims that one would expect to include in a class action, as opposed to proposing a class that appears to be gerrymandered solely to avoid Federal jurisdiction by leaving out certain potential class members or claims.

If the Federal court concludes that evasive pleading is involved, that factor would favor the exercise of Federal jurisdiction. On the other hand, if the class definition and claims appear to follow a natural pattern, that consideration would favor allowing the matter to be handled by a State court.

The fourth factor is whether there is a distinct nexus between, A, the forum where the action was brought, and, B, the class members, the alleged harm or the defendants. This factor is intended to take account of a major concern that led to this legislation, the filing of lawsuits in the out-of-the-way magnet State courts that have no real relationship to the controversy at hand. **[*H731]**

Thus, if a majority of the proposed class action members and the defendants reside in the county where the suit is brought, the court might find a distinct nexus exists. The key to this factor is the notion of there being a distinct nexus. If the allegedly injured parties live in many other localities, the nexus is not distinct, and this factor would weigh heavily in favor of the exercise of Federal jurisdiction over the matter.

The fifth factor is whether the number of citizens in the forum State in the proposed plaintiff class is substantially larger than the number of citizens from any other State, and the citizens of the other members of the proposed class is dispersed among a substantial number of States.

This factor is intended to look at the geographic distribution of class members in an effort to determine the forum State's interest in handling the litigation. If all of the out-of-State class members are widely dispersed among many other States, that point would suggest that the interest of the forum State in litigating the controversy are preeminent.

The sponsors intend that such a conclusion would favor allowing the State court in which the action was originally filed to handle the litigation. However, if a court finds that the citizenship of the other class members is not widely dispersed, then a Federal forum would be more appropriate because several States other than the forum State would have a strong interest in the controversy.

The final factor is whether one or more class actions asserting the same or similar claims on behalf of the same or other persons have been filed in the last 3 years. The purpose of this factor is to determine whether a matter should be subject to Federal jurisdiction so that it can be coordinated with other overlapping or parallel class actions.

If the other class actions on the same subject have been or are likely to be filed elsewhere, the sponsors intend that this consideration would strongly favor the exercise of Federal jurisdiction. It is the sponsors' intention that this factor be broadly interpreted and that plaintiffs not be able to plead around it with creative legal theories.

If a plaintiff brings a product liability suit alleging consumer fraud or unjust enrichment, and another suit was previously brought against some of the same defendants alleging negligence with regard to the same product, this factor would favor the exercise of Federal jurisdiction over the later-filed claim.

Madam Speaker, I now yield to my colleague, the gentleman from Virginia (Mr. Boucher), to provide some examples that illustrate how these six factors would work in litigation.

Mr. BOUCHER . Madam Speaker, I thank the gentleman for yielding to me, and I will be pleased to provide two examples.

Suppose that a California State court class action were filed against a California pharmaceutical drug company on behalf of a proposed class of 60 percent California residents and 40 percent Nevada residents alleging harmful side effects attributed to a drug sold nationwide.

In such a case, it would make sense to leave the matter in Federal court. After all, the State laws that would apply in all of these cases would vary, depending on where the drug was prescribed and purchased. As a result, allowing a single Federal court to sort out such issues and handle the balance of the litigation would make sense both from added efficiency and a federalism standpoint.

Now, suppose, in a second example, a checking account fee disclosure class action were filed in a Nevada State court against a Nevada bank located in a border city, and the class consisted of 65 percent Nevada residents and 35 percent California residents who crossed the border in order to conduct transactions in the Nevada bank.

In this hypothetical, it might make sense to allow that matter to proceed in State court. It is likely that Nevada banking law would apply to all of these claims, even those of the California residents, since all of the transactions occurred in the State of Nevada. There is also less likelihood that multiple actions will be filed around the country on the same subject so as to give rise to a coordinating Federal multidistrict litigation proceeding.

Mr. GOODLATTE . Madam Speaker, if the chairman would continue to yield.

Mr. SENSENBRENNER. I yield to the other gentleman from Virginia (Mr. Goodlatte).

Mr. GOODLATTE. I thank the chairman for yielding to me. I think those examples really reflect the intent of the legislation.

Madam Speaker, the legislation also includes a local controversy exception which is intended to ensure that truly local class actions can remain in State court under the legislation. Under this provision, Federal courts are instructed not to exercise jurisdiction over cases that meet all of the following four criteria:

First, more than two-thirds of the class members must be the citizens of the State where the suit is brought; second, there must be at least one in-State defendant from whom significant relief is sought by members of the class and whose conduct forms a significant basis of plaintiffs' claims; third, the principal injuries resulting from the alleged conduct or related conduct of each defendant must have occurred in the State where the action was originally filed; and, fourth, no other class action has been filed during the preceding 3 years asserting the same or similar factual allegations against any of the defendants.

Madam Speaker, I would ask that the chairman elaborate on these criteria.

Mr. SENSENBRENNER . Madam Speaker, reclaiming my time, yes, this provision is intended to respond to concerns that class actions with a truly local focus should not be moved to Federal court under this legislation because State courts have a strong interest in adjudicating such disputes. At the same time, this is a narrow exception that was carefully drafted to ensure that it does not become a jurisdictional loophole. Thus, each of the criteria is intended to identify a truly local class action.

First, there must be a primarily local class. Secondly, there must be at least one real local defendant. And by that the drafters meant that the local defendant must be a primary focus of the plaintiffs' claims, not just a retailer or other peripheral defendant. The defendant must be a target from whom significant relief is sought by the class, as opposed to just a subset of the class membership, as well as being a defendant whose alleged conduct forms a significant basis for the claims asserted by the class.

For example, in a consumer fraud case, alleging that an insurance company incorporated and based in another State misrepresented its policies, the local agent of the company named as a defendant presumably would not fit this criteria. He or she probably would have had contact with only some of the purported class members and, thus, would not be a person from whom significant relief would be sought by the plaintiff class viewed as a whole. And, from a relief standpoint, the real demand of the full class in terms of seeking significant relief would be on the insurance company itself.

Third, the principal injuries resulting from the actions of all the defendants must have occurred in the State where the suit was filed. This criterion means that all or almost all of the damage caused by the defendants' conduct occurred in the State where the suit was brought. If defendants engaged in conduct that allegedly injured consumers throughout the country, the case would not qualify for the local controversy exception, even if it was only brought as a single State class action.

And, fourth, no other class action involving similar allegations has been filed against any of the defendants over the last 3 years. In other words, if we are talking about a situation that results in multiple class actions, those are not the types of cases that this exception is intended to address. I would like to stress that the inquiry under this criterion should not be whether identical or nearly identical class actions have been filed. Rather, the inquiry is whether similar factual allegations have been made against the defendant in multiple class

actions, regardless of whether the same causes of action were asserted or whether the proposed plaintiff classes in the prior case was the same.

Madam Speaker, I yield to the gentleman from Virginia (Mr. Goodlatte).

Mr. GOODLATTE. I thank the chairman for yielding once again. **[\*H732]**

Madam Speaker, in this regard I think it is important to note that the exceptions in this legislation are just that, exceptions, and they should not be interpreted in ways that turn them into loopholes. For example, the legislation excludes actions against States. Obviously, this does not mean that plaintiffs can simply name a State in every consumer class action and stay out of Federal court. To the contrary, Federal courts should proceed cautiously before declining Federal jurisdiction under the subsection 1332(d)(5)(a) "state action" case exception, and do so only when it is clear that the primary defendants are indeed States, State officials, or other governmental entities against whom the court may be foreclosed from ordering relief.

The sponsors intend that primary defendants be intended to reach those defendants who are the real targets of the lawsuit, i.e. the defendants who would be expected to incur most of the loss if liability is found. Thus, the term "primary defendant" should include any person who has substantial exposure to significant portions of the proposed class in the action, particularly any defendant that is allegedly liable to the vast majority of the members of the proposed classes, as opposed to simply a few individual class members.

It is the sponsors' intention with regard to each of these exceptions that the party opposing Federal jurisdiction shall have the burden of demonstrating the applicability of an exemption. Thus, if a plaintiff seeks to have a class action remanded on the ground that the primary defendants and two-thirds or more of the class members are citizens of the home State, that plaintiff has the burden of demonstrating that these criteria are met.

Similarly, if a plaintiff seeks to have a purported class action remanded because a primary defendant is a State, that plaintiff should have the burden of demonstrating that the exception should apply.

Mr. BOUCHER . Madam Speaker, if the gentleman from Wisconsin will yield once again.

Mr. SENSENBRENNER. I yield to the gentleman from Virginia (Mr. Boucher).

Mr. BOUCHER . Madam Speaker, I thank the gentleman for yielding.

The principles that have just been enumerated apply to another provision that I would like to discuss, the mass action provision. Under this provision, defendants will be able to remove mass actions to Federal court under the same circumstances in which they will be able to remove class actions.

However, a Federal court would only exercise jurisdiction over these claims that meet the $75,000 minimum. In addition, a mass action cannot be removed to Federal court if it falls under one of the following four categories: number one, if all of the claims arise out of an event or occurrence that happened in the State where the action was filed and that resulted in injuries only in that State or in contiguous States;

number two, if it is the defendants who seek to have the claims joined for trial;

number three, if the claims are asserted on behalf of the general public pursuant to a State statute authorizing such an action;

and, number four, if the claims have been consolidated or coordinated for pretrial purposes only.

I would appreciate the gentleman from Wisconsin clarifying how the $75,000 amount in controversy minimum would apply to assessing whether Federal jurisdiction exists over a mass action, and, most importantly, explaining the intent of the sponsors with regard to the first and third exceptions.

Mr. SENSENBRENNER . Mr. Speaker, reclaiming my time, I will be happy to explain.

The mass action provision was included in the bill because mass actions are really class actions in disguise. They involve an element of people who want their claims adjudicated together, and they often result in the same abuses as class actions. In fact, sometimes the abuses are even worse because the lawyers seek to join claims that have little to do with each other and confuse a jury into awarding millions of dollars to individuals who have suffered no real injury.

Here is how the mass action provision and the current amount-in-controversy provision would work in tandem: suppose 200 people file a mass action in Mississippi against a New Jersey drug manufacturer and also name a local drug store. Three of them assert claims for a million dollars apiece, and the rest assert claims of $20,000.

The Federal Court would have jurisdiction over the mass action because there are more than 100 plaintiffs, there is minimal diversity, and the total amount of controversy exceeds $5 million, and a product liability case does not qualify for the local occurrence exception in the provision.

Then the question becomes, which claims would, in the mass action, the Federal judge keep in Federal Court, and which would be remanded? At this point the judge would have to look at each of the claims very carefully and determine whether or not they meet the $75,000 minimum.

In this regard, I would note that the plaintiffs often seek to minimize what they are seeking in the complaint so that they can stay in State court. For example, sometimes plaintiffs leave their claim for punitive damages off the original complaint to make it seem like their claims are smaller than they really are.

It is our expectation that a Federal judge would read a complaint very carefully and only remand claims that clearly do not meet the $75,000 threshold. If it is likely that a plaintiff is going to turn around in a month and add an additional claim for punitive damages, the Federal court should obviously assert jurisdiction over that individual's claims.

Finally, I would like to stress that this provision in no way is intended to abrogate 8 United States Code 3867 to narrow current jurisdictional rules. Thus, if a Federal court believed it to be appropriate, the court could apply supplemental jurisdiction in the mass action context as well.

With regard to the exceptions, it is our intent that they be interpreted strictly by a court so that they do not become loopholes for an important jurisdictional provision. Thus, the first exception would apply only in a situation where we are talking about a truly local single event with no substantial interstate effects.

The purpose of this exception is to allow cases involving environmental torts, such as a chemical spill, to remain in State court if both the event and the injuries were truly local, even though there are some out-of-state defendants.

By contrast, this exception would not apply to a product liability or insurance case. The sale of a product to different people does not qualify as an event, and the alleged injuries in such a case would be spread out over more than one State or contiguous States even if all of the plaintiffs in a particular case came from one single State.

The third exception addresses a very narrow situation, specifically a law like the California Unfair Competition Law, which allows individuals to bring a suit on behalf of the general public. Such a suit would not qualify as a mass action. However, the vast majority of cases brought under other States' consumer fraud laws which do not have a parallel provision could qualify as removable class actions.

I yield to the gentleman from Virginia.

Mr. GOODLATTE. I thank the gentleman for yielding.

Finally, Mr. Speaker, some critics have complained that the legislation removal provisions will result in delay. Can the gentleman explain why that is simply not the case?

Mr. SENSENBRENNER . Mr. Speaker, reclaiming my time, once again, critics of the legislation have it backwards. This legislation will streamline jurisdictional inquiries by putting an end to all of the gaming that takes place under the current system, and the so-called delay refers to procedural rules that already exist under the current system.

Under existing law, diversity of citizenship between the parties must exist, both at the time a complaint is filed and at the time a complaint is removed to Federal court. However, if the plaintiff files an amended complaint in State court that creates jurisdiction, **[\*H733]** or if subsequent events create jurisdiction, the defendant can then remove the case to Federal court.

Current law is also clear that once a complaint is properly removed to Federal court, the Federal court's jurisdiction cannot be ousted by later events. Thus, for example, changes in the amount of controversy after the complaint has been removed would not subject a lawsuit to be remanded to State court.

Mr. GOODLATTE . Mr. Speaker, I thank the gentleman for his leadership in moving this legislation forward and in working with the Senate to accomplish that as well.

I hope this colloquy will provide guidance on the very important jurisdictional provisions in S. 5 and the sponsor's intent.

Mr. SENSENBRENNER . Mr. Speaker, I reserve the balance of my time.

Mr. CONYERS . Mr. Speaker, I am pleased to yield 4 minutes to my good friend, the gentleman from Massachusetts (Mr. Markey) from the Committee on Energy and Commerce. He has worked with us on many of these issues.

Mr. MARKEY . Mr. Speaker, I thank the gentleman from Michigan for yielding, and I thank him for his leadership on this most critical of all consumer issues before Congress this year.

So you have all heard now the technical arguments made by the Bush administration proponents here on the House floor. So you have heard the Bush administration argument on why this is good.

Now, you want to hear what the bill is really about? Do you want to hear what the Bush administration is really interested in? Well, here it is, ladies and gentlemen. Citigroup's Smith

Barney subdivision: "Tobacco. Flash_Senate Just Passed Class Action Bill_Positive For Tobacco." Let me read it to you:

"The Senate just passed a bill, 72-26." This has gone out from Smith Barney to all their investors. "This bill is designated to funnel class action suits with plaintiffs in different States out of State courts and into the Federal court system, which is typically much less sympathetic to such litigation.

"The practical effect of the change could be that many cases will never be heard given how overburdened Federal judges are, which might help limit the number of cases."

Smith Barney advised its clients that this bill will be positive in general for the tobacco industry and that tobacco stocks have rallied on this favorable news given that this bill could have a positive impact on tobacco litigation.

That is what it is all about, ladies and gentlemen. You heard the technical defense of it for the last half hour. The impact is they are trying to protect the tobacco industry from being sued. So if you are out there, one of your family members has just found that they have a spot on their lung, they have smoked for the last 20 or 30 years, what this bill will do is it will make it more difficult for you and the other people in your States who also have found that they have spots on their lungs to get together to sue the tobacco companies.

If your children are beginning to smoke, they are 13, 14, 15, this bill is intended to make it more difficult for the people in the State of New Hampshire, or Kansas, or Oklahoma to bring a suit to stop it. That is what it is all about. Smith Barney gives the good news to the tobacco industry investors, not to smokers.

And so what they have done is this. It is brilliant in the Bush administration and that is what this side of the aisle is all about. The FDA, is it going to move in to regulate tobacco? No, they made sure they appoint people who will not do it. The EPA, are they going to move in to make sure that the oil industry does not pollute your groundwater so that the children in your neighborhood do not contract leukemia; that breast cancers do not rise? No. Are they going to have a Department of Labor which protects you against asbestos in the workplace? No.

You are not going to see those suits, ladies and gentlemen. So it comes to you and your families to go to court. And what this bill is intended to do is to not let you go to court. So it is perfect. If you are an asbestos company, your stocks are going up. If you are a tobacco company, your stocks are going up. If you are an oil company, a chemical company, your stocks are going up. Smith Barney gives you the good news, Mr. and Mrs. Investor of America.

But if you are afraid for the health of your family, if you know that the groundwater in New Hampshire has been poisoned by Amerada Hess and 22 other oil companies that are not in New Hampshire, you know what the Republicans say? You know what the Bush administration says? The case should not be held in New Hampshire. If Amerada Hess, the big oil company, is a defendant, the case should be outside of New Hampshire, not protecting the person whose family's health has been injured.

And so that is what it is all about. It is the final payback to the tobacco industry, to the asbestos industry, to the oil industry, to the chemical industry at the expense of ordinary families who need to be able to go to court to protect their loved ones when their health has been compromised. And these people are saying, your State is not smart enough, your jurors are not smart enough to understand how the MTBE ruined the groundwater in their State and poisoned thousands of people, that it has to go to a State where Amerada Hess or some large oil company feels comfortable, because they are not headquartered in New Hampshire,

they do not have a large plant in New Hampshire. All they did was sell the material which poisoned your neighborhood.

That is what it is all about, ladies and gentlemen. You just watch across the board every single interest that harms the health and well-being of America skyrocket as soon as we take the vote on final passage of this bill today because President Bush is going to sign this bill with great joy because the oil, the chemical and polluting industries are going to be happy.

Industry Note: Tobacco_Senate Just Passed Class Action Bill_Positive for Tobacco

(By Bonnie Herzog)

Summary

The Senate just passed a bill 72-26 which is designed to funnel class-action suits with plaintiffs in different states out of state courts and into the federal court system, which is typically much less sympathetic to such litigation.

The practical effect of the change could be that many cases will never be heard given how overburdened federal judges are, which might help limit the number of cases.

Although this news is positive in general for the tobacco industry, we do not necessarily believe that class actions pose a big threat to the industry. Furthermore, this type of legislation would have been a bigger help to the industry if it was passed 10 years ago.

The bill now moves to the House floor and the chances are high that it passes since the House Republican leadership said last week that it would pass the Senate's version of this legislation as long as there were no amendments.

OPINION

The Senate just passed a bill that is designed to funnel class-action lawsuits with plaintiffs in different states out of state courts and into the federal court system, which is historically much less sympathetic to such litigation.

The practical effect of the change could be that many cases will never be heard, which might also be positive for tobacco companies. Federal judges, facing overburdened dockets and ambiguities about applying state laws in a federal court, often refuse to grant standing to class-action plaintiffs.

Therefore, tobacco stocks have rallied on this favorable news given that this bill could have a positive impact on potential future tobacco litigation.

Now the bill should move to the House floor and apparently the House Republican leadership announced last week that the GOP majority in that chamber will pass the Senate's version of class-action litigation provided it arrives without amendments and from what we hear, this is in fact what has happened in the Senate. Obviously President Bush has been a big proponent of this type of legislation so we would assume that he would sign it as part of a broader fight that he hopes will lead to limits on awards in asbestos cases and to caps on pain-and-suffering awards in medical malpractice cases.

Although positive in general terms for the tobacco companies, clearly this type of legislation would have been much more useful if it were passed 10 years ago.

analyst certification

I, Bonnie Herzog, hereby certify that all of the views expressed in this research report accurately reflect my personal views about any and all of the subject issuer(s or securities. I also certify that no part of my compensation was, is, or will be directly or indirectly related to the specific recommendation(s) or view(s) in this report.

IMPORTANT DISCLOSURES

Analysts' compensation is determined based upon activities and services intended **[*H734]** to benefit the investor clients of Citigroup Global Markets Inc. and its affiliates ("the Firm"). Like all Firm employees, analysts receive compensation that is impacted by overall firm profitability, which includes revenues from, among other business units, the Private Client Division, Institutional Equities, and Investment Banking.

SMITH BARNEY EQUITY RESEARCH RATINGS DISTRIBUTION

[Data current as of 31 December 2004]

|                        | Buy | Hold | Sell |   |
|------------------------|-----|------|------|---|
| Smith Barney Global Fundamental Equity Research Coverage (2598) | 39% | 42% | 18% |   |
| % of companies in each rating category that are investment banking clients | 56% | 55% | 44% |   |

Guide to Fundamental Research Investment Ratings: Smith Barney's stock recommendations include a risk rating and an investment rating.

Risk ratings, which take into account both price volatility and fundamental criteria, are: Low [L], Medium [M], High [H], and Speculative [S].

Investment ratings are a function of Smith Barney's expectation of total return (forecast price appreciation and dividend yield within the next 12 months) and risk rating.

For securities in developed markets (US, UK, Europe, Japan, and Australia/New Zealand), investment ratings are: Buy [1] (expected total return of 10% or more for Low-Risk stocks, 15% or more for Medium-Risk stocks, 20% or more for High-Risk stocks, and 35% or more for Speculative stocks); Hold [2] (0%-10% for Low-Risk stocks, 0%-15% for Medium-Risk stocks, 0%-20% for High-Risk stocks, and 0%-35% for Speculative stocks); and Sell [3] (negative total return).

For securities in emerging markets (Asia Pacific, Emerging Europe/Middle East/Africa, and Latin America), investment ratings are: Buy [1] (expected total return of 15% or more for Low-Risk stocks, 20% or more for Medium-Risk stocks, 30% or more for High-Risk stocks, and 40% or more for Speculative stocks); Hold [2] (5%-15% for Low-Risk stocks, 10%-20% for Medium-Risk stocks, 15%-30% for High-Risk stocks, and 20%-40% for Speculative stocks); and Sell [3] (5% or less for Low-Risk stocks, 10% or less for Medium-Risk stocks, 15% or less for High-Risk stocks, and 20% or less for Speculative stocks).

Investment ratings are determined by the ranges described above at the time of initiation of coverage, a change in risk rating, or a change in target price. At other times, the expected total returns may fall outside of these ranges because of price movement and/or volatility. Such interim deviations from specified ranges will be permitted but will become subject to review by Research Management. Your decision to buy or sell a security should be based upon your personal investment objectives and should be made only after evaluating the stock's expected performance and risk.

OTHER DISCLOSURES

For securities recommended in this report in which the Firm is not a market maker, the Firm usually provides bids and offers and may act as principal in connection with such transactions. The Firm is a regular issuer of traded financial instruments linked to securities that may have been recommended in this report. The Firm regularly trades in, and may, at any time, hold a trading position (long or short) in, the shares of the subject company(ies discussed in this report. The Firm may engage in securities transactions in a manner inconsistent with this research report and, with respect to securities covered by this report, will buy or sell from customers on a principal basis.

Securities recommended, offered, or sold by the Firm: (i) are not insured by the Federal Deposit Insurance Corporation; (ii) are not deposits or other obligations of any insured depository institution (including Citibank); and (iii) are subject to investment risks, including the possible loss of the principal amount invested. Although information has been obtained from and is based upon sources that the Firm believes to be reliable, we do not guarantee its accuracy and it may be incomplete and condensed. Note, however, that the Firm has taken all reasonable steps to determine the accuracy and completeness of the disclosures made in the Important Disclosures section of this report. All opinions, projections and estimates constitute the judgment of the author as of the date of the report and are subject to change without notice. Prices and availability of financial instruments also are subject to change without notice. If this is a fundamental research report, it is the intention of Smith Barney to provide research coverage of this/these issuer(s , including in response to news affecting this issuer, subject to applicable quiet periods and capacity constraints. This report is for informational purposes only and is not intended as an offer or solicitation for the purchase or sale of a security. Any decision to purchase securities mentioned in this research must take into account existing public information on such security or any registered prospectus.

Investing in non-U.S. securities, including ADRs, may entail certain risks. The securities of non-U.S. issuers may not be registered with, nor be subject to the reporting requirements of the U.S. Securities and Exchange Commission. There may be limited information available on foreign securities. Foreign companies are generally not subject to uniform audit and reporting standards, practices and requirements comparable to those in the U.S. Securities of some foreign companies may be less liquid and their prices more volatile than securities of comparable U.S. companies. In addition, exchange rate movements may have an adverse effect on the value of an investment in a foreign stock and its corresponding dividend payment for U.S. investors. Net dividends to ADR investors are estimated, using withholding tax rates conventions, deemed accurate, but investors are urged to consult their tax advisor for exact dividend computations. Investors who have received this report from the Firm may be prohibited in certain states or other jurisdictions from purchasing securities mentioned in this report from the Firm. Please ask your Financial Consultant for additional details.

The UK's Financial Services Authority rules require that a firm must establish, implement and make available a policy for managing conflicts of interest arising as a result of publication or distribution of investment research. The policy applicable to Citigroup's equity research products can be found at www.citigroupgeo.com. This report may have been distributed simultaneously, in multiple formats, to the Firm's worldwide institutional and retail

customers. If this report is being made available via the Smith Barney Private Client Group in the United Kingdom and Amsterdam, please note that this report is distributed in the UK by Citigroup Global Markets Ltd., a firm Authorised and regulated by the Financial Services Authority (FSA) for the conduct of Investment Business in the UK. This document is not to be construed as providing investment services in any jurisdiction where the provision of such services would be illegal. Subject to the nature and contents of this document, the investments described herein are subject to fluctuations in price and/or value and investors may get back less than originally invested. Certain high-volatility investments can be subject to sudden and large falls in value that could equal or exceed the amount invested. Certain investments contained herein may have tax implications for private customers in the UK whereby levels and basis of taxation may be subject to change. If in doubt, investors should seek advice from a tax adviser. This material may relate to investments or services of a person outside of the UK or to other matters which are not regulated by the Financial Services Authority and further details as to where this may be the case are available upon request in respect of this material. This report may not be distributed to private clients in Germany. This report is distributed in Germany by Citigroup Global Markets Deutschland AG & Co. KGaA, regulated by Bundesanstalt fuer Finanzdienstleistungsaufsicht (BaFin). If this publication is being made available in certain provinces of Canada by Citigroup Global Markets (Canada) Inc. ("CGM Canada"), CGM Canada has approved this publication. If this report was prepared by Smith Barney and distributed in Japan by Nikko Citigroup Ltd., it is being so distributed under license. This report is made available in Australia to wholesale clients through Citigroup Global Markets Australia Pty Ltd. (ABN 64 003 114 832 and AFSL No. 240992) and to retail clients through Smith Barney Citigroup Australia Pty Ltd. (ABN 19 009 145 555 and AFSL No. 240813), Participants of the ASX Group. This advice has been prepared without taking account of the objectives, financial situation or needs of any particular investor. Accordingly, investors should, before acting on the advice, consider the appropriateness of the advice, having regard to their objectives, financial situation and needs. In New Zealand this report is made available through Citigroup Global Markets New Zealand Ltd., a member firm of the New Zealand Stock Exchange. Citigroup Global Markets (pty) Ltd. is incorporated in the Republic of South Africa (company registration number 2000/025866/07) and its registered office is at 145 West Street, Sandton, Johannesburg 2196. The investments and services contained herein are not available to private customers in South Africa. If this report is made available in Hong Kong by, or on behalf of, Citigroup Global Markets Asia Ltd., it is attributable to Citigroup Global Markets Asia Ltd., Citibank Tower, Citibank Plaza, 3 Garden Road, Hong Kong. If this report is made available in Hong Kong by The Citigroup Private Bank to its clients, it is attributable to Citibank N.A., Citibank Tower, Citibank Plaza, 3 Garden Road, Hong Kong. This publication is made available in Singapore through Citigroup Global Markets Singapore Pte. Ltd., a Capital Markets Services Licence holder.

Mr. SENSENBRENNER . Mr. Speaker, I always thought that Federal judges protected the rights of everybody.

Mr. Speaker, I yield 3 minutes to the gentleman from Utah (Mr. Cannon).

Mr. CANNON . Mr. Speaker, to understand the need for S. 5, we need to understand the game the class action lawyers play here and how they go about abusing the court systems. I call it Class Action Monopoly. Here is how it works. They start at Go. The first thing they do is come up with an idea for a lawsuit. And then they find a named plaintiff. It does not have to be someone who is actually injured in the process. All the lawyer really needs is an idea for a lawsuit and potential defendants who have deep pockets.  **[*H735]**

Next they find a person who is the named plaintiff. That named plaintiff is a citizen of the same State as one of the defendants and that puts them in the State court, which is where they want to be. Sometimes they have to promise to pay off that named plaintiff at this

point, but that is all part of the game.

Next the lawyers level their allegations, both in court and in the media. Remember, they do not have to have proof for their allegations. They just need a forum in which to make the allegations. Now the real fun begins after you have made the allegations. They are in State court with the named plaintiffs and their allegations, and it is time to get out of rule 23 free.

Rule 23 is the rule that would apply in Federal courts that defines when a class action can be certified consistent with fundamental fairness and due process considerations. But in this game, there is no fairness. There is no due process. So they easily convince their magnet State to certify that they have a class and at the same time they file copycat lawsuits in State courts all over the country. These are the same class actions asserting the same claims on behalf of the same people. These copycat lawsuits clog the State courts.

At this point in the game, the lawyers start making the money. Let us see where the money goes.

In the Columbia House record case, the lawyers took home $5 million and the plaintiffs got a coupon for discounts on future purchases of records.

In the Blockbuster case, the lawyers walked away with $9.25 million, and the plaintiffs again got a coupon for $1 off their next video rental, coupons that the defendant probably would have issued anyway.

In the Bank of Boston case, the lawyers settled the case and took home $8.5 million. And the customers had money deducted from their mortgage accounts to pay off the lawyers. So in the end, a State court approved these cases, and all of the consumers in the lawsuit lost money.

People may be wondering what happens to them in this game. We already know that if one is a consumer, in the consumer class, they will be lucky if they get a dollar-off coupon. If the business one works for gets sued in one of the class actions, their employer is going to take a major hit and maybe even lay them off. It is that clear in some of these cases, the basic result is that the lawyers will get lots of money, but consumers will pay because health care and car insurance premiums will go through the roof. And when the game comes to an end, they are left with no money and the lawyers are at "go" and they get to start the process all over again.

It is fundamentally important that we resolve this problem and help America move forward. I urge support of S. 5.

Mr. CONYERS . Mr. Speaker, I yield 2 1/2 minutes to the gentlewoman from California (Ms. Linda T. Sanchez).

(Ms. LINDA T. SANCHEZ and was given permission to revise and extend her remarks.)

Ms. LINDA T. SANCHEZ of California. Mr. Speaker, I rise in opposition to S. 5.

The sponsors of this bill call it the Class Action Fairness Act, but nothing about this bill is fair, especially for the victims of corporate wrongdoing. This bill erects a nearly insurmountable barrier for everyday Americans, who have been hurt or wronged, to have their day in court. Thanks to the so-called Class Action Fairness Act, people who have had their civil rights trampled on will no longer be able to bring their claims to State court. It does not matter if the laws of their home State provide better civil rights protections or that it may be more convenient for the victims of discrimination to seek justice in a court where they live. With S. 5 they must go to Federal court.

The same burden is put on the backs of hourly wage workers who sue for back pay that they are owed. These folks are struggling to put food on their family's table, and they almost certainly cannot afford the high cost of multistate litigation. With S. 5 they, too, must bring their claims to a Federal court that may not even be in their State just so that they can get the back pay that they do.

I ask all the proponents of this bill, is that their idea of fairness?

Let us be real. S. 5 is not about reducing venue shopping. It is not about the mythical scourge of predatory plaintiffs' lawyers, and it is not about the fabricated economic drain of excessive jury awards. What this bill really is about is doing a favor for unscrupulous, negligent corporations by making it harder for their victims to sue them. It is protecting big businesses who are guilty of wrongdoing from liability.

I am a lawyer and I acknowledge that there are some members of my profession who file frivolous suits. But if the lawyers are the ones that they claim are ruining this legal system, why are the sponsors of this bill making it harder for the victims?

This bill makes about as much sense as locking the door of a hospital in order to lower health care costs. Kicking people out of the system does not solve the problem, and that is exactly what S. 5 does. It penalizes the victims of wrongdoing without doing anything to improve our legal system, and it shields bad actors from having to face the consequences of their action. Where is the personal responsibility? That is why I oppose this bill.

I urge all of my colleagues to vote "no" on the final passage and to vote "yes" on the Conyers substitute.

Mr. SENSENBRENNER . Mr. Speaker, I yield 2 minutes to the gentleman from Florida (Mr. Keller).

Mr. KELLER . Mr. Speaker, I thank the gentleman for yielding me this time.

Mr. Speaker, the bottom line is that class action reform is badly needed. Currently, crafty lawyers are able to game the system by filing large, nationwide class action suits in certain preferred State courts such as Madison County, Illinois, where judges are quick to certify classes and quick to approve settlements that give the lawyers millions of dollars in fees and give the clients worthless coupons.

Let us take a look at Madison County, Illinois with this chart. Madison County, Illinois has been called the number one judicial hellhole in the United States. In 2002 we can see there were 77 class action filings, and in 2003 there were 106 class action lawsuits filed. The movie "Bridges of Madison County" was a love story. The "Judges of Madison County" would be a horror flick.

Unfortunately, all too often it is the lawyer who drives these cases and not the individuals who are supposedly hurt. For example, in a suit against Blockbuster over late fees, the attorneys received for themselves $9.25 million, while their clients got a $1-off discount coupon. Similarly, in a lawsuit against the company who makes Cheerios, the lawyers received $2 million for themselves; predictably their clients received a coupon for a box of Cheerios.

In a nutshell, these out-of-control class action lawsuits are killing jobs, they are hurting small business people who cannot afford to defend themselves, they are hurting consumers who end up paying higher prices for goods and services.

This legislation provides much-needed reform in two key areas. First, it eliminates much of the forum shopping by requiring most of these nationwide class action suits to be filed in federal court. And, second, it cracks down on these coupon-based class action settlements by requiring fee awards to be based on the number of coupons actually redeemed or the number of hours actually billed.

Mr. Speaker, I urge my colleagues to vote "yes" on this class action reform legislation. It is about common sense, it is about justice, and it is about time.

Mr. CONYERS . Mr. Speaker, I yield 3 minutes to the distinguished gentleman from Virginia (Mr. Scott).

Mr. SCOTT of Virginia . Mr. Speaker, I thank the gentleman for yielding me this time.

Mr. Speaker, we hear all this hoopla about these coupon settlements, but we do not hear any suggestion as to what to do about them. There are a lot of situations where corporations are ripping people off for small amounts of money.

For example, if a person at a checkout counter calibrates the machine to just cheat one out of a few cents, what is one's recovery in that case? Just a few cents. And the only way one can stop that is with a class action. But they would suggest there is no point in bringing the class action; as long as they did not rip them off for too much, they ought to get away with it.  **[*H736]**

Furthermore, a lot of these coupon settlements are in Federal courts anyway, so there is not going to be much change. But some of these coupon cases are the only way that we can rein in corporate abuse.

But this bill just increases complications in a gratuitous way. It took a half an hour for the proponents to explain when it is a class action and when it is not a class action. In normal cases they file it in State court. Either they certify it or not, and then one goes forward. There is not much complication. But this invites mischief. Whether it is really a class action or not, remove it anyway, and let the Federal courts mess around with it and mess around with it and mess around with it. They may never get their day in court. And if they do not certify it, what happens to one's case? They may not be able to get back to State court. So the fact that they did not certify a class action will deny one the right to even have their day in court.

This complicates venue. They do not know where the case is going to be heard. It could be that an injury happens in one State, they have corporations in that State involved, they have State plaintiffs, and here one has to go chasing around, trying to figure out where they are going to be.

The Attorneys General across the States, 47 Attorneys General in States and territories, have come out against the bill because it puts the Attorneys General in the same crack. They do not know where the case is going to be heard. If they bring a State action in State court, they may get removed. Some of the States have better wage laws, civil rights laws, sometimes consumer protections, and if the Attorneys General want to come in to protect their own citizens in their own States, they ought to have that right and not get jerked around to Federal court.

Finally, Mr. Speaker, some Federal courts are more clogged up than State courts. Some in the same area, the State courts are more clogged up than the Federal courts. Why do we have to always go into Federal court on these cases rather than have some kind of choice? Every time we have a criminal case, it will take preference over the civil cases. And in some cases where we have some terrorist cases or a backlog of Federal cases, one may never get

to hear their case in Federal court.

If we want consumers to get timely justice, we need to defeat this bill, and I hope that is what we do.

Mr. CONYERS . Mr. Speaker, I yield 4 minutes to the distinguished gentleman from North Carolina (Mr. Watt).

Mr. WATT . Mr. Speaker, I rise in opposition to S. 5, the Class Action Fairness Act. Despite its name, this bill is anything but fair to the class action device that has provided redress to large numbers of American citizens who have been harmed by the same defendant or a group of defendants.

Class action procedures have made it possible for injured Americans to aggregate small claims that might not otherwise warrant the expense of individual litigation. This bill before us will effectively undermine the utility, practicality, and choice the class action mechanism has offered to injured persons with legitimate claims against powerful entities.

There appear to be improvements in this bill from the bill we considered last Congress; yet there could and should be more improvements. But the trend thus far this session is to dispense with regular order, deny committee consideration, and to leave Members with 1 to 2 minutes to hurriedly voice our concerns. I can guarantee my colleagues, having practiced law for over 20 years, that the core provisions of this bill will invite prolonged satellite litigation into ill-defined or undefined terms in this bill, clogging the Federal courts and denying prompt justice to worthy claimants.

For example, where "significant relief" is sought against a home State defendant, the court has no jurisdiction. What is significant and what is not significant? Also, and worse in my judgment, no longer will a coherent description of the class be sufficient before the trial on the merit proceeds. Under the bill the judge must first know with certainty the absolute number of the plaintiff class, because whether he may or must decline to hear the case depends on whether a "magic" number of plaintiffs are citizens of the State where the lawsuit was filed. There are other examples too complicated to address here in the time that we have available.

But let me just say that juxtaposed against the smattering of cases paraded by the supporters of this bill as justification for this upheaval in our justice system are countless class action lawsuits by principled attorneys and courageous plaintiffs that have exposed deliberate wrongdoing, obtained justice for American citizens, and vindicated the values of fair play and equal justice that define our society.

America is distinguished from other countries because of its legal system both criminal and civil. Is it perfect? No. But the majority wages countless legislative assaults on the entire system rather than confined, deliberative, surgical repairs. Under this bill, one bad judge, we condemn all of the judges in the system. One excessive jury award, let us overhaul the entire jury system. One irresponsible lawyer, let us punish all lawyers. And here let us take these actions without any committee hearings, markup, or debate. What could be more irresponsible to our constituents?

Whatever happened to the notion that we were making our court systems convenient to people? In some of our States, the Federal courts are far removed from the places where individual litigants live. And what is it with the notion all of a sudden that my States rights friends believe that the Federal courts and the Federal Government can solve every problem in our society? That is just simply absurd, inconsistent with any kind of consistent philosophy about federalism.

I think we should defeat this flawed bill, and I thank the gentleman for yielding me this time.

Mr. CONYERS . Mr. Speaker, I yield 3 minutes to the gentleman from Virginia (Mr. Moran).

Mr. MORAN of Virginia . Mr. Speaker, I thank the gentleman for yielding me time, even though I am in opposition to his position and favor this bill. This is not a radical bill, nor is it regressive. In fact, it is a reasonable compromise designed to address what is an abuse of the judicial system. That is why The Washington Post endorses this bill. It is why the Democratic Senators from New York, California, and Illinois all voted for the bill. In fact, Democratic Senators representing 19 States voted for this bill in the other body. Why did they do this? Because they believe on balance that consumers are going to be better represented in Federal courts.

And this notion that somehow State courts are going to be more inclined to represent consumer interests rather than Federal courts on issues like tobacco and civil rights and so on, I do not think history proves that to be the case.

I am particularly sensitive to these charges that this bill is going to inhibit civil rights actions. Clearly if we look at history, it is the Federal courts that have been far more insistent upon enforcement of civil rights than State courts. Even recently in the Home Depot case, a gender-discrimination case, it was settled with a $65 million settlement, filed in Federal court. The Coca-Cola racial-discrimination settlement, which guaranteed each class member recovery of at least $38,000, was achieved in Federal court.

Contrast that to the Bank of Boston case, where the depositors in Boston were not even aware they were members of a plaintiff class, where a lawyer filed suit down in Alabama supposedly representing their interest, and they found out when they had their bank account reduced by $90; $90 was taken out of the mortgage escrow account from these depositors to pay the lawyers when they were not even aware they were a member of the plaintiff's suit, and the lawyer walks off with $8.25 million. That is judicial abuse, and that is what this bill corrects.

This is a reasonable bill. The fact is that in so many State and local courts, they do not have the resources to go through the mountains of evidence that have to be presented in class action suits. In Federal courts they are far more likely to have those resources. They have court clerks and they can hire magistrates that can go through all of the evidence.
  [*H737]


There has been far too much abuse where judges have certified these settlements at the tort lawyer's request and then, the defendant has to settle for large sums of money. That is not the way it is supposed to work.

On balance, I think the judicial system will be far more fair, responsible, and reasonable under this compromise bill; so I would urge my colleagues, particularly on the Democratic side, to support this bill.

Mr. CONYERS . Mr. Speaker, I yield myself 1 minute. I would like to respond to my good friend, the gentleman from Virginia (Mr. Moran).

First of all, I think the NAACP and the civil rights groups will be eager to find out that his wisdom is superior to their experience in the civil rights movement. What the gentleman was suggesting may have been correct a number of years ago, but I would point out to the gentleman that the Federal courts more recently have not been as desirable a forum for civil rights activities.

The Bank of Boston case, that was 10 years ago and an anomaly. There are not other examples of class actions where class members lost money. No other court has made the same mistake. I would urge that neither the gentleman nor any of us rewrite class action rules because of one mistake.

Mr. Speaker, I yield 3 minutes to the gentleman from Washington (Mr. Inslee).

(Mr. INSLEE asked and was given permission to revise and extend his remarks.)

Mr. INSLEE . Mr. Speaker, I heard an earlier speaker refer to class actions as a game. Try telling that to the 9-year-old son of Janet Huggins, a 39-year-old healthy Tennessee mother who took Vioxx and died in September 2004. Tell her family that the effort to protect her family is a game. This is not a game. This is flesh and blood, the ability to protect your family when something happens to you that you did not have anything to do with.

This bill is the Vioxx Protection Bill. It is the Wal-Mart Protection Bill. It is the Tyco Protection Bill. It is the Enron Protection Bill. Anyone in the State of Washington who saw what Enron did to us, stealing $1 billion, should not be voting for this bill, because this bill in many ways is the Just Say No Bill to People Who Are Injured By Rapacious Wrongdoers.

In three ways it says "just say no" to consumers who were hurt by Enron, because in the Federal courts, if you happen to be in a plaintiff's group of multiple States and the laws are a little different in the States, do you know what the Federal courts do? They throw out the class action.

Do you want to know why the Chamber of Commerce is spending $1 billion to lobby on what seems to be a procedural issue? Because they throw out class actions where there is any difference in States, meaning you will not be able to have a class action anywhere, anywhere, Federal or State.

Why is this so important? I liken this to right now you have two arms to protect Americans, the State judicial system and the Federal judicial system. This reduces by half the resources that are available to Americans to get redress when Enron steals from them or when Vioxx kills them.

On 9/11, did we respond to September 11 by taking out city police officers and only having the FBI? On 9/11, did we respond by not having local fire departments and only having the Coast Guard or Army fire department? No. We recognized that in our system of federalism, Americans deserve the full protection, not just half the protection.

This cuts the available judicial resources in half. Why is that important? The second reason it just says no to injured Americans is the Federal courts cannot handle these class actions. They do not have enough courts and judges. You go down and ask how long you will wait today to get into a Federal court. Then add about 4 or 5 years after this bill if this bill were to come into effect. You just say no because it takes the keys away from the courthouse.

The third reason it just says no to good American citizens is it takes from the State attorneys general their ability to protect people. That is why the States attorneys general, Republican and Democrat alike, are adamantly opposed to this bill, because this bill takes cops off the beat; attorneys generals whose job it is to protect us from what Roosevelt called the "malefactors of great wealth" are off the beat.

Mr. Speaker, we should reject this bill.

Mr. CONYERS . Mr. Speaker, I am pleased to yield 5 minutes to the distinguished gentlewoman from Texas (Ms. Jackson-Lee), a member of the Committee on the Judiciary

and a ranking subcommittee member.

(Ms. JACKSON-LEE of Texas asked and was given permission to revise and extend her remarks, and include extraneous material.)

Ms. JACKSON-LEE of Texas . Mr. Speaker, I thank the gentleman for the time that he has spent on this legislation. I think we have seen this come across our desks for a number of sessions, and we have tried to work in a bipartisan manner in order to find a way to respond to some of the larger class actions that are now proceeding before us in the courts.

Mr. Speaker, let me start out by trying to address some of the large dilemmas that have seemingly been the underpinnings of this overhaul of a system that is not broken.

I know some two or three sessions ago we were in the midst of conversations about the asbestos lawsuits. Frankly, I believe that with a reasonable dialogue and exchange, we were nearing some sort of resolution that would have allowed that heinous series of events over the years, the asbestos poisoning for many, many workers, to be brought to a conclusion.

For some reason, those favoring class action reform want to paint with a broad brush the victims, those who have been victimized by asbestos poisoning. Even today as we are looking to reconstruct some of the older buildings in my community, we are finding an asbestos problem. But because of the notice that was given through these class action lawsuits, we now have companies who are protecting workers who are going in trying to clean out asbestos. We would not have had that had we had not had this asbestos crisis.

It is the same thing with tobacco. Although there has been some humor about "don't you know when to stop smoking," we know that for years and years, years and years, there was no labeling of cigarettes to suggest that they in fact caused cancer. So the tobacco lawsuits are not in fact frivolous. They may be high in return, but they are not frivolous.

This class action lawsuit legislation, I believe, is excessive and overreaching. What it simply wants to do is burden Federal courts without giving them any resources. There is nothing in this legislation that increases the funding of our Federal courts.

Take the southern district, for example. We are so overburdened with criminal cases, immigration cases, smuggling cases, drug cases, there is absolutely no room to orderly now prosecute or allow to proceed class action lawsuits from people who have been damaged enormously.

This legislation wants to federalize mass torts, that is thousands and thousands of people, when they realize that the compromise, for example, that was offered in the Senate, the Feinstein compromise, does not do anything, because what it says is you can go into State court if you can find one of the defendants of a large corporation in your State. If you happen to be a small State or maybe some State that is not the headquarters of corporate entities, like on the east coast, for example, you will find no defendant, so you will be languishing year after year after year trying to get into Federal court.

What it also does is minimizes the opportunity of those who can secure their local lawyer to get them into a State court and burdens them with the responsibility of finding some high-priced counsel that they cannot afford to try to understand Federal procedure law to get into the Federal court. It closes the door to the least empowered: the poor, the working class and the middle class.

What we find as well is that this legislation is much broader than is needed. Why close the door to those who are injured by the failings of products? Why close the doors to those who are injured by the mass and unfortunate activities of a company like Enron in my

congressional district, penalizing thousands of workers all over America unfairly and giving them no relief, giving no relief to the pensioners who lost all of their dollars? **[\*H738]**

Mr. Speaker, what we have here is a response to no crisis, a response to no problem. Frankly, I believe that if we reasonably look at this legislation, we will find that all it does is it zippers the courthouse door.

To my good friend who mentioned that civil rights can take place wherever is necessary, let me just share with you that civil rights is not a popular cause; and, therefore, to then add it to get in line now with thousands of other cases, you can be assured that there will be a crisis.

Mr. Speaker, let me simply say I rise to support the substitute that has the civil rights carve-out, the wage-and-hour carve-out. It excludes non-action cases involving physical injuries, an attorney general carve-out, the anti-secrecy language; and in particular it does not allow companies to go offshore to avoid class action lawsuits.

Mr. Speaker, let me simply say this is a bill on the floor with no problem. But I can tell you, America, you are going to have a big problem once this bill is passed, and I am saddened by the fact that time after time we come to this floor and we close out the working people, we close out the middle-class, and we close out those who need relief.

Mr. CONYERS . Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, we have listened carefully to the discussion here, and it is very clear that one thing is for sure: this is not a simple procedural fix to class actions in our courts.

Another thing, it is clear that all of the totally unsatisfactory provisions have not been removed.

First, the bill, as the gentlewoman from Texas has said, harms working Americans and victims of discrimination who are in no position to bring individual actions of wage-and-hour cases or civil rights discrimination claims. Moving the cases to Federal court will result in many never being ever heard at all.

Many State laws provide better protection than Federal statutes. For example, 20 States provide protection for marital status and Federal law does not. Twenty-one States extend Federal definitions of national origin discrimination by including ancestry, place of birth, and citizenship status; and 31 States prohibit genetic discrimination in the workplace, not provided under Federal law.

Secondly, this bill closes the door on victims of large-scale personal injury cases resulting from accidents, environmental disasters, or dangerous drugs that are widely sold. Although these cases are filed in State courts under State law, the bill will treat them as class actions and throw them willy-nilly into the Federal court.

While harming victims of personal injury, this provision greatly helps the companies, like Merck, the company that manufactured the deadly drug Vioxx. Since the discovery of the dangers of Vioxx, hundreds of cases from all over the country have been filed against Merck, and we can anticipate likely thousands more. However, under this proposal before us today, those who suffered harm from the drug will be denied their day in court and their ability to seek justice.

Finally, this bill makes it difficult for consumers to pursue claims against defendants who violated consumer protection laws. The bill will force many of these cases filed in State courts

into the Federal system. But some Federal courts will not certify class actions involving the laws of multiple States because they deem the case too complex and unmanageable. Result: harmed consumers will never have their cases adjudicated in the courts.

It also makes it impossible for States to pursue actions against defendants who have caused harm to the State's citizens. State attorneys general often pursue these claims under State consumer protection statutes, antitrust laws, often with the attorney general acting as the class representative for the consumers of the State.

Under this bill, would we want these cases to be thrown into Federal court and severely impede the State's ability to enforce its own laws for its own citizens? That is what will happen. That is what will take place.

So I am very pleased to put in the Record the letter from the States attorneys general opposing this legislation, those attorneys general from California, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, New Jersey, New Mexico, New York, Oklahoma, Oregon, Vermont, and West Virginia.

I would also like to add the letter from the environmental organizations which have made their case as to why this would be a very harmful measure. The signatories of this letter include the United States Public Interest Research Group, PIRG; the Wilderness Society; the Sierra Club; the National Environment Trust; Greenpeace; Friends of the Earth; and the National Audubon Society, and many others.

Finally, Mr. Speaker, I include in this debate from the Leadership Conference and the AFL-CIO, and the Alliance For Justice, all writing on one letter, and they plead with us in the House of Representatives to protect working men and women and civil rights litigants by opposing the measure that is before us.

Washington, DC, February 15, 2005.

Dear Representative: On behalf of the undersigned civil rights and labor organizations, we write to urge you to vote against the Class Action Fairness Act (S. 5), which passed the Senate last week. While the bill was pending before the Senate, we pushed for an amendment offered by Senator Kennedy that would have exempted civil rights and wage and hour state law cases. Because the amendment was not adopted, we ask you to reject S. 5 in order to ensure that the Class Action Fairness Act does not adversely impact the workplace and civil rights of ordinary Americans by making it extremely difficult to enforce civil rights and labor rights.

During Congress' extensive examination into the merits of class action lawsuits, nowhere has a case been made that abuses exist in anti-discrimination and wage and hour class-action litigation. By allowing dozens of employees to bring one lawsuit together, the class-action device is frequently the only means for low wage workers who have been denied mere dollars a day to recover their lost wages. Moreover, class actions also are often the only means to effectively change a policy of discrimination. These suits level the playing field between individuals and those with more power and resources, and permit courts to decide cases more efficiently.

Wage and hour class actions are most often brought in state courts under the law of the state in which the claims arise. The reason is that state wage and hour laws typically provide more complete remedies for victims of wage and hour violations than the federal wage and hour statute. For instance, the federal Fair Labor Standards Act (FLSA) offers no protection for a worker who works 30 hours and is paid for 20, so long as the worker's total pay for the 30 hours worked exceeds the federal minimum wage. However, many states have "payment of wage" laws that would require that the worker be fully paid for those additional 10 hours of

work. Also, federal law provides no remedy for part-time workers who often work 10-16 hour days, yet earn no overtime because they work less than 40 hours per week. At least six states and territories, however, including California and Alaska, require payment of overtime after a prescribed number of hours are worked in a single day.

Likewise, state laws increasingly provide greater civil rights protection than federal law. For example, every state has passed a law prohibiting discrimination on the basis of disability. Some of these state statutes provide a broader definition of disability and a greater range of protection in comparison to the federal Americans with Disabilities Act including California, Minnesota, New Jersey, New York, Rhode Island, Washington, and West Virginia. In addition, every state has enacted a law prohibiting age discrimination in employment, and some of these state laws_including those of California, Michigan, Ohio and the District of Columbia_contain provisions affording greater protection to older workers than comparable provisions of the federal Age Discrimination in Employment Act (ADEA).

In addition, many state laws provide protections to classifications not covered by federal law. For example, the following states provide protection for marital status: Alaska, California, Connecticut, Delaware, Florida, Hawaii, Illinois, Maryland, Michigan, Minnesota, Montana, Nebraska, New Hampshire, New Jersey, New York, North Dakota, Oregon, Virginia, Washington, and Wisconsin. Moreover, several states have expanded Title VII's ban on national origin discrimination to prohibit discrimination on the basis of ancestry, or place of birth, or citizenship status. These states include Arkansas, California, Colorado, Connecticut, Hawaii, Illinois, Indiana, Kansas, Maine, Massachusetts, Missouri, New Jersey, New Mexico, Ohio, Pennsylvania, South Dakota, Vermont, West Virginia, Wisconsin, Wyoming, and the Virgin Islands.

Finally, 31 states have enacted legislation prohibiting genetic discrimination in the workplace_an important protection given the rapid increase in the ability to gather this type of information. The 31 states are Arizona, Arkansas, California, Connecticut, Delaware, Hawaii, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New York, North **[\*H739]** Carolina, Oklahoma, Oregon, Rhode Island, South Dakota, Texas, Utah, Vermont, Virginia, Washington, and Wisconsin. In addition, Florida and Illinois have enacted more limited protections against genetic discrimination.

Under S. 5, citizens are denied the right to use their own state courts to bring class actions against corporations that violate these state wage and hour and state civil rights laws, even where that corporation has hundreds of employees in that state. Moving these state law cases into federal court will delay and likely deny justice for working men and women and victims of discrimination. The federal courts are already overburdened. Additionally, federal courts are less likely to certify classes or provide relief for violations of state law.

In light of the lack of any compelling need to sweep state wage and hour and civil rights claims into the scope of the bill, which is done in the current bill, we urge you to vote against S. 5. In the event that amendments are offered, we support any amendment that, like the Kennedy amendment and others offered in the Senate, preserves the right of individuals to bring class actions in an effective, efficient manner.

If you have any questions, or need further information, please call Nancy Zirkin, Deputy Director of the Leadership Conference on Civil Rights (202-263-2880); Sandy Brantley, Legislative Counsel, Alliance for Justice (202-822-6070); or Bill Samuel, Legislative Director, AFL-CIO (202-637-5320).

Sincerely,

AARP; AFL-CIO; Alliance for Justice; American-Arab Anti-Discrimination Committee;

American Association of People with Disabilities; American Association of University Women; American Civil Liberties Union; American Federation for the Blind; American Federation of Government Employees; American Federation of School Administrators; American Federation of State, County & Municipal Employees; American Federation of Teachers; American Jewish Committee; Americans for Democratic Action.

The Arc of the United States; Association of Flight Attendants; Bazelon Center for Mental Health Law; Center for Justice and Democracy; Coalition of Black Trade Unionists; Communications Workers of America; Consortium for Citizens with Disabilities Civil Rights Task Force; Department for Professional Employees, AFL-CIO; Disability Rights Education and Defense Fund; Epilepsy Foundation; Federally Employed Women; Federally Employed Women's Legal & Education Fund, Inc.; Food & Allied Service Trades Department, AFL-CIO; Human Rights Campaign.

International Association of Machinists and Aerospace Workers; International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers; International Brotherhood of Electrical Workers; International Brotherhood of Teamsters; International Federation of Professional & Technical Engineers; International Union of Bricklayers and Allied Craftworkers; International Union of Painters and Allied Trades of the United States and Canada; International Union, United Automobile, Aerospace & Agricultural Workers of America; Jewish Labor Committee; Lawyers' Committee for Civil Rights Under Law; Lawyers' Committee for Civil Rights of the San Francisco Bay Area; Leadership Conference on Civil Rights; Legal Momentum; Mexican American Legal Defense and Educational Fund.

NAACP; NAACP Legal Defense & Educational Fund, Inc.; National Alliance of Postal and Federal Employees; National Asian Pacific American Legal Consortium; National Association for Equal Opportunity in Higher Education; National Association of Protection and Advocacy Systems; National Association of Social Workers; National Employment Lawyers Association; National Fair Housing Alliance; National Organization for Women; National Partnership for Women and Families; National Women's Law Center; Paper, Allied-Industrial, Chemical and Energy Workers International Union; Paralyzed Veterans of America.

People For the American Way; Pride At Work, AFL-CIO; Service Employees International Union; Transport Workers Union of America; Transportation Communications International Union; UAW; Unitarian Universalist Association of Congregations; UNITE!; United Cerebral Palsy; United Food and Commercial Workers International Union; United Steelworkers of America; Utility Worker Union of America; and Women Employed.

February 7, 2005.

Dear Senator: Our organizations are opposed to the sweepingly-drawn and misleadingly named "Class Action Fairness Act of 2005." This bill is patently unfair to citizens harmed by toxic spills, contaminated drinking water, polluted air and other environmental hazards involved in class action cases based on state environmental or public health laws. S. 5 would allow corporate defendants in many pollution class actions and "mass tort" environmental cases to remove these kinds of state environmental matters from state court to federal court, placing the cases in a forum that could be more costly, more time-consuming, and disadvantageous to your constituents harmed by toxic pollution. State law environmental harm cases do not belong in this legislation and we urge you to exclude such pollution cases from the class action bill.

Class actions protect the public's health and the environment by allowing people with similar injuries to join together for more efficient and cost-effective adjudication of their cases. All too often, hazardous spills, water pollution, or other toxic contamination from a single source affects large numbers of people, not all of whom may be citizens or residents of the same state as that of the defendants who caused the harm. In such cases, a class action lawsuit in

state court based on state common law doctrines of negligence, nuisance or trespass, or upon rights and duties created by state statutes in the state where the injuries occur, is often the best way of fairly resolving these claims.

For example, thousands of families around the country are now suffering because of widespread groundwater contamination caused by the gasoline additive MTBE, which the U.S. government considers a potential human carcinogen. According to a May, 2002 GAO report, 35 states reported that they find MTBE in groundwater at least 20 percent of the time they sample for it, and 24 states said that they find it at least 60 percent of the time. Some communities and individuals have brought or soon will bring suits to recover damages for MTBE contamination and hold the polluters accountable, but under this bill, MTBE class actions or "mass actions" based on state law could be removed to federal court by the oil and gas companies in many of these cases.

This could not only make these cases more expensive, more time-consuming and more difficult for injured parties, but could also result in the dismissal of legitimate cases by federal judges who are unfamiliar with, or less respectful of, state-law claims. For example, in at least one MTBE class action, a federal court dismissed the case based on oil companies' claims that the action was barred by the federal Clean Air Act (even though that law contains no tort liability waiver for MTBE). Yet a California state court rejected a similar federal preemption argument and let the case go to. a jury, which found oil refineries, fuel distributors, and others liable for damages. These cases highlight how a state court may be more willing to uphold legitimate state law claims. Other examples of state-law cases that would be weakened by this bill include lead contamination cases, mercury contamination, perchlorate pollution and other "toxic tort" cases.

In a letter to the Senate last year, the U.S. Judicial Conference expressed their continued opposition to such broadly written class action removal legislation. Notably, their letter states that, even if Congress determines that some "significant multi-state class actions" should be brought within the removal jurisdiction of the federal courts, Congress should include certain limitations and exceptions, including for class actions "in which plaintiff class members suffered personal injury or personal property damage within the state, as in the case of a serious environmental disaster." The Judicial Conference's letter explains that this "environmental harm" exception should apply "to all individuals who suffered personal injuries or losses to physical property, whether or not they were citizens of the state in question."

We agree with the Judicial Conference that cases involving environmental harm are not even close to the type of cases that proponents of S. 5 cite when they call for reforms to the class action system. Including such cases in the bill penalizes injured parties in those cases for no reason other than to benefit the polluters. No rationale has been offered by the bill's supporters for including environmental cases in S. 5's provisions. We are unaware of any examples offered by bill supporters of environmental harm cases that represent alleged abuses of the state class actions.

More proof of the overreaching of this bill is that the so-called "Class Action Fairness Act" is not even limited to class action cases. The bill contains a provision that would allow defendants to remove to federal court all environmental "mass action" cases involving more than 100 people_even though these cases are not even filed as class actions. For example, the bill would apply to cases similar to the recently concluded state-court trial in Anniston, Alabama, where a jury awarded damages to be paid by Monsanto and Solutia for injuring more than 3,500 people that the jury_found had been exposed over many years_with the companies' knowledge_to cancer-causing PCBs.

There is little doubt in the Anniston case that, had S. 5 been law, the defendants would have tried to remove the case from the state court that serves the community that suffered this

devastating harm. Even in the best-case scenario, S. 5 would put plaintiffs like those in Anniston in the position of having to fight costly and time-consuming court battles in order to preserve their chosen forum for litigating their claims. In any case, it would reward the kind of reckless corporate misbehavior demonstrated by Monsanto and Solutia by giving defendants in such cases the right to remove state-law cases to federal court over the objections of those they have injured.

The so-called "Class Action Fairness Act" would allow corporate polluters who harm the public's health and welfare to exploit the availability of a federal forum whenever they perceive an advantage to doing so. It is nothing more than an attempt to take legitimate state-court claims by injured parties out of state court at the whim of those who have committed the injury.

Cases involving environmental harm and injury to the public from toxic exposure **[*H740]** should not be subject to the bill's provisions; if these environmental harm cases are not excluded, we strongly urge you to vote against S. 5.

Sincerely,

S. Elizabeth Birnbaum, Vice President for Government Affairs, American Rivers.

Doug Kendall, Executive Director, Community Rights Counsel.

Mary Beth Beetham, Director of Legislative Affairs, Defenders of Wildlife.

Sara Zdeb, Legislative Director, Friends of the Earth.

Anne Georges, Acting Director of Public Policy, National Audubon Society.

Karen Wayland, Legislative Director, Natural Resources Defense Council.

Tom Z. Collina, Executive Director, 20/20 Vision.

Linda Lance, Vice President for Public Policy, The Wilderness Society.

Paul Schwartz, National Campaigns Director, Clean Water Action.

James Cox, Legislative Counsel, Earthjustice.

Ken Cook, Executive Director, Environmental Working Group.

Rick Hind, Legislative Director, Toxics Campaign, Greenpeace US.

Kevin S. Curtis, Vice President, National Environmental Trust.

Ed Hopkins, Director, Environmental Quality Programs, Sierra Club.

Julia Hathaway, Legislative Director, The Ocean Conservancy.

Anna Aurilio, Legislative Director, U.S. Public Interest Research Group.

National Association

of Attorneys General,

Washington, DC, February 7, 2005.

Hon. Bill Frist,

Senate Majority Leader, U.S. Senate,

Dirksen Building, Washington, DC.

Hon. Harry Reid,

Senate Minority Leader, U.S. Senate,

Hart Building, Washington, DC.

Dear Senate Majority Leader Frist and Senate Minority Leader Reid: We, the undersigned State Attorneys General, write to express our concern regarding one limited aspect of pending Senate Bill 5, the "Class Action Fairness Act," or any similar legislation. We take no position on the Act as a general matter and, indeed, there are differing views among us on the policy judgments reflected in the Act. We join together, however, in a bipartisan request for support of Senator Mark Pryor's potential amendment to S. 5, or any similar legislation, clarifying that the Act does not apply to, and would have no effect on, actions brought by any State Attorney General on behalf of his or her respective state or its citizens.

As Attorneys General, we frequently investigate and bring actions against defendants who have caused harm to our citizens. These cases are usually brought pursuant to the Attorney General's parens patriae authority under our respective consumer protection and antitrust statutes. In some instances, such actions have been brought with the Attorney General acting as the class representative for the consumers of the state. It is our concern that certain provisions of S. 5 might be misinterpreted to hamper the ability of the Attorneys General to bring such actions, thereby impeding one means of protecting our citizens from unlawful activity and its resulting harm.

The Attorneys General have been very successful in litigation initiated to protect the rights of our consumers. For example, in the pharmaceutical industry, the States have recently brought enforcement actions on behalf of consumers against large, often foreign-owned, drug companies for overcharges and market manipulations that illegally raised the costs of certain prescription drugs. Such cases have resulted in recoveries of approximately 235 million dollars, the majority of which is earmarked for consumer restitution. In several instances, the States' recoveries provided one hundred percent reimbursement directly to individual consumers of the overcharges they suffered as a result of the illegal activities of the defendants. This often meant several hundred dollars going back into the pockets of those consumers who can least afford to be victimized by illegal trade practices, senior citizens living on fixed incomes and the working poor who cannot afford insurance.

We encourage you to support the aforementioned amendment exempting all actions brought by State Attorneys General from the provisions of S. 5, or any similar legislation. It is important to all of our constituents, but especially to the poor, elderly and disabled, that the provisions of the Act not be misconstrued and that we maintain the enforcement authority needed to protect them from illegal practices. We respectfully submit that the overall purposes of the legislation would not be impaired by such an amendment that merely clarifies the existing authority of our respective States.

Thank you for your consideration of this very important matter. Please contact any of us if you have questions or comments.

Sincerely,

Mike Beebee, Attorney General, Arkansas.

Gregg Renkes, Attorney General, Alaska.

Mark Shurtleff, Attorney General, Utah.

Fiti Sunia, Attorney General, American Samoa.

Terry Goddard, Attorney General, Arizona.

John Suthers, Attorney General, Colorado.

Jane Brady, Attorney General, Delaware.

Charlie Crist, Attorney General, Florida.

Mark Bennett, Attorney General, Hawaii.

Stephen Carter, Attorney General, Indiana.

Bill Lockyer, Attorney General, California.

Richard Blumenthal, Attorney General, Connecticut.

Robert Spagnoletti, Attorney General, District of Columbia.

Thurbert Baker, Attorney General, Georgia.

Lawrence Wasden, Attorney General, Idaho.

Tom Miller, Attorney General, Iowa.

Greg Stumbo, Attorney General, Kentucky.

Steven Rowe, Attorney General, Maine.

Tom Reilly, Attorney General, Massachusetts.

Mike Hatch, Attorney General, Minnesota.

Jay Nixon, Attorney General, Missouri.

Jon Bruning, Attorney General, Nebraska.

Kelly Ayotte, Attorney General, New Hampshire.

Charles Foti, Attorney General, Louisiana.

Joseph Curran, Attorney General, Maryland.

Mike Cox, Attorney General, Michigan.

Jim Hood, Attorney General, Mississippi.

Mike McGrath, Attorney General, Montana.

Brian Sandoval, Attorney General, Nevada.

Peter Harvey, Attorney General, New Jersey.

Eliot Spitzer, Attorney General, New York.

Wayne Stenehjem, Attorney General, North Dakota.

Jim Petro, Attorney General, Ohio.

Hardy Myers, Attorney General, Oregon.

Roberto Sanchez Ramos, Attorney General, Puerto Rico.

Henry McMaster, Attorney General, South Carolina.

Roy Cooper, Attorney General, North Carolina.

Pamela Brown, Attorney General, N. Mariana Islands.

W.A. Drew Edmondson, Attorney General, Oklahoma.

Tom Corbett, Attorney General, Pennsylvania.

Patrick Lynch, Attorney General, Rhode Island.

Lawrence Long, Attorney General, South Dakota.

Paul Summers, Attorney General, Tennesse.

Darrell McGraw, Attorney General, West Virginia.

Patrick Crank, Attorney General, Wyoming.

Rob McKenna, Attorney General, Washington.

Peg Lautenschlager, Attorney General, Wisconsin.

Mr. Speaker, I urge my colleagues to seriously consider the excellent presentations made on our side of the aisle and vote against the measure that is before us today.

Mr. Speaker, I yield back the balance of my time.

Mr. SENSENBRENNER . Mr. Speaker, I yield myself the balance of the time.

Mr. Speaker, notwithstanding what we have heard from opponents of this legislation, its passage would not extinguish the legal right of any injured party, whether it be a class action, a mass action, or an individual lawsuit from proceeding in a court of competent jurisdiction in the United States. What the bill does do is it puts some sense into the class action system so that the members of the plaintiff's class will be fairly and adequately compensated rather than seeing all of their gains go to attorneys and them just getting coupon settlements from the people who have allegedly done them wrong.

I was particularly perturbed listening to the gentleman from Massachusetts (Mr. Markey), who said that the kids who start smoking at 13 and 14 years old are going to be denied their day in court, and that the tobacco companies are going to end up cashing in on a big

bonanza.

Well, I had my staff, while this was going on, look at what has happened to Altria, the parent company of Philip Morris. Since the other body passed this bill, Altria stock has gone down by at least $1.50, or 2 percent. And today, the Reuters story that came out less than an hour ago says that the Dow has been dragged down by Altria.

Now, if this was the bonanza to investors in Altria, the stock would not be going down. It is not. That is a fallacious argument. Reject the substitute and pass the bill.

Mr. HASTERT . Mr. Speaker, I'm pleased join my colleagues here today who support taking a historic first step to breaking one of the main shackles holding back our economy and America's workforce_lawsuit abuse.

For the last decade, the Republican Congress has worked to end out of control lawsuits. Today is the day we will pass common-sense legislation and put an end to Class Action Lawsuit abuse.

I particularly want to praise the efforts of House Judiciary Chairman Jim Sensenbrenner for his relentless work. Without his **[*H741]** stewardship, I don't think th achievement would have become a reality.

I come from Illinois_the Land of Lincoln_where downstate Madison County has the dubious distinction as a personal injury lawyer's paradise. No, there are not palm trees or sandy beaches there. Instead, Madison County, Illinois, is home to very warm courtrooms where frivolous lawsuits are filed virtually everyday.

Why's Madison County? The answer: "venue shopping."

Cagey trial lawyers have figured out there's a pretty good likelihood their case_no matter what its merit_will literally get its day in court because of favorable judges.

To use a sports analogy, thanks to willing judges, personal injury lawyers get to play on their "home court" each and every time they file a frivolous lawsuit there.

For instance, a legendary class action case from Madison County illustrates what's wrong with the current legal system.

In 2000, Cable TV customers who filed suit over their cable operator's late fee policy won their case, but received nothing . . . not a dime, not a nickel, not a Lincoln penny. Instead, their $5.6 million settlement went directly into the pockets of their attorneys. How is that justice? How does that help victims?

The American people deserve better. Our working families demand better.

Today's action takes a step in the right direction to end the so-called Tort Tax.

The Tort Tax makes consumers pay more for the goods and services they use.

The Tort Tax adds to the cost of everything we buy because businesses and manufacturers have to cover themselves and their employees_just in case they get sued by a greedy personal injury lawyer.

At last estimate, this outrageous Tort Tax cost the nation's economy $246 billion a year, and by 2006, it will cost the average American nearly $1,000 more each year on their purchases because of defensive business practices.

In closing, as a matter of principle, damage awards should go to the victim, not the lawyers. Lawsuits should not be "strike it rich" schemes for lawyers.

There has to be some limit to what lawyers can take from their clients. Otherwise, cagey attorneys end up with the lion's share of the settlement and the victims end up with little more than scraps.

Mr. UDALL of Colorado . Mr. Speaker, the House has considered similar legislation in 1999, 2002, and 2003. On each of those occasions, I voted "no"_not because I was unalterably opposed to Congress acting on this subject, but because in my judgment the defects of those bills outweighed their potential benefits.

When it was announced that this bill would be considered, I hoped that the pattern would be broken and that this time I would be able to support the legislation. And if the Conyers substitute had been adopted, that would have been the case.

Adoption of the substitute would have greatly improved the legislation. It would have reaffirmed the authority and ability of each State's Attorney General to carry out his or her duties under State law. It would have made sure that the bill would not prejudice people with complaints about violations of their civil rights. It would have properly focused the legislation on class actions unrelated to personal injuries. It would have added important protections for the public's right to know about the proceedings in our courts. And it would have made other changes that would have improved the bill.

Unfortunately, the substitute was not adopted_and I have come to the reluctant conclusion that I must vote against the bill.

That conclusion is reluctant because in several ways this bill is better_or, more accurately, less bad_than its predecessors.

Unlike earlier versions, S. 5 would not have a retroactive effect, so it would not affect pending cases. It also does not include a provision for immediate interlocutory appeals of denials of class action certification, or for a stay of all discovery while the appeal was pending. And in several other ways, it differs for the better from previous versions.

However, while the bill is less bad, in my opinion it still is not good enough. I remain unconvinced that the problem the bill purports to address is so great as to require such a sweeping remedy, and I am still concerned that in too many cases the side-effects of this treatment will be more severe than the disease.

Mr. Speaker, one of the most important rights we have as Americans is the ability to seek redress from the courts when we believe our rights have been abridged or we have been improperly treated. And, when a complaint arises under a State law, it is both appropriate and desirable that it be heard in State court because those are the most convenient and with the best understanding of State laws and local conditions.

Of course, it is appropriate to provide for removing some State cases to Federal courts. But I think that should be more the exception than the rule, and I think this bill tends to reverse that. I think it excessively tilts the balance between the States and the Federal government so as to throw too many cases into already-overburdened Federal courts_with the predictable result that too many will be dismissed without adequate consideration of their merits.

So, while I respect those who have urged the House to pass this bill, I cannot vote for it.

Mr. BLUMENAUER . Mr. Speaker, I agree with this bill's intent to prevent the legal system

from being "gamed" by attorneys who lump thousands of speculative claims into a single class action lawsuit and then seek out a sympathetic State court. Any abusive or frivolous class action is a drain on the system and forces innocent defendants to settle cases rather than play judicial roulette with the risk of a huge unjustified settlement.

Unfortunately, instead of narrowly focusing on such abuses, Senate bill 5 completely reconfigures the judicial system, resulting in diminished corporate accountability and fundamental legal rights of individuals. While this bill makes some improvements to limit frivolous lawsuits, it does so at a price that will make it harder for average Americans to successfully pursue real claims against interests that violate their States' consumer health, civil rights, and environmental protection laws. This is an unnecessary tradeoff. I voted for a Democratic substitute motion which would have minimized some of these abuses. Sadly, it was defeated and, as a result, I voted against final passage.

I will continue to be open to changes that make our judicial system work better, but not at the expense of the people I represent. It is essential that we hold accountable the forces that have so much impact on the lives of every American.

Mr. WEXLER . Mr. Speaker, I rise today in strong opposition to the so-called "Class Action Fairness Act." I have strong objections to not only to the text of the bill itself but also to the very process by which it was strong-armed by the Republican leadership past the Judiciary Committee. This process did not allow any opportunity for committee members to raise our objections or to work constructively to fix the major problems in this legislation. This circumvention of regular order is being sold to us with a myriad of excuses, one of them is that the bill is a simple procedural fix for a judicial crisis with nothing controversial in it.

Nothing could be further from the truth. This bill is a federal mandate to undermine and all but kill the ability to raise class actions cases in State courts. Under this so-called "procedural bill," almost every class action lawsuit would be removed from State jurisdiction and forced onto an already overburdened Federal judiciary. Moving these cases to Federal court will make litigation more costly, more time-consuming and less likely that victims can get their rightful day in court at all. This bill is so preposterously far-reaching it would prevent State courts from considering class action cases that only involve State laws. We have already added so many State cases to Federal jurisdiction that if this bill passes victims will be added to the substantial backlog of Federal cases and will likely find it difficult to ever have their cases heard.

It should be obvious to even the most casual observer that the intent of this bill is to prevent class action lawsuits from ever being heard. Members should make no mistake about it_if we pass this misguided legislation, we will have effectively shut the door on civil rights, on workers rights and on anyone injured through corporate negligence.

Mr. Speaker, I urge my colleagues to join me in opposing one of the most destructive and far reaching civil justice measures ever considered by this body.

Mr. SHAYS . Mr. Speaker, I rise in support of S. 5, the Class Action Fairness Act.

This legislation will work to balance class actions. Currently, plaintiffs' lawyers take advantage of the system by bringing large, national lawsuits in specific jurisdictions with relaxed certification criteria.

Attorneys are increasingly filing interstate class actions in State courts, mostly in what are known as "magnet" jurisdictions. Courts in these jurisdictions are attractive to lawyers because they routinely approve settlements in which attorneys receive large fees and the class members receive virtually nothing, and they also decide the claims of other state's citizens under the court's state law.

This results in more and more class actions being losing propositions for everyone involved_except for the lawyers who brought them.

The Class Action Fairness Act works to improve our legal system by allowing larger interstate class action cases to be heard in Federal courts, closing the magnet jurisdiction loophole.

This bill will also make it easier for local businesses to avoid harassment. Currently,
 **[*H742]**
plaintiffs' lawyers can name a local business in a nationwide liability suit to stay out of Federal court. This legislation will put an end to this unfair practice.

Finally, S. 5 protects consumers with a consumer class action bill of rights. The bill of rights includes several provisions designed to ensure class members_not their attorneys_are the primary beneficiaries of the class action process, and are not simply awarded a coupon at the end of a trial.

Allowing judges to limit attorney's fees when the value of the settlement received by the class member is small in comparison and banning settlements that award some class members more simply because they live closer to the court will make class action suits more fair and help compensate the people who were wronged, not the attorney's handling their case.

I strongly support S. 5 and encourage my colleagues to do so as well.

Mr. DELAHUNT. Once again, Mr. Speaker, we have before us a bill that would sweep aside generations of State laws that protect consumers. Citizens will be denied their basic right to use their own State courts to file class action lawsuits against companies_even if there are clear violations of State labor laws or State civil rights laws. This bill comes after a lobbying campaign costing business interests tens of millions of dollars. Well, that was money well spent. With this sweeping legislation, corporations will have free reign to avoid responsibility for the wrongs they commit.

It is just shameful that the victims of corporate misconduct do not have the same level of influence here in the halls of Congress. Let's not forget the people who died as a result of defective tires manufactured by Firestone. What about countless individuals who died as a result of the tobacco industry's failure to disclose the risks of cigarettes?

Well, if it is any indication of this bill's intent_tobacco is already celebrating this week. Stocks are up and the industry is glowing. Let me quote their take on this bill, "The practical effect of the change could be that many cases will never be heard given how overburdened Federal judges are."

Plainly that is the goal of the bill. The goal is to ensure that legitimate plaintiffs are denied any recovery at all. And that whatever recovery they do receive is delayed as long as possible. I have spent decades in courtrooms and I can tell my colleagues_from my own experience_that justice delayed is justice denied. The doors to the courthouse will be locked shut. And this Republican leadership is handing the key to corporate America.

With complete disregard for precedent-setting individual and class action litigation, the Republican leadership is determined to destroy America's civil justice system, eliminating protections for the poor and powerless. This bill is a disgrace to the historic victories in courts across the country_to expand consumer rights, protect our environment, and strengthen workers' rights.

And there has been complete disregard for the legislative process in the House. While we

have had hearings and markups on class action legislation in the past, this bill is quite complex and very different than previous versions. The fact that the other Chamber has already approved this matter in no way justifies a "rush to judgment" in the House, when so many important rights are at stake.

Class actions have addressed the looting of company after company by corporate insiders, whose brazen misconduct and self-dealing defrauded creditors and investors of billions of dollars, and stripped employees and retirees of their livelihood and life savings.

Yet if this bill becomes law, the victims of those practices will face new obstacles in their efforts to call those executives to task.

This bill is not about protecting plaintiffs. It's not about protecting the public. It's about protecting large corporations whose conduct has been egregious. It's about protecting the powerful at the expense of the powerless. And to prevent people from banding together as a class to challenge that power in the only way they can.

We must also see this bill in its proper context. It is part of an ambitious and multi-pronged campaign by major corporations to evade their obligations to society.

Under the guise of "deregulation" we're watching the wholesale dismantling of health and safety standards, environmental protections, and longstanding limits on concentration of ownership within the media and other key industries.

Today's bill completes this picture. It takes aim at the civil justice system that exists to correct the wrongs that the government cannot or will not address. I urge my colleagues to oppose this blatant effort to muzzle the courts. This bill is but the latest in a series of assaults by those on the other side attacking the ability of individuals to seek relief from the courts. And it is also but the latest in a series of assaults on States' rights to provide legal remedies for harm suffered by their citizens.

We cannot allow them to do it, Mr. Speaker. I urge my colleagues to vote "no."

Mr. BACA . Mr. Speaker, I ask unanimous consent to revise and extend my remarks.

Mr. Speaker, I rise in strong opposition of S. 5, the so-called "Class Action Fairness Act."

This bill will send the majority of class action suits from State to Federal courts, making it more difficult for people who have been unfairly hurt to collect compensation for their injuries.

Federal courts are already overwhelmed by a large number of drug and immigration cases, and they don't have the time or the resources to deal with complex issues of State law.

This bill has it all wrong. Instead of punishing individuals who pursue frivolous lawsuits, this bill will punish innocent people who have been wrongfully hurt.

This bill is a payoff to large companies and special interests. It takes rights away from consumers in order to protect drug manufacturers, insurance companies, HMOs and negligent doctors. There is no accountability on their part.

It is not "frivolous" for an innocent person who has been harmed through no fault of their own to seek compensation for their injuries.

When a child is disabled or maimed by a preventable error, it is not frivolous to seek damages from the company responsible for the injury.

This is a bill that's going to significantly harm small consumers who want to hold large companies accountable for defrauding them.

I urge my colleagues to vote "no" on S. 5.

Mr. MEEHAN . Mr. Speaker, I rise in opposition to S. 5, the so-called Class Action Fairness Act.

Few of us would stand here and argue that there is too much accountability in corporate America today. In recent years, millions of our constituents have been swindled out of their retirement savings by corporate crooks at Enron, WorldCom, and other companies. For years, many unscrupulous mutual fund managers were skimming off the top of their clients' investment funds. Drug companies put new products on the market like Vioxx that they knew to be unsafe.

This bill is a windfall for companies that have profited while causing harm to others. And no industry is in a better position to benefit than the tobacco industry. It's little wonder that tobacco stocks rallied at the news that the Senate had passed this bill.

I'd like to read from a Wall Street analyst's view of how this bill would impact the tobacco industry. "Flash_Senate Just Passed Class Action Bill_Positive for Tobacco," the analyst writes.

"The Senate just passed a bill 72-26 which is designed to funnel class-action suits with plaintiffs in different States out of State courts and into the Federal court system, which is typically much less sympathetic to such litigation. The practical effect of the change could be that many cases will never be heard given how overburdened Federal judges are, which might help limit the number of cases."

I only wish that the proponents of this bill would use such candid language to describe its true intent_to make sure that legitimate cases are never heard, and to shield corporations from accountability for their actions.

The class action system is a major reason why we have safer consumer products, more honest advertising, cleaner air and drinking water, and better workplace protections than many other countries.

All of us are empowered by the right to band together and seek justice. Class actions are one of the most effective and powerful ways we have to hold people accountable for their actions.

I oppose this attempt to shut the courthouse door to people who have been wronged.

Mr. STARK . Mr. Speaker, I rise today to oppose this misguided legislation to limit the ability of average Americans to seek redress for injury and harm caused by corporate malfeasance.

Don't be fooled by the title of this bill. Congress is not standing up for the average American under this bill. It's not fixing inequities in our judicial system. It's making those inequities worse by giving the upper hand to big corporations.

I won't vote for this Republican-sponsored hoax. It unfairly threatens the very people we are all elected to protect. When the so-called party of local control makes it a top priority to move class action cases from State to Federal court, there's an ulterior motive.

Don't believe the myth my Republican colleagues want to sell you. Class action suits aren't frivolous. They allow average Americans financially unable to launch a judicial battle on their

own the means to seek redress for injury or death of a loved one. They empower consumers to challenge wrongdoings by wealthy corporations who would otherwise ignore their appeal.

I don't think that the American public would be satisfied knowing that if this bill passes, the accountability of companies like Eron would be held less accountable. And the makers of
**[*H743]**
Vioxx and other dangerous drugs would be held less accountable.

It is truthful, law-abiding citizens who will lose if this bill becomes law, Apparently, in America today, we have government for, by, and of corporate interests and not the people.

I ask my colleagues to stand up for real people and vote against this shameful bill.

The SPEAKER pro tempore (Mr. Boozman). All time for general debate has expired.

Amendment in the Nature of a Substitute Offered by Mr. Conyers

Mr. CONYERS . Mr. Speaker, I offer an amendment in the nature of a substitute.

The SPEAKER pro tempore. The Clerk will designate the amendment in the nature of a substitute.

The text of the amendment in the nature of a substitute is as follows:

Amendment in the nature of a substitute offered by Mr. Conyers:

Strike all after the enacting clause and insert the following:

SECTION 1. SHORT TITLE; REFERENCE; TABLE OF CONTENTS.

(a) Short Title._This Act may be cited as the "Class Action Fairness Act of 2005".

(b) Reference._Whenever in this Act reference is made to an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of title 28, United States Code.

(c) Table of Contents._The table of contents for this Act is as follows:

Sec. 1. Short title; reference; table of contents.

Sec. 2. Findings and purposes.

Sec. 3. Consumer class action bill of rights and improved procedures for interstate class actions.

Sec. 4. Federal district court jurisdiction for interstate class actions.

Sec. 5. Removal of interstate class actions to Federal district court.

Sec. 6. Report on class action settlements.

Sec. 7. Enactment of Judicial Conference recommendations.

Sec. 8. Rulemaking authority of Supreme Court and Judicial Conference.

Sec. 9. Effective date.

## SEC. 2. FINDINGS AND PURPOSES.

(a) Findings._Congress finds the following:

(1) Class action lawsuits are an important and valuable part of the legal system when they permit the fair and efficient resolution of legitimate claims of numerous parties by allowing the claims to be aggregated into a single action against a defendant that has allegedly caused harm.

(2) Over the past decade, there have been abuses of the class action device that have_

(A) harmed class members with legitimate claims and defendants that have acted responsibly;

(B) adversely affected interstate commerce; and

(C) undermined public respect for our judicial system.

(3) Class members often receive little or no benefit from class actions, and are sometimes harmed, such as where_

(A) counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value;

(B) unjustified awards are made to certain plaintiffs at the expense of other class members; and

(C) confusing notices are published that prevent class members from being able to fully understand and effectively exercise their rights.

(4) Abuses in class actions undermine the national judicial system, the free flow of interstate commerce, and the concept of diversity jurisdiction as intended by the framers of the United States Constitution, in that State and local courts are_

(A) keeping cases of national importance out of Federal court;

(B) sometimes acting in ways that demonstrate bias against out-of-State defendants; and

(C) making judgments that impose their view of the law on other States and bind the rights of the residents of those States.

(b) Purposes._The purposes of this Act are to_

(1) assure fair and prompt recoveries for class members with legitimate claims;

(2) restore the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate cases of national importance under diversity jurisdiction; and

(3) benefit society by encouraging innovation and lowering consumer prices.

## SEC. 3. CONSUMER CLASS ACTION BILL OF RIGHTS AND IMPROVED PROCEDURES FOR INTERSTATE CLASS ACTIONS.

(a) In General._Part V is amended by inserting after chapter 113 the following:

"CHAPTER 114_CLASS ACTIONS

"Sec.

"1711. Definitions.

"1712. Coupon settlements.

"1713. Protection against loss by class members.

"1714. Protection against discrimination based on geographic location.

"1715. Notifications to appropriate Federal and State officials.

"1716. Sunshine in court records.

"1711. Definitions

"In this chapter:

"(1) Class._The term 'class' means all of the class members in a class action.

"(2) Class action._The term 'class action' means any civil action filed in a district court of the United States under rule 23 of the Federal Rules of Civil Procedure or any civil action that is removed to a district court of the United States that was originally filed under a State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representatives as a class action. The term 'class action' does not include any civil action brought by, or on behalf of, any State attorney general or the chief prosecuting or civil attorney of any county or city within a State.

"(3) Class counsel._The term 'class counsel' means the persons who serve as the attorneys for the class members in a proposed or certified class action.

"(4) Class members._The term 'class members' means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

"(5) Plaintiff class action._The term 'plaintiff class action' means a class action in which class members are plaintiffs.

"(6) Proposed settlement._The term 'proposed settlement' means an agreement regarding a class action that is subject to court approval and that, if approved, would be binding on some or all class members.

"(7) State._The term 'State' means each of the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, and any territory or possessions of the United States.

"(8) State attorney general._The term 'State attorney general' means the chief legal officer of a State.

"1712. Coupon settlements

"(a) Contingent Fees in Coupon Settlements._If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the

value to class members of the coupons that are redeemed.

"(b) Other Attorney's Fee Awards in Coupon Settlements._

"(1) In general._If a proposed settlement in a class action provides for a recovery of coupons to class members, and a portion of the recovery of the coupons is not used to determine the attorney's fee to be paid to class counsel, any attorney's fee award shall be based upon the amount of time class counsel reasonably expended working on the action.

"(2) Court approval._Any attorney's fee under this subsection shall be subject to approval by the court and shall include an appropriate attorney's fee, if any, for obtaining equitable relief, including an injunction, if applicable. Nothing in this subsection shall be construed to prohibit application of a lodestar with a multiplier method of determining attorney's fees.

"(c) Attorney's Fee Awards Calculated on a Mixed Basis in Coupon Settlements._If a proposed settlement in a class action provides for an award of coupons to class members and also provides for equitable relief, including injunctive relief_

"(1) that portion of the attorney's fee to be paid to class counsel that is based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (a); and

"(2) that portion of the attorney's fee to be paid to class counsel that is not based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (b).

"(d) Settlement Valuation Expertise._In a class action involving the awarding of coupons, the court may, in its discretion upon the motion of a party, receive expert testimony from a witness qualified to provide information on the actual value to the class members of the coupons that are redeemed.

"(e) Judicial Scrutiny of Coupon Settlements._In a proposed settlement under which class members would be awarded coupons, the court may approve the proposed settlement only after a hearing to determine whether, and making a written finding that, the settlement is fair, reasonable, and adequate for class members. The court, in its discretion, may also require that a proposed settlement agreement provide for the distribution of a portion of the value of unclaimed coupons to 1 or more charitable or governmental organizations, as agreed to by the parties. The distribution and redemption of any proceeds under this subsection shall not be used to calculate attorneys' fees under this section.

"1713. Protection against loss by class members

"The court may approve a proposed settlement under which any class member is obligated to pay sums to class counsel that would result in a net loss to the class member only if the court makes a written finding that nonmonetary benefits to the class member substantially outweigh the monetary loss.

"1714. Protection against discrimination based on geographic location

"The court may not approve a proposed settlement that provides for the payment of greater sums to some class members than to others solely on the basis that the class members to whom the greater sums are to be  **[*H744]**
paid are located in closer geographic proximity to the court.

"1715. Notifications to appropriate Federal and State officials

"(a) Definitions._

"(1) Appropriate federal official._In this section, the term 'appropriate Federal official' means_

"(A) the Attorney General of the United States; or

"(B) in any case in which the defendant is a Federal depository institution, a State depository institution, a depository institution holding company, a foreign bank, or a nondepository institution subsidiary of the foregoing (as such terms are defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)), the person who has the primary Federal regulatory or supervisory responsibility with respect to the defendant, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person.

"(2) Appropriate state official._In this section, the term 'appropriate State official' means the person in the State who has the primary regulatory or supervisory responsibility with respect to the defendant, or who licenses or otherwise authorizes the defendant to conduct business in the State, if some or all of the matters alleged in the class action are subject to regulation by that person. If there is no primary regulator, supervisor, or licensing authority, or the matters alleged in the class action are not subject to regulation or supervision by that person, then the appropriate State official shall be the State attorney general.

"(b) In General._Not later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement consisting of_

"(1) a copy of the complaint and any materials filed with the complaint and any amended complaints (except such materials shall not be required to be served if such materials are made electronically available through the Internet and such service includes notice of how to electronically access such material);

"(2) notice of any scheduled judicial hearing in the class action;

"(3) any proposed or final notification to class members of_

"(A)(i) the members' rights to request exclusion from the class action; or

"(ii) if no right to request exclusion exists, a statement that no such right exists; and

"(B) a proposed settlement of a class action;

"(4) any proposed or final class action settlement;

"(5) any settlement or other agreement contemporaneously made between class counsel and counsel for the defendants;

"(6) any final judgment or notice of dismissal;

"(7)(A) if feasible, the names of class members who reside in each State and the estimated proportionate share of the claims of such members to the entire settlement to that State's appropriate State official; or

"(B) if the provision of information under subparagraph (A) is not feasible, a reasonable estimate of the number of class members residing in each State and the estimated proportionate share of the claims of such members to the entire settlement; and

"(8) any written judicial opinion relating to the materials described under subparagraphs (3)

through (6).

"(c) Depository Institutions Notification._

"(1) Federal and other depository institutions._In any case in which the defendant is a Federal depository institution, a depository institution holding company, a foreign bank, or a non-depository institution subsidiary of the foregoing, the notice requirements of this section are satisfied by serving the notice required under subsection (b) upon the person who has the primary Federal regulatory or supervisory responsibility with respect to the defendant, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person.

"(2) State depository institutions._In any case in which the defendant is a State depository institution (as that term is defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)), the notice requirements of this section are satisfied by serving the notice required under subsection (b) upon the State bank supervisor (as that term is defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)) of the State in which the defendant is incorporated or chartered, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person, and upon the appropriate Federal official.

"(d) Final Approval._An order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under subsection (b).

"(e) Noncompliance if Notice Not Provided._

"(1) In general._A class member may refuse to comply with and may choose not to be bound by a settlement agreement or consent decree in a class action if the class member demonstrates that the notice required under subsection (b) has not been provided.

"(2) Limitation._A class member may not refuse to comply with or to be bound by a settlement agreement or consent decree under paragraph (1) if the notice required under subsection (b) was directed to the appropriate Federal official and to either the State attorney general or the person that has primary regulatory, supervisory, or licensing authority over the defendant.

"(3) Application of rights._The rights created by this subsection shall apply only to class members or any person acting on a class member's behalf, and shall not be construed to limit any other rights affecting a class member's participation in the settlement.

"(f) Rule of Construction._Nothing in this section shall be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon, Federal or State officials.

"1716. Sunshine in court records

"No order, opinion, or record of the court in the adjudication of a class action, including a record obtained through discovery, whether or not formally filed with the court, may be sealed or subjected to a protective order unless the court makes a finding of fact_

"(1) that the sealing or protective order is narrowly tailored, consistent with the protection of public health and safety, and is in the public interest; and

"(2) if the action by the court would prevent the disclosure of information, that disclosing the information is clearly outweighed by a specific and substantial interest in maintaining the

confidentiality of such information.".

(b) Technical and Conforming Amendment._The table of chapters for part V is amended by inserting after the item relating to chapter 113 the following:

"114. Class Actions

1711".

SEC. 4. FEDERAL DISTRICT COURT JURISDICTION FOR INTERSTATE CLASS ACTIONS.

(a) Application of Federal Diversity Jurisdiction._Section 1332 is amended_

(1) by redesignating subsection (d) as subsection (e), and amending the subsection to read as follows:

"(e) As used in this section_

"(1) the term 'State' means each of the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, and any territory or possessions of the United States; and

"(2) the term 'State attorney general' means the chief legal officer of a State."; and

(2) by inserting after subsection (c) the following:

"(d)(1) In this subsection_

"(A) the term 'class' means all of the class members in a class action;

"(B) the term 'class action'_

"(i) means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action; and

"(ii) does not include_

"(I) any civil action brought by, or on behalf of, any State attorney general or the chief prosecuting or civil attorney of any county or city within a State;

"(II) any class action brought under a State or local law prohibiting discrimination on the basis of race, color religion, sex, national origin, age, disability, or other classification specified in that law; or

"(III) any class action or collective action brought to obtain relief under a State or local law for failure to pay the minimum wage, overtime pay, or wages for all time worked, failure to provide rest or meal breaks, or unlawful use of child labor;

"(C) the term 'class certification order' means an order issued by a court approving the treatment of some or all aspects of a civil action as a class action; and

"(D) the term 'class members' means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

"(2) The district courts shall have original jurisdiction of any civil action in which the matter

in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which_

"(A) any member of a class of plaintiffs is a citizen of a State different from any defendant;

"(B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

"(C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

"(3) A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of_

"(A) whether the claims asserted involve matters of national or interstate interest;

"(B) whether the claims asserted will be governed by laws of the State in which the
**[*H745]**
action was originally filed or by the laws of other States;

"(C) whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction;

"(D) whether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants;

"(E) whether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States; and

"(F) whether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

"(4) A district court shall decline to exercise jurisdiction under paragraph (2)_

"(A)(i) over a class action in which_

"(I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

"(II) at least 1 defendant is a defendant_

"(aa) from whom significant relief is sought by members of the plaintiff class;

"(bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

"(cc) who is a citizen of the State in which the action was originally filed; and

"(III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

"(ii) during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons; or

"(B) two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

"(5) Paragraphs (2) through (4) shall not apply to any class action in which_

"(A) the primary defendants are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; or

"(B) the number of members of all proposed plaintiff classes in the aggregate is less than 100.

"(6) In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

"(7) Citizenship of the members of the proposed plaintiff classes shall be determined for purposes of paragraphs (2) through (6) as of the date of filing of the complaint or amended complaint, or, if the case stated by the initial pleading is not subject to Federal jurisdiction, as of the date of service by plaintiffs of an amended pleading, motion, or other paper, indicating the existence of Federal jurisdiction.

"(8) This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that action.

"(9) Paragraph (2) shall not apply to any class action that solely involves a claim_

"(A) concerning a covered security as defined under 16(f)(3) of the Securities Act of 1933 (15 U.S.C. 78p(f)(3)) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

"(B) that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

"(C) that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).

"(10) For purposes of this subsection and section 1453, an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.

"(11)(A) For purposes of this subsection and section 1453 of this title, a foreign corporation which acquires a domestic corporation in a corporate repatriation transaction shall be treated as being incorporated in the State under whose laws the acquired domestic corporation was organized.

"(B) In this paragraph, the term 'corporate repatriation transaction' means any transaction in which_

"(i) a foreign corporation acquires substantially all of the properties held by a domestic

corporation;

"(ii) shareholders of the domestic corporation, upon such acquisition, are the beneficial owners of securities in the foreign corporation that are entitled to 50 percent or more of the votes on any issue requiring shareholder approval; and

"(iii) the foreign corporation does not have substantial business activities (when compared to the total business activities of the corporate affiliated group) in the foreign country in which the foreign corporation is organized.".

(b) Conforming Amendments._

(1) Section 1335(a)(1) is amended by inserting "subsection (a) or (d) of" before "section 1332".

(2) Section 1603(b)(3) is amended by striking "(d)" and inserting "(e)".

   SEC. 5. REMOVAL OF INTERSTATE CLASS ACTIONS TO FEDERAL DISTRICT COURT.

(a) In General._Chapter 89 is amended by adding after section 1452 the following:

       "1453. Removal of class actions

"(a) Definitions._In this section, the terms 'class', 'class action', 'class certification order', and 'class member' shall have the meanings given such terms under section 1332(d)(1).

"(b) In General._A class action may be removed to a district court of the United States in accordance with section 1446 (except that the 1-year limitation under section 1446(b) shall not apply), without regard to whether any defendant is a citizen of the State in which the action is brought, except that such action may be removed by any defendant without the consent of all defendants.

"(c) Review of Remand Orders._

"(1) In general._Section 1447 shall apply to any removal of a case under this section, except that notwithstanding section 1447(d), a court of appeals may accept an appeal from an order of a district court granting or denying a motion to remand a class action to the State court from which it was removed if application is made to the court of appeals not less than 7 days after entry of the order.

"(2) Time period for judgment._If the court of appeals accepts an appeal under paragraph (1), the court shall complete all action on such appeal, including rendering judgment, not later than 60 days after the date on which such appeal was filed, unless an extension is granted under paragraph (3).

"(3) Extension of time period._The court of appeals may grant an extension of the 60-day period described in paragraph (2) if_

"(A) all parties to the proceeding agree to such extension, for any period of time; or

"(B) such extension is for good cause shown and in the interests of justice, for a period not to exceed 10 days.

"(4) Denial of appeal._If a final judgment on the appeal under paragraph (1) is not issued before the end of the period described in paragraph (2), including any extension under paragraph (3), the appeal shall be denied.

"(d) Exception._This section shall not apply to any class action that solely involves_

"(1) a claim concerning a covered security as defined under section 16(f)(3) of the Securities Act of 1933 (15 U.S.C. 78p(f)(3)) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

"(2) a claim that relates to the internal affairs or governance of a corporation or other form of business enterprise and arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

"(3) a claim that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).".

(b) Technical and Conforming Amendments._The table of sections for chapter 89 is amended by adding after the item relating to section 1452 the following:

"1453. Removal of class actions.".

(c) Choice of State Law in Interstate Class._Notwithstanding any other choice of law rule, in any class action over which the United States district courts have jurisdiction and that asserts claims arising under State law concerning products or services marketed, sold, or provided in more than 1 State on behalf of a proposed class which includes citizens of more than 1 such State, as to each such claim and any defense to such claim, the district court shall not deny class certification, in whole or in part, on the ground that the law of more than 1 State will be applied.

SEC. 6. REPORT ON CLASS ACTION SETTLEMENTS.

(a) In General._Not later than 12 months after the date of enactment of this Act, the Judicial Conference of the United States, with the assistance of the Director of the Federal Judicial Center and the Director of the Administrative Office of the United States Courts, shall prepare and transmit to the Committees on the Judiciary of the Senate and the House of Representatives a report on class action settlements.

(b) Content._The report under subsection (a) shall contain_

(1) recommendations on the best practices that courts can use to ensure that proposed class action settlements are fair to the class members that the settlements are supposed to benefit;

(2) recommendations on the best practices that courts can use to ensure that_

(A) the fees and expenses awarded to counsel in connection with a class action settlement appropriately reflect the extent to which counsel succeeded in obtaining full redress for the injuries alleged and the time, expense, and risk that counsel devoted to the litigation; and

(B) the class members on whose behalf the settlement is proposed are the primary beneficiaries of the settlement; and

(3) the actions that the Judicial Conference of the United States has taken and intends to take toward having the Federal judiciary implement any or all of the recommendations contained in the report. **[*H746]**

(c) Authority of Federal Courts._Nothing in this section shall be construed to alter the authority of the Federal courts to supervise attorneys' fees.

SEC. 7. ENACTMENT OF JUDICIAL CONFERENCE RECOMMENDATIONS.

Notwithstanding any other provision of law, the amendments to rule 23 of the Federal Rules of Civil Procedure, which are set forth in the order entered by the Supreme Court of the United States on March 27, 2003, shall take effect on the date of enactment of this Act or on December 1, 2003 (as specified in that order), whichever occurs first.

SEC. 8. RULEMAKING AUTHORITY OF SUPREME COURT AND JUDICIAL CONFERENCE.

Nothing in this Act shall restrict in any way the authority of the Judicial Conference and the Supreme Court to propose and prescribe general rules of practice and procedure under chapter 131 of title 28, United States Code.

SEC. 9. EFFECTIVE DATE.

The amendments made by this Act shall apply to any civil action commenced on or after the date of enactment of this Act.

Mr. SENSENBRENNER . Mr. Speaker, pursuant to the rule, I claim the time in opposition.

The SPEAKER pro tempore. Pursuant to House Resolution 96, the gentleman from Michigan (Mr. Conyers) and the gentleman from Wisconsin (Mr. Sensenbrenner) each will control 20 minutes.

The Chair recognizes the gentleman from Michigan (Mr. Conyers).

Mr. CONYERS . Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I would like to briefly describe why this substitute is the superior piece of legislation before us today. The substitute is much better for the following reasons: civil rights carve-out. The substitute would carve out State civil rights claims in order to make sure that civil rights plaintiffs, especially those seeking immediate injunctive relief, can have their grievances addressed in a timely manner.

Believe me, this is an issue of great moment to those of us who are still prosecuting for a fair day in our Nation and have civil rights laws to back us up, but we now are pleading to keep the proper forums. For example, every State in the Union has passed a law prohibiting discrimination on the basis of disability. The language does not affect the Federal jurisdiction over Federal claims.

The second consideration for this is the wage-and-hour carve-out. Wage-and-hour class actions are often brought in State courts because State wage-and-hour remedies are often, I am sorry to say, more complete than the Federal wage-and-hour statute; and we have examples of that.

The third reason: we exclude non-class action cases involving physical injuries. The measure before us applies not only to class actions, but also to mass torts. The Democratic substitute removes the mass tort language. And then, of course, the attorney general carve-out which clarifies cases brought by State attorneys general are excluded from the provisions of the class action bill and would not be forced into Federal court.

These are the major reasons why we encourage a supportive vote for the substitute to the measure that is being debated today.

Mr. Speaker, I reserve the balance of my time.

Mr. SENSENBRENNER . Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I rise in opposition to the Democratic substitute amendment and urge my colleagues to reject it. The new math behind the substitute amendment rests on the following arithmetic: if you add a number of amendments rejected by large bipartisan majorities in the other body last week and combine them with the amendment ideas overwhelmingly rejected on the House floor by a bipartisan vote last year, the sum will somehow equal a credible solution. Funny math.

Mr. Speaker, this formula simply does not add up. The American consumers and businesses will be left with change in their pockets if the amendment passes. The Democratic substitute is less than the sum of its parts and represents a quotient that renders Senate Bill 5's core reform elements meaningless.

The individual elements of this proposal deserve some comment and explanation. First, I note with some amusement that the substitute totally recycles the findings of S. 5. The pages of findings discuss abusive class action windfall settlements for trial attorneys, forum shopping, and the need for more of these large interstate class action cases to be in Federal court.

While the minority substitute reargues the compelling case for reform of the class action system, it is followed by text that will only perpetuate the crisis the findings identify. Their admitting you have a problem is the first step to recovery, and we appreciate that admission; but the minority sponsors clearly are not ready for step two.

One element of the substitute amendment is the State attorney general provision allowing any class action to be brought by or on behalf of the State attorney general to be in State court. This provision is unnecessary because when State attorneys general sue on behalf of their citizens, those actions are almost always "parens patriae" actions, and not class actions; and the former will be in no way affected by this bill.

Also, the provision could produce troubling associations between attorneys general and plaintiffs' lawyers. For these reasons, the Pryor amendment in the other body that this provision copies verbatim failed to garner even 40 votes on the Senate floor last week.

A second element of the substitute is the "choice of law" provision. This provision would not only eviscerate the bill, but also would overturn 70 years of established Supreme Court precedent and would export to Federal courts a primary expedient of class action abuse we seek to remedy: the reckless application by local courts of the law of one State to the entire Nation in large interstate cases.

This provision is reprinted from a Senate amendment by Senator Feinstein and Senator Bingaman. It was also soundly defeated.

The third element of the substitute is the so-called labor and civility rights carveout. This provision seeks to keep all class actions involving alleged civil rights and labor law violations in State court, despite the fact that the most generous racial discrimination and employment class action settlements in recent years have been in the Federal courts. The language was also offered in the other body and rejected.

Other major elements of the substitute include one our colleagues might remember as the Jackson-Lee House floor amendment to the bill in the last Congress. That amendment makes companies that incorporate abroad for tax purposes a citizen of a State and punishes them

by keeping them out of Federal court. This is at least an admission that going into certain State courts as a defendant is indeed punishment, and that amendment was defeated in this House by the last Congress by a vote of 183 to 238. There is also a loophole creating a provision on mass actions and a completely unnecessary public disclosure provision, both based on Senate amendments in the other body that were offered and withdrawn.

What the minority has chosen as a substitute package certainly belies any grumblings about the lack of regular order this year. Since there is not a single original idea among the provisions that has not already been debated and defeated either in this House or the other body, it is hard to give credence to such complaints. This is a package of oldies but not goodies; oldies that have been rejected and should not be resurrected.

Finally, Mr. Speaker, a vote on this substitute is clearly just a vote to further deny or delay meaningful class action reform, and a vote on the substitute could not in any way be construed as reform of any kind but, rather, support for the trial-lawyer-dominated status quo.

I urge my colleagues to reject this recycled package of recycled amendments. The time for reform of a class action system which is out of control is now.

I urge my colleague to vote "no" on the substitute, and "yes" on S. 5.

Mr. Speaker, I reserve the balance of my time.

Mr. CONYERS . Mr. Speaker, I yield 3 minutes to the gentleman from Virginia (Mr. Scott).

Mr. SCOTT of Virginia . Mr. Speaker, I rise in support of the substitute. One of the problems with the substitute is you have to debate all of the different **[*H747]** issues all at once. If we had the opportunity to introduce individual amendments, we could have discussed them one at a time and had a much more coherent discussion.

As it has been said, the underlying bill does not extinguish the right to get to court but it does gratuitously complicate the litigation. It does not fix coupons, it just moves them from State court to Federal courts. It adds procedural hurdles, and this substitute removes many of those hurdles.

The main thing it does is it carves out many of the different cases that belong in State court or at least ought to have the opportunity in the State court. It also fixes the yo-yo effect where you start off in State court, get removed to Federal court, Federal court does not certify the class, and then what happens? I guess you come back to State court or, I do not know, you might not be able to get back to State court. You may end up in a procedural trap where you have lost your case just in the time it takes to get over there and try to get back.

This amendment fixes that quagmire. It also carves out, as has been said, the State civil rights cases where some States have civil rights laws that are stronger and cover different people, different classes than the Federal laws. Wage and hour laws, some States have better laws than the Federal court. Mass torts where you have not class actions per se, but a lot of different litigants all in the same State. It fixes the problem with Attorneys General in bringing a case in State court on behalf of not only members of their State, but if the injury has occurred to a lot of other people, the Attorney General might want to bring that case.

I have a letter, Mr. Speaker, signed on this specific issue by 47 Attorneys General.

It also denies benefits under the bill for tax traitors, those who move their corporate headquarters off shore to avoid corporate taxes; and it also provides a limitation on sealed settlements that the gentleman from New York (Mr. Nadler) has been very active in making

sure that cases that are settled cannot be sealed beyond public view, unless if such a sealing would violate public health or other important considerations.

This is a well-reasoned substitute. It eliminates many but not all of the problems in the underlying bill, and I would hope that the House would adopt the substitute.

National Association

of Attorneys General,

Washington, DC, February 7, 2005.

Hon. Bill Frist,

Senate Majority Leader, U.S. Senate,

Dirksen Building, Washington, DC.

Hon. Harry Reid,

Senate Minority Leader, U.S. Senate,

Hart Building, Washington, DC.

Dear Senate Majority Leader Frist and Senate Minority Leader Reid: We, the undersigned State Attorneys General, write to express our concern regarding one limited aspect of pending Senate Bill 5, the "Class Action Fairness Act," or any similar legislation. We take no position on the Act as a general matter and, indeed, there are differing views among us on the policy judgments reflected in the Act. We join together, however, in a bipartisan request for support of Senator Mark Pryor's potential amendment to S. 5, or any similar legislation, clarifying that the Act does not apply to, and would have no effect on, actions brought by any State Attorney General on behalf of his or her respective state or its citizens.

As Attorneys General, we frequently investigate and bring actions against defendants who have caused harm to our citizens. These cases are usually brought pursuant to the Attorney General's parens patriae authority under our respective consumer protection and antitrust statutes. In some instances, such actions have been brought with the Attorney General acting as the class representative for the consumers of the state. It is our concern that certain provisions of S. 5 might be misinterpreted to hamper the ability of the Attorneys General to bring such actions, thereby impeding one means of protecting our citizens from unlawful activity and its resulting harm.

The Attorneys General have been very successful in litigation initiated to protect the rights of our consumers. For example, in the pharmaceutical industry, the States have recently brought enforcement actions on behalf of consumers against large, often foreign-owned, drug companies for overcharges and market manipulations that illegally raised the costs of certain prescription drugs. Such cases have resulted in recoveries of approximately 235 million dollars, the majority of which is earmarked for consumer restitution. In several instances, the States' recoveries provided one hundred percent reimbursement directly to individual consumers of the overcharges they suffered as a result of the illegal activities of the defendants. This often meant several hundred dollars going back into the pockets of those consumers who can least afford to be victimized by illegal trade practices, senior citizens living on fixed incomes and the working poor who cannot afford insurance.

We encourage you to support the aforementioned amendment exempting all actions brought by State Attorneys General from the provisions of S. 5, or any similar legislation. It is

important to all of our constituents, but especially to the poor, elderly and disabled, that the provisions of the Act not be misconstrued and that we maintain the enforcement authority needed to protect them from illegal practices. We respectfully submit that the overall purposes of the legislation would not be impaired by such an amendment that merely clarifies the existing authority of our respective States.

Thank you for your consideration of this very important matter. Please contact any of us if you have questions or comments.

Sincerely,

Mike Beebee, Attorney General, Arkansas.

Gregg Renkes, Attorney General, Alaska.

Mark Shurtleff, Attorney General, Utah.

Fiti Sunia, Attorney General, American Samoa.

Terry Goddard, Attorney General, Arizona.

John Suthers, Attorney General, Colorado.

Jane Brady, Attorney General, Delaware.

Charlie Crist, Attorney General, Florida.

Mark Bennett, Attorney General, Hawaii.

Stephen Carter, Attorney General, Indiana.

Bill Lockyer, Attorney General, California.

Richard Blumenthal, Attorney General, Connecticut.

Robert Spagnoletti, Attorney General, District of Columbia.

Thurbert Baker, Attorney General, Georgia.

Lawrence Wasden, Attorney General, Idaho.

Tom Miller, Attorney General, Iowa.

Greg Stumbo, Attorney General, Kentucky.

Steven Rowe, Attorney General, Maine.

Tom Reilly, Attorney General, Massachusetts.

Mike Hatch, Attorney General, Minnesota.

Jay Nixon, Attorney General, Missouri.

Jon Bruning, Attorney General, Nebraska.

Kelly Ayotte, Attorney General, New Hampshire.

Charles Foti, Attorney General, Louisiana.

Joseph Curran, Attorney General, Maryland.

Mike Cox, Attorney General, Michigan.

Jim Hood, Attorney General, Mississippi.

Mike McGrath, Attorney General, Montana.

Brian Sandoval, Attorney General, Nevada.

Peter Harvey, Attorney General, New Jersey.

Eliot Spitzer, Attorney General, New York.

Wayne Stenehjem, Attorney General, North Dakota.

Jim Petro, Attorney General, Ohio.

Hardy Myers, Attorney General, Oregon.

Roberto Sanchez Ramos, Attorney General, Puerto Rico.

Henry McMaster, Attorney General, South Carolina.

Roy Cooper, Attorney General, North Carolina.

Pamela Brown, Attorney General, N. Mariana Islands.

W.A. Drew Edmondson, Attorney General, Oklahoma.

Tom Corbett, Attorney General, Pennsylvania.

Patrick Lynch, Attorney General, Rhode Island.

Lawrence Long, Attorney General, South Dakota.

Paul Summers, Attorney General, Tennessee.

Darrell McGraw, Attorney General, West Virginia.

Patrick Crank, Attorney General, Wyoming.

Rob McKenna, Attorney General, Washington.

Peg Lautenschlager, Attorney General, Wisconsin.

Mr. SENSENBRENNER . Mr. Speaker, I yield 4 minutes to the gentleman from Missouri (Mr. Blunt), the distinguished majority Whip.

Mr. BLUNT . Mr. Speaker, the vote in this House we will take within the hour will leave only one more step, the President's signature, in this first major attack on lawsuit abuse.

I oppose the substitute and support the bill. I want to express my appreciation to the

gentleman from Wisconsin (Mr. Sensenbrenner) and his committee and all the Members, in fact, who have been willing to take on this tough fight, but particularly to the chairman for working hard to find a way to get this bill on the floor and to the President this early in this Congress.

Frivolous lawsuits are clogging America's judicial system, endangering America's small businesses, jeopardizing jobs, and driving up prices for consumers. The bill we are debating today will reduce these junk lawsuits through tougher sanctions and increased commonsense protections.

The past few years have witnessed an explosion of interstate class actions being filed in State courts, particularly  **[\*H748]**
in certain magnet jurisdictions. These magnet courts are filled with class action abuses. They routinely approve settlements in which the lawyers receive large fees and the class members receive virtually nothing.

The Class Action Fairness Act is a commonsense bipartisan plan that addresses this serious problem by allowing larger interstate class action cases, cases that truly do involve multiple States, to be filed in Federal court. In addition to unclogging certain overused courts, this bill ends the harassment of local businesses through forum shopping. Lawyers who now manipulate this system often do anything to stay out of Federal court. They sometimes name a local pharmacy or a local convenience store in a nationwide product liability suit simply because they believe that court, and that court often has created a reputation as the place to go to get unjust settlements.

Sometimes they wait and amend their complaint and add millions of dollars of claims after the deadline for removal to Federal court. This bill stops this unfair practice as well.

This bill also establishes a much-needed class action rights bill. Several provisions are specifically designed to ensure that class members, not their attorneys, are the primary beneficiaries of the class action process.

Six years ago on this floor we really began the process of attacking this system. The stories go on and on and on, to the point that by the time we passed legislation like this in the last Congress for the third Congress straight, Members were eager to just simply get a couple of minutes to talk about one of the classes where the people in the class get a dollar-off coupon, the people in the class get the smallest possible box of Cheerios, the people in the class get a 31-cent check, or the people in the class even wind up having to pay the lawyers of the class additional money because there really was no money for the people in the class that was being determined.

This bill requires that judges carefully review settlements and limits attorneys fees when the value of the settlement received by the class members is minor in comparison or when there is a net loss settlement where the class members actually end up losing money.

This bill bans settlements that award some class members a large recovery simply because they live closer to the court that the lawyers shopped for to get that case in that judge's court.

It allows Federal courts to maximize the benefit of class action settlements by requiring that unclaimed settlement funds be donated to charitable organizations.

The Class Action Fairness Act is good for small business and good for consumers. I urge a "no" vote on the substitute. I urge my colleagues to support this important legislation.

Mr. Speaker, I thank the chairman and his committee for their hard work on this effort.

Mr. CONYERS . Mr. Speaker, I yield 1 minute to the gentlewoman from California (Ms. Pelosi), the minority leader of our caucus.

Ms. PELOSI . Mr. Speaker, I rise in strong opposition to this legislation.

Today Republicans are bringing to the floor as their first major legislative action a payback to big business at the expense of consumers. The Republican agenda is to ensure that some Americans do not get their day in court.

Make no mistake that this class action bill before us today is an extreme bill. It is not a compromise bill as some have claimed. It is an extreme bill that is an injustice to consumers and a windfall for irresponsible corporations. Consumers will be hit hard by this bill, Mr. Speaker. It lumps together individual personal injury cases such as those involving Vioxx, which are not class action under current procedures, and forces them into the Federal courts. Doing so will greatly increase the likelihood that such cases will never be heard.

When Americans are injured or even killed by Vioxx or Celebrex or discriminated against by WalMart, they may never get their day in court. Those cases that do go forward will take significantly longer because the Federal courts are overburdened and unequipped for this caseload. That is why the bill is opposed by Federal judges, including The Judicial Conference of the United States. Special interests have even admitted that the real intent of this bill is to clog the Federal courts and, therefore, stop the cases.

To irresponsible corporations, however, the class action bill is a belated Valentine. It is exactly what they have asked for. Powerful corporations will largely be immune from the accountability that currently comes from meritorious State class action cases. For example, this bill would help shield large corporations from any accountability for Enron-style shareholder fraud, for activities that violate employee rights under State law, and for telemarketing fraud targeted at the elderly.

It should come as no surprise, however, that Republicans are seeking yet another way to protect irresponsible corporations.

The Washington Post reported that last year's Republican medical malpractice bill contained special liability protections that would have precluded consumers from suing to recover punitive damages arising for the types of injuries caused by Vioxx and Celebrex. Protecting big drug companies is always at the top of the Republican agenda. We saw that in the prescription drug bill under Medicare. This is yet again another example of Republicans being the handmaidens of the pharmaceutical industry.

This bill also runs counter to the principles of federalism that my colleagues on the other side of the aisle claim to support. It throws thousands of State cases into Federal courts that are not equipped to adjudicate State laws. For instance, lawsuits involving the enforcement of the State hourly wage laws, which often have greater protections than Federal wage laws, would be forced into Federal courts. In fact, 46 State Attorneys General on a bipartisan basis have requested an exemption so that they can continue to protect their citizens under the State consumer protection laws in State courts. The Republicans have rejected that request while Democrats have incorporated it into our substitute.

Democrats in our substitute support sensible approaches that weed out frivolous lawsuits but not meritorious claims. Our Democratic substitute says that certain kinds of cases must always have their day in court. Physical injury cases, civil rights cases, wage and hour cases, State Attorneys General cases, and others must be heard if we are to remain a Nation that strives for justice for all.

President Harry Truman said it so well. "The Democratic party stands for the people. The Republican party stands, and has always stood, for special interest."

I urge my colleagues to stand up to the special interests, to support the Democratic substitute, to listen, to listen to the recommendation of the Federal judges and the Judicial Conference of the United States and oppose this extreme legislation.

Mr. SENSENBRENNER . Mr. Speaker, I yield 2 1/2 minutes to the gentleman from Texas (Mr. Smith).

Mr. SMITH of Texas . Mr. Speaker, I thank the chairman of the Committee on the Judiciary for yielding me time.

Mr. Speaker, all Americans should thank the gentleman from Virginia (Mr. Goodlatte) and the gentleman from Wisconsin (Chairman Sensenbrenner) for their leadership on this most important issue.

The Class Action Fairness Act is a bipartisan, sensible bill that clarifies the rights of consumers and restores confidence in America's judicial system. It reforms the class action system and addresses the abuses that harm so many Americans.

We have all heard of the lawsuits in which plaintiffs walk away with pennies, sometimes literally, while the attorneys walk away with millions of dollars in fees. This problem will be addressed by providing greater scrutiny over settlements that involve coupons or very small cash amounts.

This legislation also ensures that deserving plaintiffs are able to make full use of the class action system. It allows easier removal of class action cases to Federal courts. This is important because class actions tend to affect numerous Americans and often involve millions of dollars. Federal court is the right place for such large lawsuits.

Moving more class actions to Federal courts also prevents one of the worst  **[\*H749]** problems in class actions today, forum shopping.

Mr. Speaker, while many concessions were made on both sides, this is still a very worthwhile bill that contains many good reforms, and I fully support it and look forward to its enactment into law and also encourage my colleagues to support it as well.

Mr. CONYERS . Mr. Speaker, I am pleased to yield 3 minutes to the gentleman from New York (Mr. Nadler), a distinguished member of the Committee on the Judiciary.

Mr. NADLER . Mr. Speaker, I thank the gentleman for yielding me the time.

I rise in strong opposition to this egregious legislation and in support of the Conyers/Nadler/Jackson-Lee substitute amendment.

This substitute amendment amends this bill in several ways to ensure that consumers, workers and victims in personal injury cases are not precluded from having a fair opportunity to present their cases in court. I know the distinguished minority leader and others have mentioned some of these instances.

My good friend Eliot Spitzer, the distinguished attorney general of New York State, has joined 46 State attorneys general in expressing their concern that this legislation could limit their power to investigate and bring actions in their State courts against defendants who have caused harm to their citizen. Our amendment clarifies that cases brought by States attorneys general will not be subject to the provision of this bill and would not be forced into Federal

court.

The substitute also includes a provision which I have advocated for many years, which actually was supported by the distinguished chairman and passed the Committee on the Judiciary a couple of times, to limit the ability of corporations settling lawsuits to demand that records that may indicate threats to public health and safety be sealed, unless it is necessary to protect trade confidentiality.

The substitute provides that when such a gag order is requested, and it is normally requested by both the plaintiff and the defendant because in the settlement the defendant insists on this as a condition of the settlement, the court then rubber stamps it. This substitute provides that if such a gag order is requested, the court must make a finding as to whether the defendant's interest in confidentiality outweighs the public interest in knowing of the threat to its health or safety.

If the court finds that the privacy interest outweighs the public interest, the court will issue the gag order. If the court finds the public interest in health and safety outweighs the privacy interest claimed in the specific case, the court must prohibit the sealing of the information.

Too often, critical information is sealed from the public and people are harmed as a result. How many people were killed or injured because the court sealed records relating to exploding Firestone tires, for one example. This provision will allow the public to learn of threats to this health and safety so as to take proper action to protect the public, while protecting legitimate confidential information.

The Conyers/Nadler/Jackson-Lee substitute amendment also deals with a major catch-22 created by the bill for victims of large and complex multistate court torts. On the one hand, the bill provides State courts cannot hear such cases; but when these cases are removed to Federal court, plaintiffs will find that the Federal courts routinely refuse to hear them. Federal courts are very reluctant to certify a multistate consumer class action suit, and six circuit courts and 26 district courts have expressly refused to consider certifying cases where several State laws apply.

Our substitute protects victims from facing this catch-22 and having the courtroom door completely closed to them by providing that if these cases are removed to Federal court by this bill, the Federal courts cannot refuse to certify a class action simply because more than one State law applies.

I urge my colleagues not to allow this bill to completely deny victims their day in court, either in State court or in Federal court. That would render this bill completely hypocritical. I urge my colleagues to vote "yes" on the Conyers/Nadler/Jackson-Lee substitute and "no" on the main bill.

Mr. SENSENBRENNER . Mr. Speaker, I yield 5 minutes to the gentleman from Virginia (Mr. Goodlatte), the author of the bill.

Mr. GOODLATTE . Mr. Speaker, I thank the chairman for yielding me time and for his leadership in bringing this legislation to the floor and for working with the Senate to achieve the compromise that we need.

The gentlewoman from California (Ms. Pelosi), the minority leader, called this an extreme Republican measure. Apparently, she has not spoken to her own fellow San Franciscan and senior Senator from her State, Dianne Feinstein, who negotiated the compromise that has brought this legislation to the floor of the House, or to Senator Chuck Schumer, also a member of the Committee on the Judiciary on the Democratic side in the Senate, or 16 other Democratic Senators who voted for this legislation.

She also apparently has not spoken to members of her own Democratic Caucus, many of whom have voted for this legislation in each of the last three Congresses that have passed the House of Representatives and many more of whom will vote for the legislation today.

A number of the folks who have spoken on the other side of the aisle criticizing the legislation have cited total inaccuracies about what the legislation will do.

The gentleman from Massachusetts (Mr. Markey) would not yield to me, but he said that the Amerada Hess case in New Hampshire, with gasoline leaking into groundwater, would not be heard in the State court; but if you live in New Hampshire and you have gasoline leaking in your groundwater and virtually all of the plaintiffs are New Hampshire residents, the case, under this bill, would be heard in the State courts.

Some have mentioned the Vioxx case against Merck would be affected by this, and they have argued that Senate 5 should be rejected because it will hurt consumers bringing Vioxx cases against Merck. The truth, however, is that this legislation will have absolutely no effect on Vioxx suits. Here is why: the majority of personal injury cases brought against Merck are individual cases that would not be affected by the bill in any manner whatsoever. These include more than 400 personal injury cases that are part of a coordinated proceeding in New Jersey State court. None of these cases will be affected by the bill because they are neither class actions nor mass actions.

Now, what kind of cases would be affected by this legislation? Well, let me show my colleagues how a select number of class action trial lawyers play the class action wheel of fortune.

How about the Kay Bee Toys case where the lawyers got $1 million in attorneys fees and the consumers got 30 percent off selected products of an advertised sale at Kay Bee Toys for one week.

Or the Poland Spring Water case where the lawyers got $1.35 million in the wheel of fortune and the consumers got coupons to buy more of the water that the lawyers were alleging was defective.

How about the Ameritech case. The price goes up, $16 million for those lawyers; the consumers, $5 phone cards.

How about the Premier Cruise line case. The lawyers got nearly $900,000. The consumers got $30 to $40 off of their next thousand dollar cruise, with a coupon to buy more of the product the lawyers were alleging was defective.

Or the computer monitor litigation, $6 million in attorneys fees in a case alleging that the size of the computer screen was slightly off, and therefore, they were entitled to something. What did the consumers get? A $13 rebate to purchase their next purchase.

How about the register.com case, $642,500 to the lawyers. The consumers, $5-off coupons.

My favorite case, the case against Chase Manhattan Bank, the lawyers got $4 million in attorneys fees, but the plaintiffs that allegedly the opponents of this bill are protecting, they got 33 cents. The catch was that at the time, to accept this 33-cent magnanimous check, they had to use a 34-cent postage stamp to send in the acceptance to get their 33-cent fee.  **[\*H750]**

How about the case that President Bush cited last week when he highlighted problems with

this of the woman who had a defective television set against Thompson Electronics, found she had been made a member of a class action seeking redress of her grievances and many others against Thompson Electronics. What did the lawyers get? $22 million in attorneys fees. What did she get? A coupon for $25 to $50 off her next purchase of exactly what she did not want, another Thompson Electronics television set.

Now, the gentlewoman from California, the minority leader, also cited the Washington Post. Let me tell my colleagues, the Washington Post has repeatedly endorsed this legislation, along with over a hundred other major newspapers, the Washington Post, the Wall Street Journal, the Financial Times, Christian Science Monitor, on and on the list goes. And here is what the Washington Post said, and that is why we need to pass this legislation today. The clients get token payments while the lawyers get enormous fees. This is not justice. It is an extortion racket that only Congress can fix.

I urge my colleagues to pass the bill.

Mr. CONYERS . Mr. Speaker, I am pleased to yield 4 minutes to the gentleman from New York (Mr. Weiner), a distinguished member of the Committee on the Judiciary.

Mr. WEINER . Mr. Speaker, I thank the gentleman from Michigan for the time.

Sometimes during these debates I like to step in to take a perspective of someone on the committee who is not a lawyer; but I have to tell my colleagues, the previous speaker, the gentleman from Virginia, went to great lengths to talk about the lawyers fees. There is nothing in this bill that limits lawyers fees, and there is not anything in the bill actually that argues for his point, which is apparently that there should be a minimum amount that wrongdoers pay to each individual aggrieved person, which is a novel argument, I have not heard it made by my colleague before, saying that the plaintiffs are receiving too little now.

Let me explain very briefly why it is that we have situations like that. Those of us who are individuals of modest means, if we have been aggrieved by a major company, if they have done something that has harmed our health or our community or our family, we as individuals frankly do not have the ability to take on a major company to stop them from doing the wrongful things, to make sure they understand that there is a cost of doing it. So we join together as a community and we bring these actions as a group. We cannot, frankly, pay the lawyer up front so they are paid on contingencies, and that is the way these actions get taken.

One thing the gentleman from Virginia did not say even once through that whole wheel of rhetoric was that any of those that were held accountable by juries of their peers were not guilty of those things. In those cases, those parties, each and every one of them, on the wheel of rhetoric actually was found by a judge or a jury to have done substantial bad things to the community. The system actually worked in those cases.

We can quibble about the person, the individual that wound up getting a payment. There were so many of them, millions of people who had been harmed by those companies, that when they were done divvying up what seemed like a very large judgment, tens of millions of dollars, there was only left a 35, 40-cent coupon and the like.

I stand perfectly ready to vote in favor of an amendment by the gentleman from Virginia to have minimum payments to people who have been harmed. If the gentleman thinks it is not enough that they get 35 cents, I am with him. Some of those companies did outrageous things to our community, and they should be held accountable. If my colleague thinks a 35-cent check is not enough, I am with him. Let us make minimum amounts that they pay for the injuries, that they have to get, because the harm is so great.

I want to remind my colleagues and the citizens watching this why the system is structured this way. Imagine for a moment if someone who is making a shoddy automobile, who was not paying attention to whether sharp objects got into a cereal box, did not have to be concerned about lawsuits anymore. Do my colleagues think they would really say let us hire that extra safety precaution, that extra employee to keep an eye out for consumers? No. They would be less inclined to do that.

The system works as it is intended. Are there abuses? I am sorry to say that there are some, and I wish we would address some of them in this legislation which, of course, we do not; but frankly to stand before the wheel of rhetoric, which really is a wheel of bad doers who got caught by the justice system, which we are trying to dismantle here today, and say this is evidence that the system does not work is entirely the opposite of the truth, unless my colleagues believe that a jury of people's peers cannot make these informed decisions, that we are the only people brilliant enough to make these decisions. I love these small government types who believe we have better judgment on these things than 12 men and women in a community, then we have to believe that the system in those cases worked.

I would say to my colleagues on both sides of the aisle that the Conyers/Nadler/Jackson-Lee substitute only puts lipstick on a fraud. It still leaves a very, very flawed bill; but at least we go from being completely destructive to only being moderately destructive, and we protect ourselves from some of the worst abuses.

Mr. Speaker, I urge a "yes" vote on the substitute, a "no" vote on the base bill, and I urge us to stop this drumbeat on the other side of blaming average Americans for being victimized by big corporations.

Mr. SENSENBRENNER . Mr. Speaker, I yield 2 minutes to the gentleman from Virginia (Mr. Goodlatte).

Mr. GOODLATTE . Mr. Speaker, I thank the gentleman from Wisconsin for yielding me this time, and I thank the gentleman from New York (Mr. Weiner) for raising the points on those cases on the class action wheel of fortune because he makes a good point. In not one of those cases was there any wrongdoing found on the part of any of those defendants because all of those were settlements. They were extortionate settlements because they are in the jurisdiction of a court where they know they are facing a hanging judge and a hanging jury.

The gentleman also raised another good point, and we should not leave plaintiffs in the situation where they get a 33-cent check or a coupon for a box of Cheerios, like in another case, and that is what this bill does. It requires extra-special scrutiny for coupon settlement cases so the courts will no longer let the manufacturers' attorneys and the defendants' attorneys come in with a settlement that simply gets out of the case, that gives the plaintiffs' attorney a huge sum of money and everyone else walks away and the plaintiffs get left holding the bag.

Mr. Speaker, the gentleman ought to talk to his colleague, the senior Senator from New York, the predecessor of his seat, who supported this legislation.

In addition, when the gentleman talks about abuse of plaintiffs in these cases, take into consideration the nationwide class action lawsuit filed in Alabama against the Bank of Boston, headquartered in Massachusetts, over mortgage escrow accounts. The class members won the case but actually lost money. Amazing.

Under the settlement agreement, the 700,000 class members received small payments of just a couple of dollars or no money at all. About a year later, they found out that anywhere from $90 to $140 had been deducted from their escrow accounts. For what? To pay their lawyers' legal fees, of what? $8.5 million. And when some of those class members, some of

those beleaguered plaintiffs, that I am glad the gentleman from New York is standing up for, sued their class action lawyers for malpractice, the lawyers countersued them for $25 million saying that their former clients were trying to harass them.

This is an extortionate practice. A small cartel of class action lawyers around the country are abusing the system and we need to change it.

Mr. CONYERS . Mr. Speaker, I yield 30 seconds to the gentleman from New York (Mr. Weiner). **[*H751]**

Mr. WEINER . Mr. Speaker, I thank the gentleman very much for yielding me this additional time, and I am surprised that such an able lawyer would be unwilling to engage in a debate on his time, but I will take 30 seconds simply to rebut what the gentleman said.

In every one of those cases on the wheel of rhetoric that the gentleman put up, those that were found guilty, those who were found to be responsible, those who were found to be culpable of doing harmful things to our community admitted it, paid a fine, paid a penalty, that was approved by a judge, and that is the fact; that the gentleman took cases of people who admitted with their actions there was wrongdoing involved.

And if they had not been caught by this system, I ask the gentleman, what system would they be caught by?

Mr. CONYERS . Mr. Speaker, I am pleased to yield the balance of my time to the gentlewoman from Texas (Ms. Jackson-Lee), a cosponsor of the substitute amendment.

(Ms. JACKSON-LEE of Texas asked and was given permission to revise and extend her remarks.)

Ms. JACKSON-LEE of Texas . Mr. Speaker, that pig may have lipstick, but I can tell my colleagues that it is still pretty unattractive.

It is interesting that my good friend from Virginia keeps talking about coupons and this 30 cents. What he is not telling those of us who understand what class action settlements really mean is that in the settlement comes the punishment for not doing or the incentive to not violate the law again. In the settlement comes an injunction that argues or stops the culprit, the violator, from doing harm again. There is an action. Class actions do not always generate into dollars to petitioners. If you have been done harm, you want that harm to stop immediately so someone else cannot be harmed.

And the class action lawsuit and the so-called millions of dollars to attorneys for attorneys fees does not take into account the preparation for that case, the depositions, the travel. So it looks as if there is a great bounty or a gift being given to lawyers who are working to ensure that the punitive entity, the entity that has caused thousands of employees to lose pensions from corporations, the entity such as MCI and others who have thrown away their corporate responsibility to their employees and caused them to lose all their money, who violated corporate laws and had the violation of trust and made sure that they did the self-dealing, these class actions were to say "and do that no more," and "we will not allow you to do that anymore."

For example, the particular amendment that is included in the Conyers-Nadler-Jackson-Lee substitute, which I rise enthusiastically to support, the tax traitor corporation which leaves America and incorporates somewhere else and depletes all of its savings accounts, or all of its accounts, so therefore if there is an action, if you are harmed, if you are hurt and you sue here in the United States, you look up in the court and you find out there is empty pockets.

Why? Because they have overcome the laws of this land. They have absconded and you have no way of seeking relief. The substitute includes the relief that is necessary to ensure that citizens and consumers are protected.

There is a civil rights carveout, so that you have a right to address your grievances without the expenses of a Federal Court. There is a wage and hour carveout, so that you can file against a company in your local jurisdiction as a class action when you have been violated on the minimum wage. Physical injuries, so that when your child is injured in a park because of a defective product you have the right to go into your State courts and seek relief.

Now, I want to share with those who feel that we are now opening the doors of opportunity with the Federal courts. Let me share this with you. This is why this is a bogus litigation or legislation that will not work. Arizona has 159 State judges, only 13 Federal courts. Tell me the difference in being able to go into a court that has 159 judges versus those who have 13.

What about the State of South Carolina, with 48 State judges and merely 10 federal judges; or Rhode Island with 22 State judges and three Federal judges; New York with 593 State judges and a mere 52 Federal courts; Louisiana, 211 State judges and 22 Federal courts?

Frankly, there is a farce going on here. At the end of the 108th Congress there were 35 judicial vacancies in the Federal courts. There is no opportunity to go into the Federal courts. They are overburdened and overworked. Justice Rehnquist said something very important. He said, "I have criticized Congress and the President for their propensity to enact more and more legislation which brings more and more cases into the Federal Court system. This criticism received virtually no public attention. If Congress enacts and the President signs new laws, allowing more cases to be brought into the Federal courts, just filling the vacancies will not be enough. We need additional judgeships."

This is a farce, I am saddened to say, even with the compromise. We all want to see the judicial system work. I know my good friend from Virginia has good intentions, but this responds to a noncrisis with no resources, no added courts to the Federal bench, and the backlog of cases all over America simply slams the door to injured parties across this land.

The substitute is fair. It allows you to go into the State courts that have a bounty of judges, allows you to be heard, and it allows those corporate offenders or those products that have offended and harmed and maybe killed, those defective automobiles, to be in the courthouse and to have their concerns heard.

Mr. Speaker, I rise in opposition to this bill, S. 5, the Class Action Fairness Act. Unfortunately for the millions of aggrieved plaintiffs in America with legitimate claims, this body has brought yet another piece of legislation to the floor that threatens to close the doors of the court.

This bill, despite its name, is not fair to all complainants who come to the courts for relief. In addition, it fails to render accountability to parties who are in the best financial position. One issue that I planned to address by way of amendment was that of punishing fraudulent parties to class action proceedings by preventing them from removing the matter to federal court.

I am a co-sponsor of the amendment in nature of a substitute that will be offered by my colleagues. With the provisions that it contains, requirements for Federal diversity jurisdiction will not be watered down resulting in the removal of nearly all class actions to Federal court. A wholesale stripping of jurisdiction from the State courts should not be supported by this body. Therefore, it needs to be made more stringent as to all parties and it needs to contain provisions to protect all claimants and their right to bring suit.

Contained within the amendment in nature of a substitute is a section that I proposed in the context of the Terrorist Penalties Enhancement Act that was included in the bill passed into law. This section relates to holding "tax traitor corporations" accountable for their terrorist acts. With respect to S. 5, the right to seek removal to Federal courts will be precluded for tax traitor corporations.

The "tax traitor corporation" refers to a company that, in bad faith, takes advantage of loopholes in our tax code to establish bank accounts or to ship jobs abroad for the main purpose of tax avoidance. A tax-exempt group that monitors corporate influence called "Citizen Works" has compiled a list of 25 Fortune 500 Corporations that have the most offshore tax-haven subsidiaries. The percentage of increase in the number of tax havens held by these corporations since 1997 ranges between 85.7 percent and 9,650 percent.

This significant increase in the number of corporate tax havens is no coincidence when we look at the benefits that can be found in doing sham business transactions. Some of these corporations are tax traitor corporations because they have given up their American citizenship; however, they still conduct a substantial amount of their business in the United States and enjoy tax deductions of domestic corporations.

The provision in the substitute amendment will preclude these corporations from enjoying the benefit of removing State class actions to Federal court. Forcing these corporate entities to defend themselves in State courts will ensure that these class action claims will be fairly and fully litigated.

Mr. Speaker, S. 5 applies not only to class actions but to all tort cases. It is highly inefficient to overwhelm the Federal courts with the massive number of State claims that will come their way. Not only are the Federal courts less sympathetic to this kind of litigation, the practical effect will be that many cases will never be heard.

The barriers to gaining Federal jurisdiction to have a case heard is much higher than in State courts by virtue of their creation. As a result, the Federal courts will be quick to **[*H752]** refuse class certification in complex litigation matters. State courts are better suited to adjudicate complex class actions.

I oppose this legislation and urge my colleagues to join me.

Mr. Speaker, I ask my colleagues to vote for the substitute and defeat the underlying bill.

Mr. SENSENBRENNER . Mr. Speaker, I yield myself the balance of my time.

Mr. Speaker, the amendment in the nature of a substitute completely guts this bill. Every crippling amendment that was rejected either in this House or the other body in this Congress or the previous Congress is incorporated in this amendment. They do not have any new ideas over there. They just repackage and try to regurgitate the old ideas that have been found lacking.

The issue in this bill is very clear, and that is that we have to restore some sanity to the civil justice system by dealing with the abuses that a small group of lawyers have turned the class action system into.

When the framers of the Constitution wrote that inspired document, they gave Congress the power to regulate interstate Congress. What has happened as a result of the abuse of the class action system is that judges in small out-of-the-way counties, like Madison County, Illinois and Jefferson County, Texas end up being the ultimate arbiters of interstate commerce.

This bill puts some balance back into the system. The amendment perpetuates the existing system. Vote "no" on the amendments, vote "no" on the motion to recommit, and pass the bill.

Mr. Speaker, I yield back the balance of my time.

The SPEAKER pro tempore (Mr. Cole of Oklahoma). Pursuant to House Resolution 96, the previous question is ordered on the bill and on the amendment in the nature of a substitute offered by the gentleman from Michigan (Mr. Conyers).

The question is on the amendment in the nature of a substitute offered by the gentleman from Michigan (Mr. Conyers).

The question was taken; and the Speaker pro tempore announced that the noes appeared to have it.

Mr. CONYERS . Mr. Speaker, I object to the vote on the ground that a quorum is not present and make the point of order that a quorum is not present.

The SPEAKER pro tempore. Evidently a quorum is not present.

The Sergeant at Arms will notify absent Members.

The vote was taken by electronic device, and there were_yeas 178, nays 247, not voting 9, as follows:


[Rollcall Vote No. 36]


YEAS - 178
Abercrombie
Ackerman
Allen
Andrews
Baca
Baird
Baldwin
Barrow
Bean
Becerra
Berkley
Berman
Berry
Bishop (GA)
Bishop (NY)
Blumenauer
Boswell
Brady (PA)
Brown (OH)
Brown, Corrine
Butterfield
Capps
Capuano
Cardin

Cardoza
Carnahan
Carson
Chandler
Clay
Cleaver
Clyburn
Conyers
Costa
Costello
Crowley
Cummings
Davis (AL)
Davis (CA)
Davis (FL)
DeFazio
DeGette
Delahunt
DeLauro
Dicks
Dingell
Doggett
Doyle
Edwards
Emanuel
Engel
Etheridge
Evans
Fattah
Filner
Frank (MA)
Gonzalez
Green, Al
Green, Gene
Grijalva
Gutierrez
Harman
Hastings (FL)
Herseth
Higgins
Hinchey
Hinojosa
Holt
Honda
Hooley
Hoyer
Inslee
Israel
Jackson (IL)
Jackson-Lee (TX)
Jefferson
Johnson, E. B.
Jones (OH)
Kanjorski
Kaptur
Kennedy (RI)

Kildee
Kilpatrick (MI)
Kind
Kucinich
Langevin
Lantos
Larsen (WA)
Larson (CT)
Lee
Levin
Lewis (GA)
Lipinski
Lofgren, Zoe
Lowey
Lynch
Maloney
Markey
McCarthy
McCollum (MN)
McDermott
McGovern
McIntyre
McKinney
McNulty
Meehan
Meek (FL)
Meeks (NY)
Melancon
Menendez
Michaud
Millender-McDonald
Miller (NC)
Miller, George
Mollohan
Moore (KS)
Moore (WI)
Nadler
Napolitano
Neal (MA)
Oberstar
Obey
Olver
Ortiz
Owens
Pallone
Pascrell
Pastor
Payne
Pelosi
Pomeroy
Price (NC)
Rahall
Reyes
Ross
Rothman
Roybal-Allard

Ruppersberger
Rush
Ryan (OH)
Sabo
Salazar
Sanchez, Linda T.
Sanchez, Loretta
Sanders
Schakowsky
Schiff
Schwartz (PA)
Scott (VA)
Serrano
Sherman
Skelton
Slaughter
Smith (WA)
Snyder
Solis
Spratt
Stark
Strickland
Tauscher
Thompson (CA)
Thompson (MS)
Tierney
Towns
Udall (CO)
Udall (NM)
Van Hollen
Velazquez
Visclosky
Wasserman Schultz
Waters
Watson
Watt
Waxman
Weiner
Wexler
Woolsey
Wu
Wynn


          NAYS - 247
Aderholt
Akin
Alexander
Bachus
Baker
Barrett (SC)
Bartlett (MD)
Barton (TX)
Bass
Beauprez
Biggert

Bilirakis
Bishop (UT)
Blackburn
Blunt
Boehlert
Boehner
Bonilla
Bonner
Bono
Boozman
Boren
Boucher
Boustany
Boyd
Bradley (NH)
Brady (TX)
Brown (SC)
Brown-Waite, Ginny
Burgess
Burton (IN)
Buyer
Calvert
Camp
Cannon
Cantor
Capito
Carter
Case
Castle
Chabot
Chocola
Coble
Cole (OK)
Conaway
Cooper
Cox
Cramer
Crenshaw
Cubin
Cuellar
Culberson
Cunningham
Davis (KY)
Davis (TN)
Davis, Jo Ann
Davis, Tom
Deal (GA)
DeLay
Dent
Diaz-Balart, L.
Diaz-Balart, M.
Doolittle
Drake
Dreier
Duncan
Ehlers

Emerson
English (PA)
Everett
Feeney
Ferguson
Fitzpatrick (PA)
Flake
Foley
Forbes
Ford
Fortenberry
Fossella
Foxx
Franks (AZ)
Frelinghuysen
Gallegly
Garrett (NJ)
Gerlach
Gibbons
Gilchrest
Gillmor
Gingrey
Gohmert
Goode
Goodlatte
Gordon
Granger
Graves
Green (WI)
Gutknecht
Hall
Harris
Hart
Hastert
Hastings (WA)
Hayes
Hayworth
Hefley
Hensarling
Herger
Hobson
Hoekstra
Holden
Hostettler
Hulshof
Hunter
Hyde
Inglis (SC)
Issa
Istook
Jenkins
Jindal
Johnson (CT)
Johnson (IL)
Johnson, Sam
Jones (NC)

Keller
Kelly
Kennedy (MN)
King (IA)
King (NY)
Kingston
Kirk
Kline
Knollenberg
Kolbe
Kuhl (NY)
LaHood
Latham
LaTourette
Leach
Lewis (CA)
Lewis (KY)
Linder
LoBiondo
Lucas
Lungren, Daniel E.
Mack
Manzullo
Marchant
Marshall
Matheson
McCaul (TX)
McCotter
McCrery
McHenry
McHugh
McKeon
McMorris
Mica
Miller (FL)
Miller (MI)
Miller, Gary
Moran (KS)
Moran (VA)
Murphy
Murtha
Musgrave
Myrick
Neugebauer
Ney
Northup
Norwood
Nunes
Nussle
Osborne
Otter
Oxley
Paul
Pearce
Pence
Peterson (MN)

Peterson (PA)
Petri
Pickering
Pitts
Platts
Poe
Pombo
Porter
Portman
Price (GA)
Pryce (OH)
Putnam
Radanovich
Ramstad
Regula
Rehberg
Renzi
Reynolds
Rogers (AL)
Rogers (KY)
Rogers (MI)
Rohrabacher
Ros-Lehtinen
Royce
Ryan (WI)
Ryun (KS)
Saxton
Schwarz (MI)
Scott (GA)
Sensenbrenner
Sessions
Shadegg
Shaw
Shays
Sherwood
Shimkus
Shuster
Simmons
Simpson
Smith (NJ)
Smith (TX)
Sodrel
Souder
Stearns
Sweeney
Tancredo
Tanner
Taylor (MS)
Taylor (NC)
Terry
Thornberry
Tiahrt
Tiberi
Turner
Upton
Walden (OR)

Walsh
Wamp
Weldon (FL)
Weldon (PA)
Weller
Westmoreland
Whitfield
Wicker
Wilson (NM)
Wilson (SC)
Wolf
Young (AK)

              NOT VOTING - 9
Davis (IL)
Eshoo
Farr
Rangel
Reichert
Stupak
Sullivan
Thomas
Young (FL)

Messrs. CULBERSON, SIMMONS, BASS, GOODE, GARY G. MILLER of California, HOBSON, FORD, CUELLAR, and Mrs. CUBIN changed their vote from "yea" to "nay."

Messrs. GEORGE MILLER of California, SMITH of Washington, and MOLLOHAN changed their vote from "nay" to "yea."

So the amendment in the nature of a substitute was rejected.

The result of the vote was announced as above recorded.

The SPEAKER pro tempore (Mr. Cole of Oklahoma). The question is on the third reading of the Senate bill.

The Senate bill was ordered to be read a third time, and was read the third time.

              Motion to Commit Offered by Mr. Brown of Ohio

Mr. BROWN of Ohio . Mr. Speaker, I offer a motion to commit.

The SPEAKER pro tempore. Is the gentleman opposed to the bill?

Mr. BROWN of Ohio. I am, Mr. Speaker.

The SPEAKER pro tempore. The Clerk will report the motion to commit.

The Clerk read as follows:

Mr. Brown of Ohio moves to commit the bill S. 5 to the Committee on the Judiciary with instructions that the Committee report the same back to the House forthwith with the following amendments:

In section 1711(2) of title 28, United States Code, as added by section 3(a) of the bill, add after the period the following: "The term 'class action' does not include any action arising by reason of the use of the drug Vioxx.".  **[*H753]**

In section 1332(d)(1)(B) of title 28, United States Code, as amended by section 4(a)(2) of the bill, insert before the semicolon the following ", except that the term 'class action' does not include any action arising by reason of the use of the drug Vioxx".

The SPEAKER pro tempore. Pursuant to the rule, the gentleman from Ohio (Mr. Brown) is recognized for 5 minutes in support of his motion.

Mr. BROWN of Ohio . Mr. Speaker, Janet Huggins died last September. She was 39 years old. She had a 9-year-old son.

She had no personal or family history of heart problems, but she suffered a fatal heart attack just a month after she began taking a new medicine for her early-onset arthritis.

That medicine she took was Merck's anti-inflammatory drug, Vioxx. Cardiologist, Dr. Eric Topol, and other researchers at the Cleveland Clinic sounded the alarm in August of 2001.

Their article in the Journal of the American Medical Association pointed to increased occurrence of heart problems in patients taking Vioxx and similar Cox-II anti-inflammatory drugs. Dr. Topol even called Merck's CEO and research director to talk about his concerns. His calls went unanswered. His warnings went unheeded.

Instead, Merck continued to sell Vioxx, continued to spend $100 million a year on direct-to-consumer advertising, encouraging more and more Americans to buy Vioxx. That is what Ms. Huggins did. She was buried the same day that Merck finally took Vioxx off the market.

Her husband Monty has filed suit against Merck. His suit will be captured, along with thousands of other Vioxx suits, under the mass actions provisions of S. 5. This bill is designed to make it more difficult for Monty Huggins and others to pursue their claims that companies like Merck will never be held accountable.

S. 5 will make it more expensive for him and much harder for him to travel for court proceedings. It may even dead-end Monty Huggins' claim entirely.

Federal Courts have repeatedly refused to certify multistate class actions because they found them too complex to choose one State law over the other. So Monty Huggins may arrive in Federal Court only to find that is the end of the line.

The bitter irony here is that Vioxx claims are not really class actions at all.

Here is a good example of the sort of things settled by class action lawsuits. This iPod portable music player is all the rage. There are some people out there who thought the batteries on these things run out too quickly. They have filed a class action lawsuit against the manufacturer. If they win, everybody in the class probably gets a few bucks and the whole thing is done.

That is what class action lawsuits are about. They do not generally involve personal injuries. They do not generally involve huge losses. There is a world of difference, Mr. Speaker, between a faulty battery in this, and the death of a 39-year-old wife and mother.

Perhaps the worst aspect of this bill is that it treats these suits the same. We should strip out

the whole class action, the mass action provision, but that is not realistic in this political environment.

My motion to commit prevents harm so obvious it cannot be ignored by specifically exempting Vioxx lawsuits.

Dr. Topol at the Cleveland Clinic, who I mentioned earlier wrote, "Neither of the two major forces in this 5-and-a-half year affair, neither Merck nor the FDA, fulfilled its responsibilities to the public."

This motion to commit offers an opportunity for someone at last to act responsibly.

If we adopt this motion to commit, Monty Huggins will have a fighting chance for justice. If we do not, the U.S. House of Representatives will join the list of those who betrayed the public's trust.

Mr. Speaker, I yield the reminder of my time to my friend, the gentleman from Arkansas (Mr. Ross).

Mr. ROSS . Mr. Speaker, the Class Action Fairness Act could not be more inappropriately named, and this motion to commit shows why.

Since 1999, Merck has spent over $100 million a year to advertise Vioxx. More than 80 million people took Vioxx, and the drug generated sales of $2.5 billion for Merck.

Merck should take responsibility for the harm their products may cause. Thousands, literally thousands of American families believe they lost a loved one or suffered personal harm because Vioxx was unsafe.

These families believe Merck knew of the danger Vioxx was causing, but allowed the drug to remain on the market anyway. Maybe they are right. Maybe they are not. But the point is that the so-called Class Action Fairness Act does not give them a fair chance to make their case before a jury of their peers.

The Class Action Fairness Act makes it very difficult for those who feel they were harmed by drugs like Vioxx from getting the justice they deserve. We should adopt this motion to commit and pass a Class Action Fairness Act worthy of the name.

Mr. GOODLATTE . Mr. Speaker, I rise in opposition to the motion to commit.

The SPEAKER pro tempore. The gentleman from Virginia (Mr. Goodlatte) is recognized for 5 minutes.

Mr. GOODLATTE . Mr. Speaker, first let me thank Chairman Sensenbrenner for his leadership in bringing us to this historic point. He and I have been working on this for over 6 years. It has passed the House of Representatives three times before.

Due to his good work, it has now passed the Senate and we have the opportunity to send it to the President. He is waiting to sign it and we shouldn't waste any more time.

Now the truth about class action fairness and Vioxx. Critics have been arguing in the press that S. 5 should be rejected because it will hurt consumers bringing Vioxx cases against Merck. The truth is, however, that this legislation will have absolutely no effect on Vioxx suits, and here is why. The majority of personal injury cases brought against Merck are individual cases that would not be affected by the bill in any manner whatsoever. These include more than 400 personal injury cases that are part of a coordinated proceeding in New

Jersey State Court. None of these cases will be affected by the bill because they are neither class actions nor mass actions.

Merck has been named in more than 75 statewide and nationwide class actions involving Vioxx, but only a small percentage are personal injury class actions. To the extent these cases do involve personal injury, most were already brought in or removed to Federal Court because each potential class member's claims exceeds $75,000. Thus, these cases are removable to Federal Court under the old rules.

There are a few cases which plaintiffs have joined together in mass action-type cases against Merck. However, not a single Vioxx case has been brought against Merck in State court by more than 100 plaintiffs, one of the requirements for removal to Federal Court under the class action legislation. Thus, there is no reason to believe that the mass action provision would affect any Vioxx-related cases whatsoever.

Most of the class actions have been brought against Merck. Since the legislation is not retroactive, it would absolutely have no effect on the 75 class actions already filed against Merck in the wake of the Vioxx withdrawal.

Mr. BROWN of Ohio . Mr. Speaker, I have a parliamentary inquiry.

The SPEAKER pro tempore (Mr. Cole of Oklahoma). Does the gentleman from Virginia yield to the gentleman from Ohio for a parliamentary inquiry?

Mr. GOODLATTE . Mr. Speaker, I do not yield.

The SPEAKER pro tempore. The gentleman from Virginia (Mr. Goodlatte) may continue.

Mr. GOODLATTE . Mr. Speaker, given the large number of suits already filed and the fact that every former Vioxx taker in America is already a proposed class member in numerous class actions, it is unlikely there will be many more class actions after the legislation is enacted.

It is bad legislation to have something pass that covers all class actions in the country for all time and name one specific product or one specific company in the legislation. It is irrelevant anyway.

Now, let me tell you the kinds of cases that are affected by this legislation. Take a look at the "Class Action Wheel of Fortune" on this chart. It will tell you what we are doing here today.
 **[*H754]**


You have got the case against Ameritech. Ameritech, the attorneys for the plaintiffs got $16 million in attorneys fees. What did the plaintiffs they represent get? Five-dollar phone cards.

The Premier Cruise Line case, the lawyers got almost $1 million; the consumers got a $30- to $40-off coupon for their next cruise.

The computer monitor litigation case, the lawyers, $6 million in fees; the consumers, a $13 rebate against your next future purchase of the alleged defective product.

Register.com, $650,000 for the lawyers; $5 for the consumers.

KB Toys, $1 million for the lawyers; 30 percent off your selected product in a unadvertised 1-week sale at KB Toys.

Poland Spring Water, $1.35 million for the lawyers; a coupon for more of the allegedly

defective water for the consumers.

My favorite case, however, is this one, the Chase Manhattan Bank case, where the lawyers got $4 million in attorneys fees; the plaintiffs, a check, we have got one right here, for 33 cents. But there was a catch, because if you wanted to accept the 33 cents, you had to use a 34-cent postage stamp to send in your acceptance notice. How is that for a bargain for you?

And how about the $22 million case that President Bush cited last week against Thompson Electronics? The lawyers got $22 million in attorneys fees; the plaintiffs, one of whom was there, got a $25- to $50-off coupon to buy more of what? The very television set that she was complaining was defective in the first place.

It is a racket, it is extortionate. The people of the country know it. When they are asked the question, who benefits from our class action industry today, 47 percent say it is the plaintiffs' lawyers; 20 percent say it is the lawyers for the companies; 67 percent of our public recognizes it is the lawyers who benefit from this system.

It is time we change it. This bill does just that. It protects American consumers and makes sure that they get justice by examining these ridiculous coupon settlements.

Mr. Speaker, I urge my colleagues to support this legislation, defeat the motion to commit, and send the bill to the President, and starting very soon, we will have justice for American consumers.

Mr. Speaker, I yield back the balance of my time.

### Parliamentary Inquiry

Mr. BROWN of Ohio . Mr. Speaker, I have a parliamentary inquiry.

The SPEAKER pro tempore. The gentleman will state it.

Mr. BROWN of Ohio . Mr. Speaker, under provisions of this bill, is it not the case that all future Vioxx cases are prohibited?

The SPEAKER pro tempore. The gentleman has not stated a proper parliamentary inquiry.

Without objection, the previous question is ordered on the motion to commit.

There was no objection.

The SPEAKER pro tempore. The question is on the motion to commit.

The question was taken; and the Speaker pro tempore announced that the noes appeared to have it.

### Recorded Vote

Mr. BROWN of Ohio . Mr. Speaker, I demand a recorded vote.

A recorded vote was ordered.

The SPEAKER pro tempore. Pursuant to clauses 8 and 9 of rule XX, this 15-minute vote on the motion to commit will be followed by 5-minute votes on the passage of S. 5, if ordered, and the motion to suspend the rules on  H. Res. 91.

The vote was taken by electronic device, and there were_ayes 175, noes 249, not voting 10, as follows:

[Rollcall Vote No. 37]

AYES_175          Abercrombie
Ackerman
Allen
Andrews
Baca
Baird
Baldwin
Barrow
Bean
Becerra
Berkley
Berman
Berry
Bishop (GA)
Bishop (NY)
Blumenauer
Boswell
Brady (PA)
Brown (OH)
Brown, Corrine
Butterfield
Capps
Capuano
Cardin
Cardoza
Carnahan
Carson
Chandler
Clay
Cleaver
Clyburn
Conyers
Costa
Costello
Crowley
Cummings
Davis (CA)
Davis (FL)
Davis (IL)
DeFazio
DeGette
Delahunt
DeLauro
Dicks
Dingell
Doggett
Doyle
Edwards
Emanuel
Etheridge

Evans
Fattah
Filner
Frank (MA)
Gonzalez
Green, Al
Green, Gene
Grijalva
Gutierrez
Harman
Hastings (FL)
Herseth
Higgins
Hinchey
Hinojosa
Holt
Honda
Hooley
Hoyer
Inslee
Israel
Jackson (IL)
Jackson-Lee (TX)
Jefferson
Johnson, E. B.
Kanjorski
Kaptur
Kennedy (RI)
Kildee
Kilpatrick (MI)
Kind
Kucinich
Langevin
Lantos
Larsen (WA)
Larson (CT)
Lee
Levin
Lewis (GA)
Lipinski
Lofgren, Zoe
Lowey
Lynch
Maloney
Markey
McCarthy
McCollum (MN)
McDermott
McGovern
McIntyre
McKinney
McNulty
Meehan
Meek (FL)
Meeks (NY)
Melancon

Menendez
Michaud
Millender-McDonald
Miller (NC)
Miller, George
Mollohan
Moore (KS)
Moore (WI)
Nadler
Napolitano
Neal (MA)
Oberstar
Obey
Olver
Ortiz
Owens
Pallone
Pascrell
Pastor
Payne
Pelosi
Price (NC)
Rahall
Reyes
Ross
Rothman
Roybal-Allard
Ruppersberger
Rush
Ryan (OH)
Sabo
Salazar
Sanchez, Linda T.
Sanchez, Loretta
Sanders
Schakowsky
Schiff
Schwartz (PA)
Scott (VA)
Serrano
Sherman
Skelton
Slaughter
Smith (WA)
Snyder
Solis
Stark
Strickland
Tauscher
Taylor (MS)
Thompson (CA)
Thompson (MS)
Tierney
Towns
Udall (CO)
Udall (NM)

Van Hollen
Velazquez
Visclosky
Wasserman Schultz
Waters
Watson
Watt
Waxman
Weiner
Wexler
Woolsey
Wu
Wynn


                    NOES_249     Aderholt
Akin
Alexander
Bachus
Baker
Barrett (SC)
Bartlett (MD)
Barton (TX)
Bass
Beauprez
Biggert
Bilirakis
Bishop (UT)
Blackburn
Blunt
Boehlert
Boehner
Bonilla
Bonner
Bono
Boozman
Boren
Boucher
Boustany
Boyd
Bradley (NH)
Brady (TX)
Brown (SC)
Brown-Waite, Ginny
Burgess
Burton (IN)
Calvert
Camp
Cannon
Cantor
Capito
Carter
Case
Castle
Chabot
Chocola

Coble
Cole (OK)
Conaway
Cooper
Cramer
Crenshaw
Cubin
Cuellar
Culberson
Cunningham
Davis (AL)
Davis (KY)
Davis (TN)
Davis, Jo Ann
Davis, Tom
Deal (GA)
DeLay
Dent
Diaz-Balart, L.
Diaz-Balart, M.
Doolittle
Drake
Dreier
Duncan
Ehlers
Emerson
Engel
English (PA)
Everett
Feeney
Ferguson
Fitzpatrick (PA)
Flake
Foley
Forbes
Ford
Fortenberry
Fossella
Foxx
Franks (AZ)
Frelinghuysen
Gallegly
Garrett (NJ)
Gerlach
Gibbons
Gilchrest
Gillmor
Gingrey
Gohmert
Goode
Goodlatte
Gordon
Granger
Graves
Green (WI)
Gutknecht

Hall
Harris
Hart
Hastert
Hastings (WA)
Hayes
Hayworth
Hefley
Hensarling
Herger
Hobson
Hoekstra
Holden
Hostettler
Hulshof
Hunter
Hyde
Issa
Istook
Jenkins
Jindal
Johnson (CT)
Johnson (IL)
Johnson, Sam
Jones (NC)
Keller
Kelly
Kennedy (MN)
King (IA)
King (NY)
Kingston
Kirk
Kline
Knollenberg
Kolbe
Kuhl (NY)
LaHood
Latham
LaTourette
Leach
Lewis (CA)
Lewis (KY)
Linder
LoBiondo
Lucas
Lungren, Daniel E.
Mack
Manzullo
Marchant
Marshall
Matheson
McCaul (TX)
McCotter
McCrery
McHenry
McHugh

McKeon
McMorris
Mica
Miller (FL)
Miller (MI)
Miller, Gary
Moran (KS)
Moran (VA)
Murphy
Murtha
Musgrave
Myrick
Neugebauer
Ney
Northup
Norwood
Nunes
Nussle
Osborne
Otter
Oxley
Paul
Pearce
Pence
Peterson (MN)
Peterson (PA)
Petri
Pickering
Pitts
Platts
Poe
Pombo
Pomeroy
Porter
Portman
Price (GA)
Pryce (OH)
Putnam
Radanovich
Ramstad
Regula
Rehberg
Renzi
Reynolds
Rogers (AL)
Rogers (KY)
Rogers (MI)
Rohrabacher
Ros-Lehtinen
Royce
Ryan (WI)
Ryun (KS)
Saxton
Schwarz (MI)
Scott (GA)
Sensenbrenner

Sessions
Shaw
Shays
Sherwood
Shimkus
Shuster
Simmons
Simpson
Smith (NJ)
Smith (TX)
Sodrel
Souder
Spratt
Stearns
Sullivan
Sweeney
Tancredo
Tanner
Taylor (NC)
Terry
Thomas
Thornberry
Tiahrt
Tiberi
Turner
Upton
Walden (OR)
Walsh
Wamp
Weldon (FL)
Weldon (PA)
Weller
Westmoreland
Whitfield
Wicker
Wilson (NM)
Wilson (SC)
Wolf
Young (AK)
Young (FL)


          NOT VOTING - 10
Buyer
Cox
Eshoo
Farr
Inglis (SC)
Jones (OH)
Rangel
Reichert
Shadegg
Stupak


          Announcement by the Speaker Pro Tempore

The SPEAKER pro tempore (Mr. Cole of Oklahoma) (during the vote). Members are advised there are 2 minutes remaining in this vote.

So the motion to commit was rejected.

The result of the vote was announced as above recorded.

Mr. MARKEY changed his vote from "aye" to "no."  **[\*H755]**


The SPEAKER pro tempore (Mr. McHugh). The question is on the passage of the Senate bill.

The question was taken; and the Speaker pro tempore announced that the ayes appeared to have it.

Mr. SENSENBRENNER . Mr. Speaker, on that I demand the yeas and nays.

The yeas and nays were ordered.

The SPEAKER pro tempore. This will be a 5-minute vote.

The vote was taken by electronic device, and there were_yeas 279, nays 149, not voting 6, as follows:

[Rollcall Vote No. 38]


YEAS - 279
Aderholt
Akin
Alexander
Bachus
Baird
Barrett (SC)
Bartlett (MD)
Barton (TX)
Bass
Bean
Beauprez
Berry
Biggert
Bilirakis
Bishop (UT)
Blackburn
Blunt
Boehlert
Boehner
Bonilla
Bonner
Bono
Boozman
Boren
Boucher
Boustany
Boyd

Bradley (NH)
Brady (TX)
Brown (SC)
Brown-Waite, Ginny
Burgess
Burton (IN)
Buyer
Calvert
Camp
Cannon
Cantor
Capito
Carter
Case
Castle
Chabot
Chandler
Chocola
Coble
Cole (OK)
Conaway
Cooper
Costa
Costello
Cox
Cramer
Crenshaw
Cubin
Cuellar
Culberson
Cunningham
Davis (AL)
Davis (IL)
Davis (KY)
Davis (TN)
Davis, Jo Ann
Davis, Tom
Deal (GA)
DeLay
Dent
Diaz-Balart, L.
Diaz-Balart, M.
Drake
Dreier
Duncan
Edwards
Ehlers
Emanuel
Emerson
English (PA)
Everett
Feeney
Ferguson
Fitzpatrick (PA)
Flake
Foley

Forbes
Ford
Fortenberry
Fossella
Foxx
Franks (AZ)
Frelinghuysen
Gallegly
Garrett (NJ)
Gerlach
Gibbons
Gilchrest
Gillmor
Gingrey
Gohmert
Gonzalez
Goode
Goodlatte
Gordon
Granger
Graves
Green (WI)
Gutknecht
Hall
Harman
Harris
Hart
Hastert
Hastings (WA)
Hayes
Hayworth
Hefley
Hensarling
Herger
Higgins
Hinojosa
Hobson
Hoekstra
Holden
Hostettler
Hulshof
Hunter
Hyde
Inglis (SC)
Issa
Istook
Jenkins
Jindal
Johnson (CT)
Johnson (IL)
Johnson, Sam
Jones (NC)
Kanjorski
Keller
Kelly
Kennedy (MN)

Kind
King (IA)
King (NY)
Kingston
Kirk
Kline
Knollenberg
Kolbe
Kuhl (NY)
LaHood
Larsen (WA)
Larson (CT)
Latham
LaTourette
Leach
Lewis (CA)
Lewis (KY)
Linder
Lipinski
LoBiondo
Lucas
Lungren, Daniel E.
Mack
Manzullo
Marchant
Marshall
Matheson
McCaul (TX)
McCotter
McCrery
McHenry
McHugh
McKeon
McMorris
Meeks (NY)
Melancon
Mica
Michaud
Miller (FL)
Miller (MI)
Miller, Gary
Moore (KS)
Moran (KS)
Moran (VA)
Murphy
Murtha
Musgrave
Myrick
Neugebauer
Ney
Northup
Norwood
Nunes
Nussle
Osborne
Otter

Oxley
Paul
Pearce
Pence
Peterson (MN)
Peterson (PA)
Petri
Pickering
Pitts
Platts
Poe
Pombo
Pomeroy
Porter
Portman
Price (GA)
Pryce (OH)
Putnam
Radanovich
Rahall
Ramstad
Regula
Rehberg
Renzi
Reyes
Reynolds
Rogers (AL)
Rogers (KY)
Rogers (MI)
Rohrabacher
Ros-Lehtinen
Royce
Ruppersberger
Ryan (WI)
Ryun (KS)
Saxton
Schwarz (MI)
Scott (GA)
Sensenbrenner
Sessions
Shadegg
Shaw
Shays
Sherwood
Shimkus
Shuster
Simmons
Simpson
Smith (NJ)
Smith (TX)
Smith (WA)
Snyder
Sodrel
Souder
Stearns
Sullivan

Sweeney
Tancredo
Tanner
Tauscher
Taylor (MS)
Taylor (NC)
Terry
Thomas
Thornberry
Tiahrt
Tiberi
Turner
Upton
Walden (OR)
Walsh
Wamp
Weldon (FL)
Weldon (PA)
Weller
Westmoreland
Whitfield
Wicker
Wilson (NM)
Wilson (SC)
Wolf
Wu
Young (AK)
Young (FL)


                    NAYS - 149
Abercrombie
Ackerman
Allen
Andrews
Baca
Baldwin
Barrow
Becerra
Berkley
Berman
Bishop (GA)
Bishop (NY)
Blumenauer
Boswell
Brady (PA)
Brown (OH)
Brown, Corrine
Butterfield
Capps
Capuano
Cardin
Cardoza
Carnahan
Carson
Clay

Cleaver
Clyburn
Conyers
Crowley
Cummings
Davis (CA)
Davis (FL)
DeFazio
DeGette
Delahunt
DeLauro
Dicks
Dingell
Doggett
Doolittle
Doyle
Engel
Etheridge
Evans
Fattah
Filner
Frank (MA)
Green, Al
Green, Gene
Grijalva
Gutierrez
Hastings (FL)
Herseth
Hinchey
Holt
Honda
Hooley
Hoyer
Inslee
Israel
Jackson (IL)
Jackson-Lee (TX)
Jefferson
Johnson, E. B.
Jones (OH)
Kaptur
Kennedy (RI)
Kildee
Kilpatrick (MI)
Kucinich
Langevin
Lantos
Lee
Levin
Lewis (GA)
Lofgren, Zoe
Lowey
Lynch
Maloney
Markey
McCarthy

McCollum (MN)
McDermott
McGovern
McIntyre
McKinney
McNulty
Meehan
Meek (FL)
Menendez
Millender-McDonald
Miller (NC)
Miller, George
Mollohan
Moore (WI)
Nadler
Napolitano
Neal (MA)
Oberstar
Obey
Olver
Ortiz
Owens
Pallone
Pascrell
Pastor
Payne
Pelosi
Price (NC)
Ross
Rothman
Roybal-Allard
Rush
Ryan (OH)
Sabo
Salazar
Sanchez, Linda T.
Sanchez, Loretta
Sanders
Schakowsky
Schiff
Schwartz (PA)
Scott (VA)
Serrano
Sherman
Skelton
Slaughter
Solis
Spratt
Stark
Strickland
Thompson (CA)
Thompson (MS)
Tierney
Towns
Udall (CO)
Udall (NM)

Van Hollen
Velazquez
Visclosky
Wasserman Schultz
Waters
Watson
Watt
Waxman
Weiner
Wexler
Woolsey
Wynn


NOT VOTING - 6

Baker
Eshoo
Farr
Rangel
Reichert
Stupak


Announcement by the Speaker Pro Tempore

The SPEAKER pro tempore (during the vote). Members are advised there are 2 minutes remaining in this vote.

So the Senate bill was passed.

The result of the vote was announced as above recorded.

A motion to reconsider was laid on the table.

**SUBJECT:** LITIGATION (93%); CLASS ACTIONS (91%); SUITS & CLAIMS (90%); SETTLEMENT & COMPROMISE (79%); JUSTICE DEPARTMENTS (59%); HOLDING COMPANIES (59%); LAWYERS (59%); BANKING & FINANCE (59%); LEGISLATIVE BODIES (59%); WITNESSES (59%); ATTORNEYS FEES (59%); LEGISLATION (59%); TRIAL & PROCEDURE (59%); LEGISLATORS (59%); ATTORNEYS GENERAL (59%); CONSENT DECREES & ORDERS (59%); US FEDERAL GOVERNMENT (59%);

**LOAD-DATE:** February 18, 2005

Service: **Get by LEXSEE®**
Citation: **151 cong rec h 723**
View: Full
Date/Time: Monday, August 18, 2008 - 11:46 PM EDT

Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator | Transactional Advisor | Counsel Selector
History | Delivery Manager | Switch Client | Preferences | Sign Out | Help


http://www.lexis.com/research/retrieve?_m=a4a8668ed3f86d38ff88ecd036846902&csvc=l...   8/18/2008



About LexisNexis  | Terms & Conditions  | Contact Us
Copyright ©  2008 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.

# COMPENDIUM
# EXHIBIT 6



Switch Client ⋮ Preferences ⋮ Sign Out ⋮ ❓ Help

Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator | Transactional Advisor | Cour

Service: **Get by LEXSEE®**
Citation: **109 s rpt 14**

☛Select for FOCUS™ or Delivery
☐

*2005 Committee Reports, February 28, 2005*

Copyright © 2005 LexisNexis Academic & Library Solutions,
a division of Reed Elsevier Inc. All rights reserved.
COMMITTEE REPORTS

109th Congress, 1st Session

Senate Report 109-14

109 S. Rpt. 14

THE CLASS ACTION FAIRNESS ACT OF 2005

**DATE:** February 28, 2005-Ordered to be printed

**SPONSOR:** Mr. Specter submitted the following

**COMMITTEE:** From the Committee on the Judiciary

REPORT
[To accompany S. 5] Retrieve bill tracking report  Retrieve full text version

**TEXT:**
Calendar No. 1

109TH CONGRESS

Report

SENATE

1st Session

109-14

--THE CLASS ACTION FAIRNESS ACT OF 2005

February 28, 2005- Ordered to be printed

Mr. SPECTER, from the Committee on the Judiciary, submitted the following

R E P O R T

together with

ADDITIONAL AND MINORITY VIEWS

[To accompany S. 5]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (S. 5) to amend title 28, United States Code, to allow the application of the principles of federal diversity jurisdiction to interstate class actions, having considered the same, reports favorably thereon, without amendments, do pass.

CONTENTS

Page

I.

Legislative History

1

II.

Votes of the Committee

3

III.

Purposes

4

IV.

Background and Need for the Legislation

6

V.

How It Works: S. 5 and Changes in Existing Law

27

VI.

Section-by-Section Analysis

29

VII.

Critics Contentions and Rebuttals

51

VIII.

Congressional Budget Office Cost Estimate

76

IX.

Regulatory Impact Statement

78

X.

Additional Views

79

XI.

Minority Views

82

XII.

Changes in Existing Law

96

I. LEGISLATIVE HISTORY

The Senate began consideration of the Class Action Fairness Act in the 105th Congress when the Senate Judiciary Subcommittee on Administrative Oversight and the Courts convened a hearing on October 30, 1997. John H. Church, Jr., John C. Coffee, Jr., Lewis H. Goldfarb, Paul V. Niemeyer, Martha Preston, and Brian Wolfman testified at the hearing on issues such as unfair class settlements, attorneys' fees, and state court abuses. On September 28, 1998, the Subcommittee on Administrative Oversight and the Courts approved S. 2083, the 'Class Action Fairness Act of 1997,' introduced by Senators Charles Grassley (R-IA) and Herb Kohl (D-WI), with an amendment in the nature of a substitute. No further action was taken on S. 2083 in the 105th Congress.

On February 3, 1999, S. 353, 'The Class Action Fairness Act of 1999,' was introduced in the 106th Congress by Senators Charles Grassley (R-IA), Herb Kohl (R-WI), and Strom Thurmond (R-SC). S. 353 was referred to the Senate Committee on the Judiciary. On May 4, 1999, the Judiciary Subcommittee on Administrative Oversight and the Courts held a legislative hearing (S. Hrg. 106-465) on the bill, and received testimony from Eleanor D. Acheson, John H. Beisner, Richard A. Daynard, E. Donald Elliot, John P. Frank, and Stephan G. Morrison.

On June 29, 2000, the Judiciary Committee approved S. 353 with an amendment in the nature of a substitute, offered by Chairman Orrin G. Hatch (R-UT), Senators Charles Grassley and Herb Kohl, by a rollcall vote of 11 years and 7 nays. S. 353 was then ordered favorably

by the Committee without additional amendment.

The Senate continued consideration of the Class Action Fairness Act in the 107th Congress when Senator Charles Grassley (R-IA), introduced S. 1712 on November 15, 2001 with Senators Kohl (D-WI), Hatch (R-UT), Carper (D-DE), Thurmond (R-SC), Chafee (R-RI), and Specter (R-PA). While S. 1712 contained similar provisions from its predecessor bills, S. 1712 included some new provisions. On July 30, 2002, the Senate Judiciary Committee, which was then chaired by Senator Leahy (D-VT), held a hearing to discuss class actions generally, during which S. 1712 was discussed at length by Committee members. The Committee received testimony from Paul Bland, Thomas Henderson, former Solicitor General Walter E. Dellinger III, (Insurance) Commissioner Laurence Mirel, Shaneen Wahl and Hilda Bankston. No further action was taken on S. 1712 during the 107th Congress.

On February 4, 2003, Senator Charles Grassley (R-IA) introduced S. 274, the 'Class Action Fairness Act of 2003.' Senators Herb Kohl (D-WI), Orrin Hatch (R-UT), Thomas Carper (D-DE), Arlen Specter (R-PA), Lincoln Chafee (R-RI), and Zell Miller (D-GA) joined the bill as original cosponsors. On April 11, 2003, the Judiciary Committee reported S. 274 favorably, with amendments, after two days of mark-up. On October 17, 2003, Senator Grassley introduced S. 1751, the 'Class Action Fairness Act of 2003,' a compromise version of the bill, with Senators Alexander (R-TN), Allen (R-VA), Carper (D-DE), Chafee (R-RI), Cornyn (R-TX), Hagel (R-NE), Hatch (R-UT), Kohl (D-WI), Lugar (R-ID), Miller (D-GA), Specter (R-PA), Sununu (R-NH) and Voinovich (R-OH). Pursuant to Rule XXIV of the Standing Rules of the Senate, a Motion to Proceed to consideration of S. 1751 was filed. On October 23, 2003, the Senate failed to invoke cloture by a vote of 59-39. Senators Grassley, Kohl, Hatch and Carper then negotiated key provisions of the bill with Senators Landrieu (D-LA), Schumer (D-NY), and Dodd (D-CT). The compromise bill, S. 2062, the 'Class Action Fairness Act of 2004,' was introduced on February 10, 2004 by Senators Grassley, the original sponsor, and Senators Kohl (D-WI), Hatch (R-UT), Carper (D-DE), Chafee (R-RI), Collins (R-ME), Dodd (R-CT), Hagel (R-NE), Landrieu (D-LA), Lugar (R-ID), Miller (D-GA), Schumer (D-NY) Specter (R-PA) and Voinovich (R-OH) as cosponsors. Pursuant to Rule XXIV of the Standing Rules of the Senate, a Motion to Proceed to consideration of S. 2062 was filed on July 7,2004. Senator Frist (R-TN) promptly filled the amendment tree and filed a cloture motion. On July 8, 2004, the Senate failed to invoke cloture by a vote of 44-43.

On January 25, 2005, Senators Charles Grassley (R-IA), Herb Kohl (D-WI), and Orrin Hatch (R-UT) introduced S. 5, the 'Class Action Fairness Act of 2005.' Senators Alexander (R-TN), Carper (D-DE), Chaffee (R-RI), Collins (R-ME), DeMint (R-SC), DeWine (R-OH), Dodd (D-CT), Ensign (R-NV), Feinstein (D-CA), Frist (R-TN), Hagel (R-NE), Kyl (R-AZ), Landrieu (D-LA), Lieberman (D-CT), Lincoln (D-AR), Lott (R-MS), Lugar (R-IN), Martinez (R-FL), McConnell (R-KY), Santorum (R-PA), Schumer (D-NY), Sessions (R-PA), Snowe (R-ME), Sununu (R-NH), Thune (R-SD), Vitter (R-LA), and Voinovich (R-OH) joined as cosponsors to the bill. On February 3, 2005, the Senate Judiciary Committee reported S. 5 favorably, without amendments.

II. VOTE ON THE COMMITTEE

Pursuant to paragraph 7 of rule XXVI of the Standing Rules of the Senate, each Committee is to announce the result of rollcall votes taken in any meeting of the Committee on any measure of amendment. The Senate Judiciary Committee, with a quorum present, met on February 3, 2005 to mark up S. 5. The Committee rejected one amendment. The following rollcall votes occurred on S. 5.

A Leahy amendment that would provide for an increase of federal judges' salaries in the amount of 16.5% of their current salaries (rounded to the nearest $100).

YEAS NAYS Leahy Hatch Kennedy (Proxy) Grassley Biden Kyl Feingold DeWine Durbin

Sessions

Graham

Cornyn

Brownback

Coburn

Kohl

Feinstein

Schumer

Specter Motion to report favorably S. 5. The motion was approved by 13 yays to 5 nays.

YEAS NAYS Hatch Leahy Grassley Kennedy (Proxy) Kyl Biden DeWine Feingold Sessions

Graham

Cornyn

Brownback

Coburn

Kohl

Feinstein

Schumer

Specter Durbin III. PURPOSES

By now, there should be little debate about the numerous problems with our current class action system. A mounting stack of evidence reviewed by the Committee demonstrates that abuses are undermining the rights of both plaintiffs and defendants. One key reason for these problems is that most class actions are currently adjudicated in state courts, where the governing rules are applied inconsistently (frequently in a manner that contravenes basic fairness and due process considerations) and where there is often inadequate supervision over litigation procedures and proposed settlements. The problem of inconsistent and inadequate judicial involvement is exacerbated in class actions because the lawyers who bring the lawsuits effectively control the litigation; their clients--the injured class members-- typically are not consulted about what they wish to achieve in the litigation and how they wish it to proceed. In short, the clients are marginally relevant at best. This stands in stark contrast to the designed purpose of class actions. Class actions were designed to provide a mechanism by which persons, whose injuries are not large enough to make pursuing their individual claims in the court system cost efficient, are able to bind together with persons suffering the same harm and seek redress for their injuries. As such, class actions are a valuable tool in our jurisprudential system. However, they are only beneficial when the class members are kept a priority throughout the process.

To make matters worse, current law enables lawyers to 'game' the procedural rules and keep nationwide or multi-state class actions in state courts whose judges have reputations for

readily certifying classes and approving settlements without regard to class member interests. In this environment, consumers are the big losers: In too many cases, state court judges are readily approving class action settlements that offer little--if any--meaningful recovery to the class members and simply transfer money from corporations to class counsel. Often, the settlement notices in such cases are so confusing that the plaintiff class members do not understand what--if anything--the settlement offers or how they can opt out of it. Multiple class action cases purporting to assert the same claims on behalf of the same people often proceed simultaneously in different state courts, causing judicial inefficiencies and promoting collusive activity. Finally, many state courts freely issue rulings in class action cases that have nationwide ramifications, sometimes overturning well-established laws and policies of other jurisdictions.

The Class Action Fairness Act of 2005 is a modest, balanced step that would address some of the most egregious problems in class action practice. The Committee emphasizes, however, that the Act is not intended to be a 'panacea' that will correct all class action abuses.

The Act has three key components.

First, S. 5 includes a consumer class action bill of rights, with multiple components. One element prohibits federal courts from approving coupon or 'net loss' settlements without making written findings that such settlements benefit the class members. Another element specifies the methods for calculating attorneys' fees in class settlements in which coupons constitute all or part of the relief afforded to claimants to ensure that such fee awards are consistent with the benefits afforded class members or the amount of real work that the class counsel have performed in connection with the litigation. Yet another element of the bill of rights provides an additional mechanism to safeguard plaintiff class members' rights by requiring that notice of class action settlements be sent to appropriate state and federal officials, so that they may voice concerns if they believe that the class action settlement is not in the best interest of their citizens.

Second, S. 5 corrects a flaw in the current diversity jurisdiction statute (28 U.S.C. Sec. 1332) that prevents most interstate class actions from being adjudicated in federal courts. One of the primary historical reasons for diversity jurisdiction 'is the reassurance of fairness and competence that a federal court can supply to an out-of-state defendant facing suit in state court.' 1

[Footnote] Because interstate class actions typically involve more people, more money, and more interstate commerce ramifications than any other type of lawsuit, the Committee firmly believes that such cases properly belong in federal court. To that end, this bill (a) amends section 1332 to allow federal courts to hear more interstate class actions on a diversity jurisdiction basis, and (b) modifies the federal removal statutes to ensure that qualifying interstate class actions initially brought in state courts may be heard by federal courts if any of the defendants so desire. Thus, S. 5 makes it harder for plaintiffs' counsel to 'game the system' by trying to defeat diversity jurisdiction, creates efficiencies in the judicial system by allowing overlapping and 'copycat' cases to be consolidated in a single federal court, places the determination of more interstate class action lawsuits in the proper forum--the federal courts.

[Footnote 1: Davis v. Carl Cannon Chevrolet-Olds, Inc. 182. F.3d 792, 797 (11th Cir. 1999).]

Third, S. 5 directs the Judicial Conference of the United States to conduct a review of class action settlements and attorneys' fees and to present Congress with recommendations for ensuring that attorneys' fees are determined in a fair and reasonable way. This provision will help address the problem of excessive attorneys' fees and will facilitate legislative oversight of the Judicial Conference's efforts in this area.

IV. BACKGROUND AND NEED FOR LEGISLATION

As set forth in Article III of the Constitution, 2

[Footnote] the Framers established diversity jurisdiction to ensure fairness for all parties in litigation involving persons from multiple jurisdictions, particularly cases in which defendants from one state are sued in the local courts of another state. Interstate class actions which often involve millions of parties from numerous states--present the precise concerns that diversity jurisdiction was designed to prevent: frequently in such cases, there appears to be state court provincialism against out-of-state defendants or a judicial failure to recognize the interests of other states in the litigation. Yet, because of a technical glitch in the diversity jurisdiction statute (28 U.S.C. Sec. 1332), such cases are usually excluded from federal court. This glitch is not surprising given that class actions as we now know them did not exist when the statute's concept was crafted in the late 1700s.

[Footnote 2: In the words of Article III, '[t]he judicial power shall extend to * * * controversies in between citizens of different states.']

This Committee believes that the current diversity and removal standards as applied in interstate class actions have facilitated a parade of abuses, and are thwarting the underlying purpose ofthe constitutional requirement of diversity jurisdiction. S. 5 addresses these concerns by establishing 'balanced diversity' a rule allowing a larger number of class actions into federal courts, while continuing to preserve primary state court jurisdiction over primarily local matters.

A. A Brief History of Class Actions

Although class actions have some roots in common law, the general concept was first codified in 1849, when several states adopted the Field Code. 3

[Footnote] To successfully plead and prosecute class actions, the Field Code merely required that numerous parties demonstrate a common interest in law or fact.

[Footnote 3: See Newberg on Class Actions 3d Sec. 13-14 to 13-17 (1997).]

Rule 23 of the Federal Rules of Civil Procedure, the rule governing federal court class actions, was initially adopted in 1938. 4

[Footnote] However, the concept of class actions that are a familiar part of today's legal landscape did not arise until 1966, when Rule 23 was substantially amended to expand the availability of the device. Under Rule 23, a class action can be brought in federal court if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. In addition, a proponent must show that the proposed class meets one of three additional requirements set forth in Rule 23(b). For example, for a Rule 23(b)(3) damages class actions to be certified, a proponent must show that 'the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.' 5

[Footnote]

[Footnote 4: For a more comprehensive history of Rule 23 see e.g., The Class Action Fairness Act of 1999: Hearings on S. 353 Before the Subcomm. on Administrative Oversight and the Courts of the Senate Comm. of the Judiciary, 106th Cong. (1999) (hereinafter 'Hearings on

S. 353'), Prepared Statement of John P. Frank.]

[Footnote 5: Fed. R. Civ. P. 23(b)(3). Alternatively for a Rule 23(b)(1) class, the class proponent must show that the prosecution of separate actions by or against individual members of the class would create a risk of either (i) inconsistent or varying adjudication which would establish incompatible standards of conduct for the party opposing the class or (ii) adjudications which, as a practical matter, would be dispositive of the interests of the other members not parties to the adjudications or which would substantially impair or impede their ability to protect their ability to protect their interests. To obtain certification of a Rule 23(b)(2) class, the proponent is required to show that the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.]

As originally envisioned, class action lawsuits were to be primarily a tool for civil rights litigants seeking injunctions in discrimination cases. 6

[Footnote] Prof. John P. Frank, a member of the 1966 Advisory Committee on Civil Rules that proposed amending Rule 23 to its current form, testified that those who wrote the new class action rule thought it would rarely (if ever) apply to product liability or mass torts cases. 7

[Footnote] In the 1980s, however, some plaintiffs' lawyers successfully persuaded judges to expand class actions to the area of mass torts. 8

[Footnote] These courts began to expand the types of claims they were willing to certify as class actions because they feared that the large number of individual mass tort cases could slow or stop the judicial system. 9

[Footnote] Thus, class actions have evolved from their original primary purpose--to counter civil rights abuses--and have become a common tool for plaintiffs' attorneys bringing personal injury or product liability claims. Yet, while the landscape of class actions has changed dramatically, the procedural rules regarding which courts can hear class actions, and, consequently, which procedural law will apply to such cases, generally have remained the same since 1966.

[Footnote 6: See Hearings on S. 353, Prepared Statement of John P. Frank ('If there was a single, undoubted goal of the committee, the energizing force which motivated the whole rule, it was the firm determination to create a class action system which could deal with civil rights and, explicitly, segregation.').]

[Footnote 7: Administrative Office of the U.S. Courts, Working Papers of the Advisory Committee on Civil Rules on Proposed Amendments to Civil Rule 23 (Vol. 2) ('Advisory Committee Working Papers'), at 260 (1997). Prof. Frank passed away late in 2002. The only surviving member of the 1966 Advisory Committee--Hon. William T. Coleman, Jr- has testified to a similar effect Id. (Vol. 3), 11/22/96 Public Hearing Tr. at 204 ('I assure you that what the courts have done with respect to Rule 23(b)(3) is far beyond what we * * * ever intended. To the extent that there's difficulty [with class actions, it] is not because of anything that was drafted in 1966, but [because] of how the rule has been handled since that time.').]

[Footnote 8: See John C. Coffee, Jr., Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343, 1358 (1995).]

[Footnote 9: Id. at 1356-58, 1363-64.]

B. Federal Diversity Jurisdiction and Removal Provisions

1. The Basics of Diversity Jurisdiction

The Constitution extends federal court jurisdiction to cases of a distinctly federal character--for instance, cases raising issues under the Constitution or federal statutes, or cases involving the federal government as a party--and generally leaves to state courts the adjudication of local questions arising under state law. However, the Constitution specifically extends federal jurisdiction to encompass one category of cases involving issues of state law: 'diversity' cases, or suits 'between Citizens of different States.' 10

[Footnote]

[Footnote 10: U.S. Const. art. III, sec. 2.]

According to the Framers, the primary purpose of diversity jurisdiction was to protect citizens in one state from the injustice that might result if they were forced to litigate in out-of-state courts. 11

[Footnote] Quoting James Madison, Judge Henry Friendly explained that diversity jurisdiction is essential to a strong union because it 'may happen that a strong prejudice may arise in some state against the citizens of others, who may have claims against them.' 12

[Footnote] Justice Frankfurter expressed a similar understanding of Madison's concerns: 'It was believed that, consciously or otherwise, the courts of a state may favor their own citizens. Bias against outsiders may become embedded in a judgment of the state court and yet not be sufficiently apparent to be made the basis of a federal claim.' 13

[Footnote]

[Footnote 11: See Pease v. Peck, 59 U.S. (18 How) 518, 520 (1856) ('The theory upon which jurisdiction is conferred on the court of the United States, in controversies between citizens of different States, has its foundation in the supposition that, possibly, the State tribunal might not be impartial between their own citizens and foreigners.'); see also Martin v. Hunter's Lessee, 14 U.S. (1 Wheat) 304, 347 (1816); Bank of the United States v. Deveaux, 9 U.S. (5 Cranch) 61, 87 (1809); Barrow S.S. Co. v. Kane, 170 U.S. 100, 111 (1898) ('The object of the provisions of the constitution and statutes of the United States in conferring upon the circuit courts of the United States jurisdiction of controversies between citizens of different States of the Union * * * was to secure a tribunal presumed to be more impartial than a court of the state in which one litigant resides.'); The Federalist No. 80, at 537-38 (Alexander Hamilton) (Jacob E. Cooke, ed. 1961) ('In order to [ensure] the inviolable maintenance of that equality of privileges and immunities to which citizens of the union will be entitled, the national judiciary ought to preside in all cases in which one state or its citizens are opposed to another state or its citizens. To secure the full effect of so fundamental a provision against all evasion and subterfuge, it is necessary that its construction should be committed to that tribunal which, having no local attachments, will be likely to be impartial between the different states and their citizens, and which, owing its official existence to the union, will never be likely to feel any bias inauspicious to the principles on which it is founded.')]

[Footnote 12: H. J. Friendly, The Historic Basis of Diversity Jurisdiction, 41 Harv. L. Rev. 483, 492-93 (1928).]

[Footnote 13: Burford v. Sun Oil Co., 319 U.S. 315, 326 (1943) (Frankfurter, J., dissenting).]

In addition to protecting individual litigants, diversity jurisdiction has two other important purposes. In testimony several years ago before the Subcommittee on Administrative Oversight and the Courts, Prof. E. Donald Elliott of the Yale Law School expressed the view

that diversity jurisdiction was designed not only to protect against actual discrimination, but also 'to shore up confidence in the judicial system by preventing even the appearance of discrimination in favor of local residents.' 14

[Footnote] In addition, several legal scholars have noted that the Framers were concerned that state courts might discriminate against interstate businesses and commercial activities, and thus viewed diversity jurisdiction as a means of ensuring the protection of interstate commerce. 15

[Footnote] As former Acting Solicitor General Walter Dellinger testified before the Committee, 'diversity jurisdiction has served to guarantee that parties of different state citizenship have a means of resolving their legal differences on a level playing field in a manner that nurtures interstate commerce.' 16

[Footnote] Both of these concerns--judicial integrity and interstate commerce--are strongly implicated by class actions.

[Footnote 14: Hearings on S. 353, Prepared Statement of E. Donald Elliott; see also, Adrienne J. Marsh, Diversity Jurisdiction: Scapegoat of Overcrowded Federal Courts, 48 Brooklyn L. Rev. 197, 201 (1989).]

[Footnote 15: See generally John P. Frank, Historical Bases of the Federal Judicial System, 13 Law & Contemp. Probs. 3, 22-28 (1948); Friendly, supra n. 12.]

[Footnote 16: See Class Action Litigation: Hearing on Class Actions Before the Senate Comm. on the Judiciary, 107th Cong. (2002) (hereinafter 'Hearing on Class Actions'), Prepared Statement of Walter E. Dellinger, III.]

Over the years since the First Congress enacted provisions in the Judiciary Act of 1789 setting forth the parameters of federal diversity jurisdiction, two statutory limitations on that jurisdiction have been constants. The first is the 'amount in controversy' requirement (currently $75,000), which Congress enacted in order to ensure that federal diversity jurisdiction extends only to non-trivial state-law cases. 17

[Footnote] The second is the 'complete diversity' requirement, a rule that federal jurisdiction lies only when all plaintiffs are diverse as to all defendants. 18

[Footnote] It is important to recognize that these procedural limitations regarding interstate class actions were policy decisions, not constitutional ones. In fact, the U.S. Supreme Court has repeatedly acknowledged that the complete diversity and minimum amount-in-controversy requirements are political decisions not mandated by the Constitution. 19

[Footnote] Indeed, as Prof. Dellinger noted in testimony before this Committee, class action legislation expanding federal jurisdiction over class actions 'would fulfill the intentions of the Framers because the rationales that underlie the diversity jurisdiction concept apply with equal--if not greater--force to interstate class actions.' 20

[Footnote] It is therefore the prerogative of Congress to modify these technical requirements as it deems appropriate.

[Footnote 17: See 28 U.S.C. Sec. 1332(a).]

[Footnote 18: See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806).]

[Footnote 19: See, e.g., Newman-Green Inc. v. Alfonzo-Larrain, 490 U.S. 826, 829 n.1 (1989) (noting that '[t]he complete diversity requirement is based on the diversity statute,

not Article III of the Constitution.'); Owen Equip. & Co. v. Kroger, 437 U.S. 365, 373 n. 13 (1978) (to the same effect).]

[Footnote 20: See Hearing on Class Actions, Prepared Statement of Walter E. Dellinger, III.]

2. Removal: How Diversity Cases Arrive in Federal Court

The concept of 'removing' cases from state courts to federal courts is based largely on the same core premise as diversity jursidiction--i.e., that an out-of-state defendant in a state court proceeding should have access to an even-handed federal forum. 21

[Footnote] The general removal statute, 28 U.S.C. Sec. 1441(a), provides that any civil action brought in a state court may be removed by the defendant(s) to federal court if the claim could have originally been brought in federal court. In other words, so long as a federal district court could exercise original jurisdiction over a claim, a defendant may remove the case to federal court.

[Footnote 21: See David P. Currie, Federal Jurisdiction 140 (3d ed. 1990).]

Section 1446(b) of Title 28 outlines the procedure for removal. Under this provision, a defendant must file papers seeking removal to federal court within 30 days after receiving a copy of the initial pleading (or service of summons if a pleading has been filed in court and is not required to be served on the defendant). If the original complaint was not removable (or if it could not be determined from the face of the complaint that it was removable), but the plaintiff subsequently amends the pleadings in such a way that removal becomes proper, then the notice of removal must be filed within 30 days of receipt by the defendant of 'a copy of an amended pleading, motion, order, or other paper from which it may first be ascertained that the case [is removable].' 22

[Footnote] The Committee notes that the purpose of this provision is to prevent plaintiffs from evading federal jurisdiction by hiding the true nature of their case. Thus, the Committee favors the broad interpretation of 'other paper' adopted by some courts to include deposition transcripts, discovery responses, settlement offers and other documents or occurrences that reveal the removability of a case. 23

[Footnote]

[Footnote 22: 28 U.S.C. Sec. 1446(b).]

[Footnote 23: A broad interpretation of 'other paper' is 'consistent with the purpose of the removal statute to encourage prompt resort to federal court when a defendant first learns that the plaintiff is alleging a federal claim * * * [and] discourages disingenuous pleading by plaintiffs in state court to avoid removal.' Addo v. Globe Life & Accident Ins. Co., 230 F.3d 759, 762 (5th Cir. 2000) (holding a post-complaint settlement letter qualifies as 'other paper' under 28 U.S.C. 1446(b)). See also S.W.S. Erectors v. Infax, Inc., 72 F.3d 489, 494 (5th Cir. 1996) (holding that deposition testimony qualifies as 'other paper' under 28 U.S.C. 1446 (b)).]

C. How Diversity Jurisdiction and Removal Statutes Are Abused

The current rules governing federal jurisdiction have the unintended consequence of keeping most class actions out of federal court, even though most class actions are precisely the type of case for which diversity jurisdiction was created. 24

[Footnote] In addition, current law enables plaintiffs' lawyers who prefer to litigate in state courts to easily 'game the system' and avoid removal of large interstate class actions to

federal court.

[Footnote 24: See generally, Victor E. Schwartz, Mark A. Behrens & Leah Lorber, Federal Courts Should Decide Interstate Class Actions: A Call for Federal Class Action Diversity Jurisdiction Reform, 37 Harv. J. Legis. 485 (Summer 2000).]

This gaming problem exists for two reasons. The first is the 'complete diversity' requirement. Although the Supreme Court has held that only the named plaintiffs' citizenship should be considered for purposes of determining if the parties to a class action are diverse, the 'complete' diversity rule still mandates that all named plaintiffs must be citizens of different states from all the defendants. 25

[Footnote] In interstate class actions, plaintiffs' counsel frequently and purposely evade federal jurisdiction by adding named plaintiffs or defendants simply based on their state of citizenship in order to defeat complete diversity. One witness at the Committee's 2002 hearing on class actions testified that her drug store was named as a defendant in 'hundreds of lawsuits' so that 'the lawyers could keep the case in a place known for its lawsuit-friendly environment.' 26

[Footnote] If all it takes to keep a class action in state court is to name one local retailer, it is no surprise that few interstate class actions meet the complete diversity requirement.

[Footnote 25: See Snyder v. Harris, 394 U.S. 332 (1969).]

[Footnote 26: See Hearing on Class Actions, Prepared Statement of Hilda Bankston.]

The second problem is created by the amount-in-controversy requirement. In interpreting 28 U.S.C. Sec. 1332(a), some federal courts of appeals, relying on a 1974 Supreme Court decision, 27

[Footnote] have held that the amount-in-controversy requirement is normally met in class actions only if each of the proposed class members individually seeks damages in excess of the statutory minimum. 28

[Footnote] That means federal courts can often only hear class actions in which each potential class member claims damages in excess of $75,000. 29

[Footnote] The Committee believes that requiring each plaintiff to reach the $75,000 mark makes little sense in the class action context. After all, class actions frequently involve tens of millions of dollars even though each individual plaintiff's claims are far less than that. Moreover, class action lawyers typically misuse the jurisdictional threshold to keep their cases out of federal court. For example, class action complaints often include a provision stating that no class member will seek more than $75,000 in relief, even though they can simply amend their complaints after the removal to seek more relief and even though the class action seeks millions of dollars in the aggregate. Under current law, that is frequently enough to keep a major class action in state court.

[Footnote 27: See Zahn v. International Paper Co., 414 U.S. 291 (1973).]

[Footnote 28: See Trimble v. Asarco, Inc., 232 F.3d 946 (8th Cir. 2000); Meritcare, Inc. v. St. Paul Mercury Ins. Co., 166 F.3d 214 (3d Cir. 1999); Leonhardt v. Western Sugar Co., 160 F.3d 631 (10th Cir. 1998).]

[Footnote 29: Other federal courts of appeals have held that for a class action to be heard in federal court only one or more named plaintiffs must have claims exceeding $75,000. See, e.g., Rosmer v. Pfizer, Inc., 263 F.3d 110 (4th Cir. 2001); Gibson v. Chrysler Corp., 261 F.

3d 927 (9th Cir. 2001); Stromberg Metal Works Inc. v. Press Mechanical Inc., 77 F.3d 928 (7th Cir. 2000); In re Abbott Labs., Inc., 51 F.3d 524 (5th Cir. 1995), aff'd by an equally divided Court, 529 U.S. 333 (2000); Allapattah Servs. v. Exxon Corp., 333 F.3d 1248 (11th Cir. 2003), cert. granted, 125 V. Ct. 317 (2004). In the view of these courts, the value of the claims of the other class members is irrelevant--they are deemed to be part of the class as a matter of supplemental jurisdiction. The Committee stresses, however, that even in those Circuits following this rule, relatively few class actions find their way into federal court because plaintiffs offer named plaintiffs who do not have $75,000 claims or name a non-diverse plaintiff or defendant in order to prevent removal of the case to federal court.]

This leads to the nonsensical result under which a citizen can bring a 'federal case' by claiming $75,001 in damages for a simple slip-and-fall case against a party from another state, while a class action involving 25 million people living in all fifty states and alleging claims against a manufacturer that are collectively worth $15 billion must usually be heard in state court (because each individual class member's claim is for less than $75,000). Put another way, under the current jurisdictional rules, federal courts can assert diversity jurisdiction over a typical state law claim arising out of an auto accident between a driver from one state and a driver from another, or a typical trespass claim involving a trespasser from one state and a property owner from another, but they cannot assert jurisdiction over claims encompassing large-scale, interstate class actions involving thousands of plaintiffs from multiple states, defendants from many states, the laws of several states, and hundreds of millions of dollars--cases that have obvious and significant implications for the national economy.

There is a growing chorus of authoritative sources declaring that something is badly amiss with the manner in which federal diversity jurisdictional requirements are applied to class actions:

The leading federal civil procedure law treatise has noted: 'The traditional principles [regarding federal diversity jurisdiction over class actions] have evolved haphazardly and with little reasoning. They serve no apparent purpose.' 30

[Footnote]

[Footnote 30: 14B Charles A. Wright, et al., Federal Practice and Procedure Sec. 3704, at 127 (3d ed. 1998).]

In a recent Minnesota state appellate court decision upholding a grant of class certification, a concurring judge noted that the nationwide class action before it was a 'poster child for national class action reform. We have here a Minnesota [state] district court, applying a New Jersey consumer fraud statute to a nationwide class of plaintiffs, with few of those plaintiffs residing in New Jersey. And, it is probably a fair assumption that the legislative authors of the New Jersey consumer protection scheme did not have in mind midwestern farmers purchasing agricultural chemicals as the protected class * * * This is not a recipe for uniformity or consistency, it is fair neither to claimants nor defendants and it is long past time for national policy makers to address class action procedures. 31

[Footnote]

[Footnote 31: Peterson v. BASF Corp., 657 N.W.2d 853, 875 (Minn. Ct. App. 2003), aff'd, 675 N.W. 2d 57 (Minn. 2004).]

The U.S. Court of Appeals for the Eleventh Circuit apologized for sending an interstate class action back to state court, noting that 'an important historical justification for diversity jurisdiction is the reassurance of fairness and competence that a federal court can supply to an out-of-state defendant facing suit in state court.' Observing that the out-of-state

defendant in that case was confronting 'a state court system [prone to] produce[] gigantic awards against out-of-state corporate defendants,' the court stated that '[o]ne would think that this case is exactly what those who espouse the historical justification for [diversity jurisdiction] would have in mind * * *' 32

[Footnote]

[Footnote 32: Davis v. Cannon Chevrolet-Olds, Inc., 182 F.3d 792, 797 (11th Cir. 1999).]

In that same case, Judge John Nangle, the former chairman of the Judicial Panel for Multidistrict Litigation, concurred: 'Plaintiffs' attorneys are increasingly filing nationwide class actions in various state courts, carefully crafting language * * * to avoid * * * the federal courts. Existing federal precedent * * * [permits] this practice * * *, although most of these cases * * * will be disposed of through 'coupon' or 'paper' settlements * * * virtually always accompanied by munificent grants of or requests for attorneys' fees for class counsel * * * [T]his judge is of the opinion that the present [jurisdictional rules] do[] not accommodate the reality of modern class litigation and settlements.' 33

[Footnote]

[Footnote 33: Id. at 798.]

In another case, Judge Anthony Scirica (formerly the chair of the Judicial Conference's Standing Committee on Rules and Procedure and now the Chief Judge of the U.S. Court of Appeals for the Third Circuit) observed that although 'national (interstate) class actions are the paradigm for federal diversity jurisdiction because * * * they implicate interstate commerce, foreclose discrimination by a local state, and tend to guard against any bias against interstate enterprises, * * * the current jurisdictional statutes [put] such class actions * * * beyond the reach of the federal courts.' 34

[Footnote]

[Footnote 34: In re Prudential Ins. Co. America Sales Practice Litig., 148 F.3d 283, 305 (3d Cir. 1998).]

And even though the Judicial Conference of the United States has historically opposed any expansion of federal jurisdiction over class actions, the Conference has more recently signaled a significant shift in position. In a March 26, 2003 letter to the Committee, 35

[Footnote] the Conference acknowledged 'current problems with class action litigation.' 36

[Footnote] Further, in that letter, the Conference for the first time 'recognize[d] that the use of [expanded] diversity jurisdiction may be appropriate to the maintenance of significant multi-state class action litigation in the federal courts.' 37

[Footnote]

[Footnote 35: Letter to then Chairman Orrin G. Hatch, Comm. on the Judiciary, U.S. Senate, from Leonidas Ralph Mecham, Secretary, Judicial Conference of the United States (dated March 26, 2003).]

[Footnote 36: Id. at 2.]

[Footnote 37: Id.]

The Committee notes that several congressional hearing witnesses (including former Carter

Administration Attorney General Griffin Bell and Clinton Administration Solicitor General Walter E. Dellinger) and other legal experts agree that if Congress were to draft an entirely new federal diversity jurisdiction statute and start over in deciding which cases should be subject to federal diversity jurisdiction Congress likely would conclude that interstate class actions are among the cases that most warrant access to the federal courts because they involve the most people, put the most money in controversy, and have the greatest implications for interstate commerce. 38

[Footnote] As Prof. Dellinger noted in his testimony before this Committee, 'the rationales that underlie the diversity jurisdiction concept apply with equal--if not greater--force to interstate class actions.' 39

[Footnote]

[Footnote 38: See generally Hearing on Class Actions; Hearings on S. 353; Hearing on H.R. 1875.]

[Footnote 39: See Hearing on Class Actions, Prepared Statement of Walter E. Dellinger III.]

D. Other Abuses of the Class Action Rules

The ability of plaintiffs' lawyers to evade federal diversity jurisdiction has helped spur a dramatic increase in the number of class actions litigated in state courts--an increase that is stretching the resources of the state court systems. In testimony to the Subcommittee on Administrative Oversight and the Courts, Prof. E. Donald Elliott pointed out that the flood of class actions in our state courts is too well documented to warrant significant discussion, much less debate. 40

[Footnote] According to studies, federal class action filings over the past ten years have increased by more than 300 percent. At the same time, class action filings in state courts have grown more than three times faster--by more than 1,000 percent. 41

[Footnote]

[Footnote 40: Hearings on S. 353, Prepared Statement of E. Donald Elliott.]

[Footnote 41: See Analysis: Class Action Litigation--A Federalist Society Survey, Class Action Watch at 5 (Vol. 1, No. 1 1998); Deborah Hensler, et al., Preliminary Results of the RAND Study of Class Action Litigation 15 (May 15, 1997); see also Advisory Committee Working Papers (Vol. 1) at ix-x (May 1, 1997) (memorandum of Judge Paul V. Niemeyer to members of the Advisory Committee on Civil Rules).]

Notably, many of these cases are being filed in improbable jurisdictions. A study conducted in three venues with reputations as hotbeds for class action activity found exponential increases in the numbers of class actions filed in recent years. For example, in the Circuit Court of Madison County, Illinois, a mostly rural county that covers 725 square miles and is home to less than one percent of the U.S. population, the number of class actions filed annually grew from 2 in 1998 to 39 in 2000--an increase of 3,650 percent. 42

[Footnote] A follow-up study found that the number of class actions filed in the county continued to grow dramatically in 2001 and 2002. 43

[Footnote] And in 2003, class action filings there catapulted to 106, up more than 5,000 percent since 1998. 44

[Footnote] According to the president of the Illinois Trial Lawyers Association (an association

representing plaintiffs' lawyers), the reason for the 2003 jump in filings was an effort to beat this legislation; plaintiffs' lawyers were 'playing it safe' and rushing to get suits filed in case the legislation was enacted in 2004. 45

[Footnote] The same studies also found that most of the class actions brought in Madison County and other magnet courts had little--if anything--to do with the venues where they were brought. 46

[Footnote]

[Footnote 42: See John H. Beisner and Jessica Davidson Miller, They're Making A Federal Case Out Of It * * * In State Court, 25 Harv. J. L. & Pub. Pol'y 1 (2001) ('Federal Case').]

[Footnote 43: See John H. Beisner and Jessica Davidson Miller, Class Action Magnet Courts: The Allure Intensifies, 4 BNA Class Action Litig. R. 58 (Jan. 24, 2003).]

[Footnote 44: Trisha L. Howard, Class Actions Set Record Last Year In Madison County/ Possible Change In Law Prompted Rush In Filing, St. Louis Post Dispatch, Jan. 11, 2004.]

[Footnote 45: Id.]

[Footnote 46: See generally Federal Case.]

The reason for this dramatic increase in state court class actions cannot be found in variations in class action rules; after all, the rules governing the decision whether cases may proceed as class actions are basically the same in federal and state courts--and of course, they are the same within states, i.e., the same in 'magnet' jurisdictions such as Madison County and St. Clair County, Illinois, as they are in more easily accessible jurisdictions such as Cook County, Illinois. In fact, thirty-six states have adopted the basic federal class action rule (Rule 23), sometimes with minor revisions. Of the remaining states, most have rules that are guided by federal court class action policy and contain similar requirements. (Two states, Mississippi and West Virginia, do not have rules or statutes authorizing class actions.) Thus, there are no wide variations between federal and state court class action policies.

The Committee finds, however, that one reason for the dramatic explosion of class actions in state courts is that some state court judges are less careful than their federal court counterparts about applying the procedural requirements that govern class actions. In particular, many state court judges are lax about following the strict requirements of Rule 23 (or the state's parallel governing rule), which are intended to protect the due process rights of both unnamed class members and defendants. In contrast, federal courts generally scrutinize proposed settlements much more carefully and pay closer attention to the procedural requirements for certifying a matter for class treatment. 47

[Footnote]

[Footnote 47: See Hearings on S. 353, Oral Statement of Senator Charles E. Grassley.]

Another problem is that a large number of state courts lack the necessary resources to supervise proposed class settlements properly. 48

[Footnote] Many state judges do not have law clerks, and the explosion of state court class actions has simply overwhelmed their dockets. Not surprisingly, abuses are much more likely to occur when state court judges are unable to give class action cases and settlements the attention they need. Federal judges, in contrast, have access to magistrates and can appoint special masters when they are faced with complex litigation like class actions. Moreover, the average state court judge is assigned 1,568 new cases each year, compared to federal

judges, who are assigned, on average, fewer than 500. 49

[Footnote]

[Footnote 48: See Hearings on S. 353, Prepared Statement of Stephen G. Morrison ('I think it is clear that the explosion of class action filings can only be attributed to the fact that certain members of the plaintiffs' bar have discovered that some of our state courts can be a fertile playing field for class litigation.').]

[Footnote 49: Compare B. Ostrom, et al., Examining the Work of State Courts 12 (Court Statistics Project 2003) ('Examining the Work of State Courts'), with Administrative Office of U.S. Courts, 2003 Federal Court Management Statistics (2004) ('Federal Court Management').]

The lack of a federal forum for most interstate class actions and the inconsistent administration of class actions in state courts have led to several forms of abuse. First, lawyers, not plaintiffs, may benefit most from settlements. Second, corporate defendants are forced to settle frivolous claims to avoid expensive litigation, thus driving up consumer prices. Third, constitutional due process rights are often ignored in class actions. Fourth, expensive and predatory copy-cat cases force defendants to litigate the same case in multiple jurisdictions, driving up consumer costs.

1. Lawyers receive disproportionate shares of settlements

The first such abuse involves settlements in which the attorneys receive excessive attorneys' fees with little or no recovery for the class members themselves. In the now infamous Bank of Boston class action settlement, 50

[Footnote] or example, the defendant bank was accused of over-collecting escrow monies from homeowners and profiting from the interest. The settlement, approved by an Alabama state court, awarded up to $8.76 each to individual class members, while the class counsel got more than $8.5 million in fees. To make matters worse, the fees were simply debited directly from individual class members' escrow accounts leaving many of them worse off than they were before the suit. In testimony before the Subcommittee on Administrative Oversight and the Courts, class member Martha Preston recounted how she received $4 from the settlement, but was charged a mysterious $80 'miscellaneous deduction,' which she later learned was an expense used to pay the class lawyers' $8.5 million settlement fee. Ms. Preston expressed her disbelief over how 'people who were supposed to be my lawyers, representing my interests, took my money and got away with it.' 51

[Footnote]

[Footnote 50: Kamilewicz v. Bank of Boston, 92 F.3d 506 (7th Cir. 1996).]

[Footnote 51: Class Action Lawsuits: Examining Victim Compensation and Attorneys' Fees: Hearings Before the Subcomm. on Administrative Oversight and the Courts of the Senate Comm. of the Judiciary, 105th Cong. (1997), Prepared Statement of Martha Preston.]

A few years ago, the National Law Journal reported on another similarly troubling state court case:

When 75-year-old Olga Heaven received some legal papers in the mail a few weeks ago, she asked her daughter, a lawyer, to look them over. A good thing, too. If Ms. Heaven had misunderstood the notice or simply thrown it away, her daughter says, she might have been required to sell her house and property as part of a recent class action settlement. * * * Ms. Heaven [was] one of 60 class action plaintiff homeowners--many of them unwitting parties to

the litigation--who received a notice that a property damage suit against a local oil refinery had settled. * * * The unusual deal requires settling plaintiffs to sell their homes to [the defendant refinery owner] for two times their tax-assessed value. In addition, the plaintiffs are required to withdraw from the lawsuit * * * and release any property damage or personal injury claims against [the defendant], which was accused of polluting the area. The settlement was set up [as] a so-called opt-out class, meaning that homeowners would be included in the deal [and required to sell their homes] unless they sent in responses to the notice within 30 days. * * * The total payout by [the defendant] could be as much as $1.1 million. Plaintiffs' lawyers could earn as much as $200,000, depending on how many plaintiffs participate in the deal. 52

[Footnote]

[Footnote 52: Kansas Case In Class By Itself, National Law Journal, Mar. 15, 1999. This settlement ultimately did not proceed, but only because the attorney daughter of one of the settlement class members happened to read her mother's mail, as noted in the article.]

Through several hearings over the past several years, the Committee has become aware of numerous class action settlements approved by state courts in which most--if not all--of the monetary benefits went to the class counsel, rather than the class members those attorneys were supposed to be representing. These settlements include many so-called 'coupon settlements' in which class members receive nothing more than promotional coupons to purchase more products from the defendants. For example:

A recent lawsuit involved customers who had Firestone tires that were among those that the National Highway Traffic Safety Administration investigated or recalled, but who did not suffer any personal injury or property damage. After a federal appeals court rejected class certification, plaintiffs' counsel and Firestone negotiated a settlement, which has now been approved by a Texas state court. Under the settlement, the company has agreed to redesign certain tires (a move already underway irrespective of the suit) and to develop a three-year consumer education and awareness camp, but the members of the class received nothing. The lawyers will receive $19 million. 53

[Footnote]

[Footnote 53: Shields et al. v. Bridgestone/Firestone Inc. et al. (No. E-0167637, Jefferson County, Texas, 2003); Miles Moor, BFS Settles Nationwide Class Action Suit; Tire Maker to Modify Certain Models, Launch Education Program, Rubber & Plastics News, August 4, 2003.]

In another state court class action settlement, in which a cruise line was accused of collecting 'port charges' that exceeded the amount actually paid by the defendant. Under the terms of the settlement, the class members received $30 to $40 discounts from another cruise line on its two- and three-night cruises out of Port Canaveral, Florida because Premier was no longer in business. 54

[Footnote] In other words, a company that had not even been sued and had absolutely no risk of liability agreed to offer coupons--no doubt because they recognize that such coupons are a promotional opportunity and not a penalty. Attorney for the plaintiffs received $887,000 in fees, costs, and expenses. 55

[Footnote]

[Footnote 54: Premier Cruise Lines, (No. 96-06932 CA-FN, Fla. Cir. Ct., Brevard County, Florida, 2003); The Law Offices of Douglas Bowdoin, for Plaintiffs, and Todd Pittenger of Lowndes, Drosdick, Doster, Kantor & Reed, P.A., for Defendant, Announce a Proposed Class Action Settlement, Business Wire, Inc., July 2, 2003.]

[Footnote 55: Premier Cruise Line Reaches Settlement, Mealey's Litigation Report: Class Actions, July 17, 2003.]

Microsoft has settled antitrust class actions in ten states in which plaintiffs alleged that Microsoft used its monopoly to gouge consumers. Based on the terms of the settlement, consumers who bought Microsoft software will receive a $5 to $10 voucher good for future purchases of particular computer hardware or software products. To receive the voucher, consumers must download a form from www.microsoftproductsettlement.com/kansas and then mail it in. To redeem the voucher, consumers must mail in the voucher, a photocopy of an original receipt, and an original UPC code. Half of the unclaimed settlement money will be used to donate Microsoft products to schools. A federal judge rejected a similar settlement in part on the ground that the school donations were intended to inflict further injury on Apple. Attorneys in these cases have sought hundreds of millions of dollars in fees. 56

[Footnote]

[Footnote 56: In Re Microsoft Litigation Settlement (No. 99 CV 17089, Johnson County, Kansas, 2003); Dan Voorhis, Here's How to Claim Your Share of Microsoft Settlement, The Wichita Eagle, December 28, 2003.]

Consumers in a state court class action alleged that the beer goblets served at a Chicago restaurant chain were misrepresented to be 12 ounces, when they held only 10.6 ounces. In settlement, the company will give away 50,000 coupons for $1 off every subsequent $5 purchase at its 22 Chicago-area restaurants. 57

[Footnote] All cash from the settlement goes to the lawyers.

[Footnote 57: Ross and Lambert v. Portillo's Restaurant Group, Inc. (00 Ch 13612, Circuit Court of Cook County, Illinois, Chancery Division, 2003); Judge Approves Portillo's Class Action Settlement Over Mislabeled Beer, PR Newswire, Nov. 26, 2003.]

To settle a state court class action alleging deceptive pricing practices on certain products, KB Toys agreed to hold a sale. 58

[Footnote] Under the settlement agreement, the toy retailer offered a 30 percent discount on selected products between October 8 and October 14, 2003. According to an independent analyst, 'KB Toys will benefit from the settlement,' because 'they're driving traffic.' 59

[Footnote] The attorneys benefited too: they received all the cash--fees and costs of $1 million. 60

[Footnote]

[Footnote 58: DeGradi v. KB Holdings, Inc. (No. 02 CH 15838, Circuit Court of Cook County, Illinois, Chancery Division, 2003).]

[Footnote 59: Betty Lin-Fisher, Shoppers Win In Suit; Customers Get a Jump on Holidays, Akron Beacon Journal, Oct. 14, 2003.]

[Footnote 60: Stephanie Zimmerman, KB Toys Settles Lawsuit Over 'Low' Prices By Offering Discount, Chicago Sun-Times, Oct. 11,2003.]

In a recent class action where consumers alleged that a company was selling cribs that were unsafe for use by infants, the class members received either a crib repair kit or a coupon for $55 which could be used toward the future purchase of a Dorel Juvenile Group Product. 61

[Footnote] Of course, the coupon is only valuable for consumers who plan to have another baby and still trust the company.

[Footnote 61: Dorel Juvenile Group, Inc. (2003); Dorel Juvenile Group Settles Class Action Lawsuit, PR Newswire, Oct. 6, 2003.]

Another recent suit involved allegations that Poland Spring water does not really come from a spring deep in the woods of Maine. The settlement calls for discounts or free water to Poland Spring customers over five years and contributions of $2.75 million to charities. In addition, the named plaintiff will receive $12,000. Plaintiffs' lawyers received $1.35 million. 62

[Footnote]

[Footnote 62: Ramsey v. Nestle Waters North America, Inc. d/b/a Poland Spring Water Co. (No. 03 CHK 817, Kane County, Illinois, 2003); Edward D. Murphy, et al., Conflict and Change; Maine's Employment and Price Levels Remained Stable Last Year, but its Economy Experienced Plenty of Turmoil, Portland Press Herald, January 4, 2004; see also www.noticeclass.com/springwatersettlement/LongFormNoticev2.pdf]

Plaintiffs alleged that GameStop Corp. misrepresented some of the video games it was selling as new, when they had actually been previously purchased and returned. 63

[Footnote] Under the settlement, GameStop agreed to post notices in stores stating: 'All software for video game consoles may have been used and returned in accordance with (the store's) return policy.' Further, anyone who bought a game from particular stores on specified dates, and can produce their receipt, will receive a coupon for 5 percent off the price of any one game. In other words, customers would receive $1.25 off a $25 dollar game--as long as they kept receipts. The coupon can be redeemed at retail locations, but not on the defendant's website. 64

[Footnote] Lawyers for the plaintiffs were paid $125,000 in fees and costs. 65

[Footnote]

[Footnote 63: Chavez v. GameStop Corp. (No. CGC-02-406658, San Francisco Superior Court, California, 2003).]

[Footnote 64: Big Class Action: Settlements and Verdicts: Consumer Goods, available at http://www.bigclassaction.com/settlements/consumer.html.]

[Footnote 65: http://www.gamestop.com/gs/help/classaction.asp.]

Plaintiffs alleged that Register.com delayed in switching purchased domains over to their customers and continued to display the company's 'Coming Soon' page which promotes the company and its advertisers. Under the settlement, class members receive coupons to use with Register.com (assuming they ever plan to register one of the company's domains again). The lawyers for the class get $642,500. 66

[Footnote]

[Footnote 66: Zurakov v. Register.com. Inc. (No. 2301, N.Y. Sup. Ct., App. Div., 2003); Tom Perrotta Panel Revives Case Over Domain Name Registry, Internet Newsletter, May 14, 2003.]

In a case involving customers who alleged that they were charged excessive late fees by

Blockbuster, the class members received $1 off coupons for rentals--at the same time, their attorneys divided up a $9.25 million fee award. Experts have predicted that at most, only 20 percent of the class members will redeem the coupons. The settlement allows Blockbuster to continue its practice of charging customers for a new rental period when they return a tape late. 67

[Footnote] In this settlement approved by a Texas state court, only the lawyers got cash.

[Footnote 67: Scott v. Blockbuster Inc. (No. DI62-535, Jefferson County, Texas, 2001); Judge OKs Blockbuster Plan On Fees, Associated Press, Jan. 11, 2002.]

To settle an Illinois state court class action in which it was accused of improperly including asbestos in its crayons, a manufacturer agreed to issue class members 75-cent coupons toward the purchase of new crayons. The attorneys got $600,000 in fees.

In another recent case, Food Lion settled a state court class action filed by a consumer group by offering 28-cent coupons to customers who held an MVP discount card between 1995 and 1998. The plaintiff class alleged that Food Lion charged too much sales tax on discounted products purchased with the discount card. 68

[Footnote] Only the lawyers got money.

[Footnote 68: Attention Shoppers: Food Lion Rebate Due, Greensboro News & Record, Feb. 25, 2002.]

A manufacturer offered consumers who bought a dozen Pinnacle golf balls free golf gloves. When the manufacturer ran out of the golf gloves and substituted a set of three free golf balls, it was hit with a class action. The settlement provided that the manufacturer would send each class member three more free golf balls. Meanwhile, by order of a state court, the attorneys who brought the lawsuit received $100,000 in fees and the persons who served as class representatives each received $2,500. 69

[Footnote]

[Footnote 69: Enough Already With the Lawsuits, Kansas City Star, July 10, 1999.]

Under the settlement in this state court case, which resulted from allegations regarding changes in the American Airlines frequent flyer program, members of the program received vouchers good for $25 to $75 off the price of future travel, or a similarly valued reduction in the number of miles required for an award. American also agreed to pay the lawyers up to $25 million in fees. One news article about the settlement quoted travel experts saying that 'the practical value of those discounts will be modest,' and 'American could end up generating enough extra revenue to more than offset the cost of the offer.' 70

[Footnote]

[Footnote 70: American Airlines Settles Lawsuits Over Frequent Flier Program, Fort Worth Star-Telegram, June 22, 2000.]

A class action alleged that certain 'zip drives' contained a defect that sometimes caused the failure of the drives or the zip disks. The plaintiffs' attorneys received $4.7 million in fees, while the estimated 28 million purchasers of an Iomega Zip drive between 1995 and March 19, 2001 received coupons for rebate of between $5 and $40 on future purchases of Iomega products. In addition, the settlement called for the defendant to donate $1 million of its products to schools. 71

[Footnote] Virtually all of the cash paid in this state court-approved settlement went to lawyers.

[Footnote 71: Rinaldi v. Iomega Corp. (No. 98C-09-064-RRC, Delaware); Utah-Based Tech Company Settles Lawsuit With Rebate Offer, Standard-Examiner, Apr. 14, 2001.]

In a suit involving port charges, a sea cruise line agreed to give vouchers for a future cruise worth $25 to $55 off a future cruise to 4.5 million people who sailed on its cruises between April 19, 1992 and June 4, 1997. The vouchers can be used for a future cruise or redeemed for cash at 15 percent or 20 percent of face value. 72

[Footnote] In this state court class action settlement, only the lawyers received cash payments.

[Footnote 72: Carnival Cruise Settles Lawsuit, Florida Today, Mar. 16, 2001.]

In a case alleging flawed television sets, Thomson Consumer Electronics agreed to reimburse customers who had receipts documenting repairs, to provide $50 rebates on the purchase of future products for consumers who did not repair their problems or did not have receipts, and to provide $25 rebates on future products to consumers who did not experience a problem. Under the terms of the settlement approved by an Illinois state court, the lawyers reportedly received $22 million in fees and costs. 73

[Footnote] According to news reports, more than 2,640 people opted out of the settlement; some said they opted out because the form was complicated and others said they opted out because the attorneys' fees were so high. 74

[Footnote]

[Footnote 73: Thomson Antes Up $100 Million Settlement, Mar. 12, 2001.]

[Footnote 74: Baird v. Thomson Consumer Electronics, Inc. (No. 00-L-00761, Madison County, Illinois); 2,640 Television Owners Tune Out Class Action Suit, Belleville (Ill.) News-Democrat, Aug. 19, 2001.]

In the settlement of a state court class action involving allegations of overly aggressive fees and rates by a Minnesota credit card company, class members received discount coupons with a retail value of $19.95, an $8 dollar donation in their name to the Boys and Girls Clubs of America and the right to apply for a 9.9 percent interest credit card and to join a promotional travel discount club. They also had the potential to receive between $10 and $70 in cash. The company agreed to change its practices, and the lawyers received $5.6 million in fees. 75

[Footnote]

[Footnote 75: Fischl v. Direct Merchants Credit Card Bank, N.A. (CT 00-007129, Hennepin County, Minnesota); Soft Firm: Too Often, The SF Law Firm Of Lieff, Cabraser, Heimann & Bernstein Strikes Settlements That Give The Firm Millions Of Dollars In Legal Fees--And Its Class Action Clients Too Little, SF Weekly, May 29, 2002.]

In one state court class action involving faulty pipes, lawyers for a group of Alabama plaintiffs received more than $38.4 million in fees, and lawyers for a class of Tennessee plaintiffs received $45 million, or the equivalent of about $2,000 an hour. In contrast, the homeowners only received 8 percent rebates toward new plumbing--and to get those rebates, they had to first prove that they had suffered leaks and then go out and buy a new system. 76

[Footnote] The money in the settlement flowed primarily to class counsel.

[Footnote 76: See Richard B. Schmitt, Leaky System: Suits Over Plastic Pipe Finally Bring Relief, Especially for Lawyers, Wall St. J., Nov. 20, 1995, at A1.]

In March 1995, a computer manufacturer settled multiple state court class actions alleging a chip flaw that would arise only once in 27,000 years for the average spreadsheet user. It essentially agreed to do what it was already doing: offer free replacements, maintain service centers, operate toll-free phone numbers, and provide diagnostic computer programs. Meanwhile, counsel received $4.27 million in fees. 77

[Footnote]

[Footnote 77: See The (San Francisco) Recorder, Jan. 4, 1996.]

In a group of state court class actions settled in 2002, class members alleging that they were not fully advised of 'energy surcharges' applied when they checked into hotels during California's electricity crisis were given $10 coupons. 78

[Footnote] Only the lawyers are receiving cash.

[Footnote 78: Hotel Chains Settle Class-Action Suit Over Energy Surcharges, San Diego Union-Tribune, July 4, 2002.]

In another case, an Illinois state court approved a coupon settlement of a class action filed against Southwestern Bell Mobile Systems, Inc., alleging that the company failed to fully disclose the fact that it rounded up customer calls to the next minute. Under the state court settlement, the class members received $15 vouchers toward Cellular One products, while the lawyers took home more than $1 million in fees. 79

[Footnote]

[Footnote 79: See Michelle Singletary, Coupon Settlements Fall Short, Wash. Post, Sept. 12, 1999, at H01. For more examples of coupon settlements, see Hearings on S. 353, Prepared Testimony of Stephan G. Morrison.]

In a state court class action alleging that Coca-Cola improperly added sweeteners to apple juice, defendant agreed to distribute 50-cent coupons toward the purchase of apple juice. Meanwhile, class counsel received $1.5 million. 80

[Footnote]

[Footnote 80: Lawyers Get $1.5 Million, Clients Get 50 Cents Off, Fulton County Daily Report, Nov. 21, 1997.]

The Chicago Tribune reported that in a state court class action against a record company to recover the prices paid for albums by the group Milli Vanilli (that contained the voices of other performers), class members were given a settlement of $1 to $3 each. The Illinois state court awarded the lawyers $675,000, but the lawyers turned around and petitioned the court for an increase to $1.9 million.

In a state court action alleging that General Mills treated oats with a nonapproved-pesticide, class members were offered coupons; the attorneys received $1.75 million. 81

[Footnote]

[Footnote 81: Cereal Plan Called Soggy, National Law Journal, May 22, 1995.]

In a settlement of a state court class action against Packard Bell alleging a product defect, class members were offered a six-month extended service contract for which they were each required to pay $25. Only the lawyers got cash.

To settle a state court class action alleging collusion to fix cellular phone prices, wireless phone service providers agreed to provide coupons and discounts to customers in several California counties. 82

[Footnote] The lawyers, however, received cash.

[Footnote 82: Cellular Carriers Settle Price-Fixing Allegations, Seattle Times, July 26, 1997.]

In a settlement of a similar state court antitrust class action involving cellular service in a different area, coupons and small service credits were offered. But counsel obtained agreement to be paid up to $9.5 million. 83

[Footnote] Virtually all the cash paid in the settlement went to lawyers.

[Footnote 83: Judge OK's Plan For Class Members, The Recorder, Feb. 24, 1998.]

In another case, class action plaintiffs alleged that discount stores overstated the value of software bundles that came with computers. In a class settlement approved by a state court, consumers received coupons worth the lesser of a 7% or $25 discount off the future purchases of products from defendants' stores. The attorneys received $890,000 in fees. 84

[Footnote]

[Footnote 84: Los Angeles Times, June 8, 1998, at D3.]

2. Judicial blackmail forces settlement of frivolous cases

A second common abuse in state court class actions is the use of the class device as 'judicial blackmail' in cases that border on frivolous. Because class actions are such a powerful tool, they can give a class attorney unbounded leverage, particularly in jurisdictions that are considered plaintiff-friendly. Such leverage can essentially force corporate defendants to pay ransom to class attorneys by settling--rather than litigating--frivolous lawsuits. This is a particularly alarming abuse because the class action device is intended to be a procedural tool and not a mechanism that affects the substantive outcome of a lawsuit. Nonetheless, state court judges often are inclined to certify cases for class action treatment not because they believe a class trial would be more efficient than an individual trial, but because they believe class certification will simply induce the defendant to settle the case without trial. 85

[Footnote] As Judge Richard Posner of the U.S. Court of Appeals for the Seventh Circuit has explained, 'certification of a class action, even one lacking merit, forces defendants to stake their companies on the outcome of a single jury trial, or be forced by fear of the risk of bankruptcy to settle even if they have no legal liability. * * * [Defendants] may not wish to roll these dice. That is putting it mildly. They will be under intense pressure to settle.' 86

[Footnote] Hence, when plaintiffs seek hundreds of millions of dollars in damages, basic economics can force a corporation to settle the suit, even if it is meritless and has only a five percent chance of success.

[Footnote 85: See E. Donald Elliott Managerial Judging and the Evolution of Procedure, 53 U.

Chi. I. Rev. 306, 323-24 (1986).]

[Footnote 86: In re Rhone-Poulenc Rorer Inc., 51 F.3d 1293,1299 (7th Cir. 1995). See also Blair v. Equifax Check Servs. Inc., 181 F.3d 832, 834 (7th Cir. 1999) ('a grant of class status can put considerable pressure on the defendant to settle, even when the plaintiffs probability of success on the merits is slight').]

Not surprisingly, the ability to exercise unbounded leverage over a defendant corporation and the lure of huge attorneys' fees have led to the filing of many frivolous class actions.

As District of Columbia Insurance Commissioner Lawrence Mirel has testified before the Committee, insurance companies are often forced to settle lawsuits even though the challenged actions were fully in accordance with state law--or encouraged by state policies. 87

[Footnote] For example, two automobile insurance companies, worried about mounting legal expenses and negative publicity, settled a lawsuit over a long-standing industry-wide practice of rounding insurance premiums up to the nearest dollar for nearly $36 million, even though the premiums were calculated according to specific instructions from the Texas Department of Insurance. 88

[Footnote]

[Footnote 87: See Hearing on Class Actions, Statement of Lawrence Mirel.]

[Footnote 88: Id.]

Other brow-raising examples of frivolous suits are common. One such case was brought against Ford Motor Company in New York state court by the Milberg Weiss firm, one of the better known plaintiffs' class action firms in the country. The case involved an inadvertent mistake made by Ford--it had put a slightly overstated price on the window stickers on certain vehicles. As soon as Ford discovered the mistake, the company began sending letters to the affected customers apologizing for the error and enclosing checks that more than compensated them. Nonetheless, fully knowing that this refund program was already well underway, the Milberg Weiss law firm filed a class action lawsuit charging that Ford had committed fraud. Even worse, it asked the court immediately to enjoin Ford from continuing its refund efforts--presumably so that the lawyers could get a cut of the refund money. In this case, the court properly dismissed the action; nonetheless, Ford was required to waste time and corporate resources on a lawsuit that clearly served no legitimate purpose. 89

[Footnote]

[Footnote 89: See Faden-Bayes Corp. v. Ford Motor Co., Index No. 97-601076 (N.Y. Sup. Ct. County of New York) (filed Feb. 28, 1997).]

3. Current class action rules can ignore due process rights

A third type of class action abuse occurs when state courts ignore the due process rights of out-of-state defendants by denying them the opportunity to contest the plaintiffs' claims against them. One witness who testified before the Subcommittee on Administrative Oversight and the Courts blamed this phenomenon on a 'laissez faire' attitude of some state courts. 90

[Footnote] The most egregious examples of this are the so-called 'drive-by class certification' cases, in which a class is certified before the defendant has a chance to respond to the complaint, or in some cases, has even received the complaint. In one lawsuit filed against an

auto manufacturer in a Tennessee state court, for example, the complaint was filed on July 10, 1996. Plaintiffs filed several inches of documents with their complaint. Amazingly, by the time the court closed that same day, the judge had entered a nine-page order granting certification of a nationwide class of 23 million members. The defendant was not even notified about the lawsuit before the certification and thus had no opportunity to tell its side of the story. 91

[Footnote] And upon checking, the defendant discovered that a group of record companies had the same experience with the same judge in an antitrust class action filed several days earlier. 92

[Footnote] Similar1y, in one of the cases to develop out of the Firestone tire controversy, a Tennessee state court certified a nationwide class just four days after the defendants were served with the complaint (and obviously without benefit of any input from defendants). 93

[Footnote] And in another case, a Kentucky state court ordered injunctive relief in favor of the class before the defendant was even notified of the lawsuit. 94

[Footnote]

[Footnote 90: See Hearings on S. 353, Prepared Statement of John H. Beisner.]

[Footnote 91: Hearings on S. 353, Prepared Statement of Stephen G. Morrison.]

[Footnote 92: Id.]

[Footnote 93: See Order of National Class Certification, Davison v. Bridgestone/Firestone, Inc., Case No. 00C2298 (Eighth Cir. Ct., 20th Jud. Dist., Nashville, Tenn.) (dated Aug. 18, 2000).]

[Footnote 94: See Order, Farkas v. Bridgestone/Firestone, Inc., Case No. 00-CI-5263 (Cir. Ct., Jefferson County, KY) (dated Aug. 18, 2000).]

4. Some magnet state courts easily certify national class actions

A fourth type of class action abuse that is prevalent in state courts in some localities is the 'I never met a class action I didn't like' approach to class certification. 95

[Footnote] Some state courts with this permissive attitude have even certified classes that federal courts had already found uncertifiable. In one case, for example, a state court judge certified a nationwide class of persons who claimed that the house siding they had purchased was defective. Later, a federal district court judge presented with the same case rejected any prospect of certifying a class in that manner, finding that affording class treatment in that case would clearly violate the due process rights of the defendants and the purported class members. 96

[Footnote]

[Footnote 95: See Hearings on S. 353, Prepared Statement of Stephen Morrison.]

[Footnote 96: Compare Naef v. Masonite Corp., No. CV-94-4033 (Cir. Court, Mobile County, Alabama), with In re Masonite Hardboard Siding Prods. Litig., 170 F.R.D. 417, 424 (E.D. La. 1997).]

Another example of this phenomenon is a spate of class actions against automobile manufacturers alleging that the paint on 20-year-old vehicles was discoloring or peeling.

Federal and state courts across the country, including the Texas Supreme Court, have consistently rejected attempts to certify classes in these cases, recognizing that each claimant's facts vary such that a jury would have to consider separately the claims of each of the thousands of class members. 97

[Footnote] Most recently, on August 14, 2003, the Texas Court of Appeals rejected a proposed class, finding that a class trial would give a jury 'the unmanageable task of separately examining numerous paint systems, assessing their different failure rates and making separate determinations about which combination of processes, if any, is defective.' 98

[Footnote] Astoundingly, just one month after the most recent Texas court ruling, a Madison County, Illinois judge certified an even broader, more complex nationwide class asserting identical paint claims against Ford regarding vehicles in service for almost 25 years. 99

[Footnote]

[Footnote 97: See, e.g., In re Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 214 (E.D. La. 1998); Sanneman v. Chrysler Corp, 191 F.R.D. 441 (E.D. Pa. 2000); Ford Motor Co. v. Sheldon, 22 S.W. 3d 444 (Tex. 2000); Schurk v. DaimlerChrysler Corp., No. 97-2-04113-9 (Wash. Sup. Ct., Feb. 24, 2000).]

[Footnote 98: See Ford Motor Co. v. Sheldon, 113 S.W. 3d 839 (Tex. App. 2003).]

[Footnote 99: Phillips v. Ford Motor Co., No. 99-L-1041 (Cir. Ct., Madison County, Illinois Sept. 15, 2003).]

5. Copy cat class actions clog the courts and permit forum shopping

Yet another common abuse is the filing of 'copy cat' class actions (i.e., duplicative class actions asserting similar claims on behalf of essentially the same people). Sometimes these duplicative actions are filed by lawyers who hope to wrest the potentially lucrative lead role away from the original lawyers. In other instances, the 'copy cat' class actions are blatant forum shopping--the original class lawyers file similar class actions before different courts in an effort to find a receptive judge who will rapidly certify a class. When these similar, overlapping class actions are filed in State courts of different jurisdictions, there is no way to consolidate or coordinate the cases. The 'competing' class actions must be litigated separately in an uncoordinated, redundant fashion because there is no state court mechanism for consolidating state court cases. The result is enormous waste--multiple judges of different courts must spend considerable time adjudicating precisely the same claims asserted on behalf of precisely the same people. 100

[Footnote] As a result, state courts and class counsel may 'compete' to control the cases, often harming all the parties involved. In contrast, when overlapping cases are pending in different federal courts, they can be consolidated under one single judge to promote judicial efficiency and ensure consistent treatment of the legal issues involved.

[Footnote 100: For example, in the litigation concerning Firestone tires, approximately 100 virtually identical class actions seeking to represent the same purported class members were filed in courts all over the country. And in the recently publicized HMO cases, multiple overlapping class actions were filed against each of the major health insurance companies. No less than 17 class actions have been filed against Humana, most of which assert similar allegations and claims on behalf of similarly defined nationwide classes. In the Humana situation, the federal cases were consolidated for pretrial proceedings before a single judge. See In re Humana Inc. Managed Care Litig., 2000 U.S. Dist. LEXIS 5099 (J.P.M.L. Apr. 13, 2000). There is no parallel methodology for consolidating state court class actions. In the 12

months ending September 30, 2002, over 7,000 cases were centralized for pretrial proceedings through the MDL process. See http://www.uscourts.gov/judbus2002/tables/s19sep02.pdf.]

E. National Class Actions Belong in Federal Court Under Traditional Notions of Federalism

Many of the abuses taking place in state courts are magnified by the growing trend among plaintiffs' attorneys to bring huge class actions on behalf of hundreds of thousands or even millions of consumers. These cases, which generally involve overly broad claims, put any class members with real injuries at risk. The incentive for class lawyers to gather the largest class possible is clear: why sue on behalf of just 1,000 people when you can sue for 1 million claimants and increase your intake? The problem with such broad claims, however, is that the entire lawsuit proceeds on a lowest common denominator basis. As a result, persons with legitimate injuries will be lumped in with the 'average,' often meritless claims and will not be given individual attention for their grievances. 101

[Footnote]

[Footnote 101: See Hearings on S. 353, Prepared Statement of John H. Beisner.]

The effect of class action abuses in state courts is being exacerbated by the trend toward 'nationwide' class actions, which invite one state court to dictate to 49 others what their laws should be on a particular issue, thereby undermining basic federalism principles. 102

[Footnote] A recent study found that 77 percent of class actions brought in 2001 in a rural Illinois county known for its heavy class action docket sought to certify nationwide classes. 103

[Footnote] These cases challenged matters as diverse as MTBE in wells; telephone billing practices; chicken processing procedures; and insurance reimbursement policies. Clearly, a system that allows state court judges to dictate national policy on these and numerous other issues from the local courthouse steps is contrary to the intent of the Framers when they crafted our system of federalism. In one case, for example, plaintiffs filed suit in an Alabama county court on behalf of more than 20 million people alleging that the design of federally mandated airbags is faulty. 104

[Footnote] From the standpoint of federalism, this suit defies logic. Why should an Alabama state court tell 20 million people in all 50 states what kind of airbags they can have in their cars?

[Footnote 102: See Hearings on S. 353, Prepared Statement of John H. Beisner.]

[Footnote 103: See John H. Beisner, and Jessica Davidson Miller, Class Action Magnet Courts: The Allure Intensifies, 4 BNA Class Action Litig. R. 58 (Jan. 24, 2003).]

[Footnote 104: See Smith v. General Motors Corp., et al., Civ. A. No. 97-39 (Cir. Ct. Coosa County, AL).]

The most egregious of such cases are those in which one state court issues nationwide rulings that actually contradict the laws of other states. This problem is particularly prevalent in insurance cases, which are being filed in increasingly greater number. As District of Columbia Insurance Commissioner Lawrence Mirel has testified before this Committee, class actions 'frequently go[] around or simply ignore[] the role of state regulators.' 105

[Footnote]

[Footnote 105: See Hearing on Class Actions, Prepared Statement of Lawrence Mirel.]

One case reported in the New York Times, for example, involved a longstanding practice of the State Farm Insurance Companies (shared by other insurers) of using non-original equipment manufacturer (OEM) parts to repair cars. 106

[Footnote] The practice was fully disclosed to policyholders, and the majority of states expressly permit insurers to specify non-OEM parts. Indeed, two states, Hawaii and Massachusetts, actually require the specification of non-OEM parts. Nonetheless, plaintiffs brought suit in Illinois state court claiming that all non-OEM parts used by policyholders were inferior to OEM parts, and that State Farm had breached its contractual obligation to policyholders and committed fraud each time it specified such parts. Even though the plaintiffs eventually dropped their claim that all non-OEM parts were inferior, and conceded that this could only be determined on a part-by-part basis, the trial court still permitted the jury to reach a group judgment on the class action. The court was not even deterred by the fact that the plaintiffs in the class came from states throughout the nation with widely varying laws regarding the use of non-OEM parts, including the two states--Hawaii and Massachusetts--that strongly embraced the very practice condemned by plaintiffs. 107

[Footnote] Indeed, in affirming a $1.3 billion verdict against State Farm in this case, an Illinois state appellate court acknowledged that it had disregarded 'state insurance commissioners [w]ho testified that the laws of many of our sister states permit and in some cases * * * [even] encourage' usage of non-OEM parts. 108

[Footnote]

[Footnote 106: Suit Against Auto Insurer Could Affect Nearly All Drivers, N.Y. Times, Sept. 27, 1998, at 29.]

[Footnote 107: See Snider v. State Farm Mutual Automobile Insurance Co., Cir. Ct. for Williamson City, IL, Docket No. 97-L-114 (1999).]

[Footnote 108: Avery v. State Farm Mut. Auto. Ins. Co., 746 N.E.2d 1242, 1254 (Ill. Ct. App. 2001).]

The State Farm case is not unique. This state court interference with the laws of other jurisdictions is becoming disturbingly common. For example:

An appellate court in Illinois recently affirmed the certification of a class consisting of Illinois residents and residents of 16 other states. The plaintiffs alleged the defendant telecommunications company had collected, on behalf of municipalities, taxes from customers located in unincorporated areas in violation of the Illinois consumer protection law. The court noted that because '50-state class actions are not uncommon in Illinois' it was not problematic that 'the laws of 17 states are potentially implicated here.' 109

[Footnote] Similarly, a year earlier another Illinois appellate court affirmed the certification of a nationwide class of consumers alleging violations of the same Illinois law with no regard for the laws of the other states involved. 110

[Footnote]

[Footnote 109: PJ's Concrete Pumping Serv. v. Nextel W. Corp., 803 N.E.2d 1020, 1030 (Ill. Ct. App. 2004), appeal denied, 813 NE.2d 223 (Ill. 2004), cert. denied, 125 S. Ct. 410 (2004).]

[Footnote 110: Clark v. TAP Pharm. Prods., Inc., 798 N.E.2d 123 (Ill. Ct. App. 2003).]

The Supreme Court of Oklahoma recently affirmed the certification of a nationwide product liability class action, applying the laws of a single state to transactions that occurred in all 50 states. 111

[Footnote] Thus, in this case, a state court has decided effectively to override whatever policy determinations another state's legislature or courts may have made on warranty or product liability policy to protect their own residents.

[Footnote 111: Ysbrand v. DaimlerChrysler Corp., 81 P.3d 618 (Okla. 2003).]

Another recent class action filed in Oklahoma involved allegations that the defendants failed to account for slop oil in monthly accountings rendered to certain oil producers. The lawsuit sounded in tort and contract, involved 'millions of dollars,' and transactions that occurred in 'more than twenty states.' 112

[Footnote] The Supreme Court of Oklahoma affirmed the certification of a nationwide class, ignoring the fact that the case would require resolution of the laws of twenty states.

[Footnote 112: Black Hawk Oil Co. v. Exxon Corp., 1998 Okla. LEXIS 82 (Okla. 1998).]

The Minnesota Court of Appeals and the Minnesota Supreme Court recently affirmed a nationwide class action, applying the laws of a single state to transactions that occurred in many different jurisdictions (and virtually none of which occurred in the state whose laws were applied) 113

[Footnote] One judge who decided the case openly acknowledged that the court was engaging in the 'false federalism' that has become part of the state court class action game. 114

[Footnote]

[Footnote 113: Peterson v. BASF Corp., 657 N.W. 2d 853 (Minn. Ct. App. 2003), affd., 675 N.W. 2d 57 (Minn. 2004).]

[Footnote 114: Id. at 875.]

A few years ago, a state trial court in Minnesota approved for class treatment a case involving millions of claimants from 44 states that would have had the effect of dictating the commercial codes of all those states. 115

[Footnote] The specific issue in the case was whether individuals have a state law right to recover interest on refundable deposits paid to secure an automobile lease. In certifying a class in that case, the court adopted an understanding of Minnesota's version of the Uniform Commercial Code that was contrary to the interpretation of every other state to have considered the issue under their own versions of the UCC. And by certifying the class, the court decided that its unprecedented interpretation of the UCC would bind the remaining 43 states that had yet to decide the question (even though the 'Uniform Commercial Code is not uniform' and is interpreted differently in different states 116

[Footnote] ). In essence, the action of the Minnesota court proposed to dictate the interpretation of 43 other states' UCC provisions even though the other states might well have reached a different conclusion in applying their own state's laws.

[Footnote 115: Rosen v. PRIMUS Automotive Fin. Servs., Inc., No. CT 98-2733 (Minn. D. Ct., 4th Jud. Dist., May 4, 1999).]

[Footnote 116: Walsh v. Ford Motor Co., 807 F.2d 1000, 1016-17 (D.C. Cir. 1986).]

The sentiment reflected in these cases flies in the face of basic federalism principles by embracing the view that other states should abide by a deciding court's law whenever it decides that its own laws are preferable to other states' contrary policy choices. Indeed, such examples of judicial usurpation, in which one state's courts try to dictate its laws to 49 other jurisdictions, have been duly criticized by some congressional witnesses as 'false federalism.' 117

[Footnote] Moreover, they have posed serious problems for the courts of other states. For example, the Vermont Supreme Court recently nullified the settlement in the Bank of Boston case, holding that the Alabama court that approved the settlement failed to provide due process to the Vermont class members in that case, who ended up paying $30,000 in attorneys' fees. 118

[Footnote] In contrast, a Connecticut court recently found that a woman who had been part of an Alabama class action settlement on roofing shingles could not have her day in court because she was bound by the settlement she knew nothing about. 119

[Footnote]

[Footnote 117: See Interstate Class Action Jurisdiction Act of 1999: Hearing on H.R. 1875 Before the House Comm. on the Judiciary, 106th Cong. (1999) (hereinafter 'Hearing on H.R. 1875), Prepared Statement of Walter E. Dellinger III.]

[Footnote 118: See State of Vermont v. Homeside Lending, Inc. and Bank Boston Corporation, 826 A.2d 997 (Vt. 2003).]

[Footnote 119: Rigat v. GAF Materials Corp., 2002 Conn. Super. LEXIS 272 (Conn. Super. Jan 25, 2002).]

Given the range and severity of class action abuse, it is not surprising that defendants find it necessary to remove actions against them to a federal forum--a forum where the threat of prejudice is significantly lower. Under current law, however, plaintiffs' lawyers can easily manipulate their pleadings to ensure that their cases remain at the state level. As noted above, the two most common tactics employed by plaintiffs' attorneys in order to guarantee a state court tribunal are: adding parties to destroy diversity and shaving off parties with claims for more than $75,000. It is not rare to see complaints in which plaintiffs sue several major corporations and then add one local supplier or dealer as a defendant merely to defeat diversity. 120

[Footnote] Other complaints seek $74,999 in damages on behalf of each plaintiff or explicitly exclude from the proposed class anybody who has suffered $75,000 or more in damages. 121

[Footnote]

[Footnote 120: See Hearings on S. 353, Prepared Statement of Stephen G. Morrison.]

[Footnote 121: Id.]

The Committee believes that the federal courts are the appropriate forum to decide most interstate class actions because these cases usually involve large amounts of money and many plaintiffs, and have significant implications for interstate commerce and national policy. By enabling federal courts to hear more class actions, this bill will help minimize the class

action abuses taking place in state courts and ensure that these cases can be litigated in a proper forum.

V. HOW S. 5 WORKS

S. 5 is a modest attempt to address a number of the problems and abuses in the current class action system. First, S. 5 implements a consumer bill of rights that requires greater scrutiny of both coupon and net loss settlements, regulates attorneys' fee awards in coupon settlements, prohibits extra compensation to class members who are geographically located near the court, and requires notice of proposed class settlements to appropriate state and federal officials.

Second, S. 5 includes a narrowly-tailored expansion of federal diversity jurisdiction to ensure that class actions that are truly interstate in character can be heard in federal court. S. 5 also includes modest amendments to current removal provisions that will make it harder for counsel to 'game the system' and keep class actions in state court by naming local defendants who are not real parties to the controversy or by amending their pleadings after the deadline for removal. These provisions will create efficiencies in the judicial system by enabling overlapping and 'copycat' cases to be consolidated in a single federal court, rather than proceeding simultaneously in numerous state courts under the current system.

At the same time, however, S. 5 leaves in state court: (1) class actions in which all the plaintiffs and defendants are residents of the same state; (2) class actions with fewer than 100 plaintiffs; (3) class actions involving less than $5 million; (4) class actions in which a state government entity is the primary defendant; (5) class actions brought against a company in its home state, in which 2/3 or more of the class members are also residents; and (6) class actions involving certain local controversies.

Finally, S. 5 addresses the problem of unfair settlements and excessive attorneys' fees by directing the Judicial Conference of the United States to conduct a review of class action settlements and attorneys' fees and to present Congress with recommendations to improve the system.

CONSUMER BILL OF RIGHTS

S. 5 requires greater scrutiny of coupon settlements; such settlements are prohibited absent written findings by the court that they benefit the class members. In addition, S. 5 regulates attorneys' fees in class settlements in which coupons constitute all or part of the remedy provided to class members. S. 5 also prohibits extra compensation to members of a class simply because they live closer to the court. These provisions are intended to prevent some of the more abusive class action settlement practices that came to the Committee's attention during hearings on class action abuses.

S. 5 would also amend the class action rules by requiring that class counsel serve appropriate state and federal officials with notice of a proposed settlement. This notice must occur no later than 10 days after the proposed settlement is filed in federal court.

The notice to the appropriate officials would include: (1) A copy of the complaint and amended complaints, unless those materials are available through the Internet and the notice includes directions on how to access the materials on-line; (2) notice of any scheduled judicial hearing in the class action; (3) proposed or final notification to class members of the right to be excluded from the class; (4) any proposed or final class action settlement; (5) any settlement made between class counsel and defendants' counsel; (6) any final judgment or notice of dismissal; and (7) the names of the class members who reside in each respective state and the proportionate claims of such members. The designated officials would then have at least 90 days to review the proposed settlement before the court gives final

settlement approval.

Nothing in this section creates an affirmative duty for either the state or federal officials to take any action in response to a class action settlement. Moreover, nothing in this section expands the current authority of the state or federal officials.

DIVERSITY JURISDICTION AND REMOVAL

S. 5 would amend the diversity jurisdiction and removal statutes applicable to larger interstate class actions by modifying 28 U.S.C. 1332 to incorporate the concept of balanced diversity. The bill grants the federal courts original jurisdiction to hear interstate class action cases where (a) any member of the proposed class is a citizen of a different state from any defendant; and (b) the amount in controversy exceeds $5 million (aggregating claims of all purported class members, exclusive of interest and costs).

The bill, however, includes several provisions ensuring that where appropriate, state courts can adjudicate certain class actions that have a truly local focus. The first is the 'Home State' exception. Under this provision, if two-thirds or more of the class members are from the defendant's home state, the case would not be subject to federal jurisdiction. Conversely, class actions filed in the home state of the primary defendant would automatically be subject to federal jurisdiction (assuming the other prerequisites are met) if less than one-third of the proposed class members are citizens of that state. For cases brought in a defendant's home state in which between one-third and two-thirds of the class members were citizens of that state, federal jurisdiction would also exist; however, a federal judge would have the discretion, in the interests of justice, to decline to exercise that jurisdiction based on consideration of six factors designed to help assess whether the claims at issue are indeed local in nature.

In addition, S. 5 contains a 'Local Controversy Exception' intended to ensure that state courts can continue to adjudicate truly local controversies in which some of the defendants are out-of-state corporations. In order to fall within the Local Controversy Exception, a class action must meet the following four criteria: (1) The class must be primarily local, meaning that more than two-thirds of class members must be residents of the state in which the action was filed; (2) at least one real defendant (whose alleged conduct is central to the class's claims and from whom the class seeks significant relief) must also be local; (3) the 'principal injuries' caused by the defendants' conduct must have occurred in the state where the suit was brought; and (4) no other similar class actions have been filed against any of the defendants (by the same or other proposed classes) in the preceding three years. If all of these four criteria are satisfied, the case will not be subject to federal jurisdiction under the bill.

S. 5 also excludes from its federal jurisdiction grant: (1) Class actions involving fewer than 100 plaintiff class members; (2) class actions in which the primary defendants are states, state officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; (3) any securities class actions covered by the Securities Litigation Reform Act; and (4) corporate governance cases.

In order to enable more class actions to be removed to federal court, S. 5 would also create three new rules regarding the removal of class actions filed in state court. First, any defendant would be able to remove a class action to federal court without the consent of any other defendant. Second, any defendant would be able to remove a class action to federal court, even if that defendant is a citizen of the state in which the action was brought. And third, the current ban on removal of a class action to federal court after one year would be eliminated, although the current requirement that removal occur within 30 days of notice of grounds for removal would be retained.

REPORT ON CLASS ACTION SETTLEMENTS

S. 5 would direct the Judicial Conference of the United States, with the assistance of the Federal Judicial Center and Administrative Office of the United States Courts, to prepare a report on class action settlements to be transmitted to the House and Senate Judiciary Committees. The report will include (1) recommendations on best practices to ensure the fairness of settlements for class members and to ensure the appropriateness of attorneys' fees and expenses, and (2) a discussion of any actions taken or planned by the Judicial Conference to implement the report recommendations.

VI. SECTION-BY-SECTION ANALYSIS

Section 1- Section 1 establishes the 'Class Action Fairness Act of 2005' as the short title of the bill.

Section 2- Section 2 sets forth findings and purposes. The Committee is concerned that there have been abuses of the class action device over the last decade that have hurt consumers, adversely affected interstate commerce, and undermined public respect for our judicial system. In particular, the Committee is concerned about class actions that do little to benefit--and sometimes actually harm--the class members who are supposed to be the beneficiaries of such cases, while enriching their lawyers. The Committee is also concerned that this problem is exacerbated by confusing notices that make it difficult for class members to understand and effectively exercise their rights. Taken together, the Committee believes that such abuses hurt consumers by resulting in higher prices and less innovation, and that they undermine the principles of diversity jurisdiction, which were established by the Framers to promote interstate commerce.

The purposes of the Act are therefore to assure fair and prompt recoveries for class members with legitimate claims; to restore the intent of the Framers by expanding federal jurisdiction over interstate class actions; and to benefit society by encouraging innovation and lowering consumer prices.

Section 3- Section 3 sets forth a 'Consumer Class Action Bill of Rights' to help ensure that class actions do not hurt their intended beneficiaries. This section is intended to address a number of common abuses that were discussed by witnesses at class action hearings and have been reported on in the press--and to encourage greater judicial scrutiny of proposed class action settlements.

New section 28 U.S.C. 1711 defines the term 'class action' to include representative actions filed in federal district court under Rule 23 of the Federal Rules of Civil Procedure, as well as actions filed under similar rules in state courts that have been removed to federal court. It also defines the following terms: class counsel, class members, plaintiff class action and proposed settlement.

New section 28 U.S.C. 1712 is aimed at situations in which plaintiffs' lawyers negotiate settlements under which class members receive nothing but essentially valueless coupons, while the class counsel receive substantial attorneys' fees. For example, in a recent settlement of a class action against a video rental chain, customers received coupons toward video rentals and purchases, while the plaintiffs' class counsel were paid $9.25 million in fees and expenses. One commentator observed that 'the real winners in the settlement are the lawyers who sued the company,' who will be paid 'in cash, not coupons.' 122

[Footnote]

[Footnote 122: Scott v. Blockbuster Inc., (No, D162-535, Jefferson County, Texas, 2001); Judge OKs Blockbuster Plan On Fees, Associated Press, Jan. 11, 2002.]

In order to address such inequities, Section 1712(a) states that in class action settlements in which it is proposed that an attorney fee award be based solely on the purported value of the coupons awarded to class members, the fee award should be based on the demonstrated value of coupons actually redeemed by the class members. Thus, if a settlement agreement promises the issuance of $5 million in coupons to the putative class members, but only 1/5 of potential class members actually redeem the coupons at issue, then the lawyer's contingency fee should be based on a recovery of $1 million--not a recovery of $5 million.

In some cases, the proponents of a class settlement involving coupons may decline to propose that attorney's fees be based on the value of the coupon-based relief provided by the settlement. Instead, the settlement proponents may propose that counsel fees be based upon the amount of time class counsel reasonably expended working on the action. Section 1712(b) confirms the appropriateness of determining attorneys' fees on this basis in connection with a settlement based in part on coupon relief. As is stated on its face, nothing in this section should be construed to prohibit using the 'lodestar with multiplier' method of calculating attorney's fees. By the same token, nothing in this section expands the authorization for the use of a multiplier; a multiplier may be used only to the extent authorized by existing law.

In some class action settlements, the terms may be a combination of coupon relief, plus some form of equitable relief, including an injunction. In such circumstances, the settlement may also include fees for obtaining the equitable relief. Thus, if a proposed settlement provides for both coupons and equitable relief, then the portion of the award that is a contingent fee based on the value of the coupons must be calculated based on the value of redeemed coupons, and the portion not based on the value of the coupons should be based on the time spent by class counsel on the case.

The Committee wishes to make clear that nothing in Section 1712 is intended to change current law regarding the circumstances under which an award of attorneys' fees is appropriate. In particular, the Committee stresses that this section is not intended to change in any respect current law governing the circumstances under which fee shifting is permitted in cases that are resolved through full litigation (that is, cases that are not settled). Moreover, the Committee wishes to make clear that it does not intend to change current law in any respect regarding the circumstances under which the parties may justifiably agree to fee awards in connection with settlements. Section 1712 is intended solely to regulate the manner in which fees otherwise authorized by existing law should be calculated.

Section 1712( d) allows a court to hear expert testimony from a witness on the actual value of redeemed coupons to assist the court in determining the proper contingent fee. This provision addresses the situation where the actual value of the coupons differs from their face value. For example, a coupon for $250 off a vehicle purchase may not really be worth $250.

Section 1712(e) provides that a federal judge may not approve a coupon settlement without first conducting a hearing and determining that the settlement terms are fair, reasonable, and adequate for class members. In making that determination, the judge should consider, among other things, the real monetary value and likely utilization rate of the coupons provided by the settlement. The section further provides that a federal court may, in its discretion, require that a proposed settlement provide for the distribution of a portion of the value of unclaimed coupons to a charitable organization or governmental entity; however, any such distribution shall not be used as the basis for the award of any attorneys' fees. So, for example, if a proposed settlement provided for the distribution of one million $1 coupons, but only 250,000 were claimed and used, the federal court supervising the settlement could require that 500,000 of the unclaimed coupons be made available to the U.S. Army for distribution to enlisted personnel serving in the military. However, in determining an

appropriate fee award for class counsel, counsel would be able to rely only on the value of the 250,000 coupons actually redeemed by class members. The fee award could not be based on the value of the 250,000 unused coupons or the 500,000 coupons that might be used by military personnel.

The Committee wishes to make clear that it does not intend to forbid all non-cash settlements. Such settlements may be appropriate where they provide real benefits to consumer class members (e.g., where coupons entitle class members to receive something of actual value free of charge) or where the claims being resolved appear to be of marginal merit. However, where such settlements are used, the fairness of the settlement should be seriously questioned by the reviewing court where the attorneys' fees demand is disproportionate to the level of tangible, non-speculative benefit to the class members. In adopting this provision, it is the intent of the Committee to incorporate that line of recent federal court precedents in which proposed settlements have been wholly or partially rejected because the compensation proposed to be paid to the class counsel was disproportionate to the real benefits to be provided to class members. 123

[Footnote]

[Footnote 123: See, e.g., Cope v. Duggins, 2001 WL 333102 (E.D. La. 2001) (rejecting proposed class settlement because attorneys' fees were disproportionate to class benefits); Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp. 2d 561 (E.D. Pa. 2001) (same); Sheppard v. Consolidated Edison Co., 2000 WL 33313540 (E.D.N.Y. 2000) (same); Polar Int'l Brokerage Corp. v. Reeve, 187 F.R.D. 108 (S.D.N.Y. 1999) (same).]

New section 28 U.S.C. 1713 prohibits federal courts from approving a proposed settlement under which class members would be required to pay class counsel a sum of money that results in a net loss (as occurred in the Bank of Boston case, discussed above), unless the court makes a written finding that nonmonetary benefits to the class members substantially outweigh the monetary loss.

New section 28 U.S.C. 1714 prohibits federal courts from approving proposed settlements that provide for payment of greater sums to certain class members based on where they reside. The Committee wishes to emphasize that this provision is intended solely to prohibit circumstances in which the preferential payments have no legitimate legal basis. For example, it may be perfectly appropriate for a settlement of an environmental class action to differentiate settlement payment amounts based on a claimant's proximity to an alleged chemical spill, if it appears that those persons in closer proximity have suffered greater injury. This provision is not intended to affect such a determination. But where putative class members' claims are legally and factually indistinguishable, it is inappropriate to give one class member extra settlement benefits merely because he or she resides in (or closer to) the county where the court sits.

New section 28 U.S.C. 1715 sets forth requirements for notification to appropriate federal and state officials of proposed class action settlements. New section 1715 is designed to ensure that a responsible state and/or federal official receives information about proposed class action settlements and is in a position to react if the settlement appears unfair to some or all class members or inconsistent with applicable regulatory policies. Section 1715 requires each defendant, within 10 days after a proposed class action settlement is filed in federal court, to provide notice of the proposed settlement to: (1) the U.S. Attorney General (or for banks and thrifts, the entity with primary regulatory or supervisory responsibility over the defendant); and (2) the state official that has primary regulatory or supervisory responsibility over the defendant or who licenses or otherwise authorizes the defendant to conduct business in the state (or for state depository institutions, the state bank supervisor in the state in which the defendant is incorporated or chartered). If there is no state official that meets the requirements set forth in the Act, notice must be provided to the state attorney

general. The notice must include: (1) a copy of the complaint and attached materials; (2) the date and time of any scheduled judicial hearing; (3) proposed or final notification to the class members; (4) the proposed settlement; (5) any other agreement between class counsel and the defendant; (6) any final judgment or notice of dismissal; (7) the names of class members who reside in each state and their proportional share of the settlement, or if that is not feasible, a reasonable estimate of the number of class members in the state and their share of the settlement; and (8) any written judicial opinion related to the proposed settlement. A federal court cannot issue a final order approving a settlement until 90 days after the appropriate federal and state officials are served. If the defendants do not comply with this provision, a class member can refuse to comply with--or be bound by--the settlement agreement.

The Act also clarifies that it should not be construed to impose any obligations, duties or responsibilities on the federal and state officials who receive notice of a class action settlement pursuant to this provision. Thus, federal and state officials will be notified about proposed settlements and have an opportunity to get involved if they think it is appropriate but will not be required to do so.

Abusive class action settlements in which plaintiffs receive promotional coupons or other nominal damages while class counsel receive large fees are all too commonplace. The risk of such abusive practices is particularly pronounced in the class action context because these suits often involve numerous plaintiffs, each of whom has only a small financial stake in the litigation. As a result, few (if any) plaintiffs closely monitor the progress of the case or settlement negotiations, and these cases become 'clientless litigation,' in which the plaintiff attorneys and the defendants have 'powerful financial incentives' to settle the 'litigation as early and as cheaply as possible, with the least publicity.' 124

[Footnote] These financial incentives create inequitable outcomes. 'For class counsel, the rewards are fees disproportionate to the effort they actually invested in the case.* * * For society, however, there are substantial costs: lost opportunities for deterrence (if class counsel settled too quickly and too cheaply), wasted resources (if defendants settled simply to get rid of the lawsuit at an attractive price, rather than because the case was meritorious), and--over the long run--increasing amounts of frivolous litigation as the attraction of such lawsuits becomes apparent to an ever-increasing number of plaintiff lawyers.' 125

[Footnote]

[Footnote 124: Deborah Hensler, et al., Class Action Dilemmas, Pursuing Public Goals for Private Gain ('Class Action Dilemmas'), at 10 (1999) (executive summary).]

[Footnote 125: Id.]

New 28 U.S.C. 1715 requires defendants to provide notice of proposed settlements to the appropriate federal official and to the appropriate state official of each state in which a class member resides. Under new section 1715(a), the appropriate federal official is the Attorney General of the United States, or in the case of depository institutions and other banks, the person who has primary federal regulatory supervisory responsibility over the defendant if some or all of the matters at issue in the litigation are subject to regulation or supervision by that person. Thus, for example, if a national bank were sued over its lending practices, notice would have to be provided to the Comptroller of the Currency. If it were sued in a nationwide lawsuit regarding the food in its cafeterias, notice would be provided to the Attorney General.

Under new section 28 U.S.C. 1715(a), the appropriate state official is defined as the person in the state who has primary regulatory or supervisory responsibility with respect to the defendant or licenses the defendant, if some or all of the matters alleged in the class action are subject to regulation by that person. If no such regulatory or licensing authority exists, or

the matters are not subject to regulation by that person, then notice should be given to the state attorney general. Thus, for example, in a case against an insurance company involving insurance practices, such as how premiums are calculated, notice would be required to the state insurance commissioner in each state where the company is licensed and where class members reside. If some class members reside in states where the company does not do business and therefore is not subject to regulation, then notice would be given to those states' attorneys general. Similarly, if the company at issue were a toy manufacturer, which is not licensed by a particular regulatory body, then notice would have to be given to the state attorney general of each state where plaintiffs reside.

New section 1715(c) clarifies that in the case of federal depository institutions and other non-state depository institutions, the notice requirements are satisfied by notifying the person who has primary Federal regulatory or supervisory responsibility with respect to the defendant, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person. No notice is required to state officials in these circumstances. Thus, for example, if a national bank were sued over its depository or lending practices, notice would have to be given to the Comptroller of the Currency, who has regulatory authority over the institution. However, no notice would be required to state officials.

With regard to state depository institutions, the notice requirements are satisfied by notifying the state banking supervisor in the state where the defendant is incorporated, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person, and upon the appropriate federal official. Thus, no notice is required to state officials in other states even if some class members reside in those states.

This provision is intended to combat the 'clientless litigation' problem by adding a layer of independent oversight to prohibit inequitable settlements. Under Section 1715(b), class counsel must provide the notice within 10 days after the proposed settlement is filed in court. Such notice must include, according to 28 U.S.C. 1715(b)(1)(8): a copy of the complaint; any scheduled judicial hearings; any final judgment or notice of settlement; any proposed or final notice to the class; and the names of class members who reside in each state, if feasible. The notice would also include any written judicial decision related to settlement, a final judgment, or notice of dismissal. If disagreement arises over the feasibility of providing the names of class members and their proportional share of the proposed settlement under 28 U.S.C. 1715(b), it is the intent of the Committee that class counsel bear the burden of proving that it is not feasible to provide any of this required information.

Once the appropriate state and federal officials have received notice under 28 U.S.C. 1715 (b), they would then have at least 90 days to review the proposed settlement and decide what (if any) action to take to protect the interests of the plaintiff class. The state and federal officials are not required to take any affirmative action once they receive the proposed settlement according to new section 28 U.S.C. 1715(f); nor does this section expand their current authority in any respect.

Section 28 U.S.C. 1715(e)(1) instructs that in cases where the appropriate state and federal officials are not provided notice of the potential settlement, plaintiffs can choose not to be bound by that settlement. The Committee wishes to make clear that this provision is intended to address situations in which defendants have simply defaulted on their notification obligations under this provision; it is not intended to allow settlement class members to walk away from an approved settlement based on a technical noncompliance (e.g., notification of the wrong person, failure of the official to receive notice that was sent), particularly where good faith efforts to comply occurred. In particular, the Committee wishes to note that where the appropriate officials received notification of a proposed settlement from at least one defendant, section 1715(e) should not be operative. New subsection 1715(e)(2) specifically states that a class member may not refuse to comply with a settlement if the notice was directed to the appropriate federal official and to the state attorney general or the primary

licensing authority. This provision reflects the overall intent of section 1715 that a settlement should not be undermined because of a defendant's innocent error about which federal or state official should have received the required notice in a particular case.

The Committee believes that notifying appropriate state and federal officials of proposed class action settlements will provide a check against inequitable settlements in these cases. Notice will also deter collusion between class counsel and defendants to craft settlements that do not benefit the injured parties.

Section 4.--Section 4 amends 28 U.S.C. Sec. 1332 to re-designate current subsection 1332 (d) as subsection (e) and create a new subsection 1332(d).

The definitional provisions of Section 4--as reflected in the new section 1332(d)(1)--are self-explanatory. However, the Committee notes that as with the other elements of section 1332 (d), the overall intent of these provisions is to strongly favor the exercise of federal diversity jurisdiction over class actions with interstate ramifications. In that regard, the Committee further notes that the definition of 'class action' is to be interpreted liberally. Its application should not be confined solely to lawsuits that are labeled 'class actions' by the named plaintiff or the state rulemaking authority. Generally speaking, lawsuits that resemble a purported class action should be considered class actions for the purpose of applying these provisions.

The new subsection 1332(d)(2) gives the federal courts original jurisdiction over class action lawsuits in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and either (a) any member of a class of plaintiffs is a citizen of a different state from any defendant; (b) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a state; or (c) any member of a class of plaintiffs is a citizen of a state and any defendant is a foreign state or a citizen or subject of a foreign state.

The Committee notes that for purposes of the citizenship element of this analysis, S. 5 does not alter current law regarding how the citizenship of a person is determined, including the provisions of 28 U.S.C. Sec. 1332(c) specifying that 'a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business.'

While the core concept of the bill is that class actions filed against defendants outside their home state are subject to federal jurisdiction if citizens from different states are on opposing sides and more than $5 million is at issue, new subsections 1332(d)(3) and (d)(4)(B) address the jurisdictional principles that will apply to class actions filed against a defendant in its home state, dividing such cases into three categories.

First, for cases in which two-thirds or more of the members of the plaintiff class and the primary defendants are citizens of the state in which the suit was filed, subsection 1332(d) (4)(B) states that federal jurisdiction will not be extended by S. 5. Such cases will remain in state courts under the terms of S. 5, since virtually all of the parties in such cases (both plaintiffs and defendants) would be local, and local interests therefore presumably would predominate.

Second, cases in which more than two-thirds of the members of the plaintiff class or one or more of the primary defendants are not citizens of the state in which the action was filed will be subject to federal jurisdiction, pursuant to the provisions of subsection 1332(d)(2). Federal courts should be able to hear such lawsuits because they have a predominantly interstate component--they affect people in many jurisdictions, and the laws of many states may be at issue.

Finally, there is a middle category of class actions in which more than one-third but fewer

than two-thirds of the members of the plaintiff class and the primary defendants are all citizens of the state in which the action was filed. In such cases, the numbers alone may not always confirm that the litigation is more fairly characterized as predominantly interstate in character. New subsection 1332(d)(3) therefore gives federal courts discretion, in the 'interests of justice,' to decline to exercise jurisdiction over such cases based on the consideration of six factors:

Whether the claims asserted are of 'significant national or interstate interest'- If a case presents issues of national or interstate significance, that argues in favor of the matter being handled in federal court. For example, if a nationally distributed pharmaceutical product is alleged to have caused injurious side-effects and class actions on the subject are filed, those cases presumably should be heard in federal court because of the nationwide ramifications of the dispute and the probable interface with federal drug laws (even if claims are not directly filed under such laws). Under this factor, the federal court should inquire whether the case does present issues of national or interstate significance of this sort. If such issues are identified, that point favors the exercise of federal jurisdiction. If such issues are not identified and the matter appears to be more of a local (or intrastate) controversy, that point would tip in favor of allowing a state court to handle the matter.

Whether the claims asserted will be governed by laws other than those of the forum state- As noted previously, the Committee believes that one of the significant problems posed by multi-state state court class actions is the tendency of some state courts to be less than respectful of the laws of other jurisdictions, applying the law of one state to an entire nationwide controversy and thereby ignoring the distinct, varying state laws that should apply to various claims included in the class depending on where they arose. Under this factor, if the federal court determines that multiple state laws will apply to aspects of the class action, that determination would favor having the matter heard in the federal court system, which has a record of being more respectful of the laws of the various states in the class action context. Conversely, if the court concludes that the laws of the state in which the action was filed will apply to the entire controversy, that factor will favor allowing the state court to handle the matter.

Whether the class action has been pleaded in a manner that seeks to avoid federal jurisdiction- The purpose of this inquiry is to determine whether the plaintiffs have proposed a 'natural' class--a class that encompasses all of the people and claims that one would expect to include in a class action, as opposed to proposing a class that appears to be gerrymandered solely to avoid federal jurisdiction by leaving out certain potential class members or claims. If the federal court concludes evasive pleading is involved, that factor would favor the exercise of federal jurisdiction. On the other hand, if the class definition and claims appear to follow a 'natural' pattern, that consideration would favor allowing the matter to be handled by a state court.

Whether there is a 'distinct' nexus between: (a) the forum where the action was brought, and (b) the class members, the alleged harm, or the defendants- This factor is intended to take account of a major concern that led to this legislation--the filing of lawsuits in out-of-the-way 'magnet' state courts that have no real relationship to the controversy at hand. Thus, for example, if the majority of proposed class members and the defendant reside in the county where the suit is brought, the court might find distinct nexus exists. The key to this factor is the notion of there being a distinct nexus. If the selected forum's nexus to the controversy is shared by many other forums (e.g., some allegedly injured parties live in the locality, just as allegedly injured parties live in many other localities), the nexus is not distinct, and this factor would in that circumstance weigh heavily in favor of the exercise of federal jurisdiction over the matter.

Whether the number of citizens of the forum state in the proposed plaintiff class(es) is substantially larger than the number of citizens from any other state, and the citizenship of

the other members of the proposed class(es) is dispersed among a substantial number of states- This factor is intended to look at the geographic distribution of class members in an effort to gauge the forum state's interest in handling the litigation. To be subject to this inquiry, between one-third and two-thirds of the class members are citizens of the state in which the class action was filed and all of the primary defendants are also citizens of that state. If all of the other class members (that is, the class members who do not reside in the state where the action was filed) are widely dispersed among many other states (e.g., no other state accounted for more than five percent of the class members), that point would suggest that the interests of the forum state in litigating the controversy are preeminent (versus the interests of any other state). The Committee intends that such a conclusion would favor allowing the state court in which the action was originally filed to handle the litigation. However, if a court finds that the citizenship of the other class members is not widely dispersed, the opposite balance would be indicated. A federal forum would be favored in such a case because several states other than the forum state would have a strong interest in the controversy.

Whether one or more class actions asserting the same or similar claims on behalf of the same or other persons have been filed in the last three years- The purpose of this factor is efficiency and fairness: to determine whether a matter should be subject to federal jurisdiction so that it can be coordinated with other overlapping or parallel class actions. If other class actions on the same subject have been (or are likely to be) filed elsewhere, the Committee intends that this consideration would strongly favor the exercise of federal jurisdiction so that the claims of all proposed classes could be handled efficiently on a coordinated basis pursuant to the federal courts' multidistrict litigation process as established by 28 U.S.C. Sec. 1407. Under that process, it is likely that all class actions filed on an issue will be handled by a single tribunal that will, in any event, be facing the challenge of interpreting the varying state laws and assessing how they should be applied to the purported class claims. Thus, allowing a case to remain in federal court so that it may become part of that coordinated multi district litigation proceeding makes good sense. On the other hand, if other courts are unlikely to have to undertake the burden of handling the class claims and the state court appears positioned to handle the case in a manner that is respectful of state law variations, that consideration would favor remand of the matter to state court.

It is the Committee's intention that this factor be interpreted liberally and that plaintiffs not be able to plead around it with creative legal theories. If a plaintiff brings a product liability suit alleging consumer fraud or unjust enrichment, and another suit was previously brought against some of the same defendants alleging negligence with regard to the same product, this factor would favor the exercise of federal jurisdiction over the later-filed claim.

The following examples are intended to be illustrative of how these factors would work.

If a California state court class action were filed against a California pharmaceutical drug company on behalf of a proposed class of 60% California residents and 40% Nevada residents alleging harmful side effects attributable to a drug sold nationwide, it would make sense to leave the matter in federal court. The state laws that would apply in all of these cases would vary depending on where the drug was prescribed and purchased, such that allowing a single court to sort out such issues and handle the balance of the litigation would make sense both from an efficiency and federalism standpoint. These concerns would be even greater and the arguments for asserting jurisdiction stronger if another class action alleging similar side-effects has been filed in the last three years.

On the other hand, if a checking account fee disclosure class action were filed in a Nevada state court against a Nevada bank located in a border city and the class consisted of 65% Nevada residents and 35% California residents (who crossed the border to conduct transactions in the Nevada bank), it might make sense to allow that matter to proceed in

state court. It is likely that Nevada banking law would apply to all claims (even those of the California residents), since all of the transactions occurred in Nevada. And there is less likelihood that multiple actions will be filed around the country on the same subject, so as to give rise to a coordinating federal multidistrict litigation proceeding. Thus, the federalism concerns would be substantially diminished.

In sum, the Committee intends that these factors would permit a federal court, in its discretion, to allow a class action asserting primarily local claims under local law for what is primarily a local group of claimants to proceed in state court, particularly where the action has not been pleaded manipulatively to avoid federal jurisdiction and the case is not likely to become an 'orphan' that cannot be coordinated with similar class actions that are or, in the future, may be pending in federal court.

New subsection 1332(d)(4)(A) is the 'Local Controversy Exception' to the foregoing provisions that otherwise expand federal diversity jurisdiction over class actions. This subsection requires that federal diversity jurisdiction over a class action under the foregoing provisions be declined if the proponents of that view clearly demonstrate that each and every of the following criteria are satisfied in the case at issue: (1) more than 2/3 of class members are citizens of forum state; (2) there is at least one in-state defendant from whom significant relief is sought by members of the class and whose conduct forms a significant basis of plaintiffs' claims; (3) the principal injuries resulting from the alleged conduct, or related conduct, of each defendant were incurred in the state where the action was originally filed; and (4) no other class action asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons has been filed during the preceding three years.

This provision is intended to respond to concerns that class actions with a truly local focus should not be moved to federal court under this legislation because state courts have a strong interest in adjudicating such disputes. At the same time, this is a narrow exception that was carefully drafted to ensure that it does not become a jurisdictional loophole. Thus, the Committee wishes to stress that in assessing whether each of these criteria is satisfied by a particular case, a federal court should bear in mind that the purpose of each of these criteria is to identify a truly local controversy--a controversy that uniquely affects a particular locality to the exclusion of all others.

The first criterion--that greater than two-thirds of all class members in the aggregate are citizens of the State in which the action was originally filed--is a critical inquiry for determining whether the matter is a local controversy. The proponents of applying the exception thus must demonstrate that a supermajority of the class members are local in the sense that they all reside in the forum state.

Under the second criterion, there must be at least one real local defendant. By that, the Committee intends that the local defendant must be a primary focus of the plaintiffs' claims-- not just a peripheral defendant. The defendant must be a target from whom significant relief is sought by the class (as opposed to just a subset of the class membership), as well as being a defendant whose alleged conduct forms a significant basis for the claims asserted by the class. For example, in a consumer fraud case alleging that an insurance company incorporated and based in another state misrepresented its policies, a local agent of the company named as a defendant presumably would not fit this criteria. He or she probably would have had contact with only some of the purported class members and thus would not be a person from whom significant relief would be sought by the plaintiff class viewed as a whole. Obviously, from a relief standpoint, the real demand of the full class in terms of seeking significant relief would be on the insurance company itself. Similarly, the agent presumably would not be a person whose alleged conduct forms a significant basis for the claims asserted. At most, that agent would have been an isolated role player in the alleged scheme implemented by the insurance company. 126

[Footnote] In this instance, the real target in this action (both in terms of relief and alleged conduct) is the insurance company, and if that company is not local, this criterion would not be met.

[Footnote 126: The Committee wishes to stress that the presence of conspiracy allegations should not alter this inquiry. For example, if in the hypothetical discussed here, the class alleges that the agent conspired with the insurance company with respect to the alleged scheme, it theoretically would expose the agent to potential liability to the entire class. But that would not change the relatively minor role that the agent played in the overall misconduct that is alleged and would not change the fact that the agent is not the real target of the litigation, which is the inquiry contemplated by this criterion.]

The third criterion is that the principal injuries resulting from the actions of all the defendants must have occurred in the state where the suit was filed. By this criterion, the Committee means that all or almost all of the damage caused by defendants' alleged conduct occurred in the state where the suit was brought. The purpose of this criterion is to ensure that this exception is used only where the impact of the misconduct alleged by the purported class is localized. For example, a class action in which local residents seek compensation for property damage resulting from a chemical leak at a manufacturing plant in that community would fit this criterion, provided that the property damage was limited to residents in the vicinity of the plant. However, if the defendants engaged in conduct that could be alleged to have injured consumers throughout the country or broadly throughout several states, the case would not qualify for this exception, even if it were brought only as a single-state class action.

The fourth and final criterion is that no other class action involving similar allegations has been filed against any of the defendants over the last three years on behalf of the same or other persons. In other words, if a controversy results in the filing of multiple class actions, it is a strong signal that those cases may not be of the variety that this exception is intended to address. As such, it is a test for assessing whether a controversy is localized. The Committee wishes to stress that another purpose of this criterion is to ensure that overlapping or competing class actions or class actions making similar factual allegations against the same defendant that would benefit from coordination are not excluded from federal court by the Local Controversy Exception and thus placed beyond the coordinating authority of the Judicial Panel on Multidistrict Litigation. The Committee also wishes to stress that the inquiry under this criterion should not be whether identical (or nearly identical) class actions have been filed. The inquiry is whether similar factual allegations have been made against the defendant in multiple class actions, regardless of whether the same causes of actions were asserted or whether the purported plaintiff classes were the same (or even overlapped in significant respects).

The following two examples are intended to illustrate how the Committee intends this provision to work:

A class action is brought in Florida state court against a Florida funeral home regarding alleged wrongdoing in burial practices. Nearly all the plaintiffs live in Florida (about 90 percent). The suit is brought against the cemetery, a Florida corporation, and an out-of-state parent company that was involved in supervising the cemetery. No other class action suits have been filed against the cemetery. This is precisely the type of case for which the Local Controversy Exception was developed. Although there is one out-of-state defendant (the parent company), the controversy is at its core a local one, and the Florida state court where it was brought has a strong interest in resolving the dispute. Thus, this case would remain in state court.

A class action is brought in Florida against an out-of-state automobile manufacturer and a

few in-state dealers, alleging that a certain vehicle model is unsafe because of an allegedly defective transmission. The vehicle model was sold in all fifty states but the class action is only brought on behalf of Floridians. This case would not fall within the Local Controversy Exception for two reasons. First, the automobile dealers are not defendants whose alleged conduct forms a significant basis of the claims or from whom significant relief is sought by the class. Even if the plaintiffs are truly seeking relief from the dealers, that relief is just small change compared to what they are seeking from the manufacturer. Moreover, the main allegation is that the vehicles were defective. In product liability cases, the conduct of a retailer such as an automobile dealer does not form a significant basis for the claims of the class members. Second, the case falls outside the Local Controversy Exception because the 'principal injuries resulting from the alleged conduct,'--i.e., selling a vehicle with a defective transmission--were incurred in all fifty states. The fact that the suit was brought as a single-state class action does not mean that the principal injuries were local. In other words, this provision looks at where the principal injuries were suffered by everyone who was affected by the alleged conduct--not just where the proposed class members were injured. Thus, any defendant could remove this case to federal court.

New subsection 1332(d)(5)(A) and (B) specify, respectively, that S. 5 does not extend federal diversity jurisdiction to class actions in which (a) the primary defendants are states, state officials, or other governmental entities against whom the district court may be foreclosed from ordering relief ('state action' cases) or (b) the number of members of all proposed plaintiff classes in the aggregate is fewer than 100 class members ('limited scope' cases). The purpose of the 'state action' cases provision is to prevent states, state officials, or other governmental entities from dodging legitimate claims by removing class actions to federal court and then arguing that the federal courts are constitutionally prohibited from granting the requested relief. This provision will ensure that cases in which such entities are the primary targets will be heard in state courts that do not face the same constitutional impediments to granting relief. The 'limited scope' cases provision is intended to allow class actions with relatively few claimants to remain in state courts. 127

[Footnote]

[Footnote 127: Under federal law, a purported class action may involve as few as 21 class members. See, e.g., Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1553 (l1th Cir. 1986) (noting that classes encompassing fewer than 21 persons normally are not subject to class certification); Tietz v. Bowen, 695 F. Supp. 441,445 (C.D. Cal. 1987) (certifying class with 27 class members).]

Federal courts should proceed cautiously before declining federal jurisdiction under the subsection 1332(d)(5)(A) 'state action' case exception, and do so only when it is clear that the primary defendants are indeed states, state officials, or other governmental entities against whom the 'court may be foreclosed from ordering relief.' In making such a finding, courts should apply the guidance regarding the term 'primary defendants' discussed below. The Committee wishes to stress that this provision should not become a subterfuge for avoiding federal jurisdiction. In particular, plaintiffs should not be permitted to name state entities as defendants as a mechanism to avoid federal jurisdiction over class actions that largely target non-governmental defendants. Similarly, the subsection 1332(d)(5)(B) exception for 'limited scope' cases (actions in which there are fewer than 100 class members) should also be interpreted narrowly. For example, in cases in which it is unclear whether 'the number of members of all proposed plaintiff classes in the aggregate is less than 100,' a federal court should err in favor of exercising jurisdiction over the matter.

Pursuant to new subsection 1332(d)(6), the claims of the individual class members in any class action shall be aggregated to determine whether the amount in controversy exceeds the sum or value of $5,000,000 (exclusive of interest and costs). The Committee intends this subsection to be interpreted expansively. If a purported class action is removed pursuant to

these jurisdictional provisions, the named plaintiff(s) should bear the burden of demonstrating that the removal was improvident (i.e., that the applicable jurisdictional requirements are not satisfied). And if a federal court is uncertain about whether 'all matters in controversy' in a purported class action 'do not in the aggregate exceed the sum or value of $5,000,000,' the court should err in favor of exercising jurisdiction over the case.

By the same token, the Committee intends that a matter be subject to federal jurisdiction under this provision if the value of the matter in litigation exceeds $5,000,000 either from the viewpoint of the plaintiff or the viewpoint of the defendant, and regardless of the type of relief sought (e.g., damages, injunctive relief, or declaratory relief). The Committee is aware that some courts, especially in the class action context, have declined to exercise federal jurisdiction over cases on the ground that the amount in controversy in those cases exceeded the jurisdictional threshold only when assessed from the viewpoint of the defendant. For example, a class action seeking an injunction that would require a defendant to restructure its business in some fundamental way might 'cost' a defendant well in excess of $75,000 under current law, but might have substantially less 'value' to a class of plaintiffs. Some courts have held that jurisdiction does not exist in this scenario under present law, because they have reasoned that assessing the amount in controversy from the defendant's perspective was tantamount to aggregating damages. Because S. 5 explicitly allows aggregation for purposes of determining the amount in controversy in class actions, that concern is no longer relevant.

The Committee also notes that in assessing the jurisdictional amount in declaratory relief cases, the federal court should include in its assessment the value of all relief and benefits that would logically flow from the granting of the declaratory relief sought by the claimants. For example, a declaration that a defendant's conduct is unlawful or fraudulent will carry certain consequences, such as the need to cease and desist from that conduct, that will often 'cost' the defendant in excess of $5,000,000. Or a declaration that a standardized product sold throughout the nation is 'defective' might well put a case over the $5,000,000 threshold, even if the class complaint did not affirmatively seek a determination that each class member was injured by the product.

Overall, new section 1332(d) is intended to expand substantially federal court jurisdiction over class actions. Its provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant.

As noted above, it is the intent of the Committee that the named plaintiff(s) should bear the burden of demonstrating that a case should be remanded to state court (e.g., the burden of demonstrating that more than two-thirds of the proposed class members are citizens of the forum state). Allocating the burden in this manner is important to ensure that the named plaintiffs will not be able to evade federal jurisdiction with vague class definitions or other efforts to obscure the citizenship of class members. The law is clear that, once a federal court properly has jurisdiction over a case removed to federal court, subsequent events generally cannot 'oust' the federal court of jurisdiction. 128

[Footnote] While plaintiffs undoubtedly possess some power to seek to avoid federal jurisdiction by defining a proposed class in particular ways, they lose that power once a defendant has properly removed a class action to federal court.

[Footnote 128: See, e.g., St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 293 (1938).]

For purposes of class actions that are subject to subsections 1332(d)(3) and (d)(5)(A), the Committee intends that 'primary defendants' be interpreted to reach those defendants who are the real 'targets' of the lawsuit--i.e., the defendants that would be expected to incur most

of the loss if liability is found. Thus, the term 'primary defendants' should include any person who has substantial exposure to significant portions of the proposed class in the action, particularly any defendant that is allegedly liable to the vast majority of the members of the proposed classes (as opposed to simply a few individual class members).

It is the Committee's intention with regard to each of these exceptions that the party opposing federal jurisdiction shall have the burden of demonstrating the applicability of an exemption. Thus, if a plaintiff seeks to have a class action remanded under section 1332(d)(4)(A) on the ground that the primary defendants and two-thirds or more of the class members are citizens of the home state, that plaintiff shall have the burden of demonstrating that these criteria are met by the lawsuit. Similarly, if a plaintiff seeks to have a purported class action remanded for lack of federal diversity jurisdiction under subsection 1332(d)(5)(B) ('limited scope' class actions), that plaintiff should have the burden of demonstrating that 'all matters in controversy' do not 'in the aggregate exceed the sum or value of $5,000,000, exclusive of interest and costs' or that 'the number of all proposed plaintiff classes in the aggregate is less than 100.'

The Committee understands that in assessing the various criteria established in all these new jurisdictional provisions, a federal court may have to engage in some fact-finding, not unlike what is necessitated by the existing jurisdictional statutes. The Committee further understands that in some instances, limited discovery may be necessary to make these determinations. However, the Committee cautions that these jurisdictional determinations should be made largely on the basis of readily available information. Allowing substantial, burdensome discovery on jurisdictional issues would be contrary to the intent of these provisions to encourage the exercise of federal jurisdiction over class actions. For example, in assessing the citizenship of the various members of a proposed class, it would in most cases be improper for the named plaintiffs to request that the defendant produce a list of all class members (or detailed information that would allow the construction of such a list), in many instances a massive, burdensome undertaking that will not be necessary unless a proposed class is certified. Less burdensome means (e.g., factual stipulations) should be used in creating a record upon which the jurisdictional determinations can be made.

New subsection 1332(d)(7) clarifies that the citizenship of members of proposed classes would be determined as of the date the action was filed. Thus, questions about whether two-thirds of the members of a proposed class were citizens of a particular state would be determined as of that date. The only exception is where the original complaint does not indicate the existence of federal jurisdiction and plaintiffs later serve paper (particularly an amended complaint) that creates such citizenship or makes it evident. Then, consistent with the approach in existing section 1446(b), the 'snapshot' of class membership citizenship is taken as of the date on which that new paper is served.

New subsection 1332(d)(8) clarifies that the diversity jurisdiction provisions of this section shall apply to any class action before or after the entry of a class certification order by the court. The purpose of this provision is to confirm that both pre- and post-certification class actions shall be subject to the jurisdictional and removal provisions of S. 5. The Committee wishes to make clear that this provision is not intended to alter the deadlines for removal in the current Judicial Code or as are established by this legislation. This section is merely intended to indicate that the status of a class action (certified or uncertified) should not affect the removability of a case as otherwise permitted by the applicable removal statutes.

Pursuant to new subsection 1332(d)(9), the Act excepts from new subsection 1332(d)(2)'s grant of original jurisdiction those class actions that solely involve claims that relate to matters of corporate governance arising out of state law. The purpose of this provision is to avoid disturbing in any way the federal vs. state court jurisdictional lines already drawn in the securities litigation class action context by the enactment of the Securities Litigation Uniform Standards Act of 1998 (P.L. 105-353).

The Committee intends that this exemption be narrowly construed. By corporate governance litigation, the Committee means only litigation based solely on (a) state statutory law regulating the organization and governance of business enterprises such as corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and business trusts; (b) state common law regarding the duties owed between and among owners and managers of business enterprises; and (c) the rights arising out of the terms of the securities issued by business enterprises.

This exemption would apply to a class action relating to a corporate governance claim filed in the court of any state. Consequently, it would apply to a corporate governance class action regardless of the forum in which it may be filed, and regardless of whether the law to be applied is that of the State in which the claim is filed.

For purposes of this exemption, the phrase 'the internal affairs or governance of a corporation or other form of business enterprise' is intended to refer to the internal affairs doctrine defined by the U.S. Supreme Court as 'matters peculiar to the relationships among or between the corporation and its current officers, directors and shareholders. * * *' 129

[Footnote] The phrase 'other form of business enterprise' is intended to include forms of business entities other than corporations, including, but not limited to, limited liability companies, limited liability partnerships, business trusts, partnerships and limited partnerships.

[Footnote 129: Edgar v. MITE Corp., 457 U.S. 624, 645 (1982). See also Draper v. Paul N. Gardner Defined Plan Trust, 625 A.2d 859, 865-66 (Del. 1993); McDermott, Inc. v. Lewis, 531 A.2d 206, 214-15 (Del. 1987); Ellis v. Mutual Life Ins. Co., 187 So. 434 (Ala. 1939); Amberjack Ltd. Inc. v. Thompson, 1997 WL 613676 (Tenn. App. 1997); NAACP v. Golding, 679 A.2d 554,559 (Ct. App. Md. 1996); Hart v. General Motors Corp., 517 N.Y.S.2d 490, 493 (App. Div. 1987).]

The subsection 1332(d)(9) exemption to new section 1332( d) jurisdiction is also intended to cover disputes over the meaning of the terms of a security, which is generally spelled out in some formative document of the business enterprise, such as a certificate of incorporation or a certificate of designations. The reference to the Securities Act of 1933 contained in new subsection 1332(d)(8)(A) is for definitional purposes only. Since that law contains an already well-defined concept of a 'security,' this provision simply imports the definition contained in the Securities Act.

New subsection 1332(d)(10) provides that for purposes of this new section and section 1453 of title 28, an unincorporated association shall be deemed to be a citizen of a state where it has its principal place of business and the state under whose laws it is organized. This provision is added to ensure that unincorporated associations receive the same treatment as corporations for purposes of diversity jurisdiction. The U.S. Supreme Court has held that '[f] or purposes of diversity jurisdiction, the citizenship of an unincorporated association is the citizenship of the individual members of the association.' 130

[Footnote] This rule 'has been frequently criticized because often * * * an unincorporated association is, as a practical matter, indistinguishable from a corporation in the same business.' 131

[Footnote] Some insurance companies, for example, are 'inter-insurance exchanges' or 'reciprocal insurance associations.' For that reason, federal courts have treated them as unincorporated associations for diversity jurisdiction purposes. Since such companies are nationwide companies, they are deemed to be citizens of any state in which they have insured customers. 132

[Footnote] Consequently, these companies can never be completely or even minimally diverse in any case. It makes no sense to treat an unincorporated insurance company differently from, say, an incorporated manufacturer for purposes of diversity jurisdiction. New subsection 1332(d)(10) corrects this anomaly.

[Footnote 130: United Steelworkers of America v. R.H. Bouligny, Inc., 382 U.S. 145 (1965).]

[Footnote 131: See, e.g., 14 A.L.R. Fed. 849 (2004) (noting dissatisfaction with the prevailing rule and citing one leading authority that commented that 'many unincorporated associations bear functional resemblances to corporations * * * [and] the diversity citizenship status of such associations [i]s 'anomalous' in view of the fictional citizenship accorded to corporations and in view of the fact that many states treat these associations as juridical entities, and has emphatically called upon Congress to provide that where unincorporated associations have entity status under state law, they should be treated analogously to corporations for purposes of diversity jurisdiction').]

[Footnote 132: See Tuck v. United Services Automobile Ass'n, 859 F.2d 842 (10th Cir. 1988); Baer v. United Services Automobile Ass'n, 503 F.2d 393 (2d Cir. 1974); Truck Insurance Exchange v. The Dow Chemical Co., 331 F. Supp. 323 (W.D. Mo. 1971).]

New subsection 1332(d)(11) expands federal jurisdiction over mass actions--suits that are brought on behalf of numerous named plaintiffs who claim that their suits present common questions of law or fact that should be tried together even though they do not seek class certification status. Mass action cases function very much like class actions and are subject to many of the same abuses.

Under subsection 1332(d)(11), any civil action in which 100 or more named parties seek to try their claims for monetary relief together will be treated as a class action for jurisdictional purposes. Thus, if such a civil action met the other diversity jurisdictional prerequisites set forth for class actions in this legislation, that civil action would be subject to federal jurisdiction, subject to several exceptions. A mass action meeting the other applicable federal diversity jurisdiction criteria would not be eligible for federal jurisdiction if any of the following criteria are satisfied by the action:

All the claims asserted in the action arise out of an event or occurrence in the state where the suit is filed and the injuries were incurred in that state and contiguous states (e.g., a toxic spill case);

The defendants (not the plaintiffs) sought to join the claims;

The claims are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a state statute specifically authorizing such an action; or

The claims have been consolidated or coordinated solely for pretrial purposes.

Subsection 1332(d)(11)(B)(i) includes a statement indicating that jurisdiction exists only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under section 1332(a). The Committee notes that the intent of this proviso is as follows. If a mass action satisfies the criteria set forth in the section (that is, it involves the monetary relief claims of 100 or more persons that are proposed to be tried jointly on the ground that the claims involve common questions of law or fact and it meets the tests for federal diversity jurisdiction otherwise established by the legislation), it may be removed to a federal court, which is authorized to exercise jurisdiction over the action. Under the proviso, however, it is the Committee's intent that any claims that are included in the mass action

that standing alone do not satisfy the jurisdictional amount requirements of Section 1332(a) (currently $75,000), would be remanded to state court. Subsequent remands of individual claims not meeting the section 1332 jurisdictional amount requirement may take the action below the 100-plaintiff jurisdictional threshold or the $5 million aggregated jurisdictional amount requirement. However, so long as the mass action met the various jurisdictional requirements at the time of removal, it is the Committee's view that those subsequent remands should not extinguish federal diversity jurisdictional over the action.

Under subsections 1332(d)(11)(C) and (D), respectively, a mass action removed to a federal court under this provision may not be transferred to another federal court under the MDL statute (28 U.S.C. Sec. 1407) unless a majority of the plaintiffs request such a transfer, and the statute of limitations for any claims that are part of a mass action will be tolled while the mass action is pending in federal court.

The Committee find that mass actions are simply class actions in disguise. They involve a lot of people who want their claims adjudicated together and they often result in the same abuses as class actions. In fact, sometimes the abuses are even worse because the lawyers seek to join claims that have little to do with each other and confuse a jury into awarding millions of dollars to individuals who have suffered no real injury.

For these reasons, it is the Committee's intent that the exceptions to this provision be interpreted strictly by federal courts. The first exception would apply only to a truly local single event with no substantial interstate effects. The purpose of this exception was to allow cases involving environmental torts such as a chemical spill to remain in state court if both the event and the injuries were truly local, even though there are some out-of-state defendants. By contrast, this exception would not apply to a product liability or insurance case. The sale of a product to different people does not qualify as an event. And the alleged injuries in such a case would be spread out over more than one state (or contiguous states)-- even if all the plaintiffs in the particular case come from one state.

The third exception addresses a very narrow situation, specifically a law like the California Unfair Competition Law, which allows individuals to bring a suit on behalf of the general public. Such a suit would not qualify as a mass action. However, the vast majority of cases brought under other states' consumer fraud laws, which do not have a parallel provision, could qualify as removable mass actions.

The final exception would apply to claims that are consolidated or coordinated solely for pretrial proceedings. If a number of individually filed cases are consolidated solely for pretrial proceedings--and not for trial--those cases have not truly been merged in a way that makes them mass actions warranting removal to federal court. On the other hand, if those same cases are consolidated exclusively for trial, or for pretrial and trial purposes, and the result is that 100 or more persons' claims will be tried jointly, those cases have been sufficiently merged to warrant removal of such a mass action to federal court.

In addition, this provision is in no way intended to abrogate 28 U.S.C. 1367 or to narrow current jurisdictional rules in any way. Thus, if a federal court believed it to be appropriate, the court could apply supplemental jurisdiction in the mass action context as well.

The following example is intended to illustrate how this provision would work.

Two hundred people jointly file a mass action in West Virginia against a Pennsylvania drug manufacturer and also name a local drugstore. Three of them assert claims for $1 million each, and the rest assert claims of $20,000. The federal court would have jurisdiction over the mass action because there are more than 100 plaintiffs, there is minimal diversity, the total amount in controversy exceeds $5 million and a product liability case does not qualify for the 'local' occurrence exception in the provision. The Committee then intends for the

judge to consider closely which claims meet the $75,000 minimum, noting that plaintiffs often seek to minimize what they are seeking in a complaint so they can stay in state court. For example, sometimes plaintiffs leave their claim for punitive damages off the original complaint to make it seem like their claims are smaller than they really are. It is the Committee's expectation that a federal judge would read a complaint very carefully, and only remand claims that clearly do not meet the amount-in-controversy threshold. If it is likely that a plaintiff is going to turn around in a month and add a claim for punitive damages, the federal court should obviously assert jurisdiction over that individual's claims.

Section 5.--Section 5 establishes the procedures for removal of interstate class actions over which the federal court is granted original jurisdiction in new section 1332(d).

The general removal provisions currently contained in Chapter 89 of Title 28 would continue to apply to class actions, except where they are inconsistent with the provisions of the Act. For example, like other removed actions, matters removable under this bill may be removed only 'to the district court of the United States for the district and division embracing the place where such action is pending.' 133

[Footnote] However, the general requirement contained in section 1441(b) that an action be removable only if none of the defendants is a citizen of the state in which the action is brought would not apply to the removal of class actions under the jurisdictional provisions of section 1332(d). Imposing such a restriction on removal of class actions would subvert the intent of the Act because it would essentially allow a plaintiff to defeat removal jurisdiction by suing both in-state and out-of-state defendants. Such a restriction on removal of class actions would perpetuate the current 'complete diversity' rule for class actions that new section 1332(d) rejects. The Act does not, however, disturb the general rule that a case can only be removed to the district court of the United States for the district and division embracing the place where the action is pending. 134

[Footnote] In addition, the Act does not change the application of the Erie Doctrine, which requires federal courts to apply the substantive law dictated by applicable choice-of-law principles in actions arising under diversity jurisdiction. 135

[Footnote]

[Footnote 133: See 28 U.S.C. Sec. 1441(a).]

[Footnote 134: Id.]

[Footnote 135: See Erie Railroad Co. v. Thompkins, 304 U.S. 64 (1938).]

New subsection 1453(b) provides that removal may occur without the consent of any other defendant. This revision to the removal rules will prevent a plaintiffs' attorney from recruiting a 'friendly' defendant (e.g., a local retailer) who could refuse to join in a removal to federal court and thereby thwart the legitimate efforts of the primary corporate defendant to seek a federal forum in which to litigate the pending claims. By this provision, it is the Committee's intent to overrule caselaw developed by the federal courts requiring the consent of all parties, 136

[Footnote] to the extent that such precedents might be applied to class actions subject to the expanded jurisdictional and removal provisions of S. 5.

[Footnote 136: See e.g., Hewitt v. City of Stanton, 798 F.2d 1230 (9th Cir. 1986); Mitchell v. Kentucky-American Water Co., 178 F.R.D. 140, 142 (E.D. Ky. 1997).]

New subsection 1453(c) provides that an order remanding a class action to state court is

reviewable by appeal at the discretion of the reviewing court. The purpose of this provision is to develop a body of appellate law interpreting the legislation without unduly delaying the litigation of class actions. As a general matter, appellate review of orders remanding cases to state court is not permitted, as specified by 28 U.S.C. 1447(d). New subsection 1453(c) provides discretionary appellate review of remand orders under this legislation but also imposes time limits. Specifically, parties must file a notice of appeal within seven days after entry of a remand order. In addition, the appeals court must issue a final decision on appeal within 60 days. However, the parties may agree to give the court more time, and the court may, on its own, avail itself of one ten-day extension.

The Committee notes that the current prohibition on remand order review was added to section 1447 after the federal diversity jurisdictional statutes and the related removal statutes had been subject to appellate review for many years and were the subject of considerable appellate level interpretive law. The Committee believes it is important to create a similar body of clear and consistent guidance for district courts that will be interpreting this legislation and would particularly encourage appellate courts to review cases that raise jurisdictional issues likely to arise in future cases.

In order to be consistent with the exceptions to federal diversity jurisdiction granted under new section 1332(d), new subsection 1453(d) provides that the class action removal provisions shall not apply to claims involving covered securities or corporate governance litigation. In addition, claims concerning a covered security, as defined in section 16(f)(3) of the Securities Act of 1933 or section 28(f)(5)(E) of the Securities Exchange Act of 1934, are excepted from the class action removal rule as well. These are essentially claims against the officers of a corporation for a precipitous drop in the value of its stock, based on fraud. Because Congress has previously enacted legislation governing the adjudication of these claims, 137

[Footnote] it is the Committee's intent not to disturb the carefully crafted framework for litigating in this context. Thus, claims involving covered securities are excluded from the new section 1332(b) jurisdiction. The parameters of this subsection are intended to be conterminous with new subsection 1332(d)(9).

[Footnote 137: See Public Law 104-67, the 'Private Securities Litigation Reform Act of 1995,' and Public Law 105-353, the 'Securities Litigation Uniform Standards Act of 1998.']

Section 5 also amends Section 1446(b) to clarify that the provisions in that section prohibiting the removal of cases more than one year after their commencement do not apply to class actions. Thus, removals taken under these revised provisions for class actions may be taken more than one year after commencement of the action at issue. This change is intended to prevent attorneys from engaging in the type of gaming that occurs under the current class action system. In the most extreme example, a plaintiffs' attorney could file suit under current law against a friendly defendant, triggering the start of the one-year limitation after which removal may not be sought under any condition. One year and one day after filing suit, the plaintiff's attorney could then serve an amended complaint on an additional defendant, at which time it would be too late for that new defendant to remove the case to federal court--regardless of whether diversity jurisdiction exists and irrespective of the practical merits of the case. The same unfair result would also occur if plaintiffs' counsel dismisses non-diverse parties or increases the amount of damages being pled after the one-year deadline. By allowing class actions to be removed at any time when changes are made to the pleadings that bring the case within section 1332(d)'s requirements for federal jurisdiction, this provision will ensure that such fraudulent pleading practices can no longer be used to thwart federal jurisdiction. It is not the intention of the Committee to change section 1446(b)'s requirements that an action must be removed within thirty days of being served with the initial pleading or thirty days after receipt of an amended pleading, motion, order or other paper from which it may be ascertained that the case is one which is or has

become removable.

Section 6.--Section 6 directs the Judicial Conference of the United States, with the assistance of the Director of the Federal Judicial Center and the Director of the Administrative Office of the United States Courts, to prepare and transmit to the Committees on the Judiciary of the Senate and House of Representatives a report on class action settlements. The report shall contain recommendations on the best practices that courts can use to ensure that proposed class action settlements are fair to the class members that these settlements are supposed to benefit. In addition, the report shall contain recommendations on the best practices that courts can use to ensure that fees and expenses awarded to attorneys in connection with a class action settlement appropriately reflect the extent to which counsel obtained full redress for the injuries alleged in the complaint, and the time, expense and risk devoted to the litigation. Finally, the report shall identify the actions that the Judicial Conference has taken and intends to take toward having the federal judiciary implement the recommendations in the report.

Section 6 contains a provision stating that nothing in the Act shall be construed to alter the authority of the federal courts to supervise the award of attorneys' fees. It is the Committee's intent not to disrupt the federal courts' broad discretion to approve attorneys' fees based on fairness determinations, notwithstanding contractual arrangements between attorneys and their clients.

Section 7- Section 7 provides that the enactments of the Judicial Conference recommendations shall take effect on the date of enactment of this Act or on December 1, 2003 (as specified in that order), whichever occurs first. This provision is a relic from an earlier version of this legislation and is of no effect since the recommendations have already been enacted.

Section 8.--Section 8 clarifies that nothing in the bill restricts the authority of the Judicial Conference and Supreme Court to implement new rules relating to class actions. Section 8 is intended to ensure that the bill not be interpreted as restricting in any way the ongoing efforts of the federal Judicial Conference's Advisory Committee on Civil Rules and Standing Committee on Rules and Procedure to promulgate improved rules governing class actions.

Section 9.--Section 9 provides that the amendments made by the Act shall apply to any civil action commenced on or after the date of enactment.

VII. CRITICS CONTENTIONS AND REBUTTALS

Critics' Contention No. 1: S. 5 would transfer nearly every class action from state to federal court and would add to the overwhelming workload faced by our federal courts.

Response:

During Committee debate on previous versions of this bill, the most frequently expressed concern was that its jurisdictional provisions would overload the federal judiciary. That argument, however, ignores three key facts. First, the bill will not move most class actions to federal court. Second, many state courts, where the critics apparently would like to confine all interstate class actions, are more burdened than the federal courts, and are less equipped to deal with complex cases like class actions. Indeed, many state courts have comparatively crushing caseloads. Third, federal courts can handle duplicative class actions more efficiently through multidistrict litigation proceedings.

First, a recent study debunked the myth promoted by some of the bill's critics that S. 5 will move nearly all class actions to federal court. 138

[Footnote] The study looked at the only six states that had data readily available on on-line databases and found that more than 50 percent of the class actions for which there were rulings during a five-year period would not be removable to federal court under the Class Action Fairness Act. 139

[Footnote] By contrast, the study found that in Madison County, Illinois, more than 85 percent of the cases would be removable to federal court under the bill. 140

[Footnote] Put simply, the study found that The Class Action Fairness Act is a narrowly tailored bill that will not overwhelm the federal judiciary. Rather, the bill leaves most legitimately local disputes in state court, while ensuring that large, interstate class actions like those typically brought in Madison and St. Clair counties and other magnet courts can be heard in federal court.

[Footnote 138: John H. Beisner & Jessica Davidson Miller, There will be no Exodus: An Empirical Study of S. 2062's Effects on Class Actions, Mealey's Tort Reform Update (April 2004).]

[Footnote 139: Id. at 16.]

[Footnote 140: Id. at 20.]

Second, contrary to critics' contentions, the average state court judge is assigned three times as many cases as his or her federal counterparts. State court judges are assigned (on average) 1,568 new cases each year. 141

[Footnote] For example, in California, the average judge was assigned 1,546 cases in 2003. In Florida, the average was 2,206. In New Jersey, the average was 2,810 cases. And in Texas, it was 1,701 cases. In contrast, each federal court judge was assigned an average of just 483 new cases during the twelve-month period ending September 30, 2003. 142

[Footnote]

[Footnote 141: Examining the Work of State Courts at 12.]

[Footnote 142: See Federal Court Management.]

Critics of the bill also ignore the fact that many state courts are tribunals of general jurisdiction--they hear all sorts of cases, including divorce matters, custody disputes, name change petitions, traffic violations, small claims contract disputes, minor misdemeanors, and major felonies. Thus, when a class action is filed before those courts, it diminishes the court's ability to provide a broad array of very basic legal services for the local community. The judges presiding over those state courts have far fewer resources for dealing with huge, complex cases, like class actions.

Federal court judges usually have two or three law clerks; state court judges often have none. And federal court judges usually can delegate aspects of their cases (e.g., discovery issues) to magistrate judges or special masters; state court judges typically lack such resources.

Third, critics also overlook the fact that even if both court systems were similarly burdened, federal courts could still deal with class actions more efficiently for two reasons. First, federal courts can coordinate 'copy cat' or overlapping class actions. The record before the Committee indicates that it is not uncommon to see twenty, thirty, or even 100 class actions filed on the same subject matter. Sometimes, competing lawyers file these cases; other times, they are filed by the same lawyers who are simply forum-shopping for the most

receptive judge. When these similar, overlapping class actions are filed in state courts of different jurisdictions, there is no way to consolidate or coordinate the cases. The result is enormous waste, to say nothing of the unfairness. Defendants are forced to defend the same case in many different courts. And class members are harmed because the various class counsel compete with each other to achieve the best settlement for the lawyers. In contrast, if overlapping or similar class actions are filed against the same defendant in two or more different federal courts, the multidistrict litigation process (established by 28 U.S.C. Sec. 1407) permits the transfer and consolidation of those cases to a single judge. The federal court multidistrict litigation system regularly consolidates multiple overlapping class actions in this manner, preventing the waste that occurs in state courts.

Finally, critics who focus on the federal courts' workload are missing the point--class actions are precisely the kind of cases that should be heard in federal court. Class actions usually involve the most people, most money, and most interstate commerce issues. They also usually involve issues of nationwide implications. Interstate class actions are certainly no less deserving of a federal forum than the 2,525 cases heard in federal court each year to recover a few thousand dollars in defaulted student loans, or the 17,952 federal personal injury cases (e.g., single person medical malpractice cases). 143

[Footnote] Ultimately, regardless of the impact on the federal court caseload, large interstate class actions belong in federal court.

[Footnote 143: See Administrative office of the U.S. Courts, Judicial Business of the United States Courts 2003 (2004) ('Judicial Business'), at 129-31.]

Critics' Contention No. 2: Abuses of class actions exist in both federal and state courts, and allowing more interstate class actions to be heard in federal court thus will not solve any problems.

Response:

At congressional hearings on the subject of class actions, witness after witness provided compelling evidence that serious abuses of the class device are occurring primarily in state courts. 144

[Footnote]

[Footnote 144: See generally Class Action Lawsuits: Examining Victim Compensation and Attorneys' Fees, Hearings Before the Subcommittee on Administrative Oversight and the Courts of the Senate Committee on the Judiciary, 105th Cong. (1997); Hearings on Mass Torts and Class Actions Before the Subcommittee on Courts and Intellectual Property of the House Committee on the Judiciary, 105th Cong. (1998), Hearing on H.R. 1875, The Class Action Jurisdiction Act of 1999 Before the House Committee on the Judiciary, 106th Cong. (1999).]

Moreover, several studies also indicate that the class action abuse problem, particularly with respect to class settlements, is primarily a state court issue. For example, a detailed Federal Judicial Center study concluded that '[i]n most [class actions handled by federal courts subject to the study], net monetary distributions to the class exceeded attorneys' fees by substantial margins.' 145

[Footnote] In stark contrast, an Institute for Civil Justice/RAND study indicated that in state court consumer class action settlements not involving personal injuries, class counsel typically walk off with more money than all of the class members combined. 146

[Footnote] The ICJ/RAND study offered three compelling rationales for allowing more

interstate class actions to be heard by federal courts:

[Footnote 145: Federal Judicial Center, Empirical Study of Class Actions in Four Federal District Courts 68-69 (1996).]

[Footnote 146: Class Action Dilemmas, at 19.]

(1) 'federal judges scrutinize class action allegations more strictly than state judges, and deny certification in situations where a state judge might grant it improperly;'

(2) 'state judges may not have adequate resources to oversee and manage class actions with a national scope;' and

(3) 'if a single judge is to be charged with deciding what law will apply in a multi state class action, it is more appropriate that this take place in federal court than in a state court.' 147

[Footnote]

[Footnote 147: Id. at 28.]

While some abuses do occur in federal court, the extent to which they take place in no way even approaches the level of abuse evidencing itself in state court. Indeed, it is interesting that while few state court systems have attempted to address class action abuses, the federal court system, which has far less of a problem in the first place, has invested considerable effort in developing new rules reflecting best practices that courts should follow in handling class litigation, particularly in the settlement context. Those revisions, enacted last year, 148

[Footnote] will dovetail with the 'consumer bill of rights' provisions in S. 5 to bolster federal court safeguards in the proper handling of class action cases.

[Footnote 148: See Amendments to Federal Procedural Rules, 71 U.S.L.W. 4253, 4254-55 (U.S. Apr. 1, 2003) (Supreme Court order amending rules pursuant to Rules Enabling Act).]

Critics' Contention No. 3: To date, the only mechanism that has been successful in imposing liability on some industries, such as the tobacco or firearms industries, has been class action lawsuits. Allowing removal of state class actions to federal court will destroy the impact that class actions are having on these socially irresponsible businesses. Therefore, we should exempt certain industries from the diversity and removal provisions of S. 5.

Response:

Opponents of S. 5 would prohibit federal courts from exercising jurisdiction over those class actions brought against certain industries, including HMOs, tobacco companies, nursing homes, and firearms manufacturers. In addition, opponents have suggested that claims arising from state consumer protection statutes or state environmental protection laws should be exempt from the bill as well.

However, industry-specific exemptions from federal jurisdiction make no sense. Like bills of attainder, such exemptions irrationally single out a specific industry and slam the federal courthouse door in its face. The proposal to carve out certain legitimate, yet presently unpopular, industries contradicts the constitutional purposes of federal diversity jurisdiction-- to allow interstate businesses to have claims against them heard in federal court under diversity so as to avoid local biases and to promote and enhance, rather than hamper, interstate commerce. The notion that certain industries are less entitled to federal court protection is utterly inconsistent with the purpose and goals of diversity jurisdiction. Simply

put, there should not be one set of rules for one category of defendants and another for another group of defendants.

Moreover, there is no evidence that plaintiffs will be less successful in litigating their class action claims in federal court. 149

[Footnote] Class actions against unpopular corporate defendants, such as the firearms and tobacco industry have successfully proceeded in Federal court, and have resulted in beneficial judgments and settlements for the plaintiff classes. For example, the class action that is touted as the only real success the class counsel have had against the firearms industry 150

[Footnote] turns out to be a federal court class action. 151

[Footnote] Assuming that a case is a meritorious class action asserting meritorious claims, there is no reason to believe such a case heard by a federal court would have an outcome different from a state court case, particularly given that the federal court normally would apply the same state substantive law as a state court considering the same case.

[Footnote 149: Indeed, there is no evidence that plaintiffs' counsel believe that they must file in state court in order to succeed. Tobacco class actions prove this point. Of the purported class actions on tobacco issues initiated in recent years, many were originally filed in federal courts. Moreover, there is no evidence that classes are more likely to be certified in state courts. The reality is that the vast majority of courts--both federal and state courts--that have considered the issue have denied certification of proposed tobacco classes. The state court certification denials include: In re Tobacco Cases II, No. JCCP-4042, slip op. (Md. Ct. App. May 16, 2000); Reed v. Philip Morris, Inc., No. 96-5070, slip op. (D.C. Super. Ct. July 23, 1999); Philip Morris, Inc. v. Angeletti, No. 961450501 CE212596, slip op. (Md. Ct. App. May 16, 2000); Taylor v. American Tobacco Co., No. 97715975, slip op. (Mich. Cir. Ct. Jan. 20, 2000); Contentino v. Philip Morris, Inc., No. MID-L-5135-97, slip op. (N.J. Super. Ct. Oct. 26, 1998); Small v. Lorilard Tobacco Co., 6791 N.Y.S.2d 593 (App. Div. 1998), aff'd, 698 N.Y.S.2d 615 (1999); and Geizer v. American Tobacco Co., 696 N.Y.S.2d 345 (1999). At least three federal courts have certified tobacco-related classes: In re Simon II Litig., 212 F. Supp. 2d 57 (E.D.N.Y. 2002) (certifying nationwide punitive damages class of smokers' claims against tobacco companies) (appeal pending); Iron Workers Local Union No. 17 Insurance Fund v. Philip Morris Inc., 182 F.R.D. 523 (N.D. Ohio 1998); Northwest Laborers-Employers Health & Security Trust Fund v. Philip Morris Inc., 1997 U.S. Dist. LEXIS 21299 (W.D. Wash. Dec. 24, 1997). In addition, a U.S. Magistrate Judge recommended certification of a class in Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc., 188 F.R.D. 365 (D. Or. 1998), but that recommendation was never acted upon by the district court judge. Three state courts (two in Florida and one in Louisiana) have certified tobacco-related classes: R.J. Reynolds Tobacco Co. v. Engle, 672 So.2d 39 (Fla. Ct. App. 1996) (affirming the trial court's certification of tobacco class); Broin v. Philip Morris Cos., 641 So. 2d 888 (Fla. Ct. App. 1996) (ordering trial court to certify tobacco class); Scott v. American Tobacco Co., 725 So. 2d 10 (La. Ct. App. 1998) (affirming trial court certification of tobacco class). However, a Florida appeals court has decertified the Engle classe see Liggett Group, Inc. v. Engle, 853 So. 2d 434 (Fla. Ct. App. 2003), and the matter is under review by the Florida Supreme Court, see 873 So. 2d 1222 (Fla. 2004). Thus, the scorecard is basically even; there is no evidence that class members will be treated differently in state court.]

While critics have pointed to the two Florida tobacco class actions as evidence that state courts will somehow be tougher on the tobacco industry, there is no real support for this contention. In the first tobacco class action to reach conclusion after a class was certified and the matter was tried (Broin, a Florida state court case), the matter ultimately settled. But the class members received no money at all. Under the terms of settlement, they obtained only a 'right to sue' individually. Meanwhile, the class counsel were awarded $49 million (on the basis of a medical research contribution made by defendants). Counsel for one of the class

members who protested the settlement reportedly commented: 'It's mind-boggling that a court would permit this kind of settlement to go ahead. What is the class getting out of this? Nothing.' The Legal Intelligencer, Sept. 22, 1999, at 4. The second case, Engle v. R.J. Reynolds Tobacco Co., received a lot of publicity because the jury awarded a $145 billion verdict to the class of Florida smokers. However, as noted above, the verdict was vacated after an appeals court found that trying the plaintiffs' claims on a classwide basis was improper. Engle, 853 So. 2d 434 (Fla. Ct. App. 2003), review granted, 873 So. 2d 1222 (Fla 2004).

Moreover, there is no evidence that tobacco cases would be tried more quickly in state courts. It took six years to get the first tobacco class action to trial in state court; the second took more than four years. The average time to trial in federal court civil cases is shorter.

Finally, it is clear that certain opponents of the bill are trying to single-out certain unpopular industries, such as the firearms industry, because they are unpopular. But that is exactly what the Framers of the Constitution were trying to avoid. They were trying to ensure a fair, even-handed federal court forum for defendants that may otherwise be haled into a local court less concerned about protecting the rights of an out-of-state company.

[Footnote 150: 145 Congo Rec. H8577 (Sept. 23, 1999 (floor debate on H.R. 1789) (Rep. Nadler asserting that a '1995 class action against Remington Arms * * * settled for $31.5 million * * * [and] led to the implementation of greater safety protections or owners of shotguns').]

[Footnote 151: See Garza v. Sporting Goods Properties, Inc., 1996 U.S. Dist. LEXIS 2009 (W.D. Tex. Feb. 6, 1996) (approving class settlement).]

Critics' Contention No. 4: S. 5 should exclude civil rights cases, in order to ensure that civil rights plaintiffs have maximum access to our courts.

Response:

Critics who would exclude civil rights cases from the scope of S. 5 have it backwards.

First, an amendment that would affirmatively exclude civil rights cases from federal jurisdiction would be contrary to a long tradition of encouraging the availability of our federal courts to address civil rights claims. Indeed, Congress has already enacted several statutes that are intended to ensure that civil rights cases can be heard in federal courts. For example, one statute permits removal to federal court of a broad range of civil rights actions. 152

[Footnote] And more importantly, one general jurisdiction statute--28 U.S.C. Sec. 1343-- provides broad federal jurisdiction over a whole host of civil rights claims (e.g., any action 'for injury to person or property or because of the deprivation of any right or privilege of a citizen of the United States,' any action 'to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights'). Indeed, that section provides original federal jurisdiction over any action 'to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens.'

[Footnote 152: 28 U.S.C. Sec. 1443.]

Second, the assumption of the amendment that federal courts are clogged and unable to handle civil rights cases has no basis. Indeed, as discussed above, the federal court workload issue is overblown, ignoring the burdens that class actions place on ill equipped state courts.

Several of our federal judicial districts may need additional resources. Wherever that need has been confirmed, additional resources should be provided (as they were in 1999 and again in 2002, when new permanent and temporary federal district court judgeships were added). But those spot shortages are no excuse for continuing to deny both consumers and corporations their due process rights by keeping interstate class actions a state court monopoly.

Third, federal courts have a long record of certifying discrimination class actions and approving hefty settlements in such cases. The most generous racial discrimination class action settlements in recent years--like the Home Depot gender discrimination case settlement (which paid class members about $65 million) and the $192 million Coca-Cola race discrimination settlement (in which each class member was guaranteed a recovery of at least $38,000)--were achieved in and approved by federal courts. These cases stand in stark contrast to the typical state court class action, in which consumers are lucky if they get a $5 coupon.

Finally, civil rights litigants have nothing to fear from federal judges. Federal judges, under Article III of the Constitution, are appointed for life. One reason the Framers designed the federal judiciary that way was to protect federal judges from political pressure and ensure that they would provide equal treatment to minority groups with less political power. It is thus no accident that federal courts have issued decisions like Brown v. Board of Education that, although unpopular at the time, paved the way for future civil rights laws like Title VII and Section 1983.

Critics' Contention No. 5: S. 5 would unfairly tilt the playing field by providing an advantage to defendant corporations at the expense of consumers.

Response:

This concern mischaracterizes the content and intent of the bill. S. 5 is court reform--not tort reform. It would simply allow federal courts to handle more interstate class actions. It makes no changes in substantive law whatsoever. Critics of S. 5 erroneously argue that the bill would reverse the ordinary presumption that a plaintiff chooses his or her own court. Yet, in this context, there is no such presumption. In fact, the whole purpose of diversity jurisdiction is to preclude any such presumption by allowing state-law based claims to be removed from local courts to federal courts, so as to ensure that all parties can litigate on a level playing field and thereby protect interstate commerce interests. 153

[Footnote]

[Footnote 153: See, e.g., Peaset v. Peck, 59 U.S. (18 How.) 518, 520 (1856).]

Article III of the Constitution ensures that there will be a fair, uniform, and efficient forum (a federal court) for adjudicating interstate commercial disputes, so as to nurture interstate commerce. Some scholars have persuasively argued that diversity jurisdiction, of all the powers exercised under the Constitution, has had the greatest influence in melding the United States into a single nation, by fostering interstate commerce, communication and the uninterrupted flow of capital for investment into various parts of the Union, and sustaining the public credit and the sanctity of private contracts. 154

[Footnote]

[Footnote 154: See John J. Parker, The Federal Constitution and Recent Attacks Upon It, 18 A.B.A. J. 433, 437 (1932).]

S. 5 promotes these important constitutional norms. The statutory 'gatekeeper' for federal

diversity jurisdiction--28 U.S.C. Sec. 1332--generally allows federal courts to hear cases that are large (that is, cases with large 'amounts in controversy') and that have interstate implications (that is, cases involving citizens from multiple jurisdictions). These requirements were intended to ensure that diversity jurisdiction is preserved for those cases with significant interstate and economic impacts. Class actions would normally satisfy these requirements because they usually involve big dollar amounts and parties from multiple jurisdictions. Yet, because section 1332 was enacted prior to the existence of the modern-day class action, it does not take into account the unique circumstances presented by class actions. Consequently, section 1332, as presently drafted, tends to exclude the overwhelming majority of class actions from federal courts, while inviting into federal courts much smaller single-plaintiff cases having few (if any) interstate ramifications. Such a result is inconsistent with the federal judiciary's proper jurisdictional role. S. 5 would correct this technical problem and thereby promote the underlying goals of diversity jurisdiction.

As former Clinton Administration Acting Solicitor General Walter Dellinger has testified in congressional hearings, if Congress were to now re-write the federal diversity jurisdiction statute, interstate class actions undoubtedly would be one of the first categories of cases to be included within the scope of the statute. 155

[Footnote] This makes plain sense insofar as class action lawsuits typically involve more people, more money, and more interstate commerce issues than any other type of case. S. 5 will simply fix the technical problem in section 1332 and judicial interpretation of the diversity requirements that keep most class actions in state court.

[Footnote 155: See Hearings on H.R. 1875, statement of Walter E. Dellinger.]

Critics' Contention No. 6: S. 5 will limit the capacity to use class actions as private attorneys general actions to deter corporate wrongdoing.

Response:

During past Committee debates, some members have opposed expanding federal jurisdiction over class actions on the ground that doing so would limit the use of class actions as private attorney general actions--as a deterrent to corporate wrongdoing. As one member stated, the purpose of a class action is to 'dissuade. It is the same reason that we have treble damages.' 156

[Footnote] In the view of that member, 'the most important function that class actions serve is to allow private attorneys general to step forward and hold corporations accountable for decisions that affect the public safety.' 157

[Footnote]

[Footnote 156: See transcript of markup, Senate Judiciary Committee on S. 353, p. 19:2-17 (June 29, 2000) (statement of Joseph R. Biden, Jr., U.S. Senate).]

[Footnote 157: Id.]

The problem with this argument is that for all of the reasons discussed above, S. 5 will not limit the legitimate use of class actions at all. But more fundamentally, there is no historical basis for the assertion that class actions were intended to create this private attorney general device.

Although a few courts have over the years referred to the deterrent effects of class actions, the promulgation history of the current Rule 23 of the Federal Rules of Civil Procedure reflects no intent to create a private attorney general device. In recent years, members of

the Advisory Committee on Civil Rules that developed the current version of the rule have testified that Rule 23 was not intended to serve that purpose. In testimony before the Advisory Committee on Civil Rules in 1996, the Hon. William T. Coleman, Jr., specifically denounced the proposition that 'a purpose of Rule 23 is to hand a private attorney general's badge to any counsel who wants it.' 158

[Footnote] He also stated that

[Footnote 158: Advisory Committee Working Papers (vol. 4), at 456.]

back in 1966, that was not the intended purpose of Rule 23(b)(3). If there is interest in deputizing all attorneys everywhere to enforce our laws, that's a matter that should be decided by Congress, not through the class action provisions in the Federal Rules of Civil Procedure. The courts' tolerance for this vigilante-style use of class actions is a root cause of the abuses that must be correct. 159

[Footnote]

[Footnote 159: Id.]

In congressional testimony several years ago, Prof. John P. Frank, another 1966 Advisory Committee member, sounded similar sentiments:

What I wish to call to your attention is what I think is a serious problem here: that the class action rule, wholly without regard to its original purpose, has become something of a device for social administration, which should never have been the product of the rules at all. These are matters which should be handled by the Congress and by administrative agencies, and not attempted efforts to govern various parts of the economy by lawsuits which give more to the counsel * * * that they do to those who should benefit from them.

I particularly adopt the statement of the chair of the [Advisory Committee on Civil Rules] at the present time, Judge Paul Niemeyer * * * in which he says: 'I believe that Rule 23 was never intended to be a rule to enhance enforcement of substantive claims. Such legitimization should, in my judgment, be effected by Congress, and congress might well conclude * * * that it is too anarchical to authorize private attorneys to self-appoint themselves as enforcers of law without adequate accountability to the lawmakers or the public.' 160

[Footnote]

[Footnote 160: Mass Torts and Class Action Lawsuits: Hearing before the Subcom. On Courts and Intellectual Property of the House Committee on the Judiciary, 105th Cong., 2d Sess. 20-21 (March 5, 1998) (statement of John P. Frank, Esq.).]

Even if the critics were correct that deterrence was an intended purpose of class actions, that assertion is self-defeating because, in the Committee's view, the concept of class actions serving a 'private attorney general' or other enforcement purpose is illegal. If the intended purpose of Rule 23 was to empower private attorneys to act as 'attorneys general,' the rule plainly bestows substantive rights not otherwise available under common or statutory law. Interpreted in this way, the rule runs afoul of the Rules Enabling Act, 161

[Footnote] which forbids federal courts from adopting 'rules of practice and procedure' that may 'abridge, enlarge or modify any substantive right.' To the extent that class actions are characterized as having a private attorney general purpose, there are strong arguments that Rule 23 is simply null and void. 162

[Footnote]

[Footnote 161: 28 U.S.C. Sec. 2072(b).]

[Footnote 162: The federal courts have frequently rejected efforts to use the Federal Rules of Civil Procedure to expand substantive rights. See e.g., In re Baldwin-United Corp. 770 F.2d 328, 335 (2d Cir. 1985) (rejecting arguments that Fed. R. Civ. P. 23 could be used as authorizing issuance of an injunction to protect class members); Synanon Church v. United States, 557 F. Supp. 1329, 1330 n.2 (D.D.C. 1983) (rejecting argument that Fed. R. Civ. P. 57 creates right to jury trials in declaratory judgment actions). Cf. Douglas v. NCNB Nat'l Bank, 979 F.2d 1128, 1130 & n.2 (5th Cir. 1992) (declining to apply Fed. R. Civ. P. 13(a) where doing so would 'abridge as lender's substantive rights and enlarge the debtor's substantive rights'). Similar views have been expressed by state courts. See, e.g., Southwestern Refinery Co. v. Bernal, 22 S.W. 3d 425, 432 (Tex. 2000) ('[C]lass actions do not exist in some sort of alternative universe outside our normal jurisprudence. Our procedural rules provide otherwise: the form of an action under the rules must not 'enlarge or diminish any substantive rights or obligations of any parties to any civil action.') (quoting Tex. R. Civ. P. 815).]

Critics' Contention No.7: S. 5 will result in delays for injured consumers.

Response:

This criticism stems from baseless concerns about the federal courts' caseload and the possible impact of this legislation on the ability of the federal courts to resolve these cases in a timely manner. However, as noted above, the average state court judge is assigned three times as many cases as his or her federal counterparts. Thus, to the extent that caseloads affect how quickly cases are resolved, the problems are much worse in state court than in federal court. For all of the reasons set forth previously, there is no basis for arguing that S. 5 would overwhelm the federal courts with class action cases and thereby adversely affect the ability of consumers to find timely redress for their injuries in federal court.

Notably, the evidence available shows that federal courts move more quickly than state courts. A study conducted last year by the Federal Judicial Center found that state courts are far more likely than federal courts to let class actions linger without ruling on class certification. 163

[Footnote] (The study also found that federal courts certify classes at approximately the same rate as state courts.) Moreover, the median time for final disposition of a civil claim filed in federal court is just 9.3 months, and the median time to trial in a civil matter in federal court is 22.5 months. 164

[Footnote] There is no evidence that on average, state courts proceed more quickly, even though most state court cases are less complicated than federal court cases.

[Footnote 163: Federal Judicial Center, The Impact of Amchem and Ortiz on Choice of a Federal or State Forum in Class Action Litigation: A Report to the Advisory Committee on Civil Rules Regarding a Case-Based Survey of Attorneys (April 2004) (2004 Federal Judicial Center Study).]

[Footnote 164: See Judicial Business.]

In addition, there is no basis for the claim that the bill's appeal provision would slow down litigation. To the contrary, the bill includes strict time limits to ensure that appeals of remand orders will not meaningfully delay litigation of class actions.

Finally, as noted above, federal courts can also resolve duplicative class actions more efficiently by consolidating them. Plaintiffs' lawyers frequently file copycat class actions in various state courts around the country, clogging judges' dockets and forcing judges to duplicate each other's work. Unlike state courts, federal courts can take advantage of multi-district consolidation procedures that enable one judge to consolidate dozens of class actions and resolve them far more efficiently. This is yet another way in which The Class Action Fairness Act will speed up justice--not slow it down.

In sum, there simply is no basis to the claims that consumers will be worse off in federal court, or that the resolution of class actions will be delayed because of the federal judiciary's workload.

Critics' Contention No. 8: S. 5 will trample on the rights of states to manage their legal systems, thus undermining the principles of federalism that our system of government is built upon.

Response:

While some critics have alleged that this bill will somehow undermine federalism principles, exactly the opposite is true. S. 5 has been carefully crafted to correct a problem in the current system that does not promote traditional concepts of federalism. In fact, it is the current system and the wave of state court class actions that has trampled on the rights of states to manage their legal systems by allowing state court judges to interpret and apply the laws of multiple jurisdictions. When state courts preside over class actions involving claims of residents of more than one state, they frequently dictate the substantive laws of other states, sometimes over the protests of those other jurisdictions (as discussed previously). When that happens, there is little those other jurisdictions can do, since the judgment of a court in one state is not reviewable by the state court of another jurisdiction.

It is far more appropriate for a federal court to interpret the laws of various states (a task inherent in the constitutional concept of diversity jurisdiction), than for one state court to dictate to other states what their laws mean or, even worse, to impose its own state law on a nationwide case. Why should a state court judge elected by the several thousand residents of a small county in Alabama tell New York or California the meaning of their laws? Why should an Illinois state court judge interpret decisions by Virginia or Wisconsin courts? Why should a state court judge be able to overrule other state laws and policies? Why should state courts be setting national policy?

S. 5 simply allows more class action cases filed in state court to be removed to federal court. S. 5 does not change substantive law--it is, in effect, a procedural provision only. As such, class action decisions rendered in federal court should be the same as if they were decided in state court--under the Erie doctrine, federal courts must apply state substantive law in diversity cases. Moreover, if federal court judges are not familiar with state law on a particular issue, they have the authority to ask a state court to 'certify' a question of law e.g., to advise them how a state's laws should be applied in an uncharted situation. This procedure allows the federal courts to apply state law appropriately and gives states the ability to manage their legal systems without becoming bound by other states' interpretations of their laws.

In short, contrary to critics' contentions, the real harm to federalism is the status quo--leaving the bulk of class action cases in state court. Federal courts are the appropriate forum to decide interstate class actions involving large amounts of money, many plaintiffs and interstate commerce disputes, and these matters of interstate comity are more appropriately handled by federal judges appointed by the President and confirmed by the Senate. S. 5 simply restores this proper balance by resolving an anomaly of diversity jurisdiction. True to the concept of federalism, S. 5 appropriately leaves certain 'intrastate' class actions in state

court: cases involving small amounts in controversy; cases with a class of 100 plaintiffs or less; cases involving plaintiffs, defendants and governing law all from the same state; cases against states and state officials; and certain securities and corporate governance cases. As such, S. 5 promotes the concept of federalism and protects the ability of states to determine their own laws and policies for their citizens.

Critics' Contention No. 9: S. 5 assumes that federal courts will not engage in the same 'false federalism' that state courts are accused of fostering. There really is no evidence that in the class action context, federal courts will intrude less on the states' rights to interpret their own laws than have state courts.

Response:

A principal purpose of the Class Action Fairness Act is to correct what former Acting Solicitor General Walter Dellinger has labeled a wave of 'false federalism.' As he testified before the Senate Judiciary Committee last July, the problem is that 'many state courts faced with interstate class actions have undertaken to dictate the substantive laws of other states by applying their own laws to * * * other states, resulting in a breach of federalism principles. * * *'

As discussed previously, a prime example of this situation is the Avery case, 165

[Footnote] in which defendant State Farm allegedly breached auto insurance policies nationwide by requiring the use of less expensive non-original equipment manufacturer parts ('non-OEM parts') in repairing accident-damaged vehicles. The Illinois state court certified a nationwide class, and at trial, a jury rendered a $1.3 billion verdict against State Farm.

[Footnote 165: Avery v. State Farm Mut. Auto Insurance Co., 746 N.E.2d 1242, 1254 (Ill. Ct. App. 2001).]

The case is noteworthy on the 'false federalism' issue because the court applied Illinois consumer protection law to all class claims in the case. It did so even though Illinois law on this subject contravened the laws and policies of other states in which some class members lived--laws and policies encouraging (or even requiring) insurers to use less expensive, non-OEM parts in making accident repairs as a means of containing auto insurance costs. In affirming the verdict, an Illinois state appellate court acknowledged that it had disregarded 'state insurance commissioners [who] testified that the laws in many of our sister states permit and in some cases * * * [even] encourage' usage of non-OEM parts. 166

[Footnote] The New York Times reported that the decision effectively 'overturn[ed] insurance regulations * * * in New York, Massachusetts, and Hawaii, among other places' establishing 'what amounts to a national rule on insurance.' 167

[Footnote] As discussed previously, Avery is not an isolated occurrence. Numerous state courts have trampled on these federalism principles, all in an effort to certify classes that should not be certified. 168

[Footnote]

[Footnote 166: Id. at 1254.]

[Footnote 167: See Matthew J. Wald, Suit Against Auto Insurer Could Affect Nearly All Drivers, N.Y. Times, Sept. 27, 1998, Sec. 1, at 29.]

[Footnote 168: See, e.g., Ysbrand v. DaimlerChrysler Corp., 81 P. 3d 618 (Okla. 2003) (affirming certification of nationwide product liability class, applying the law of one state to all

claims); Peterson v. BASF Corp., 657 N.W.2d 853 (Minn. Ct. App. 2003), aff'd, 675 N.W.2d 57 (Minn. 2004) (affirming nationwide consumer protection act case, applying the law of one state to all claims).]

A premise of the Class Action Fairness Act is that this problem can be corrected by expanding federal jurisdiction over interstate class actions, the theory being that federal courts will not engage in 'false federalism' games. But what proof is there that the federal courts will not similarly botch these critical choice-of-law issues?

In reality, there is ample evidence that the federal courts will not engage in the 'false federalism' that is so rampant in state court class actions. To start, it should be noted that the lead federal court--the U.S. Supreme Court--has repeatedly warned that courts should not attempt to apply the laws of one state to behaviors that occurred in other jurisdictions:

'Laws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extra-territorial effect only by the comity of the other States.' Huntington v. Attrill, 146 U.S. 657,669 (1892).

'[I]t would be impossible to permit the statutes of [one State] to operate beyond the jurisdiction of that State * * * without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends.' New York Life Ins. Co. v. Head, 234 U.S. 149, 161 (1914).

'A state does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that state.' Bigelow v. Virginia, 421 U.S. 809, 824 (1975).

States should not apply their own laws to matters with which they have no significant contact. Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 821-22 (1985).

And on April 7, 2003, the U.S. Supreme Court again warned state courts on this issue, striking down one state's effort to apply its laws to conduct that occurred elsewhere: 'A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction.' State Farm Mut. Auto. Ins. Co. v. Campbell, 2003 WL 1791206 (U.S. Apr. 7, 2003).

Unlike many state courts, federal courts have consistently heeded the Supreme Court's admonitions. The record shows that in the class action context, federal courts have been extremely respectful of the interests of each state in having its laws applied (as appropriate) to its own residents, particularly in recognizing the substantial variations of those laws in the class action context.

In recent years, numerous federal courts (applying the choice-of-law doctrines of various jurisdictions) have considered which laws should apply in proposed nationwide class actions asserting state law-based claims. Those courts have consistently concluded that in a nationwide or multi-state class action, the choice-of-law rules of the state in which the action was originally filed must be applied. 169

[Footnote] Further, they have consistently concluded that those choice-of-law rules must be applied to 'each plaintiffs claims.' 170

[Footnote] Based on those principles, federal courts have consistently concluded that the laws of all states where purported class members were defrauded, injured, or purchased the

challenged product or service must come into play. 171

[Footnote] And in those very few instances in which a federal district court has toyed with the idea of engaging in 'false federalism' (i.e., applying a single state's law to all asserted claims), that notion has been reversed on appeal almost immediately. 172

[Footnote]

[Footnote 169: See, e.g., In re Bridgestone/Firestone, Inc. Prods. Liab. Litig., 288 F.3d 1012 (7th Cir. 2002), cert. denied sub nom. Gustafton v. Bridgestone/Firestone, Inc., 537 U.S. 1105 (2003).]

[Footnote 170: See, e.g., Georgine v. Amchem Prods., 83 F.3d 610, 627 (3d Cir. 1996), aff'd sub nom. Amchem Prods. v. Windsor, 521 U.S. 591 (1997).]

[Footnote 171: See, e.g., Georgine, 83 F.3d at 627; Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1187-90 (9th Cir. 2001); Zapka v. Coca-Cola Co., No. 99 CV 8238, 2000 U.S. Dist. LEXIS 16552, at *11-13 (N.D. Ill. Oct. 26, 2000); Fisher v. Bristol-Myers Squibb Co., 181 F.R.D. 365, 369 (N.D. Ill. 1998); Dhamer v. Bristol-Myers Squibb Co., 183 F.R.D. 520, 532-34 (N.D. Ill. 1998); Jones v. Allercare, Inc., 203 F.R.D. 290, 307 (N.D. Ohio 2001); In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. 332, 346-54 (D.N.J. 1997); Marascalco v. Int'l Computerized Orthokeratology Soc'y, Inc., 181 F.R.D. 331, 338-39 (N.D. Miss. 1998); In re Ford Motor Co. Bronco II Prods. Liab. Litig., 177 F.R.D. 360, 369-71 (E.D. La. 1997); In re Stucco Litig., 175 F.R.D. 210, 214, 215-217 (E.D.N.C. 1997); Ilhardt v. A.O. Smith Corp., 168 F.R.D. 613, 619-20 (S.D. Ohio 1996); Harding v. Tambrands Inc., 165 F.R.D. 623, 629-30, 631-32 (D. Kan. 1996); Walsh v. Ford Motor Co., 130 F.R.D. 260, 271-75 (D.D.C. 1990); Feinstein v. Firestone Tire & Rubber Co., 535 F.Supp. 595, 608 (S.D.N.Y 1982).]

[Footnote 172: See, e.g., In re Bridgestone/Firestone, Inc., 288 F.3d at 1024; Szabo v. Bridgeport Machines, Inc., 249 F.3d 672, 674-75 (7th Cir. 2001); Spenc v. Glock, GES.m.b.H., 227 F.3d 308, 313-15 (5th Cir. 2000); In re AM. Med. Sys., 75 F.3d 1069, 1085 (6th Cir. 1996); Castano v. American Tobacco Co.. 84 F.3d 734, 741-43, 739-50 (5th Cir. 1995); In re Rhome-Poulenc Rorer, Inc., 51 F.3d 1293, 1302 (7th Cir. 1995); Walsh v. Ford Motor Co., 807 F.2d 1000, 1017-19 (D.C. Cir. 1990).]

The bottom line is that over the past ten years, the federal court system has not produced any final decisions--not even one--applying the law of a single state to all claims in a nationwide or multi-state class action. And there are hundreds of federal court decisions (examples of which are set forth above) flatly rejecting arguments to use such a 'false federalism' choice-of-law approach--applying the laws of a single state to all claims in a multi-state case. That's the record that confirms that the passage of the Class Action Fairness Act will end the 'false federalism' game that is occurring in the state court class action arena.

Critics' Contention No. 10: S. 5 could deny plaintiff class members any meaningful ability to recover damages for their injuries.

Response:

In arguing that this bill would hurt consumers, some opponents have gone so far as to list several state court class actions which supposedly have served consumers well, inferring that removal of such cases to federal court is tantamount to a denial of justice. This argument assumes that the federal courts are inferior to state courts--that a federal court cannot arrive at a just outcome. If the cases cited by S. 5's opponents would not have had the same outcome in federal court as they did in state court, it is because the federal courts may have

been more careful to avoid the abuses of the system that occur in state courts. The only thing that would be denied when an interstate class action is removed to federal court is the plaintiffs' lawyers' ability to strike it rich on class actions that should not be certified by any court because they do not meet the requirements of a proper class.

Moreover, the claim that federal courts never certify class actions is unfounded. A study last year by the Federal Judicial Center found that federal courts certify classes at approximately the same rate as state courts. According to the study, class actions were 'almost equally likely to be certified' in the two systems: federal courts certified classes 22 percent of the time, while state courts certified classes 20 percent of the time. 173

[Footnote] The study also found that consumers fare better in federal court class actions. According to the report, the average recovery per class member was higher in federal court: $517 vs. $350. 174

[Footnote]

[Footnote 173: See 2004 Federal Judicial Center Study.]

[Footnote 174: Id.]

In fact, federal courts invented class actions and have led the way in using the device to redress grievances, particularly in the civil rights and consumer protection context. Federal courts certify numerous class actions for a broad range of claims including securities fraud, antitrust violations, and discrimination every year. 175

[Footnote] In addition, many of the cases in which federal courts certify classes involve state law claims (even though relatively few state law-based class actions can make it into federal court under current jurisdictional law. 176

[Footnote] For example:

[Footnote 175: See Responses To Written Questions From Senators Orrin G. Hatch and Charles E. Grassley to Walter Dellinger, Attachment A (list of exemplar cases in which federal courts have certified classes since 2001).]

[Footnote 176: Under current law, a purely state law-based class action normally can be heard in federal court only if each and every class members demands at least $75,000 in damages and none of the named plaintiffs have the same state citizenship of any of the named defendants. Since at least some class members in nearly all class actions seek less than $75,000 per class member or sue at least one non-diverse defendant, there are currently very few class action cases in federal court that involve exclusively state law claims.]

Recently a federal court in New York certified a class of New York residents and a nationwide class of plaintiffs who alleged that they were overcharged when they used their credit cards abroad. 177

[Footnote] Plaintiffs' claims were based on violations of New York law and common law fraud.

[Footnote 177: In re Currency Conversion Fee Antitrust Littg., 2004 U.S. Dist. LEXIS 24134 (S.D.N.Y. Dec. 2, 2004).]

A federal district court in Massachusetts certified a class consisting of Massachusetts plaintiffs who were employed as auto damage appraisers. 178

[Footnote] The plaintiffs alleged that they were not properly paid for overtime and sought recovery under Massachusetts law.

[Footnote 178: McLaughlin v. Liberty Mut. Ins. Co., 224 F.R.D. 304 (D. Mass. 2004).]

A federal district court in Texas certified a product liability class of plaintiffs whose infants had been administered the drug E-Ferol and alleged that they should have been warned of the risk of death associated with the drug. 179

[Footnote] Plaintiffs also alleged that the testing and approval process for the drug was flawed.

[Footnote 179: Klein v. O'Neal, Inc. 222 F.R.D. 564 (N.D. Tex. 2004).]

A federal district court in New York recently certified a statewide class of plaintiffs alleging violations of New York's consumer protection law in a case involving diamond pricing. 180

[Footnote]

[Footnote 180: Leider v. Ralfe, 2004 U.S. Dist. LEXIS 15345 (S.D.N.Y. 2004).]

A federal court certified a class of Tennessee residents who claimed defendants had violated various state consumer protection laws by failing to properly disclose the requirements for obtaining benefits under a long-term care insurance policy. 181

[Footnote]

[Footnote 181: Bradbery v. John Hancock Mutual Life Insurance Co., 217 F.R.D. 408 (W.D. Tenn. 2003).]

The federal court in this case certified a class of commercial lobstermen from New York and Connecticut who brought claims under various state laws, alleging that the use of certain insecticides by defendants caused massive lobster die-off. 182

[Footnote]

[Footnote 182: Fox v. Cheminova, Inc., 213 F.R.D. 113 (E.D.N.Y. 2003).]

A federal court recently certified a class of parking lot customers in Washington state who asserted claims against a collection agency under federal and state law. 183

[Footnote]

[Footnote 183: Hansen v. Ticket Track, Inc., 213 F.R.D. 412 (W.D. Wash. 2003).]

A federal court in Florida certified a class of consumers who entered into sales contracts with a funeral home. The class members alleged claims under federal and state law. 184

[Footnote]

[Footnote 184: Brown v. Funeral Services of Florida, Inc., 212 F.R.D. 602 (S.D. Fla. 2003).]

A federal court in Minnesota certified a nationwide class of plaintiffs who sought medical monitoring under various state laws for their allegedly defective heart valves. 185

[Footnote]

[Footnote 185: In Re St. Jude Medical Inc. Silzone Heart Valves Products Liability Litigation, 2003 U.S. Dist. LEXIS 5188 (D. Minn. March 27, 2003).]

A federal court certified a class of Montanans who alleged that their automobile insurer acted in bad faith. 186

[Footnote]

[Footnote 186: Burton v. Mountain West Farm Bureau Mutual Insurance Co., 2003 WL 1740461 (D. Mont. March 31, 2003).]

In Massachusetts, a federal court certified a six-state class action on behalf of homeowners who alleged their heating systems were defective. 187

[Footnote]

[Footnote 187: Payne v. Goodyear Tire & Rubber Co., 216 F.R.D. 21 (D. Mass. 2003).]

The federal district court for Rhode Island certified a nationwide class action brought on behalf of credit cardholders alleging that Fleet Bank violated federal and state laws in the manner in which it set payment due dates and posted payments to credit cards. 188

[Footnote]

[Footnote 188: Bond v. Fleet Bank (RI) N.A., 2002 U.S. Dist. LEXIS 22324 (D.R.I. October 10, 2002).]

In Michigan, a federal court certified a nationwide class of consumer borrowers alleging that Central Clearing's 'payday loan' transactions violated federal and state laws. 189

[Footnote]

[Footnote 189: Gilkey v. Central Clearing, 202 F.R.D. 515 (E.D. Mich. 2001).]

A federal district court certified a class of automobile insurance policy holders in the District of Columbia alleging violations of federal and state law. 190

[Footnote]

[Footnote 190: Wells v. Allstate Insurance Company, 210 F.R.D. 1 (D.D.C. 2002).]

A federal court certified a class of Pennsylvanians in a case brought on behalf of consumer debt holders alleging that the defendant sent out false and deceptive debt collection letters. The complaint alleged violations of federal and state laws. 191

[Footnote]

[Footnote 191: Oslan v. Collection Bureau of Hudson Valley, 206 F.R.D. 109 (E.D. Pa. 2002).]

A federal court certified a class action brought on behalf of former employees at a Pennsylvania plant, alleging that Tyson Foods failed to fully pay its employees. The complaint alleged violations of federal and state laws. 192

[Footnote]

[Footnote 192: DeAsencio v. Tyson Foods, 2002 U.S. Dist. LEXIS 13038 (E.D. Pa. July 17, 2002).]

While opponents of the bill cite cases that allegedly achieved greater justice in state court than they would have received if they had been removed to federal court, it is clear that this is pure speculation. In fact, federal courts have certified hundreds of cases for class treatment in recent years, and the rules governing the decision of whether cases may proceed as class actions are basically the same in federal and state courts. Further, under the Erie doctrine, federal courts apply state substantive law in diversity cases. Consequently, a removed class action should have the same substantive law applied to it, regardless of whether it is in federal or state court.

Additionally, strict analysis by courts in deciding whether a group of plaintiffs can proceed on a class basis should be encouraged, rather than discouraged. The purpose of the current requirements in Rule 23 and similar state court class action rules is to protect the due process rights of both plaintiffs and defendants. When judges indiscriminately certify class actions, unnamed plaintiffs lose important legal rights and can be denied appropriate awards for their injuries, and defendants become more vulnerable to frivolous and unjustifiably magnified class actions.

Allowing individual states to certify classes for their own citizens on particular issues could result in a denial of relief for the citizens of other states, particularly given the limited resources available to some defendants to satisfy all pending claims. For example. some hailed the now reversed punitive damages verdict in the Engle tobacco class action that continues to proceed in Florida Supreme Court. There, a Florida jury awarded $135 billion in punitive damages to a class of Florida residents. But if that verdict were upheld, citizens of other states might be denied any relief whatsoever on their claims against tobacco companies because the Florida residents (through their single state class action) would have taken all available money to pay their punitive damages claims. In short, Florida residents would have been paid billions of dollars in excess of what they claim for their real personal injury damages, while residents of all other states would not have even received what they claim to be owed for the basic personal injuries that they allege. As one commentator has noted.

This is what fuels the [state court class action] litigation lottery. If you are the first in line to demand punitive damages, you may receive awards in the billions. Injured parties in later [class actions] are likely to receive less. * * * They may receive nothing if the first award killed the company or the industry. None of this makes much sense. There is no reason why one group of litigants should, solely on the basis of residency in a particular state, receive the lion's share of damages to the deprivation of hundreds of thousands of other injured parties. Moreover, there is no reason why one state should be able to impose this result on other states when a problem and its victims are shared by the nation as a whole. 193

[Footnote]

[Footnote 193: Jonathan Turley, A Crisis of Faith: Tobacco and the Madisonian Democracy, 37 Harv. J. on Legis. 433, 475 (2000).]

Of course, this situation would not arise if S. 5 were passed, since all qualifying interstate class actions on a particular subject could be removed to federal court and consolidated before a single federal court judge under the multidistrict litigation mechanism described previously. That judge would be able to manage the proceeding to ensure that no group of litigants gained advantage over the others by virtue of their residency (or any other irrelevant factor).

A large quantity of class actions in state court, like the Broin tobacco case in Florida, results in millions of dollars for plaintiffs' counsel but nothing of any value for plaintiffs. An Institute for Civil Justice/RAND study has confirmed this pattern, finding that class counsel in state court consumer class action settlements, typically walk off with more money than all of the class members combined. 194

[Footnote] The ICJ/RAND study provides three compelling rationales for allowing more interstate class actions to be heard by federal courts: (1) 'federal judges scrutinize class action allegations more strictly than state judges, and deny certification in situations where a state judge might grant it improperly;' (2) 'state judges may not have adequate resources to oversee and manage class actions with a national scope;' and (3) 'if a single judge is to be charged with deciding what law will apply in a multistate class action, it is more appropriate that this take place in federal court than in a state court.' 195

[Footnote] S. 5 would help assure fairer settlements by allowing the federal courts to review more class action lawsuits, as well as by providing notice to state Attorneys General so they can better protect their citizens against unfair settlement agreements.

[Footnote 194: See Class Action Dilemmas, at 23.]

[Footnote 195: Id. at 28.]

Moreover, in contrast to many state courts, which have demonstrated a willingness to approve class action settlements where the bulk (if not all) of the benefits go to the lawyers, federal courts have certified numerous settlement classes in cases that involved alleged violations of state law. These cases typically result in real relief for the class members. Following are a few examples:

A federal district court in Texas certified a nationwide settlement class alleging violations of federal lending law and state consumer protection law. 196

[Footnote] The court approved a class settlement in which the defendants agreed to forgive $52 million in debt incurred by class members and establish a settlement fund totaling $11 million for monetary payments to plaintiffs who had repaid their loans. In addition, the defendants agreed to substantial restrictions on future lending activities.

[Footnote 196: Purdie v. Ace Cash Express, Inc., 2003 U.S. Dist. LEXIS 22547 (N.D. Tex. 2003).]

A federal district court in Ohio approved a nationwide settlement class in a products liability suit involving allegedly defective orthopedic implants. 197

[Footnote] The settlement fund, which provided for medical monitoring and research, totaled more than $1 billion.

[Footnote 197: In Re: Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation, 2002 U.S. Dist. LEXIS 21693 (N.D. Ohio 2002).]

In another case, a federal district court in Pennsylvania certified a nationwide settlement class of plaintiffs alleging consumer fraud and personal injuries related to two prescription diet drugs, fenfluramine and dexfenfluramine. 198

[Footnote] The settlement provided $3.75 billion for personal injury claims, medical monitoring and research. The class counsel agreed to limit their fees to about 9 percent of that.

[Footnote 198: In re Diet Drugs (Fen-Phen), 2000 U.S. Dist. LEXIS 12275 (E.D. Pa. 2000).]

Critics' Contention No. 11: S. 5 will cause delay and mass confusion because of (a) the difficulty of assessing compliance with jurisdictional requirements at the outset and (b) the potential that class membership and definitions will change over time.

Response

The contention that S. 5 (particularly its differing treatment of categories of cases when a suit is filed in the defendant's home state) would complicate and delay the final resolution of jurisdictional inquiries is absolutely groundless. In reality, the jurisdictional standards in S. 5 will simplify--not complicate--a court's jurisdictional inquiries. The critics forget that under the current standards, many (and possibly most) newly-filed state court class actions are removed to federal court to test whether the class counsel's efforts to evade federal jurisdiction have been successful (even though those removal attempts normally fail and the cases are remanded to state court). Those inquiries are often quite complicated and can create significant delays.

For example, as noted previously, counsel often include in their complaint extraneous parties in order to prevent the complaint from complying with the current 'complete diversity' requirement. Our federal courts have ruled that those arguably extraneous parties can be ignored in the jurisdictional analysis if their claims are meritless, 199

[Footnote] and quite frequently, the claims of those parties are challenged in class actions as part of the jurisdictional analysis, requiring the court to take time to engage in the complicated process of assessing the merits of their claims. Under current law, this time-consuming 'fraudulent joinder' issue arises in many purported class actions that are removed to federal court. 200

[Footnote]

[Footnote 199: See, e.g., Whitaker v. American Telecasting, Inc., 261 F.3d 196, 207 (2d Cir. 2001) ('In order to show that naming a non-diverse defendant is a 'fraudulent joinder' effected to defeat diversity [jurisdiction], the defendant must demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the plaintiff's pleadings, or that there is no possibility, based on the pleadings, that the plaintiff can state a cause of action against the non-diverse defendant in state court.') (citations omitted); Morris v. Princess Cruises, Inc., 236 F.3d 1061,1067 (9th Cir. 2001) ('Joinder of a non-diverse defendant is deemed fraudulent, and the defendant's presence in the lawsuit is ignored for purposes of determining diversity, '[i]f the plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state.') (citations omitted); Tillman v. R.J. Reynolds Tobacco, 253 F.3d 1302, 1305 (11th Cir. 2001) ('it is appropriate for a federal court to dismiss * * * [nondiverse] defendant and retain diversity jurisdiction if the complaint shows that there is no possibility that the plaintiff can establish any cause of action against [the] defendant'); Heritage Bank v. Redcom Laboratories, Inc., 250 F.3d 319 (5th Cir. 2001) (to similar effect).]

[Footnote 200: In recent years, many federal courts have been required to address fraudulent joinder issues in the context of class actions removed to federal court. See, e.g., Jamison v. Purdue Pharma CO., 251 F. Supp. 1315 (S.D. Miss. 2003) (mass action matter); Hardy v. Ducote, 246 F. Supp. 2d 509 (E.D. La. Jan. 20, 2003) Burns v. Friedli, 241 F. Supp. 2d 519 (D. Md. 2003); Moore v. Wyeth-Ayerst Labs., 236 F. Supp. 509 (D. Md. 2002); Shields v. Bridgestone/Firestone, Inc., 232 F. Supp. 2d 715 (E.D. Tex. 2002); Little v. Purdue Pharma, L.P., 227 F. Supp. 2d 838 (S.D. Ohio 2002) In re Diet Drugs Prods. Liab. Litig., 220 F. Supp. 2d 414 (E.D. Pa. 2002); Doherty v. Aventis Pasteur, Inc., 2002 U.S. Dist. LEXIS 9596 (N.D. Cal. May 15, 2002); Garcia v. Aventis Pasteur, Inc., 2002 U.S. Dist. LEXIS 15122

(W.D. Wash. Apr. 22, 2002); Ohler v. Purdue Pharma L.P., 2002 U.S. Dist. LEXIS 2368 (E.D. La. Jan. 22, 2002); Mead v. Aventis Pasteur, Inc., 2002 U.S. Dist. LEXIS 25645 (D. Or. Jan. 7, 2002).]

Similarly, the process of assessing whether a class action complies with the current jurisdictional amount requirement is also often 'an expensive and time consuming process,' 201

[Footnote] requiring discovery on the nature and value of the named plaintiffs' claims. As noted previously, in some federal Circuits, the jurisdictional amount requirement in a class action is satisfied by showing that any member of the proposed class is asserting damages in excess of $75,000, and in other Circuits, the question is whether each and every member of the putative class has individually an amount in controversy exceeding $75,000.' 202

[Footnote] Again, this time-consuming issue, often requiring significant amounts of record review and fact-finding, is litigated very frequently in the many class actions that are removed to federal court under current law. 203

[Footnote]

[Footnote 201: See C.A. Wright, A.R. Miller et al., Federal Practice and Procedure Sec. 3707, at 225 (1998).]

[Footnote 202: Id. Sec. 3705, at 65 (2003 Supp.).]

[Footnote 203: In recent years, many feral courts have had to resolve jurisdictional amount issues in resolving motions to remand class actions. See, e.g., In re Bridgestone/Firestone Inc Tires Prods. Liab. Litig., 256 F. Supp. 2d 884 (S.D. Ind. 2003); Adans v. Nationwide Mutual Ins. Co., 2003 U.S. Dist. LEXIS 4973 (N.D. Tex. Mar. 31, 2003); Kary v. Exxon/Mobil Corp., 2003 U.S. Dist. LEXIS 4599 (D.N.D. Mar. 19, 2003); Faircloth v. National Home Loan Corp., 313 F. Supp. 2d 544 (M.D.N.C. 2003), aff'd, 2004 US. App. LEXIS 1039 (4th Cir. 2004) Carric v. Sears, Roebuck and Co., 252 F. Supp. 2d 116 (M.D. Pa. 2003); Dash v. FirstPlus Home Loan Trust, 248 F. Supp. 2d 489(M.D.N.C. Mar. 6, 2003); Harris v. Physicians Mut. Ins. Co., 240 F. Supp. 3d 715 (N.D. Ohio 2003); Radlo v. Rhone-Poulenc, S.A., 241 F. Supp. 2d 61 (D. Mass. 2002); Shields v. Bridgestone/Fireston, Inc., 232 F. Supp. 2d 715 (E.D. Tex. 2002); Tremblay v. Philip Morris, Inc., 231 F. Supp. 2d 411 (D.N.H. 2002); Mentzel v. Comcast Cable Communications, 222 F. Supp. 2d 923 (E.D. Mich. 2002); Trapazzo v. Prudential Property & Casualty Ins. Co., 220 F. Supp. 2d 628 (E.D. Tex. 2002); Perotti v. Black & Decker, Inc., 205 F. Supp. 2d 813 (N.D. Ohio 2002); Perry v. Hartford Ins. Co. of the Midwest, 198 F. Supp. 2d 836 (E.D. Tex. 2002); City of University City, Missouri v. AT&T Wireless Services, Inc., 229 F. Supp. 2d 927 (E.D. Mo. 2002); Mehlenbacher v. Akzo Nobel Salt, Inc., 207 F. Supp. 2d 71 (W.D.N.Y. 2002); Perry v. Hartford Ins. Co. of the Midwest, 198 F. Supp. 2d 836 (E.D. Tex. 2002); Gavriles v. Verizon Wireless, 194 F. Supp. 2d 674 (E.D. Mich. 2002); Bethea v. St. Paul Guardian Ins. Co., 2002 U.S. Dist. LEXIS 15780 (E.D. La. Aug. 21, 2002); Nabal v. BJ's Wholesale Club, Inc., 2002 U.S. Dist. LEXIS 15106 (E.D. Pa. Aug. 1, 2002); Pope v. Independent Order of Foresters, 2002 U.S. Dist. LEXIS 13550 (W.D. Ky. July 23, 2002); Post v. General Motors Corp., 2002 U.S. Dist. LEXIS 9968 (S.D.N.Y. May 31, 2002); Sylvester v. Daimler Chrysler Corp., 2002 U.S. Dist. LEXIS 17989 (N.D. Ohio May 30, 2002); Green v. Party City Corp., 2002 U.S. DIst. LEXIS 7750 (C.D. Cal. Apr. 9, 2002); Cigna Healthcare of St Louis Inc., v. Kaiser, 181 F. Supp. 2d 914 (N.D. Ill. 2002) aff'd and modified in part, 294 F.3d 849 (7th Cir. 2002).]

In sum, S. 5 will make the resolution of class action jurisdictional issues easier--not harder. The need to deal with the bona fides of counsel's efforts to use dubious parties to avoid diversity will evaporate. In short, it will be much easier to figure out whether any class member is diverse as to any defendant (the 'minimal diversity' inquiry established by S. 5)

than resolving the fraudulent joinder issues regularly presented under the current rule ('complete diversity'). Likewise, it will be much easier to determine whether the amount in controversy presented by a purported class as a whole (that is, in the aggregate) exceeds $5 million than it is to assess the value of the claim presented by each and every individual class member, as is required by the current diversity jurisdictional statute.

The critics' concerns that events might occur after a complaint is filed or removed that would either create federal jurisdiction in a way never intended or would remove federal jurisdiction in an arbitrary manner are similarly unfounded. While questions regarding events occurring after a complaint is filed or removed to federal court will, of course, arise under S. 5, those same (or, at least, very similar) questions arise in current practice on jurisdictional issues. Well-established law exists to resolve these questions, and S. 5 does not change--or even complicate--the answers to these questions. In short, the 'rules of the road' on such issues are already established, and S. 5 does not change them.

Under existing law (which S. 5 would not change), 'diversity' of citizenship between the parties must exist both at the time a complaint is filed and at the time a complaint is removed to federal court. 204

[Footnote] For this reason, the federal court would generally only need to measure the diversity of the parties at the outset of the litigation. For example, in a case filed on behalf of a class of California citizens against a California company, there would be no minimal diversity when the case was filed--and thus the case could not be removed simply because one named plaintiff or class member later moved to Nevada. Similarly, if a class action against a California company were filed in California and more than 66% of the class members were California citizens at the time the case was filed, changes in those class members' residences would not alter the jurisdictional analysis. In other words, no court would be required to engage in a residency play-by-play after the time the complaint was filed.

[Footnote 204: Coury v. Prot, 85 F.3d 244, 249 (5th Cir. 1996); Kanzelberger v. Kanzelberger, 782 F.2d 774, 776 (7th Cir. 1986).]

If, however, the plaintiff in the above example of her or her own volition filed an amended complaint in state court that added Nevada plaintiffs (or that brought the percentage of Nevada plaintiffs above 33% in a suit in the defendant's home state), jurisdiction would exist at the time that complaint was filed. Accordingly, as dictated by current law, the defendant could remove the case to federal court. 205

[Footnote]

[Footnote 205: See Caterpillar, Inc. v. Lewis, 519 U.S. 61 69 (1996) ('In a case not originally removable, a defendant who received a pleading or other paper indicating the postcommencement satisfaction of federal jurisdictional requirements--for example, by reason of the dismissal of a nondiverse party--may remove the case to federal court within 30 days of receiving such information.').]

Current law (that S. 5 does not alter) is also clear that, once a complaint is properly removed to federal court, the federal court's jurisdiction cannot be 'ousted' by later events. Thus, for example, changes in the amount in controversy after the complaint has been removed would not subject a case to be remanded to state court. The Supreme Court established this principle in St. Paul Mercury Indem. Co. v. Red Cab Co., 206

[Footnote] stating that 'events occurring subsequent to removal which reduce the amount recoverable, whether beyond the plaintiff's control or the result of his volition, do not oust the district court's jurisdiction once it has attached.' The same would be true if a case was

removed to federal court because minimal diversity existed at the time and, because of a later event, minimal diversity was eliminated. This would occur if, for example, the federal court dismissed the claims of out-of-state plaintiffs, leaving only the claims of in-state plaintiffs against an in-state defendant intact. 'It uniformly has been held that in a suit properly begun in federal court the change of citizenship does not oust the jurisdiction. The same rule governs a suit brought in a state court and removed to federal court.' 207

[Footnote]

[Footnote 206: 303 U.S. 283, 293 (1938).]

[Footnote 207: Id. at 294-95.]

Sound policy reasons support this rule. If a federal court's jurisdiction could be ousted by events occurring after a case was removed, plaintiffs who believed the tide was turning against them could simply always amend their complaint months (or even years) into the litigation to require remand to state court. 'If the plaintiff could, no matter how bona fide his original claim in the state court, reduce the amount of his demand to defeat federal jurisdiction the defendant's supposed statutory right of removal would be subject to the plaintiff's caprice. The claim, whether well or ill founded in fact, fixes the right of the defendant to remove, and the plaintiff ought not to be able to defeat that right and bring the cause back to the state court at his election. 208

[Footnote] Similarly, a defendant prevailing on the merits always shows that the amount in controversy, at the end of the day, is zero. Thus, if subsequent events could unravel a federal court's jurisdiction, a defendant could prevail on the merits, only to have the federal court conclude that it lacks jurisdiction to enter a judgment. 209

[Footnote]

[Footnote 208: Id. at 294.]

[Footnote 209: Herremans v. Carrera Designs, Inc., 157 F.3d 1118, 1121 (7th Cir. 1998) (holding that the jurisdictional test is 'not whether the plaintiff is actually entitled' to $75,000, '[o]therwise every diversity case that a plaintiff lost on the merits would be dismissed for lack of federal jurisdiction').]

It is also clear under existing law that even if a case is not originally removable, it can become removable because of subsequent events (other than changes in the citizenship of the original parties, which, as noted above, do not effect jurisdiction). Thus, as applied under S. 5, if a plaintiff, through amendment or otherwise, increased the amount in controversy, created minimal diversity, or changed the class definition in a case filed in the defendant's home state to include more than 33% of out-of-state plaintiffs, a complaint filed in state court--and previously not subject to federal jurisdiction--could properly be removed. 210

[Footnote] Otherwise, the plaintiff could simply file a complaint not subject to removal and then later amend it, thereby circumventing federal jurisdiction. Similarly, if a plaintiff defines a class so as to allow diverse parties to become members of a class as the case proceeds, removal may be appropriate if diverse parties actually enter the class. For example, if a class action is filed in state court against an Indiana company on behalf of all persons affected by a chemical spill and it is initially thought that all class members are Indiana citizens, the case may become removable later in the litigation if it emerges that citizens of other states fall within the class definition or have become members of the class as the effects of the chemical spill spread. If this were not the rule, major interstate controversies could evade federal jurisdiction because counsel filed a class action before the parameters of the controversy were fully developed. Any alternative rule would allow class counsel to urge

rejection of federal jurisdiction on the grounds that only non-diverse Indiana citizens were in the class and then turn around months later and purport to represent thousands of persons residing outside of Indiana. It should be noted that class counsel can limit the potential for removal as the case proceeds by defining the class to encompass only parties that were injured as of the date on which the action was filed or only parties who are citizens of a certain state.

[Footnote 210: See Caterpillar, Inc., 519 U.S. at 69.]

Critics' Contention No. 12.: S. 5's provisions expanding federal jurisdiction over class actions are invalid because they exceed the jurisdictional authorization of Article III of the Constitution.

Response:

This concern is groundless. As viewed by many Circuits, a federal court may exercise diversity jurisdiction over a purported class action only if none of the plaintiffs named in the complaint share state citizenship with any defendant. In other words, no named plaintiff may be a citizen of the same state as any defendant. This so-called 'complete diversity' prerequisite for federal jurisdiction is wholly a policy creation of Congress, establishing a scope of federal diversity jurisdiction narrower than what is authorized by Article III. 211

[Footnote] Broader definitions of diversity jurisdiction would be wholly consistent with Article III. '[I]n a variety of contexts, [federal courts] have concluded that Article III poses no obstacle to the legislative extension of federal [diversity] jurisdiction * * * so long as any two adverse parties are not co-citizens.' 212

[Footnote]

[Footnote 211: See Strawbridge v. Curtiss, 3 Cranch 267 (1806) (complete diversity requirement derives from '[t]he words of the act of Congress,' not the Constitution).]

[Footnote 212: State Farm Fire & Cas. Co. v. Tashire, 386 U.S. 523, 530-31 (1967) (citing Am. Fire & Cas. Co. v. Finn, 341 U.S. 6, 10 n.3 (1951); Wichita R. & Light Co. v. Pub. Util. Comm'n. 260 U.S. 48 (1922); Barney v. Latham, 103 U.S. 205, 213 (1881)).]

Critics suggest that S. 5 is constitutionally suspect because it would authorize federal jurisdiction over purported class actions in which there is 'minimal (but not complete) diversity'--that is, cases in which any member of the purported class (whether or not explicitly named in the caption of the complaint) has state citizenship that differs from any defendant (using the definitions already in 28 U.S.C. Sec. 1332). Citing no precedents whatsoever, the critics allege that there is an absolute bar on considering unnamed class members to be 'parties' to a purported class action. They contend that those unnamed persons must be ignored completely in determining whether the two sides meet the applicable diversity requirement.

But the premise of this challenge--that unnamed class members cannot be deemed parties to an action--is flatly inconsistent with the fact that in a variety of contexts over the years, federal court have treated unnamed class members as parties to class actions. For example:

In Zahn v. International Paper Co., 213

[Footnote] the U.S. Supreme Court considered whether federal diversity jurisdiction existed over a purported Rule 23(b)(3) class that had not been certified. The district court declined to exercise federal jurisdiction (or to allow the matter to proceed as a class action) because even though '[t]he claim of each of the named plaintiffs was found to satisfy the * * *

jurisdictional amount,' 'not every individual owner in the class has suffered * * * damages in excess of' the amount-in-controversy threshold. 214

[Footnote] The Supreme Court concurred, holding that in determining whether the amount-in-controversy prerequisite for diversity jurisdiction is satisfied, a trial court is obliged to look at whether each purported claimant, even if unnamed, meets the $75,000 jurisdictional amount requirement. 215

[Footnote] Thus, in this respect, the federal courts have for many years treated unnamed class members as 'parties.'

[Footnote 213: 414 U.S. 291 (1973).]

[Footnote 214: Zahn v. International Paper Co., 53 F.R.D. 430 (D. Vt. 1971).]

[Footnote 215: Zahn v. International Paper Co., 414 U.S. at 301 ('Each plaintiff in a Rule 23 (b)(3) class action must satisfy the jurisdictional amount, and any plaintiff who does not must be dismissed from the case--'one plaintiff may not ride in on another's coattails.').]

Similarly, in Devlin v. Scardelletti, 216

[Footnote] the Supreme Court recently held that unnamed class members are considered 'parties' for purposes of mounting an appeal. Thus, Devlin rejects the contention that unnamed class members cannot be considered 'parties' to the litigation.

[Footnote 216: 536 U.S. 1 (2002).]

Earlier, the Supreme Court ruled that normally, the filing of a class action immediately tolls the statute of limitations as to all unnamed class members. 217

[Footnote] In short, all unnamed class members are treated as parties--treated as if they had filed the litigation themselves. Significantly the American Pipe Court declared that 'the claimed members of the class stood as parties to the suit until and unless they received notice thereof and chose not to continue.') 218

[Footnote]

[Footnote 217: See, e.g., American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974).]

[Footnote 218: Id. at 550 (emphasis added).]

Along these same lines, many courts have held that under Fed. R. Civ. P. 23(e), a court must ensure that unnamed class members' interests are protected if class claims are dismissed. 219

[Footnote] In other words, the court is obliged (at least at some level) to treat the unnamed class members as parties to the litigation.

[Footnote 219: See Diaz v. Trust Territory of Pacific Islands, 876 F.2d 1401, 1408 (9th Cir. 1989); Glidden v. Chromalloy American Corp., 808 F.2d 621, 626-28 (7th Cir. 1986).]

S. 5 proposes that Congress declare unnamed class members to be 'parties' to the litigation for purposes of the 'minimal diversity' jurisdictional requirement. As evidenced by the foregoing examples, such a congressional determination about who is a class action 'party' would be wholly consistent with long-standing practice. For years, Congress and the courts have made practical determinations about how various categories of parties should be

treated in assessing compliance with diversity jurisdiction prerequisites and specifically about the circumstances in which unnamed class members should be treated as parties to a lawsuit. The enactment of the 'minimal diversity' provisions of S. 5 would be merely another such practical determination a determination that for purposes of the 'minimal diversity' jurisdictional inquiry established by the legislation, unnamed class members (as well as any named class members) shall be considered 'parties.' Congress is certainly empowered to establish such a definition in this instance.

The critics are also wrong to suggest that The Class Action Fairness Act 'dictate[s] * * * state court [rules of civil] procedure' and thus impinges upon the sovereignty of the state. 220

[Footnote] Critics quote Prof. Larry Tribe as saying that 'for Congress directly, regulate the procedures used by state courts in adjudicating state-law tort claims * * * would raise serious questions under the Tenth Amendment and principles of Federalism.' 221

[Footnote] Of course, when Professor Tribe made that statement, he was not referring to The Class Action Fairness Act. That is because The Class Action Fairness Act does not regulate the procedures 'used by state courts' at all. Rather, it simply changes the federal jurisdiction statute to expand the diversity jurisdiction of federal courts to encompass more class action.

[Footnote 220: S. Rep. 108-123, at 77-78 (2002) (Minority views).]

[Footnote 221: S. Rep. 108-123, at 77-78 (2003) (Minority views).]

If cases subject to that broader jurisdictional grant are removed to federal court (or brought there in the first place), it is of course permissible for Congress to regulate the procedures by federal courts to resolve such cases. Indeed, if Congress cannot specify laws and procedures to be used by federal courts, then all of the federal rules of civil procedure (which are transmitted to Congress for final approval) would be unconstitutional.

The critics' contention that The Class Action Fairness Act 'overstep[s] [Congress's] specific constitutional power to regulate interstate commerce' 222

[Footnote] is equally baseless. This final 'serious' constitutional argument is another red herring. In the first place, it is difficult to imagine why The Class Action Fairness Act--which by its text regulates only very large interstate class actions involving at least two (and sometimes up to 50) states--could be unconstitutional when there is no debate that a $75,001 slip and fall case involving citizens of only two states can appropriately be heard by a federal court.

[Footnote 222: Id.]

Thus, the critics would have to concede that their view of the Commerce Clause abolishes all diversity jurisdiction, in direct contravention of Article III, Supreme Court precedent, and Congressional authority exercised literally since the year of our nation's founding.

Even if the critics' attack on the Commerce Clause were not so obviously misguided given the separate authority Congress has to regulate federal courts, The Class Action Fairness Act targets activity with substantial effects on interstate commerce. It targets only those lawsuits involving parties from different states, is limited to very large lawsuits involving at least $5 million, and regulates economic activity (the transfer of resources through litigation) that collectively has substantial effects on interstate commerce. As the legislative history makes abundantly clear, abusive state court class action practices exact a staggering toll on interstate commerce. The Class Action Fairness Act is thus not only constitutional, it is necessary as a matter of public policy.

In sum, the Committee notes that the exercise of this expanded jurisdiction can be grounded on a Commerce Clause rationale as well. In that regard, the Committee notes that the legislation contains findings that the state court class action abuses identified in the record before the Committee are having a serious adverse effect on interstate commerce and that the legislation (particularly its jurisdictional provisions) is intended to ameliorate those adverse effects.

Critics' Contention No. 13: S. 5 will make it harder for consumers to bring class action lawsuits against pharmaceutical manufacturers and should be amended to exclude drug cases.

S. 5 poses no barrier for consumers seeking to bring suits against pharmaceutical manufacturers. All the bill does is move certain class actions to federal court. Moreover, an industry-specific exemption from federal jurisdiction, such as the carve-out proposed by this critique, makes no sense, since it irrationally slams the federal courthouse door on one industry--the very kind of treatment that the Framers sought to avoid by creating diversity jurisdiction. Such an approach is ill-advised for several reasons.

First, such an amendment would unfairly single out the pharmaceutical industry and deny defendants a fair, even-handed federal court forum. Moreover, this contention is inconsistent with what the Framers had in mind in establishing diversity jurisdiction in Article III of the Constitution. They wanted to allow interstate businesses to have claims against them heard in federal court so as to avoid local biases. Nowhere in this concept is the idea that certain industries should be exempted from this right--i.e., that certain kinds of businesses are less entitled to federal court protection. In short, such an exclusion would fly in the face of the Constitution, as well as the basic purpose of the bill.

Second, the flood of litigation surrounding recent drug withdrawals demonstrates the need for class action reform. Under the current system, plaintiffs' lawyers frequently file hundreds of overlapping class action lawsuits in various state court jurisdictions around the country. And since we have 50 different state court systems, these cases cannot be coordinated or consolidated before one judge. As a result, both sides have to engage in duplicative discovery, the judges end up duplicating each others' work, and different courts often reach different decisions on the same pretrial issues. To make matters worse, the current system encourages plaintiffs' lawyers to compete against each other--vying to achieve the first nationwide settlement that will eviscerate the remaining class actions involving similar claims.

In contrast, when numerous duplicative class actions are brought in federal court, the federal multi district litigation (MDL) mechanism allows all the cases to be coordinated for pretrial proceedings in one federal court. That means all the parties in all the cases typically set up one document depository, the court issues consistent rulings on discovery issues and summary judgment motions, and the court can preside over settlement negotiations that address the concerns of all the plaintiffs in all the cases--rather than just strike a deal with one group of plaintiffs' lawyers. Put simply, MDL proceedings are fairer, more efficient, and less expensive.

Third, federal courts have demonstrated their effectiveness in handling nationwide class actions against pharmaceutical companies. Federal court proceedings have resulted in numerous pro-consumer settlements in pharmaceutical cases. For example, the settlement in In re Diet Drugs (Fen-Phen) provided $3.75 billion for personal injury claims, medical monitoring and research. 223

[Footnote] Similarly, in In re: Copley Pharmaceutical Inc., Albuterol Products Liability Litigation, an MDL court approved a $150 million settlement for consumers. 224

[Footnote] And in Bowling v. Pfizer,, the federal court approved a settlement providing approximately $200 million in medical monitoring for plaintiffs who had received allegedly defective heart valves. 225

[Footnote]

[Footnote 223: In re Diet Drugs (Fen-Phen), 2000 U.S. Dist. LEXIS 12275 (E.D. Pa. 2000).]

[Footnote 224: In re: Copley Pharmaceutical Inc., Albuterol Products Liability Litigation, 1 F. Supp. 2d 1407 (D. Wyo. 1998).]

[Footnote 225: Bowling v. Pfizer Inc., 922 F. Supp. 1261 (S.D. Ohio 1996).]

Fourth, regulatory decisions regarding which pharmaceutical drugs are available to the American public should not be shifted away from the Food and Drug Administration into the hands of plaintiffs' lawyers, judges and juries. Many class actions against pharmaceutical manufacturers are filed in spite of the fact that the FDA has investigated an alleged problem and concluded that the drug should remain on the market. Class action lawyers borrow from the factual work undertaken by the agency and use the class action vehicle as a way to relitigate the agency's decisions. The authority to decide whether consumers should have access to pharmaceuticals should remain with the FDA. And if there are problems with FDA, the solution is to fix the agency--not to transfer its power to self-interested class action lawyers.

Finally, the claims of some critics that it is more difficult to have a class certified in federal court than in state court have been disproved. As noted previously, a study by the Federal Judicial Center found that class actions were 'almost equally likely to be certified' in the two systems: federal courts certified classes 22 percent of the time, while state courts certified classes 20 percent of the time. 226

[Footnote] The study also debunked another myth often repeated by opponents of The Class Action Fairness Act--that state courts move more quickly than federal courts. According to the study, federal courts are much more speedy in resolving class action issues: state courts, in contrast, are more likely to let class actions linger without ruling on class certification. Finally, to the extent that caseloads affect how quickly cases are resolved, the problems are much worse in state court than in federal court. State court judges are assigned (on average) 1,568 new cases each year. 227

[Footnote] In contrast, each federal court judge was assigned an average of just 483 new cases during the twelve-month period ending September 30, 2003. 228

[Footnote]

[Footnote 226: See 2004 Federal Judicial Center Study.]

[Footnote 227: Examining the Work of State Courts at 12-13.]

[Footnote 228: See Federal Court Management.]

VIII. CBO COST ESTIMATE

S. 5 would expand the types of class-action lawsuits that would be initially heard in federal district courts and would provide guidelines for the award of attorney's fees in certain types of settlements. CBO estimates that implementing the bill would cost the federal district courts about $7 million a year, subject to appropriation of the necessary funds. Enacting the bill would not affect direct spending or revenues. S. 5 contains no intergovernmental

mandates as defined in the Unfunded Mandates Reform Act (UMRA) and would impose no costs on state, local, or tribal governments. S. 5 would impose private-sector mandates, as defined in UMRA, but CBO estimates that the direct cost of those mandates would fall below the annual threshold established by UMRA ($123 million in 2005, adjusted annually for inflation).

Under S. 5, most class-action lawsuits would be heard in a federal district court rather than a state court. Therefore, CBO estimates that the bill would impose additional costs on the federal district court system. While the number of cases that would be filed in federal court under this bill is uncertain, CBO expects that a few hundred additional cases would be heard in federal court each year. According to the Administrative Office of the United States Courts, class-action lawsuits tried in federal court cost the government, on average, about $23,000. That figure includes salaries and benefits for clerks, rent, utilities, and associated overhead expenses but excludes the costs of the salaries and benefits of judges. CBO estimates that implementing S. 5 would cost about $7 million annually.

CBO also estimates that enacting this bill could increase the need for additional district judges. Because the salaries and benefits of district court judges are considered mandatory, adding more judges would increase direct spending. However, S. 5 would not--by itself-- affect direct spending because separate legislation would be necessary to authorize an increase in the number of district judges. In any event, CBO expects that enacting the bill would not require a significant increase in the number of federal judges, so that any potential increase in direct spending from subsequent legislation would probably be less than $500,000 a year.

S. 5 would require the Judicial Conference of the United States to transmit a report on class- action settlements to the Congress no later than one year after the bill's enactment. CBO estimates that this provision would cost less than $500,000 in 2005.

S. 5 would impose a private-sector mandate by possibly limiting the size of awards that attorneys could receive in certain class-action settlements. If a proposed class-action settlement provides coupons to a class member, the bill would require the attorneys' fees to be based on the value of the coupons that are redeemed or on the amount of time reasonably expended working on the case by class counsel. In current practice, the attorney's fee is sometimes based on the total value of the settlement. According to information from industry representatives and academic studies, settlements with coupons account only for about 10 percent of all class-action settlements. Moreover, according to those sources, attorneys' fees correlate very closely with the amount of time spent on such cases by class counsel. Therefore, because attorneys' fees would still be negotiated as part of any settlement, CBO estimates that the direct cost of the mandate, as measured by loss of income for attorneys in class-action settlements, would be small, if any.

In addition, S. 5 would impose a private-sector mandate on defendants participating in a proposed class-action settlement. The bill would require defendants to make certain notifications and disclosures to the appropriate state official of each state in which a class member resides and the appropriate federal official within 10 days after a proposed settlement is filed in court. The bill defines a proposed settlement as an agreement regarding a class action that is subject to court approval and would be binding on the class. The required notices and disclosures would include a copy of the suit, a copy of the proposed settlement, a statement of class members' rights, and certain other materials. In effect, the defendants would have to provide copies of documents and materials related to information that they usually already possess about the case. Further, the provision would allow for the use of the Internet in making such disclosures. Thus, CBO estimates that the costs of complying with this mandate would be small.

The CBO staff contacts for this estimate are Gregory Waring (for federal costs), and Paige

Piper/Bach (for the private-sector impact). This estimate was approved by Peter H. Fontaine, Deputy Assistant Director for Budget Analysis.

IX. REGULATORY IMPACT STATEMENT

In compliance with paragraph 11(b)(1), rule XXVI of the Standing Rules of the Senate, the Committee, after due consideration, concludes that S. 5 will not have a significant regulatory impact.

X. ADDITIONAL VIEWS OF SENATOR PATRICK LEAHY

The circulation and filing of this report occurred after passage of the legislation for Senate consideration of the underlying bill. Indeed, it was filed after the House of Representatives passed this legislation and on the same day that the President signed the measure into law. Committee reports, like Committee consideration of measures, are intended to assist the Senate in its consideration of the matter. Committees tend to have Members with expertise and experience that help shape legislation for Senate consideration. In this case, that did not occur. Instead, at the insistence of the Republican leadership, this bill was rushed through the Judiciary Committee and then forced through the Senate without amendment.

The Republican leadership's timetable was so short that there was no opportunity to prepare a Committee report before final passage. There was no time for Senators to review a cost estimate from the Congressional Budget Office. There was no evaluation of the regulatory impact of the bill. That this report is being filed after Senate consideration means that it did not serve the principal purpose for which Committee reports are intended.

Several days ago, the Senate had pending before it for a few days the so-called 'Class Action Fairness Act.' In lockstep mode, bill supporters rejected every effort to clarify or improve the bill. During the few days it was pending, a few modest amendments were offered to clarify some ambiguous provisions and to respond to serious concerns raised by the National Conference of State Legislatures, the National Association of State Attorneys General, prominent legal scholars, consumer and environmental groups and civil rights organizations. All these efforts were rejected. Anyone who watched the Senate on C-SPAN or reviews the Congressional Record will see ample evidence that the 'fix was in'. Thus, despite legitimate concerns acknowledged by some of this legislation's sponsors and supporters, the bill was not improved in any regard on its short journey through the Senate.

I am disappointed that the Senate has been reduced to taking its marching orders on major legislation from corporate special interests and the White House. The Senate could have made limited but important improvements to the bill but, instead, the majority of Senators refused to even consider minor improvements let alone the major flaws in this legislation.

This legislation will make it harder for American citizens to protect themselves against violations of state civil rights, consumer, health, and environmental protection laws by forcing these cases out of local state courts. Aside from being convenient, state courts have experience with the legal and factual issues involved in these important cases. This bill will sweep these cases into federal courts and, thereby, erect new barriers to lawsuits and place new burdens on plaintiffs.

The biggest concern raised by legal scholars and agreed to by several Senate sponsors of the bill would have addressed the recent trend in the federal courts not to certify class actions if multi-state laws are involved. Given this development, what this bill may result in doing is removing class actions to federal court where they will likely be dismissed for involving multiple state laws and where they will not be considered on the merits because the federal court will choose not to consider a case involving the laws of the states. Cynics might even speculate that is what the business groups behind this purported 'procedural' change are

really seeking, the dismissal of meritorious cases on procedural grounds by the federal courts.

Many Senators understand that this bill could deny justice to consumers and others in class actions who band together to seek relief in state court. Senator Feinstein and Senator Bingaman worked together on an amendment to alleviate this legal Catch-22. It is unfortunate that the wisdom of their common-sense solution was rejected.

Anyone who reads this bill will notice that despite its title, it affects more than just class actions. Individual actions, consolidated by state courts for efficiency purposes, are not class actions. Despite the fact that a similar provision was unanimously struck from the bill during the last Congress, mass actions reappeared in this bill this Congress. Federalizing these individual cases will no doubt delay, and possibly deny, justice for victims suffering real injuries. Senator Durbin's amendment would have clarified the bill's effect on these cases but it was not adopted.

Prominent civil rights organizations and labor advocates requested that the bill be modified to acknowledge the fact that many of our states have their own protective civil rights and employment laws. Senator Kennedy's amendment to exempt civil rights and wage and hour cases from this bill was a sensible solution. I was proud to cosponsor it and regret that this amendment was also rejected.

This class action legislation has also been criticized by nearly all of the state Attorneys General in this country. They expressed a specific concern that S. 5 could limit their official powers to investigate and bring actions in their state courts against defendants who have caused harm to their citizens because in certain instances they file suit as the class representative for the consumers of their state. Not even this minor clarification, requested by nearly every state's highest law enforcement officer, was acceptable to the bill's supporters as they to adopt Senator Pryor's amendment.

It is disappointing to me that the Senate has refused to listen to the wise counsel of our state legislatures, our state law enforcement officers, our state judges and even the views expressed by our federal judiciary. They serve in the institutions that we are affecting by enacting this legislation.

This bill contains language to reduce the delay parties can experience when a case is removed to federal court by setting a time limit for appeals of remand orders. However, no measure is included in the bill that would set a timeline for the district court to rule on the actual remand motion. This means that plaintiffs' claims may be removed from state court, just to languish on the federal docket for years, without any recourse. Senator Feingold offered a modest amendment to set a reasonable time limit for the district court to rule on remand orders. This solution received praise from one of the sponsors of the legislation, yet the amendment was rejected.

I predict this legislation will be manipulated by well-paid corporate defense lawyers to create complex, expensive and lengthy litigation over the criteria and factors in the bill and whether they apply to a particular case. Unfortunately, one of the great boons--or more properly boondoggles--of this legislation, to the extent it does not simply deter meritorious class actions that would otherwise have been brought by consumers, is that it will make them more costly, burdensome and complicated.

The so-called Class Action Fairness Act falls short of the expectation set by its title. It will leave many injured parties who have valid claims with no avenue for relief, and that is anything but fair to the ordinary Americans who look to us to represent them in the United States Senate.

PATRICK LEAHY.

XI. MINORITY VIEWS OF SENATORS LEAHY, KENNEDY, BIDEN, FEINGOLD, AND DURBIN

I. INTRODUCTION

We strongly oppose S. 5, the 'Class Action Fairness Act of 2005.' Although the legislation is described by some of its proponents as a 'modest bill' not effecting 'a substantive change in the law', in reality it will cause a radical revision of the class action rules and diversity jurisdiction requirements. We believe it would bar most state class actions from being heard in state courts and prevent many nationwide class actions from being heard in either state or federal court.

This legislation and previous versions have been opposed by the federal 1

[Footnote] and state 2

[Footnote] judiciaries, as well as, state legislatures. 3

[Footnote] S. 5 is also opposed by dozens of civil rights, consumer, environmental and public interest advocates 4

[Footnote] and several state Attorneys General. 5

[Footnote]

[Footnote 1: See Letter from Ralph Mecham, Secretary, Judicial Conference of the United States (Mar. 26, 2003) (in 2003, the Conference voted to oppose the jurisdictional provisions that remain in S. 5 because the provisions 'would add substantially to the work of the Federal courts and are inconsistent with principles of Federalism').]

[Footnote 2: See Letter from Annice M. Wagner, President, Conference of Chief Justices (Mar. 28, 2002) ('Absent hard evidence of the inability of the state judicial systems to hear and decide fairly class actions brought in state courts, we do not believe that such a procedure is warranted.').]

[Footnote 3: See Letter from Sen. Michael Balboni, Chair, National Conference of State Legislatures (Feb. 2, 2005) ('The effect of S.5 on state legislatures is that state laws in the areas of consumer protection and antitrust which were passed to protect citizens of a particular state against fraudulent or illegal activities will almost never be heard in state courts.').]

[Footnote 4: See Letters to Committee Members in opposition to similar class action measures from the AARP, ADA Watch/National Coalition for Disability Rights, AFL-CIO, Alliance for Healthy Homes, Alliance for Justice, Alliance for Retired Americans, American Association of People with Disabilities, American Association of University Women, American Cancer Society, American Heart Association, American Federation of Government Employees, American Federation of State, County and Municipal Employees, American Lung Association, American-Arab Anti-Discrimination Committee, Americans for Democratic Action, Bazelon Center for Mental Health Law, Brady Campaign to Prevent Gun Violence, United with the Million Mom March, Campaign For Tobacco-Free Kids, Center for Disability and Health, Center for Justice and Democracy, Center for Responsible Lending, Center for Women Policy Studies, Civil Justice, Inc., Clean Water Action, Coalition to Stop Gun Violence, Commission on Social Action of Reform Judaism, Communication Workers of America, Consumer Federation of America, Consumers for Auto Reliability and Safety, Consumers Union, Disability Rights Education Fund, Earthjustice, Education Law Center, Environmental Working Group, Epilepsy

Foundation, Families USA, Federally Employed Women, Friends of the Earth, Gray Panthers, Greenpeace, Homeowners Against Deficient Dwellings, Jewish Labor Committee, Lawyers' Committee For Civil Rights Under Law, Leadership Conference on Civil Rights, Mexican American Legal Defense and Educational Fund, Mineral Policy Center, NAACP Legal Defense and Education Fund, National Alliance of Postal and Federal Employees, National Asian Pacific American Legal Consortium, National Association for the Advancement of Colored People, National Association for Equal Opportunity in Higher Education, National Association of Consumer Advocates, National Association of Consumer Agency Administrators, National Association of the Deaf, National Association of Protection and Advocacy Systems, National Bar Association, National Campaign for Hearing Health, National Center on Poverty Law, National Coalition on Black Civic Participation, National Committee on Pay Equity, National Consumer Law Center, National Consumers Coalition, National Consumers League, National Council of La Raza, National Employment Lawyers Association, National Fair Housing Alliance, National Gay and Lesbian Task Force, National Law Center on Homeless & Poverty, National Legal Aid and Defender Association, National Organization for Women, National Partnership for Women and Families, National Resources Defense Council, National Workrights Institute, National Women's Health Network, National Women's Law Center, North Carolina Justice Center, NOW Legal Defense Fund, People for the American Way, Pride at Work, Project Equality, Public Citizen, Religious Coalition for Reproductive Choice, Sargent Shriver National Center of Poverty Law, Service Employees International Union, Sierra Club, Tobacco Control Resource Center, Tobacco Products Liability Project, UNITE!, United Food and Commercial Workers International Union, United Policyholders, United Steelworkers of America, USAction, U.S. Public Interest Research Group, Violence Policy Center, and Women Employed (May 21, 2004).]

[Footnote 5: See Letter from Eliot Spitzer, Attorney General New York and W.A. Drew Edmondson, Attorney General of Oklahoma, on behalf of the Attorneys General of the States of California, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, New Mexico, New York, Oklahoma, Vermont and West Virginia (Feb. 7, 2005).]

By providing plaintiffs access to the courts in cases where a defendant may have caused small injuries to a large number of persons, class action procedures have traditionally offered a valuable mechanism for aggregating small claims that otherwise might not warrant individual litigation. This legislation will undercut that important principle by making it far more burdensome, expensive, and time-consuming for groups of injured persons to obtain access to justice. Thus, it would be more difficult for citizens to seek redress for violations of civil rights, employment discrimination, and consumer health, safety and environmental laws, to name but a few important laws. The legislation will prevent state courts from considering class action cases which involve solely violations of state laws, such as state consumer protection laws.

'The Class Action Fairness Act of 2005' will force most state class action cases into federal courts. It will provide automatically for both original jurisdiction and the removal of state class action claims to federal court at the request of either party in cases involving violations of state law if any member of the plaintiff class and at least one primary defendant are citizens of different states. 6

[Footnote]

[Footnote 6: See The Class Action Fairness Act of 2005, S. 5, 109th Cong. 4(a)(2) (2005) (adding 28 U.S.C. 1332(d)(2)). Current law requires complete diversity before a state law case is eligible for removal to Federal court, meaning all of the defendants must be citizens residing in different states than the plaintiffs. See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806). In Snyder v. Harris, 394 U.S. 332 (1969), the Supreme Court held that the court should only consider the citizenship of named plaintiffs for diversity purposes, and not the citizenship of absent class members.]

As part of the expanded diversity jurisdiction, the bill also provides for the removal of state class actions to federal court at the request of either party if fewer than one-third of the plaintiff class members are citizens of a different state than any primary defendant, even if the primary defendant conducts substantial business in that state. 7

[Footnote] The legislation would allow removal of a class action to federal court in cases where between one-third and two-thirds of the plaintiffs are citizens of the same state as the primary defendants. 8

[Footnote]

[Footnote 7: Senate Bill 5 Sec. 4(a)(2) (adding 28 U.S.C. 1332(d)(3)).]

[Footnote 8: Id.]

Under the legislation, federal courts are directed to abstain from hearing a class action only where (1) more than two-thirds of the plaintiffs are citizens of the same state as at least one of the primary defendants; (2) the principal injuries occurred in that state; (3) the matters in controversy are less than $5,000,000 or the membership of the proposed class is less than 100; or (4) the primary defendants are states, state officials, or other government entities against whom the district court may be foreclosed from ordering relief. 9

[Footnote]

[Footnote 9: Senate Bill 5 Sec. 4(a)(2) (adding 28 U.S.C. 1332(d)(4)). The legislation also excludes securities-related and corporate governance class actions from coverage and makes a number of other procedural changes, such as easing the procedural requirements for removing a class action to Federal court (i.e., permitting removal to be sought by any plaintiff or defendant and eliminating the one-year deadline for filing removal actions) and tolling the statute of limitation periods for dismissed class actions. See Senate Bill 5 4(a)(2) (adding 28 U.S.C. 1332(d)(9)).]

In the context of the 'Local Controversy Exception', the Committee Report erroneously conflates the concepts of citizenship and residence. 10

[Footnote] Contrary to the Committee report, the legislation provides that the touchstone for this exception is citizenship not residence. This more narrow exception will no doubt result in many more class actions being removed to federal court.

[Footnote 10: See Committee Report at p. 44.]

This bill contains a 'Consumer Class Action Bill of Rights.' This section includes some safeguards that we agree will improve class action litigation for all parties, such as protection against a proposed settlement that would result in a net loss to a class member and protection against discrimination based on geographic location. 11

[Footnote] We also recognize that improvements were made to the bill in the last Congress such as: restricting use of coupon settlements; allowing civil rights and consumer plaintiffs to be compensated for the particular hardships they endure as a result of initiating and pursuing litigation as named plaintiffs; eliminating the notification burden; prohibiting retroactivity and providing for greater judicial discretion. 12

[Footnote]

[Footnote 11: Senate Bill 5 3.]

[Footnote 12: Id.]

We object to the fact that S. 5 is written to favor corporate defendants at the expense of victims. Before even considering S. 5, the Committee and the full Senate should have insisted on receiving objective and comprehensive data justifying such a dramatic intrusion into state court prerogatives. Nothing in the way of such information now exists. Before the Committee considered this bill, a hearing on class action litigation would have helped the Committee develop consensus reforms to better serve both defendants and plaintiffs before the Committee proceeded to a markup on S. 5.

We had hoped that the Committee would undertake a deliberate and careful review of information from parties actually involved in class action litigation to provide a realistic picture of the benefits and problems with class actions. But, instead, the Committee has simply decided that the time is now for federalizing nearly all class actions where most of plaintiffs' claims will take longer and be more expensive.

We recognize that there are some genuine problems with some class action litigation that should be addressed by federal legislation for the benefit of both defendants and plaintiffs. This legislation, however, is heavily biased in favor of defendants. Rather than address the system's real failings, S. 5 will make it more difficult for the vast majority of legitimate, well-intentioned class actions to move forward, by placing cumbersome restrictions on citizens' rights to seek redress for their injuries.

In short, we agree with the position of the National Conference of State Legislatures when they urged us 'to remember that state policy choices should not be overridden without a showing of compelling national need. We should await evidence demonstrating that states have broadly overreached or are unable to address the problems themselves. There must be evidence of harm to interests of national scope that require a federal response, and even with such evidence, federal preemption should be limited to remedying specific problems with tailored solutions, something that S. 5 does not do.' 13

[Footnote]

[Footnote 13: National Conference of State Legislatures Letter, supra note 3.]

For these and other reasons set forth herein, we strongly oppose S. 5.

II. S. 5 WILL HURT CONSUMERS, VICTIMS, AND THE ENVIRONMENT

Proponents of this legislation claim that S. 5 will protect consumers while remedying the worst abuses of the class action system, yet consumer advocates overwhelmingly oppose these alleged 'reforms.' 14

[Footnote]

[Footnote 14: See Letter in Opposition to S. 274 from the Consumer Federation of America, Consumers Union, and U.S. Public Interest Research Group (Feb. 5, 2003).]

A. Federal courts' refusal to certify class actions will leave victims in limbo

There can be little doubt that S. 5 will have a serious adverse impact on the ability of consumers and victims to obtain compensation in cases involving widespread harm. At a minimum, the legislation will force most state class action claims into federal courts where it is generally more expensive for plaintiffs to litigate cases and where defendants could force plaintiffs to travel long distances to attend proceedings. It is also typically more difficult and

time consuming to certify a class action in federal court. By pushing cases from state to federal court, S. 5 creates more problems than it solves.

Fourteen states, representing nearly one-third of the nation's population, 15

[Footnote] have adopted different criteria for class action rules than Rule 23 of the Federal Rules of Civil Procedure. 16

[Footnote] In addition, with respect to those states which have enacted an analog to Rule 23, the federal courts are likely to represent a more difficult forum for class certification to occur. This ratcheting up of the standard is the result of a series of several federal cases, such as Castano v. American Tobacco Co. 17

[Footnote] , In re Rhone-Poulenc Rorer, Inc., 18

[Footnote] In re American Medical Systems, Inc., 19

[Footnote] Georgine v. Amchem Products, Inc., 20

[Footnote] Broussard v. Meineke Discount Mufflers, 21

[Footnote] and Ortiz v. Fibreboard, 22

[Footnote] which have made it more difficult to establish the 'predominance requirement' necessary to establish a class action under the federal rules.

[Footnote 15: Three states still use their common law rules, rather than statutes, to permit class actions (Mississippi, New Hampshire, and Virginia); four states use Field Code-based rules based on the 'community of interest' test (California, Nebraska, South Carolina, and Wisconsin); and seven states use class action rules modeled on the original Federal Rule 23 (1938) which creates a distinction among class members which depends on the substantive character of the right asserted (Alaska, Georgia, Louisiana, New Mexico, North Carolina, Rhode Island, and West Virginia). See 3 Herbert B. Newberg & Alba Conte, Newberg on Class Actions Sec. 13.04 (3d ed. 1992 & Supp. 1997).]

[Footnote 16: Fed. R. Civ. P. 23(a) (stating four factual prerequisites that must be met before a court will certify the lawsuit as a class action: (1) size--the class must be so large that joinder of all of its members is not feasible; (2) common questions--there must be questions of law or fact common to the class; (3) typical claims--the claims or defenses of the representatives must be 'typical' of those of the class; and (4) representation--the representatives must fairly and adequately represent the interests of the class).]

[Footnote 17: 84 F.3d 734 (5th Cir. 1996) (preventing the certification of a nationwide class action brought by cigarette smokers and their families for nicotine addiction where there was found to be too wide a disparity between the various state tort and fraud laws for the class action vehicle to be superior to individual case adjudication).]

[Footnote 18: 51 F.3d 1293 (7th Cir. 1995) (decertifying, under the Erie doctrine, a nationwide negligence class action brought on behalf of hemophiliacs infected with the AIDS virus through use of defendants' blood clotting products because of diversity of state laws).]

[Footnote 19: 75 F.3d 1069 (6th Cir. 1996) (decertifying a proposed plaintiff settlement class comprising all U.S. residents implanted with defective or malfunctioning inflatable penile prostheses that were manufactured, developed, or sold by defendant company because common questions of law or fact did not predominate the action to such an extent that warranted class certification).]

[Footnote 20: 521 U.S. 591 (1997) (overturning consensual settlement between a class of workers injured by asbestos and a coalition of former asbestos manufacturers because of disparate levels of the class members' knowledge of their injuries and class members' large amount at stake in the litigation).]

[Footnote 21: 155 F.3d 331 (4th Cir. 1998) (rejecting class certification brought by Meineke franchisees alleging violations of franchise, tort, unfair trade, and other laws).]

[Footnote 22: 527 U.S. 815 (1999) (finding mandatory limited fund class treatment under Rule 23(b)(1)(B) is not appropriate unless the maximum funds available are clearly inadequate to pay all claims).]

Plaintiffs removed to Federal courts are subject to the Federal Rules of Civil Procedure. In accordance with Rule 23(b)(3), their cases will not be certified by the Federal court if they cannot show that a common question of law predominates. As this rule has been interpreted by many Circuit 23

[Footnote] and District Courts, 24

[Footnote] Federal courts are not certifying class actions involving the laws of multiple states. In fact, six Circuit Courts and 26 District Courts have consistently denied certification of multi-state consumer cases. Only one court has granted certification of these cases and even that case, from the Third Circuit, has been distinguished on its facts. [add footnote: See In re School Asbestos Litig., 789 F.2d 996, 1011 (3d Cir. 1986)]

[Footnote 23: See, e.g., Georgine v. Amchem Products, Inc., 83 F.3d 610 (3d Cir. 1996) (refusing to certify a nationwide asbestos suit because the laws of multiple states would have to be applied), Spence v. Glock, Ges.m.b.H., 227 F.3d 308 (5th Cir. 2000) (reversing the district court's certification because 'it erred in its choice of law analysis'), In re American Medical Systems, Inc., 75 F.3d 1069 (6th Cir. 1996) (denying class certification due to variances in state laws), In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002) (refusing certification because the district court would have to apply the laws of several states according to Indiana's choice of law rules), and Zinser v. Accufix Research Inst., 253 F.3d 1180 (9th Cir. 2001) (holding the plaintiffs with pacemakers made of lead had not demonstrated which state's laws apply under California choice of law rules).]

[Footnote 24: See, e.g., Chin v. Chrysler Corp., 182 F.R.D. 448 (D.N.J. 1998), In re Masonite Corp. Hardboard Siding Prods. Liab. Litig., 170 F.R.D. 417 (E.D. La. 1997), Lyon v. Caterpillar, Inc., 194 F.R.D. 206 (E.D. Pa. 2000).]

Not only are the courts concerned with the federalism implications of such action, but recognize that by doing so, cases become simply unmanageable as courts try to apply the laws of each plaintiff's state to the plaintiff. Scholars who track multi-state class action suits have found that if a case involves too many state laws, then Federal court judges can and do dismiss the case. 25

[Footnote] In fact, the U.S. Chamber of Commerce has recognized this stating, 'federal courts have consistently refused to certify nationwide class actions in product defect cases because the need to apply the laws of many different states would make such a sprawling class action unmanageable.' 26

[Footnote]

[Footnote 25: Letter from Arthur R. Miller, Bruce Bromley Professor of Law, Harvard Law School (Jun. 17, 2004).]

[Footnote 26: Id. (quoting Brief of the Chamber of Commerce of the United States as Amicus Curiae in Support of Appellants, In re Simon II Litigation, No. 03-7141 (2nd Cir. June 3, 2003).]

Federalizing class action cases creates an incentive for violators to break the laws of multiple states, as any collective action to hold them accountable will likely be dismissed. And, consumers, workers and victims will be prevented from having many important multi-state class actions heard in either the state or Federal courts. As a result, we will likely begin to see fewer dangerous and ineffective products and devices removed from the marketplace.

Consumers pay the price when Federal courts dismiss a case. When this occurs, '[a] consumer could bring the claim in state court as an individual action. However, individual cases would be impractical to litigate, would not have the same deterrent effect, and would have the potential to overwhelm state courts.' 27

[Footnote]

[Footnote 27: See Letter from the Consumer Federation of America, Consumers Union, and U.S. PIRG (Feb. 5, 2003).]

Even if consumers get their day in Federal court under this legislation, consumer advocates argue that just outcomes are unlikely. Federal court decisions will likely be narrowly tailored, without establishing legal precedent for future state court cases brought under the particular law in question. Because of this, the class action legislation 'will slow--and in some cases thwart--the continual interpretation of state law.' 28

[Footnote]

[Footnote 28: Id.]

To solve this significant problem, S. 5 should be amended to ensure that cases which are removed from state courts are at least not immediately dismissed by the Federal judge on choice of law grounds. One solution to this loophole in the legislation is the subject of Senator Bingaman's amendment. Quite simply, a Federal judge presented with a case that involves a choice of law issue should be able to apply the state law that has a sufficient connection to the case. In this way, not only are citizens' rights and access to the courts preserved, but the Federalism concerns that the removal creates are undercut because state laws are being enforced. 29

[Footnote] This sensible solution to a glaring deficiency in the bill also had the support of Chairman Specter, as he noted during the Committee's markup.

[Footnote 29: See id.]

B. One-sided delays of justice must be avoided

Last Congress, Senators Dodd, Schumer and Landrieu were able to improve the legislation by adding a provision to the class action bill to require that any appeal of a motion to remand be ruled on by the court of appeals within 60 days. However, before a motion to remand can be appealed it first needs to be ruled on by the lower district court. S. 5 overlooks this step and creates another loophole which defendants can exploit to delay trials. The bill contains no deadline on how long district courts can take to rule on a motion to remand. By simply removing all class actions to Federal court, defendants can exploit this lack of a statutory deadline; and therefore benefit from the delay, which inevitably increases the costs of trials and leaves the plaintiffs in limbo.

Since the bill already addressed the need for speedy resolution of remand appeals, it should similarly require speedy resolution for motions to remand at the district court level. Senator Feingold proposed an amendment that would have simply required district courts to work within the same timeframe as the appeals courts. Under his proposal, any motion for remand to a state court would need to be decided by a district court within 60 days, which tracks the 60 days timeframe afforded to the appeals court. Sen. Feingold's amendment, which he withdrew at the request of Chairman Specter, also provided an automatic additional 10 days for review of the remand motion, and the ability to seek more time for review, if necessary.

C. Barriers to justice for consumers and victims of mass torts

This legislation will also severely limit the ability of consumers to pursue class action in state court, even when state consumer protection laws are implicated. Consumers pay the price when Federal courts dismiss a case. When this occurs, '[a] consumer could bring the claim in state court as an individual action. However, individual cases would be impractical to litigate, would not have the same deterrent effect, and would have the potential to overwhelm state courts.' 30

[Footnote 30: See Letter from the Consumer Federation of America, Consumers Union, and U.S. PIRG (Feb. 5, 2003).]

Even if consumers get their day in Federal court under this legislation, consumer advocates argue that just outcomes are unlikely. Federal court decisions will likely be narrowly tailored, without establishing legal precedent for future state court cases brought under the particular law in question. Because of this, the class action legislation 'will slow--and in some cases thwart--the continual interpretation of state law.' 31

[Footnote]

[Footnote 31: Id.]

As the American Bar Association Task Force on Class Action Legislation's recent report noted, 'any expansion [of Federal court jurisdiction] should preserve a balance between legitimate state-court interests and Federal-court jurisdictional benefits.' 32

[Footnote] The current legislation clearly fails this test.

[Footnote 32: ABA Task Force on Class Action Legislation, Report of the ABA Task Force on Class Action Legislation at 3 (Feb. 2003). See also Letter in Opposition to S. 274, The Class Action Fairness Act of 2003, from the Consumers Union (Apr. 2, 2003).]

Proponents of S. 5 argue that while many class actions will be removed to federal courts, plaintiffs can still bring their individualized claims in state courts. This is not an adequate solution because state judges often consolidate cases to ease their dockets. This procedure allows cases with similar questions of law and fact to be consolidated for all or part of the proceedings. Consolidation does not make the case a class action. However, S. 5 reaches not only class actions, but these consolidated cases as well, through a new term of art called 'mass actions.' 33

[Footnote] For example, the plaintiffs who have brought individual claims against Merck for injuries sustained by Vioxx have had their actions consolidated in the courts. Federalizing these cases would seriously delay not only the victims' compensation but would also prevent victims from holding the drug companies accountable. S. 5 places state court judges in a considerable Catch-22: either do not consolidate the cases and be overloaded with work, or consolidate and cede control of an issue relating to their state laws to the federal courts.

[Footnote 33: Senate Bill 5 Sec. 4(a)(2) (adding 28 U.S.C. 1332(d)(11)).]

Senator Durbin proposed an amendment to rectify this Catch-22 by narrowing the scope of mass tort cases that would be affected by S. 5. Despite the fact that a similar provision was unanimously struck from the bill during the mark-up of class actions legislation in the Judiciary Committee in the last Congress, mass torts are again included in S. 5.

The net result of these various changes is that under the proposed legislation, it will be far more difficult for consumers and other injured individuals to obtain justice in class action cases at the state or Federal level.

D. Special punishment for the environment and civil rights

By removing many important environmental class actions from state to federal court, S. 5 not only denies to state courts the opportunity to interpret their own state's environmental protection laws, it hampers and deters plaintiffs from pursuing important environmental litigation. The well-documented backlog in the federal courts and the need for attorneys to engage in choice of law debates will significantly increase the time and cost of environmental litigation. Ultimately, environmental class actions may not get litigated and the incentive polluters have to keep our environment clean will be reduced.

Moreover, by failing to carve out an exception in S. 5 to protect the environment, the majority ignores the advice of the Judicial Conference of the United States, chaired by Chief Justice Rehnquist. In its March 26, 2003, letter, the Judicial Conference noted that even if the Congress adopts class action removal legislation, there should be certain exceptions such as 'a class action in which plaintiff class members suffered personal injury or physical property damage within the state, as in the case of a serious environmental disaster.' 34

[Footnote]

[Footnote 34: See Judicial Conference Letter, supra note 1.]

Just as S. 5 turns a blind eye toward the environment and to the advice of Chief Justice Rehnquist, the proposed legislation will make it much more difficult to use class actions as a means of protecting civil rights. 35

[Footnote] Class actions are the most effective means to change a policy of discrimination and to bring claims for small amounts of individual wage loss. State laws offer more extensive protections for low wage workers and for many members of minority groups, as well as for the disabled. Several civil rights organizations have argued that S. 5 and its 'additional, substantial and costly noticing requirements and built-in delays are not a matter of due process, but are overly burdensome and improperly assume that federal and state officials have proper interest in, and a capacity to respond to, each and every class action.' 36

[Footnote]

[Footnote 35: See Letter in Opposition to S. 5 from the Leadership Conference on Civil Rights, AFL-CIO, Alliance for Justice, Lawyers' Committee for Civil Rights Under Law, Mexican American Legal Defense and Educational Fund, National Asian Pacific American Legal Consortium, National Partnership for Women and Families, National Workers Rights Institute, National Women's Law Center, People for the American Way, Women Employed and others (Feb. 2, 2005).]

[Footnote 36: See Letter in Opposition to S. 274 from the Leadership Conference on Civil

Rights, Alliance for Justice, Lawyers' Committee for Civil Rights Under Law, Mexican American Legal Defense and Educational Fund, National Asian Pacific Legal Consortium, National Partnership for Women and Families, National Workers Rights Institute, National Women's Law Center, People for the American Way, and Women Employed (Mar. 20, 2003).]

Indeed, class action litigation has been essential to vindicating basic civil rights through our courts. For example, the landmark Supreme Court decision in Brown v. Board of Education was the culmination of appeals from four class action cases, three from federal court decisions in Kansas, South Carolina and Virginia and one from a decision by the Supreme Court of Delaware. Only the Supreme Court of Delaware, the state court, got the case right by deciding for the African-American plaintiffs. The state court justices understood that they were constrained by the existing Supreme Court law, but nonetheless held that the segregated schools of Delaware violated the Fourteenth Amendment. Before any federal court did so, a state court rejected separate and unequal schools.

S. 5 sets up several new hurdles for plaintiffs who file class actions. These requirements will be especially burdensome for many civil rights claimants.

The bill's requirement to provide 'notice' to state officials, such as a state attorney general, will certainly lead to delays in the proceedings. As a result, some of the critical evidence of malice or discriminatory intent required to prevail in civil rights and discrimination cases could be lost while this additional step is taken. In addition, this added hurdle will likely be redundant because many of these plaintiffs will have already gone through an administrative proceeding before being allowed to file a discrimination claim.

As a consequence of the assault that S. 5 would launch on the defense of civil liberties, many civil rights advocates--including the Lawyers' Committee for Civil Rights Under Law, the Leadership Conference on Civil Rights, the Mexican American Legal Defense and Education Fund, and the National Asian Pacific Legal Consortium--have concluded that this legislation 'would discourage civil rights class actions, impose substantial barriers to settling class actions and render Federal courts unable to provide swift and effective administration of justice.' 37

[Footnote]

[Footnote 37: Id.]

This legislation would have been greatly improved if amended by a carve-out proposed by Senator Kennedy for civil rights and employment law cases. The bill indiscriminately applies to all multi-state class action suits, without pausing to consider the implications on important civil rights abuse challenges. States have strengthened their civil rights laws after years of federal encouragement to do so, but now S. 5 will take away the states' means of enforcing those laws. If violators are allowed to side-step these protections by removing cases to the federal courts, those efforts will have been for naught.

Even if Federal courts take up the claims, state judicial interpretations of civil rights laws will be full of holes due to a lack of state-level adjudication of issues. The bill's additional notice requirement will not only lead to significant delays affecting plaintiffs' ability to gain critical evidence of malice or discriminatory intent, but also would likely be redundant as most plaintiffs already have gone through an administrative proceeding. Taken together, these barriers will certainly result in worthy claimants being discouraged from filing class action suits and civil rights violators going unpunished.

We all agree that some reform is needed to improve the efficiency and fairness of our nation's class action procedures. At the same time, many state legislatures have worked hard to develop a system of laws that defend and protect all citizens' civil rights so it is

unfortunate that this bill seeks to gut those efforts through a clumsy reform effort. Senator Kennedy proposed a refined approach that would have enabled victims of civil rights violations to have their day in court. This amendment would have exempted civil rights, as well as wage and hour state law cases, from S. 5 and therefore maintain the status quo for these claims.

E. Improvements made on coupon settlements

This class action bill makes an improvement on the use of worthless coupon settlements, which provide little or no tangible benefits to class action plaintiffs. Typically, these settlements involve an agreement by plaintiffs' and defendants' counsel that fully pay for the attorney fees and expenses of the plaintiffs' counsel while class members are left holding coupons to buy the defendants' products. For example, in a federal class action case alleging a price-fixing conspiracy between major airlines, class members were awarded $400 million in flight coupons. However, the coupons were restricted to certain dates and small increments of travel making them virtually unusable to consumers. 38

[Footnote]

[Footnote 38: See In re Domestic Air Transportation Antitrust Litigation, 137 F.R.D. 677 (N.D. Ga. 1991).]

This version of the class action bill creates incentives for class members' attorneys to seek a remedy for their clients by tying the attorneys' compensation to the value of coupons which are actually redeemed. 39

[Footnote] To help the court make a determination of this value, the judge may hear from expert witnesses. 40

[Footnote] If the coupons are not used to determine counsel's compensation, then the award fee must at least be 'based upon the amount of time class counsel reasonably expended working on the action,' subject to approval by the court. 41

[Footnote] If the plaintiffs' attorneys secure a mixed award, i.e. coupons and an injunction, then part of their fee will be based on the coupons redeemed and part will be based on the reasonable expenditure of time. 42

[Footnote] Any settlement based on coupons will be subject to a hearing before the judge who will determine if the proposed settlement if 'fair, reasonable and adequate.' 43

[Footnote]

[Footnote 39: Senate Bill 5 3 (adding 28 U.S.C. 1712 (a)).]

[Footnote 40: Id. (adding 28 U.S.C. 1712 (d)).]

[Footnote 41: Id. (adding 28 U.S.C. 1712 (b) (1-2)).]

[Footnote 42: Id. (adding 28 U.S.C. 1712 (c)).]

[Footnote 43: Id. (adding 28 U.S.C. 1712 (e)).]

III. S. 5 WILL DAMAGE THE FEDERAL AND STATE COURT SYSTEMS

By expanding federal class action jurisdiction to include almost all state class actions, S. 5 will inevitably result in a significant increase in the federal courts' workload. In its letter to

the Judiciary Committee concerning a prior version of this bill, the Judicial Conference warned that:

[T]he effect of the class action provisions of [S. 353] would be to move virtually all class action litigation into the Federal courts, thereby offending well-established principles of Federalism [and] * * * hold[ing] the potential for increasing significantly the number of [class action] cases currently being litigated in the Federal system. 44

[Footnote]

[Footnote 44: See Letters from Judicial Conference (Jul. 26, 1999 and Aug. 23, 1999).]

In addition to overwhelming the federal courts with new time-intensive class actions, S. 5 will undermine state courts' independent authority. State Attorneys General recently wrote to Senate leaders objecting to this 'federalizing' of most class actions under this legislation:

S. 5 would vastly expand federal diversity jurisdiction, and thereby would result in most class actions being filed in or removed to federal court. This transfer of jurisdiction in cases raising questions of state law will inappropriately usurp the primary role of state courts in developing their own state tort and contract laws, and will impair their ability to establish consistent interpretations of those laws. 45

[Footnote]

[Footnote 45: Letter from Eliot Spitzer, Attorney General New York and W.A. Drew Edmondson, Attorney General of Oklahoma, on behalf of the Attorneys General of the States of California, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, New Mexico, New York, Oklahoma, Vermont and West Virginia (Feb. 7, 2005).]

Even more troublesome than these potential workload problems, S. 5 raises serious constitutional issues by challenging the vision of our founders and the intent of the Constitution. This legislation undermines James Madison's vision of a federal government 'limited to certain enumerated objects, which concern all the members of the republic.' 46

[Footnote]

[Footnote 46: The Federalist No. 14 (James Madison).]

This bill does not merely operate to preempt state laws; rather, it unilaterally strips the state courts of their ability to use the class action procedural device to resolve state law disputes. As the Lawyers' Committee for Civil Rights Under Law observes, citing Bank of the United States v. Deveaux:

For over 200 years, Federal diversity jurisdiction has been exercised with care and hesitation, demonstrating that Congress believed, with few exceptions 'tribunals of the state * * * administer justice as impartially as those of the nation, to parties of every description.' 47

[Footnote]

[Footnote 47: See Letter from Lawyers' Committee for Civil Rights Under Law (Apr. 9, 2003) (quoting Bank of the United States v. Deveaux, 9 U.S. (5 Cranch) 61, 87 (1809)); see also City of Indianapolis v. Chase Nat'l Bank, 314 U.S. 63, 76 (1941).]

The courts have previously found that efforts by Congress to dictate such state court procedures implicate important Tenth Amendment Federalism concerns and should be avoided. For example, in Fielder v. Casey the Supreme Court observed that it is an

'unassailable proposition * * * that States may establish the rules of procedure governing litigation in their own courts.' 48

[Footnote]

[Footnote 48: 487 U.S. 131, 138 (1988) (finding Wisconsin notice-of-claim statute to be preempted by 42 U.S.C. Sec. 1983, which holds anyone acting under color of law liable for violating constitutional rights of others).]

Similarly, in Johnson v. Fankell, the Court reiterated what it termed 'the general rule bottomed deeply in belief in the importance of State control of State judicial procedure * * * that Federal law takes State courts as it finds them' 49

[Footnote] and observed that judicial respect for the principal of Federalism 'is at its apex when we confront a claim that Federal law requires a State to undertake something as fundamental as restructuring the operation of its courts' and 'it is a matter for each State to decide how to structure its judicial system.' 50

[Footnote]

[Footnote 49: 520 U.S. 911, 919 (1997) (holding that Idaho procedural rules concerning appealability of orders are not preempted by 42 U.S.C. Sec. 1983) (quoting Henry M. Hart, Jr., The Relations Between State and Federal Law, 54 Colum. L. Rev. 489, 508 (1954)).]

[Footnote 50: Id. at 922. See also Howlett v. Rose, 296 U.S. 356, 372 (1990) (quoting Henry M. Hart, Jr., The Relations Between State and Federal Law, 54 Colum. L. Rev 489, 508 (1954) for the proposition that Federal law should not alter the operation of the state courts); New York v. United States, 505 U.S. 144, 161 (1992) (stating that a law may be struck down on Federalism grounds if it 'commandeer[s] the legislative processes of the States by directly compelling them to enact and enforce a Federal regulatory program').]

These same constitutional concerns were highlighted by Professor Laurence Tribe in his testimony regarding the constitutionality of a proposed federal class action rule applicable to state courts included in tobacco legislation proposed during the 105th Congress. Professor Tribe observed: '[f]or Congress directly to regulate the procedures used by state courts in adjudicating state-law tort claims--to forbid them, for example, from applying their generally applicable class action procedures in cases involving tobacco suits--would raise serious questions under the Tenth Amendment and principles of Federalism.' 51

[Footnote]

[Footnote 51: The Global Tobacco Settlement: Hearings Before the Senate Comm. on the Judiciary, 105th Cong. (1997) (statement of Laurence H. Tribe, Tyler Professor of Law, Harvard Law School). Indeed, Former-Chairman Hatch praised Professor Tribe at the Committee's June 4, 2003, hearing on asbestos litigation as 'known here and throughout the country as one of the most respected constitutional scholars and practitioners.']

The Supreme Court's most recent decisions further indicate that S. 5 is an unacceptable infringement upon state sovereignty. In United States v. Morrison, 52

[Footnote] the Court invalidated parts of the Violence Against Women Act, claiming that Congress overstepped its specific constitutional power to regulate interstate commerce. Despite vast quantities of data illustrating the effects that violence against women has on interstate commerce, the Court essentially warned Congress not to extend its constitutional authority to 'completely obliterate the Constitution's distinction between national and local authority.' S. 5, introduced and considered in Committee without a hearing and without any

convincing data, ignores the Court's admonitions and subverts the federal system by hindering the states' ability to adjudicate class actions involving important and evolving questions of state law. S. 5 not only obliterates the distinction between national and local authority, it effectively annihilates local authority over state class actions.

[Footnote 52: 529 U.S. 598 (2000).]

Responding to these significant constitutional concerns, proponents of this legislation argue that state courts will not give fair hearings to out-of-state defendants, but support for their assertion is bereft of evidence. First, the Supreme Court has already made clear that the state courts are constitutionally required to provide due process and other fairness protections to the parties in class action cases. In Phillips Petroleum Co. v. Shutts, 53

[Footnote] the Supreme Court held that in class action cases, state courts must ensure that: (1) the defendant receives notice plus an opportunity to be heard and participate in the litigation; 54

[Footnote] (2) an absent plaintiff must be provided with an opportunity to remove himself or herself from the class; (3) the named plaintiff must at all times adequately represent the interests of the absent class members; and (4) the forum state must have a significant relationship to the claims asserted by each member of the plaintiff class. 55

[Footnote]

[Footnote 53: 472 U.S. 797 (1985).]

[Footnote 54: Id. at 812 (stating that the notice must be the 'best practicable, reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections') (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314-315 (1950)).]

[Footnote 55: Id. at 806-810. These findings were reiterated by the Supreme Court in 1995 in Matsushita Elec. Indust. Co. v. Epstein, 516 U.S. 367 (1995) (holding that state class actions are entitled to full faith and credit so long as, inter alia: the settlement was fair, reasonable, adequate and in the best interests of the settlement class; notice to the class was in full compliance with due process; and the class representatives fairly and adequately represented class interests).]

Secondly, as fears of local court prejudice have subsided and concerns about diverting federal courts from their core responsibilities have increased, the policy trend in recent years has been towards limiting Federal diversity jurisdiction. 56

[Footnote] For example, Congress enacted the Federal Courts Improvement Act of 1996, 57

[Footnote] which increased the amount in controversy requirement needed to remove a diversity case to federal court from $50,000 to $75,000. This statutory change was based on the Judicial Conference's determination that fear of local prejudice by state courts was no longer relevant 58

[Footnote] and that it was important to keep the federal judiciary's efforts focused on federal issues. 59

[Footnote]

[Footnote 56: Ironically, during the 104th Congress, the Republican Party was extolling the virtues of state courts in the context of their efforts to limit habeas corpus rights, which

permit individuals to challenge unconstitutional state law convictions in Federal court.]

[Footnote 57: 28 U.S.C 1332(a) (West Supp. 1998).]

[Footnote 58: See Judicial Conference of the United States, Long Range Plan for the Federal Courts, Recommendation 7 at 30 (1995).]

[Footnote 59: See id.]

IV. CONCLUSION

Contrary to its supporters' assertions, S. 5's provisions are much broader than merely prohibiting nationwide class actions from being pursued in state court. In fact, this bill will override the current state laws governing class actions in the fifty states. And, in practice, it will bar many, if not most, state class actions filed solely on behalf of residents of a single state, solely involving matters of that state's law from being heard in that state court, so long as one plaintiff or one primary defendant is a citizen of a different state. This is clearly an extreme and distorted change to the diversity jurisdiction standards in our court system.

As a result, these drastic changes to longstanding federal procedural rules will make it harder for citizens to protect themselves against violations of state civil rights, consumer, health, and environmental protection laws by forcing these class action cases out of convenient state courts into federal courts, with significant new barriers and burdens on plaintiffs.

For these reasons, and until we reach consensus on improvements to class action litigation for the benefit of defendants and plaintiffs, we remain strongly opposed to S. 5.

Patrick J. Leahy.

Edward M. Kennedy.

Joseph R. Biden.

Russell D. Feingold.

Richard J. Durbin.

XII. CHANGES IN EXISTING LAW

The Committee has determined that it is necessary, in order to expedite the business of the Senate, to dispense with the requirements of rule XXVI, paragraph 12, of the Standing Rules of the Senate, with respect to comparing the proposed changes and existing provisions of the United States Code.

**SUBJECT:** LITIGATION (92%); CLASS ACTIONS (91%); SUITS & CLAIMS (90%); JURISDICTION (79%); US FEDERAL GOVERNMENT (79%); ATTORNEYS FEES (59%); INJUNCTIONS (59%); SETTLEMENT & COMPROMISE (59%); TESTIMONY (59%); US STATE GOVERNMENT (59%); LAW COURTS & TRIBUNALS (59%); CIVIL RIGHTS (59%); INTERSTATE COMMERCE (59%); LEGISLATIVE BODIES (59%);

**LOAD-DATE:** April 28, 2005

Service:    **Get by LEXSEE®**
Citation:   **109 s rpt 14**
View:       Full
Date/Time:  Sunday, August 24, 2008 - 1:41 AM EDT

Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator | Transactional Advisor |
Counsel Selector

History | Delivery Manager | Switch Client | Preferences | Sign Out | Help



About LexisNexis  |  Terms & Conditions  |  Contact Us
Copyright ©  2008 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.